**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC, | |
| Plaintiffs, | |
| v. | Civil Action No. 3:19-cv-01470-RDM |
| PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC, | Honorable Robert D. Mariani |
| Defendants. | **JURY TRIAL DEMANDED** |

**FIRST AMENDED COMPLAINT**

1.      This is an action for patent infringement under 35 U.S.C. § 271, *et seq*., by Savvy Dog Systems, LLC and POM of Pennsylvania, LLC (together, "Plaintiffs") against Pennsylvania Coin, LLC and PA Coin Holdings, LLC (collectively, "PA Coin" or "Defendants") for infringement of U.S. Patent No. 7,736,223 (the "'223 Patent"). A true and correct copy of the '223 Patent is attached hereto as **Exhibit A**.

**THE PARTIES**

2.      Plaintiff Savvy Dog Systems, LLC is a limited liability company formed under the laws of Wyoming with a principal place of business in Duluth, Georgia.

3.      Plaintiff POM of Pennsylvania, LLC ("POM") is a limited liability

1

company formed under the laws of Wyoming with a principal place of business in Duluth, Georgia.

4.    Upon information and belief, Defendant Pennsylvania Coin, LLC is a Pennsylvania limited liability company with a principal office located at 300 Olive Street, Scranton, Pennsylvania, 18509.  Pennsylvania Coin may be served with process by service at its registered office, 300 Olive Street, Scranton, PA, 18509.

5.    Upon information and belief, Defendant PA Coin Holdings, LLC is a Pennsylvania limited liability company with a principal office located at 300 Olive Street, Scranton, Pennsylvania, 18509.  PA Coin Holdings may be served with process by service at its registered office, 300 Olive Street, Scranton, PA, 18509.

6.    Upon information and belief, PA Coin is under common ownership and control, shares common offices with and has overlapping executive teams and directors, operating in tandem as a single enterprise for the purpose of distributing gaming products throughout Pennsylvania.

7.    Upon information and belief, PA Coin maintain office locations as regular and established places of business in Pennsylvania in this judicial district, including a regular and established place of business in Nanticoke, Pennsylvania. They use these offices and their employees to regularly and systematically conduct their business – the distribution and sale of gaming equipment – throughout Pennsylvania.

8.   PA Coin are in the business of selling and offering for sale in the United States, including selling throughout Pennsylvania, including in this judicial district, the Infringing Products, as explained in greater detail below.

## JURISDICTION AND VENUE

9.   This is an action for infringement of a United States patent arising under 35 U.S.C. §§ 271, 281, and 284–85, among others. This Court has subject matter jurisdiction over the action for patent infringement under 28 U.S.C. §§ 1331 and 1338(a).

10.   Defendants have availed themselves of the privilege of doing business in Pennsylvania, including in this judicial district.  Defendants are both Pennsylvania limited liability companies and have regular and established places of business in Pennsylvania, including its offices identified above and facilities in Pennsylvania from which PA Coin operates their business.

11.   Venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400(b) because PA Coin have committed acts of infringement of the '223 Patent by making, using, offering for sale and/or selling Infringing Products in this judicial district, where they are located and where they have at least one regular and established place of business.

## FACTUAL BACKGROUND

12.   Plaintiffs incorporate by reference the foregoing Paragraph 1-11 of the

First Amended Complaint as if restated fully herein.

13.    Savvy Dog Systems, LLC is the record title owner of the '223 Patent. POM has an exclusive license in Pennsylvania which entitles it to the substantive rights of a patent owner in Pennsylvania, including the right to sue for and collect past, present and future damages and to seek injunctive or any other relief for infringement of the '223 Patent in Pennsylvania.

14.    The '223 Patent lawfully issued on June 15, 2010 and was filed June 30, 2006.  The '223 Patent claims priority to U.S. Application No. 11/430,770, filed on May 9, 2006, which claims priority to provisional application No. 60/788,363 filed March 31, 2006.  The '223 Patent is titled "Electronic Gaming Method and System Having Preview Screen."

15.    The '223 Patent is valid and enforceable.

16.    Michael R. Pace ("Pace") is the sole inventor of the '223 Patent.

17.    Pace is a longstanding and knowledgeable participant in the electronic gaming industry.  Among other things, he is recognized in the industry for significant accomplishments that include creating the first countertop video game, developing the first game terminal that offered multiple games in a single console, and developing the immensely successful Pot-O-Gold video game. He is the recipient of many U.S. Patents, further demonstrating that he is an innovator in the

gaming industry.  He is also familiar with the state of the art in the electronic gaming industry as it existed *circa* 2006, when the '223 Patent was applied for.

18.    The use of gambling devices with game processors to implement games of chance (e.g., bingo, slot machines, poker) is largely outlawed because the games in question are considered games of chance.  *See* Ex. A, at 1:13-60.  However, amusement machines that are more skill-based may be permitted.  *See id*. at 1:13-24.  "To qualify as a skill-based amusement machine … the outcome of play during the game must be controlled by the person playing the game and not by predetermined odds or random chance controlled by the machine."  *Id*. at 1:24-27.

19.    Pace recognized as of the time the '223 Patent was applied for that what was not known in the prior art was a game processor that would infuse into a game a level of skill.  Therefore, he conceived of and reduced to practice the invention described in the '223 Patent and applied for letters of patent on his invention on June 30, 2006.

20.    Among other things, the '223 Patent describes a game processor that is enhanced over the known game processors of the prior art.  Unlike the game processors of the prior art, in the '223 Patent, the processor "test[s] the [game] field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play."  Ex. A at 9:63-66.  The testing is needed to

"ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." *Id*. at 16:59-62.

21.    Next, the specification states that the invention is for "providing a game preview display to players of an amusement or entertainment electronic game before playing the game." *Id*. at 1:64-67.  "The field is presented to the player on the game display as a preview of the game in step 602. In one embodiment, the player can select from a plurality of game preview displays, with each game preview being associated with a different play level. Any potential player can observe the game display for as long as desired before making a decision to play the displayed game in decision step 604." *Id*. at 10:37-43.

22.    Prior to the time of the patent application in 2006, gaming terminals such as electronic slot machines and video poker machines were devoid of a game processor that incorporated testing and preview elements as described in the claims of the '223 Patent.  The electronic gaming industry considered such practices counter-intuitive.

23.    In short, the '223 Patent, in specific claims (*e.g.,* claim 44) and in the specification, describes an embedded game processor specially configured to implement the elimination of chance through the ability of a player to see the next game outcome on-screen before ever making a financial commitment. This

enhances the appeal of the game in jurisdictions which do not permit games of chance, but do permit games of predominant skill.

24.     A person of ordinary skill in the art as of 2006 would have understood in general that an embedded processor refers to a special purpose, low-power processor, as opposed to a generic processor used for operating a general purpose computer.

25.     The claims of the '223 Patent encompass novel and non-obvious electronic game processor technology that was neither well-understood, routine nor conventional to a skilled artisan at the time of the invention. Such novel and unconventional technology includes, but is not limited to, a game processor that is specially configured for testing the game elements and automatically previewing the feature of a game to be played to a player prior to initiating activation of game play.

26.     Pace's considerable experience in the electronic gaming industry, as well as the technical and gaming experience of the team that worked with him to reduce the '223 Patent to practice in commercial gaming terminals eventually offered for sale by POM, led to the conclusion that a game processor specially configured to test and preview in this manner was not routine, conventional or well-understood in the gaming industry or in any analogous prior art.  As of June 2006, the gaming industry was devoid of a gaming processor that could transform

a traditional game of chance into a predominant game of skill by infusing it with a more informed decision whether to play the game after considering the preview.

27. After the application leading to the issuance of the '223 Patent was applied for in 2006, the patent examiner assigned to the application at the U.S. Patent and Trademark Office (USPTO) conducted an independent search of the prior art to see whether there was any relevant art teaching the elements of the claims, including the enhanced game processor configured to test and preview, as described above.

28. The examiner's own search and consideration of the Information Disclosure Statement filed with the application led to an independent assessment of the relevant prior art, including U.S. Patent Nos. 6,028,604 and 7,040,985, and Published Patent Application Nos. 2005/0003883 and 2005/0202385, as well as certain non-patent literature. None of these references teach a special game processor configured for testing and preview in accordance with claims of the '223 Patent, such as claim 44. Consideration of this and other prior art shows that the claims of the '223 Patent contained elements, including the specially configured game processor, which were unconventional *circa* June 2006 when the '223 Patent was applied for.

29. At the time the examiner decided to allow the claims of the '223 Patent, the examiner issued an "Examiner's Reasons for Allowance" of, for

example, claim 44 (during prosecution, claim 47) of the '223 Patent, which included the following statement: "[Claim 44] distinguishes over the prior art in that the prior arts do not teach a system and method of playing an electronic game of … testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in creating the field." This shows, at a minimum, that as of the June 2006 application for the '223 Patent, a special game processor for testing and preview was not conventional or well-understood or routine technology.

30.    The USPTO patent examiner, Mr. Pace and other knowledgeable gaming technologists and game developers who worked with Mr. Pace on implementation of a commercial embodiment of the '223 Patent have each concluded that the specially configured game processor as claimed in claim 44 of the '223 Patent was not only unconventional and non-generic technology, but novel and non-obvious technology.

31.    The '223 Patent protects one of the important features of POM-licensed games such as the Tic-Tac-Fruit game which is specifically identified in the '223 Patent. One of the important features of these games is the elimination of chance through the ability of a player to see the next game outcome on-screen before ever making a financial commitment. This in turn eliminated any hope of

gain and in turn enhanced the appeal of the game in jurisdictions which do not permit games of chance, but do permit games of predominant skill.

32. As a result, the POM games incorporating the enhanced game processor claimed in claim 44 of the '223 Patent were commercially successful. They were allowed as predominant games of skill in states such as the Commonwealth of Pennsylvania, for example. Subsequent to the filing of the '223 Patent, other companies such as Banilla Games sought to copy the approach taken by the POM games – including embedding a game board suitable for installation into a gaming terminal with a specially configured game processor that performs testing and preview features in an effort to elevate the level of skill associated with the game. By copying the '223 Patent as embodied in the POM games, companies such as Banilla were able to more effectively compete with POM in the marketplace.

33. The preview described in the '223 Patent may be implemented in several different embodiments. One embodiment, among others, expressly described in the '223 Patent is directed to the game preview displayed being a results screen. For example, the '223 Patent states "In this case, the preview screen could actually be the results screen, displaying the game outcome." (Ex. A at 11:20-22). The '223 Patent further states, "The displayed game could actually be

10

the result which may or may not be a winning combination of symbols." (Ex. A at 11:48-49).

34. The '223 Patent is directed to methods and devices that implement specific, concrete innovations in a gaming terminal. The '223 Patent describes counter-intuitive operations, such as, "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," as recited in claim 44.

35. Unlike conventional gaming terminals, the claims of the '223 Patent include elements that are not well-known, generic or routine. Prior art solutions such as the gaming processors for implementing electronic poker or blackjack failed to appreciate the overall features of the claimed invention described in the well-ordered combination of elements of each claim, and the specially configured game processor specifically.

36. The '223 Patent describes "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play." Prior to the time of invention, gaming terminals such as conventional slot machines were devoid of this claim element. It would be counter-intuitive for business and technical reasons to add this functionality.

37.    The claims of the '223 Patent encompass novel and non-obvious gaming technology that was neither well-understood, routine nor conventional to a skilled artisan at the time of the invention. Such novel technology includes, but is not limited to, testing the game field and automatically displaying an actual game to be played to a player prior to initiating activation of game play.

38.    The fact that the technology claimed in the '223 Patent is not routine, generic or conventional is also illustrated by the fact that years after its March 2006 priority date, other companies in the industry were creating and seeking patents for themselves on similar technology to that disclosed in the '223 Patent, and were themselves representing to the U.S. Patent and Trademark Office that their "inventions" were, in fact, patentable (*i.e.*, novel and non-obvious).  They certainly would not have spent their time, money and effort attempting to patent technology that was merely conventional, routine or generic at the time.

39.    For example, U.S. Patent No. 9,530,282 (the "'282 Patent") issued on December 27, 2016.  A true and correct copy of the '282 Patent is attached hereto as **Exhibit B**.  The '282 Patent is titled "Video Game Gaming System".  It claims a "method of adapting games of skill into a gaming machine" including the steps of accepting initiation of a play, providing one or more single-player games, evaluating and recording results, presenting a Paytable, evaluating and distributing

any payout, and managing a variance of a Return To Player (RTP) of the Paytable. (Ex. B at claim 1).

40.    The '282 Patent, which was examined by the USPTO years after issuance of the '223 Patent, resulted in a finding that the '282 Patent technology represented nonconventional, non-routine technology directed to providing gaming devices for playing a game of skill.

41.    PA Coin have infringed and continue to infringe the '223 Patent by selling and offering to sell gaming terminal equipment which infringe the '223 Patent.  This gaming equipment is referred to elsewhere herein as the "Infringing Products."

42.    Specifically, the Infringing Products sold and offered for sale by PA Coin include electronic video gaming terminals equipped with gaming (circuit) boards supplied by Banilla Games, and having preloaded thereon one or more games thereon described by Banilla Games as "Preview + Skill" games.  These games include such games as Lightning Skill, Super Skill 1, Superior Skill 2, Superior Skill 3, Superior Skill: Lightning Edition, Choice Skill 1, Choice Skill 2, Choice Skill 3, Choice Skill 4 (collectively, the "Preview + Skill Games").   In addition, the Infringing Products include electronic video gaming terminals equipped with gaming (circuit) boards supplied by Banilla Games, and having preloaded thereon one or more games thereon described by Banilla Games as

13

Fusion 1, Fusion 2, and Fusion 3 (collectively "Fusion Games").

43.     Claim 44 of the '223 Patent is reads as follows (with claim element designators added in bold):

**[44P]** An electronic gaming system comprising:

**[44.1]** an electronic game terminal including a touch screen display;

**[44.2]** a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

**[44.3]** constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

**[44.4]** determining at least one winning combination for each play of the game;

**[44.5]** testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

**[44.6]** automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

**[44.7]** determining if the player has decided to play the displayed game; and

**[44.8]** displaying an outcome resulting from play of the displayed game.

44.     PA Coin offer for sale, sell, distribute and install the Infringing Products.

45.    Referring to the preamble **[44P]** of Claim 44, as embodied in the PA Coin gaming terminals including Superior Skill: Lightning Edition, these terminals are an electronic gaming system.  For example, the Superior Skill: Lightning Edition is described in Banilla's advertising as follows:

> **Superior Skill: Lightning Edition** is the latest exciting addition to Banilla's Choice/Superior Skill line of games. It features 3 of our most popular classic-style nudge games from the Superior Skill Series, including Nut Shack, Silver & Gold Spins, and Double Shot, and 2 Hot Swap favorites, Bathtime Bucks and Spooky's Loot. We made these games even MORE exciting by incorporating the popular "Follow the Banana Feature," making Superior Skill: Lightning Edition the perfect addition to your route!

*See* http://www.banillagames.com/product/lightning-edition/

46.    The Lightning Skill games also practice **[44P]**.  For example, as described on the Banilla website, "*Lightning Skill* is a new addition to Banilla's Choice/Superior Skill line of games. It offers 3 classic style nudge games, including *Fabulous Las Vegas, Piggy Bank or Bust,* and *Silver and Gold Spins*."
*See* http://www.banillagames.com/product/lightning-skill/

47.    The Superior Skill 1 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 1 -Superior Skill 1 has five exclusive games specially for the skill-based amusement market! It contains 3 classic nudge games and 2 hot swap titles." *See*

http://www.banillagames.com/superior-skill/superior-skill-1/

48.     The Superior Skill 2 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 2 has five exclusive games specially for the skill-based amusement market!  It contains 3 classic nudge games and 2 hot swap titles." *See* http://www.banillagames.com/superior-skill/superior-skill-2/

49.     The Superior Skill 3 games also practice **[44P]**.  For example, as described on the Banilla website, "Superior Skill 3 has five exclusive games specially for the skill-based amusement market!  It contains 4 classic nudge games and 1 hot swap title." *See* http://www.banillagames.com/superior-skill/superior-skill-3/

50.     The Choice Skill 1 games also practice **[44P]**.  For example, as described on the Banilla website, "Choice Skill 1 is a three game multi-pack that includes 3 single line choice skill games. This game incorporates a preview and a skill task such that skill predominates over chance! Give us a call for more details!" *See* http://www.banillagames.com/choice-skill-1/

51.     The Choice Skill 2 games also practice **[44P]**.  For example, as described on the Banilla website, "Choice Skill 2 is a three game multi-pack that includes 3 hot swap titles. Hot swap is a new patent pending concept in which the player must choose the correct icon to complete the proper winning pay line. This

game incorporates a preview and a skill task such that skill predominates over chance!" *See* http://www.banillagames.com/choice-skill-2/

52.     The Choice Skill 3 games also practice **[44P]**.  For example, as described on the Banilla website, "Choice Skill 3 is a three game multi-pack that includes two nudge games and 1 hot swap title. Hot swap is a new patent pending concept in which the player must choose the correct icon to complete the proper winning pay line. This game incorporates a preview and a skill task such that skill predominates over chance!" *See* http://www.banillagames.com/choice-skill-3/

53.     The Choice Skill 4 games also practice **[44P]**.  For example, as described on the Banilla website, "Choice Skill 4 is a three game multi-pack that includes 3 single line choice skill games.  This game incorporates a preview and a skill task such that skill predominates over chance!" *See* http://www.banillagames.com/choice-skill-4/

54.     For at least these reasons, preamble **[44P]** of Claim 44 is present in all of the Infringing Products.

55.     Regarding element **[44.1]** of Claim 44, as embodied in the PA Coin gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes "an electronic game terminal including a touch screen display." Shown below is a user manipulating the game terminal's touch screen of the Superior Skill: Lightning Edition:



56.    Shown below is the game terminal's touch screen of the Superior

Skill: Lightning Edition game:



57.    Shown below is the game terminal's touch screen of the

Superior Skill 1 game, Superior Skill 2 game, and Superior Skill 3 game:







58.    Shown below is the game terminal's touch screen of the Choice Skill 1 game, Choice Skill 2 game, Choice Skill 3 game, and Choice Skill 4 game:









59.    For at least these reasons, element **[44.1]** of Claim 44 is present in the Infringing Products.

60.    Regarding element **[44.2]** of Claim 44, as embodied in the PA Coin gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes "a game processor for generating an interactive electronic game on the game terminal."  As shown above, each of the Preview + Skill Games of the Infringing Products receives a user's touch screen commands, processes them, and generates an output to allow for a user to interact with the game terminal.  These operations necessarily use a game processor to process the electronic inputs and generate electronic outputs that drive the touch screen display.

61.  For at least these reasons, element **[44.2]** of Claim 44 is present in the Infringing Products.

62.  Regarding element **[44.3]** of Claim 44, as embodied in the PA Coin gaming terminals including Superior Skill: Lightning Edition, each of these terminals includes a game processor configured for "constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols."  As shown below, the Superior Skill: Lightning Edition constructs a field having 3x3 array of elements for the interactive touch screen game display.  An element may be one among a set of predefined game symbols, highlighted in the pay table indicated by the red box.



63.    In the example above, the game symbols above conform to the theme of "gold and silver" and may be "a seven", "a star", "a one-bar", "a two-bar", "a three-bar", etc.

64.    Shown below, the Lightning Skill constructs a field having 3x3 array of elements for the interactive touch screen game display:



65.    As shown below, the Superior Skill 1 game, Superior Skill 2 game, and Superior Skill 3 game each constructs a field having 3x3 array of elements for the interactive touch screen game display:







66.     As shown below, the Choice Skill 1 game, Choice Skill 2 game, Choice Skill 3 game, and Choice Skill 4 game each constructs a field having 3x3 or 3x5 array of elements for the interactive touch screen game display:









67.    For at least these reasons, element **[44.3]** of Claim 44 is present in the Infringing Products.

68.    Regarding element **[44.4]** of Claim 44, as embodied in the PA Coin gaming terminals including each and every one of the Skill + Preview Games, each of these terminals includes a game processor configured for "determining at least one winning combination for each play of the game." As demonstrated by the foregoing screenshots above, each of the Skill + Preview Games includes a "pay table" (shown on the left hand side of the foregoing screenshots)  constructed by the processor for display to the user, and a "prize viewer" feature which illustrates the outcome of the next game before it is played.  The pay table represents a processor-based construct implementing the rules the processor applies to

determining all of the various winning combinations and payouts for each game. The pay table is embodied in the computer code that is present in the firmware used by the game processor, and generated on the screen for a user to see accordingly. In operation, a game processor is configured for "determining at least one winning combination for each play of the game" by assessing in advance of the game to be played whether and to what extent play of the game will result in any of the winning combinations embodied within the pay table. As a result, each of the Skill + Preview Games uses the gaming processor to determine at least one winning combination before game play for each game, or a step that performs equivalent to **[44.4]** in terms of its function, way and result. This is discussed in more detail with respect to the following claim elements.

69.     For at least these reasons, element **[44.4]** of Claim 44 is present in the Infringing Products, either literally or under the doctrine of equivalents.

70.     Regarding element **[44.5]** of Claim 44, as embodied in the PA Coin gaming terminals including any of the Preview + Skill Games, each of these terminals includes a game processor configured for "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."

71.    Each of the Preview + Skill Games determines the prize value for the next game in advance of game play.  When this occurs, whether the game in question is a hot swap and/or a nudge game, the processor ensures that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field.  Representatives of POM of Pennsylvania have extensively tested the Infringing Products in the context of "nudge" and "hot swap" games to determine whether they ever provide inaccurate "prize viewer" data relating to the outcome of the next game to be played, and have confirmed that they do not. This testing supports the conclusion that the programming logic of the processor dictates that the processor work its way through the rules of the various potential winning combinations and payouts of the applicable pay table rules before it can preview the outcome of the next game.

72.    For example, in the Preview + Skill Games that are nudge games, once the prize is determined and the user chooses to play, the user interacts with the game field by "nudging" a group of symbols higher or lower to complete the game field.  But, in accordance with the programming logic of the processor, the game processor will have tested the game field against its pay table prior to display to ensure that, without the nudging, the game field will not inadvertently yield a combination that is more valuable than the predetermined prize value.

73.    Shown below is an image that depicts the "nudging" interaction (red circle added for emphasis) that does not inadvertently create a winning combination greater than the prize value.



74.    To elaborate further on the operation of each of the Preview + Skill Games, if the determined winning combination were three particular symbols in a row corresponding to payout of $0.25, then, completing the game field by nudging or hot swapping will not inadvertently lead to a combination with a payout greater than $0.25.

75.    For the Preview + Skill Games that additionally or alternatively include a "hot-swap" feature, the Infringing Products test the game field against its pay table prior to displaying the game to the player to ensure that a winning

combination more valuable than the determined winning combination is not generated inadvertently in completing the field.  The hot-swap feature is described as follows: "Hot swap is a new patent pending concept in which the player must choose the correct icon to complete the proper winning pay line. This game incorporates a preview and a skill task such that skill predominates over chance!" *See, e.g.,* http://www.banillagames.com/choice-skill-3/

76.    Hot-swap allows for a user to complete the game field.  Prior to displaying a game with a hot-swap, the Infringing Products test and ensure that a hot-swap selection does not inadvertently lead to a winning combination that exceeds the determined winning combination as presented in the preview.  Just as with the nudge games discussed above, for the hot swap games, testing the game field in this manner is important to ensure that the game does not yield a combination that is more valuable than the predetermined prize value.

77.    For at least these reasons, element **[44.5]** of Claim 44 is present in the Infringing Products, either literally or under the doctrine of equivalents.

78.    Regarding element **[44.6]** of Claim 44, as embodied in the PA Coin gaming terminals including Preview + Skill Games, each of these terminals includes a game processor configured for "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play."  Shown below is an automatic display of an actual game

including, specifically, an overlaid prize viewer with interactive "press play" language also displayed on the screen, signifying that the user has not yet initiated activation of gameplay.  The user can see the game to be played, the previewed game results and is presented the decision whether to "press play" in order to play the game.



79.    Each of the Preview + Skill Games includes a prize viewer functionality and display screen substantially similar to the foregoing display shown.

80.     As another example, Banilla's Website describes the Infringing

Products as games that "incorporate[] a preview" or "ha[ve] a preview." *See e.g.,*

http://www.banillagames.com/ choice-skill-1/; *see also*

http://www.banillagames.com/choice-skill-2/;

http://www.banillagames.com/choice-skill-3/; *see also*

http://www.banillagames.com/choice-skill-4/; *see also*

http://www.banillagames.com/superior-skill/superior-skill-1/; *see also*

http://www.banillagames.com/superior-skill/superior-skill-2/; *see also*

http://www.banillagames.com/superior-skill/superior-skill-3/.

81.     For at least these reasons, element **[44.6]** of Claim 44 is present in the

Infringing Products.

82.     Regarding element **[44.7]** of Claim 44, as embodied in the PA Coin

gaming terminals including each of the Preview + Skill Games, each of these

terminals includes a game processor configured for "determining if the player has

decided to play the displayed game."  Shown in the screenshot above, the user is

presented with the option to "Press Play" on an interactive touch screen.  The game

processor therefore receives inputs from the user which it processes in order to

determine if the user has decided to "play" the displayed game.

83.     For at least these reasons, element **[44.7]** of Claim 44 is present in the

Infringing Products.

84.     Regarding element **[44.8]** of Claim 44, as embodied in the PA Coin n gaming terminals including any of the Preview + Skill Games, each of these terminals includes a game processor configured for displaying an outcome resulting from play of the displayed game.  After a user hits play, the game processor of each of the Preview + Skill games performs an animation and then displays the outcome of the displayed game.  For example, in the case of each Preview + Skill Game, any prize value of a completed game is added to the user's credits and then displayed for the user to see on the screen.

85.     Below, a red circle identifies the outcome resulting from play of the displayed game of the Superior Skill: Lightning Edition, which includes an amount won and a total amount of credits as a result of the outcome:



86.    Below, a red circle identifies the outcome resulting from play of the displayed game of the Superior Skill 1 game, Superior Skill 2 game, and Superior Skill 3 game, each includes an amount won and a total amount of credits as a result of the outcome or a last won outcome:







87.     Similar to the other Preview + Skill Games, the Lightning Skill,
Choice Skill 1 game, Choice Skill 2 game, Choice Skill 3, and Choice Skill 4
game, each includes an amount won and a total amount of credits as a result of the
outcome or a last won outcome.

88.     The Fusion Games are also examples of Infringing Products that
infringe at least claim 44.

89.     Referring to the preamble **[44P]** of the claim 44, as embodied in the
PA Coin gaming terminals including Fusion Games, these terminals are an
electronic gaming system.   For example, Fusion Games described as follows:

> Fusion is the next level of entertaining gaming experiences! It is a 5
> game multi-pack that includes 5 nudge games. It is a slick and
> innovative design that works on a 32" vertical monitor. This game is a

beauty and will be a must-have in your location!

*See* http://www.banillagames.com/product/fusion-2/

90.    For at least these reasons, preamble **[44P]** of Claim 44 is present in the Infringing Products.

91.    Regarding element **[44.1]** of Claim 44, as embodied in the PA Coin gaming terminals including Fusion Games, each of these terminals includes "an electronic game terminal including a touch screen display."  Fusion Games include a "26″ Wide Foot Print", a "Vertical 32″ Touch Screen Hd Monitor" and a "Sleek & Innovative Design."

*See* http://www.banillagames.com/product/fusion/

92.    Shown below is the game terminal's touch screen of the Fusion Games:



93.    For at least these reasons, element **[44.1]** of Claim 44 is present in the Infringing Products.

94.    Regarding element **[44.2]** of Claim 44, as embodied in the PA Coin gaming terminals including Fusion Games, each of these terminals includes "a game processor for generating an interactive electronic game on the game terminal."  As shown above, each of the Fusion Games of the Infringing Products receives a user's touch screen commands, processes them, and generates an output to allow for a user to interact with the game terminal.  These operations necessarily use a game processor to process the electronic inputs and generate electronic outputs that drive the touch screen display.

95.    Below is an image of the touch screen display of a representative Fusion Game, which facilitates user interaction.



96.    For at least these reasons, element **[44.2]** of Claim 44 is present in the Infringing Products.

97.    Regarding element **[44.3]** of Claim 44, as embodied in the PA Coin gaming terminals including Fusion Games, each of these terminals includes a game processor configured for "constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a

plurality of predetermined game symbols." As shown below, the Fusion Games

each construct a field having 3x3 array of elements for the interactive touch screen

game display. An element may be one among a set of predefined game symbols,

highlighted in the red box.



98.    In the example above, the game symbols above conform to the theme

of "Great American Buffalo" and may be "a ram", "a bear", "a buffalo", "a

bobcat", "a deer", etc.

99.    For at least these reasons, element **[44.3]** of Claim 44 is present in the

Infringing Products.

100.   Regarding element **[44.4]** of Claim 44, as embodied in the PA Coin

gaming terminals including each and every one of the Fusion Games, each of these

terminals includes a game processor configured for "determining at least one

winning combination for each play of the game." As demonstrated by the

foregoing screenshots above, each of the Fusion Games includes a "prize viewer"

feature which illustrates the outcome of the next game before it is played and  pay

table (shown on the top of the ensuing screenshots) constructed by the processor for display to the user.  The pay table represents a processor-based construct implementing the rules the processor applies to determining all of the various winning combinations and payouts for each game.  The pay table is embodied in the computer code that is present in the firmware used by the game processor, and generated on the screen for a user to see accordingly.  In operation, a game processor is configured for "determining at least one winning combination for each play of the game" by assessing in advance of the game to be played whether and to what extent play of the game will result in any of the winning combinations embodied within the pay table.  As a result, each of the Fusion Skill + Preview Games uses the gaming processor to determine at least one winning combination before game play for each game, or a step that performs equivalent to [44.4] in terms of its function, way and result.  This is discussed in more detail with respect to the following claim elements.

101.   For at least these reasons, element **[44.4]** of Claim 44 is present in the Infringing Products, either literally of under the doctrine of equivalents.

102.   Regarding element **[44.5]** of Claim 44, as embodied in the PA Coin gaming terminals including any of the Fusion Games, each of these terminals includes a game processor configured for "testing the game field prior to displaying the game to the player to ensure that a winning combination more

valuable than the determined winning combination is not generated inadvertently in completing the field."

103. Each of the Fusion Games determines the prize value for the next game in advance of game play. When this occurs, whether the game in question is a hot swap and/or a nudge game, the processor ensures that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field. Representatives of POM of Pennsylvania have extensively tested the Infringing Products in the context of "nudge" and "hot swap" games to determine whether they ever provide inaccurate "prize viewer" data relating to the outcome of the next game to be played, and have confirmed that they do not. This testing supports the conclusion that the programming logic of the processor dictates that the processor work its way through the rules of the various potential winning combinations and payouts of the applicable pay table rules before it can preview the outcome of the next game.

104. For example, in the Fusion Games that are nudge games, once the prize is determined and the user chooses to play, the user interacts with the game field by "nudging" a group of symbols higher or lower to complete the game field. But, the game processor will have tested the game field against its pay table, in accordance with the programming logic of the processor, prior to display to ensure

that, without the nudging, the game field will not inadvertently yield a combination that is more valuable than the predetermined prize value.

105.   When describing a gaming terminal configured for Fusion Games, Banilla's website states that it "is a 5 game multi-pack that includes 5 nudge games."

*See* http://www.banillagames.com/product/fusion-2/

106.   Shown below is an image that depicts the "nudging" interaction (red circle added for emphasis) that does not inadvertently create a winning combination greater than the prize value.



107.   To elaborate further on the operation of each of the Fusion Games, if the determined winning combination were three particular symbols in a row corresponding to payout of $0.25, then, completing the game field by nudging will not inadvertently lead to a combination with a payout greater than $0.25.

108.   For at least these reasons, element **[44.5]** of Claim 44 is present in the Infringing Products.

109.   Regarding element **[44.6]** of Claim 44, as embodied in the PA Coin gaming terminals including Fusion Games, each of these terminals includes a game processor configured for "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play."  Shown below are several examples of Fusion Games.   As shown in each below, the Fusion Games each include an automatic display of an actual game including, specifically, an overlaid prize viewer with interactive "press play" language also displayed on the screen, signifying that the user has not yet initiated activation of game play.  The user can see the game to be played, the previewed game results and is presented the decision whether to "press play" in order to play the game.






110.    For at least these reasons, element **[44.6]** of Claim 44 is present in the Infringing Products.

111.    Regarding element **[44.7]** of Claim 44, as embodied in the PA Coin gaming terminals including each of the Fusion Games, each of these terminals includes a game processor configured for "determining if the player has decided to play the displayed game." Shown in the screenshots above, the user is presented with the option to "Press Play" on an interactive touch screen. The game processor therefore receives inputs from the user which it processes in order to determine if the user has decided to "play" the displayed game.

112.   For at least these reasons, element **[44.7]** of Claim 44 is present in the Infringing Products.

113.   Regarding element **[44.8]** of Claim 44, as embodied in the PA Coin in gaming terminals including any of the Fusion Games, each of these terminals includes a game processor configured for displaying an outcome resulting from play of the displayed game.  After a user hits play, the game processor of each of the Fusion games performs an animation and then displays the outcome of the displayed game.  For example, in the case of each Fusion Game, any prize value of a completed game is added to the user's credits and then displayed for the user to see on the screen.

114.   Below, a red circle identifies the outcome resulting from play of the displayed game of Fusion Games, which includes an amount won as a result of the outcome:



115.   For at least these reasons, element **[44.8]** of Claim 44 is present in the Infringing Products.

## COUNT I – INFRINGEMENT OF THE '223 PATENT

116.   Plaintiffs hereby incorporate Paragraphs 1 through 115 of this Complaint as though fully set forth herein.

117.   The '223 Patent is valid and enforceable.

118.   Defendants have infringed and continue to infringe the '223 Patent under 35 U.S.C. § 271(a), either literally or under the Doctrine of Equivalents, by

selling, distributing and installing an electronic gaming system within the United States that embodies the inventions of the '223 Patent.

119. On information and belief, Defendants have had knowledge and notice of the '223 Patent.

120. Plaintiffs have been and continue to be damaged by the Defendants' infringement of the '223 Patent.

121. By reason of the above described acts of infringement, Plaintiffs are entitled to an award of substantial damages in an amount to be determined at trial, including, at a minimum, its lost profits and/or a reasonable royalty, or both.

122. Furthermore, Plaintiffs are entitled to injunctive relief barring Defendants from continuing to sell and offer for sale the Infringing Products.

123. Plaintiffs are entitled to a reasonable royalty for Defendants' infringement of the '223 Patent.

124. Defendants' infringement of the '223 Patent has been continues to be willful.

125. Defendants' infringement of the '223 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

126. Defendants' continued infringement of the '223 Patent causes harm to Plaintiffs in the form of price erosion, loss of goodwill, damage to reputation, loss of business opportunities, and direct and indirect competition. Monetary damages

are insufficient to compensate Plaintiffs for these harms.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court to enter judgment as follows:

A.      That Defendants have directly infringed the '223 Patent by making, using, selling and offering for sale the Infringing Products;

B.      That Defendants be ordered to pay damages adequate to compensate Plaintiffs for their infringement of the '223 Patent, but in no event less than lost profits and/or a reasonable royalty, together with prejudgment and post-judgment interest thereon;

C.      That Defendants be enjoined from further infringement of the '223 Patent;

D.      That the case be deemed exceptional pursuant to 35 U.S.C. § 285, and further that Plaintiffs be awarded their reasonable attorneys' fees and costs from PA Coin in this matter; and

E.      That Plaintiffs be granted such other and additional relief, including equitable relief such as specific performance, as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a jury trial as to all issues so triable.

**KLEINBARD LLC**

November 1, 2019

Matthew H. Haverstick (PA ID No. 85072)
Eric J. Schreiner (PA ID No. 76721)
Paul G. Gagne (PA ID No. 42009)
Shohin H. Vance (PA ID No. 323551)
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-2000
Fax: (215) 568-0140
mhaverstick@kleinbard.com
eschreiner@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

Of counsel:

Steven G. Hill, GA Bar No. 354658
*Admitted pro hac vice*
John L. North, GA Bar No. 545580
*Admitted pro hac vice*
Martha L. Decker, GA Bar No. 420867
*Admitted pro hac vice*
HILL, KERTSCHER & WHARTON, LLP
3350 Riverwood Parkway
Atlanta, Georgia 30339
Telephone: (770) 953-0995
Fax: (770) 953-1358
sgh@hkw-law.com
jln@hkw-law.com
md@hkw-law.com

*Counsel for Plaintiffs Savvy Dog Systems,
LLC and POM of Pennsylvania, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that Plaintiffs' First Amended Complaint was filed on this

1st day of November, 2019 via the Court's CM/ECF filing system, which will send

electronic notice of such filing to all counsel of record.

_____
Paul G. Gagne