2019 WL 210938
Only the Westlaw citation
is currently available.
United States District
Court, M.D. Pennsylvania.

Phillip MYERS, et al., Plaintiffs,

v.

CITY OF WILKES-
BARRE, et al., Defendants.

3:18-CV-42

|

Filed 01/15/2019

**Attorneys and Law Firms**

Ryan Lockman, Mark B. Frost & Associates, Philadelphia, PA, for Plaintiffs.

Drew P. McLaughlin, Mark W. Bufalino, Elliott Greenleaf & Dean, Wilkes-Barre, PA, John G. Dean, Elliott Greenleaf & Dean, Scranton, PA, for Defendants.

## MEMORANDUM OPINION

Robert D. Mariani, United States District Court Judge

## I. INTRODUCTION AND PROCEDURAL HISTORY

*1 On January 5, 2018, Plaintiffs Phillip Myers and Daniel Duffy filed a Complaint against Defendants City of Wilkes-Barre, PA, Mayor Tony George, Police Chief Marcella Lendacky, and Commander Ronald Foy, alleging that "[t]he City of Wilkes-Barre, Pennsylvania, by and through the individual defendants, retaliated against Plaintiffs when Plaintiffs engaged in certain speech, association and union activities, all of which were protected under the First Amendment." (Doc. 1, at ¶ 1). Count I of the Complaint alleges that the individual defendants violated Plaintiffs' First Amendment rights and Count II alleges that the City of Wilkes-Barre violated 42 U.S.C. § 1983 by "develop[ing] and maintain[ing] a number of deficient policies and/or customs which caused the deprivation of Plaintiffs' constitutional rights". (Doc. 1).

Defendants thereafter filed a Motion to Dismiss Plaintiffs' Complaint (Doc. 8), which is now before the Court. The issues have been fully briefed and Defendants' Motion is ripe for disposition. For the reasons set forth below, the Court will grant in part and deny in part Defendants' Motion to Dismiss.

## II. FACTUAL ALLEGATIONS

Plaintiffs' Complaint (Doc. 1) alleges the following facts which, for the purposes of resolving Defendants' Motion to Dismiss, the Court takes as true:

Plaintiffs Phillip Myers and Daniel Duffy have, since April 19, 2002, and February 6, 2014, respectively, been police officers for the Wilkes-Barre Police Department ("WBPD"), which is the police force for the City of Wilkes-Barre. (Doc. 1, at ¶¶ 5, 6).

Defendant City of Wilkes-Barre is a municipality in Luzerne County, Pennsylvania,

2019 WL 210938

with municipal offices located at 40 East Market Street, Wilkes-Barre PA 18711. (*Id.* at ¶ 7).

Since approximately January 4, 2016, Defendant Tony George has served as Mayor for the City of Wilkes-Barre. Mayor George is the former police chief of the WBPD, the police department controlled and operated by the City of Wilkes-Barre. (*Id.* at ¶ 8).

Defendant Marcella Lendacky held the position of Acting Police Chief of the WBPD from approximately January, 2016 to March, 2016. On or about March 21, 2016, Lendacky was appointed as permanent Chief of Police by Mayor George and served in this capacity for all times material to this action. Prior to being made Chief, Lendacky's permanent rank was that of Lieutenant. (*Id.* at ¶ 9).

Defendant Commander Ronald Foy has served as Patrol Commander for the WBPD since July, 2016. (Doc. 1, at ¶ 10).

The WBPD employs approximately fifty-five patrol officers, eight detectives, seven sergeants, three lieutenants, two commanders, and one police chief. (*Id.* at ¶ 12). The WBPD chapter of the Police Benevolent Association ("PBA") serves as the union and bargaining unit for patrol officers, detectives, sergeants, and lieutenants in the WBPD, but does not represent the commanders or chief. (*Id.* at ¶¶ 13, 15, 16). At all times material to this action, Plaintiff Myers served as President of the WBPD chapter of the PBA and, since January, 2017, Plaintiff Duffy has served as Vice President of the WBPD chapter of the PBA. (*Id.* at ¶¶ 13, 14).

*2 On or about March 17, 2015, Duffy filed a complaint against then-Lieutenant Lendacky. The complaint alleged that Lendacky was engaging in a course of conduct that repeatedly violated agency codes of conduct and was targeting Duffy. (Doc. 1, at ¶ 17). Purportedly as a result of Duffy's complaint, Duffy was removed from Lendacky's shift and Lendacky was sent to POLEX ("Police Law Enforcement Executive Training"). (*Id.* at ¶¶ 18, 19). Other Lieutenants attended the same training with Lendacky. (*Id.* at ¶ 18).

In approximately September or October of 2015, then-mayoral candidate Tony George asked the PBA and local Fraternal Order of Police ("FOP") to endorse him for Mayor of Wilkes-Barre. Myers, as PBA President, was asked by George to have the union endorse him for mayor. (*Id.* at ¶ 20). In response, Myers advised George that the PBA does not endorse candidates and thus the PBA would not endorse him. (*Id.* at ¶ 21). On or about October 9, 2015, the PBA formally voted not to endorse George for Mayor. (*Id.* at ¶ 22).

In November, 2015, Tony George was elected Mayor of Wilkes-Barre. (Doc. 1, at ¶ 23).

At the end of 2015, Lieutenant Chris Roberts, Records Commander at the WBPD, reported to then-Police Chief Hughes that Lieutenant Lendacky was altering police reports and/or reclassifying reports in order to reflect lesser crimes than had actually been committed. Chief Hughes indicated that he planned to investigate the matter. (*Id.* at ¶ 24).

On or about January 4, 2016, Tony George took office as mayor. (*Id.* at ¶ 25). On or about January 7, 2016, George removed Myers from his position as Community Policing Sergeant "in retaliation for Myers' refusal to have the PBA endorse him for mayor." (*Id.* at ¶ 26). Later that month, George "coerced" Chief Hughes to immediately go on leave and retire at the end of March of 2016; and then appointed Lendacky as interim chief of police. (*Id.* at ¶ 27). Purportedly as a result of this change in leadership, no investigation was performed regarding Lendacky altering and/or reclassifying reports. (*Id.* at ¶ 28).

Also in January of 2016, Lieutenant Roberts left his position as records commander, and submitted concerns about Lendacky to the City of Wilkes-Barre's human resources department. (Doc. 1, at ¶ 29).

In March, 2016, in an effort to prevent Lendacky's permanent appointment to Chief, Myers, with input from the PBA board, drafted a letter regarding Lendacky with the intention of having it approved by the PBA and sent to Mayor George and the Council. (*Id.* at ¶ 30). However, on March 21, 2016, the day on which the PBA was to close voting on whether the letter should be submitted to the mayor, George promoted Lendacky at an impromptu swearing-in ceremony despite the fact that Chief Hughes was still on leave and was not set to formally retire for another week. (*Id.* at ¶¶ 31, 32). Nonetheless, the same day George swore-in Lendacky, at Myers' recommendation, the PBA voted to submit the letter regarding Lendacky and sent the letter to Mayor George. (*Id.* at ¶ 34). Myers was responsible for the drafting of the letter and the effort to have it submitted on behalf of the PBA. (*Id.* at ¶ 35).

In approximately July of 2016, Ronald Foy was appointed to Patrol Commander by Lendacky despite having no prior training or experience in a leadership role. (Doc. 1, at ¶ 36).

In September of 2016, Myers, in his union capacity, and other union members, held meetings with Mayor George and City Administrator Ted Wampole regarding the state of the department, the department's relations with outside agencies, the relationship between the administration and PBA, and leadership issues with Lendacky and her Command. (*Id.* at ¶ 37).

**\*3** In approximately October and November of 2016, due to complaints made to Myers by PBA members, the PBA ran a confidence survey – organized by Myers – among its members regarding the Chief and Command Staff in the department. (*Id.* at ¶ 38). In November, Myers released the completed survey to the City Administration and then presented it to the City Council in December, 2016. (*Id.* at ¶ 39). Myers indicated in his presentation that the PBA believed that the police department was mismanaged, that morale was unacceptably low, and that public safety had suffered and would continue to suffer if the problems identified were not remedied. Myers also requested an investigation into the conduct of Lendacky as Chief. (*Id.* at ¶ 40).

In December, 2016, Myers, "in his union capacity," gave City Administrator Wampole copies of police reports which had allegedly

been changed or altered by Lendacky while she was Lieutenant and Police Chief. In these reports, crimes were reclassified as lesser offenses, in order to affect the crime statistics for the City of Wilkes-Barre and in order to portray a message that crime was decreasing in Wilkes-Barre. (*Id.* at ¶ 41).

No action was taken by the City of Wilkes-Barre or Mayor George in response to Myers' request for an investigation into Lendacky's management, nor was any action taken in response to Myers' complaints to Wampole regarding Lendacky allegedly falsifying crime records. (Doc. 1, at ¶ 42).

In December, 2016, Plaintiff Daniel Duffy was elected Vice President of the PBA. (*Id.* at ¶ 43). In December, 2016, and January, 2017, "in his capacity as Vice President of the PBA," Duffy complained that training certifications for First Aid, CPR, and Taser expired for the majority of WBPD officers, thus causing a safety concern for both officers and the public. (*Id.* at ¶ 44). Thereafter, Commander Foy "hastily" organized a CPR and First Aid training session, "which he was not qualified to conduct, and which did not meet minimum safety standards of the American Red Cross." (*Id.* at ¶ 45). In response, Duffy and Myers, "in their union capacity," complained to Lendacky and Wampole regarding Foy's training and stated that it violated instructor codes of conduct of the American Red Cross. (*Id.* at ¶ 46). Foy thereafter "threatened" to investigate Plaintiffs and withhold annual training pay from all PBA Members, (*Id.* at ¶ 47). Duffy and Myers then complained to City Administration regarding Foy's threats. (Doc. 1, at ¶ 48).

Foy also ordered that Myers and Duffy were prohibited, even in their union capacity, from making complaints to the City administrator, mayor, or city council, and stated that Plaintiffs were required to take all union complaints up the chain of command, even for PBA business with City management, (*Id.* at ¶ 49).

After Duffy again complained to Wampole on behalf of the union regarding an issue involving the service of summary warrants for magisterial district court by PBA members, Duffy was told by Magistrate Judge Malloy that City management had put a "target on your (Duffy's) back." Malloy also told Duffy that Wampole had recently inquired about a claim that Duffy created a disturbance in Malloy's courtroom, which Malloy informed Wampole was false. (*Id.* at ¶ 51).

In April, 2017, Foy ordered that officers would be prohibited from reviewing any police reports other than their own reports. This order prevented officers from staying informed about crimes in the City of Wilkes-Barre. Plaintiffs believed that this order was illegal and posed a threat to public safety and to the safety of WBPD and PBA police officers. (*Id.* at ¶¶ 52, 53). The PBA and Duffy and Myers subsequently concluded that this order was a matter of public concern. Therefore, that same month, Duffy wrote a Facebook post, in collaboration with Myers, "in their capacity as PBA officers and on behalf of the PBA", regarding Foy's Order, and one and/or both of the Plaintiffs posted it on the PBA Facebook page. (Doc. 1, at ¶¶ 54, 55). Duffy and Myers also separately emailed Chief Lendacky to request that the order be rescinded. (*Id.* at ¶ 56).

**\*4** Later in April, 2017, Myers was called into a meeting with Foy and Commander Joseph Coffay. Myers was told that his presence was in his union capacity. Duffy also attended the meeting, in his union capacity. (*Id.* at ¶ 57). Foy informed Myers and Duffy that Mayor George had ordered him to investigate the PBA Facebook posting. (*Id.* at ¶ 58). Foy also ordered Myers to reveal information regarding who authored the post and who administered the union Facebook page, which Myers refused to do. (*Id.* at ¶ 59). Myers subsequently emailed Lendacky about this encounter, requesting her to instruct Foy to rescind his order for Myers to reveal the author of the post. (*Id.* at ¶ 60).

In May of 2017, allegedly "in retaliation for Plaintiffs' protected complaints, their refusal of an unlawful order, and the fact that they were perceived by the Defendants as having authored and/or been responsible for the posting of the aforementioned PBA Facebook post," the City of Wilkes-Barre issued disciplinary charges against Myers and Duffy. (Doc. 1, at ¶ 61).

Plaintiffs subsequently again unsuccessfully sought to have Chief Lendacky rescind Foy's order. (*Id.* at ¶ 62). On September 6, 2017, "in his union capacity," Duffy emailed Mayor George and Administrator Wampole to have the order rescinded. (*Id.* at ¶ 63). Later that same night, the City of Wilkes-Barre issued suspension notices due to Myers and Duffy's postings on the PBA Facebook page. (*Id.* at ¶ 64).

On September 7, 2017, referencing the order at issue, Commander Coffay ordered that officers

were again permitted to read other police reports. (*Id.* at ¶ 65).

On October 5, 2017, having learned that Myers and Duffy had been suspended, the City Council recommended that an outside entity be retained to conduct an inquiry into the WBPD's management practices. (*Id.* at ¶ 66).

Duffy and Myers, in their capacity as PBA President and Vice President, met with Councilmembers, and again complained about the WBPD's management. (Doc. 1, at ¶ 67).

On or about September 16, 2017, Duffy, "in his capacity as Vice President of the PBA", emailed Mayor George and City Administrator Wampole about an ongoing course of "unbecoming conduct" by Foy. (*Id.* at ¶ 68). In response, Mayor George claimed that Duffy had threatened him and Wampole in the email. (*Id.* at ¶ 69). Duffy was thereafter served with a disciplinary notice for charges based on his email to Mayor George and Administrator Wampole. (*Id.* at ¶ 70).

At this time, Myers and Duffy also learned that Lendacky had emailed the Mayor information about them, involving a lawsuit filed against Duffy while at his previous employer, and a civil suit filed by Myers for wrongful termination twenty years earlier at his previous agency. (*Id.* at ¶ 71). Mayor George subsequently forwarded this information to reporters, suggesting that the reporters write a negative news story about Duffy and Myers. (Doc. 1, at ¶ 72).

On or about October 18, 2017, Duffy was terminated for his email to Mayor George and

for the PBA Facebook post, which Defendants perceived that Duffy had written. (*Id.* at ¶ 73). Myers was also suspended without pay, related to his refusal to name the author of the PBA Facebook post. (*Id.* at ¶ 74).

On December 14, 2017, Myers received a *Loudermill* notice, informing him that he would again be disciplined. At the time of the filing of the Complaint, Myers had not yet received any discipline related to this notice. (*Id.* at 75).

On January 4, 2018, Myers received notice that he was going to be suspended without pay from January 10, 2018, to February 1, 2018, regarding a separate matter unrelated to the December 14, 2017, notice. The separate matter was related to a November 6, 2017, *Loudermill* notice that Defendant had issued to Myers. (*Id.* at 76).

### III. STANDARD OF REVIEW

**\*5** A complaint must be dismissed under Federal Rule Civil Procedure 12(b)(6), if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The plaintiff must aver "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 118 (3d Cir. 2013) (internal citations and quotation marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but ... disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere Conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.' " *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.' " *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility

2019 WL 210938

determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* at 786-787 (quoting *Iqbal*, 556 U.S. 679).

However, even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendants assert that Plaintiffs' Complaint must be dismissed on several bases. Specifically, Defendants argue that (1) the Complaint fails to state a claim upon which relief can be granted; (2) the claims against Defendants George and Lendacky in their official capacities must be dismissed as duplicative; and (3) the City of Wilkes-Barre is immune from punitive damages and thus the demand for punitive damages against Wilkes-Barre must be dismissed. (*See generally*, Doc. 10).[1]

[1] Although Defendants' motion to dismiss originally also sought dismissal of Plaintiffs' complaint "based upon a prior pending action ... [, a]fter further investigation and research, Defendants no longer seek dismissal of Plaintiffs' complaint on that basis." (Doc. 10, at 2 n.1).

## A. Defendants George and Lendacky in their Official Capacities and Punitive Damages Against the City of Wilkes-Barre

*6 Plaintiffs do not contest Defendants' assertion that the City of Wilkes-Barre is immune from punitive damages and specifically "concede the punitive damages claim against the City." (Doc. 13, at 1 n.1). Accordingly, the Court will grant Defendants' motion to dismiss the punitive damage claim against the City of Wilkes-Barre. Plaintiffs' demand for punitive damages thus remains pending only against the individual defendants.

Furthermore, Defendants' request that Plaintiffs' § 1983 Official Capacity claims against Mayor George and Chief Lendacky be dismissed as duplicative of the claims against the City of Wilkes-Barre (Doc. 10, at 14) will be granted.[2]

[2] Plaintiffs' brief in opposition to Defendants' Motion to Dismiss does not address this argument by Defendants.

The Supreme Court has emphasized that suits against state actors in their official capacity "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Hafer v. Melo*, 502 U.S. 21, 25, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991)

(quoting *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ). In other words:

> Suits against state officials in their official capacity therefore should be treated as suits against the State. Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.... Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law. Thus, on the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right.

*Id.* Further, previous decisions

> make[ ] clear that the distinction between official-capacity suits and personal-capacity suits is more than a mere pleading device. State officers sued for damages in their official capacity are not "persons" for purposes of the

suit because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals.

*Id.* at 27 (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ) (internal alterations, citations, and quotation marks omitted). Here, Plaintiffs' Complaint alleges that the City of Wilkes-Barre, "by and through the individual defendants, retaliated against Plaintiffs" in violation of the First Amendment. (Doc. 1, at ¶ 1). Where both the City of Wilkes-Barre and Defendants George and Lendacky have been sued for the violations of Plaintiff's First Amendment rights, the claims against Defendants George and Lendacky in their official capacities are duplicative of the claims against the City of Wilkes-Barre and those individual defendants will thus be dismissed in their official capacities only.

**B. Plaintiffs' First Amendment Claims**

The Court will next address Defendants' principal argument in support of their motion to dismiss — that Plaintiffs fail to state a claim upon which relief can be granted because: (1) Plaintiffs did not engage in protected First Amendment speech; (2) no causal connection exists between Plaintiffs' speech and any adverse employment action; and (3) the Complaint is "riddled with Conclusory allegations devoid of further factual enhancement." (*See* Doc. 10, at 3-14).

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

"[T]o plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). *See also,* *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009) ("To state a First Amendment retaliation claim, a public employee plaintiff must allege that his activity is protected by the First Amendment, and that the protected activity was a substantial factor in the alleged retaliatory action.... If these two elements are satisfied, the burden shifts to the defendants to demonstrate that the same action would occur if the speech had not occurred.") (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006); *Green v. Phila. Hous. Auth.*, 105 F.3d 882, 885 (3d Cir. 1997) ).

## 1. Whether Plaintiffs Engaged in Constitutionally Protected Conduct

*7 In the present action, the Complaint broadly assert that the Defendants violated the Plaintiffs' First Amendment rights by retaliating against them for engaging in "certain speech, association and union activities." (Doc. 1, at ¶ 1). Although both parties largely limit their analyses in their respective briefs in support of, and in opposition to, the motion to dismiss to the issue of whether Plaintiffs have adequately pleaded a First Amendment free speech claim, the Court must also address the sufficiency of the pleadings with respect to the First Amendment association claim alleged by Plaintiffs.

"The [Supreme] Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). With respect to a First Amendment free speech claim, "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Id.* When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. However, if an employee speaks as a citizen on a matter of public concern, "[t]he question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Id.* at 418. Thus, a public employee's "speech is protected by the First Amendment only (1) if he spoke as a citizen (and not as an employee), (2) if his speech involved a matter of public concern, and (3) if his employer lacked an adequate justification for treating him differently from the general public." *De Ritis v. McGarrigle*, 861 F.3d 444, 452 (3d Cir. 2017) (quotation marks omitted); *see also,* *Hill*, 455 F.3d at 241-242 (quotation marks omitted) ("A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an

adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made.").

Here, Myers and Duffy, as police officers for the Wilkes-Barre Police Department, were both public employees. Plaintiffs assert that their statements or "complaints" alleged in the Complaint were made in their capacity as union representatives (Doc. 13, at 8), positions they held by virtue of their employment as police officers (*see* Doc. 1, at ¶ 15).

In analyzing a free speech claim, the Supreme Court has clarified that under *Garcetti*'s "pursuant to official duties" test, the "critical question ... is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014); *see also*, *Flora v. Cty. of Luzerne*, 776 F.3d 169 (3d Cir. 2015) (applying *Lane* by asking whether the plaintiffs speech was "part of his ordinary responsibilities," that is, "part of the work he was paid to perform on an ordinary basis"); *Dougherty v. Sch. Dist. of Phila.*, 772 F.3d 979, 990 (3d Cir. 2014) ("If anything, *Lane* may broaden *Garcetti*'s holding by including 'ordinary' as a modifier to the scope of an employee's job duties."). In *Lane*, the Court emphasized that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech." *Lane*, 573 U.S. at 240.

*8 Nonetheless, Courts have repeatedly held that a public employee generally does not act as a private citizen when engaging in speech performed while in his *official capacity* as a union officer. *See e.g., Hill v. City of Phila.*, 2008 WL 2622907, *6 (E.D. Pa. 2008) ("Any activity or related speech which allegedly led to retaliation against [plaintiff] was conducted pursuant to his official duties as a union delegate acting on behalf of employees of a municipal agency, and not as a citizen."), *aff'd*, 331 F.App'x 138, 142 (3d Cir. 2009); *Beresford v. Wall Twp. Bd. Of Educ.*, 2010 WL 445684, *6 (D.N.J. 2010) (finding that one reason, among others, that Plaintiff failed to establish that his speech was protected was because "Plaintiff was not acting as a private citizen when engaging in speech as a public employee and President of the WITA union because such speech was performed while Plaintiff was in his official capacity as negotiator of his union."); *Foster v. Twp. of Pennsauken*, 2017 WL 2780745, *10 (D.N.J. 2017) ("Plaintiff's advocacy for the [implementation of twelve-hour shifts] in his position as a representative for the union was not done as a private citizen, because those statements were made pursuant to his duties as a representative of the union in negotiating their new contract.") (citing *Hill*, 331 F.App'x at 142; *Beresford*, 2010 WL 445684, at *6). *See also, Killion v. Coffey*, 696 F.App'x 76, 79 n.4 (3d Cir. 2017) (rejecting police officers' argument that union activity is *per se* protected conduct).

Upon review of the present Complaint, the large majority of the factual allegations setting forth the basis for Plaintiffs' "protected" speech are specifically pleaded as having been done by Plaintiffs in their "union capacity" or on behalf

Myers v. City of Wilkes-Barre, Slip Copy (2019)

2019 WL 210938

of the PBA. (*See e.g.*, Doc. 1, at ¶¶ 21, 30, 35, 37, 38, 41, 44, 46, 51, 55, 63, 67, 68). Although the fact that Plaintiffs were union officials, in itself, does not bar Plaintiffs from asserting a viable First Amendment free speech claim, Plaintiffs have effectively severely limited their ability to state a claim that they engaged in protected speech under the First Amendment due to their repeated and specific assertions that their speech and complaints were made in their capacities as union officers. Even affording Plaintiffs every reasonable inference, Plaintiffs' pleadings can be clearly read as asserting that a majority of Plaintiffs' speech was undertaken as part of their *official* duties as union officers in the PBA. As a result, with respect to those allegations which specifically allege that Plaintiffs acted within their union capacities or on behalf of the union, Plaintiffs have not adequately pleaded that they were acting as private citizens rather than pursuant to their official duties as union officers.

However, the Complaint sets forth several factual allegations wherein, affording Plaintiffs every reasonable inference, it is not evident that one or both of them were acting within their official duties as union officials or police officers. As to those factual pleadings, although Defendants argue that Plaintiffs' Complaint "only details a lengthy history of employee complaints up the chain of command concerning administrative policy and appointments" and Plaintiffs' speech is therefore not protected as they were only speaking in the course of their official duties, (Doc. 10, at 4-5)[3], "[w]hether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law," *Dougherty*, 772 F.3d at 988,

in that "the scope and content of a plaintiff's job responsibilities is a question of fact, but the ultimate constitutional significance of those facts is a question of law", *Flora*, 776 F.3d at 175. Here, the precise contours of Plaintiffs' employment responsibilities and duties, either as police officers or union officials, have not been pleaded in the Complaint. In the absence of these allegations, it cannot be discerned whether one or both of the plaintiffs were speaking as private citizens when they made certain statements set forth in the Complaint, or instead whether each of their statements was strictly within scope of their official duties as Wilkes-Barre police officers or union officials.

3    *See e.g.*, Foraker v. Chaffinch, 501 F.3d 231, 241 (3d Cir. 2007) (declining to extend First Amendment protection to the speech of police officers when they were, pursuant to their job duties, "report[ing] problems ... up the chain of command"), *abrogated on other grounds by* Borough of Duryea v. Guarnieri, 564 U.S. 379, 131 S.Ct. 2488, 180 L.Ed.2d 408 (2011).

*9 Next, when analyzing a free speech claim, in addition to the requirement that the plaintiff must speak as a private citizen, "[t]o be protected, the speech must implicate a matter of public concern.... Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v. Clinton Cty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 146-148, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) ). "In determining whether the speech at issue satisfies this element, courts should take into account the employee's motivation as well as whether it is important to our system of self-government that the expression take place."

*Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015). For example, speech may be a matter of public concern when the speaker seeks to "bring to light actual or potential wrongdoing or breach of public trust" on the part of government officials. *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 170 (3d Cir. 2008) (quoting *Connick*, 461 U.S. at 148). The speech is not protected if it "constitute[s] merely personal grievances." *Feldman v. Phila. Hous. Auth.*, 43, F.3d 823, 829 (3d Cir. 1994) (citing *Connick*, 461 U.S. at 147). Nonetheless, speech motivated by private concern may also qualify as protected speech if it "addresses a matter that concerns the public as well as the speaker." *Brennan v. Norton*, 350 F.3d 399, 412 (3d Cir. 2003). As the Third Circuit has instructed,

> Because we are not to make a superficial characterization of the speech or activity taken as a whole, we conduct a particularized examination of each activity for which the protection of the First Amendment is claimed to determine whether it involves a matter of public concern, while taking care not to cherry pick something that may impact the public while ignoring its manner and context. That is to say, we will hold that a discrete unit of speech addresses a matter of public concern if it discusses fundamental problems reaching beyond the employee's day-to-day minutiae, such as a concern that all assistant district attorneys in an office are required to work on political campaigns, a concern about academic integrity in today's youth generally, or a concern about academic standards applicable to a university as a whole. But if a discrete unit of speech addresses only the employee's own problems, and even if those problems brush against a matter of public concern by virtue of that employee's public employment, then that speech is merely a personal grievance.

*De Ritis*, 861 F.3d at 455 (internal citations, alterations, and quotation marks omitted).

Here, Defendants argue that "Plaintiffs' claims are a transparent attempt to constitutionalize their employee grievances regarding the managerial directives of their superiors...." (Doc. 10, at 7). Although Defendants may ultimately succeed in demonstrating that each of Plaintiffs' actions and statements did not involve matters of public concern, such an argument is premature in light of Plaintiff's allegations. Specifically, Plaintiffs' Complaint includes multiple allegations that Lendacky "falsified" crime records, that police officers did not have up-to-date First Aid,

CPR, and Taser training certifications, and that when they were trained, that training "did not meet minimum safety standards" (*see e.g.*, Doc. 1, at ¶¶ 24, 41, 42, 44, 45). At this stage in the pleadings, the Court cannot read these allegations as merely constituting "personal grievances." Rather, affording Plaintiffs every reasonable inference, this speech may constitute a matter of public concern as it seeks to "bring to light actual or potential wrongdoing or breach of public trust", *Borden*, 523 F.3d at 170, on the part of the Chief of Police, Police Commander, and Wilkes-Barre Mayor.

Finally, to demonstrate that they are entitled to First Amendment protection for their free speech claim, Plaintiffs must have sufficiently pleaded that the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement(s) they made. "The problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Once again, Defendants' arguments are premature. Although Defendants argue that "Plaintiffs' social media and other public criticisms of the City's Administration and administrative directives of their superior officers would and have unjustifiably jeopardized the order, discipline, and functioning of the Department" (Doc. 10, at 9), this argument requires the Court to accept facts not contained within the Complaint

and Defendants' perception of how those facts impact Plaintiffs' claims. Although the Court recognizes that the public "has little interest in speech that 'brush[es] ever so gently against a matter of public concern' but nonetheless remains 'focused upon [the employee's] private grievances as an employee,' " *De Ritis*, 861 F.3d at 457 (quoting *Miller*, 544 F.3d at 550-551), based on the pleadings alone, the Court is unable to say as a matter of law that each of Plaintiffs' actions focused only on their private grievances.

**\*10** For the foregoing reasons, drawing all reasonable inferences in favor of Plaintiffs, the Court finds that they have sufficiently alleged that they engaged in constitutionally protected conduct with respect to their First Amendment free speech claim.

Nonetheless, although Plaintiffs have only barely successfully pleaded their claim that they were engaged in protected speech such that their free speech claim will be allowed to proceed, this Court's analysis differs with respect to Plaintiffs' association claim, and specifically whether Plaintiffs have sufficiently pleaded that they engaged in constitutionally protected conduct such that their association claim may survive. When analyzing a pure First Amendment association claim, the Third Circuit recently held that *Garcetti* is inapplicable as it "applies to speech, not association." *Palardy v. Twp. of Millburn*, 906 F.3d 76, 83 (3d Cir. 2018). Specifically, the Court explained that "mere membership in a public union is always a matter of public concern" and that "it is hard to imagine a situation where a public employee's membership in a union would be one of

his 'official duties.' " *Id.* Furthermore, while *Palardy* was decided at the motion for summary judgment stage, the Circuit found that "there is no evidence that Palardy's membership in the police officers' union was one of his job duties." *Id.* Here, at this earlier stage in the proceedings, although Plaintiffs' pleadings indicate that "the PBA serves as the union for patrol officers, detectives, sergeants and lieutenants in the" WBPD (Doc. 1, at ¶ 15), these pleadings do not state that, all the relevant times, this membership was mandatory or "one of [their] job duties", nor that Duffy and Myers' participation as officers in the union were part of their job duties in any way.

Here, Plaintiffs have repeatedly alleged that that they were union members and engaged in union activity. The Court believes the case law makes it clear that actions taken as agents of the union are generally not constitutionally protected. However, the case law makes equally clear that membership in, or association with, a union has constitutional protection. At the pleadings stage, giving the plaintiffs every reasonable inference in support of their causes of action and giving them the further benefit of the requirement that the Court liberally construe their pleadings, it is the Court's view that at this time it cannot say as a matter of law that Plaintiffs have only pleaded a cause of action based on their union activity in discharging their official duties as union officers, and not one based only on union status and membership. *See* *Palardy*, 906 F.3d at 83 (in a pure association claim, "it is hard to imagine a situation where a public employee's membership in a union would be one of his 'official duties.' "). Thus, at the motion to dismiss stage, Plaintiffs have also adequately

pleaded that they engaged in constitutionally protected conduct through their membership in, and association with, the PBA sufficient to support their First Amendment association claim.

Finally, this Court notes that the Circuit in *Palardy* admitted that it has "dismissed associational claims that [it] viewed as co-extensive with the plaintiff's free speech claim", *Palardy*, 906 F.3d at 84. The Court explained:

> **\*11** Although *Pickering, Connick,* and *Garcetti* were cases about speech, some circuits apply the same rubric to cases involving the associational rights of public employees. This is especially true when an employee's freedom of association claim "implicate[s] associational rights in essentially the same way and to the same degree" as his free speech claim. *Sanguigni v. Pittsburgh Bd. of Pub. Educ.,* 968 F.2d 393, 400 (3d Cir. 1992) ("We hold ... that *Connick* governs [the plaintiff's] freedom of association claim because that claim is based on speech that does not implicate associational rights to any significantly greater degree than the employee speech at issue in *Connick*.").

*Id.* at 81. *See also,* *Gorum,* 561 F.3d at 185 n.4 ("[Gorum's] associational claim is linked closely enough with his free-speech claim to justify application of the citizen-speech and public-concern requirements."). At the pleadings stage, the Court is unable to determine whether Plaintiffs' association claims are co-extensive with Plaintiffs' free speech claims. Therefore, the claims will all

be allowed to proceed. However, there is by necessity a need, either on summary judgment or at trial, to distinguish any association claims under *Palardy* that may proceed because they are simply claims of retaliation based on union membership with claims related to Plaintiffs' union-related speech, *see Palardy*, 906 F.3d at 83 ("[U]nion-related speech is different than mere union membership. Because labor unions advocate for their employees on a wide range of issues, the number of possible subjects for union-related speech is similarly wide-ranging. Conversely, union membership is a dichotomy – either an employee is a union member, or he is not."). As for claims that are entirely based on allegations of retaliation based on free speech, the development of the evidence must show, whether, under *Pickering, Connick*, and *Garcetti*, the statements made and the actions taken were, in fact, with respect to matters of public concern and were expressed by Plaintiffs as private citizens and not as advocates for the union or its members or as police officers within the scope of their official duties.

### 2. Whether Plaintiffs Have Adequately Alleged Retaliatory Action Sufficient to Deter a Person of Ordinary Firmness from Exercising his Constitutional Rights and a Causal Link between the Constitutionally Protected Conduct and the Retaliatory Action

The Court turns to the other two elements necessary to succeed on any First Amendment retaliation claim: whether the retaliatory action was sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and whether a causal link existed between the constitutionally protected conduct and the retaliatory action.

Defendants do not address the first aforementioned element. Instead, Defendants focus on the last element and argue that "Plaintiffs' complaint fails to allege an unusually suggestive time proximity between Plaintiffs' allegedly protected speech and the suspension of Plaintiffs and ultimate termination of Officer Duffy." (Doc. 10, at 10).

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997) ).

Where a plaintiff cannot establish a causal connection between his protected activity and the retaliatory action through "unusually suggestive temporal proximity" or a "pattern of antagonism coupled with timing," he must show that the trier of fact could infer causation from the "evidence gleaned from the record as a whole." *Lauren W*, 490 F.3d at 267. "Where the time between the protected activity and the adverse action is not so close as to be unusually suggestive of a causal connection standing alone, courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee, or other types of circumstantial evidence ... that give rise to an inference of causation when considered as a whole."

*Marra v. Phila Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) (citations omitted).

**\*12** "The showing of causation is critical. Summary judgment will be granted on a First Amendment retaliation claim when there 'is simply no basis in the evidence' to make the causal link." *Garcia v. Newtown Twp.*, 483 F. App'x 697, 702 (3d Cir. 2012) (quoting *Lauren W*, 480 F.3d at 272). Indeed, the Third Circuit has recognized that:

> A court must be diligent in enforcing these causation requirements because otherwise a public actor cognizant of the possibility that litigation might be filed against him, particularly in an individual capacity, could be chilled from taking action that he deemed appropriate and, in fact, was appropriate. Consequently, a putative plaintiff by engaging in protected activity might be able to insulate himself from actions adverse to him that a public actor should take. The point we make is not theoretical as we do not doubt that public actors are well aware that persons disappointed with official decisions and actions frequently bring litigation against the actors responsible for the decisions or actions in their individual capacities, and the actors surely would want to avoid such unpleasant events. Thus, it would be natural for a public actor to attempt to head off a putative plaintiff with the unwarranted expenditure of public funds. Courts by their decisions should not encourage such activity and, by enforcing the requirement that a plaintiff show causation in a retaliation case, can avoid doing so as they will protect the public actor from unjustified litigation from his appropriate conduct. In this regard we recognize that often public actors such as those in this case must make a large number of decisions in charged atmospheres thereby inviting litigation against themselves in which plaintiffs ask the court to second guess the actors' decisions.

*Lauren W*, 480 F.3d at 267-268.

Although it remains to be determined whether some or all of the actions taken by Plaintiffs were done within the scope of their official duties as police officers or union officials, and therefore not protected, assuming at this stage in the proceedings that Plaintiffs did engage in constitutionally protected conduct,

Plaintiffs' Complaint again barely pleads sufficient factual allegations to warrant denial of Defendants' motion to dismiss. However, Plaintiffs' Complaint details a steady and continuing series of actions undertaken by Plaintiffs over the course of more than a year wherein one or both complained on a number of occasions about Lendacky, Foy, the possible alteration of police records, the overall state of the police department, concerns about mismanagement within the department, and the effect of these issues on public safety. In turn, Plaintiffs' Complaint also details a continuing pattern of allegedly antagonistic conduct or animus over this same period of time, which, liberally construing Plaintiffs' Complaint, sufficiently pleads a possible causal connection between any protected activity by Plaintiffs and retaliatory actions on the part of one or more Defendants.

Although the allegations of the Complaint prevent this Court from determining the precise timing of certain actions by Plaintiffs, and the timing of the retaliation they claim they endured as a result of those actions, the Complaint does arguably set forth a pattern of antagonism as well as actual antagonistic conduct or animus against the employees, that may give rise to an inference of causation when considered as a whole. Thus, liberally construing Plaintiffs' pleadings, Plaintiffs have provided sufficient factual assertions which show "more than a sheer possibility that [ ] defendant[s] ha[ve] acted unlawfully," *Connelly*, 809 F.3d at 786.

## V. CONCLUSION

**\*13** Although the Court remains skeptical that Plaintiffs will ultimately succeed on their First Amendment claims in light of Plaintiffs' factual pleadings and the applicable case law, Plaintiffs' allegations sufficiently "nudge[ ] their claims across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, to warrant a denial of Defendants' motion to dismiss Plaintiffs' First Amendment claims for failure to state a claim. At this stage in the proceedings, the Court deems it prudent to allow this action to move forward so as to establish a fully developed record such that a full evaluation can be made in light of the evidence adduced through discovery, rather than dismissing Plaintiffs' Complaint with leave to amend, an exercise which the Court feels will not serve either the parties' interests or the interest of avoiding unnecessary delay.

Therefore, for the reasons set forth in this Memorandum Opinion, the Court will grant in part and deny in part Defendants' Motion to Dismiss (Doc. 8). A separate Order follows.

**All Citations**

Slip Copy, 2019 WL 210938

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 6168615
Only the Westlaw citation
is currently available.
United States District Court, D. Delaware.

GROOVE DIGITAL, INC., Plaintiff,
v.
KING.COM, LTD., King.com Inc.,
and King.com (US) LLC, Defendants.

Civil Action No. 1:18-cv-00836-RGA
|
Entered 11/26/2018

**Attorneys and Law Firms**

Karen L. Pascale, Robert M. Vrana, Young, Conaway, Stargatt & Taylor LLP, Wilmington, DE, Brian S. Seal, Pro Hac Vice, Thomas G. Southard, Pro Hac Vice, for Plaintiff.

Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, for Defendants.

**MEMORANDUM ORDER**

Richard G. Andrews, United States District Judge

*1 Presently before me is Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6). (D.I. 10). The Parties have briefed the issues. (D.I. 11, 14, 15). For the reasons set out below, Defendants' motion is **GRANTED-IN-PART.**

Plaintiff filed its Complaint on June 4, 2018. (D.I. 1). It alleges Defendants' *Candy Crush Saga, Candy Crush Soda Saga,* and *Bubble Witch 2 Saga* games ("Accused Products") infringe all the claims of U.S. Patent No. 9,454,762 (" '762 Patent). (*Id.* at ¶ 9). Specifically, Plaintiff alleges that Defendants directly, indirectly, jointly, and willfully infringe the Patent. (*Id.* at ¶¶ 16-29). The '762 Patent covers a "system and method for delivering and serving local content and advertisements to an end user on a network, including wired and wireless networks." ('762 Patent at 1:13-16).

**I. LEGAL STANDARD**
When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." (internal quotation marks omitted) ).

## II. DISCUSSION

Defendants argue that every claim in the Complaint fails to meet the pleading standard. I largely disagree and find that the Complaint is almost entirely sufficient. However, Defendants are correct that Plaintiff failed to sufficiently plead a claim of willful infringement.

### A. Sufficiency of Allegations Against Each Defendant

The Complaint sufficiently asserts each Defendant's role in the alleged infringement. Defendants argue that the Complaint's use of "King" to refer collectively to the various King entities amounts to a failure to allege individual liability. (D.I. 11 at 6-8). However, a complaint that collectively refers to defendants meets Rule 8's pleading standard if "it can be reasonably inferred that each and every allegation is made against each individual defendant." *Zond, Inc. v. Fujitsu Semiconductor Ltd.*, 990 F. Supp. 2d 50, 53-54 (D. Mass. 2014). Plaintiff specifically identifies Defendant King.com, Ltd. as committing certain allegedly infringing acts in Paragraph 9 of the Complaint. (D.I. 1). Plaintiff goes on to allege specific acts of Defendants King.com, Inc. and King.com (U.S.), LLC in Paragraph 10. (*Id.*). Those factual allegations are sufficient to support an inference that all three King Defendants engaged in the alleged infringing conduct. Thus, Plaintiff has sufficiently pled claims against each of the three defendants.

### B. Direct Infringement

**\*2** The Complaint adequately alleges direct infringement. To satisfy the *Iqbal* pleading standard in a patent case, "[s]pecific facts are not necessary." *Disc Disease Solutions Inc. v. VGH Solutions, Inc.*, 888 F.3d 1256, 1260 (Fed. Cir. 2018) (quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) ). The Complaint need only give defendant "fair notice of what the [infringement] claim is and the ground upon which it rests." *Id.* In the Complaint, Plaintiff identifies specific Accused Products which it alleges directly infringe the claims of the '762 Patent. (D.I. 1 at ¶¶ 18-19). "[It] describes the overall purpose of the invention and describes the elements of the claims, including the claimed use of push notifications to deliver browser-independent content to a networked device." (D.I. 14 at 7). In the infringement count specifically, Plaintiff identifies the Accused Products, identifies the asserted claims, and explains the basis of the infringement allegation. (*See* D.I. 1 at ¶¶ 16-29). Those allegations, when read with the rest of the Complaint, sufficiently describe how the Defendants' Accused Products allegedly infringe the claims. [1]

---

[1]  Defendants argue that Plaintiff should have included screenshots and more detailed infringement contentions (D.I. 11 at 10-12). That level of specificity may be helpful at the pleading stage, but it is not what Rule 8 requires.

### C. Induced Infringement

The Complaint plausibly states a claim for induced infringement. Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer." "To prove induced infringement, the

patentee must show direct infringement, and that the alleged infringer knowingly induced infringement and possesses specific intent to encourage another's infringement." *Toshiba Corp. v. Imation Corp.*, 681 F.3d 1358, 1363 (Fed. Cir. 2012) (internal quotation marks omitted). Pre-suit knowledge is not required to plead a claim of induced infringement. See *Walker Digital, LLC v. Facebook, Inc.*, 852 F. Supp. 2d 559, 565 (D. Del. 2012). To plausibly plead intent, a complaint must contain facts "showing that [the alleged indirect infringer] specifically intended [the direct infringers] to infringe [the patent]." *In re Bill of Lading Transmission & Processing Sys. Patent Lit.*, 681 F.3d 1323, 1339 (Fed. Cir. 2012). Plaintiff's filing of the Complaint is sufficient to establish the requisite knowledge for post-filing indirect infringement liability. Moreover, the Complaint contains sufficient factual allegations to support an inference of specific intent. (*See e.g.*, D.I. 1 at ¶ 25 ("King encourages continued direct infringement of the ... claims of the '762 Patent by at least widely publicizing its Accused Products and providing on its website and in the Accused Products themselves instructions for conducting the directly infringing use.") ). Thus, Plaintiff's allegations are sufficient to support a claim of induced infringement.

### D. Contributory Infringement

The Complaint plausibly states a claim for contributory infringement. A plaintiff sufficiently pleads contributory infringement when it asserts that a defendant: "(1) had knowledge of the patent; (2) sold products especially made for infringing use; (3) had knowledge of the infringing use; (4) sold products with no substantial noninfringing use; and (5) [others] directly infringed." *Walker Digital, LLC*, 852 F. Supp. 2d at 567. Plaintiff's allegation of contributory infringement reads:

> King contributes to direct infringement of the asserted claims of the '762 Patent by *providing game players with the necessary software* and instructions to operate the Accused Products, including the downloading of applet applications for the delivery and display of browser-independent content. The software and instructions are not staple articles of commerce and have *no substantial noninfringing uses.* They are specifically designed to work with the Accused Products and their *only purpose is to operate in a manner that directly infringes* the asserted claims of the '762 Patent.

*3 (D.I. 1 at ¶ 28 (emphasis added) ). This clearly alleges each of the unique components of a contributory infringement claim. Moreover, knowledge of the patent and of infringing use are sufficiently established via the filing of the complaint. Thus, when read in combination with the rest of the Complaint, this claim is sufficient.

### E. Joint Infringement

"In circumstances where one party performs some of the steps of a patent claim, and another entity performs other of the claimed steps, a theory of joint infringement may establish liability." *EON Corp. IP Holdings LLC v. FLO TV Inc.*, 802 F. Supp. 2d 527, 534 (D. Del. 2011). Plaintiff alleges that the King Defendants acted jointly with their customers: "King induces continued infringement by at least *encouraging and instructing game players to perform some or all of the claimed steps*, while in certain instances *performing certain of the steps itself* in coordination with such performance by game players. (D.I. 1 at ¶ 26 (emphasis added) ). This is sufficient to permit a reasonable inference that Plaintiff has a "plausible claim for relief" with respect to its claim for joint infringement. *See Iqbal*, 556 U.S. 678-79. Thus, I will deny Defendants' request that I dismiss this claim.

### F. Willful Infringement

The Complaint fails to sufficiently state a claim for willful infringement. "[T]o state a claim of willful infringement, the patentee must allege facts in its pleading plausibly demonstrating that the accused infringer had committed subjective willful infringement as of the date of the filing of the willful infringement claim." *Välinge Innovation AB v. Halstead New England Corp.*, 2018 WL 2411218, at *10-12 (D. Del. May 29, 2018) (discussing *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1282 (Fed. Cir. 2017), *cert. dismissed*, No. 17-804, 2018 WL 3978434 (U.S. Aug. 17, 2018) ). The complaint alleges only post-filing knowledge of the alleged infringement. (D.I. 1 at ¶ 29). Thus, it fails to meet the pleading standard for willful infringement which requires allegations of willful conduct prior to the filing to the claim. I will grant Defendants' motion to dismiss Plaintiffs willful infringement claims.

### III. CONCLUSION

The Complaint adequately pleads claims of direct infringement, induced infringement, contributory infringement, and joint infringement against each Defendant. However, the Complaint fails to sufficiently plead a claim of willful infringement. Thus, Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) (D.I. 10) is **GRANTED-IN-PART**. Plaintiff's willful infringement claims are dismissed without prejudice.

### All Citations

Slip Copy, 2018 WL 6168615

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.