IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAVVY DOG SYSTEMS, LLC,          :
et al.,                          :
                    Plaintiffs   :   Case No. 3:19-CV-01470
                                 :
            vs.                  :
                                 :   (Judge Wilson)
PENNSYLVANIA COIN, LLC, et       :
al.,                             :
                    Defendants   :


TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
BEFORE THE HONORABLE JENNIFER P. WILSON
UNITED STATES DISTRICT COURT JUDGE
MARCH 17, 2020; 9:44 A.M.
HARRISBURG, PENNSYLVANIA


FOR THE PLAINTIFFS (via speakerphone):

    Steven G. Hill, Esquire
    Martha L. Decker, Esquire
    Hill, Kertscher & Wharton, LLP
    3350 Riverwood Parkway, Suite 800
    Atlanta, GA  30339

FOR THE DEFENDANTS (via speakerphone):

    John V. Gorman, Esquire
    Amy M. Dudash, Esquire
    Morgan, Lewis & Bockius, LLP
    1701 Market Street
    Philadelphia, PA  19103


Lori A. Shuey
Federal Certified Realtime Reporter
United States Courthouse
228 Walnut Street, P.O. Box 983
Harrisburg, PA  17108-0983
717-215-1270
lori_shuey@pamd.uscourts.gov
Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription.

*THE COURT:*  Good morning, counsel.

*ATTORNEY GORMAN:*  Good morning, Your Honor.

*ATTORNEY HILL:*  Good morning.

*THE COURT:*  This is the time scheduled for the oral argument in *Savvy Dog Systems, LLC, and POM of Pennsylvania, LLC, v. Pennsylvania Coin, LLC, and PA Coin Holdings, LLC*.

What I'd like to do -- of course, this was originally scheduled to be in court, and I appreciate very much everyone's accommodation so that we could convert this to a telephonic oral argument.  Hopefully that was the right decision.  I think in light of emerging events, it appears to be the right decision.  So I appreciate everyone's quick work in making this converted to a telephone conference today.

I do apologize for keeping you waiting, counsel.  We had a discrepancy between the most recent scheduling order and our calendar, our office calendar.  So we are on track now, and as indicated by Ms. Dixon, we are on the record.

Because this is telephonic, I'm going to ask you to identify who's participating for each side on this call, and then I'll ask you to state who will be presenting the argument for each side.

So let me begin by essentially taking roll.  Who is on the call for plaintiffs?

*ATTORNEY GORMAN:*  Somebody might be on mute, Your Honor.

*ATTORNEY HILL:*  Thank you very much.  Good morning.  This is Steve Hill for Plaintiffs Savvy Dog and POM of Pennsylvania.  I believe Martha Decker is also on the line.

*THE COURT:*  Okay.  And who will be presenting the argument today on behalf of plaintiffs?

*ATTORNEY HILL:*  I will, Your Honor.

*THE COURT:*  All right.  And then who is on the call on behalf of defendants?

*ATTORNEY GORMAN:*  Good morning, Your Honor.  This is John Gorman of Morgan Lewis, I'm joined by my colleague Amy Dudash, and I will be presenting the argument this morning.

*THE COURT:*  Thank you, counsel.  And I'll just request, since we have two male speakers presenting arguments, for the benefit of the court reporter if you could just state your name before you speak.

And what I'd like to do is, initially I'll give defendant the floor first, and so, Attorney Gorman, you can make your presentation to me.  We'll obviously know it's you speaking at that point.  I'll give you the opportunity to present your argument uninterrupted.

I'll then turn things over to Attorney Hill, the same courtesy, I'll give you the opportunity to make your presentation to the court uninterrupted.  And then at that point I do have several questions, and so I'd like to go back and forth.  That's the juncture at which it will be more

important for you to identify who is speaking.  And then after I've exhausted my questions, I'll give you each an opportunity to briefly wrap up and make, essentially, just a closing statement to the court.

I will also -- I've already coordinated with my courtroom deputy -- will be marking your PowerPoint presentations as Defendants' Exhibit 1 and Plaintiffs' Exhibit 1, and we will make those part of the record of today's proceeding.

Are there any preliminary questions or issues to raise before we launch into your presentations?

*ATTORNEY GORMAN:*  Your Honor, this is John Gorman for the defendants.  I had understood from your order that the parties were allocated 30 minutes for their argument, including time for rebuttal.  And I guess I had been planning on sort of doing a presentation and then reserving a certain amount for rebuttal.

Is that something, in light of what you just said, that I should still consider doing, or is it, as I think you just laid out, we give a presentation, Mr. Hill will give a presentation, you'll have questions, and then a closing statement?

*THE COURT:*  Well, thank you for reminding me.  In the sea of things we have changed over the past several days, I did lose track of that.

Let's do this, why don't you each tell me how much time you'd like to reserve for rebuttal.  What I referred to as a closing statement we'll refer to as rebuttal.  But I do intend to ask questions, as well.  So I'll give you the opportunity for your reserved rebuttal time to have the last word, each of you, after I've asked my questions.

So for the defense, how much time would you like to reserve for rebuttal?

*ATTORNEY GORMAN:*  I will then try to reserve about ten minutes, Your Honor.

*THE COURT:*  All right.  And plaintiff?

*ATTORNEY HILL:*  I'll reserve five minutes.

*THE COURT:*  Very good.  And we will keep track of defendants' initial period of 20 minutes of argument time and plaintiffs' 25 minutes of initial argument, with my questions intervening, and then ten and five minutes of rebuttal respectively.  All right.  Thank you for reminding the court of that.

Are there any other preliminary matters before we begin?  Okay, hearing none, then I will turn the floor over to Attorney Gorman, and I'll be glad to hear from you.

*ATTORNEY GORMAN:*  Thank you, Your Honor.  May it please the court, I'm presenting argument this morning on defendants' motion to dismiss the first amended complaint in this case.

There are two grounds that are ripe for Your Honor to decide. The first is, defendants move for dismissal because the asserted patent-in-suit, the '223 patent, is invalid under 35 U.S.C. Section 101, under the patent statute, because the '223 patent claims patent-ineligible subject matter.

The second grounds for defendants' motion is that the first amended complaint fails to plead a plausible claim for infringement and should be dismissed. The defendants had moved to dismiss plaintiffs' willful infringement allegations, but in plaintiffs' opposition brief they said they are withdrawing that, so that is no longer a ripe issue.

If I could turn to the first basis for defendants' motion, it is that the '223 patent claims are invalid under 35 U.S.C. Section 101, and the defendants respectfully move that Your Honor dismisses the first amended complaint on those grounds.

That section of the patent statute provides what material may be patented and what is a valid patent in terms of subject matter. It states that a patent must disclose a new and useful process, machine, manufacture, or composition of matter or any new and useful improvement thereof.

The question of whether or not a patent is valid under Section 101 is an issue of law for the court to decide. It is ripe for adjudication on a motion to dismiss for all the reasons cited in the cases that we cited in Section VA1 of our

opening brief.  I'll also point out that the *Aatrix Software* case, the Federal Circuit case of May of 2018, affirmed the propriety of resolving patent eligibility on motions to dismiss.

Your Honor, this is going to be a little bit cumbersome, so you'll have to indulge me, but it might be useful if you turn to Page 3 of the presentation materials that we sent.

*THE COURT:*  Thank you.  I have that page in front of me.

*ATTORNEY GORMAN:*  Okay.  Great.  As Your Honor is well aware from reviewing the papers, the framework for Your Honor to determine whether or not the '223 patent is valid is the framework that was provided by the Supreme Court in the *Alice* court case.  It's a decision that came down four years after the patent in the suit was issued by the patent office.

And under that framework, Your Honor is to consider the eligibility of the '223 patent in two steps.  At Step One, Your Honor is to determine whether the claims at issue are directed to a patent-ineligible concept, such as an abstract idea, which is the case in this particular patent.

If Your Honor determines that, in fact, Step One has been met, Your Honor moves to Step Two to determine whether there is an inventive concept in the claims, an element or a combination of elements that is sufficient to ensure that the

patent in practice amounts to significantly more than the patent on the eligible -- ineligible concept itself.  And the patent-in-suit, the '223 patent, fails both of these steps.

Turning to *Alice* Step One, if Your Honor has taken the opportunity to read through the '223 patent at any length, you will see that while the patent discusses many things, it does not discuss some sort of technological improvement.  It does not discuss some sort of improvement in computer functionality.

What the '223 patent is putting out as the invention is a type of gameplay.  And if Your Honor takes a look at column one of the '223 patent in the background of the invention, you'll see the context in which the applicants have developed this purported invention.

And it is the context of a series of gaming laws at the state and federal level regulating what constitutes a skill-based game.  And what the applicants have done is advanced a particular way of playing the game that deals with that legal framework.  You can see this throughout the entirety of the patent.

If you look at slide 4, this just blows up the title of the patent, which you'll see it references an electronic gaming method and system having a preview screen, because this method of gameplay is essentially taking a game and showing it to a player before they actually play the game to deal with this regulatory and legal framework about skill-based games.

If you turn to slide 5, you'll see that this is a blowup of the abstract which is on the face of the patent. And, again, you'll see that the thrust of this, what the specification is directed to, is this gaming method and system, and it lays out what all the steps are of this method of gameplay.

If you turn to slide 6, you'll see in the background of the invention, when the applicants are talking about the invention, they're not talking about some sort of technological improvement, they're talking about a method and system for providing a display to players before the players play the game.  Likewise on slide 7, you'll see in the summary of the invention that the applicants direct the purported invention to that, as well.

So the entire -- and I should also say at claim -- at slide 8, we've taken a picture of one of the drawings.  Not only in sort of the words of the specification, but if you look at the figures themselves, all are directed to the steps that one would take to play the game in this particular way.

And slide 8 is just depicting Figure 6, which is just showing the flowchart of the various steps of being able to implement this gameplay, the logic, if you will, of carrying out those steps.

So everything in the specification is directing the purported invention to this method of gameplay.  And so, too,

is the case with respect to the claims.  And if you look at slide 9 of the presentation, what we've done here is, we've set forth this method of gameplay that's reflected, certainly, in the representative claim, but in all of the claims.

This method of game playing -- and I won't read it word for word, Your Honor, just for time constraints, but essentially six basic steps about constructing a field, figuring out what a winning combination in the game would be, testing the field just to make sure that the winning combination isn't higher than you intended, automatically displaying the game to the player before they play the game, figuring out if the player wants to play the game, and then displaying an outcome resulting from the game.

And if you look at the following slide, slide 10, it deals with representative claim 44.  This sets forth, again, this method of gameplay in the context of some generic gaming components like a game terminal, a touchscreen display, a game processor.

Now, claim 44 is the representative claim in this matter.  As you note from our opening brief, we explain why that is the case.  I'll note that plaintiffs did not, in their opposition brief, challenge that claim 44 was a representative claim, and so I don't know that there's a real legitimate issue over this point, but it may make sense for me to just walk through why that's the case.

If Your Honor looks at all of the claims of the patent, what Your Honor is going to see, that all of the claims of the patent focus on and are directed to, when you look at them as a whole, this method of gameplay carrying out these steps.

So, for example, if you turn to slide 11, this sets forth claim 1. And what we've tried to do here is show you how these particular steps track the same steps that are set forth in claim 44. Likewise, if you look at slide 12, this shows claim 37, which is, again, setting forth where we've tried to show where the -- essentially the same claim steps as claim 44 are set forth, as well. Claim 58 on slide 13 is the same thing.

And, in fact, if you look at all of the claims, you'll see the same thing. All of these claims are directed to this method of gameplay. And I'll note that not all of the claims even reference any specific technological components. For example, claim 1, claim 37, claim 58, there is no reference, for example, to a game processor. So clearly the focus of all these claims and the patent as a whole is to this method of gameplay.

And so, Your Honor, the determination then for you is to figure out, okay, if these are directed to this gameplay, is this gameplay an abstract idea? And, Your Honor, the case law says a helpful way of assessing whether the claims of a patent

are directed to an abstract idea is to consider whether all the steps of the claim could be performed by human beings.

In our opening brief at Pages 9 through 11, we spent a considerable portion of our brief walking through for Your Honor why these -- this way of playing a game could be carried out by human beings.  We use an example where two friends at a kitchen table could take out a deck of cards and basically play all of the steps that are in this -- in the method, the stated claim method.

I'll point out -- I won't go that into detail for Your Honor unless during your questioning you'd like me to go to it, and I certainly have the slides to do it.  I will point out, however, that the plaintiff, in their opposition brief, didn't really challenge the fact that all of these claims could be performed by --

*(Interruption.)*

*THE COURT:*  Let's pause a moment here.  I want to just make sure we're all still on the call.  Obviously I have Attorney Gorman.  Plaintiffs counsel, are you there?

*ATTORNEY HILL:*  I am.

*THE COURT:*  Okay.  There was a --

*ATTORNEY HILL:*  I'm not sure who just called in.

*THE COURT:*  I'm sorry?

*(Interruption.)*

*ATTORNEY GORMAN:*  Your Honor, I think what's happened

is --

*ATTORNEY HILL:* I think that was our local counsel.

*ATTORNEY GORMAN:* I think they joined the call, but I think they just left the call again.

*THE COURT:* Okay. Who do we have participating on the call currently on behalf of plaintiffs?

*ATTORNEY HILL:* Your Honor, this is Steve Hill and Martha Decker for the plaintiffs.

*THE COURT:* Okay.

*ATTORNEY HILL:* I'm not aware of anyone else.

*THE COURT:* Well, someone else joined the call. I think it may have been Attorney Vance, but then he appears to have left the call.

*ATTORNEY HILL:* Correct.

*THE COURT:* It's perfectly fine with me if he joins, but what I don't want to do is have him interrupt Attorney Gorman's argument. So if someone could email or text him to let him know that if he could wait until Attorney Gorman finishes his argument and then if he wants to -- we can give him a moment to join the call, but I'd prefer not to have it interrupted during anyone's argument.

*ATTORNEY HILL:* Agreed, Your Honor. Martha, please send him an email to that effect.

*THE COURT:* And then when Attorney Gorman finishes -- and, of course, Attorney Gorman, I'm crediting you for this

time, but when you're finished with your argument, Attorney Hill, if, before you begin, you want to give me an indication of whether we should pause for a moment to let Attorney Vance join in, then we can do it at that juncture.  Okay?

*ATTORNEY HILL:*  Yes.  Thank you.

*THE COURT:*  Absolutely.  Attorney Gorman, the floor is yours again.

*ATTORNEY GORMAN:*  Thank you, Your Honor.  And I think, by my count, it still leaves me about ten minutes, unless you've got a different count.  So I'll just start back into it again.

*THE COURT:*  Absolutely.

*ATTORNEY GORMAN:*  So, again, I think where I left off was making the point that there was no real dispute by plaintiffs in their opposition brief that, in fact, all of these steps could be performed by a human.  It certainly didn't point out any step that required some sort of technological --

*THE COURT:*  Attorney Gorman, are you there?  Attorney Hill, are you there?

*ATTORNEY HILL:*  I am.

*THE COURT:*  Attorney Gorman, are you there?  Attorney Hill, can you hear Attorney Gorman?

*ATTORNEY HILL:*  I cannot.

*THE COURT:*  Okay.  Let's give this just a moment.

*ATTORNEY DUDASH:*  Your Honor, this is Amy Dudash, and

I'm just emailing John to make sure he didn't get disconnected or something else happened.

*THE COURT:*  Okay.  Well, we'll pause his time, and we'll let you figure that out on your end, and we'll just stand by.

*(Pause in proceedings.)*

*ATTORNEY GORMAN:*  Sorry.

*THE COURT:*  Welcome back, Attorney Gorman.

*ATTORNEY GORMAN:*  My apologies, Your Honor.  I frankly don't know what happened.  I was sitting here talking -- and I assure you it was excellent argument -- and my assistant came in to tell me that nobody could hear me.  So I apologize.

*THE COURT:*  I'm sure it was your finest moment of the argument yet, and I have no doubt that you can re-create it in its entirety.  By our count, you still have ten minutes remaining.

*ATTORNEY GORMAN:*  Okay.

*THE COURT:*  So you can pick up where you think you left off.  I'll tell you where I think you left off, just to be helpful, in my notes, we were looking at the combination -- the slides that begin on Page 14, and you were explaining to me how two humans sitting at a kitchen table could essentially re-create the claim elements (a) through (f).

*ATTORNEY GORMAN:*  Thank you, Your Honor.  I'll take two here.  So my point was, as we've laid this out in our

brief, that two human beings sitting at a kitchen table can, in fact, perform all the steps of this claim.

And I think I was pointing out just before we had our break that I don't think this is an issue of real dispute.  If you look at plaintiffs' opposition brief, plaintiffs have not challenged that, in fact, all of these gameplay steps could, in fact, be performed by two humans on their own, so I don't think there's a real dispute.

And if Your Honor, when -- if you have questions during the later portion, if you want to walk through that in any way, if you have any questions, I'm certainly prepared to do that.

But, in essence, because all of these claims are directed to this method of gameplay steps which can be performed by a human being, the claims of the '223 patent are directed to an abstract idea, and it satisfies *Alice* Step One.

Let me just take this opportunity to make sure, is everyone still there and I haven't cut out?

*THE COURT:*  The court is here.

*ATTORNEY GORMAN:*  Okay.

*THE COURT:*  Attorney Hill?

*ATTORNEY HILL:*  Yes, we're here.  Thank you.

*ATTORNEY GORMAN:*  Okay.  Great.  I'm not touching my phone ever again.  All right.

So, Your Honor, moving on to *Alice* Step Two, the

question then is, are there any features that transform this abstract idea of gameplay into patent-eligible subject matter, and the answer is no.

If you look at representative claim 44, for example, there's some recital of generic features like terminal and touchscreen and game processor, but they don't transform this abstract idea of gameplay into an inventive concept based on many of the cases cited in our briefing.

So if Your Honor turns to slide 18 of our presentation, this is why many courts have consistently found that gameplay claims like the one at issue here are ineligible under Section 101, and these are the same claims that are -- I'm sorry, the same cases that are recited at Section 16 of our opening brief.

So plaintiffs' response to an effort to try and save itself from patent ineligibility is to try and latch on to a particular limitation of claim 44 of the game processor.  But this is unavailing, and the arguments fail at both steps of the *Alice* analysis.

At *Alice* Step One, plaintiffs try to argue that the claims are directed to the game processor.  But as we've just walked through the specification, the specification certainly doesn't suggest that that's the case.  "Game processor" is not in the title.  It's certainly not in the abstract.  It's not referenced in the summary of the invention.  And if you look at

the vast majority of the general description of the invention, you're not going to see any reference to a game processor.

In fact, Your Honor, if you do a word search of the entire patent, you're going to find that the phrase "game processor" only appears twice. And if you look at slide 19 of the presentation -- if you could let me know when you're there, Your Honor.

*THE COURT:* I am there.

*ATTORNEY GORMAN:* Okay. That's also my check to make sure that I'm still here. If you see here, this is a blowup of the only instances in which "game processor" is actually referenced in the entire patent specification. And you'll see that it's just generically talking about having components for carrying out this particular way of playing the game.

There is nothing here in the specification or in this portion that suggests that the game processor is improved from a technical perspective or that it would operate differently than it otherwise would. Nor is there any sort of suggestion that the game processor here is essentially overcoming some sort of technical difficulty in doing the gameplay.

The purported invention here is nothing more than applying this abstract idea of carrying out this particular gameplay and then saying, well, the game processor does it. That's in the specification. Nor do the claims suggest that they are directed to the game processor.

All of the claims, when you look at them, have these steps of method of gameplay, but not all the claims even have "game processor" in them.  So plaintiffs are simply wrong to suggest that these claims are directed to the game processor as opposed to the method of gameplay.

Now, what plaintiffs also try and do is then say, well, the allegations in the first amended complaint about the game processor raise a fact issue over whether there's an inventive concept, but there is no fact dispute that would bar Your Honor from dismissing the complaint at this point on 101 grounds.

First, one of the things that plaintiff does is -- plaintiffs do, rather, is they riff on different variations on what the claim language is.  You'll read through the first amended complaint and you'll read through their brief and I started writing all the different ways down that they described it: a special purpose processor; an embedded game processor; a special purpose low-power processor; an enhanced game processor; a specially configured game processor; a special game processor.

But there is no fact dispute that the claim recites "game processor," and the case law stands for the proposition that an inventive concept must be evident in the claims.  And the claims do not satisfy *Alice* Step Two where the claim language does not provide any specific showing of what's

inventive about the limitation in question.

The claims speak "game processor," and there's nothing further to describe or define the game processor. And based on the case law that we've cited, including the *Maxon* case from the Northern District of Illinois, the court can conclude that this is, in fact, a generic processor.

But there's another reason why the -- there is no fact dispute, because even if you accept the proposition that "game processor" somehow gets transformed into "enhanced game processor" or one of these other things that plaintiffs are calling it, and even if you credit the factual allegations about them, the allegations in the first amended complaint, nor the claims themselves, provide the requisite inventive concept.

Plaintiffs allege a special purpose processor because it's new or original. And if you look at what they're actually alleging, what they're essentially saying is that this special purpose processor is new and original because it's carrying out these steps for the first time, these steps of the gameplay.

But let's point out what it is not. They are not alleging that there is some sort of technological advancement in the processor itself, that the processor represents some improvement of computer functioning, or that there's an allegation regarding anything regarding the specific architecture of the claimed component. Using a computer component in a new way does not render a component

unconventional, and there's no authority for this proposition.

So even accepting all of the allegations in the first amendment -- I'm sorry, the first amended complaint as true, that doesn't get plaintiff there because they -- even if you credit those allegations, that is not enough to create an inventive concept.

If I could direct your attention to slide 23, Your Honor, and I'll try and finish up my opening with these points, the plaintiff and -- both parties brief the significance of some recent Federal Circuit case law, the *Berkheimer* and the *Aatrix* cases.  And it's worth making some of the points that we made already in our brief just to highlight them here.  Those recent Federal Circuit cases do not preclude dismissal in the case.

We cite on this slide, you'll see the same case we cite in our brief, but it makes the point that the *Berkheimer* and *Aatrix* cases don't stand for the proposition that the plaintiff can simply avoid dismissal by reciting in the complaint that the invention at issue is novel and that the inventive concept resides in the abstract idea itself, which is exactly what the plaintiffs are doing here.  They're saying that the inventive concepts lie in these steps, these testing steps and these display steps, of the inventive concept -- of the claim.

So the *Berkheimer* case, for example, there were fact

issues that were created in the specification, and so the court had to credit those fact issues at the motion to dismiss.  By the way, no such statements here in the '223 patent that in any way credit the game processor as anything.

But in *Berkheimer*, what they gave credit to was the fact that those statements in the specification were about improvements to computer technology.  The specification explained that claimed improvement increased efficiencies in computer functionality over a prior art system.

*Aatrix* was a similar situation.  In *Aatrix*, there were specific factual allegations made at the motion to dismiss phase about a data file that the court found barred a determination at the motion to dismiss phase.  But importantly, those allegations weren't just allegations that the data file was carrying out steps in a new and improved way.

If you read that case, you'll see that the record provided detailed, concrete allegations that were directed to the data file in that case being an improvement in the computer technology itself.  It was describing technological problems present in the prior art and how they were saved by the invention.

If you look at Page 1127 of that decision, they talk about the claimed invention saving storage space and RAM and the claimed invention reducing risk of thrashing, a condition that slowed down a prior art system.  In other words, in that

case, the court was faced with concrete and detailed allegations about why the particular limitation at issue was directed to a technological improvement.

That is not the case in the '223 patent, it is not the case in the first amended complaint that there's any concrete allegations talking about why the '223 patent represents an advance in computer technology itself.

*THE COURT:*  All right.

*ATTORNEY GORMAN:*  Thank you, Your Honor.  I've reached 20 minutes, and so I'll reserve the rest of my time.

*THE COURT:*  Very good.  Attorney Hill.

*ATTORNEY HILL:*  Thank you, Your Honor.  I appreciate your allowing us to do this by teleconference.  And I'll admit that this is the first time I've ever done a court hearing from home, so I'm a little bit unfamiliar.  But if you have our slide deck, I will -- I took the liberty of labeling each slide with a number at the top so that it might be easier to quickly navigate through it.

I'm going to start with slide 2 of our slide deck, which simply highlights the specific part of the cover page of the '223 patent, which is Exhibit A to the amended complaint. And I've enlarged that portion of the cover sheet of the patent on slide 3 so that you can see that this particular patent was applied for June 30, 2006, and was based on a provisional application March 31 of 2006, setting up the construct that the

relevant time frame for measuring the invention, what had preceded it is the 2006 time frame.

Turning to slide 4, which is just to introduce the defendants' brief in support of the motion to dismiss, there are a lot of criticisms of the patent that have been leveled by Mr. Gorman, I would merely state at this time, but this is not a case, at this point, about whether or not certain qualities or features of the claims are obvious, so whether the processor I've described in claim 44 is adequately described in the specification portion, the written description.  There are other sections of the patent act, such as Section 112, that address those types of defenses.  Whether -- what the issue at hand is, is the question of patentable subject matter.

And if you turn to slide 5, this is the language of Section 101 of the patent act defining, for example, the invention of a machine that is otherwise subject to conditions and requirements of the patent act as being eligible for patentability.

Now, admittedly, there is a judicial exception that had been crafted for laws of nature, natural phenomenon, and abstract idea laid out most recently by the Supreme Court in the *Alice* decision.  And *Alice* stated, 573 U.S. at 216, that the concern that drives this judicial exception, the patentability, is one of preemption.  In other words, don't preempt the basic building blocks of science and innovation and

therefore preclude your competitors from being able to have access to those same building blocks.

*Alice* examined a patent which automated a well-known trading activity, intermediated settlement. This is a basic business practice. And so computer software that --

THE COURT: I'm sorry, Attorney Hill, I hate to interrupt. We're just having a little bit of difficulty understanding. There's like a muffled quality to your voice, and I don't want the court reporter to miss anything you're saying. So I don't know if you're using a hand-held phone or if you're on speakerphone, but maybe adjust whatever you're speaking into so that it's --

ATTORNEY HILL: Is this better?

THE COURT: Yes, we think so.

ATTORNEY HILL: I changed the settings on my headset, so hopefully this is better.

THE COURT: Very good. Please continue.

ATTORNEY HILL: Okay. So still looking at slide 5, discussing the fact that *Alice* examined a patent which automated the well-known activity of intermediated settlement, which was a basic business practice in the trading field, and held that that method was not patentable and was merely an effort to preempt that basic business activity and keep it under the limited monopoly of the patent for the 20-year period of conferral for a utility patent.

Now, of course, our contention here, at a fundamental level, was that the claim 44 at issue does no such thing.  It does not attempt to preempt any type of basic building block of science, technology, or even business.  But, more specifically, turning to slide 6, we look at the defendants' contention that claim 44 is directed to the abstract idea of playing the game.

Now, the '223 patent, I'm sure the court understands that the '223 patent is divided into figures and then the specification and then it concludes by denominating 75 different claims.  Each one of those claims represents its own inventive right.

Judge Rich, the former Chief Judge of the Federal Circuit, was fond of the expression that in patent law, the name of the game is the claim.  And since each claim presumptively is claiming a different aspect of the written description of the inventor's disclosed embodiment, we necessarily have to pay close attention to the language of the claim that is at issue.

And in this case, what is -- looking at slide 7, what the defendants admit that they're doing with respect to representative claim 44 is that they are, quote, distilling it to its simplest form, unquote.  We would take that one step further, in view of the warning by the Federal Circuit in the *Enfish* decision, that the claim as a whole has to be taken into consideration.

What we don't want to do is oversimplify the claim in order to make it fit into what can be called an abstract concept.  And, of course, our brief lays out the fact that the claim, claim 44, when it is looked at as a whole -- and you can turn to slide 8 to see claim 44 -- is actually, this particular claim is actually directed to a system that is comprised of a terminal, a touchscreen display, and a game processor, the game processor configured for.  And then the remaining rules of the claim are laid out there as elements of the configuration of the game processor rather than for standing stout.

So when we look at this particular claim as a whole, we don't see that this is a claim that is directed to playing a game so much as it is directed to a system that sets up a specific architecture, such that when a specific game is played in that architecture, it can elevate that game from a level -- from a game of chance more towards a game of skill.

This is not the same as the other claims of the '223 patent.  Claim 1, for example, shown in the defendants' presentation at slide 11, involved the use of a wildcard during the play of the game.

Claim 70 specifically relates to a computer program product rather than a game processor specially configured in the manner called out by claim 44, where instead of configuring the game processor in the way that claim 44 describes, the six rules are instead processed through an application program that

is loaded into a computer.

But those are not the claims that are at issue here. Here, claim 44 is claiming a machine, which is statutory in Section 101.  It's not claiming a bingo game.  It's not claiming cards, dice, or a method for racing horses.  It does describe in the written description playing a particular game as a means to illustrate certain aspects of the invention, in particular, for example, the wildcard feature of the game that is claimed elsewhere.

But that's not what is being claimed in claim 44.  We think that the processor that is described in claim 44 is not merely a conventional game processor or a conventional processor circa 2006.  And I'll elaborate more on that in Step Two of the *Alice* inquiry.

Now, we recognize -- in closing on *Alice* Step One, we recognize that this is a close call.  The thing that differentiates claim 44 from the gaming cases that are relied upon by the defendants in their motion is really the fact that there is a specially configured game processor that is being claimed here and that this is not merely the description of the basic elements involved in playing a game, such as shuffling cards or allocating bingo playing pieces.

Now turning to slide 9, which introduces *Alice* Step Two in the defendants' motion to dismiss where they claim that claim 44 does not elevate the abstract concept of playing a

game to any type of patentable subject matter.

Assuming, for the sake of argument, that the court determines that the defendants are correct and that claim 44 is still to access -- and this is directed to the abstract concept of playing a game.  The *Alice* Step Two analysis shows that the claim contains a tangible element that is not, itself, well known or conventional --

*(Interruption.)*

*ATTORNEY HILL:*  -- such that claim 44 is transformed into patentable subject matter.  The Federal Circuit, in *In re Smith* --

*THE COURT:*  I'm sorry, Attorney Hill, not your fault --

*ATTORNEY HILL:*  Yes.

*THE COURT:*  -- but on my end, there were several emergency vehicles.  You may be able to hear them.  Could I just ask you to pause for a minute?

*ATTORNEY HILL:*  Yes, of course.

*THE COURT:*  And this is an important part of your argument.  If I could ask you to back up a step.  You had introduced slide 9, and you were explaining what it is about claim 44 under *Alice* Step Two that makes this an inventive concept.  It's an important point.  I don't want it to be lost.  Can you back up a step and begin that section of your argument again?

*ATTORNEY HILL:*  I'm happy to.  Let's jump back to slide 8 for a moment.  If you look at slide 8, which has claim 44, and you look at Line 51 and 52, those lines recite "the game processor configured for."

Now, that "configured for" language is then followed by the remaining six rules, if you will, for implementation as configuration of the game processor.  But it's that "configured for" that we contend makes the game processor of slide 8 different than a conventional game processor or a conventional processor in general.

If you look at the Federal Circuit decision in *In re Smith*, which was cited in our brief, it's the Federal Circuit case from 2016, there the Federal Circuit held that a method of conducting a wagering game using a deck of cards was not eligible for patentability.

But in discussing Step Two of the *Alice* test, the Federal Circuit said, quote, This is not to say that all inventions in the gaming arts would be foreclosed from patent protection under Section 101.  We could envisage, for example, claims directed to a game using a new or original deck of cards potentially succeeding under Step Two of *Alice*.

So in *Aatrix*, we have a new data file.  In other cases, new software interfaces have been held patentable.  And the Federal Circuit suggested in *In re Smith* that a new or original deck of cards could be patent-eligible under Step Two.

But the defendants insist that a special processor -- and by "special," what I mean is specially configured so that it does more than just what a basic off-the-shelf processor or game processor would otherwise do -- is not eligible for protection under Step Two as the something extra that is concrete and sufficient to elevate a patent beyond the realm of a mere abstract idea.

If you look at our slide 10, this is just to illustrate the point that there's a difference between general purpose processors and a special processor. We're not trying -- when we use phrases like "enhanced processor" or "special processor," we're not using that terminology in any way other than to differentiate that this is not something that was conventional, that you could go buy off the shelf at an AV Electronics or a Radio Shack or a Best Buy.

If you go purchase an Intel processor and snap it in your PC or you purchase an ARM processor and you snap it into your cellphone, it may very well be able to operate those devices as a general processor is designed to do. However, if you snap it onto the motherboard of your gaming terminal, it is not going to act as the game processor of claim 44 because it lacks the configuration that claim 44 requires of the processor.

That is -- and we understand, by the way, while we're on this point, that the processor and configuration of the

processor described in claim 44 is judged through the looking glass of a person of ordinary skill in the art.  That's always a test.

And so our contention, of course, is that a person of ordinary skill in the art would understand that the references to "processor" and "embedded processor" highlighted in defendants' slides 19 and 21 are references to one and the same processor.

It's a processor that is specially embedded on a gaming board, and it is -- and it has firmware in the processor that actually allows the processor to act in the manner consistent with its design.  Firmware is what allows a processor to carry out programming instructions that are embedded in the processor ab initio.

So that is -- we recognize that the defendants have critiqued the distinction of a special processor versus a general processor by going into the specification rather than looking at the plain language of claim 44 and saying, well, there are only two references to "processor" in the specification.

That's really beyond the point because you don't judge the -- you only judge *Alice* Step Two through the elements of the claim itself.  And the elements of the claim lay out that this is a game processor, but it's not just any game processor, any game processor circa 2006, it is a game

processor that is specially configured in the manner that claim 44 goes on to specify, including the testing and preview of a game prior to gameplay.

*Alice*, by contrast, noted that the transformation into a patent-eligible application requires more than simply stating the abstract idea while applying the words "apply it."

Here, to carry that to its logical end, if the abstract concept called for in the defendants' motion is playing a game, claim 44 would merely state the abstract concept of playing a game and apply it on a general purpose computer, but that is not what claim 44 is doing.

Claim 44 is actually doing considerably more than that in its description of how to specially configure a gaming processor in order that when it is applied, a game of chance can be elevated to a game of skill.  The actual nuance of the game is not specifically laid out in claim 44, which makes it different than the gaming cases relied upon by the defendants' motion.

Slide 11 is the claim at issue in *Aatrix*.  And in *Aatrix Software*, of course, what they looked at was that this claim, while describing the abstract concept of data processing, nevertheless contained an element, a data file, that raised a factual issue over whether or not that data file, as claimed, was merely conventional or well understood at the time of the patent.

And turning to slide 12, you get the critical inquiry of *Alice* Step Two in the *Aatrix* decision where they state that the second step is satisfied when the claim limitations involve more than the performance of well-understood, routine, and conventional activities previously known to the industry.

This is our entire point, that the special game processor, when it is configured to carry out specifically the testing and preview steps that are in claim 44, is doing -- is a processor that is doing more than merely performing well-understood, routine, and conventional processor activity that were previously known in the industry. And that is a question of fact that is inappropriate for resolution on a motion to dismiss.

I also note that the en banc Federal Circuit voted eleven to one to deny rehearing. And in the plurality opinion that Judge Moore issued on that issue in *Aatrix* noted that this is an unremarkable proposition, that what would have been well understood, routine, and conventional to a skilled artisan at a particular point in time is a question of fact.

Now, slide 13 goes on to lay out the fact that there is a sliding scale of conventional to novel. When we use these types of terms, on the one hand, "conventional" is referring to the most ordinary things in the eyes of a person of skill, and it goes all the way up to "novelty," which is something that a person of ordinary skill in the art has never encountered

before.

We're saying that this particular game processor, configured in the way that it is called to be configured in claim 44, is not well understood, and it, in fact, goes all the way to the opposite end of the continuum and is shown to be novel in the evidence and pleadings of record.

Slide 14 shows the quote from *Berkheimer* suggesting that whether something is well understood, ordinary, or routine goes beyond what was merely known in the art.  In other words, it imposes a higher burden of proof to show that something was well understood or conventional than to merely say that it may have been pointed to in some piece of prior art, however obscure.

But we show in the pleadings, in Paragraphs 28 and 29 of the amended complaint, for example, that this is actually a novel game processor.  And if you turn to slide 15, you can see the specific configuration of the game processor to test and then preview.  In the manner called out by claim 44 are things that were not known prior to that point in time, making this processor truly novel as opposed to being truly well understood or conventional.

And there is evidence in the record, starting at slide 16, that shows that this patent did entail a review of various prior art references before it was issued.

And if you look at slide 17, this is the quote

reproduced from Paragraph 29 of the amended complaint where the patent examiner specifically stated with respect to issue claim 44 that it distinguishes over the art because the prior arts don't teach a system of playing an electronic game testing the game field prior to displaying the game.

So there's nothing in the allegation of -- there's nothing in the '223 patent itself or in other evidence that contravenes the well-pled allegations of Paragraphs 28 and 29 of the amended complaint.

I'm going to pause there for a second before transitioning to the infringement issue just to wrap this up.

The notion in certain -- in one of the slides that the defendants presented is that you cannot have the abstract idea be the alleged inventive concept of *Alice* Step Two.  We are not claiming that the abstract idea of playing the game is the inventive concept in *Alice* Step Two.

Rather, we are claiming that a game processor specially configured to test and preview in the manner described in claim 44 goes beyond the abstract concept of playing the game and renders a fact issue over whether or not the patent is eligible subject matter under Section 101 as opposed to merely being an abstract idea subject to the judicial exception, Section 101.

On the infringement framework, I'll be very brief.  We have a fundamental disagreement over what the standard is.  I'd

like to refer the court to a recent case out of Delaware, *CoolTVNetwork*, 2019 Westlaw 4415283, which contains an excellent discussion of the notice purpose of the patent infringement pleading requirements.

It is a good case because it involves similar disputes over whether or not certain images shown of the accused products actually met various claim terms.  And it resolved the motion to dismiss by denying it on the basis that whether or not there may ultimately be infringement is not what is tested at the pleading stage.

At the pleading stage what is tested is whether or not the complaint sufficiently alerts the defendant to what it is in the accused product that is accused of infringing the claim.

And there is an excellent discussion in the *CoolTVNetwork* case of the Federal Circuit's recent decision in *Nalco* and how -- and a distinguishing of the *North Star Innovations* case that is relied upon by the defendants in their reply brief.

When the proper standard is applied to the paragraphs of the amended complaint that are in question relating to elements 44.4 and 44.5, the court can see that there is a very specific representation that is being made.

For example, if you turn to slide 19, you can see that in slide 19 we've pointed out --

THE COURT:  Well, actually, Attorney Hill, I'm just

going to ask you to pause for one second.

*ATTORNEY HILL:*  Yes.

*THE COURT:*  I do want to hear your arguments on slides 19 and 20, but can you provide the citation you were just discussing?  I think you said Cool TV -- I didn't catch the case name or the citation.

*ATTORNEY HILL:*  Network, 2019 Westlaw 4415283.

*THE COURT:*  And did you say that's District of Delaware?

*ATTORNEY HILL:*  It is a District of Delaware decision from late last year, I believe.

*THE COURT:*  All right.  Thank you.  And I'm sorry, I didn't mean to take you off your argument.  You were on slide 19.

*ATTORNEY HILL:*  No problem.  So here we are on slide 19 looking at the pay table that is highlighted.  But if the court reviews the allegations of Paragraph 68 and Paragraph 100, there is a detailed discussion of how the pay table represents a processor-based construct for implementing the determination of the various winning combinations and payouts for each game.

Now, in their reply brief at Page 15 and 16, we are criticized because the preview -- the game preview, prize viewer boxes shown in the photos captured and reproduced in the amended complaint do not show win, so how can that show a

winning combination?

If the court will look at slide 20, you will see an example picture from Paragraph 55 of the amended complaint showing a winning combination. And where it says 75 cents, that ties to one of the winning combinations of the pay table that has the value that is associated with 75 cents.

It's very difficult, just taking a step back, to imagine that you'd have an electronic game that isn't capable of determining at least one winning combination per each play of the game.

Whether -- I don't really care to get into some of the more claim construction oriented arguments that the defendants are making because claim construction is typically premature at this stage, but we have clearly pointed out with specificity and therefore put them on notice of what the accusation of infringement is.

The same thing goes for the testing allegation. The court reviewed allegations at amended complaint Paragraph 32. You can see where the allegation is made that Banilla Games, as POM of Pennsylvania became increasingly commercially successful with its games, Banilla Games began copying the testing and preview elements and implementing them on special game processors that they then, in turn, sell to the defendants for marketing and sales inside the State of Pennsylvania.

THE COURT: Okay.

*ATTORNEY HILL:*  Amended complaint Paragraph 71 --

*THE COURT:*  Attorney Hill, you're at the end of your time.  I think you have detailed those allegations pretty thoroughly in your opposition brief, haven't you?

*ATTORNEY HILL:*  Yes, we have, Your Honor.

*THE COURT:*  All right.

*ATTORNEY HILL:*  And we're happy to stand on that, unless Your Honor has any questions in the question phase or anything that you'd like me to address specifically about that in our rebuttal.

*THE COURT:*  Thank you very much.  All right.  So we have ten minutes reserved for defendant, five minutes for plaintiff.  I'm going to put you on hold for just one moment, and then I'll launch into some questions.  Okay, counsel?

*ATTORNEY GORMAN:*  Yes.

*(Brief recess.)*

*THE COURT:*  Okay, counsel, I am back.  And these are really in no particular order, so bear with me.  The first question is for plaintiffs.

So, Attorney Hill, I'm not sure I'm completely understanding whether you agree or not that claim 44 is representative for purposes of this infringement suit.  Can you explain to me whether you agree or disagree with defendant on that specific point?

*ATTORNEY HILL:*  Claim 44 is representative.

*THE COURT:* So that is not in dispute?

*ATTORNEY HILL:* Correct.

*THE COURT:* Okay. Turning to defendant, Attorney Gorman, you have cited a number of cases -- both in your brief and then they are incorporated into one of your slides -- that discuss different types of games, and you've provided the specific citations. This is incorporated into slide 18.

*ATTORNEY GORMAN:* Yes, Your Honor.

*THE COURT:* My question for you is, in the post-*Alice* universe of cases, so from later 2014 on, could you identify for me what case, either from the set that you've identified or another case, that you think is the most factually analogous case to this case finding a patent invalid under Section 101?

*ATTORNEY GORMAN:* Your Honor, I think it's the *In re Smith* case that we cite there. It's also, interestingly, the case that plaintiffs' counsel just discussed. But it dealt with basically a new way of playing a game with an existing card pick.

And while, in fact, that -- I mean, that's essentially what these claims are, too. They're taking basically "game processor" and they're saying the point of novelty is they're playing -- a new way of playing this particular game where you preview what the game is going to be before the game is actually played.

So if I had to pick one, Your Honor -- I love them all

so much, but if I had to pick one, I'd pick that one.

THE COURT:  Okay.  Thank you.  Now, basically the same question, but let me pose this question to plaintiff.

In the post-*Alice* universe, what would you say is the most factually analogous case finding a patent valid or declining to rule at the motion to dismiss stage because of a fact issue?

ATTORNEY HILL:  Probably -- it's difficult, Your Honor, because there are bits and pieces of analogies.  I'm going to look at two district court decisions.

One is *Ameranth v. Genesis Gaming*, where at Step One the court was quick to point out that it's not the court's role to develop the theories of what the abstract notion is for the parties.  And a district court case out of the Eastern District of Texas, *Maxell v. Huawei*, 2018 Westlaw 4179107, where the court applied *Alice* Step Two in denying a motion to dismiss stating that the technology as claimed was not merely reciting a generic component for performing a known conventional activity.

That's exactly -- that encapsulates exactly what our argument is, a special processor of claim 44 is not a generic processor for performing conventional activities that were known in 2006, whether a processor or in gaming in general.

THE COURT:  Okay.  And I want to make sure I get those citations.  The first case you referenced was -- I think you

said *Ameranth v. Genesis*.  Did I hear that correctly?

*ATTORNEY HILL:*  Correct, 2014 Westlaw 7012391.

*THE COURT:*  And what court is that from?

*ATTORNEY HILL:*  Central District of California, 2014.

*THE COURT:*  Okay.  Thank you.  And then the *Maxell* case, what was the --

*ATTORNEY HILL:*  2008.

*THE COURT:*  First, what was the case name?

*ATTORNEY HILL:*  *Maxell*, M-a-x-e-l-l, v. *Huawei*, H-u-a-w-e-i.

*THE COURT:*  Okay.  And the citation?

*ATTORNEY HILL:*  2018 Westlaw 4179107.

*THE COURT:*  And which court is that case issued from?

*ATTORNEY HILL:*  I believe that's Judge Gilstrap in the Eastern District of Texas.

*THE COURT:*  All right.  Now, I want to make sure -- let's focus just on *Alice* Step One for a moment.  Start with defendant.  I think I understood from your argument that the abstract idea, in your view, is -- I wrote down a method of gameplay.  Am I understanding your position as to what the abstract idea is, Attorney Gorman?

*ATTORNEY GORMAN:*  Yes, Your Honor.  Just to augment that, it's a way of playing a particular game.  I mean, at the highest level, it's a way of playing a game that displays to the player what the game is before the player plays the game.

And so, you know, there are, I think as plaintiffs call them, six rules to playing this game.

It is that way of playing the game that is the abstract idea, again, to be carried out by a human in all aspects. And, in fact, I don't think I've heard plaintiffs, even in their argument today, challenge that, in fact, all of these steps could be carried out by a human, which I think the case law makes it an abstract idea.

*THE COURT:* Okay. Let's pause there. Thank you for that answer, Attorney Gorman.

Turning to Attorney Hill, you heard what Attorney Gorman said. I did hear you say earlier in your argument that you concede that the issue at *Alice* Step One is a, quote, close call. I want to give you the opportunity and I'm going to ask you to respond specifically to this argument about the -- respond to the argument that the abstract idea here is a method or way of playing a game. Attorney Hill, are you there?

*ATTORNEY HILL:* Sorry, Your Honor, the mute button got me there. If you can turn to slide 6 of our presentation, I have highlighted the brief in contention that the defendants make regarding what the abstract idea is. They said the abstract idea is playing a game.

We disagree with that, and I think what is happening is that there's a little bit of shifting sand going on here, because the argument that I heard today is method of gameplay.

I'm not sure that a method of gameplay is any different than playing a game, but to the extent that it is, I would say the six rules that are laid out in claim 44 are not -- they are not the rules of the game because the claim is utterly agnostic as to the game that is being played.

Instead, the six rules are more like establishing almost an architecture or a platform for taking the notion of a game that is a game of skill and elevating it to a game of chance when it is loaded onto that platform.

If you look at the Federal Circuit's decision in *McRO*, you'd see that where the -- the rules in *McRO* for automated facial recognition, these rules were not improving the functioning of a computer, but they were rules that were not conventional, meaning that they were not the rules that people used in the prior art who were doing facial recognition.

On that basis, the rules were determined to pass muster under *Alice* Step One, meaning they're nonabstract.

*THE COURT:*  Okay.  You would agree --

*ATTORNEY GORMAN:*  Your Honor, may I --

*THE COURT:*  Attorney Hill, you would agree with me that any game, for example, a card game or a dice game, has rules of play.  Right?

*ATTORNEY HILL:*  Of course.

*THE COURT:*  So the rules -- and I'm looking at slide 8 of your presentation which delineates claim 44, these are

rules, are they not?

*ATTORNEY HILL:* I think it's fair -- if you take starting with "constructing a field" at Line 53 and you take that language all the way to the bottom of the claim and you evaluate it -- and I think it's fair to characterize those as rules -- they are rules for setting up a game to be played, not necessarily for playing the game.

*THE COURT:* Okay. So I understand -- let me see if I can articulate back to you what I'm understanding, because this is a very nuanced point.

Defendants' argument is these -- what I see on claim 44, elements (a) through (f) that the game processor is configured for, defendant is characterizing as the rules of a game. And I understand you to be -- you are taking issue with that argument, and your distinction is, no, these are rules that make the game processor able to convert a game of chance to a game of skill, not limited to any specific game.

Now, feel free to correct me, but that's what I'm understanding at this point.

*ATTORNEY HILL:* That's correct.

*THE COURT:* Okay. Let me ask Attorney Gorman to respond to that. I want to give you an opportunity to respond to that distinction.

*ATTORNEY GORMAN:* Well, Your Honor, they're not just rules for the processor, because as plaintiff has conceded,

claim 44 is representative of all the claims.  These rules are in all the claims, whether there's a processor or not.  They're rules of how to play the game.

If I sat down with my ten-year-old son and I told him I was going to play the game this way, I was going to lay out the cards on the field and I was going to first check to make sure that he didn't win too much and then I did something that wasn't the way that I had said, he would have said, Dad, you broke the rules.

So it's not just these are technological rules, these are rules of how to play the game.  The only difference in claim 44 as opposed to the other claims is that they're saying, oh, and then the processor will be used to do these rules.  But they're still abstract rules on how you play the game.

*THE COURT:*  Okay.  When I say "okay," I'm not indicating -- I'm just indicating an understanding of your arguments.

Turning to *Alice* Step Two, the inventive concept prong, I think I understand both of your arguments.  You both really focused in very nicely on this in your arguments.  I do want to -- just a technical question directed to Attorney Hill.

I think I understood correctly from your brief, but I want you to correct me if I'm wrong, yours is an elements only argument, not an ordered combination argument.  Is that right?

*ATTORNEY HILL:*  That's right.  The game processor as

configured is an element.  It's not a method claim, so these are not what follows in the configuration, it's not the ordering of steps.  It's describing the configuration of the game processor, so it's a single element.

*THE COURT:*  Okay.  Turning to you, Attorney Gorman -- and I know that you sort of ran out of time before you had an opportunity to delve into the *Iqbal/Twombly* portion of your argument.  You characterized in your brief claim element 44.4 and claim element 44.5 as not a plausible claim of patent infringement.  You referred to those as implausible patent infringement arguments or claims.

What factual allegations would be sufficient, in your view, to plausibly state a claim for patent infringement with respect to this specific claim?

*ATTORNEY GORMAN:*  Well, Your Honor, you have me at somewhat of a disadvantage because I'm frankly not sure that plaintiffs could, consistent with Rule 11, actually plead facts that would make it plausible.

But, you know, if we're drawing from an infinite -- any fact that's possible, if they pointed to some fact that would suggest that the processor actually was carrying out the step, not that it was possible that it was, but something more than possible, that might be able to do it.

But there has to be some fact in that regard.  And pointing to the pay table, for example, in these screens is

equivalent of putting a sticker on the side of these machines and saying, by the way, if you see three diamonds, you could get a hundred dollars.  If you see three clovers, you could get two hundred dollars.

It's not indicating at all what a processor is doing. There's nothing in sort of the gameplay of the computer that says, ah, because this step follows this step, you're seeing that the processor had to get there.  There's certainly nothing like that.

For the testing component, you know, I think what it boils down to is they allege that they have done some testing and said, boy, every time we've tested this, they pay out the prize that they say they're going to pay out, therefore this processor must be testing.

And it just simply doesn't acknowledge the possibility that it's not just chance that you get to these -- or serendipity, in their words, that you get to the results of these games, and it doesn't necessarily have to be testing, there could be another way.

It could be that you have a deck of cards where all of the face cards are at the front and all of the non-face cards are at the bottom.  And without testing, you know that the first twelve cards from the top of the deck are going to be a face card because you know there are twelve face cards in a deck and you know they're all at the top.  You don't have to

test, you don't have to rely on luck.

So a fact that doesn't make it more than possible would have to be what you had in there.

*THE COURT:*  But, Attorney Gorman, at the pleading stage, right -- so plaintiffs don't have access to your client's game processors, so at the pleading stage, what is the test you would have me hold them to?

I understand that you're saying the words "possible" versus "plausible," but for the purpose of making a pleading, they've done some degree of testing and they have stated factual allegations about what they believe that testing shows.

What additional allegations would you have me require of them at this pleading stage?

*ATTORNEY GORMAN:*  So, Your Honor, first let me say with respect to the *CoolTV* case that plaintiff cited, I don't think that's been cited in the briefs, so I'm at somewhat of a disadvantage to state, you know, how that relates to this.

But separate from what may be in that particular case, before the plaintiffs are to bring suit, they're supposed to have a Rule 11 basis that satisfies that there is a reasonable basis for the fact that the accused devices practice all the limitations of the claim.

So what facts would they need?  It's what are the facts that would make them think it's not just possible that once they get in discovery, they'll figure out if there's

infringement, they're supposed to have a Rule 11 reasonable basis to do that from the outset.

So if, for example, they had gotten their hands on a particular game and when they got their hands on a particular game, they were able to crack it open and perhaps reverse-engineer it and perhaps say, what we've been able to determine is the code says this, or if they're able to say, look, there are these three steps that we do again and again and again which shows that this step must be happening, but under *Iqbal/Twombly*, you don't just get to say, well, we think that this might be happening and let's get into discovery to figure out if that's the case.

THE COURT:  All right.  Let me stay with you for a moment, Attorney Gorman.  At plaintiffs' slides -- let me direct you to the right pages.

Plaintiffs' slides 12, 13, and 14, I believe these are specifically referencing the *Aatrix* decision.  Do you agree that the *Aatrix* decision formulation of essentially, you know, in words what we see depicted as a pyramid at slide 13 is a relevant question to be answered in this case?

ATTORNEY GORMAN:  No, Your Honor.

THE COURT:  Why not?

ATTORNEY GORMAN:  The plaintiffs are confusing the concept of novelty with patent eligibility.  And you'll recall Mr. Hill said, at the outset of his argument, the issue here is

not obviousness, which is a novelty question, the issue here is one of whether or not this is patent eligible.

The fact that the patent office, prior to 2014, found that no one -- that the prior art didn't disclose these steps before only means that the potential way of playing a game may not be reflected in the prior art.

But even if you assume the facts to be true that no one had ever performed these steps before, the fact that they're new steps doesn't change the fact that they're an abstract idea.  And placing the steps, even new steps, in a generic technological environment does not rescue it from a patent eligibility standpoint.  So the fact that there's no prior art out there pointing to the fact that this is the case doesn't save that.

And, in fact, the *ChargePoint* case which we reference at slide -- it's in our reply brief, and it's at slide 23 of the materials that I presented to you, Your Honor, this is sort of a point that they reinforce there.  Because if it, in fact, is an abstract idea, novel or not, even if you assume it's unconventional steps, the fact that these steps, which are, as plaintiffs concede, not some sort of ordered combination, if they don't reflect some sort of technological advance or technological, you know, innovation with respect to the processor, then all they're relying upon as the inventive concept is the abstract steps themselves.

And as *ChargePoint* determined at the motion to dismiss phase looking at the claims and the specifications, that that inventive concept was really just the abstract idea, if the abstract idea happens to be new rules, that doesn't change the fact that it's an abstract idea.  So the novelty issue is not what guides the analysis, Your Honor.

*ATTORNEY HILL:*  Your Honor, could I respond to that?

*THE COURT:*  Well, hold on.  I just want to ask Attorney Gorman, but that analysis would apply at Step One. Under *Alice* Step Two, in making a determination -- assume for a moment, Attorney Gorman, that I were to determine that -- I would agree with your view that this is a method for playing a game which is an abstract concept and now I'm doing inventive concept analysis under *Alice* Step Two.

How do I do that analysis without looking at whether this particular method of playing a game was a novel or inventive concept in 2006 without delving into some analysis of facts?

*ATTORNEY GORMAN:*  So this is the point, Your Honor, I was trying to make and I probably didn't make all that well in my opening, that even if you assume that the allegations in the first amended complaint, that these ways of playing the game were novel, that still doesn't get you there for *Alice* Step Two.

And the *Aatrix* case is actually a good example of

that.  If you read that case, the reason why there was an inventive concept that was found is because the inventive concept represented a technological improvement.  It's not just something new, it's something new that is advancing technology that was a computer development in that particular case.

If the new thing is just simply an abstract idea, then -- you know, even if no one had carried out that abstract idea before, that doesn't render, for example, in this case, the game processor as the inventive concept because the game processor is merely carrying out the abstract idea in a generic environment.

And, you know, again, simply carrying out on a conventional computer component new steps doesn't render that component to be the inventive concept.  And here they're trying to argue the game processor is what the inventive component is.  But all the game processor is doing is carrying out these aspects, these rules, what have been conceded to be rules of playing this game.

*THE COURT:*  Thank you, Attorney Gorman.  Attorney Hill, please go ahead and respond to this issue.

*ATTORNEY HILL:*  Thank you, Your Honor.  So I'm going to begin by addressing the novelty issue as it relates to patent eligibility in general.

Let's begin with the *Mayo* case, United States Supreme Court case, 566 U.S., this is at Page 90, quote, In evaluating

the significance of additional steps, the Section 101 patent eligibility inquiry and, say, the Section 102 novelty inquiry might sometimes overlap.  This language was specifically noted, as well, by the Federal Circuit in the *Aatrix* decision, 890 F.3d at 1355.

When you make *Alice* Step Two into an inquiry -- and I'll refer you to our slide 12 so that we -- or, actually, yes, slide 12, the box in the top right-hand corner of the slide. When you make the second step of the *Alice* test dependent upon whether or not a claim element involves more than the performance of well-understood, routine, and conventional activity, you are likely to bring the question of whether or not there is a novel aspect to, for example, a specially configured processor into play.  There's no tension there.

Yes, they are overlapping concepts, but they're not at odds.  They're not working at odds.  And they serve different purposes in Section 102 for evaluating the *Alice* exception to the statutory patentability of a machine versus, say, the novelty of the ordered combination of the elements in a claim under Section 102.

They still use the same vocabulary, and you're still talking about -- in this case, you're still talking about a processor that is specially configured in such a way that that processor is a claim element that is not, circa 2006, well understood, routine, or conventional.

Moreover, the activities carried out by the processor in terms of the testing or preview of the game are not what the Federal Circuit referred to here in the quote, conventional activities previously known to the industry.  The examiner found exactly the opposite, and that's what we highlight in Paragraph 28 and 29 of the amended complaint.

*Aatrix* is not confined to situations where the patent claim at issue improves the functioning of a computer. Admittedly, those were amongst the allegations of the complaint in that case, but *Aatrix* does not couch its holding as hinging on whether or not the claim element or claimed combination is a well -- is not a well understood, routine, or conventional act that improves the functioning of a computer system.

There are many cases that have picked up on the dicta in the *Alice* decision, but *Alice* itself, the language was very clear that looking at whether or not the performance of the computer is improved is, quote, for example, unquote, a way of surviving Step Two of the *Alice* test.

*Alice* there differentiated that hypothetical from what it found were the facts of the case where the idea of intermediated settlement was claimed on a, quote, unspecified generic computer, unquote.  Here, we don't have an unspecified generic computer or processor.  We have a highly specific and special, specially configured processor that was not known prior to the application that led to the issuance of the '223

patent.

And the *ChargePoint* decision that Mr. Gorman relies upon is easily distinguished because there the plaintiff wasn't even arguing that there were allegations in the complaint over whether or not there was a fact issue for the court to take into consideration regarding *Alice* Step Two.  Instead, there was merely analysis by the court of *Alice* Step Two referring internally to the contents of the specification itself.

Here, the specification is utterly silent on whether and to what extent the processor specified in claim 44 is or is not conventional.  And the evidence of record, referring to the statements by the patent office and the evidence that was considered during patent prosecution, do not contradict the allegations of the amended complaint that, in fact, the processor specially configured for testing and preview is not well understood or conventional circa 2006 and the activities performed by that processor were not conventional activities circa 2006.

*THE COURT:*  Okay.  So, Attorney Hill, just let me make sure I understand this.  You are not claiming that your client invented the game processor itself.  Right?

*ATTORNEY HILL:*  Correct, not a generic game processor as it existed in 2006.

*THE COURT:*  Well, okay, just follow through with me for one minute, though.  You're not claiming that plaintiffs

invented a game processor.  Right?

I understand your argument to be that your clients invented the special configuration for the game processor.  Am I understanding that incorrectly?

*ATTORNEY HILL:*  Yes, in terms of the way that the -- and just this is -- I mean, we're almost --

*THE COURT:*  Well, what is --

*ATTORNEY HILL:*  -- dancing on the head of a pin.  But specifically --

*THE COURT:*  What is a game processor?  Attorney Hill, I mean, be really basic here.  What is a game processor?

*ATTORNEY HILL:*  Right, a game processor is an embedded processor on a motherboard that is programmed to play a specific type of game.

*THE COURT:*  Okay.

*ATTORNEY HILL:*  So, for example, a game processor for a slot machine, you would have a game processor for a slot -- for an electronic slot machine, which, preprogrammed to play slots, it would have a random number generator in it, as part of it, to be able to create all of the combinations that are necessary in order to randomize the game.

*THE COURT:*  And is a game processor a computer?  Is it a piece of hardware?

*ATTORNEY HILL:*  Yes.

*THE COURT:*  Okay.  So you're not claiming that your

clients, the plaintiffs, invented the hardware.  Right?

*ATTORNEY HILL:*  The hardware of a processor, no.  The firmware, the firmware of the processor of claim 44 is something that has been the subject of the '223 patent.

*THE COURT:*  Okay.  And could I understand that the firmware of the processor is the means by which the configuration is accomplished?  Is that correct?

*ATTORNEY HILL:*  That is correct.  Every processor has firmware, Your Honor.  An Intel processor that's snapped into the motherboard of your PC, it has firmware embedded in it before it ever encounters an operating system or any other type of application software.

*THE COURT:*  Okay.  Let me turn back to Attorney Gorman for a moment.  Attorney Gorman, I'm looking at your slide 19, and you explained in your argument that the only times that the words "game processor" are mentioned in patent '223 is what you have listed on slide 19.  Did I understand that argument correctly?  Are you there, Attorney Gorman?

*ATTORNEY GORMAN:*  I'm sorry, Your Honor, I was on mute.  Can you hear me?

*THE COURT:*  Sure.  So did I understand correctly at your slide 19, your position is the only two times the words "game processor" are mentioned in the '223 patent are those depicted on slide 19?

*ATTORNEY GORMAN:*  The only two times that they're

mentioned in the specification, Your Honor.  They're also mentioned in the patent claims.

*THE COURT:* Okay.  And that is my question, because I'm looking at slide 8 in plaintiffs' presentation, and here clearly the word "game processor" appears twice on slide 8 in claim 44.  So what is the difference between the specification and claim 44, which we now all agree is the representative claim?

*ATTORNEY GORMAN:* Of course, Your Honor.  So the question before Your Honor is whether the claim -- the claims at issue, which are what are being asserted in the case, which is what plaintiff has to show are infringed, whether or not those are eligible under Section 101 or not.

The case law discusses that when you are to be evaluating what the claims are directed to, you can look to the specification to determine to what extent these claims are directed to, for example, the six rules of gameplay or to something else.

And so my purpose of walking through the specification was to highlight the point that the patent in general and as a whole, just like the claims, is really directed to the particular way of playing the game.

And my point of referencing "game processor" is if you look at these other cases and they look to portions of the specification, you'll see that there will be frequently

instances where the specification is talking about the novel aspect of something that's in the claims that the courts then say, all right, well, then there's these statements about whether or not these aspects of the claims are innovative and why and what they're doing to advance the art, whether it be technologically.

Is your question, though, Your Honor, more basic as to what is a specification?

*THE COURT:* Sure, because I thought you were making a fairly significant point in your initial argument that, hey, look, the only time the words "game processor" are mentioned are depicted on this slide. And so you seem to be kind of walking that back and saying, well, but you really need to look at specifically the language of the claim, which is what's depicted in slide 8 in plaintiffs' presentation.

So I guess I have sort of lost a little bit of understanding of what the significance of the specification is.

*ATTORNEY GORMAN:* Sure. Okay. And my apologies. There's no question, Your Honor, that the *Alice*, the *Alice* analysis begins and ends with the claims because those are what's actually asserted in the case.

Now, the specification is essentially that portion of the patent before the numbered claims that come at the end. And so the specification, you'll see cases that talk about it breeding life and meaning into aspects of the patent, and if

you read these cases, they're all looking at the specification as guidance as to what the invention is about.

So my only point -- I certainly didn't mean to suggest that "game processor" was not in the claims. And, in fact, if you look at slide 10 where I've put forth what that is, it says "game processor."

The point, though, is that "game processor" in the claims is just reciting to a game processor. It's not reciting to what Mr. Hill keeps characterizing as enhanced, specially configured, and all of this. And, in fact, if you look at the specification, the specification doesn't suggest that the game processor is sort of enhanced, specially configured. The specification says "game processor" to carry out some particular steps.

And, in fact, if you look at the slide that we prepared at slide 20, you're going to see that in the very next paragraph from the one on slide 19, there's a discussion in the patent about a computer readable medium, and you're going to see that the computer readable medium is described as having program instructions that carry out all the same things that they were talking about the generic game processor carrying out in the beginning.

So the point that I was trying to make was the claims and the specification supports that when you use the specification to help understand the claims, all of these

claims are directed to this type of gameplay, not to the game processor.

*THE COURT:* And I understand your point. I do. Okay. That exhausts my questions, so I'm going to go back and allow plaintiffs' counsel, you have five minutes remaining, and then, Attorney Gorman, on behalf of defendants, you'll have the last word with ten minutes remaining.

Counsel, do you need a break or are you prepared to wrap up?

*ATTORNEY HILL:* We're prepared to wrap up for the plaintiffs.

*THE COURT:* All right.

*ATTORNEY GORMAN:* And for the defendant.

*THE COURT:* Thank you. So let me begin with Attorney Hill.

*ATTORNEY HILL:* Thank you, Your Honor. I want to pick up with the last issue that Mr. Gorman was laying out regarding the defendants' position about the interplay between the claims and the specification.

I think at a fine level the parties agree that the focus is -- first and foremost and at all times must remain on the claim. In a patent document, you begin with the written description of the inventor's preferred embodiment. That is, every aspect, characteristic of the invention is laid there for the world to see. That's the price the inventor pays in order

to get the patent monopoly.  To make a thorough disclosure, it has to be sufficiently, adequately detailed to enable practice of the invention.

We're not here to decide the adequacy of that specification in terms of how it would be perceived by a person of ordinary skill in the art.  Those issues are reserved for Section 112 analysis at a later point in the case, if at all.

But what we are here to do is look at what the *Enfish* decision said, to look at the claim at issue as a whole. That's true for Step One as *Enfish* made clear.  And *Aatrix* makes clear that the focus for *Alice* Step Two is on whether, for the claim at issue, there is an element or an ordered combination of elements that are -- that either alone or in combination with others are -- present something more than well understood, conventional, or routine activities in the industry to a person of ordinary skill in the art as of the time of invention.

So the red herrings that have been thrown out are attempting to conflate the language of claim 44 with the references in the specification where it relates to the plain language of the claim that the game processor in claim 44 is not merely being claimed as a conventional game processor, but is specifically configured for testing and previewing the game before it is played.

Secondly, there are other claims that are not at issue

in this motion that are consistently being referred to by the defendant in an effort to try to shore up their argument against claim 44.  Claim 44 is a representative claim, and what that means is that we are allowing the court to look at that claim, and we are saying that if this claim doesn't survive, then the litigation doesn't survive.

We're not saying that claim 44 is commensurate in scope with all of the other claims of the '223 patent that are not at issue in this case.  So for them to point to some other claim and to say claim 44 is representative, therefore we should be able to look at all of these other claims and see whether or not they can help tilt the scale in our favor on the claim 44 analysis, that's improper.

Lastly, with regard to the computer readable medium, this claim discussion, because we do have other claims that recite a computer readable medium, such as claim 75, but this highlights exactly the point, every one of these claims in the patent is presumptively different in scope.

The inventor is allowed to claim different aspects of his invention or different potential implementations or embodiments of his invention in different places.  And all that's for the court to decide relating to *Alice* Step One and Step Two is based on direction to claim 44, the individual elements as they are stated in claim 44.

Yes, the specifications can help to clarify any points

of ambiguity that may come up about how a specific term should be understood through the eyes of a person of ordinary skill in the arts, but it ends there.

So when that analysis is properly applied -- at least with respect to *Alice* Step Two, we've shown that there is a fact question regarding whether or not a game processor specially configured for testing and previewing a game before the game is played is novel and not well-understood, routine, or conventional activity as of 2006.  That point is made abundantly clear by concrete factual allegations in Paragraphs 28 and 29 of the amended complaint.

And based on the *Aatrix* decision, the express language used by the Federal Circuit with regard to what *Alice* Step Two looks at and the fact that it is, when properly pled, a factual issue for the court's determination after discovery has been conducted, on that basis and that basis alone, the motion to dismiss on eligibility should be denied.

*THE COURT:*  All right.  And I understand your argument.  Thank you, counsel.  Attorney Gorman.

*ATTORNEY GORMAN:*  Thank you, Your Honor.  Let me sort of jump around and try and close a loop on a number of various points, and then I'll wrap up.

First, it seems from plaintiffs' counsel's last argument that the issue of representative claim is somehow at play again.  To be clear, the case law says that there's a

representative claim when all the claims are substantially similar and linked to the same abstract idea.

And there's no question here that all of the claims, as you heard the discussion from both parties, all relate to these six rules. Sometimes they involve other aspects of it, sometimes they involve a different context in which they are coming out, but all of these claims relate to the same abstract idea of playing this game in this particular matter.

So claim 44 is a representative claim, and all of the claims are invalid if claim 44 is invalid because claim 44, too, is directed to this abstract idea like every other claim.

Sort of jumping around, the *Aatrix* case, I just would like to focus Your Honor on the fact that the *Aatrix* case, there are specific statements in there. The question about whether or not the fact allegations raise an issue of fact at the motion to dismiss phase, yes, there were facts that were raised at the motion to dismiss phase. But the facts that the court had to assume to be true were facts that led the court to say, if true, then there has been a technological improvement, and that would constitute a -- the inventive concept.

To quote from Page 1128, quote, There are concrete allegations regarding the claimed combination's improvement to the functioning of the computer. Quoting from 1127, quote, These allegations suggest that the claimed invention is directed to an improvement in the computer technology itself

and not directed to generic components performing conventional activities.

So the case, like many of the other cases, is focusing on when you're looking at fact allegations, do those fact allegations, even accepted as true, will they be ones that would satisfy the inventive concept analysis.

And this leads me to my next point, which goes back to the novelty point. The novelty point may be, in some cases, an issue that's relevant to the patent eligibility analysis. So, for example, had the plaintiffs here alleged facts that, if true, would say that what they were doing was a technological improvement and then they further alleged that that was not conventional or well understood, the court would have to assume, at this stage, that the technological improvement was novel.

But here, what their allegations are is what is novel is not something that represents a technological improvement. As you heard Mr. Hill say, they didn't invent the processor. What they're doing is, they're using the processor in a way to carry out these steps which, even if you assume them to be novel, are still abstract steps.

So in this particular case, novelty isn't an issue, because even if you assume that they are right, that what they're saying that they were doing for the first time was novel, all they're saying is what they were doing is something

that does not represent an inventive concept.  There's no ordered combination to these rules of the game.  They've expressly disavowed that.  They have not suggested that there is some innovation or improvement in computer technology.

What this boils down to then is carrying out these abstract steps, and those abstract steps are not enough, separate from the novelty issue, to convert this into patent-eligible subject matter.

The other point that I'd just reinforce is the discussion about the claims.  The claims, Your Honor -- and claim 44 is a great example of this.  It takes the steps of the abstract gameplay and says a game processor does this.

It doesn't talk about firmware.  It doesn't talk about anything that's different about this processor in the claims -- and we can look to the specification, too, to reinforce that -- but in the claims to reinforce anything that this is a game processor that carries out this abstract idea.

Even if that's new, that doesn't mean that it's anything more than a generic game processor carrying out the steps.  Your Honor, are you still with me?

THE COURT:  I am.

ATTORNEY GORMAN:  Okay.  Good.  Now I'm gun-shy.  So, you know, there is no case and plaintiffs have pointed to no case that what they're doing rises to the level of an inventive concept, that they can simply take an abstract idea and say

that abstract way of doing something, even if no one has done it before, that abstract way of doing something, if it doesn't represent a technological advancement and there's not a particular ordered combination, they haven't cited to a single case that says that would satisfy *Alice* Step Two.

They keep saying that it's a highly specific, specially configured game processor. The claim says "game processor." It doesn't say anything about the firmware, it doesn't say anything about anything else.

The last thing I'll say, Your Honor, is there was some discussion -- well, I'll say two things. First, there was some discussion by Mr. Hill about the *McRO* case. The *McRO* case was also a case where, if Your Honor reads that, you're going to find that the court found that those claims contained, again, a technological improvement.

So while there were specific rules that were involved there, there was sufficient information in the record to allow the court to determine that the rules were improving the existing technological process.

But when there is nothing in the patent claims themselves or in the specification to suggest that those rules represent some sort of improvement from a technical perspective, then *McRO* doesn't stand for the proposition that you can just say "rules" and you're going to have patentability.

And then the last thing I'll say, Your Honor, is, there were a number of cases that were cited during Mr. Hill's argument: the *CoolTVNetwork* case, the *Ameranth*/*Genesis* case, the *Maxell* case.  I don't believe any of those cases were actually cited in the papers, and if for some reason Your Honor thinks that those decisions are going to be critical to Your Honor's decision, we would welcome an opportunity, once we've had an opportunity to actually review those, to comment on those, just so we're not, you know, sandbagged with cases that we've never heard before.  And that's all I have, Your Honor.

THE COURT:  Thank you, counsel.  It does appear to me -- well, actually, let me, on that very last point, Attorney Hill, it did appear to me that those cases were not cited in your opposition brief.  Is that correct?

Let me pull out your brief.  The reason I think they're not in there, I was looking for the citation while you were providing them and not finding them in your table of authorities.

ATTORNEY HILL:  You're correct, Your Honor, these are cases that -- for example, the *CoolTVNetwork* case we found when we Shepardized the case.  One other case was from -- I believe it was *North Star Innovations* was a case that they cited in their reply brief.  We saw it because it was a more recent decision.

THE COURT:  Okay.  So the *CoolTV*, *Ameranth*, and there

was a third case, *Maxon* or *Maxell*?  Wait, *CoolTVNetwork*, *Ameranth* --

ATTORNEY HILL:  *Ameranth* and *Maxell*.

THE COURT:  *Maxell*.  All right.  So because these cases, you relied on them and pointed to them specifically as being important cases for the court to look at, they weren't cited in your brief, what I'd like to do is ask you each to submit just a no-more-than-two-page -- it can be single-spaced -- letter brief following today's argument.  I'll give you a deadline.

I'll have plaintiffs' counsel submit a letter brief addressing those, the applicability of those three cases by Friday, and then I'll direct defense counsel to submit a responsive letter brief, again, limited to those three cases, no more than two pages, single spaced, by Wednesday of the following week.  The dates for those would be -- Friday is --

COURTROOM DEPUTY:  The 20th.

THE COURT:  The 20th and Wednesday is the 25th.  And I'll enter an order following the conclusion of this call setting those deadlines.  Do you have any questions about that, counsel?  Are we all clear on which three cases?

ATTORNEY GORMAN:  Yes for defendants, Your Honor.

ATTORNEY HILL:  Yes, Your Honor, for the plaintiffs.

THE COURT:  All right.  Well, thank you, counsel. This was very helpful.  I appreciate your slides.  Those will

be admitted to record as Plaintiffs' Exhibit 1 and Defendants' Exhibit 1.  This was very helpful, and I will look forward to receiving your briefs on Friday and Monday.

*LAW CLERK:*  Wednesday.

*THE COURT:*  I'm sorry, Friday and Wednesday.  I was writing and thinking at the same time.  Always dangerous.

*ATTORNEY GORMAN:*  Thank you very much, Your Honor.

*THE COURT:*  Thank you and have a good day.

*ATTORNEY HILL:*  Thank you, Your Honor.

*(Whereupon, the proceedings were adjourned at 11:44 a.m.)*

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Lori A. Shuey, Federal Certified Realtime Reporter, in and for the United States District Court for the Middle District of Pennsylvania, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-captioned matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated in Harrisburg, Pennsylvania, this 23rd day of March, 2020.

**/s/ Lori A. Shuey**
Lori A. Shuey
Federal Certified Realtime Reporter