# <u>EXHIBIT A</u>

# UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

BANILLA GAMES, INC.

Petitioner,

v.

SAVVY DOG SYSTEMS, LLC,

Patent Owner.

Case No. CBM2020-00014

Patent No. 7,736,223

————————————————————————————————————————

# PETITION FOR COVERED BUSINESS METHOD PATENT REVIEW
## OF U.S. PATENT NO. 7,736,223
### CHALLENGING CLAIMS 1-75

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

**TABLE OF CONTENTS**

PETITIONERS' EXHIBIT LIST ...........................................................................V

I.      INTRODUCTION ...................................................................................1

II.     MANDATORY NOTICES .......................................................................1

        A.    Real Party-in-Interest (37 C.F.R. § 42.8(b)(1)).................................1

        B.    Related Matters (37 C.F.R. § 42.8(b)(2)). .......................................1

        C.    Counsel (37 C.F.R. §42.8(b)(3)) and Service Information (37
              C.F.R. §42.8(b)(3)-(4)). ...............................................................1

III.    FEES ......................................................................................................2

IV.     THE CHALLENGED '223 PATENT......................................................2

V.      LEVEL OF ORDINARY SKILL IN THE ART.........................................4

VI.     GROUNDS FOR STANDING (37 C.F.R. § 42.304(A)) .........................4

        A.    Petitioner Has Standing and Is Not Estopped. .................................4

        B.    The '223 Patent Is a CBM Patent.....................................................6

        1.    The '223 Patent Claims Involve a "Financial Product Or
              Service" Because They Cover Determining and Value-
              Testing "Winning Combinations" For an Electronic Game
              Which Players Play In Hopes Of Winning Financial Payouts.........7

        2.    The '223 Patent Does Not Claim a "Technological
              Invention." ..................................................................................12

VII.    STATEMENT OF PRECISE RELIEF REQUESTED FOR EACH
        CHALLENGED CLAIM (37 C.F.R. § 42.304(B))................................16

        A.    Claims for Which Review Is Requested (37 C.F.R. §
              42.304(b)(1)). .............................................................................16

        B.    Statutory Grounds of Challenge (37 C.F.R. § 42.304(b)(2)). ........16

VIII.   PROPOSED CLAIM CONSTRUCTIONS FOR CBM REVIEW
        (37 C.F.R. § 42.304(B)(3)) ..................................................................18

        A.    Non-Means-Plus-Function Terms. ..................................................19

        1.    "Completing The Field" (All Claims)............................................19

        B.    Means-Plus-Function Terms. .........................................................21

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

1.   "Game Processor [For / Configured For]" Limitations (Claims 13-24, 44-50, and 64-69). ...................................................23

2.   "Program Instructions That [Perform Claimed Functions]" Limitations (Claims 25-36, 51-57, 70-75). ..................................30

3.   "Component For" (Claims 45,-46, 65). ..........................................33

IX.   GROUND 1:  THE CHALLENGED CLAIMS ARE INELIGIBLE UNDER 35 U.S.C. § 101 (37 C.F.R. § 42.304(B)(4)) ............................34

   A.   Claim 44 Is Representative of All Challenged Claims. .................34

   B.   Representative Claim 44 Fails to Claim Patent-Eligible Subject Matter Pursuant to 35 U.S.C. § 101. ...............................49

   1.   *Guidance* Step 1:  The '223 Patent Is Directed to the Abstract Process of Game Play. ...................................................51

   2.   *Guidance* Step 2A, Prong One: The '223 Patent Is Directed to a Judicial Exception—the Abstract Idea of Game Play. ............51

   3.   *Guidance* Step 2A, Prong 2: Representative Claim 44 Does Not Integrate the Abstract Idea into a Practical Application. ........56

   4.   *Guidance*, Step 2B: Representative Claim 44 Does Not Contain an Inventive Concept. .....................................................60

X.   GROUND 2:  THE CLAIMS ARE UNPATENTABLE UNDER 35 U.S.C. § 112, FIRST PARAGRAPH, FOR LACK OF WRITTEN DESCRIPTION WITH RESPECT TO THE VALUATION TESTING LIMITATION ........................................................................65

   A.   Legal Standard for Written Description. ......................................65

   B.   The Written Description Is Not Met Because There Is No Description of *How* to Achieve the Claimed Function of the Valuation Testing Limitation. ......................................................67

   C.   The Applicant Alleged There Was Support for the Valuation Testing Limitation, but the Cited Portions of the Specification Fails. .........................................................................70

   D.   The Specification's Other References to "Testing" Are Also Irrelevant. ...........................................................................75

XI.   GROUND 3: CLAIMS 13-24, 44-50, AND 64-69 ARE UNPATENTABLE UNDER 35 U.S.C. § 112, SIXTH PARAGRAPH, FOR INDEFINITENESS ............................................79

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

XII.      GROUND 4: CLAIMS 25-36, 51-57, AND 70-75 ARE
          UNPATENTABLE UNDER 35 U.S.C. § 112, SIXTH
          PARAGRAPH, FOR INDEFINITENESS ...............................................79

XIII.     GROUND 5: CLAIMS 45-46 AND 65 ARE UNPATENTABLE
          UNDER 35 U.S.C. § 112, SIXTH PARAGRAPH, FOR
          INDEFINITENESS ...................................................................................80

XIV.      CONCLUSION ........................................................................................80

LISTING OF CLAIMS.........................................................................................81

CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITS........101

CERTIFICATE OF SERVICE ...........................................................................102

iv

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

**PETITIONERS' EXHIBIT LIST**

| Exhibit | Description |
| --- | --- |
| Ex.1001 | U.S. Patent No. 7,736,223 |
| Ex.1002 | File History of U.S. Patent No. 7,736,223 (App. No. 11/428,026) |
| Ex.1003 | Declaration of Garry Kitchen |
| Ex.1004 | Letter from Patent Owner's Counsel, D. Scott Sudderth, to Petitioner, dated Jan. 15, 2019 |
| Ex.1005 | First Amended Complaint filed in *Savvy Dog Systems, LLC et al. v. Pennsylvania Coin, LLC et al.*, Civ. Action No. 3:19-cv-01470-RDM (M.D. Penn.) |
| Ex.1006 | Excerpts of March 17, 2020 Hearing in *Savvy Dog Systems, LLC et al. v. Pennsylvania Coin, LLC et al.*, Civ. Action No. 3:19-cv-01470-RDM (M.D. Penn.) |
| Ex.1007 | U.S. Pub. No. 2007/0232384 (Publication of App. No. 11/428,026) |
| Ex.1008 | Definition of "Valuable" in Merriam-Webster's Collegiate Dictionary 1382 (11th ed. 2003) |
| Ex.1009 | Opinion regarding Motion To Dismiss filed in *Savvy Dog Systems, LLC et al. v. Pennsylvania Coin, LLC et al.*, Civ. Action No. 3:19-cv-01470-RDM (M.D. Penn.) |
| Ex.1010 | U.S. Patent No. 7,040,985 |

v

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

## I. INTRODUCTION

Pursuant to 35 U.S.C. § 321, Section 18 of the Leahy-Smith America Invents Act (the "AIA"), and 37 C.F.R. § 42.300 *et seq.*, Banilla Games, Inc. ("Petitioner") requests Covered Business Method ("CBM") review of claims 1-75 (the "challenged claims") of U.S. Patent No. 7,736,223 (the "'223 patent") (Ex.1001).

## II. MANDATORY NOTICES

### A. Real Party-in-Interest (37 C.F.R. § 42.8(b)(1)).

The real party-in-interest is Banilla Games, Inc.

### B. Related Matters (37 C.F.R. § 42.8(b)(2)).

The '223 patent is subject to litigation pending in the U.S. District Court of the Middle District of Pennsylvania. *See* Ex.1005, *Savvy Dog Sys., et al. v. Pa. Coin Holdings, LLC, et al.*, C.A. No. 3:19-cv-01470-JPW (M.D. Pa.), First Amended Complaint.

As of the filing of this petition, no other judicial or administrative matters are known to Petitioner that would affect, or be affected by, a decision in a CBM review of the '223 patent.

### C. Counsel (37 C.F.R. §42.8(b)(3)) and Service Information (37 C.F.R. §42.8(b)(3)-(4)).

Petitioner designates Dion M. Bregman (Reg. No. 45,645) as lead counsel for this matter and Kenneth J. Davis (Reg. No. 50,688) and Ahren C. Hsu-Hoffman (Reg. No. 50,862) as back-up counsel for this matter.

1

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

Postal mailings and hand-deliveries for lead and back-up counsel should be addressed to: Morgan, Lewis & Bockius LLP, 1400 Page Mill Rd., Palo Alto, CA 94304 (Telephone: 650.843.4000; Fax: 650.843.4001).

Pursuant to 37 C.F.R. §42.8(b)(4), Petitioner consents to e-mail service at: Banilla-CBM@morganlewis.com.

For compliance with 37 C.F.R. §42.10(b), a Power of Attorney is also filed concurrently herewith.

## III.    FEES

Any fees should be charged to Deposit Account No. 50-0310 (Order No. 125150-8000).

## IV.    THE CHALLENGED '223 PATENT

The alleged "present invention" of the '223 patent relates to "electronic games" which have become "very popular" in "several states [that] have legalized certain types of gaming but under heavy regulation." Ex.1001 at 1:18-21. The '223 patent describes electronic "skill-based games" that, while still involving "[s]ome chance," are designed to comport with state, federal, and tribal government regulations. *See id.* at 1:18-60. The '223 patent describes the basic idea of playing such games and the concept of providing a preview of the game to a potential player before the game is played. *See id.* at 1:64-67. A preview is presented to allow a potential game player to decide whether to play a game before the player commits

to playing the game, which purportedly renders the game one of "skill" instead of "chance."[1]  The '223 patent claims a system for playing this type of preview skill game using generic computing components, a method for accomplishing the game play, and a generic computer program for carrying out the game play.  The specification of the '223 patent describes the supposed invention "in the context of the Tic-Tac-Fruit" game—a game that uses fruit symbols and is "loosely derived from tic-tac-toe."  Ex.1001 at 3:59-62; *see also id.* at Figs. 1A and 1B; Ex.1003 ¶¶ 29-31.

Playing a game is nothing new.  Indeed, the '223 patent itself acknowledges that "amusement and entertainment type electronic games ha[d] become very popular with the public" by the time the patent was filed in 2006.  *See* Ex.1001 at 1:18-21; Ex.1003 ¶ 32.

The '223 patent teaches that a "game processor" may be used to generate the electronic game.  Ex.1001 at 2:29-31.  But, similarly to playing a game, there is nothing new about a "game processor."  Indeed, the '223 patent describes no particular, much less novel, implementation of a "game processor."  Rather, the

---

[1] The '223 patent describes the supposed need to have games of "skill" in order to avoid running afoul of certain state regulations that prohibit gambling or use of gambling devices.  *See* Ex.1001 at 1:21-32.

patent contains only two brief mentions of this generic component, describing it only in terms of the functions it supposedly performs. *Id.* at 2:28-45. The '223 patent provides no details regarding the configuration of the "game processor" apart from a description of the functions that it performs. The patent is devoid of any further detail regarding the processor. Ex.1003 ¶ 33.

## V.   LEVEL OF ORDINARY SKILL IN THE ART

A person of ordinary skill in the art ("POSITA") in the field of the '223 patent (*i.e.*, electronic gaming) would have had (1) a bachelor's degree in engineering or computer science or equivalent experience and (2) at least two years of development experience in the electronic gaming industry. Ex.1003 ¶¶ 25-27.

## VI.   GROUNDS FOR STANDING (37 C.F.R. § 42.304(A))

### A.   Petitioner Has Standing and Is Not Estopped.

A party has standing to petition for CBM review if it has been sued or charged with infringement of the challenged patent such that it would have standing to bring a declaratory judgment action in federal district court. AIA § 18(a)(1)(B); 37 C.F.R. § 42.302(a).

Petitioner has standing because there is an actual dispute regarding the validity and infringement of the '223 patent. In particular, Patent Owner has expressly accused Petitioner of infringing the '223 patent. Ex.1004. And, Patent Owner has initiated a district court proceeding for alleged infringement of the '223 patent against a third-party distributor of Petitioner's products. As such, Petitioner has

standing to seek a declaratory judgment that the '223 patent is invalid and to file this petition.

Petitioner is not estopped from filing this petition because neither it nor any real party-in-interest or privy has previously challenged the patentability of the claims of the '223 patent. 35 U.S.C. § 325(e)(1); 37 C.F.R. § 42.302(b). Furthermore, Petitioner is not barred from filing this petition under 37 C.F.R. § 42.302(c) because Petitioner has not filed a civil action challenging the validity of any claim of the '223 patent.

Consistent with 37 C.F.R. § 42.303, this petition is timely because more than nine months have passed since the '223 patent issued, and post-grant review is not available under 35 U.S.C. § 321(c).

The '223 patent is currently being asserted by Patent Owner against third-party companies that use Petitioner's products in *Savvy Dog Sys., et al. v. Pa. Coin Holdings, LLC, et al.*, C.A. No. 3:19-cv-01470-JPW (M.D. Pa.). In this litigation, Patent Owner has accused touchscreen games made by Petitioner (*e.g.*, Superior Skill: Lightning Edition, Lightning Skill, and Superior Skill) of infringement, although Petitioner is not a party to the litigation. *See, e.g.*, Ex.1005 ¶ 42. The defendants named in the lawsuit filed a motion to dismiss the suit on patent ineligibility grounds, asserting that the claims are directed to an abstract idea without any inventive concept. The district court found the claims directed to an abstract

idea, but denied the motion as premature finding that questions of fact precluded resolution of the Section 101 inquiry at the pleading stage.  Ex.1009 at pp. 18-19.  This lawsuit is still pending and in its early stages.  The parties have not yet exchanged claim construction positions, and the district court has not yet construed any claims.

### B.    The '223 Patent Is a CBM Patent.

Section 18(d)(1) of the AIA "on its face covers a wide range of finance-related activities."  *Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1325 (Fed. Cir. 2015).  The Patent Office may institute a CBM review of any patent that qualifies as a CBM patent under the AIA.  AIA § 18(a)(1)(E).  The AIA defines a CBM patent as:

> a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions.

AIA § 18(d)(1).  The statute thus establishes a two-prong test for determining whether a patent qualifies for CBM review: the claimed invention (1) must relate to use or operation of a "financial product or service" and (2) must not be a directed to a "technological invention."  *Id.*

Only one claim needs to qualify as a CBM for the entire patent to be subject to CBM review.  77 Fed. Reg. 48,734, 48,736 (Aug. 14, 2012); *see also Versata*,

6

793 F.3d at 1327 (affirming CBM determination based on single-claim standard). Here, as demonstrated below, all claims of the '223 patent render this patent eligible for CBM review.

**1. The '223 Patent Claims Involve a "Financial Product Or Service" Because They Cover Determining and Value-Testing "Winning Combinations" For an Electronic Game Which Players Play In Hopes Of Winning Financial Payouts.**

As the Federal Circuit explained in *Versata*, "the definition of 'covered business method patent' is not limited to products and services of only the financial industry, or to patents owned by or directly affecting the activities of financial institutions such as banks and brokerage houses." 793 F.3d at 1325. Rather, "[t]he plain text of the statutory definition contained in § 18(d)(1) . . . on its face covers a wide range of finance-related activities." *Id.* For example, in *Versata* the Federal Circuit found claims that covered "determining a price of a product" using "multi-level product and organizational groups" to be sufficiently "used in the practice, administration, or management of a financial product or service" to subject the patent to CBM review. *Id.* at 1311, 1325-26.

Here, each of the claims of the '223 patent are directed to obtaining value—via a "winning combination," "redemption value," "monetary payout" or other financial indices. Claims 4, 16, and 28 discuss "redeeming a player's **credit balance** and **associated payout** for each **winning combination**" (emphasis added)—a

reference to the something of value that a player can obtain as a credit balance and then redeem for cash payout.  Claims 43, 50, 57, 63, 69, and 75 recite "replac[ing] a current symbol on a **pay line**" (emphasis added)—again, a focus on the value that results from carrying out the claimed game play.

This claimed value is also found in claims 10, 21, and 32, which each recite the fact that "each **winning combination** of symbols has an **associated payout** to the player" (emphasis added).  Further, claims 1, 6, 7, 8, 13, 25, 37, 44, and 70 cover methods and systems for "electronic gaming" where the game provides the player with an opportunity to win value by forming a "winning combination" of symbols presented on a game field.  Indeed, similar to the claims in *Versata* which covered making a valuation determination (*i.e.*, the price of a product based on organizational groups), the '223 patent's claims cover determining something of value (*i.e.*, a "determined winning combination") as well as making a valuation determination (*i.e.*, by testing the game field for "more valuable" inadvertently generated winning combinations) to manage and administer what payouts a player can win.

Claims 12, 17, and 34 recite that "the **denomination of play** corresponds to the **level of play**" (emphasis added).  Further, during prosecution of the '223 patent, the applicant clarified that when a player selects the "level of play," the player is actually selecting the "**denomination of a wager**."  Ex.1002 at p. 188 (1/26/2010 Office Action Response at p. 26) (emphasis added).

8

The Board has held that activities involving payouts (specifically including games of chance)—like the "associated payout" recited in numerous claims—are financial in nature and eligible for CBM review. In *Bally Gaming, Inc. v. New Vision Gaming & Development, Inc.*, CBM2018-00005, the Board held that a claim reciting a game involving the placement of a "bonus wager" and "paying" a "winning player a payout" was financial in nature and rendered the patent eligible for a CBM review. 2019 WL 2527364, at *5 (P.T.A.B. June 19, 2019). Similarly, in *International Internet Technologies, LLC v. Sweepstakes Patent Co.*, the Board held that claims directed toward lottery games involving payouts of monetary awards involved a financial product or service. CBM2015-00106, 2016 WL 8944566, at *4-6 (P.T.A.B. July 29, 2015).

Further, the Federal Circuit has held that claims involving a transfer of funds are "financial in nature" for purposes of CBM review eligibility. *See SightSound Techs., LLC. v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015) (holding that methods for electronic sale involving charge to party's account constituted transfer of funds, and, thus, qualified as CBM review eligible "financial service"); *Secure Axcess, LLC v. PNC Bank N.A.*, 848 F.3d 1370, 1381 (Fed. Cir. 2017) (reaffirming this holding); *see also SIPCO, LLC v. Emerson Elec. Co.*, 939 F.3d 1301, 1310 (Fed. Cir. 2019) (finding claims reciting "automated teller machine" or "vending

machine" to be CBM review eligible).  Here, the payouts claimed in the '223 patent

constitute such transfers, and, thus, the '223 patent is CBM review eligible.

Further, each claim of the '223 patent requires, prior to the player initiating

game play, "determin[ing] . . . **at least one winning combination** for each play of

the game" and "testing the game field prior to displaying the game to the player to

ensure that **a winning combination more *valuable* than the determined winning**

**combination** is not generated inadvertently in completing the field."  *See* Ex.1001

at claims 1, 13, 25, 37, 44, 70 (emphasis added).  Generating and redeeming value

brings a claim within the ambit of CBM review jurisdiction.  *See Delta Airlines, Inc.*

*v. Loyalty Conversion Sys. Corp.*, CBM2014-00096, 2014 WL 4925862, at *4

(P.T.A.B. Sept. 29, 2014) (finding claim directed to converting or transferring

loyalty points that had "monetary value" were directed to activity that was financial

in nature).  As such, each "winning combination" recited in the claims is to some

extent "valuable"[2] and, according to the '223 patent, that value corresponds to a

monetary value, such as the "associated payout" referenced in claim 10, 21, and 32,

as shown in the below exemplary award table:

---

[2] Consistent with the teaching of the '223 patent, dictionary definitions also confirm

that "valuable" means "having monetary value."  Ex.1008, Merriam-Webster's

Collegiate Dictionary, at 1382 (11th ed. 2003).

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

TABLE 1

| Symbol/Denomination | 50¢ | $1.00 | $2.00 | $4.00 |
|---|---|---|---|---|
| | Tic-Tac-Fruit (Classic) | | | |
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

Ex.1001 at 5:35-47; *see also id.* at 5:27-31 ("If the player had selected a denomination of $2.00 and made a location selection for the wild symbol that simultaneously completed a line of three bells and a line of three plums, his winnings would have been the equivalent of $14.00 in points, $10.00 for the line of three bells and $4.00 for the line of three plums.").  The '223 patent further explains that "[a]ll accumulated credits will be redeemed as a cash voucher on a printed ticket . . . that can be presented to a redemption counter . . . for cash payment."  *Id.* at 5:37-40. Because each claim of the '223 patent recites a game that determines an intended "determined winning combination" and purports to administer and manage the game so as to ensure that a winning combination "more *valuable* than the determined winning combination" is not inadvertently generated, all claims are used in the practice, administration, and management of a financial product or service, and, thus, render this patent eligible for a CBM review.

### 2. The '223 Patent Does Not Claim a "Technological Invention."

A patent that otherwise qualifies as a CBM patent is nevertheless excluded from CBM review if it is directed to a "technological invention"—*i.e.*, if "the claimed subject matter as a whole" (1) "recites a technological feature that is novel and unobvious over the prior art" and (2) "solves a technical problem using a technical solution." 37 C.F.R. § 42.301(b); *Versata*, 793 F.3d at 1326. Both prongs must be satisfied in order to exclude the patent as a technological invention. *See Versata*, 793 F.3d at 1326-27; *Apple Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1240 (Fed. Cir. 2016). Only "those patents whose novelty turns on a technological innovation over the prior art and are concerned with a technical problem which is solved with a technical solution and which requires the claims to state the technical features which the inventor desires to protect" should be excluded from CBM review. 157 Cong. Rec. S1360, S1364 (daily ed. Mar. 8, 2011) (Statement of Sen. Schumer). The claims of the '223 patent do not meet either prong of the technological invention exclusion. Ex.1003 ¶¶ 68-80.

### a. *The '223 patent claims include only conventional technology components that are not novel.*

There can be no "technological improvement" where, as here, the '223 patent claims merely contain a recitation of (1) "known technologies," (2) "the use of known prior art technologies," and (3) a combination of "prior art structures to

achieve the normal, expected, or predictable result of that combination." *Versata*, 793 F.3d at 1326. The claims of the '223 patent only recite what are at best generic and/or well-known "technological" components: an "electronic game terminal," a "touch screen display," and a "game processor." *See, e.g.*, Ex.1001 at claims 1, 8, 13-15, 18-19, 23, 25, 35, 37, 44, 51, 58, 64, 70. The '223 patent contains only scant discussion of these generic components and does not allege that any of these components constitute technological advancements or were novel at the time of the claimed invention. Ex.1003 ¶¶ 72-88. Indeed, the '223 patent acknowledges that "electronic games" were "very popular" at the time of the alleged invention. Ex.1001 at 1:18-20. Touch screens and the use of processors for gaming were likewise generic and/or well known. *See Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2005 WL 3970076, at *2 (N.D. Cal. Sept. 6, 2005) (discussing touch screen technology patent in 2005); Ex.1001 at Abstract ("A casino game and method having . . . a processor displaying on a second display a matrix comprising symbols."); Ex.1003 ¶¶ 77-88.

The term "game processor"—which is not a term of art—is mentioned only twice in the '223 patent's specification and never as any sort of technological advancement and never in any level of detail to even suggest the "game processor" itself possesses features that differ from prior art. *See* Ex.1003 ¶¶ 44, 75-80. Indeed, according to the '223 patent, the "game processor" has nondescript "components"

for carrying out basic computing steps.  Ex.1001 at 2:31-45; *id.* at 4:40-43.  The '223

patent never discloses what the components are or *how* these components are

implemented and function.[3]  *See* Ex.1003 ¶ 80.  The claims also do not recite any

improvement to the way in which the "game processor" performs the recited

functions.  *Id.*; *see also id.* ¶¶ 81-88.

The '223 patent does not describe or claim a new computer or processor.

Instead, at best, it references known or nondescript technology (including a "game

processor") to claim steps for playing a game.  *See id.* ¶ 80.  There is nothing in the

'223 patent that demonstrates otherwise, and, thus the Board should determine that

---

[3] Nor does the patent differentiate the "game processor" due to any specific firmware

or software allegedly that may be run thereon.  *See id.* ¶ 85.  The '223 patent itself

never mentions "firmware" let alone explains that (or how) any undisclosed

firmware could transform the game processor into a novel device.  *See id.*  Nor could

it.  Firmware has been used in the video gaming industry for decades.  *Id.* ¶ 86.

Likewise, there is nothing novel regarding any storing of software supposedly

contained in the game processor.  *Id.*  Storing software on a processing device has

also been around for decades.  *Id.* ¶¶ 86-87.  A "game processor" using firmware or

software to carry out the game play is neither new nor inventive.  *See id.* ¶¶ 85-87;

*see also id.* ¶¶ 76-81.

14

the generically claimed well-known computer components are just that—generic and/or well known. *See Maxon, LLC v. Funai Corp.*, 255 F. Supp. 3d 711, 718 (N.D. Ill. 2017) ("Because the specification does not define the processor, the court is left to conclude that it is a generic processor.").

> **b.**     *The '223 patent does not solve a technical problem with a technical solution.*

The '223 patent also fails the second prong of the technological invention test because it does not solve a technical problem with a technical solution. The '223 patent mentions only non-technological problems—(1) profitability and business considerations arising out of game play and payout (Ex.1001 at 7:10-8:22) and (2) claimed "testing" of the game prior to play in order to ensure that a winning combination not more valuable than desired results from game play (*id.* at 14:1-4, 16:16-19, 59-62; 18:13-16, 64-67; Ex.1003 ¶¶ 73, 75, 80). Notably absent is any mention of a purported technological problem. Ex.1003 ¶ 73.

The Federal Circuit has held that a claim does not include a "technological feature" if its "elements are nothing more than general computer system components used to carry out the claimed process." *Blue Calypso v. Groupon, Inc.*, 815 F.3d 1331, 1341 (Fed. Cir. 2016); *see also Versata*, 793 F.3d at 1327 ("[T]he presence of a general purpose computer to facilitate operations through uninventive steps does not change the fundamental character of an invention."). But, this is precisely what the '223 patent describes—a "game processor" that at most refers to a generic, well-

known, and conventional central processing unit ("CPU") or microprocessor that executes program instructions to generate a game. *See* Ex.1003 ¶¶ 53, 72-73, 76-81. Using a generic or well-known component to carry out the human activity of game play is not a technological solution to any purported problem. *See Monster Worldwide, Inc. v. Career Destination Dev.*, *LLC*, CBM2014-00070, 2014 WL 4219510, at *7 (P.T.A.B. Aug. 20, 2014) (using generic computer components to optimize non-technological activity is insufficient to satisfy prong two of CBM-ineligibility standard).

## VII.    STATEMENT OF PRECISE RELIEF REQUESTED FOR EACH CHALLENGED CLAIM (37 C.F.R. § 42.304(B))

### A.    Claims for Which Review Is Requested (37 C.F.R. § 42.304(b)(1)).

Petitioner respectfully requests review of claims 1-75 of the '223 patent and the cancellation of these claims for being unpatentable and ineligible.

### B.    Statutory Grounds of Challenge (37 C.F.R. § 42.304(b)(2)).

The challenged claims are ineligible under 35 U.S.C. § 101 and unpatentable under § 112, ¶¶ 1 and 6.[4]  Specifically, Petitioner challenges the following claims on

---

[4] Paragraph 1 of 35 U.S.C. § 112 was replaced with newly designated § 112(a) by § 4(c) of the AIA, and AIA § 4(e) makes those changes applicable "to any patent application that is filed on or after" September 16, 2012.  Because the application

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

the following grounds:

| Ground | Statutory Basis | Claims |
|:---:|:---|:---|
| 1 | § 101 – Patent-Ineligible Subject Matter | All claims. |
| 2 | § 112, ¶ 1 – All Claims Are Unpatentable for Lack of Written Description for the Limitation "Testing the Game Field Prior To Displaying the Game to the Player To Ensure that a Winning Combination More Valuable than the Determined Winning Combination Is Not Generated Inadvertently in Completing the Field" | All claims. |
| 3 | § 112, ¶ 6 – Claims with Means-Plus-Function Limitation "Game Processor" Are Unpatentable As Indefinite | Claims 13-24, 44-50, and 64-69. |
| 4 | § 112, ¶ 6 – Claims with Means-Plus-Function Limitation "Program Instructions" Are Unpatentable As Indefinite | Claims 25-36, 51-57, and 70-75. |
| 5 | § 112, ¶ 6 – Claims with Means-Plus-Function Limitation "Component For" Are Unpatentable As Indefinite | Claims 45-46 and 65. |

As demonstrated herein, it is more likely than not that Petitioner will prevail

in establishing the unpatentability of the claims challenged on each of these grounds.

---

resulting in the '223 patent was filed before that date, this petition refers to the pre-

AIA version of § 112.

## VIII.  PROPOSED CLAIM CONSTRUCTIONS FOR CBM REVIEW (37 C.F.R. § 42.304(B)(3))

In the instant proceeding, patent claims are to be construed according to the standard used in a district court proceeding as set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*).  *See* 37 C.F.R. § 42.300(b).  Petitioner applies that standard as articulated by the Board.  *See* 83 Fed. Reg. 51340, *e.g.*, 51343 (Oct. 11, 2018).[5]

Petitioner proposes the following constructions as relevant to the § 112 issues raised in this Petition, but does not believe that claim construction is necessary to resolve the question of § 101 eligibility as the construction of any term would not affect the lack of any claim's eligibility.  For example, although Petitioner proposes a construction for "completing the field," it is only to clarify that this is a player-performed action.  This construction does not alter the abstract, result-focused, and functional nature of this step and the limitation in which it appears.  Further, Petitioner proposes construing "game processor" because this term fails to connote specific structure and thus invokes § 112, ¶ 6.  While indefinite, at most, the term "game processor" refers to a generic, well-known, and conventional CPU or microprocessor that executes program instructions to generate a game.  Ex.1003 ¶

---

[5]  Because the application resulting in the '223 patent was filed before September 16, 2012, claims are construed under pre-AIA standards.

53.  The other terms Petitioner contends invoke § 112, ¶ 6 likewise are indefinite, but, at most, refer to generic, well-known, and conventional components.  Thus, the resolution of the meanings of any of these terms is not necessary for the § 101 analysis.

It is worth noting that in the pending district court litigation, Patent Owner did not argue that claim construction was necessary for the district court to conduct a § 101 analysis.

Again, the following constructions are provided because they are relevant to the § 112 issues raised in this Petition.

### A.    Non-Means-Plus-Function Terms.

#### 1.    "Completing The Field" (All Claims).

Each and every claim of the '223 patent requires "**testing** the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in **completing the field**" or program instructions that perform this same step.  *See* Ex.1001 at claims 1, 13, 25, 37, 44, 51, 58, 64, 70 (emphasis added).  This entire limitation is referred to herein as the "**Valuation Testing Limitation**."

Petitioner proposes construing a portion of this limitation, the "**completing the field**" language, to clarify that it is a **player-performed step**.  As discussed in Ground 2 below, the overall Valuation Testing Limitation is neither disclosed in nor

19

supported by the specification. The specification, however, sheds light on what "completing the field" means when discussing general aspects of how the Tic-Tac-Fruit game is played. For example, the specification explains that "[t]he player is presented a field completely filled with apparently random symbols. . . . **The player chooses the displayed symbol in the field to become the 'wild' symbol**[,] and the symbol(s) that it represents[,] becomes the symbol necessary **to *complete* a winning line(s)**." Ex.1001 at 4:3-4:12 (emphasis added); *see also id.* at 4:26-35 (describing a wild symbol may complete multiple lines, and also once a player selects a location, the game examines the field of elements for complete lines); *id.* at 4:38-47 (discussing assessing whether there are complete lines). As such, a POSITA would understand that "completing the field" refers to the player completing the field, such as by choosing which symbol should become the "wild" symbol to form a winning combination. Ex.1003 ¶¶ 40-42.

Patent Owner's interpretation of this element aligns with Petitioner's interpretation. In the district court case, Patent Owner has asserted that "completing the field" is a player-performed step. *See, e.g.*, Ex.1005 (First Amended Complaint) ¶ 72 ("**[T]he user interacts with the game field** by 'nudging' a group of symbols higher or lower to **complete the game field**." (emphasis added)).

Therefore, a POSITA would understand that "completing the field" as recited in the Valuation Testing Limitation refers to a player-performed step. As such, the

Valuation Testing Limitation requires testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently **when the player completes the field**.

### B.    Means-Plus-Function Terms.

Under 35 U.S.C. § 112, ¶ 6, a patentee may claim a means for performing a specified function without reciting in the claim itself any structure for performing the function.  Although the statute uses the words "means for," those words are not required for a term to be subject to § 112, ¶ 6.

Rather, the absence of the word "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  This presumption can be overcome, however, if "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."  *Id.* at 1349 (internal citations and quotations removed).  The "essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id.* at 1348.

Whether claim language invokes 35 U.S.C. § 112, ¶ 6, is "a legal question of claim construction."  *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1341 (Fed. Cir.

2019). Construing a means-plus-function limitation is a two-step process. The first step is to "identify the claimed function." *Williamson*, 792 F.3d at 1351. The second step is to determine "what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* "Corresponding structure" in the specification requires that the disclosed structure in the specification be "clearly link[ed]" to the function recited in the claims. *Id.* at 1352.

In the case of § 112, ¶ 6 terms related to computer-implemented inventions, the law "require[s] that the specification disclose an algorithm for performing the claimed function." *Media Rights Techs. Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015). "Where there are multiple claimed [§ 112, ¶ 6] functions, . . . the patentee must disclose adequate corresponding structure to perform all of the claimed functions." *Id.* As the Federal Circuit has made clear:

> [W]here a disclosed algorithm supports some, but not all, of the functions associated with a means-plus-function limitation, we treat the specification as if no algorithm has been disclosed at all. In such instances, we are not faced with a disclosure which addresses itself to an identifiable function, but arguably does so inadequately.

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318-19 (Fed. Cir. 2012). If the specification fails to disclose structure for the claimed functions in the specification, then the claim is indefinite. *See Media Rights*, 800 F.3d at 1374-75.

As demonstrated below, the claim terms "game processor [for / configured for]," "program instructions that [perform claimed functions]," and "component for" are means-plus-function limitations that should be construed according to § 112, ¶ 6, but that lack any corresponding structure.

> 1.      **"Game Processor [For / Configured For]" Limitations (Claims 13-24, 44-50, and 64-69).**

> a.      *These are means-plus-function limitations.*

The term "game processor" is a nonce word that does not bring to mind any specific structure, internal components, or operations to a POSITA.  Ex.1003 ¶ 43. A POSITA would not know if this term referred to hardware, software, or a combination of both.  *Id.* ¶ 44.

The fact that "game processor" includes the term "processor" does not avoid the application of § 112, ¶ 6.  The Board has settled that the term "processor" can be used as a substitute for "means" and invoke the application of § 112, ¶ 6.  *See, e.g.*, *Ex Parte Lakkala*, No. 2011-001526, 2013 WL 1341108, at *7 (P.T.A.B. Mar. 13, 2013) (informative) (finding "**processor**" to be a "non-structural term" that invokes § 112, ¶ 6) (emphasis added); *Ex Parte Smith*, No. 2012-007631, 2013 WL 1341109, at *8 (P.T.A.B. Mar. 14, 2013) (informative) (same); *Ex Parte Erol*, No. 2011-00143, 2013 WL 1341107, at *9 (P.T.A.B. Mar. 13, 2013) (informative) ("**processor adapted to**" perform several steps invokes § 112, ¶ 6) (emphasis added).  Post-*Williamson*, other district courts have followed suit.  *See, e.g.*, *Konami*

23

*Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483, 2018 WL 1020120, at *12 (D. Nev. Feb. 21, 2018) ("**processor configured to execute a game**" invokes § 112, ¶ 6) (emphasis added); *GoDaddy.com, LLC v. RPost Commc'ns. Ltd.*, No. CV-14-00126, 2016 WL 212676, at *52-53 (D. Ariz. Jan. 19, 2016) ("**processor for associating**" invokes § 112, ¶ 6) (emphasis added).

Here, the term "game processor" likewise invokes § 112, ¶ 6. The '223 patent does nothing to clarify whether the "game processor" refers to any particular structure and, in fact, confirms that it does not. Ex.1003 ¶ 45. Indeed, the specification describes the "game processor" in one of the most nondescript and nonstructural manners imaginable—namely, that it includes "components" for performing various functions.[6] *See* Ex.1001 at 2:29-45; MPEP § 2181 (identifying

---

[6] The specification refers once to an "embedded computer processor," Ex.1001 at 4:41, but never equates this with the "game processor" or any of the purported "components" in the "game processor." Ex.1003 ¶ 82. The "embedded computer processor" referred to in the specification is never mentioned in the claims of the '223 patent. *See id.* Nor is any claimed function tied to the "embedded computer processor." *See id.* Thus, the "embedded computer processor" is irrelevant to this inquiry into whether an "embedded computer processor" has any structural significance.

"**component** for" as a "**nonstructural generic placeholder**") (emphasis added); Ex.1003 ¶ 45.  According to the specification, the functions performed by these supposed "components" of the "game processor" include "constructing a field . . .," "presenting the field . . .," "receiving the player's selection . . .," and "displaying each winning combination. . . ."  *See* Ex.1001 at 2:29-45.

Moreover, nothing in the claims imparts any structural significance to the term "game processor."   Ex.1003 ¶ 46.  The "game processor [for /configured for]" limitations all recite purely functional limitations without reciting sufficiently definite structure for performing the recited functions.  *Id.*  For example, claim 44 recites a "**game processor for** generating an interactive game" and a "**game processor configured for**: constructing a field having a plurality of elements. . .; determining at least one winning combination for each play of the game; testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; automatically displaying an actual game to be played. . .; determining if the player has decided to play the displayed game; and displaying an outcome. . . ."  Ex.1001 at claim 44 (emphasis added).  The other independent and dependent claims with the "game processor [for / configured for]" limitation likewise recite purely functional limitations, including many which

25

are the same or similar to those recited in claim 44. *See, e.g., id.* at independent claims 13, 64; Ex.1003 ¶ 46.

In view of the claims and the specification's teachings, a POSITA would not understand the non-artful term "game processor" to refer to "sufficiently definite structure." *Williamson*, 792 F.3d at 1349; Ex.1003 ¶¶ 44-46.

Even if "processor" has some structural meaning (which it does not here), § 112, ¶ 6 still applies if "the claim term . . . recites 'function without reciting **sufficient structure for performing that function**.'" *Williamson*, 792 F.3d at 1349 (emphasis added). Here, as in the above-cited cases, the term "processor" fails to recite sufficient structure because (1) the specification fails to describe what the processor is and (2) even if this term referred to a conventional CPU or microprocessor, there is no algorithm recited in the claims to perform the recited functions. Ex.1003 ¶ 47; *see Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015) ("A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor. All other computer-implemented functions **require disclosure of an algorithm**."); *Ex Parte Lakkala*, 2013 WL 1341108, at *6 (finding "processor" to invoke 112(6) where functions recited would require additional programming to implement on a general purpose processor). Each of the claims with the "game processor [for / configured for] limitation requires at least "generating an interactive electronic game. . .,"

"[generating / constructing] a game field. . .," "determin[ing] . . . at least one winning combination for each play of the game," "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and "automatically displaying an actual game to be played. . . ." *See* Ex.1001 at claims 13, 44, 64. A CPU or microprocessor by itself cannot perform these functions. Ex.1003 ¶ 47. Instead, it must execute an algorithm to perform them. *Id.* Because no algorithms for performing these functions are recited, the claims lack sufficient structure to perform the recited functions and § 112, ¶ 6 applies. *Id.*

Because the '223 patent treats "game processor" as a generic placeholder for a non-descript device that performs the recited functions, it is a means-plus-function limitation. *See Williamson*, 792 F.3d at 1350 (holding that term that is merely "generic description for software or hardware that performs a specific function" is means-plus-function term). In claim 13, this limitation has the functions recited at 13:55-14:13; in claim 44, the functions are recited at 16:50-17:2; in claim 64, the functions are recited at 18:51-19:11; and, for each dependent claim reciting this limitation, the additional functions are recited therein. But as shown below, the specification fails to describe the requisite structure.

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

**b.**    *No corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions.*

A POSITA would understand that the functions recited in the claims as performed by the "game processor [for / configured for]" limitation—*i.e.*:

- "generating an interactive electronic game . . .,"

- "[generating / constructing] a game field . . .,"

- "determin[ing] . . . at least one winning combination for each play of the game,"

- "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and

- "automatically displaying an actual game to be played . . ."

—are performed by software algorithms.  Ex.1003 ¶ 49.  "It is well-established that the corresponding structure for a function performed by a software algorithm is the algorithm itself."  *EON Corp.*, 785 F.3d at 621 (Fed. Cir. 2015).  Thus, the corresponding structure from the specification must be "more than simply a general purpose computer or microprocessor," and, indeed, the specification must "disclose an algorithm for performing the claimed function."  *Noah Sys.*, 675 F.3d at 1312.

28

Here, the '223 patent's specification fails to disclose any algorithms for performing the functions recited in the claims with the "game processor [for / configured for]" limitation. Ex.1003 ¶¶ 50-52. The specification refers loosely to "underlying software algorithms" used for game construction, but fails to disclose such algorithms. *Id.* ¶ 51. Moreover, as discussed in Section IX incorporated here, the specification provides no description at all of the purely functional limitation of "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," recited in all claims and referred to herein as the "Valuation Testing Limitation." *Id.* As for the other functions, the specification and figures merely parrot back the same functional language recited in the claims without disclosing any algorithms for processing by a "game processor." *Id.*; *see, e.g.*, Ex.1001 at 4:12-25 (disclosing high-level steps for constructing game field but providing no algorithms for the processor to execute to follow these steps); Fig. 6 (Step 600 "CONSTRUCT FIELD FOR GAME DISPLAY," Step 601 "PRESENT FIELD ON GAME DISPLAY"); *see Aristocrat Tech. Australia Pty. Ltd v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008) ("[S]imply describ[ing] the function to be performed, not the algorithm by which it is performed" cannot support computer-implemented means-plus-function claims).

Because the specification discloses no algorithms for performing each of the claimed functions, claims 13-24, 44-50, and 64-69 are indefinite, and, therefore, unpatentable. *See WMS Gaming, Inc. v. Int'l Gaming Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).

To the extent that the Board disagrees and finds that the "game processor" does not invoke § 112, ¶ 6, then at most this term refers to a conventional CPU or microprocessor that executes program instructions to generate a game. Ex.1003 ¶ 53.

### 2. "Program Instructions That [Perform Claimed Functions]" Limitations (Claims 25-36, 51-57, 70-75).

#### a. *These are means-plus-function limitations.*

The "program instructions" limitations all recite purely functional limitations without reciting sufficiently definite structure for performing the recited functions. For example, claim 51 recites "**program instructions** that construct a game field having a plurality of elements. . .; **program instructions** that determine at least one winning combination for each play of the game; **program instructions** that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; **program instructions** that automatically display an actual game to be played . . . ; **program instructions** that

30

determine if the player has decided to play the displayed game; and **program instructions** that display an outcome . . ." Ex.1001 at claim 51 (emphasis added).

Here, the "program instructions" limitations do not recite any structure to perform the recited functions. Instead, the claims use the generic term "program instructions." As a result, these terms are drafted as "traditional means-plus-function limitation[s], and merely replace[] the term 'means'" with the term "program instructions." *Williamson*, 792 F.3d at 1350. Such functional claiming invokes § 112, ¶ 6 because "simply disclosing software [ ] without providing some detail about the means to accomplish the function is not enough." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

The term "program instructions" does not convey definite structure to perform the recited functions. Ex.1003 ¶ 55. Rather, a POSITA would understand that "program instructions" simply refers to unspecified software instructions. Ex.1003 ¶ 56. Consistent with this, the specification fails to provide any structural meaning for "program instructions" or to distinguish that term from generic software. *Id.* The variety of different functions that follow the term confirms that it is a generic placeholder rather than definite structure. *Id.*; *see, e.g.*, *Global Equity (SA) Pty. Mgmt. Ltd. v. Expedia, Inc.*, No. 2:16-cv-95, 2016 WL 7416132, at *29-30 (E.D. Tex. Dec. 22, 2016) (holding "program code for" invokes § 112, ¶ 6 because it fails to convey structure when the term is "defined only by the function that it performs.

. . . There are no indicia of the structural nature of this code in the claim or in the disclosure of the [] patent.").

Therefore, the "program instructions" limitations invoke § 112, ¶ 6. In claim 25, this limitation has the functions recited at 14:66-15:21; in claim 51, the functions recited at 17:27-45; in claim 70, the functions cited at 19:37-20:20; and, for each dependent claim reciting this limitation, the additional functions recited therein. Ex.1003 ¶ 57.

> **b.** *No corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions.*

A POSITA would understand that the functions recited in the claims with the "program instructions" limitation—*i.e.*:

- "[generating / constructing] a game field . . .,"

- "determin[ing] . . . at least one winning combination for each play of the game,"

- "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and

- "automatically displaying an actual game to be played. . . ."

—are performed by software algorithms. Ex.1003 ¶ 58.

32

These functions are the same as those discussed above with respect to the "game processor" limitation. As explained herein, the corresponding structure for a software algorithm is the algorithm itself, and the specification fails to disclose algorithms for performing each of these recited functions. *Id.* ¶ 59. Again, in particular, the specification provides no description at all for the Valuation Testing Limitation. *Id.* For the other functions, there are no disclosed algorithms. *Id.*

Because the specification discloses no algorithms for performing each of the claimed functions, claims 25-36, 51-57, and 70-75 are indefinite and therefore unpatentable. *Id.* ¶ 60; *WMS Gaming*, 184 F.3d at 1349.

To the extent the Board disagrees and finds that "program instructions" does not invoke § 112, ¶ 6, then at most this term refers to conventional commands that can be executed by a computer. Ex.1003 ¶ 61.

### 3.    "Component For" (Claims 45,-46, 65).

Claims 45 and 65 recite "a **component for** generating and displaying a next game field on the game display simultaneously in proximity to a currently displayed game." Claim 46 depends on claim 45.

"Component" is a recognized nonce word and thus invokes § 112, ¶ 6. *See* MPEP § 2181 ("The following is a list of nonstructural generic placeholders that may invoke . . . [§ 112, ¶ 6]: 'mechanism for,' 'module for,' 'device for,' 'unit for,'

'**component for**,' 'element for,' 'member for,' 'apparatus for,' 'machine for,' or 'system for.'"); Ex.1003 ¶ 63.

The function recited in these claims is "generating and displaying a next game field on the game display simultaneously in proximity to a currently displayed game."

A POSITA would recognize that this function is performed by a software algorithm, Ex.1003 ¶¶ 64-65, and thus an algorithm needs to be disclosed in the specification as corresponding structure.

But, as with the other functions discussed above for the "game processor" and "program instructions" limitations, no corresponding structure can be identified for this limitation because the specification fails to disclose an algorithm for the recited function. *Id.* ¶ 66. Claims 45-46 and 65 are therefore indefinite. *Id.* ¶ 67.

## IX. GROUND 1: THE CHALLENGED CLAIMS ARE INELIGIBLE UNDER 35 U.S.C. § 101 (37 C.F.R. § 42.304(B)(4))

### A. Claim 44 Is Representative of All Challenged Claims.

The Board can determine **eligibility** of the entire '223 patent based on analysis of **representative claim 44** alone. *See* 37 C.F.R. § 41.37(iv); *see also Alice Corp. Pty., Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 224 (2014) (conducting patentability analysis based on single representative claim); *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 74-75 (2012) (same). Where "all the claims are substantially similar and linked to the same abstract idea," the Board can focus

its patentability analysis on a representative claim. *See Content Extraction &*

*Transmission LLC v. Wells Fargo Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014);

*see also Supercell Oy v. Gree, Inc.*, Case PGR2018-00008, 2019 WL 80477, at *2,

*6-7 (P.T.A.B. Jan. 2, 2019) (using representative claim to evaluate patentability

under § 101). Here, all claims of the '223 patent are directed to the same abstract

idea—playing a game.

In corresponding district court proceedings, Patent Owner admitted that claim

44 is representative for purposes of a § 101 analysis. Ex.1006 at 40:25 ("Claim 44

is representative."). Representative claim 44 of the '223 patent claims the abstract

idea of playing a game, including "constructing a field having a plurality of

elements," "determining if the player has decided to play," and "displaying an

outcome resulting from play":

    44. [**44.1**] An electronic gaming system comprising:

    [**44.a**] an electronic game terminal including a touch screen display;

    [**44.b**] a game processor for generating an interactive electronic game
        on the game terminal, the game processor configured for:

    [**44.c**] constructing a field having a plurality of elements for the
        interactive game display wherein each element includes a game
        symbol from a plurality of predetermined game symbols;

    [**44.d**] determining at least one winning combination for each play of
        the game;

    [**44.e**] testing the game field prior to displaying the game to the player
        to ensure that a winning combination more valuable than the

determined winning combination is not generated inadvertently in completing the field;

[**44.f**] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

[**44.g**] determining if the player has decided to play the displayed game; and

[**44.h**] displaying an outcome resulting from play of the displayed game.

Ex.1001 at claim 44 (with annotations added).

All of the claims of the '223 patent recite these same basic steps for implementing game play. *See* Ex.1003 ¶ 68. Indeed, as reflected in the chart below, each of the remaining independent claims consist of nothing more than the game play steps of claim 44 with additions that add no meaningful changes to alter the focus of the claims. Claim 44 claims the idea of game play at its most basic form—a field with a plurality of elements, test, and then the game played.

The remaining claims add additional steps or limitations to this game play—a wild card or player interaction—without altering that the claims are directed to the abstract idea of game play as illustrated in the chart below. The following table shows how each of the remaining independent claims fail to add any patent-eligible subject matter:

36

| Claim No. | Independent Claim Language (Annotated to illustrate Comparison to Representative Claim 44) | Additional Elements | Focus of Claim |
|---|---|---|---|
| 1 | [**1.a**] An electronic gaming method comprising the steps of:<br><br>[**44.c**] constructing a game field having a plurality of elements for [**44.a**] an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, [**44.d**] wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but [**44.g**] there is no winning combination without player interaction with the game display;<br><br>[**44.e**] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>[**44.f**] automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play; | [**1.a**] Alters element [44.1] to be a "method" instead of a "system."<br><br>[**1.b**] receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection. | Claim 1—like claim 44—is focused on the idea of game play. In claim 1, the game play involves the addition of a "wild symbol."<br><br>Claiming a method for this game play instead of a system does not alter the focus of the claim. |

| | | | |
|---|---|---|---|
| | [**1.b**] receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and<br><br>[**44.h**] displaying each winning combination of symbols on the touch screen display. | | |
| 13 | [**44.1**] An electronic gaming system comprising:<br><br>[**44.a**] an electronic game terminal including a touch screen display;<br><br>[**44.b**] a game processor for generating an interactive electronic game on the game terminal with a plurality of options selectable by a player, the game processor configured for:<br><br>[**44.c**] constructing a game field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols,<br><br>[**44.d**] wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but | None, includes elements from claims 44 and 1, including the "system" of claim 44. | The use of a "wild symbol" does not alter the result here as explained *supra*. |

| | | | |
|---|---|---|---|
| | [**44.g**] there is no winning combination without player interaction with the game display;<br><br>[**44.e**] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>[**44.f**] automatically displaying an actual game to be played on the touch screen game display prior to initiating activation of game play;<br><br>[**1.b**] receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and<br><br>[**44.h**] displaying each winning combination of symbols on the touch screen display. | | |
| 25 | [**25.a**] A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code | [**25.a**] Claims a computer program instead of the method or system of claims 1 or 44 for carrying out game play. | Using a "computer program" to carry out game play that involves a wild symbol does not alter that claim 25 is |

| | | |
|---|---|---|
| embedded therein, the computer readable storage medium comprising:<br><br>program instructions that [**44.c**] construct a game field having a plurality of elements for [**44.a**] an interactive touch screen game display on an electronic game terminal [**44.c**] wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, [**44.d**] wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game [**44.g**] but there is no winning combination without player interaction with the game display;<br><br>program instructions that [**44.e**] test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | Includes elements from claims 1 and 44. The computer program claimed carries out the game play of claim 44 involving the "wild symbol" of claim 1. | directed to game play. |

| | | | |
|---|---|---|---|
| | program instructions that [**44.f**] automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;<br><br>program instructions that [**1.b**] receive the player's selection of a field element as a location for a wild symbol and [**44.e**] determine each winning combination of symbols that is formed by such selection;<br><br>and program instructions that [**44.h**] display each winning combination of symbols on the touch screen display. | | |
| 37 | [**1.a**] An electronic gaming method comprising the steps of:<br><br>[**44.c**] constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;<br><br>[**44.d**] determining at least one winning combination for each play of the game;<br><br>[**44.e**] testing the game field prior to displaying the game to | None, a method (like the method of claim 1) for carrying out the game play steps of claim 44. | A method of carrying out game play steps is directed to game play. |

41

| | | | |
|---|---|---|---|
| | the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>[**44.f**] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;<br><br>[**44.g**] determining if the player has decided to play the displayed game; and<br><br>[**44.h**] displaying an outcome resulting from play of the displayed game. | | |
| 51 | [**25.a**] computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising:<br><br>program instructions that [**44.c**] construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from | None, a computer program product of claim 25 for carrying out the game play steps of claim 44. | Computer program for carrying out game play steps is directed to the abstract idea of game play. |

42

| | | | |
|---|---|---|---|
| | a plurality of predetermined game symbols;<br><br>program instructions that [**44.d**] determine at least one winning combination for each play of the game;<br><br>program instructions that [**44.e**] test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>program instructions that [**44.f**] automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;<br><br>program instructions that [**44.g**] determine if the player has decided to play the displayed game; and<br><br>program instructions that [**44.h**] display an outcome resulting from play of the displayed game. | | |
| 58 | [**1.a**] A method for displaying a plurality of electronic game fields for selection by a player before initiating play of a | [**58.1**] Receiving a signal from the player to generate the game, generate the | The addition of the element of a receipt of a signal from the player to carry out the |

| | | |
|---|---|---|
| selected game comprising the steps of:<br><br>[**58.1**] receiving a signal from the player to generate an interactive electronic game on a touch screen display of an electronic game terminal;<br><br>[**44.c**] generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;<br><br>[**44.d**] determining at least one winning combination for each play of the game;<br><br>[**44.e**] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>[**44.f**] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;<br><br>[**58.1**] receiving a signal from the player to generate another of the plurality of electronic game | game fields, and select the game field. | game play does not alter the fact that the claim is directed to game play.<br><br>Receiving a signal is a well-known feature in games. |

| | | | |
|---|---|---|---|
| | fields associated with a different level of play prior to initiating activation of game play;<br><br>[**44.c**] generating and automatically displaying another of the plurality of electronic game fields; and<br><br>[**58.1**] receiving the player's selection of the electronic game field to play prior to initiating activation of game play. | | |
| 64 | [**44.1**] A system for displaying a plurality of electronic game fields each associated with a different level of play comprising:<br><br>[**44.a**] an electronic game terminal including a touch screen display;<br><br>[**44.b**] a game processor for generating an interactive electronic game display on a game terminal, the game processor configured for displaying a plurality of electronic game fields for selection by a player before initiating play of a selected game by:<br><br>[**58.1**] receiving a signal from the player to generate an interactive electronic game; | None, a system for carrying out game play, including the player interaction features claimed in claim 58. | A system for carrying out game play, including player interaction elements, is directed to the abstract idea of game play. |

45

[**44.c**] generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

[**44.d**] determining at least one winning combination for each play of the game;

[**44.e**] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

[**44.f**] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

[**58.1**] receiving a signal from the player to generate another of the plurality of electronic game fields associated with another level of play prior to initiating activation of game play:

[**44.c**] generating and automatically displaying another of the plurality of electronic game fields; and

|  |  |  |  |
|---|---|---|---|
|  | [**58.1**] receiving the player's selection of the electronic game field to play prior to initiating activation of game play. |  |  |
| 70 | [**25.a**] A computer program product for displaying a plurality of interactive electronic game fields for selection by a player when executed on a processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising:<br><br>[**58.1**] program instructions that receive a signal from a player to generate interactive electronic game on a touch screen display of an electronic game terminal;<br><br>program instructions that [**44.c**] generate a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;<br><br>program instructions that [**44.d**] determine at least one winning combination for each play of the game;<br><br>program instructions that [**44.e**] test the game field prior to displaying the game to the player | None, a computer program product for carrying out the game play steps of claim 44, with the player interaction claimed in claim 58. | A computer program product, for carrying out game play, which includes player interaction elements, is directed to the abstract idea of game play. |

| | | |
|---|---|---|
| to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;<br><br>program instructions that [**44.f**] automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;<br><br>program instructions that [**58.1**] receive a signal from the player to generate another of the plurality of electronic game fields associated with a different level of play prior to initiating activation of game play;<br><br>program instructions that [**44.f**] generate and automatically display another of the plurality of electronic game fields; and<br><br>program instructions that [**58.1**] receive the player's selection of the electronic game field to play prior to initiating activation of game play. | | |

As set forth above each of the independent claims recites minor variations on the basic concept of game play, which do not alter the abstract and patent-ineligible subject matter of these claims. The dependent claims do nothing to alter the ineligible subject matter of the independent claims and are all directed to aspects of

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

how game play is implemented: selecting a game level and activating the game (claims 2, 14, 26); determining if a player has decided to play (claims 3, 15, 27); paying the player for winning the game (claims 4, 10, 16, 21, 28, 32); defining the game field geometry, positioning the game field or where symbols are placed on the game field (claims 5-7, 18-20, 29-31, 38-42, 45-49, 52-56, 59-62, 65-68, 71-74); showing game fields to the player and determining which game to play based on a player's selection (claims 8, 9, 23, 24, 35, 36); odds of winning the game (11, 22, 33); level of play is related to denomination of play (claim 12, 17, 34); and defining how a play makes a move in the game (claims 43, 50, 57, 63, 69, 75); Ex.1003 ¶ 71.

**B.    Representative Claim 44 Fails to Claim Patent-Eligible Subject Matter Pursuant to 35 U.S.C. § 101.**

Section 101 of the Patent Act requires that a patent disclose a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. There are three important exceptions to § 101: "laws of nature, physical phenomena, and abstract ideas." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980). In *Alice*, the Supreme Court set forth a two-step test under which to assess patentability under § 101. First, the Board must assess whether the patent claims are "directed to" an abstract idea. If the patent claims are directed to an abstract idea, then the Board examines whether the claims "contain[ ] an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." 573 U.S. at 221.

49

In order to assess whether representative claim 44 claims patent ineligible subject matter under the *Alice* framework, the Board applies recent revised guidance on the application of § 101.  *See* 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019) ("Guidance").  Under the Guidance, the Board must (1) look to whether the representative claim recites any of these judicial exceptions and, if so, (2) determine whether the claim has additional elements that integrate the judicial exception into a practical application.  *See Price f(x) AG & Pricef(x), Inc. v. Vendavo, Inc.*, CBM2019-00020, 2019 WL 2865567, at *6-7 (P.T.A.B. July 2, 2019) (quoting 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019)).  Only if a claim (1) recites a judicial exception and (2) does not integrate that exception into a practical application, will the Board look to whether the claim; (3) adds a specific limitation beyond the judicial exception that is not "well-understood, routine, conventional" in the field (*see* MPEP § 2106.05(d)); or (4) simply appends well-understood, routine, conventional activities previously known to the industry, specified at a high level of generality, to the judicial exception.  *See Price f(x) AG*, 2019 WL 2865567, at *6-7.

Here, application of each step of the Guidance demonstrates that the claims of the '223 patent are directed to ineligible subject matter.  Thus, like numerous other gaming-related patents, the '223 patent claims ineligible subject matter given that there is nothing to transform this purely conventional activity into patent-eligible

subject matter. *See, e.g.*, *In re Marco Guidenaar Holding B.V.*, 911 F.3d 1157, 1160, 1162 (Fed. Cir. 2018); *In re Smith*, 815 F.3d 816, 818-19 (Fed. Cir. 2016) (patent directed to rules for playing card game invalid); *Scibetta v. Slingo, Inc.*, Civil Action No. 16-8175 (JMV), 2018 WL 466224, at *10 (D.N.J. Jan. 17, 2018) (patents "directed towards a wagering game using at least one standard deck of cards" invalid).

### 1. *Guidance* Step 1:  The '223 Patent Is Directed to the Abstract Process of Game Play.

"The first step of the eligibility determination asks if the claim is to a **process**, machine, manufacture, or composition of matter."   35 U.S.C. § 101 (emphasis added).  Here, the '223 patent is directed to a method (**process**) of playing a game, and, thus, satisfies Step 1 of the Guidance.  *See* Ex.1001 at 12:51 ("An electronic gaming method comprising the steps of . . . ."); *see also Price f(x) AG*, 2019 WL 2865567, at *7 (determining method of preparing price quote using technology was directed to "process" of pricing).

### 2. *Guidance* Step 2A, Prong One: The '223 Patent Is Directed to a Judicial Exception—the Abstract Idea of Game Play.

Step 2A, Prong 1 asks whether the claims recite a judicial exception—*e.g.*, an abstract idea.  Here, representative claim 44 is simply a way to play a game.  The claimed game could just as easily be played by a human with a deck of playing cards as it could be electronically, which demonstrates its abstract nature.  *See* Ex.1003 ¶

74; *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 383 (D. Del. 2015), *rev'd in part on other grounds by* 838 F.3d 1301 (Fed. Cir. 2016) (A "helpful way of assessing whether the claims of [a patent] are directed to an abstract idea is to consider if all of the steps of the claim could be **performed by human beings**." (emphasis added)).

For example, Dave Dealer may decide to play a game with Paul Player. The game will involve using traditional playing cards arranged in a tic-tac-toe configuration (3 x 3). The cards have traditional suits—*i.e.*, hearts, diamonds, clubs, and spades. Like tic-tac-toe, a player wins the game when the player matches three of the same symbol in a row—horizontally, vertically, and/or diagonally. Three of a kind is worth $3 (if spades), $2 (if hearts), $1 (if clubs), and $0 (if diamonds). The below table illustrates how humans can carry out the steps of claim 44 of the '223 patent:

| | Steps Recited in Claim 44 of the '223 patent | Example of How Humans Can Perform Recited Steps | |
|---|---|---|---|
| 1 | constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols | To set up the game, Dave Dealer puts down the cards, but does not reveal these cards to Paul Player. | |

| | | | |
|---|---|---|---|
| 2 | determining at least one winning combination for each play of the game | Dave Dealer may have prepared the deck ahead of time so that he would expect to know the winning outcome from the placement of the wild card.<br><br>For example, a player can create a winning combination by placing a "wild" joker card on the eight of diamonds to obtain three hearts along the diagonal. | |
| 3 | testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field | Dave Dealer imagines the joker over each card to check that no single placement of the joker will yield a more valuable win than the diagonal win.<br><br>After Dave Dealer imagines two unplanned three of a kind wins with spades, Dave Dealer replaces the queen of spades with a queen of clubs to ensure his planned win (three of a kind of hearts) is highest.<br><br>(The '223 patent is devoid of detail on how testing is performed to achieve the "ensure" objective.) | |

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

| | | |
|---|---|---|
| 4 | automatically displaying an actual game to be played . . . to a player prior to initiating activation of the game play | Dave Dealer then reveals to Paul Player the cards on the table. | |
| 5 | determining if the player has decided to play the displayed game | Dave Dealer asks Paul Player if he wants to play the game. Paul says "yes." Dave Dealer hands Paul Player a joker card. Paul Player completes the field by placing the joker down over one of the cards. | |
| 6 | displaying an outcome resulting from play of the displayed game | Paul Player places the joker on top of any card on the table. For example, Paul Player places the joker over the 8 of diamonds, which results in a three of a kind match. Dave Dealer shows Paul Player his winnings. | |

Ex.1003 ¶ 74.

The Supreme Court, the Federal Circuit, and the Board have repeatedly found that such methods constitute abstract ideas. *See, e.g.*, *Alice*, 537 U.S. at 220; *Planet*

54

*Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1007 (Fed. Cir. 2014) ("[M]anaging a bingo game while allowing a player to repeatedly play the same sets of numbers in multiple sessions."); *Bally Gaming*, 2019 WL 2527364, at *16, *21 (finding patent directed at rules for playing bonus wagering game patent ineligible). Applying generic computer components to carry out the claimed human activity does *not* transform it into a non-abstract idea. *See RaceTech*, 167 F. Supp. 3d 853, 863 (W.D. Ky. 2016) ("[T]he analysis turns on the fundamental nature of wagering which can be achieved with ordinary mental steps, despite the use of computers to speed up the process.").

In a pending district court proceeding, Patent Owner argued that representative claim 44 is directed to more than merely playing a game. Specifically, Patent Owner asserted that, taken as a whole, claim 44 is directed to a gaming system comprising a tangible game processor specifically configured to test and preview a game. Yet, nowhere does the '223 patent describe any special configuration of a tangible game processor. *See* Ex.1003 ¶¶ 81-88. The claimed game processor is nothing but an object for carrying out the claimed abstract gaming method. Moreover, merely citing a tangible computer component for performing an abstract concept would not make a claim non-abstract. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 611 (Fed. Cir. 2016); *see also Wireless Media Innovations, LLC v. Maker Terminals, LLC*, 100 F. Supp. 3d 405, 415 (D.N.J. Apr. 20, 2015) ("While

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

Plaintiff argues that the claim is not abstract because it includes the use of tangible components, the Court has already noted that an abstract idea is not rendered patentable just because of connections to the physical world."). The focus of each claim in the '223 patent is on playing a game, not on improved tangible computer processors. Indeed, many of the '223 patent claims do not even recite a processor. The Federal Circuit, numerous district courts, and this Board have held that playing a game or steps directed thereto are abstract and patent-ineligible ideas notwithstanding the implementation of game play on a computer. *See, e.g.*, *Planet Bingo*, 576 F. App'x at 1008; *RaceTech*, 167 F. Supp. 3d at 863; *Supercell*, 2019 WL 80477.

> **3.      *Guidance* Step 2A, Prong 2: Representative Claim 44 Does Not Integrate the Abstract Idea into a Practical Application.**

There is nothing in representative claim 44 (or any of the other claims) that integrates the abstract idea of game play into a practical application. *See* Ex.1003 ¶ 75. Indeed, claim 44 merely recites steps for implementing game play—constructing a game field having a plurality of elements, testing the game field, automatically displaying the actual game to be played to a player, determining if the player has decided to play, and displaying an outcome resulting from play—along with an "electronic game terminal" and "game processor," which are not described as anything more than an instrumentality to carry out the claimed game play. *See*

*id.* There is no inventive element recited in the claim beyond the abstract idea of game play. Indeed, it is well-established that "[m]erely including instructions to implement an abstract idea on a computer and merely using a computer as a tool to perform an abstract idea are not practical applications under Step 2A, Prong 2." *Bally Gaming*, 2019 WL 2527364, at *24 (internal alterations omitted). But this is precisely what claim 44 of the '223 patent claims—generic components for carrying out game play that humans could perform. *See* Ex.1003 ¶¶ 75-81. As such, this claim (as with all the others) fails to integrate the abstract idea of playing this particular game into a practical application. *See Bally Gaming*, 2019 WL 2527364, at *15 (recitation of rules for playing wagering game fail to integrate abstract idea into practical application).

Moreover, neither representative claim 44 nor any other claims recite any improvement to the way in which a computer performs the functions of game play. *See* Ex.1003 ¶¶ 75-88. Instead, the "game processor" is merely a non-descript means for carrying out the steps of game play. *Id.* ¶ 80. Thus, there is nothing in the '223 patent that suggests the game processor "over[came] some sort of technical difficulty." *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 768 (Fed. Cir. 2019).

Likewise, the '223 patent's game play step of "displaying an actual game to be played . . . prior to initiating activation of game play" (referred to here as the

"preview feature") does not constitute an improvement to computer technology. *See* Ex.1003 ¶ 89. The preview feature is merely a step to implement game play that allows a player can see the actual game before deciding to play it. *Id.* The '223 patent never ties the preview feature to any technological advancement. *Id.* A human being could play and preview the game with a deck of cards—thus, this feature does not provide the requisite integration into practical application to salvage patentability under Step 2A, prong 2. *See id.*

Indeed, playing the game play within a certain technological environment (*e.g.*, a "game terminal" with a "touch screen" a "game processor") fails to integrate the claimed game play into a practical application. *See generally Ex Parte Seid*, Appeal 2017-009988, 2019 WL 411129, at *8 (P.T.A.B. Jan. 17, 2019) ("linking the use of the judicial exception to a particular technological environment, e.g., one or more processors linked to a third party on-line source via a computer network" insufficient at Step 2A to demonstrate practical integration); *see also Ex Parte Skiba*, Appeal 2019-005143, 2020 WL 2217123, at *5 (P.T.A.B. May 4, 2020) (using computer as tool to perform abstract idea does not demonstrate practical integration). There is nothing about any of the elements in the independent or dependent claims (in addition to claim 44)—use of a wild card or player interactions—which demonstrates integration into a practical application. *See* Ex.1003 ¶ 75. "[T]he additional elements do not improve computer capabilities or a technical field. Nor

do they implement the abstract ideas on a particular machine that is integral to the claims or effect a transformation or reduction of a particular article to a different state or thing." *Ex Parte Hilster*, Appeal 2019-001571, 2020 WL 2217063, at *7 (P.T.A.B. May 4, 2020) (finding carrying out claim abstract idea through, "an interactive path" and with specific tools such as an extractor, did not constitute integration into practical application).

At bottom, "the focus of the claims" is not on an improvement in computers as tools, but on "[a] certain independently abstract idea[ ]"—playing a game in a certain way—"that use[s] computers as tools." *FairWarning IP, LLC v. Iatric Sys., Inc.*, 839 F.3d 1089, 1095 (Fed. Cir. 2016) (alterations omitted). The '223 patent "does not evidence any improvement in computer technology itself, but merely provides a generic environment in which to carry out the abstract idea." *Nice Sys. Ltd. v. Clickfox, Inc.*, 207 F. Supp. 3d 393, 400 (D. Del. 2016). Merely reciting a "game processor" (which is at best a conventional CPU or microprocessor) does not change the fundamental nature of any claim in which it appears. *See* Ex.1003 ¶¶ 75-76, 81. These claims are not directed to a novel CPU or microprocessor (or any other technological component), but, rather, to game play that happens to be carried out using a nondescript "game processor." Indeed, the Federal Circuit has made plain that "[i]f a claim's only 'inventive concept' is the application of an abstract idea using conventional and well-understood techniques, the claim has not been

59

transformed into a patent-eligible application of an abstract idea." *BSG Tech. LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1290-91 (Fed. Cir. 2018).  That is the case here—what at best a generic component, the "game processor," is just being used to carry out steps of game play; this is nothing transformative.

### 4.    *Guidance*, Step 2B: Representative Claim 44 Does Not Contain an Inventive Concept.

Transforming an abstract idea into a patent-eligible application requires more than "stating the abstract idea while adding the words 'apply it with a computer.'"  *Alice*, 573 U.S. at 211 (citing *Mayo*, 566 U.S. at 72).  Other than reciting steps for playing the game, representative claim 44 at best only recites generic computer components—an "electronic game terminal," "touch screen display," and "game processor."  Ex.1003 ¶¶ 75-80.  The '223 patent, therefore, lack sufficient features beyond the abstract idea of playing a game that constitute an "inventive concept"—*i.e.*, "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself."  *Alice*, 573 U.S. at 217-18 (internal alteration and citation omitted).[7]

---

[7] Petitioner does not assert that the '223 patent preempts all types of game play.  But a lack of complete preemption does not demonstrate patent eligibility.  *Ariosa*

No "inventive concept" can be found in the application of vaguely described components—such as "electronic gaming system," "game processor," "game terminal," and "touch screen display"—to game play. Neither the claims nor the specification provide any technical detail regarding these generic components.[8] *See* Ex.1003 ¶¶ 75-76, 80-81. *See Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1338-39 (Fed. Cir. 2013) (claims recited "event processor" without implementation details); *Intellectual Venture I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) (claims recited "a generic computer element—a processor—and a series of generic computer 'components' that merely restate[d] their individual functions"). Further, the specification

---

*Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). Here, the '223 patent purports to preempt game play involving the specific steps claimed—previewing and testing.

[8] Moreover, the '223 patent does not describe these components as improving technology or being inventive or new at the time the '223 patent application was filed. Nor could it. As the '223 patent acknowledges, "electronic games" were "very popular" at the time of the alleged invention, Ex.1001 at 1:18-20, and touch screens were well known. *See Fresenius Med.*, 2005 WL 3970076, at *2 (discussing touch screen technology patent in 2005).

emphasizes the broad use of conventional media types ("diskettes or CD ROMs and transmission type media such as analog or digital communications links") in connection with the claimed invention, Ex.1001 at 12:29-32, highlighting that the physical components of the purported inventive system do not provide the requisite inventive concept to salvage the claims as patentable. In sum, nothing in the patent points to anything non-conventional about the hardware or software components that perform the claimed game. *See TriPlay v. WhatsApp, Inc.*, C.A. No. 13-1703-LPS-CJB, 2018 WL 1479027, at *8 (D. Del. Mar. 27, 2018) (where "specification repeatedly explains that the components being used are general purpose computers, processes, and devices," claims are not transformed into patentable subject matter). Thus, the '223 patent's "mere recitation of concrete, tangible components is insufficient to confer patent eligibility to an otherwise abstract idea." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d at 614 (collecting cases "finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea"); *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1368 (Fed. Cir. 2015) (emphasizing that "instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible").

Further, there is no "inventive concept" in limiting the claimed game play to the electronic gaming context. As the Supreme Court stated in *Bilski v. Kappos*,

"limiting an abstract idea to one field of use . . . [does] not make the concept patentable." 561 U.S. 593, 612 (2010). The Federal Circuit too has made clear that "attempt[s] to limit the use" of an abstract idea "to a particular technological environment" are insufficient to save a claim. *Ultramercial, Inc. v. Hulu, Inc.*, 772 F.3d 709, 716 (Fed. Cir. 2014); *see BSG Tech.*, 899 F.3d at 1286-87 (limiting claimed method to generic environment insufficient to salvage patentability); *Elec. Power Grp., LLC v. Alstom, S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016).

Likewise, there is no "inventive concept" in the particular ordering of the claimed game steps. In the district court proceeding, Patent Owner acknowledged that the steps of representative claim 44 are not an ordered combination. *See* Ex.1006 at 47:22-48:4 (Q. "[Y]ours is an elements only argument, not an ordered combination argument. Is that right?" A: "That's right . . . it's not the ordering of steps."). Each of the individual steps recited in claim 44 does nothing more than implement the abstract idea of game play in a known and conventional manner, by constructing a field, reviewing that field, and then having someone play the game. *See Alice*, 573 U.S. at 217 (viewing claims as ordered combination does not "transform the nature of the claim" into patent-eligible subject matter). The claims "add nothing . . . that is not already present when the steps are considered separately." *Id.* at 225.

Moreover, there is nothing in the claims or the specification of the '223 patent that demonstrates that the arrangement of the abstract steps constitutes an improvement to the generic technology used to carry out the game play. *See Twilio, Inc. v. Telesign Corp.*, 249 F. Supp. 3d 1123, 1150-51 (N.D. Cal. 2017). Indeed, "narrowing or reformulating an abstract idea"—in this case taking game play and using a generic or well-known components to carry it out—cannot be an inventive concept, and "it is irrelevant whether [use of the abstract idea] may have been non-routine or unconventional as a factual matter." *BSG Tech*, 899 F.3d at 1291. Because, as a matter of law, "narrowing or reformulating an abstract idea" cannot be an inventive concept, "it is irrelevant whether [use of the abstract idea] may have been nonroutine or unconventional as a factual matter." *Id.* at 1291. Merely, narrowing game play to include preview and testing does not alter the abstract idea of game play. The claimed "features" of the game play are just additional elements (*i.e.*, rules) of the game. But, rules of a game are still a part of the abstract game play.

At bottom, none of the '223 patent claim limitations add the requisite "something more" to transform the abstract idea of playing a game into a patent-eligible application of that idea.

## X.    GROUND 2:  THE CLAIMS ARE UNPATENTABLE UNDER 35 U.S.C. § 112, FIRST PARAGRAPH, FOR LACK OF WRITTEN DESCRIPTION WITH RESPECT TO THE VALUATION TESTING LIMITATION

### A.    Legal Standard for Written Description.

The specification of a patent must "contain a written description of the invention."  35 U.S.C. § 112, ¶ 1.[9]  The test for written description is "**whether the disclosure** of the application relied upon **reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter** as of the filing date."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).

In *Ariad*, the Federal Circuit *en banc* held that the written description requirement is **separate** from the enablement requirement.  *Id.* at 1344.  As such, written description is "'**not a question of whether one skilled in the art might be able to construct the patentee's device from the teachings of the disclosure** . . . . Rather, it is a question whether the application necessarily discloses that particular

---

[9] Paragraph 1 of 35 U.S.C. § 112 was replaced with newly designated § 112(a) by § 4(c) of the AIA, Pub. L. No. 112-29, and AIA § 4(e) makes those changes applicable "to any patent application that is filed on or after" September 16, 2012.  Because the application resulting in the '223 patent was filed before that date, this Petition refers to the pre-AIA version of § 112.

device.'"  *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 923 (Fed. Cir. 2004) (quoting *Jepson v. Coleman*, 314 F.2d 533, 536 (C.C.P.A. 1963)); *see also Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1571 (Fed. Cir. 1997) ("**It is the disclosures of the applications that count**.") (emphasis added); *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1295 (Fed. Cir. 2002) ("That is, the disclosure must show he had invented each feature that is included as a claim limitation.").  "**[A] description that merely renders the invention obvious does not satisfy the requirement.**"  *Ariad*, 598 F.3d at 1352 (emphasis added); *see, e.g., Rivera v. Int'l Trade Comm'n*, 857 F.3d 1315, 1322 (Fed. Cir. 2017) (finding lack of written description support where the specification did not disclose claimed feature even if claimed feature might have been obvious in view of the specification's teachings to a skilled artisan).

Further, "**[t]he written description requirement is not met if the specification merely describes a desired result**."  *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, 782 F.3d 671, 682 (Fed. Cir. 2015) (emphasis added).  In applying this standard to computer-implemented functional claims (like those at issue in this Petition), the Federal Circuit has stated that "**[t]he more telling question is whether the specification shows possession by the inventor of *how* [the claimed function] is achieved**."  *Id.* at 683; *see also Ariad*, 598 F.3d at 1357-58 (finding lack of written description of claims reciting method of reducing activity

66

of gene transcription factor where specification provided "a mere mention of a desired outcome" and only "hypothesizes with no accompanying description").

### B.    The Written Description Is Not Met Because There Is No Description of *How* to Achieve the Claimed Function of the Valuation Testing Limitation.

Each and every claim of the '223 patent requires "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" or program instructions that perform this same step—the Valuation Testing Limitation.  *See* Ex.1001 at claims 1, 13, 25, 37, 44, 51, 58, 64, 70.    As discussed above in the claim construction section (Section VIII.A.1), incorporated here, "completing the field" is a step performed by the player.  The Valuation Testing Limitation thus requires "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently **when the player completes the field**."

None of the '223 patent's specification, figures, or originally filed claims use the language of the Valuation Testing Limitation.  Ex.1003 ¶¶ 94-95.  Yet, even if the specification disclosed the Valuation Testing Limitation word-for-word (which it does not) or if a POSITA would know how to perform and implement the required testing (which Patent Owner may argue), this would still be insufficient.  To satisfy

the written description requirement, the specification must do more than merely repeat the same words or functions recited in the claims—it must describe *how* the inventor intended to perform what is claimed. *See Vasudevan*, 782 F.3d at 683 ("**The more telling question is whether the specification shows** possession by the inventor of **how [the claimed function] is achieved**.") (emphasis added); *In re Wilder*, 736 F.2d 1516, 1520-21 (Fed. Cir. 1984) (affirming rejection of claims directed to indicating location of information recorded on a dictating machine because **the specification does "little more than outlin[e] goals appellants hope the claimed invention achieves and the problems the invention will hopefully ameliorate**") (emphasis added).

For example, in *Ariad*, the Federal Circuit found that claims reciting a method of reducing the activity of a gene transcription factor, NF-KB, were invalid for lack of written description support where "the specification at best describes decoy molecule structures and **hypothesizes with no accompanying description** that they could be used to reduce NF-KB activity." 598 F.3d at 1358 (emphasis added). The Federal Circuit explained that "this disclosure [in the specification] is not so much an 'example' as it is a mere mention of a **desired outcome**." *Id.* at 1357 (emphasis added). Without any written description support that explains how to perform the claimed function, "**[s]uch claims merely recite a description of the problem to be**

68

**solved while claiming all solutions to it** . . . **leaving** it to the pharmaceutical industry to complete **an unfinished invention**." *Id.* at 1353 (emphasis added).

The Board has likewise applied the same reasoning from *Vasudevan* and *Ariad* to find a lack of written description for computer-implemented inventions where the specification failed to describe how the inventor intended for claimed computing functions to be performed. *See In re Ennis*, Appeal No. 2017-001365, 2018 WL 1778246, at *2 (P.T.A.B. Mar. 29, 2018) (citing *Vasudevan* and *Ariad*). In *In re Ennis*, the Board affirmed the examiner's finding that the claimed step of "selecting the advertisement from a database of advertisements based on the processed event information and the processed crowd information" lacked written description support. Even though the specification disclosed this step nearly word-for-word, the Board was "**unable to discern from these disclosures**, or any other disclosures identified by Appellants, **any explanation of *how* Appellants intended to achieve the claimed function**." *Id.* at *3 (emphasis added).

Here, the '223 patent's specification fails to provide any required details about *how* the named inventor intended for the claimed testing to be performed to achieve the aspirational result of ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field. Ex.1003 ¶ 96. Indeed, despite alleging the purported invention relies on "underlying software algorithms," the specification discloses none. *Id.* Because

69

there is no written description support that explains how to perform the testing required by the Valuation Testing limitation, the "claims merely recite a description of the problem to be solved while claiming all solutions to it . . . leaving it to the [gaming] industry to complete an unfinished invention." *Ariad*, 598 F.3d at 1353; *see* Ex.1003 ¶ 96.

### C. The Applicant Alleged There Was Support for the Valuation Testing Limitation, but the Cited Portions of the Specification Fails.

The Valuation Testing Limitation was introduced into only some of the pending claims in a response to rejection of the claim on January 23, 2010, and into the remaining claims following the March 2010 examiner interview and amendment—nearly four years after the application was filed. In the January 23, 2010, response to an Office Action the applicant pointed only to "Paragraph 39" as support for the Valuation Testing Limitation:

> Claims 6, 19 and 32 have been amended to clarify the testing step. Support for the amendment is found at least in **Paragraph 39**. Testing the constructed field before presenting the field to the player on the game display ensures that a winning combination more valuable than the selected winning combinations is not generated inadvertently in completing the field.

Ex.1002 at p. 190 (1/26/2010 Office Action Response at p. 28). It was unclear whether the applicant was referring to Paragraph 39 of the as-filed application or

70

Paragraph 39 of the published application. Regardless, neither supports the Valuation Testing Limitation. Ex.1003 ¶ 97.

Paragraph 39 of the as-filed application contains no relevant disclosures as this paragraph merely refers to certain steps shown in Figure 2 related to "determining the remaining number of plays . . . that are available at different denominations (i.e., levels) of play." Ex.1002 at pp. 18-19 (pages 14 and 15 of original application). Nothing in this paragraph concerns testing a game field as required by the Valuation Testing Limitation. Ex.1003 ¶ 98.

Paragraph 39 of the published application also fails to support the added Valuation Testing Limitation because it contains no description of *how* the claimed testing step is to be performed to achieve the claimed objective—referring instead to the aspirational and undisclosed "software algorithm":

> [Paragraph 39] Essentially, the Tic-Tac-Fruit electronic game presents a task whereby the player must select the appropriate field element to replace with a wild symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random selection from a finite pool of available prizes. The device selects the quantity of lines that will present a winning outcome. Prizes may be presented on one, two, three, or four lines in a single game play. The device selects the level of prize(s) to be awarded. A **software algorithm** assesses the arrangement of the prize(s) to be offered to **assure that no other, more valuable prizes will inadvertently be**

71

**presented**.  The key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player.

Ex.1007 ¶ 0039 (emphasis added); Ex.1003 ¶ 99.  Moreover, Paragraph 39 refers to assessing offered prizes to assure that no other, more valuable prizes "**will inadvertently be presented**" instead of the claimed objective: "to ensure that a winning combination more valuable than the determined winning combination **is not generated inadvertently in completing the field**."  *See id.* (emphasis added); Ex.1001 at 6:19-33 (location of Paragraph 39 in issued patent).  A POSITA would not equate the inadvertent presentation of a prize in Paragraph 39 with an inadvertent winning combination being generated **when a player completes a field**.  Ex.1003 ¶ 100.  Plainly, a prize could be presented inadvertently in a game field even if a field is not completed by a user.  *Id.*  Paragraph 39 addresses the former, not the latter. *Id.*

Paragraph 39 also refers to "prizes" which a POSITA would understand to be different from "winning combinations."  *Id.* ¶ 101.  Yet, even if "prizes" were deemed to be the same as "winning combinations," Paragraph 39's teachings still fail to provide support.  At most, were one to substitute "winning combinations" for "prizes" in the specification, Paragraph 39 would still only refer to assessing the arrangement of "winning combinations."  *Id.*  Nothing in such a hypothetical

Paragraph 39 discloses testing **to ensure** that a more valuable winning combination is not generated inadvertently **when the player completes the field**. *Id.*

Even if the specification were found to disclose an algorithm that tests for the possibility of a more valuable winning combination being generated inadvertently when the player completes the field (which it does not disclose), the specification never describes the added steps that are needed to <u>ensure</u> that such an event does not occur, which is also a requirement of the Valuation Testing Limitation. There is simply no teaching in the specification as to how to do that. Ex.1003 ¶ 102.

Nothing in Paragraph 39, including its last sentence, cures this deficiency. *See* Ex.1003 ¶ 103. The last sentence of this paragraph only states that "the key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player."[10] Ex.1001 at 6:30-32. A POSITA would understand that the last sentence of paragraph 39 only teaches a technique for the player to obtain the highest value prize that is intended to be offered to that player. Ex.1003 ¶ 103.

---

[10] A POSITA would understand that, according to the teachings of paragraph 39, the "highest value prize" referenced here refers to the highest value prize that is intended "to be offered" to the player after the game "selects the level of prize(s) to be awarded" and/or "determine[s] [the prize(s)] by a random selection from a finite pool of available prizes." *See* Ex.1001 at 6:22-30; Ex.1003 ¶ 103.

73

For example, if the intended highest value prize is associated with three Bell symbols, this technique teaches replacing one of those three Bell symbols with a non-winning symbol such as a Titanium symbol. *Id.* This technique, however, does nothing to ensure that a winning combination more valuable than the determined winning combination will not be inadvertently generated when the player completes the field. *Id.*

In fact, the technique of paragraph 39 could readily lead to scenarios where the player is able to obtain a more valuable prize associated with a more valuable winning combination. *Id.* For example, if the technique replaces one of the three Bell symbols with a Titanium symbol (as in the prior example) but another Titanium symbol is already in a line with that newly introduced Titanium symbol, this will result in a field where there is a winning combination (*i.e.*, three Titanium symbols) more valuable than the determined winning combination (*i.e.*, three Bell symbols) that can be inadvertently generated when the player completes the field. *Id.*

Therefore, the portions of the specification cited by the applicant during prosecution are irrelevant to and fail to provide written description support for the Valuation Testing Limitation. Ex.1003 ¶ 104.

**D.    The Specification's Other References to "Testing" Are Also Irrelevant.**

The '223 patent's specification refers to "testing" in various places, but the only instances of "testing" mentioned are for entirely different purposes.  Ex.1003 ¶ 105.

The specification refers to "test[ing] the complete field for compliance with the goals set by steps 1 and 3," which are "1. chose the **number of winning lines** (*i.e.*, 1, 2, 3, 4); 2. chose the **orientation** of each of the winning lines (*i.e.*, horizontal, vertical, or diagonal); 3. chose the **symbols** for each of the lines (*i.e.*, cherries, plums, bells, etc.)."  Ex.1001 at 4:51-64 (emphasis added); *see also id.* at 9:58-64, 10:29-34 (describing testing for compliance with same goals plus whether symbols were randomly selected for remaining grid elements).  This testing, however, only relates to choosing the number of winning lines, the orientation of those lines, the symbols in those lines, and the randomly selected symbols for the remaining spots.  Ex.1003 ¶ 105.  None of this testing even relates to, much less requires out of necessity, evaluating whether a "more valuable" winning combination might be inadvertently generated by the player, which is what the Valuation Testing Limitation requires. *Id.*

In addition, the specification refers to a "test" performed by an "embedded computer processor" which iterates through each of the 134 million possible field combinations (that number of combinations is based on an assumption that there are

75

eight symbols and nine spots) and "test[s] each combination to determine if it has **any complete lines**." Ex.1001 at 4:36-43. But a POSITA would have no reason to understand that the "embedded computer processor" referenced here is the same component as the "game processor," which in claim 44 and multiple other claims is what is required to be configured to perform the testing required by the Valuation Testing Limitation. Ex.1003 ¶ 106. Further, the test described with respect to the "embedded computer processor" does not evaluate whether a "more valuable" winning combination might be inadvertently generated by a player completing the field. *Id.* All this test is said to achieve is determining whether a particular field combination (of the 134 million possible field combinations) has "**any complete lines**" (*e.g.*, 3 Bell symbols in a row). *Id.* As this test only achieves the goal of identifying fields with already complete lines (*e.g.*, 3 Bell symbols in a row), this test has nothing to do with evaluating whether there is a more valuable winning combination than the determined winning combination in a given field or whether there is a winning combination that might be inadvertently generated when the player completes the field. *Id.*

Finally, the specification teaches that "game software" "determines all of the initial 'no-line' fields and tests each of these for potential winners where **all fields that can potentially complete a line are counted**." Ex.1001 at 4:44-47. But, as with the "embedded computer processor" test just discussed, the specification does

not even teach that this is a test performed by the "game processor" or describe how it is performed. Ex.1003 ¶ 107. Moreover, all the "game software" test does is identify "potential winners" so as to allow for counting of "all fields that can potentially complete a line." Ex.1001 at 4:45-47. The "game software" test simply does not evaluate whether there is a winning combination that might be inadvertently generated when the player completes the field or whether that winning combination is more valuable than the determined winning combination. Ex.1003 ¶ 107. In fact, after the "game software" test is performed, the patent goes on to explain that "the player must examine each lineup and symbol values to determine the best location for selecting the wild symbol on the field displayed." Ex.1001 at 4:44-50. There is no further testing described that will ensure against the inadvertent generation of a winning combination more valuable than the determined winning combination when the player examines each lineup and selects the wild symbol. Ex.1003 ¶ 107. As such, a POSITA would recognize that test performed by the "game software" is only concerned with counting fields with a line that can be potentially completed, and fails to disclose the testing required by the Valuation Testing Limitation, which requires evaluating whether a more valuable winning combination might be inadvertently generated when the player completes the field to ensure that this does not occur. *Id.*

A POSITA would recognize that none of the described testing discloses explicitly or inherently performing the testing required by the Valuation Testing Limitation—*i.e.*, testing to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently when the player completes the field. Ex.1003 ¶ 108. Rather, the only express reference to "testing" in the patent's specification relates to choosing the number of winning lines, the orientation of those lines, the symbols in those lines, and the symbols in the other grid elements; to identify and ferret out which fields have any complete lines already; or to identify and count which fields have lines which can potentially be completed. *Id.* None of this testing even relates to, much less requires out of necessity, evaluating whether a "more valuable" winning combination might be inadvertently generated by the player, which is what the Valuation Testing Limitation requires. *Id.* And, notably, the above references to "testing" in the specification describe only the function ascribed to the test rather than disclosing an algorithm as to specifically how that described testing is actually accomplished. *Id.*

Just as critically, none of the goals purported to be sought by the "testing" disclosed in the '223 patent specification includes ensuring that **a winning combination more valuable** than the determined winning combination **is not generated inadvertently when the player completes the field**. *Id.* ¶ 109. And, nowhere in the four corners of the '223 patent is it described or suggested that,

ensuring that **a winning combination more valuable** than the determined winning combination **is not generated inadvertently when the player completes the field** is necessary to achieve the purported goals of the "testing" referred to in the '223 specification. *Id.* ¶ 109.

In sum, the specification provides no support for the Valuation Testing Limitation and thus fails to confirm that the named inventor was in possession of this concept at the time of filing. *Id.* ¶ 110. Because the Valuation Testing Limitation is present in every claim of the '223 patent, all claims are unpatentable for lack of written description support.

## XI. GROUND 3: CLAIMS 13-24, 44-50, AND 64-69 ARE UNPATENTABLE UNDER 35 U.S.C. § 112, SIXTH PARAGRAPH, FOR INDEFINITENESS

The term "game processor" appears in claims 13-24, 44-50, and 64-69. As demonstrated above in Section VIII.B.1, incorporated here, claims 13-24, 44-50, and 64-69 are indefinite because "game processor" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions.

## XII. GROUND 4: CLAIMS 25-36, 51-57, AND 70-75 ARE UNPATENTABLE UNDER 35 U.S.C. § 112, SIXTH PARAGRAPH, FOR INDEFINITENESS

The term "program instructions" appears in claims 25-36, 51-57, 70-75. As demonstrated above in Section VIII.B.2, incorporated here, claims 25-36, 51-57, 70-

75 are indefinite because "program instructions" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions.

## XIII.  GROUND 5: CLAIMS 45-46 AND 65 ARE UNPATENTABLE UNDER 35 U.S.C. § 112, SIXTH PARAGRAPH, FOR INDEFINITENESS

The term "component for" appears in claims 45-46 and 65.  As demonstrated above in Section VIII.B.3, incorporated here, claims 45-46 and 65 are indefinite because "component for" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing the claimed functions.

## XIV.  CONCLUSION

The Challenged Claims should be cancelled as ineligible and unpatentable.

Dated:  May 21, 2020                          Respectfully Submitted,

                                             /Dion M. Bregman/
                                             Dion M. Bregman (Reg. No. 45,645)

## LISTING OF CLAIMS

1. An electronic gaming method comprising the steps of:

constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play;

receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and

displaying each winning combination of symbols on the touch screen display.

2. The electronic gaming method of claim 1 further comprising the steps of receiving the player's selection of a play level and activating game play.

3. The electronic gaming method of claim 1 further comprising the step of determining if the player has decided to play the game field displayed on the game display.

4. The electronic gaming method of claim 3 further comprising the step of redeeming a player's credit balance and an associated payout for each winning combination of symbols on each game previously played.

5. The electronic gaming method of claim 1 wherein the constructed field is a two-dimensional array having a plurality of rows and columns.

6. The electronic gaming method of claim 1 wherein the step of constructing the field comprises:

determining an orientation of each winning combination for the play of the game;

determining the symbols for each of the winning combinations;  and

randomly determining symbols for the remaining elements of the field.

7. The electronic gaming method of claim 6 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

8. The electronic gaming method of claim 1, further comprising the steps of:

constructing a plurality of game fields each having a plurality of game symbols, with each game field corresponding to a selectable level of play;  and

82

automatically displaying each of the plurality of game fields on the touch screen game display sequentially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

9. The electronic gaming method of claim 8 further comprising receiving the player's selection of a sequentially displayed game to play.

10. The electronic gaming method of claim 1 wherein each winning combination of symbols has an associated payout to the player.

11. The electronic gaming method of claim 1 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

12. The electronic gaming method of claim 1 wherein the denomination of play corresponds to the level of play.

13. An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal with a plurality of options selectable by a player, the game processor configured for  constructing a game field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning

83

combination for each play of the game but there is no winning combination without player interaction with the game display;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display prior to initiating activation of game play;

receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection;  and

displaying each winning combination of symbols on the touch screen display.

14. The electronic gaming system of claim 13 wherein the game processor is further configured for receiving the player's selection of a play level and activating game play.

15. The electronic gaming system of claim 13 wherein the game processor is further configured for determining if the player has decided to play the game field displayed on the game display.

16. The electronic gaming system of claim 15 wherein the game processor is further configured for redeeming a player's credit balance and an associated

payout for each winning combination of symbols on each game previously played.

17. The electronic gaming system of claim 16 wherein the denomination of play corresponds to the level of play.

18. The electronic gaming system of claim 13 wherein the game processor is further configured for constructing the field as a two-dimensional array having a plurality of rows and columns.

19. The electronic gaming system of claim 13 wherein the game processor is further configured for:

determining an orientation of each winning combination for the play of the game;

determining the symbols for each of the winning combinations;  and

randomly determining symbols for the remaining elements of the field.

20. The electronic gaming system of claim 19 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

21. The electronic gaming system of claim 13 wherein each winning combination of symbols has an associated payout to the player.

22. The electronic gaming system of claim 13 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

23. The electronic gaming system of claim 13 wherein the game processor is further configured for:

constructing a plurality of game fields each having a plurality of game symbols, with each field corresponding to a selectable level of play; and

automatically displaying each of the plurality of game fields on the touch screen game display sequentially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

24. The electronic gaming system of claim 23 wherein the game processor is further configured for receiving the player's selection of a sequentially displayed game to play.

25. A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising:

program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for

each play of the game but there is no winning combination without player interaction with the game display;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that receive the player's selection of a field element as a location for a wild symbol and determine each winning combination of symbols that is formed by such selection;  and

program instructions that display each winning combination of symbols on the touch screen display.

26. The computer program product for electronic gaming of claim 25 further comprising program instructions that receive the player's selection of a play level and activate game play.

27. The computer program product for electronic gaming of claim 25 further comprising program instructions that determine if the player has decided to play the game field displayed on the game display.

28. The computer program product for electronic gaming of claim 27 further comprising program instructions that redeem a player's credit balance and an associated payout for each winning combination of symbols on each game previously played.

29. The computer program product for electronic gaming of claim 25 wherein the field is a two-dimensional array having a plurality of rows and columns.

30. The computer program product for electronic gaming of claim 25 wherein the program instructions that construct the field comprise:

program instructions that determine an orientation of each winning combination for the play of the game;

program instructions that determine the symbols for each of the winning combinations; and

program instructions that randomly determine symbols for the remaining elements of the field.

31. The computer program product for electronic gaming of claim 30 wherein the orientation of each winning combination is horizontal, vertical or diagonal.

32. The computer program product for electronic gaming of claim 25 wherein each winning combination of symbols has an associated payout to the player.

33. The computer program product for electronic gaming of claim 25 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game.

34. The computer program product for electronic gaming of claim 25 wherein the denomination of play corresponds to the level of play.

35. The computer program product for electronic gaming of claim 25 further comprising:

program instructions that construct a plurality of game fields each having a plurality of game symbols, with each game field corresponding to a selectable level of play;  and

program instructions that display each of the plurality of game fields on the touch screen game display sequentially for each selectable level of play, wherein the player's selection of the level of play determines which of the sequentially displayed games is actually played.

36. The computer program product for electronic gaming of claim 35 further comprising program instructions that receive the player's selection of a sequentially displayed game to play.

37. An electronic gaming method comprising the steps of:

constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game;  and

displaying an outcome resulting from play of the displayed game.

38. The electronic gaming method of claim 37 further comprising generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game.

39. The electronic gaming method of claim 38 wherein the additional game field is for a next game to be played.

40. The electronic gaming method of claim 37 wherein the displayed game comprises a two-dimensional array of game symbols.

41. The electronic gaming method of claim 37 wherein the displayed game comprises a one-dimensional array of game symbols.

90

42. The electronic gaming method of claim 37 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

43. The electronic gaming method of claim 42 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

44. An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game; and

displaying an outcome resulting from play of the displayed game.

91

45. The electronic gaming system of claim 44 further comprising a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game.

46. The electronic gaming system of claim 45 wherein the additional game field is for a next game to be played.

47. The electronic gaming system of claim 44 wherein the displayed game comprises a two-dimensional array of game symbols.

48. The electronic gaming system of claim 44 wherein the displayed game comprises a one-dimensional array of game symbols.

49. The electronic gaming system of claim 44 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

50. The electronic gaming system of claim 49 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

51. A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising:

program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

program instructions that determine at least one winning combination for each play of the game;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that determine if the player has decided to play the displayed game;  and

program instructions that display an outcome resulting from play of the displayed game.

52. The computer program product for electronic gaming of claim 51 further comprising program instructions that generate and display an additional game field simultaneously on the game display in proximity to the displayed game.

53. The computer program product for electronic gaming of claim 52 wherein the additional game field is for a next game to be played.

54. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a two-dimensional array of game symbols.

55. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a one-dimensional array of game symbols.

56. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols.

57. The computer program product for electronic gaming of claim 56 further comprising program instructions that enable a player to move a reel up or down at least one position to replace a current symbol on a pay line and change an outcome of the displayed game.

58. A method for displaying a plurality of electronic game fields for selection by a player before initiating play of a selected game comprising the steps of:

receiving a signal from the player to generate an interactive electronic game on a touch screen display of an electronic game terminal;

generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

94

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

receiving a signal from the player to generate another of the plurality of electronic game fields associated with a different level of play prior to initiating activation of game play;

generating and automatically displaying another of the plurality of electronic game fields; and

receiving the player's selection of the electronic game field to play prior to initiating activation of game play.

59. The method for displaying a plurality of electronic game fields of claim 58 further comprising generating and displaying a next game field simultaneously on the game display in proximity to a currently displayed game.

60. The method for displaying a plurality of electronic game fields of claim 58 wherein the displayed game comprises a two-dimensional array of game symbols.

61. The method for displaying a plurality of electronic game fields of claim 58 wherein the displayed game comprises a one-dimensional array of game symbols.

62. The method for displaying a plurality of electronic game fields of claim 58 wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

63. The method for displaying a plurality of electronic game fields of claim 62 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

64. A system for displaying a plurality of electronic game fields each associated with a different level of play comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game display on a game terminal, the game processor configured for displaying a plurality of electronic game fields for selection by a player before initiating play of a selected game by  receiving a signal from the player to generate an interactive electronic game;

generating a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

receiving a signal from the player to generate another of the plurality of electronic game fields associated with another level of play prior to initiating activation of game play;

generating and automatically displaying another of the plurality of electronic game fields;  and

receiving the player's selection of the electronic game field to play prior to initiating activation of game play.

65. The system for displaying a plurality of electronic game fields of claim 64 further comprising a component for generating and displaying a next game field on the game display simultaneously in proximity to a currently displayed game.

66. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a two-dimensional array of game symbols.

67. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a one-dimensional array of game symbols.

68. The system for displaying a plurality of electronic game fields of claim 64 wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

69. The system for displaying a plurality of electronic game fields of claim 68 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line.

70. A computer program product for displaying a plurality of interactive electronic game fields for selection by a player when executed on a processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising:

program instructions that receive a signal from a player to generate interactive electronic game on a touch screen display of an electronic game terminal;

program instructions that generate a game field having a plurality of elements for the interactive game display wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

98

program instructions that determine at least one winning combination for each play of the game;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that receive a signal from the player to generate another of the plurality of electronic game fields associated with a different level of play prior to initiating activation of game play;

program instructions that generate and automatically display another of the plurality of electronic game fields;  and

program instructions that receive the player's selection of the electronic game field to play prior to initiating activation of game play.

71. The computer program product for displaying a plurality of electronic game fields of claim 70 further comprising program instructions that generate and display a next game field on the game display simultaneously in proximity to a currently displayed game.

99

72. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a two-dimensional array of game symbols.

73. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a one-dimensional array of game symbols.

74. The computer program product for displaying a plurality of electronic game fields of claim 70 wherein the displayed game comprises a plurality of vertically-oriented reels, each reel having a plurality of game symbols.

75. The computer program product for displaying a plurality of electronic game fields of claim 70 further comprising program instructions that enable a player to move a reel up or down at least one position to replace a current symbol on a pay line and change an outcome of the displayed game.

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

## CERTIFICATION OF COMPLIANCE WITH TYPE-VOLUME LIMITS

This Petition includes 17,487 words, as counted by Microsoft Word, and is therefore in compliance with the 18,700-word limit established by 37 C.F.R. 42.24(a)(1)(i).  Accordingly, pursuant to 37 C.F.R. 42.24(d), lead counsel for the Petitioners hereby certify that this Petition complies with the type-volume limits established for a petition requesting CBM.

Dated:  May 21, 2020                           Respectfully Submitted,

                                              */Dion M. Bregman/*
                                              Dion M. Bregman (Reg. No. 45,645)

101

Petition for CBM Review of Patent No. 7,736,223
Case No. CBM2020-00014

## CERTIFICATE OF SERVICE

Pursuant to 37 C.F.R. 42.6(4) and 42.105, counsel for Petitioners hereby certify that on May 21, 2020 copies of this Petition, Power of Attorney, and all supporting exhibits were sent via Priority Mail Express to the correspondence address of record for the '223 patent:

WOMBLE BOND DICKINSON (US) LLP
ATTN: IP DOCKETING
P.O. BOX 7037
ATLANTA GA 30357-0037

A courtesy copy of this Petition, Power of Attorney and supporting exhibits was also served via email on Patent Owner's counsel of record in the district court litigation:

Matthew H. Haverstick (PA 85072)
Eric J. Schreiner (PA 76721)
Shohin H. Vance (PA 323551)
Kleinbard LLC
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: 215.568.2000
Fax: 215.568.0140
mhaverstick@kleinbard.com
eschreiner@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

Steven G. Hill
John L. North
Martha L. Decker
Hill, Kertscher & Wharton, LLP
3350 Riverwood Parkway
Atlanta, GA 30339
Telephone: 770.953.0995
Fax: 770.953.1358
sgh@hkw-law.com
jln@hkw-law.com
md@hkw-law.com

Dated:  May 21, 2020

Respectfully Submitted,

*/Ahren C. Hsu-Hoffman/*
Ahren C. Hsu-Hoffman (Reg. No. 50,862)