# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

SAVVY DOG SYSTEMS, LLC, and
POM of Pennsylvania, LLC,

      Plaintiffs,

      v.

PENNSYLVANIA COIN, LLC, and PA
COIN HOLDINGS, LLC

      Defendants.

CIVIL ACTION NO: 3:19-cv-01470-JPW

## DEFENDANTS' INITIAL INVALIDITY CONTENTIONS

Pursuant to the paragraph 6(d) of the Case Management Order (Dkt. No. 50), Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC ("Defendants") hereby serve their Initial Invalidity Contentions.

## I.  INTRODUCTION

### A.  Patent-In Suit

These Initial Invalidity Contentions address U.S. Patent No. 7,736,223 (the "'223 patent").

### B.  Priority Dates

Plaintiffs' June 2, 2020 First Supplemental Response to Defendant's Interrogatory No. 4 states that Plaintiffs "are not at this time taking the position that the priority date of any claim precedes the date of filing of the earliest application leading to the issuance of the '223 Patent." Plaintiffs further state that the "exact date of conception is not presently known, they believe the date of conception for all inventions claimed in the 223 Patent is between January 1, 2006 and March 31, 2006."  Although Plaintiffs reference purported documentation related to the '223 patent, Plaintiffs have not identified this or other documentation allegedly supporting a conception date between January and March, 2006.

Plaintiffs have also not established that any claim is entitled to a priority date earlier than

the '223 patent's filing date of June 30, 2006.

Because Plaintiffs have not indicated that there is sufficient documentation or evidence to support a conception date before the filing date of the application that resulted in the '223 patent and further have not established that any claim is entitled to the benefit of an earlier filed application, for the purposes of these Initial Invalidity Contentions, Defendants assume a priority date of June 30, 2006 for the claims of the '223 patent.

To the extent Plaintiffs are permitted to assert an earlier conception date, otherwise claim an earlier priority date, and/or produce sufficient evidence or it is found that the '223 patent is entitled to an earlier filing date, Defendants reserve the right to amend and/or supplement their invalidity contentions.

### C.    Claim Scope

These Initial Invalidity Contentions are based on Defendants' present understanding of the claims and/or claim constructions that may be discerned in light of Plaintiffs' allegations of infringement and apparent interpretation of the claims.  Defendants' contentions are not, and should in no way be interpreted as, admissions, suggestions, or adoptions of any particular claim scope or construction.  Defendants take no position on any matter of claim construction in these Initial Invalidity Contentions.  Defendants reserve the right to propose any claim construction they consider appropriate and/or to contest any claim construction they consider inappropriate. Defendants reserve the right to amend or supplement their Initial Invalidity Contentions after the Court construes the terms of the claims.

### D.    Amendment and Supplementation

Defendants make these disclosures based on information currently available to Defendants, including, but not limited to, their current knowledge, their current understanding of the '223 patent, and Plaintiffs' Disclosure of Asserted Claims and Infringement Contentions.  Defendants

have not completed their investigation of the facts relating to this case, and discovery in this action is ongoing. Plaintiffs have not yet provided their proposed constructions for terms and phrases in the '223 patent. Accordingly, Defendants reserve the right to modify, supplement, or otherwise amend these Initial Invalidity Contentions to address any additional information uncovered by Defendants, including any newly discovered prior art or new theories of invalidity.

### E. Scope of Contentions

These Initial Invalidity Contentions disclose the current bases for Defendants' contentions regarding invalidity, *i.e.*, prior art references under 35 U.S.C. §§ 102 and 103, failure to name the true inventors of the claimed subject matter as required by § 102(f), indefiniteness under 35 U.S.C. § 112, ¶ 2, lack of written description under 35 U.S.C. § 112, ¶ 1, and ineligible subject matter under 35 U.S.C. § 101.[1]

## II. INVALIDITY UNDER 35 U.S.C. §§ 102 AND 103

### A. Invalidating Prior Art

Table 1 identifies prior art references that anticipate and/or render obvious one or more claims of the '223 patent.

---

[1] Citations to Title 35 of the United States Code refer to the pre-AIA version of the Code. *See* America Invents Act, P.L. 112-29 (Sept. 16, 2011) at §§ 3(n) and 4(e) (amendments to 35 U.S.C. §§ 102 and 103 take effect and apply to applications filed on or after March 16, 2013, and amendments to 35 U.S.C. § 112 take effect and apply to applications filed on or after September 16, 2012).

**Table 1: Invalidating References for the '223 Patent**

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| | Tic Tac Fruit Electronic Game Product/System (including at least versions 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27), as well as documentation, publications, and/or knowledge regarding the Tic Tac Fruit Electronic Game | | Before June 30, 2006. | Ex. A-1, A2-A-6 |
| Farley | Nick Farley & Associates | Report on the review and analysis of the *Tic-Tac-Fruit* game | Mar. 7, 2005 | Ex. A-1, A-2 - A-6 |
| Fawley et al. | Fawley & Associates | Skill-Based Amusement Machines Known as Tic Tac Fruit | Oct. 28, 2004 | Ex. A-1, A-2 - A-6 |
| Turner | | Tic-Tac-Fruit: An analysis | Nov. 15, 2004 | Ex. A-1, A-2 - A-6 |
| Toland | Pittsburgh Post-Gazette | Ohio 'skill' game a cross-border lure | Apr. 30, 2006 | Ex. A-1, A-2 - A-6 |
| Walker et al. | US 2003/0060276 | Method and apparatus for offering a guaranteed win | Mar. 27, 2003 | Ex. A-2, A-1, A-3 - A-6 |
| Michaelson et al. | US 7,291,069 | Central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller | Nov. 6, 2007 (filed Mar. 6, 2003) | Ex. A-3, A-1, A-2, A-4, A-5, A-6 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Michaelson et al. | US 2004/0176167 | Central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller | Nov. 6, 2007 (filed Mar. 6, 2003) | Ex. A-3, A-1, A-2, A-4, A-5, A-6 |
| Vancura | US 7,040,985 | Method and apparatus for selecting wild symbols by a player | May 9, 2006 (filed Jan. 15, 2002) | Ex. A-4, A-1, A-2, A-3, A-5, A-6 |
| Vancura | US 2003/0153382 | Method and apparatus for selecting wild symbols by a player | Aug. 14, 2003 | Ex. A-4 |
| Kowell | US 8,491,369 | Method and apparatus for playing a skill game | Jul. 23, 2013 (filed Apr. 3, 2007) priority to Prov. App. No. 60/815,352 (filed Jun. 21, 2006) | Ex. A-1 – A-6 |
| Weingardt | US 5,482,289 | Method of playing a bingo game with progressive jackpot | Jan. 9, 1996 | Ex. A-1 – A-6 |
| Daly | US 7,108,602 | Multi-reel slot machine with selectable reel play | Sep. 19, 2006 (filed Mar. 24, 2005) | Ex. A-1 – A-6 |
| Marchini et al. | GB 2,251,112 | Entertainment machines | Jun. 24, 1992 | Ex. A-1 – A-6 |
| Chambers | GB 2,382,911 | Player configurable entertainment | June 11, 2003 | Ex. A-6, A-1 – A-5 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| | | machine | | |
| Farrell et al. | EP 0449,433 | Gaming and amusement machines | October 2, 1991 | Ex. A-1 – A-6 |
| Carroll, J. | *Commonwealth v. McClintock*, 257 Mass. 431, 432–35, 154 N.E. 264, 264 (1926) | | Nov. 29, 1926 | Ex. A-1 – A-6 |
| Evans, J. | *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105–06 (1925) | | Dec. 15, 1925 | Ex. A-1 – A-6 |
| Thompson | Gambling in America | An Encyclopedia of History, Issues, and Society | | Ex. A-1 – A-6 |
| Papp | *Ohio SB 220 Bill Analysis – Legislature Service Commission*, 126th General Assembly | | October 27, 2005 | Ex. A-1 – A-6 |
| Riedthaler | Case No. 1342-05 | *Proceedings Before the Liquor Control Commission of the State of Ohio* | October 19, 2005 | Ex. A-1 – A-6 |
| Gordon | Wash. Att'y Gen. Op. 1969 NO. 9, 1969 WL 98526 | *Lotteries -- Gambling -- Pinball Machines -- Punchboards -- Pull Tabs -- Cards -- Bingo -- Authority To License -- City – County* | Apr. 30, 1969 | Ex. A-1 – A-6 |
| Bregenzer | US 2004/0224754 | Slot machine with added player selection | Nov. 11, 2004 | Ex. A-5, A-1, A-2, A-3, A-4, A-6 |
| Muir | US 2005/0003883 | Method and apparatus for previewing a game | Jan. 6, 2005 (filed Aug. 2, 2004) | Ex. A-1 – A-6 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Chan | US 6,602,133 | Interactive electronic puzzle game and a method for providing the same | Aug. 5, 2003 | Ex. A-1 – A-6 |
| Marshall Fey | Slot Machines | An Illustrated History of America's Most Popular Coin-Operated Gaming Device | 1983 | Ex. A-1 – A-6 |
| Marshall Fey | Slot Machines | A Pictorial History of the First 100 Years | 1989 | Ex. A-1 – A-6 |
| Schuring et al. | 126th General Assembly Regular Session 2005-2006 | Ohio SB 220 Bill | At least October 19, 2005 | Ex. A-1 – A-6 |

### B.    Claim Charts

Attached hereto as Exhibits A-1 – A-6 are charts that set forth prior art references along with exemplary citations where each element of the asserted claims of the '223 patent is found in the prior art system and/or reference.  Attached hereto as Exhibit B is a chart that identifies with exemplary citations where each element of the other claims of the '223 patent are found in the prior art system and/or reference.  It is also noted that the only features that Plaintiffs contend distinguish the claims from any version of Tic-Tac-Fruit that pre-dates the '223 patent (for example, at least versions 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27) is "the ability to test and preview a game before the player makes a decision to play the game."  Plaintiffs' Response to Interrogatory No. 10, dated May 22, 2020.

These claim charts include citations to exemplary disclosures in the prior art references. Other portions of the identified prior art may, either expressly or inherently, anticipate and/or render obvious one or more elements of the claims.  The citations provided are merely non-limiting

examples, and should not be understood to preclude Defendants from relying on other portions of the prior art references.  It should also be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field.  To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, engineering, or other technical knowledge.  Defendants reserve the right to rely on any portion of the identified prior art, additional documents that describe the prior art, additional prior art, additional documents that lend context to the prior art, and fact witness and/or expert testimony to demonstrate the invalidity of the claims and/or to aid in understanding of the cited portions of the identified prior art.

Where Defendants cite to a particular drawing or figure in the claim charts, the citation encompasses not only the drawing or figure, but also any corresponding text within the specification of the prior art reference associated with the drawing or figure.  Similarly, where Defendants cite to particular text of the specification that relates to or references a drawing or figure in a prior art reference, the citation should be understood to encompass not only the text, but also the drawing or figure associated with that reference.

To the extent that the terms "game processor" and/or "program instructions" do not invoke § 112, ¶ 6 and are not found to be indefinite, then these terms and the functions they perform are disclosed, taught, and/or suggested as shown in the attached invalidity claim charts.

Defendants do not take any position at this time as to whether the subject matter recited in the preamble limits the claims and will address this issue at the appropriate juncture, such as during the claim construction process.

Although not required by the Case Management Order, Defendants have included exemplary contentions of the rationale that supports a conclusion of obvious that may include in some instances the basis for one of ordinary skill in the art to modify the prior art or combine specific references to arrive at the claimed invention. These examples are intended to be non-limiting. To the extent that Plaintiffs contend that any of the prior art fails to disclose one or more limitations of the claims, Defendants reserve the right to identify portions of the aforementioned references, additional prior art references and testimony that, address the alleged missing limitation to support a conclusion of obviousness and render each and every limitation of the claims obvious.

The motivation to combine, modify, add, limit, or otherwise vary any of the prior art references, alone and/or in combination, discussed herein is found, explicitly or implicitly, in at least one or more of the following:

1.     a person of ordinary skill in the art's own knowledge or common sense;

2.     the prior art references themselves;

3.     the subject matter acknowledged as prior art in the '223 patent;

4.     the interrelated teachings of multiple prior art references identified herein;

5.     the nature of the problem to be purportedly solved by the '223 patent and the existence of similar improvements in similar applications;

6.     design incentives and other market forces, including the advantages of creating a superior and more desirable product and the effects of demands known to the design community or present in the marketplace, such as the desire to create games of skill and/or games where the outcome is not determined largely or wholly by chance in order to comply with federal, state, and/or local gaming regulations;

7.     the ability to implement the alleged invention as a predictable variation of the prior

-9-

art;

8.    improvements in similar devices;

9.    any needs or problems known in the field and purportedly addressed by the '223 patent; and

10.    the number of identified, predictable solutions to the problem(s) purportedly addressed by the '223 patent.

In addition to the specific combinations of prior art identified herein, Defendants reserve the right to rely on other rationales or combinations of the prior art references disclosed herein. Defendants further reserve the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

Evidence that there would have been a motivation to combine the prior art references identified above includes the interrelated teachings of multiple prior art references; the effects of demands known to the design community or present in the marketplace; the existence of a known problem for which there was an obvious solution encompassed by the claims of the '223 patent; the existence of a known need or problem in the field of the endeavor at the time of the invention(s); and the background knowledge that would have been possessed by a person having ordinary skill in the art.

In addition, the motivation to combine the teachings of the prior art references disclosed herein is found in the references themselves and: (1) the nature of the problem being solved, (2) the express, implied, and inherent teachings of the prior art, (3) the knowledge of persons of ordinary skill in the art, (4) the fact that the prior art is generally directed to the same fields of art, and/or (5) the predictable results obtained in combining different elements of the prior art.

Multiple teachings, suggestions, motivations, and/or reasons to modify any of the

-10-

references and/or to combine any two or more of the references disclosed herein come from many sources, including the prior art (specific and as a whole), common knowledge, common sense, predictability, expectations, industry trends, design incentives or need, market demand or pressure, market forces, obviousness to try, the nature of the problem faced, and/or knowledge possessed by a person of ordinary skill and is inherent in the nature of the problem to be solved.

## III.    INVALIDITY UNDER 35 U.S.C. § 112

### A.    Indefiniteness under 35 U.S.C. § 112, ¶ 1

The following claim terms lack written description support under 35 U.S.C. § 112, ¶ 1.

#### 1.    *All Claims (Valuation Testing Limitation)*

Independent Claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 of the '223 patent recite "[testing/test] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," referred to as the "Valuation Testing Limitation." The specification of a patent must "contain a written description of the invention." 35 U.S.C. § 112, ¶ 1. The test for written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).

The "completing the field" is a step performed by the player. The Valuation Testing Limitation thus requires "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently **when the player completes the field**."

None of the '223 patent's specification, figures, or originally filed claims use the language of the Valuation Testing Limitation. Yet, even if the specification disclosed the

Valuation Testing Limitation word-for-word (which it does not) or if a person of ordinary skill in the art ("POSITA") would know how to perform and implement the required testing, this would still be insufficient.  To satisfy the written description requirement, the specification must do more than merely repeat the same words or functions recited in the claims—it must describe how the inventor intended to perform what is claimed.

Here, the '223 patent's specification fails to provide any required details about how the named inventor intended for the claimed testing to be performed to achieve the aspirational result of ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field.  Indeed, despite alleging the purported invention relies on "underlying software algorithms," the specification discloses none.  Because there is no written description support that explains how to perform the testing required by the Valuation Testing limitation, the "claims merely recite a description of the problem to be solved while claiming all solutions to it . . . leaving it to the [gaming] industry to complete an unfinished invention." *Ariad*, 598 F.3d at 1353.

Although the Applicant alleged during prosecution there was support for the Valuation Testing Limitation, the cited portions of the specification fail.  The Valuation Testing Limitation was introduced into only some of the pending claims in a response to rejection of the claim on January 23, 2010, and into the remaining claims following the March 2010 examiner interview and amendment—nearly four years after the application was filed.  In the January 23, 2010, response to an Office Action the applicant pointed only to "Paragraph 39" as support for the Valuation Testing Limitation:

> Claims 6, 19 and 32 have been amended to clarify the testing step.  Support for the amendment is found at least in **Paragraph 39**.  Testing the constructed field before presenting the field to the player on the game display ensures that a winning

combination more valuable than the selected winning combinations is not generated inadvertently in completing the field.

'223 patent File History at p. 190 (1/26/2010 Office Action Response at p. 28)

It was unclear whether the applicant was referring to Paragraph 39 of the as-filed application or Paragraph 39 of the published application. Regardless, neither supports the Valuation Testing Limitation.

Paragraph 39 of the as-filed application contains no relevant disclosures as this paragraph merely refers to certain steps shown in Figure 2 related to "determining the remaining number of plays . . . that are available at different denominations (i.e., levels) of play." '223 patent File History at pp. 18-19 (pages 14 and 15 of original application). Nothing in this paragraph concerns testing a game field as required by the Valuation Testing Limitation.

Paragraph 39 of the published application also fails to support the added Valuation Testing Limitation because it contains no description of *how* the claimed testing step is to be performed to achieve the claimed objective—referring instead to the aspirational and undisclosed "software algorithm":

> [Paragraph 39] Essentially, the Tic-Tac-Fruit electronic game presents a task whereby the player must select the appropriate field element to replace with a wild symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random selection from a finite pool of available prizes. The device selects the quantity of lines that will present a winning outcome. Prizes may be presented on one, two, three, or four lines in a single game play. The device selects the level of prize(s) to be awarded. A **software algorithm** assesses the arrangement of the prize(s) to be offered to **assure that no other, more valuable prizes will inadvertently be presented**. The key

symbol needed to obtain the highest value prize is replaced with a
non-winning symbol prior to display to the player.

*See* U.S. Pat. Pub. No. 2007/0232384 (Publication of the application that resulted in the '223 patent) ("'223 Pub.") ¶ 0039 (emphasis added).

Moreover, Paragraph 39 refers to assessing offered prizes to assure that no other, more valuable prizes "**will inadvertently be presented**" instead of the claimed objective: "to ensure that a winning combination more valuable than the determined winning combination **is not generated inadvertently in completing the field**." *See id.* (emphasis added); '223 patent at 6:19-33 (location of Paragraph 39 in issued patent). A POSITA would not equate the inadvertent presentation of a prize in Paragraph 39 with an inadvertent winning combination being generated **when a player completes a field**. Plainly, a prize could be presented inadvertently in a game field even if a field is not completed by a user. *Id.* Paragraph 39 addresses the former, not the latter.

Paragraph 39 also refers to "prizes" which a POSITA would understand to be different from "winning combinations." Yet, even if "prizes" were deemed to be the same as "winning combinations," Paragraph 39's teachings still fail to provide support. At most, were one to substitute "winning combinations" for "prizes" in the specification, Paragraph 39 would still only refer to assessing the arrangement of "winning combinations." Nothing in such a hypothetical Paragraph 39 discloses testing **to ensure** that a more valuable winning combination is not generated inadvertently **when the player completes the field**.

Even if the specification were found to disclose an algorithm that tests for the possibility of a more valuable winning combination being generated inadvertently when the player completes the field (which it does not disclose), the specification never describes the added steps that are needed to <u>ensure</u> that such an event does not occur, which is also a requirement of the Valuation Testing Limitation. There is simply no teaching in the specification as to how to do that.

Nothing in Paragraph 39, including its last sentence, cures this deficiency. The last sentence of this paragraph only states that "the key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player."[2] '223 patent at 6:30-32. A POSITA would understand that the last sentence of Paragraph 39 only teaches a technique for the player to obtain the highest value prize that is intended to be offered to that player. For example, if the intended highest value prize is associated with three Bell symbols, this technique teaches replacing one of those three Bell symbols with a non-winning symbol such as a Titanium symbol. This technique, however, does nothing to ensure that a winning combination more valuable than the determined winning combination will not be inadvertently generated when the player completes the field.

In fact, the technique of Paragraph 39 could readily lead to scenarios where the player is able to obtain a more valuable prize associated with a more valuable winning combination. For example, if the technique replaces one of the three Bell symbols with a Titanium symbol (as in the prior example) but another Titanium symbol is already in a line with that newly introduced Titanium symbol, this will result in a field where there is a winning combination (*i.e.*, three Titanium symbols) more valuable than the determined winning combination (*i.e.*, three Bell symbols) that can be inadvertently generated when the player completes the field.

Therefore, the portions of the specification cited by the applicant during prosecution are irrelevant to and fail to provide written description support for the Valuation Testing Limitation.

---

[2] A POSITA would understand that, according to the teachings of Paragraph 39, the "highest value prize" referenced here refers to the highest value prize that is intended "to be offered" to the player after the game "selects the level of prize(s) to be awarded" and/or "determine[s] [the prize(s)] by a random selection from a finite pool of available prizes." *See* '223 patent at 6:22-30.

The specification's other references to "testing" are also irrelevant. The '223 patent's specification refers to "testing" in various places, but the only instances of "testing" mentioned are for entirely different purposes. The specification refers to "test[ing] the complete field for compliance with the goals set by steps 1 and 3," which are "1. chose the number of winning lines (*i.e.*, 1, 2, 3, 4); 2. chose the orientation of each of the winning lines (*i.e.*, horizontal, vertical, or diagonal); 3. chose the symbols for each of the lines (*i.e.*, cherries, plums, bells, etc.)." '223 patent at 4:51-64; *see also id.* at 9:58-64, 10:29-34 (describing testing for compliance with same goals plus whether symbols were randomly selected for remaining grid elements). This testing, however, only relates to choosing the number of winning lines, the orientation of those lines, the symbols in those lines, and the randomly selected symbols for the remaining spots. None of this testing even relates to, much less requires out of necessity, evaluating whether a "more valuable" winning combination might be inadvertently generated by the player, which is what the Valuation Testing Limitation requires.

In addition, the specification refers to a "test" performed by an "embedded computer processor" which iterates through each of the 134 million possible field combinations (that number of combinations is based on an assumption that there are eight symbols and nine spots) and "test[s] each combination to determine if it has any complete lines." '223 patent at 4:36-43. But a POSITA would have no reason to understand that the "embedded computer processor" referenced here is the same component as the "game processor," which in claim 44 and multiple other claims is what is required to be configured to perform the testing required by the Valuation Testing Limitation. Further, the test described with respect to the "embedded computer processor" does not evaluate whether a "more valuable" winning combination might be inadvertently generated by a player completing the field. All this test is said to achieve is determining whether a particular field

combination (of the 134 million possible field combinations) has "any complete lines" (*e.g.*, 3 Bell symbols in a row).  As this test only achieves the goal of identifying fields with already complete lines (*e.g.*, 3 Bell symbols in a row), this test has nothing to do with evaluating whether there is a more valuable winning combination than the determined winning combination in a given field or whether there is a winning combination that might be inadvertently generated when the player completes the field.

Finally, the specification teaches that "game software" "determines all of the initial 'no-line' fields and tests each of these for potential winners where all fields that can potentially complete a line are counted."  '223 patent at 4:44-47.  But, as with the "embedded computer processor" test just discussed, the specification does not even teach that this is a test performed by the "game processor" or describe how it is performed.  Moreover, all the "game software" test does is identify "potential winners" so as to allow for counting of "all fields that can potentially complete a line." *Id.* at 4:45-47.  The "game software" test simply does not evaluate whether there is a winning combination that might be inadvertently generated when the player completes the field or whether that winning combination is more valuable than the determined winning combination.  In fact, after the "game software" test is performed, the patent goes on to explain that "the player must examine each lineup and symbol values to determine the best location for selecting the wild symbol on the field displayed." *Id.* at 4:44-50.  There is no further testing described that will ensure against the inadvertent generation of a winning combination more valuable than the determined winning combination when the player examines each lineup and selects the wild symbol.  As such, a POSITA would recognize that test performed by the "game software" is only concerned with counting fields with a line that can be potentially completed, and fails to disclose the testing required by the Valuation Testing Limitation, which requires evaluating

whether a more valuable winning combination might be inadvertently generated when the player completes the field to ensure that this does not occur.

A POSITA would recognize that none of the described testing discloses explicitly or inherently performing the testing required by the Valuation Testing Limitation—*i.e.*, testing to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently when the player completes the field. Rather, the only express reference to "testing" in the patent's specification relates to choosing the number of winning lines, the orientation of those lines, the symbols in those lines, and the symbols in the other grid elements; to identify and ferret out which fields have any complete lines already; or to identify and count which fields have lines which can potentially be completed. None of this testing even relates to, much less requires out of necessity, evaluating whether a "more valuable" winning combination might be inadvertently generated by the player, which is what the Valuation Testing Limitation requires. And, notably, the above references to "testing" in the specification describe only the function ascribed to the test rather than disclosing an algorithm as to specifically how that described testing is actually accomplished.

Just as critically, none of the goals purported to be sought by the "testing" disclosed in the '223 patent specification includes ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently when the player completes the field. And, nowhere in the four corners of the '223 patent is it described or suggested that, ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently when the player completes the field is necessary to achieve the purported goals of the "testing" referred to in the '223 specification.

In sum, the specification provides no support for the Valuation Testing Limitation and thus

-18-

fails to confirm that the named inventor was in possession of this concept at the time of filing. Here, the '223 patent's specification fails to provide any required details about how the named inventor intended for the claimed testing to be performed to achieve the aspirational result of ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field. The specification provides no support for the Valuation Testing Limitation and thus fails to confirm that the named inventor was in possession of this concept at the time of filing. Because independent claims 1, 13, 25,  37, 44, 51, 58, 64, and 70 lack written description support and are invalid under 35 U.S.C. § 112, ¶ 1, all other claims that depend from them are also invalid.

2.      *Claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 (Determination Limitation)*

Claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 and the claims depending therefrom are invalid under § 112, ¶ 1 because there is no written description support for claims 1, 13, 25, 37, 44, 51, 58, 64, and 70's requirement of "determin[ing] . . . at least one winning combination for each play of the game." This limitation will be referred to herein as the "Determination Limitation." These claims also require (1) "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" (referred to herein as the "Valuation Testing Limitation") and (2) "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" (referred to herein as the "Automatic Display Limitation").

A POSITA would understand that the Determination Limitation requires a particular order of steps where determining at least one winning combination for each play of the game occurs before (1) the testing required by the Valuation Testing Limitation and (2) the actual game is displayed to the player as required by the Automatic Display Limitation.

A claim "requires an ordering of steps when the claim language, as a matter of logic or grammar, requires that the steps be performed in the order written, or the specification directly or implicitly requires" an order of steps. *TALtech Ltd. v. Esquel Apparel, Inc.*, 279 F. App'x 974, 978 (Fed. Cir. 2008); *see also Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1320 (Fed. Cir. 2013) (concluding that claim that recites "processing" an "electronic advertisement" necessarily indicates that "creation of the ad must happen before the processing begins").

The Determination Limitation requires a particular order of steps because the Valuation Testing Limitation requires testing "to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently."  As a matter of logic, that "determined winning combination" must first be determined per the Determination Limitation before the testing required by the Valuation Testing Limitation can be performed.  In addition, since the Valuation Testing Limitation requires "testing . . . prior to displaying the game to the player," the testing required by the Valuation Testing Limitation must be performed before the actual game is displayed to the player as required by the Automatic Display Limitation.

The specification lacks written description support for the Determination Limitation in at least three respects.  First, there is no written description support for the Valuation Testing Limitation because the valuation testing required by this limitation is not described in the specification.  Because that testing is not described, there is no description of performing any steps before or after that testing is performed.  Thus, there is no written description support for the Determination Limitation's requirement of determining at least one winning combination for each play of the game before performing the testing required by the Valuation Testing Limitation.

Second, the specification provides no support for the Determination Limitation's requirement of determining at least one winning combination before the game is displayed to the

player. Rather, the specification teaches the opposite—*i.e.*, that "determin[ing] the winning combinations" is a step that occurs *after* the game is displayed to the player. *See* '223 patent at 9:66-10:9 ("The [game] field is presented to the player in step 502. . . . The game software determines the winning combinations of symbols in step 510."); *id.* at 10:37-62. This is made clear by the flow charts in Figures 5 and 6, which each disclose that the "DETERMINE WINNING COMBINATIONS" step (highlighted in yellow) occurs *after* the "present [constructed game] field" step (highlighted in green):



Because the specification teaches the **opposite** of what is required (*i.e.*, determining the winning combination after, rather than before, displaying the game to the player), these teachings fail to provide any explicit or inherent support for the Determination Limitation.

Third, the specification fails to provide written description support because, even if it disclosed achieving the goal of determining at least one winning combination for each play of the game in advance of the required testing and displaying (it does not), the specification still fails to provide any details as to how such a determination can be achieved. Indeed, the specification refers to "underlying software algorithms" multiple times but fails to disclose any actual algorithms. Also, the flow charts in Figures 5 and 6 of the patent (reproduced above) contain boxes that say merely say "DETERMINE WINNING COMBINATIONS" without disclosing any steps that teach how this determination can be made. *See* '223 patent at Fig. 5 (box 510) & Fig. 6 (box 616). And, as just discussed, the specification's teachings regarding game field construction entirely fail to address determining any winning combinations prior to the game being displayed to the player and thus certainly fail to disclose how any such determining can be achieved.

In sum, the '223 patent's specification fails to provide written description support for the Determination Limitation. Because independent claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 lack written description support and are invalid for lack of written description support, all other claims that depend from them are also invalid.

## B.    Indefiniteness under 35 U.S.C. § 112, ¶ 6

### 1.    *Claims 13-24, 44-50, and 64-69*

Asserted Claim 44 recites "a game processor for generating an interactive electronic game on the game terminal, the game processor configured for . . . ." Claim 44, and the other claims having this term, are indefinite because "game processor" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions.

The term "game processor" is a nonce word that does not bring to mind any specific structure, internal components, or operations to a POSITA. A POSITA would not know if this term referred to hardware, software, or a combination of both.

The fact that "game processor" includes the term "processor" does not avoid the application of § 112, ¶ 6.  Here, the term "game processor" likewise invokes § 112, ¶ 6.  The '223 patent does nothing to clarify whether the "game processor" refers to any particular structure and, in fact, confirms that it does not.  Indeed, the specification describes the "game processor" in one of the most nondescript and nonstructural manners imaginable—namely, that it includes "components" for performing various functions.[3]  *See* '223 patent at 2:29-45.  According to the specification, the functions performed by these supposed "components" of the "game processor" include "constructing a field . . .," "presenting the field . . .," "receiving the player's selection . . .," and "displaying each winning combination. . . ."  *See id.* at 2:29-45.

Moreover, nothing in the claims imparts any structural significance to the term "game processor."  The "game processor [for /configured for]" limitations all recite purely functional limitations without reciting sufficiently definite structure for performing the recited functions.  For example, claim 44 recites a "**game processor for** generating an interactive game" and a "**game processor configured for**: constructing a field having a plurality of elements. . .; determining at least one winning combination for each play of the game; testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; automatically displaying an actual game to be played. . .; determining if the player has decided to play the

---

[3] The specification refers once to an "embedded computer processor," '223 patent at 4:41, but never equates this with the "game processor" or any of the purported "components" in the "game processor."  The "embedded computer processor" referred to in the specification is never mentioned in the claims of the '223 patent.  Nor is any claimed function tied to the "embedded computer processor."  Thus, the "embedded computer processor" is irrelevant to this inquiry into whether an "embedded computer processor" has any structural significance.

displayed game; and displaying an outcome. . . ." '223 patent at claim 44 (emphasis added).  The other independent and dependent claims with the "game processor [for / configured for]" limitation likewise recite purely functional limitations, including many which are the same or similar to those recited in claim 44.  *See, e.g.*, *id.* at independent claims 13, 64.

In view of the claims and the specification's teachings, a POSITA would not understand the non-artful term "game processor" to refer to "sufficiently definite structure."  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015).

Even if "processor" has some structural meaning (which it does not here), § 112, ¶ 6 still applies if "the claim term . . . recites 'function without reciting sufficient structure for performing that function.'"  *Williamson*, 792 F.3d at 1349.  Here, as in the above-cited cases, the term "processor" fails to recite sufficient structure because (1) the specification fails to describe what the processor is and (2) even if this term referred to a conventional CPU or microprocessor, there is no algorithm recited in the claims to perform the recited functions.  Each of the claims with the "game processor [for / configured for] limitation requires at least "generating an interactive electronic game. . .," "[generating / constructing] a game field. . .," "determin[ing] . . . at least one winning combination for each play of the game," "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and "automatically displaying an actual game to be played. . . ."  *See* '223 patent at claims 13, 44, 64.  A CPU or microprocessor by itself cannot perform these functions.  Instead, it must execute an algorithm to perform them.  *Id.*  Because no algorithms for performing these functions are recited, the claims lack sufficient structure to perform the recited functions and § 112, ¶ 6 applies.  *Id.*

Because the '223 patent treats "game processor" as a generic placeholder for a non-descript

device that performs the recited functions, it is a means-plus-function limitation. In claim 13, this limitation has the functions recited at 13:55-14:13; in claim 44, the functions are recited at 16:50-17:2; in claim 64, the functions are recited at 18:51-19:11; and, for each dependent claim reciting this limitation, the additional functions are recited therein. But as shown below, the specification fails to describe the requisite structure.

Moreover, no corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions. A POSITA would understand that the functions recited in the claims as performed by the "game processor [for / configured for]" limitation—*i.e.*:

- "generating an interactive electronic game . . .,"

- "[generating / constructing] a game field . . .,"

- "determin[ing] . . . at least one winning combination for each play of the game,"

- "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and

- "automatically displaying an actual game to be played . . ."

—are performed by software algorithms. "It is well-established that the corresponding structure for a function performed by a software algorithm is the algorithm itself." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015). Thus, the corresponding structure from the specification must be "more than simply a general purpose computer or microprocessor," and, indeed, the specification must "disclose an algorithm for performing the claimed function." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318-19 (Fed. Cir. 2012).

Here, the '223 patent's specification fails to disclose any algorithms for performing the functions recited in the claims with the "game processor [for / configured for]" limitation. The specification refers loosely to "underlying software algorithms" used for game construction, but fails to disclose such algorithms. Moreover, as discussed in Section IX incorporated here, the specification provides no description at all of the purely functional limitation of "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," recited in all claims and referred to herein as the "Valuation Testing Limitation." As for the other functions, the specification and figures merely parrot back the same functional language recited in the claims without disclosing any algorithms for processing by a "game processor." *See, e.g.*, '223 patent at 4:12-25 (disclosing high-level steps for constructing game field but providing no algorithms for the processor to execute to follow these steps); Fig. 6 (Step 600 "CONSTRUCT FIELD FOR GAME DISPLAY," Step 601 "PRESENT FIELD ON GAME DISPLAY").

Because the specification discloses no algorithms for performing each of the claimed functions, independent claim 44 is indefinite and invalid under 35 U.S.C. § 112, ¶ 6, and, therefore, the claims that depend from claim 44—*i.e.*, at least claims 47 and 49-50—are also invalid.

2.     *Claims 25-36, 51-57, and 70-75*

Asserted Claim 51 recites "**program instructions** that construct a game field having a plurality of elements. . .; **program instructions** that determine at least one winning combination for each play of the game; **program instructions** that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; **program instructions** that automatically display an actual game to be played . . .; **program instructions** that determine if the player has decided to play the displayed game; and **program instructions** that display an

outcome . . ." '223 patent at claim 51 (emphasis added). Claim 51, and the other claims having this limitation, are indefinite because "program instructions" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions.

The "program instructions" limitations all recite purely functional limitations without reciting sufficiently definite structure for performing the recited functions. For example,

Here, the "program instructions" limitations do not recite any structure to perform the recited functions. Instead, the claims use the generic term "program instructions." As a result, these terms are drafted as "traditional means-plus-function limitation[s], and merely replace[] the term 'means'" with the term "program instructions." *Williamson*, 792 F.3d at 1350. Such functional claiming invokes § 112, ¶ 6 because "simply disclosing software [ ] without providing some detail about the means to accomplish the function is not enough." *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

The term "program instructions" does not convey definite structure to perform the recited functions. Rather, a POSITA would understand that "program instructions" simply refers to unspecified software instructions. Consistent with this, the specification fails to provide any structural meaning for "program instructions" or to distinguish that term from generic software. The variety of different functions that follow the term confirms that it is a generic placeholder rather than definite structure.

Therefore, the "program instructions" limitations invoke § 112, ¶ 6. In claim 25, this limitation has the functions recited at 14:66-15:21; in claim 51, the functions recited at 17:27-45; in claim 70, the functions cited at 19:37-20:20; and, for each dependent claim reciting this limitation, the additional functions recited therein.

-27-

Moreover, no corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions.  A POSITA would understand that the functions recited in the claims with the "program instructions" limitation—*i.e.*:

- "[generating / constructing] a game field . . .,"

- "determin[ing] . . . at least one winning combination for each play of the game,"

- "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," and

- "automatically displaying an actual game to be played. . . ."

—are performed by software algorithms.

These functions are the same as those discussed above with respect to the "game processor" limitation.  As explained herein, the corresponding structure for a software algorithm is the algorithm itself, and the specification fails to disclose algorithms for performing each of these recited functions.  Again, in particular, the specification provides no description at all for the Valuation Testing Limitation.  For the other functions, there are no disclosed algorithms.

Because the specification discloses no algorithms for performing each of the claimed functions, independent claim 51 is indefinite and invalid under 35 U.S.C. § 112, ¶ 6, and, therefore, the claims that depend from claim 51—*i.e.*, at least claims 54 and 56-57—are also invalid.

> 3.    *Claims 45-46*

Claim 45 recites "a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game."  Claim 45 is indefinite because "component for" is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions.

"Component" is a recognized nonce word and thus invokes § 112, ¶ 6. The function recited in these claims is "generating and displaying a next game field on the game display simultaneously in proximity to a currently displayed game." A POSITA would recognize that this function is performed by a software algorithm, and thus an algorithm needs to be disclosed in the specification as corresponding structure.

But, as with the other functions discussed above for the "game processor" and "program instructions" limitations, no corresponding structure can be identified for this limitation because the specification fails to disclose an algorithm for the recited function. Claims 45-46 are therefore indefinite. Because claim 45 is indefinite and invalid under 35 U.S.C. § 112, ¶ 6, claim 46, which depends from claim 45, is also invalid.

## IV.    INVALIDITY UNDER 35 U.S.C. § 101

The following claim terms are invalid because they are directed to ineligible subject matter under 35 U.S.C. § 101.

### A.    All Claims

All claims of the '223 patent are invalid because they are directed to patent ineligible subject matter, for example, the abstract idea of game play. The claims of the '223 patent do not recite any inventive concepts, steps, or otherwise that transform the abstract idea into patent-eligible material. The '223 patent simply recites generic, off-the-shelf computer components and computational steps that could be easily performed by human beings. Further explanation as to why  the '223 patent is invalid under 35 U.S.C. § 101 is provided in Defendants' Brief in Support of Their Motion to Dismiss, Dkt. No. 32 at 5-20 and Defendants' Reply Brief in Support of Their Motion to Dismiss, Dkt. No. 43-1 at 3-14, which are incorporated herein by reference.

## V.    INVALIDITY UNDER 35 U.S.C. § 112(f)

Under the pre-AIA Patent Code, a patent is invalid if the inventor "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (2006); *see also In re VerHoef*, 888 F.3d 1362, 1365, n.1 (Fed. Cir. 2018), as amended (May 7, 2018).  Section 102(f) "requires that a patent accurately name the correct inventors of a claimed invention." *In re VerHoef*, 888 F.3d at 1365.  If an unnamed inventor contributed any "essential feature" of a claimed invention, the claim is invalid under Section 102(f), even if other limitations were contributed by named inventors. *Id.* at 1366.

On information and belief, discovery will show that one or more individuals contributed an essential feature of the claimed invention, namely, the preview feature, and that these one or more individuals communicated this idea to Michael R. Pace, the sole named inventor on the '223 patent, including, but not limited to, individuals involved with various Ohio government proceedings regarding the Tic-Tac-Fruit prior art, such as *Fraternal Order of Eagles Aerie 2171 Meigs, Inc. v. Ohio Dep't. Pub'l. Safety*, Case No. 05-CV-060 (Ct. Common Pls., Meigs Cty, OH); *In re: FOE Aerie 2171*, Proceedings Before the Liquor Control Commission of the State of Ohio, Case No. 1342-05; *State of Ohio v. Jeffrey A. Mayle*, Case No. 2005-CRB-30662.  According to at least Plaintiffs' Amended Complaint (Dkt. No. 25), the preview feature is an essential feature of the claims.  On information and belief, these one or more individuals is/are the true purported inventor of at least the preview feature of the claims.  Because an unnamed inventor contributed an essential feature, all claims are invalid under 102(f).

Dated:  June 4, 2020              MORGAN, LEWIS & BOCKIUS LLP

                                  */s/John V. Gorman*
                                  John V. Gorman (PA 80631)
                                  Kenneth J. Davis (PA 87944) (admitted *pro hac vice*)
                                  Amy M. Dudash (PA 311898) (admitted *pro hac vice*)
                                  1701 Market Street
                                  Philadelphia, PA  19103
                                  Telephone:  215.963.5000
                                  Fax:  215.963.5001
                                  john.gorman@morganlewis.com
                                  kenneth.davis@morganlewis.com
                                  amy.dudash@morganlewis.com

                                  *Attorneys for Defendants Pennsylvania Coin, LLC and PA
                                  Coin Holdings, LLC*