# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM of PENNSYLVANIA, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC <br><br> Defendants. | CIVIL ACTION NO: 3:19-cv-01470-JPW <br><br><br> Honorable Jennifer P. Wilson |

## **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

John V. Gorman (PA 80631)
Kenneth J. Davis (PA 87944) (admitted *pro hac vice*)
Amy M. Dudash (PA 311898) (admitted *pro hac vice*)
Morgan, Lewis & Bockius LLP
1701 Market Street
Philadelphia, PA  19103
Telephone:  215.963.5000
Fax:  215.963.5001
john.gorman@morganlewis.com
kenneth.davis@morganlewis.com
amy.dudash@morganlewis.com

*Attorneys for Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC*

Dated:  July 16, 2020

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................1

II.   BACKGROUND ...................................................................................1

    A.   The '223 Patent ..........................................................................1

    B.   The '223 Patent Prosecution History .......................................2

    C.   Person of Ordinary Skill in the Art ..........................................3

III.  Applicable LEGAL STANDARDS.......................................................3

    A.   Claim Construction....................................................................3

    B.   Means-Plus-Function Claim Limitations ..................................6

    C.   Indefiniteness.............................................................................7

IV.   AGREED UPON CONSTRUCTIONS..................................................8

V.    DISPUTED CLAIM TERMS FOR CONSTRUCTION.............................8

    A.   "game processor" ......................................................................8

        1.   "game processor" is an indefinite means-plus-function term. ...........................................................................8

            a.   "game processor" is a means-plus-function term because it recites function without corresponding structure. ...............................................................8

            b.   The '223 patent fails to disclose sufficient structure that corresponds to the claimed functions......11

        2.   If the Court holds "game processor" is not a means-plus-function term, it should adopt Defendants' alternative construction. ............................................................12

    B.   "winning combination" ...........................................................14

    C.   "[determining/determine/determined] at least one winning combination for each play of the game" ...........................16

    D.   "test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"...............................20

# TABLE OF CONTENTS
## (continued)

**Page**

    1.    The Court should construe the claim phrase in its entirety. ...................................................................21

    2.    Defendants' proposed construction comports with the intrinsic evidence. ....................................................22

    3.    The Court should reject Plaintiffs' unsupported and ambiguous constructions.........................................25

E.    "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" ..................................................26

F.    "actual game to be played"..................................................30

G.    "program instructions" ........................................................33

VI.    CONCLUSION.........................................................................36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Applied Medical Resources Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006) ..............................................................29

*Aristocrat Tech. Australia Pty. Ltd v. Int'l Game Tech.*,
521 F.3d 1328 (Fed. Cir. 2008) .........................................................11, 14

*Baran v. Med. Device Techs., Inc.*,
616 F.3d 1309 (Fed. Cir. 2010) ..............................................................19

*Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*,
616 F.3d 1249 (Fed. Cir. 2010) ..............................................................24

*Cadence Pharmas., Inc. v. Paddock Labs. Inc.*,
886 F. Supp. 2d 445 (D. Del. 2012).........................................................21

*Chamberlain Grp, Inc. v. Lear Corp.*,
516 F.3d 1331 (Fed. Cir. 2008) ................................................................5

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ..............................................................28

*DSW, Inc. v. Shoe Pavilion, Inc.*,
537 F.3d 1342 (Fed. Cir. 2008) ................................................................5

*Eastman Chem. Co. v. Aktiengesellschaft*,
47 Fed. App'x. 566 (Fed. Cir. 2002) .......................................................22

*Edwards Lifesciences LLC v. Cook, Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) ..............................................................30

*Endo Pharmas. Inc. v. Actavis LLC*,
922 F.3d 1365 (Fed. Cir. 2019) ...........................................................4, 5

*Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*,
785 F.3d 616 (Fed. Cir. 2015) ..................................................................9

*Every Penny Counts, Inc. v. Am. Express Co.*,
563 F.3d 1378 (Fed. Cir. 2009) ................................................................3

*Function Media, LLC v. Google, Inc.*,
   708 F.3d 1310 (Fed. Cir. 2013) ...........................................................................35

*Gaming, Inc. v. High 5 Games, LLC*,
   No. 2:14-cv-01483, 2018 WL 1020120 (D. Nev. Feb. 21, 2018) ......................10

*Global Equity (SA) Pty. Mgmt. Ltd. v. Expedia, Inc.*,
   No. 2:16-cv-95, 2016 WL 7416132 (E.D. Tex. Dec. 22, 2016).........................34

*GoDaddy.com, LLC v. RPost Commc'ns. Ltd.*,
   No. CV-14-00126, 2016 WL 212676 (D. Ariz. Jan. 19, 2016).........................10

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) .............................................................................7

*Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co.*,
   285 F.3d 1046 (Fed. Cir. 2002) .....................................................................19, 20

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999) ..............................................................................22

*K-2 Corp. v. Salomon S.A.*,
   191 F.3d 1356 (Fed. Cir. 1999) ............................................................................16

*Ex Parte Lakkala*,
   No. 2011-001526, 2013 WL 1341108 (P.T.A.B. Mar. 13, 2013) ..................9, 10

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
   720 Fed. App'x 623 (Fed. Cir. 2018) ...................................................................22

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) .................................................................................5

*Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*,
   462 F.3d 1344 (Fed. Cir. 2006) ............................................................................10

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003) .............................................................................6

*Media Rights Techs. Inc. v. Capital One Fin. Corp.*,
   800 F.3d 1366 (Fed. Cir. 2015) .............................................................................7

*Nautilus Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014)..................................................................................................7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ...............................................................................4

*PPC Broadband, Inc. v. Corning Optical Commc'ns. RF, LLC*,
   815 F.3d 747 (Fed. Cir. 2016) ...............................................................................19

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*)...............................................3, 4, 5, 30

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
   511 F.3d 1132 (Fed. Cir. 2007) .............................................................................19

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013) .........................................................................5, 31

*Ex Parte Smith*,
   No. 2012-007631, 2013 WL 1341109 (P.T.A.B. Mar. 14, 2013) ......................10

*SourceOne Global Partners, LLC v. KGK Synergize, Inc.*,
   No. 08 C 7403, 2010 WL 2232944 (N.D. Ill. June 3, 2010) ..............................22

*Versa Corp. v. Ag–Bag Int'l Ltd.*,
   392 F.3d 1325 (Fed. Cir. 2004) .............................................................................21

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) .....................................................................*passim*

*WMS Gaming, Inc. v. Int'l Gaming Tech.*,
   184 F.3d 1339 (Fed. Cir. 1999) .......................................................................12, 36

**Statutes**

35 U.S.C. § 112(f).....................................................................................................6

35 U.S.C. § 112, ¶ (6) .......................................................................................*passim*

**Other Authorities**

U.S. Patent No. 7,736,223....................................................................................*passim*

## I.    INTRODUCTION

Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC (collectively, "Defendants") propose constructions for disputed claim terms of U.S. Patent No. 7,736,223 (the "'223 patent") that align with the plain language and context of the claims, the specification, and the prosecution history. Plaintiffs Savvy Dog Systems, LLC and POM of Pennsylvania, LLC (collectively, "Plaintiffs") propose constructions that are divorced from the claim language and that do not make sense when read in context of the claims. For the asserted means-plus-function claim terms, the Court should find these terms to be indefinite. For the remaining terms, the Court should adopt Defendants' proposed constructions.

## II.   BACKGROUND

### A.    The '223 Patent

The alleged "present invention" of the '223 patent relates to electronic "skill-based" games that, while involving "[s]ome chance," are designed to comport with state, federal, and tribal government regulations. *See* '223 patent[1] at 1:18-60. The patent describes the basic idea of playing such games with a game preview. *See id.* at 1:64-67. The preview of the game is presented to a player so she can evaluate the game and decide whether to play the game before committing to doing so, which purportedly renders the game one of "skill" instead of "chance." The '223 patent

---

[1] The '223 patent is attached as Exhibit C to the Joint Claim Construction Statement (Dkt. No. 71-3).

claims a system for playing this type of preview game using generic computing components, a method for accomplishing the game play, and a generic computer program for carrying out the game play. The patent describes the supposed invention "in the context of the Tic-Tac Fruit" game—a game that uses fruit symbols and is "loosely derived from tic-tac-toe." *Id.* at 3:59-62.

### B. The '223 Patent Prosecution History

To obtain a U.S. patent, an applicant must submit an application and "prosecute" the patent before U.S. Patent and Trademark Office (the "PTO"). The application includes proposed claims that define invention scope and a specification that purports to provide written support for those claims. A PTO examiner reviews the claims and issues Office actions based on that review. In response, an applicant may amend the claims and/or make arguments in order to obtain a patent. The prosecution history is the record of the PTO's patent examination, including the applicant's submissions and the PTO's actions and responses. An allowed patent issues with a specification having a written description portion followed by allowed claims.

Here, the application from which the '223 patent issued was filed on June 30, 2006. The PTO twice rejected the claims of the application in Office actions dated December 4, 2008 and June 4, 2009 because the prior art disclosed what was claimed. After each rejection, the applicant amended the claims and presented

arguments purporting to distinguish the claims over prior art references. On March 23, 2010, the PTO interviewed the applicant and discussed adding the "testing" limitation to the claims. On April 16, 2010, the PTO examiner issued an amendment to the claims and allowed as-numbered claims 1-9, 11-20, 22-33, 35-66, 68-73 and 75-80.[2] The '223 patent issued on June 15, 2010.

### C. Person of Ordinary Skill in the Art

A person of ordinary skill in the art ("POSITA") at the time of the purported invention (*i.e.*, 2006) in the field of the '223 patent (*i.e.*, electronic gaming) would have had (1) a bachelor's degree in engineering or computer science or equivalent experience and (2) at least two years of development experience in the electronic gaming industry.

## III. APPLICABLE LEGAL STANDARDS

### A. Claim Construction

"The purpose of claim construction is to determine the meaning and scope of the patent claims." *Every Penny Counts, Inc. v. Am. Express Co.*, 563 F.3d 1378, 1381 (Fed. Cir. 2009). The Court determines the meaning of claim terms. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*). It must construe patent claims in order to settle disputes about claim scope and to translate

---

[2] Claims in the application were renumbered prior to patent issuance—*i.e.*, claim 47 in the application became claim 44 in the '223 patent and claim 54 in the application became claim 51 in the '223 patent.

terms into definitions that jurors can understand.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008).  Claim terms are given "the meaning that the term would have to a" POSITA "at the time of the invention." *Phillips*, 415 F.3d at 1313.  A POSITA "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent[.]"  *Id.*

To ascertain the meaning of claim terms, the Court must consult "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean."  *Id.* at 1314.  Publicly available sources fall into two categories: "intrinsic evidence" and "extrinsic evidence."  *Endo Pharmas. Inc. v. Actavis LLC*, 922 F.3d 1365, 1371 (Fed. Cir. 2019).

The first source of intrinsic evidence is the words of the claims themselves. "[T]he words of a claim 'are generally given their ordinary and customary meaning,'" which is the meaning that the words would have to a POSITA "at the time of" the patent application.  *Phillips*, 415 F.3d at 1313.

The second source of intrinsic evidence is the patent specification, which "is the single best guide to the meaning of a disputed term."  *Id.* at 1315.  Although useful for interpreting words in a claim, limitations from the specification should not be read into claims where they do not otherwise exist.  *See DSW, Inc. v. Shoe Pavilion, Inc.*, 537 F.3d 1342, 1347 (Fed. Cir. 2008).

The third source of intrinsic evidence is the patent's prosecution or file history. This "history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Phillips*, 415 F.3d at 1317.

Intrinsic evidence is the most important evidence of a term's meaning. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013). "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995). Although the Court "may consider extrinsic evidence in claim construction, 'such evidence is generally of less significance than the intrinsic record,'" *Endo*, 922 F.3d at 1371, and is less preferred than intrinsic evidence. *See Chamberlain Grp., Inc. v. Lear Corp.*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). Extrinsic evidence cannot be used to vary the meaning of terms contrary to unambiguous meaning expressed in intrinsic evidence. *Phillips*, 515 F.3d at 1317, 1324.

## B.     Means-Plus-Function Claim Limitations

Claim terms may be drafted in "means-plus-function" form in which a claim element is recited "as a means . . . for performing a specified function without the recital of structure, material, or acts in support thereof."  35 U.S.C. § 112(f).[3] However, "[t]he price that must be paid for use of that convenience is limitation of the claim to the means specified in the written description [of the patent] and equivalents thereof."  *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

The words "means for" are not required for a term to be subject to § 112, ¶ 6. Rather, the absence of the word "means" creates a rebuttable presumption that § 112, ¶ 6 does not apply.  *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015).  This presumption can be overcome if "the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function."  *Id.* (internal alterations and quotations omitted).  The "essential inquiry is not merely the presence or absence of the word 'means' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure."  *Id.*

---

[3] Recent amendments to the Patent Act renumbered former § 112, ¶ 6 to § 112(f). Because the earlier version of the Patent Act applies to the '223 patent, Defendants refer to § 112, ¶ 6.

Construing a means-plus-function limitation is a two-step process: (1) "identify the claimed function" and (2) determine "what structure, if any, disclosed in the specification corresponds to the claimed function." *Id.* at 1351. "Corresponding structure" in the specification must be "clearly link[ed]" "to the function recited in the claim." *Id.* at 1352.

 "Where there are multiple claimed [§ 112, ¶ 6] functions . . . the patentee must disclose adequate corresponding structure to perform *all* of the claimed functions." *Media Rights Techs. Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1374 (Fed. Cir. 2015) (emphasis in original).[4]  If the specification fails to disclose structure for claimed functions, then the claim is indefinite. *See id.* at 1374-75.

## C.    Indefiniteness

Claims that "fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention" are invalid for indefiniteness. *See Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  The indefiniteness inquiry asks whether the claims scope is clear to a POSITA thereby discharging the notice function of the claims. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370-71, 1374 (Fed. Cir. 2014) (affirming indefiniteness finding made during claim construction).  "It cannot be sufficient that a court can ascribe *some* meaning to the patent's claims." *Nautilus*, 572 U.S. at 911 (emphasis in original).  Rather, a valid

---

[4] Unless otherwise stated, all emphasis is added.

claim "must provide objective boundaries for those of skill in the art." *Interval*

*Licensing*, 766 F.3d at 1371.

## IV.    AGREED UPON CONSTRUCTIONS

The parties' agreed upon constructions are set forth in Exhibit A to the Joint

Claim Construction Chart (Dkt. No. 71-1).

## V.    DISPUTED CLAIM TERMS FOR CONSTRUCTION

### A.    "game processor"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| game processor | "a CPU or microprocessor with input/output circuitry that executes program instructions to generate a game."<br><br>Not a means-plus-function term. | This is a means plus function term without corresponding structure and is indefinite.<br><br>Alternatively, "a conventional CPU or microprocessor processor that executes program instructions to generate a game." |

### 1.    "game processor" is an indefinite means-plus-function term.

#### a.    "game processor" is a means-plus-function term because it recites function without corresponding structure.

Claims 13-19, 23-25, 44, and 64 each recite a "game processor" that performs

specific claimed functions. *See, e.g.*, '223 patent at claim 44 (a "*game processor for*

*generating an interactive electronic game*"; "*game processor configured for*:

constructing a field . . .; determining at least one winning combination for each play

of the game; testing the game field . . . ; automatically displaying an actual game to

be played . . .; determining if the player has decided to play the displayed game; and displaying an outcome. . .").  However, these claims do not describe the structure of the claimed "game processor."  Nor does the sole paragraph of the specification that mentions "game processor;" it simply references nondescript and nonstructural "components" for performing various functions.[5]  *See id.* at 2:28-45.  As such, the claims' reference to "game processor" does not recite sufficient definite structure.  Because the '223 patent treats "game processor" as a generic placeholder for a non-descript device that simply performs the recited functions, it is a means-plus-function limitation.  *See Williamson*, 792 F.3d at 1348-50.

Even if a POSITA understood "game processor" to refer to a conventional CPU or microprocessor, this would be an insufficient disclosure of structure to escape means-plus-function treatment.  "A microprocessor or general purpose computer lends sufficient structure only to basic functions of a microprocessor.  All other computer-implemented functions require disclosure of an algorithm."  *Eon Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 623 (Fed. Cir. 2015); *see Ex Parte Lakkala*, No. 2011-001526, 2013 WL 1341108, at *6 (P.T.A.B. Mar.

---

[5] The "embedded computer processor" mentioned only once in the specification ('223 patent at 4:41) is irrelevant to whether the *claimed* "game processor" has any structural significance.  The patent never equates this "embedded computer processor" with the "game processor" or any of its purported "components."  No claim mentions an "embedded computer processor," nor is any claimed function tied to the "embedded computer processor" in the specification.

13, 2013) (finding "processor" invoked § 112, ¶ (6) where functions recited would require additional programming to implement on general purpose processor).  But while each of the pertinent patent claims recite computer-implemented functions being performed by the "game processor," none disclose an algorithm.

That these claims do not expressly recite the term "means" does not save them from means-plus-function treatment.  *See Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1353 (Fed. Cir. 2006).  Numerous district courts have found the term "processor" to be a substitute for "means" and thus subject to § 112, ¶ 6.  *See, e.g.*, *Gaming, Inc. v. High 5 Games, LLC*, No. 2:14-cv-01483, 2018 WL 1020120, at \*12 (D. Nev. Feb. 21, 2018) ("processor configured to execute a game"); *GoDaddy.com, LLC v. RPost Commc'ns. Ltd.*, No. CV-14-00126, 2016 WL 212676, at \*52-53 (D. Ariz. Jan. 19, 2016) ("processor for associating").  So too has the PTO.  *See, e.g.*, *Lakkala*, 2013 WL 1341108, at \*7 ("processor" is "non-structural term" that invokes § 112, ¶ 6); *Ex Parte Smith*, No. 2012-007631, 2013 WL 1341109, at \*8 (P.T.A.B. Mar. 14, 2013) (same).  Like those tribunals, this Court should interpret the generic recital of "game processor" as a means-plus-function limitation under 35 U.S.C. § 112, ¶ (6).

### b.    The '223 patent fails to disclose sufficient structure that corresponds to the claimed functions.

Once the Court determines the claims invoke § 112, ¶ (6), it must follow a two-step process to construe them.  First, the Court must "identify the claimed function."  *Williamson*, 792 F.3d at 1351.  Here, the claims expressly state what functions are performed by the "game processor."  *See, e.g.*, claim 13 (functions recited at 13:55-14:13); claim 44 (functions recited at 16:50-17:2); claim 64 (functions recited at 18:51-19:11).

Second, the Court must determine what structure, if any, disclosed in the specification is "clearly link[ed]" to the claimed functions.  *Williamson*, 792 F.3d at 1352.  The '223 patent specification discloses none.  As discussed, *supra*, the sole paragraph in the specification that references "game processor" describes no structure for it.  *See* '223 patent at 2:28-45.  Nor do the specification's sporadic references to "underlying software algorithms" suffice.  *Id.* at 9:56, 10:27.  These references do not disclose any details regarding such algorithms, let alone the steps of the algorithms themselves.  *See Aristocrat Tech. Australia Pty. Ltd v. Int'l Game Tech.*, 521 F.3d 1328, 1334 (Fed. Cir. 2008) ("[S]imply describ[ing] the function to be performed, not the algorithm by which it is performed" cannot support computer-implemented means-plus-function claims.).    In particular, nothing in the specification links structure to the claimed function of "testing the game field prior to displaying the game to the player to ensure that a winning combination more

11

valuable than the determined winning combination is not generated inadvertently in completing the field," which is recited in all claims containing the term "game processor."

Because the specification fails to disclose any structure, including any algorithm, for performing the functions recited in claims 13-19, 23-25, 44, and 64, those claims are indefinite, and, therefore, invalid. *See WMS Gaming, Inc. v. Int'l Gaming Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999).

### 2. If the Court holds "game processor" is not a means-plus-function term, it should adopt Defendants' alternative construction.

Should the Court hold that "game processor" is not a means-plus-function term, Defendants alternatively propose the Court construe the term as a "conventional CPU or microprocessor processor that executes program instructions to generate a game." Plaintiffs' proposed construction deviates from Defendants' proposal in two respects, both of which the Court should reject.

First, Plaintiffs' construction omits that the CPU/microprocessor is conventional. However, nothing in the intrinsic record describes the "game processor" as unconventional or specialized. Indeed, the claims themselves recite no structure for the processor—unconventional or otherwise. And the single paragraph in the specification that even mentions a "game processor" ('223 patent at 2:28-45) does not describe the features of the processor or indicate that the

12

processor must be different from then-existing processors to carry out the described functions. Tellingly, the patent never describes the processor as an advancement in the art or itself an innovation. Rather, the patent touts the overall "electronic gaming method and system" as the purported invention. *See, e.g.*, '223 patent, Title ("Electronic Gaming Method And System Having Preview Screen"); Abstract (making no mention of a processor); 1:13-17 (describing purported invention as related to "a method and system for providing a game preview display. . . ."). In the absence of any intrinsic evidence specifying the game processor to have specialized structure, or itself constituting an innovation, the "game processor" must be conventional, and any construction by the Court should reflect that.

Second, Plaintiffs' construction improperly adds a limitation that a CPU or microprocessor must include "input/output circuitry." But neither the patent nor the prosecution history anywhere references such circuity—with respect to a "game processor" or otherwise. The Court should reject Plaintiffs' efforts to inject this unsupported limitation into the construction of "game processor."

13

### B.    "winning combination"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| winning combination | "array of symbols yielding a successful outcome or corresponding to a prize" | "array of game symbols in the game field yielding a successful outcome" |

The parties agree that a "winning combination" involves an array of symbols yielding a successful outcome. However, the parties' proposals differ in three respects.

First, Defendants' construction makes clear that the symbols combined for a win are *game* symbols. This accords with the express language of the claims themselves. For example, claim 1 states:

> 1.  An electronic gaming method comprising the steps of:
> *constructing a game field* having a plurality of elements . . . wherein each element is filled by a *game symbol* from a plurality of predetermined *game symbols*, wherein the *game symbols* for each element are automatically determined such that there is at least one *winning combination* for each play of the game . . .

All other independent claims make similar references. *See* '223 patent at claims 13, 25, 37, 44, 51, 64, 70. There is simply no basis to construe "winning combination" in a way that might suggest combination of something other than the "game symbols" referenced in the claims.

Second, Defendants' construction includes—and Plaintiffs' construction improperly omits—that a winning combination is of "game symbols *in the game field*." The '223 patent claims (like claim 1 excerpted above) describe the winning

14

combinations of symbols in relation to a constructed game field. Each independent claim further specifies in the "testing" step that a winning combination is generated "in completing the field." Moreover, throughout the specification, the applicant consistently described the winning combination as being a combination of symbols *in the game field*. *See, e.g.*, '223 patent, Abstract (winning combination formed by selection of game field element); 2:21-25, 40-43, 59-62 (same); 3:63-4:25 (winning line formed through selection of game symbol in game field); 5:59-6:5 (game field does not have winning combination until player engages in selecting element of game field); 9:58-61 (discussing rules for selecting number, orientation, and symbols for the winning combination in constructing game field); 10:29-31 (same); 10:5-11 (winning combination results from player symbol selection in game field); 10:57-64 (same). Simply put, nothing in the intrinsic record suggests a combination is winning if not in the game field.

Third, Plaintiffs' construction creates confusion by stating that a "winning combination" is comprised of symbols "yielding a successful outcome *or* corresponding to a prize." By stating "or", Plaintiffs' construction incorrectly implies that a "winning combination" could exist where a symbol array corresponds to a prize but does *not* yield a successful outcome. This is nonsensical. Plaintiffs' construction concedes that a winning combination is comprised of symbols "yielding a successful outcome," thus the "corresponding to a prize" language is unnecessary

15

at best, and confusing at worst. Indeed, "prize" is not defined in the specification, and Plaintiffs' proposal does not explain what "prize" means, which could lead to jury confusion. There is no reason to add the "prize" concept to the claims, and the Court should not indulge Plaintiffs' efforts to redraft the claims to explicitly refer to "prize." *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, [courts] give effect to the terms chosen by the patentee.").

Accordingly, the Court should adopt Defendants' proposed construction of "winning combination."

### C.   "[determining/determine/determined] at least one winning combination for each play of the game"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| [determining/ determine/ determined] at least one winning combination for each play of the game | "establish[ing] or ascertain[ing] at least one array of symbols yielding a successful outcome or corresponding to a prize for each game to be played" | "[guaranteeing/guarantee/ guaranteed] at least one winning combination that may be formed for each game to be played" |

The parties advance two very different interpretations for this term. Under Defendants' construction, a winning combination is selected for each game played such that *a player can actually win each game*. Under Plaintiffs' construction, winning combinations that a player could theoretically encounter during a game are

16

established, but an actual game played may not involve any of them, so a *win may not be possible for each game*.    The intrinsic record establishes the former interpretation, not the latter, is correct.

The Court's analysis should start with the plain language of the claim itself. The phrase "at least one winning combination for each play of the game," on its face, supports that each game is winnable, and not that a winning combination may be unattainable for some games.    The specification also supports that a winning combination is guaranteed to be available to the player for each play of the game. For example, applicant stated:

> The present invention will be described in the context of the Tic-Tac Fruit electronic skill-based amusement game. . . .  Tic-Tac Fruit is a game loosely derived from tic-tac-toe that uses player skill to solve a puzzle.  The similarity to tic-tac-toe extends from the use of a field or grid of nine spots or tiles arranged in a three by three array.  On each play of the electronic game, the game software program constructs a puzzle or task for the player to solve.  *The electronic game always incorporates at least one correct solution and sometimes generates alternative solutions* that may not provide the same prize as the best solution. . . .
>
> The player is presented a field completely filled with apparently random symbols selected from a set of nine symbols that includes a "wild" symbol. . . .  The player chooses the displayed symbol in the field to become the "wild" symbol and the symbol(s) that it represents becomes the symbol necessary to complete a *winning line(s). . . . The game's construction of the field guarantees that at least one line may be formed* by playing the wild symbol selection in the proper spot.  On average, two lines may be formed if the optimal spot for the "wild" symbol is selected. *However, there is always the possibility that at least one line can be formed.*

'223 patent at 3:59-4:2, 4:6-8, 4:18-25.

Plaintiffs' construction is incorrect for several reasons. First, it injects confusion into the term by specifying two different meanings of "determine:" (1) "establish," which could mean "set up on a firm or permanent basis" and (2) "ascertain," which could mean to merely "find something out." *Compare* New Oxford American Dictionary, 2d ed. (2005) (Ex. 1) at 576 (definition of "establish")*, with id.* at 90 (definition of "ascertain"). Both cannot be right in the context of the term and neither makes clear what the intrinsic record does: that a specific winning combination(s) is achievable by the player each time the game is played.

Second, Plaintiffs' construction is impermissibly broad because it could be misunderstood to encompass a basic award schedule, like the one shown at Table 1 and described at column 5, lines 14-49 of the '223 patent. That award schedule exhaustively defines all possible symbol combinations (*e.g.*, "3 Titanium," "3 Bell," "3 Plum") that would result in a payout *if* a player completes a line with those symbols. But the specification does not describe such an award schedule as a determined "winning combination for each play of the game." Yet, under Plaintiffs' construction, reference to this schedule would arguably be "ascertaining the winning combination for each play of the game" because the list of possible winning combinations applies to each game, even if none of them are actually attainable for a particular game played. Mere creation of an award schedule does not guarantee

18

that a winning combination will be actually be achievable by a player in a given game, which is what the claim requires.

Plaintiffs may argue that the Court should not construe the "determining" step to guarantee the availability of a winning combination to a player because, in two paragraphs, the specification discloses alternative embodiments that mention non-winning combinations. *See* '223 patent at 11:14-26, 43-60. But even assuming *arguendo* that these embodiments somehow involve instances where winning combinations are not achievable for each play of the game, they do not undermine Defendants' proposed construction. "It is not necessary that each claim read on every embodiment." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010). And while a construction which excludes a preferred embodiment is "rarely, if ever correct," "[t]his does not mean . . . that each and every claim ought to be interpreted to cover each and every embodiment." *See PPC Broadband, Inc. v. Corning Optical Commc'ns. RF, LLC*, 815 F.3d 747, 755 (Fed. Cir. 2016). Indeed, not all subject matter disclosed in a patent is claimed. *See Johnson & Johnston Assoc. Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1050, 1052 (Fed. Cir. 2002); *see also Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007) ("Where . . . multiple embodiments are disclosed . . . claims . . . exclude embodiments where those embodiments are inconsistent with the unambiguous language in the patent's specification or prosecution history.").

19

Here, applicant chose to claim an invention where there is "at least one winning combination for each play of the game."  Applicant cannot seek to enlarge the scope of its claim by reference to unclaimed alternate embodiments that purportedly do not require an achievable winning combination for each play of the game.  *Johnson*, 285 F.3d at 1055; *see also id.* at 1052 ("[W]hile the specification may be referred to limit the claim, it can never be made available to expand it.").

Accordingly, the Court should adopt Defendants' construction of the "determining . . ." term.

**D.    "test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"**

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field | *testing the game field . . . to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently*: "examin[ing] or observ[ing] an array of symbols prior to displaying the game to the player to ensure that the anticipated prize corresponding to the array is not superseded by the award of a better prize"<br><br>*more valuable*: "Having a better outcome or a higher prize level" | "test[ing] the previously constructed field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently when the player completes a winning combination during play of the game" |

| | *in completing the field*: "in making the field from the plurality of predetermined game symbols" | |
|---|---|---|

For the "testing . . ." step, which appears in every independent claim of the '223 patent, the Court should construe the entire claim phrase as a cohesive term and adopt Defendants' construction.

### 1.    The Court should construe the claim phrase in its entirety.

Construing the entire disputed term as a single phrase is consistent with the way the '223 patent uses the phrase and will preserve internal coherence in the patent. *See Cadence Pharmas., Inc. v. Paddock Labs. Inc.*, 886 F. Supp. 2d 445, 455 (D. Del. 2012) (construing claim phrase as single term); *see also Versa Corp. v. Ag–Bag Int'l Ltd.*, 392 F.3d 1325, 1336 (Fed. Cir. 2004) (claims must be construed to comport with instrument as a whole and preserve internal coherence).  Yet Plaintiffs break the entire phrase into two parts (first, "test[ing] . . . inadvertently" and, second, "in completing the field") and then propose separate, unconnected constructions for each part and for "more valuable."   But "more valuable" and "in completing the field" are not recited in the '223 patent claims except in connection with the "testing . . . inadvertently" phrase.  As such, "[c]onstruing the disputed phrase in pieces would be more likely to lead to inconsistent or erroneous constructions." *SourceOne Global Partners, LLC v. KGK Synergize, Inc.*, No. 08 C 7403, 2010 WL 2232944, at *4 n.5 (N.D. Ill. June 3, 2010).

21

### 2.    Defendants' proposed construction comports with the intrinsic evidence.

Defendants' construction clarifies that when the "testing" step refers to "*the* game field," it refers to the field constructed in a previous claimed step. *See, e.g.*, claim 44 (first reciting "constructing *a* field" then "testing *the* game field"); claim 51 (reciting that program instructions "construct *a* game field" then "test *the* game field"); *see also Eastman Chem. Co. v. Aktiengesellschaft*, 47 Fed. App'x. 566, 573-74 (Fed. Cir. 2002) (holding "the" in a claim must have antecedent basis in claim construction). Such constructed field is the only "field" previously referenced, thus no other construction is feasible in the context of the claims.

Defendants' construction also makes clear that, when the "testing" step refers to "displaying *the* game to the player," "*the* game" is the claimed "actual game to be played on the touch screen display" that is "displayed . . . to the player" in the "automatically display[ing]" step. This is evident from the context of the claims, given that both the "testing" and "automatically displaying" steps refer to the game displayed to the player. *See Liqwd, Inc. v. L'Oreal USA, Inc.*, 720 Fed. App'x 623, 627 (Fed. Cir. 2018) ("Context is central in claim construction"); *accord Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999). Moreover, there is nothing elsewhere in the intrinsic record to suggest that the displayed game in the "testing" step is different from the displayed game in the "automatically displaying" step.

22

Defendants' construction also clarifies the antecedent basis for "*the* determined winning combination." The phrase "determined winning combination" does not appear elsewhere in the claim, thus the only logical antecedent basis for it is the winning combination referenced in the previous "[determining/determine/determined]" step. As such, Defendants' construction specifies that "*the* determined winning combination" is "the previously determined winning combination."

Finally, Defendants' construction explains what it means when a winning combination is generated "in completing the field." The intrinsic evidence supports that this phrase means "when the player completes a winning combination during play of the game." First, the claim context supports that a "winning combination" is the product of "completing the field", given that the claimed step is "test[ing] . . . to ensure that a *winning combination . . .* is not *generated* inadvertently *in completing the field*." Further, the context of the claim shows that the antecedent basis of "*the* field" is the same "game field" referenced earlier in the "testing" limitation, which, as discussed above, is itself a reference to the previously constructed game field. Moreover, the claim context and applicant's express choice of the term "completing" indicates that "completing" the previously constructed field is something more than just making the field in the first place. *See Becton, Dickinson & Co. v. Tyco Healthcare Group, LP*, 616 F.3d 1249, 1254 (Fed. Cir. 2010) ("Where a claim lists

23

elements separately, 'the clear implication of the claim language' is that those elements are 'distinct component[s]' of the patented invention.").

The intrinsic record also supports that "completing" an already constructed field occurs when a player creates a winning combination on a game field during play of the game. For example, the specification explains that "[t]he player is presented a field completely filled with apparently random symbols. . . . The player chooses the displayed symbol in the field to become the 'wild' symbol[,] and the symbol(s) that it represents[,] becomes the symbol necessary to *complete* a winning line(s)." '223 patent at 4:3-4:12; *see also id.* at 4:26-35 (describing wild symbol may "complete" multiple lines, and that once player selects location, game examines field of elements for "complete" lines); *id.* at 4:38-47 (discussing assessing whether there are "complete" lines). As such, a POSITA would understand that "completing the field" refers to the *player* creating a winning combination.[6] It does not refer to the mere construction of the field by the claimed methods or systems.

---

[6] Plaintiffs admit in their own pleading that "completing the field" is performed by the player. *See* First Amended Complaint, Dkt. No. 25, ¶ 72 *("[T]he user interacts with the game field* by 'nudging' a group of symbols higher or lower to *complete the game field*.")*.

### 3. The Court should reject Plaintiffs' unsupported and ambiguous constructions.

Plaintiffs' proposed constructions ignore the context of the claims and introduce unnecessary ambiguity. First, Plaintiffs nonsensically substitute "examin[ing] or observing" for "testing", despite that the plain and ordinary meaning of those terms differ. *Compare* New Oxford American Dictionary, 2d ed. (2005) (Ex. 1) at 1743 (definition of "test" is "procedure intended to establish the quality, performance, or reliability of something"), *with id.* at 1175 (definition of "observe" is "notice or perceive (something) and register it as being significant"). Second, Plaintiffs improperly substitute "an array of symbols" with "the game field," but the specification makes clear they are not the same thing. While a game field is made up of game symbols, *see* '223 patent at 2:12-17, symbols are not themselves a game field, as the patent discloses displaying game symbols to a player that are *not* within a game field. *See, e.g.*, *id.* at 5:2-14 (describing that "different symbols that can be displayed are shown in the left column of the display" of Fig. 1A, and differentiating that symbol display from field played by player).

Third, Plaintiffs propose a construction of "more valuable"—a phrase given no specialized meaning in the intrinsic record—that, at best, unnecessarily redefines a term readily understood by a lay person, and, at worst, injects ambiguity by providing alternate meanings that are themselves vague: *i.e.*, "a better outcome *or* a

higher prize."  As discussed, *supra* § V.B., there is no reason to inject the concept of "prize" into claims that do not recite such word.

Finally, Plaintiffs' proposed construction of "in completing the field" is inconsistent with the plain context of the claims because it improperly equates "completing" the field to "making" it.  As discussed, *supra* § V.D.2, the context of the claims demonstrates that the game field that is completed has already been made, *i.e.*, "constructed."

E.    **"automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play"**

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play | "programmatically instruct[ing] the terminal display on the touch screen the identification of the next game to the player, including showing the player an otherwise unknown system-generated attribute of the next game before the player commits to play the next game" | "automatically display[ing] an actual game to be played on the touch screen game display to the player before the player commits to play the displayed game" |

The parties' respective constructions of this term differ in three key aspects. The Court should adopt Defendants' construction in each respect.

First, the parties disagree about "automatically display[ing] . . . on the touch screen game display."  This portion of the disputed term needs no construction.

26

Nowhere in the intrinsic record does the applicant define the phrase to have a particular meaning or use the term in some specialized manner. The "touch screen game display" is simply an antecedent reference to the touch screen display mentioned at the outset of each independent claim. *See* claims 1, 25, 37, 51 (reciting "an interactive touch screen game display on an electronic game terminal"); claims 13, 44, 64 (reciting "electronic game terminal including a touch screen display"); claims 58, 70 (reciting "touch screen display of an electronic terminal"). "Automatically display" is a phrase comprised of commonly, readily understood words, and needs no further explanation from the Court. *See* Ex. 1 at 108, 488 (dictionary definitions of "automatic" and "display").

Nonetheless, Plaintiffs improperly seek to substitute "automatically display . . . on the touch screen game display" with "programmatically instruct the terminal display[7] on the touch screen." There is nothing in the intrinsic record that suggests applicant ascribed that meaning to the term. Plaintiffs are brazenly attempting to rewrite the claims, which as originally written, require that the claimed act of "automatically displaying" be performed by specifically identified components. *See, e.g.*, claims 13, 44 ("game processor configured for . . . automatically displaying"); claims 25, 51, 71 ("program instructions that automatically display").

---

[7] Adding further confusion, the term "terminal display" does not appear in the claims or specification. Presumably, Plaintiffs intend "terminal display" to mean the "touch screen game display" that is actually recited in the claim term at issue.

27

This is inconsistent with the plain language of the claims, and is an improper rewriting of them. "[C]ourts may not redraft claims, whether to make them operable or to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (citations omitted). Further, adopting Plaintiffs' construction would result in many claims redundantly and illogically reciting "program instructions that programmatically instruct. . . ." *See* claims 25, 51, 71.

Second, the parties disagree about what is the displayed "actual game to be played." The Court should adopt Defendants' construction of this portion of the term for the reasons stated *infra* at § V.F.

Third, while the parties agree the "actual game to be played" is displayed to the player "before the player commits to play" a game, Defendants' construction provides that the player commits to play the *displayed* game, whereas Plaintiffs suggest the player must commit to play a "*next*" game. Defendants' proposal is supported by the plain language of the claim, which specifies that the game displayed is what is played: "automatically *display* an actual game *to be played*."

28

Defendants' proposal is also consistent with the intrinsic record, which repeatedly describes a player committing to play the game field displayed to him or her. For example, the abstract describes that a "field of game symbols is presented on the game display to the player as a preview for deciding *whether or not to play*



From FIG 6

*the displayed game*. If the player decides to *play the game*, the player selects a field element to turn the symbol displayed into a wild symbol." *See* '223 patent, Abstract. The specification also includes illustrative examples of FIGS. 6 & 8 whereby a game field is displayed to a player, and the player then makes a decision to play "the displayed game." *Id.* at 10:36-43, 12:1-8.

Plaintiffs' construction improperly injects the concept of "next game" into this term. But "next game" is a different term found in claims depending from those that recite "actual game to be played." *See* dependent claims 39, 46, 53, 59, 65, 71. In each of these dependent claims, the "next game" being displayed is distinct from and in addition to the "actual game" being played. *See Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333, n.3 (Fed. Cir. 2006) (Federal Circuit "presume[s] that the use of . . . different terms in the claims connotes different meanings."). Incorporating "next game" into the construction of "actual game to be

29

played," as Plaintiffs suggest, would impermissibly ignore such distinctions and add needless confusion.

**F.      "actual game to be played"**

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| actual game to be played | "the identification of the next game, including at least an otherwise unknown system-generated attribute of the next game" | "the constructed game field of the game to be played" |

Defendants' proposed construction reflects how the applicant itself defined the term.  A patent's specification and prosecution history "may reveal a special definition given to a claim term by the patentee[.]"  *Phillips*, 415 F.3d at 1316; *see Edwards Lifesciences LLC v. Cook, Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009).  In such cases, "the inventor's lexicography governs."  *Phillips*, 415 F.3d at 1316.  Here, in a January 26, 2010 submission, the applicant amended its then pending claims and stated:

> Since the terms "preview" and "present" have led to an apparent lack of clarity in the claim language, these terms have been eliminated from all pending claims. Applicant's use of preview . . . was intended to convey that the player at an electronic game terminal always sees the next game to be played on the terminal. . . .  Applicant defined the next game to be played which was automatically displayed to the player . . . as a "game preview."  However, the automatically displayed game field represented the actual game to play. . . .  To further clarify this step, independent claims 1, 14, 27, 40, 47, and 54 have been amended to recite "automatically displaying

30

> the game field on the game field on the touch screen display to a player prior to initiating activation of game play."  This recitation clarifies that *the actual game to be played (i.e., the game field constructed in the first recited step)* is automatically displayed to the player in order for the player to decide whether to initiate play of the game displayed.  When the player hits the Play button, he is initiating play of the actual game field that is displayed. *Thus, the player can study the game field carefully to determine the optimum location of the wild symbol before he makes any commitment to play the displayed game. . . .*

*See* Jan. 26, 2010 Amendment (Dkt. No. 71-4) at pp. 26-27; *see also id.* at 32.  By using "*i.e.*" to explain what "actual game to be played" meant, applicants acted as their own lexicographer and defined the term accordingly.  *See SkinMedica*, 727 F.3d at 1200 ("*i.e.*" signals intent to define word to which it refers) (citing cases). This excerpt also highlights the critical reason that the *game field*—and not some other piece of information about the game—is displayed: so that the player can evaluate where he could place the wild symbol in the game field.

This is only one of the many instances in the intrinsic record where the applicant equated a *displayed game* with a *constructed game field*.  For example:

- "A *field of game symbols is presented on the game display* to the player as a preview for deciding whether or not to play *the displayed game*."  *See* '223 patent, Abstract.

- "*A game field is constructed* having a plurality of elements on a game display . . . *The field of game symbols* is presented on the game display to the player as a preview for deciding whether or not to play *the displayed game*."  *Id.* at 2:12-19.

31

- "FIG. 6 illustrates the processing logic for an exemplary embodiment having a game preview display. Processing begins, as indicated in step 600, with the *construction of a field of elements for a game display . . . . The field is presented to the player on the game display as a preview of the game* in step 602. . . ." *Id.* at 10:22-43; *accord id.* at 11:61-12:12:8 (similarly equation of game played with constructed game field in FIG 8); *see also id.* at 2:31-40; 2:50-59; 2:67-3:5; 10:63-11:7.



FIG. 6

The claims themselves also equate the game played with the game field displayed. *See, e.g.*, claims 3, 15, 27 (dependent claims stating that player plays "game field displayed"); claims 8, 23, 35 (equating "game fields on the touch screen game display" to "displayed games"). Claim 38, which depends from claim 35, discusses "displaying an *additional* game field simultaneously on the game display in proximity to the displayed game"; the only possible antecedent basis for this is what is *first* displayed in claim 38, *i.e.*, the "actual game to be played." *Accord* dependent claim 45. The prosecution history confirms this. *See* Jan. 26, 2010 Amendment (Dkt. No. 71-4) at p. 33 ("displaying an additional game field" is "[i]n other words, two games . . . displayed simultaneously").

The Court should reject Plaintiffs' proposed construction for various reasons. First, it ignores applicant's express definition and consistent use of "actual game to be played." Second, it unjustifiably broadens the term so that a constructed game field need not be shown when an "actual game" is displayed to a player. Specifically,

32

Plaintiffs contort the term's meaning to include an "identification of the next game," and to specifically include an "otherwise unknown system-generated attribute of the next game." Tellingly, there is no support in the intrinsic record for Plaintiffs' expansive interpretation. Indeed, the phrase "otherwise unknown system-generated attribute of the next game" appears nowhere in the intrinsic record. <u>Third</u>, as discussed *supra* at § V.F, reference to a "next game" in Plaintiffs' proposed construction introduces confusion and ambiguity into the claims. The Court should reject Plaintiffs' construction, and instead adopt the construction that comports with applicant's own definition.

### G.    "program instructions"

| Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| program instructions | "conventional commands that can be executed by a computer" | (1) Indefinite<br><br>This is a means-plus-function term.<br><br>**Function(s)**: the functions recited at 14:66-15:21; in claim 51, the functions recited at 17:27-45; in claim 70, the functions cited at 19:37-20:20; and, for each dependent claim reciting this limitation, the additional functions recited therein.<br><br>**Structure**: None. |

| | | (2) Alternative: "conventional commands that can be executed by a computer" |
|---|---|---|

The Court should find this term to be a means-plus-function term with no corresponding structure.

Claims 25-28, 30, 35, 36, 51, 52, 57, 70, 71, and 75 each recite "program instructions" that perform certain claimed functions. *See, e.g.*, '223 patent at claim 51 ("*program instructions* that construct a game field . . . .; *program instructions* that determine at least one winning combination for each play of the game; *program instructions* that test the game field . . .; *program instructions* that automatically display an actual game to be played . . . ; *program instructions* that determine if the player has decided to play the displayed game; and *program instructions* that display an outcome . . . .").

But the claims do not specify any structure for the "program instructions." Nor does the sole paragraph of the specification that references "program instructions." As such, these terms are drafted as "traditional means-plus-function limitation[s], and merely replace[] the term 'means'" with the term "program instructions." *Williamson*, 792 F.3d at 1350; *see also Global Equity (SA) Pty. Mgmt. Ltd. v. Expedia, Inc.*, No. 2:16-cv-95, 2016 WL 7416132, at *29-30 (E.D. Tex. Dec. 22, 2016) (holding "program code for" invokes § 112, ¶ 6 because it fails to convey structure when term is "defined only by the function that it performs. . . . There are

34

no indicia of the structural nature of this code in the claim or in the disclosure of the [] patent."). Such functional claiming invokes § 112, ¶ 6 because "simply disclosing software . . . 'without providing some detail about the means to accomplish the function, is not enough.'" *Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).

After determining that claims reciting "program instructions" invoke § 112, ¶ 6, the Court must first identify the claimed functions. Here, the functions are the various acts that the claims expressly state are performed by "program instructions." *See, e.g.*, claim 25 (functions recited at 14:66-15:21); claim 51 (functions recited at 17:27-45); claim 70 (functions recited at 19:37-20:20).

Then, the Court must determine whether there is any structure disclosed in the '223 patent specification clearly linked to the recited functions. There is not. As discussed above, the specification's description of "program instructions" describes no structure for performing the functions. And the specification's sporadic references to "algorithms" do not disclose any details about those algorithms, much less what the steps of the algorithms are. *See supra* § V.A. In particular, the specification fails to describe any structure—algorithm or otherwise—that is linked the recited "testing" limitation. Because the specification discloses no algorithms

35

for performing each of the claimed functions, claims 25-36, 51-57, and 70-75 are indefinite and therefore unpatentable. *WMS Gaming*, 184 F.3d at 1349.[8]

## VI.   CONCLUSION

For the foregoing reasons, the Court should adopt Defendants' proposed constructions.

Dated:  July 16, 2020                    Respectfully submitted,

                                         MORGAN, LEWIS & BOCKIUS LLP

                                         */s/John V. Gorman*
                                         John V. Gorman (PA 80631)
                                         Kenneth J. Davis (PA 87944) (admitted *pro hac vice*)
                                         Amy M. Dudash (PA 311898) (admitted *pro hac vice*)
                                         1701 Market Street
                                         Philadelphia, PA  19103
                                         Telephone:  215.963.5000
                                         Fax:  215.963.5001
                                         john.gorman@morganlewis.com
                                         kenneth.davis@morganlewis.com
                                         amy.dudash@morganlewis.com

                                         *Attorneys for Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC*

---

[8] If the Court holds that the "program instructions limitation" is not a means-plus-function limitation, then the parties agree this term may be construed as "conventional commands that can be executed by a computer."

36