# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SAVVY DOG SYSTEMS, LLC, a Wyoming limited liability company, and POM OF PENNSYLVANIA, LLC a Wyoming limited liability company, | |
| Plaintiff, | Civil Action No. 3:19-cv-01470-JPW |
| v. | Honorable Jennifer P. Wilson |
| PENNSYLVANIA COIN, LLC, a Pennsylvania limited liability company, and PA COIN HOLDINGS, LLC, a Pennsylvania limited liability company, | |
| Defendants. | |

## PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF

# **TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES ........................................................................ iii-v

I.  Introduction....................................................................................... 1

II.  Claim Construction Principles........................................................ 2

III.  The Law of Patent Indefiniteness.................................................. 4

IV.  Terms to be Construed ................................................................... 5

   A.  Term 1 ...................................................................................... 5

      1.  A Presumption exists that "game processor" is not subject to MPF treatment ........................................................ 6

      2.  "Game Processor" is the "name for structure." ....................... 7

      3.  The context of Claim 44 further precludes the application of MPF to "game processor."....................................... 9

      4.  Because MPF law does not apply to "game processor," the claim is not indefinite .............................................. 13

   B.  Terms 2 & 3 ............................................................................ 14

   C.  Term 4 .................................................................................... 20

   D.  Terms 5 & 6 ........................................................................... 26

   E.  Term 7 .................................................................................... 34

# TABLE OF AUTHORITIES

**PAGE**

*Cases*:

*Amdocs (Israel) Limited v. Openet Telecom,*
 1:10-cv-910, 2018 WL 1699429 (E.D. Va. April 6, 2018)…………………35-36

*Amgen Inc. v. Hoechst Marion Roussel, Inc*.,
 314 F.3d 1313 (Fed. Cir. 2003)……………………………………………..33

*Apex Inc. v. Raritan Computer, Inc.*,
 325 F.3d 1364 (Fed. Cir. 2003)……….………………………………………..6

*Apple Inc. v. Motorola, Inc.,*
 757 F.3d 1286 (Fed. Cir. 2014) ……………………………………..…………13

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.,*
 521 F.3d 1328 (Fed. Cir. 2008) ………………………………………*passim*

*Bowers v. Baystate Techs. Inc*.,
 320 F.3d 1317 (Fed. Cir. 2003)………..…………………………………30

*CCS Fitness, Inc. v. Brunswick Corp.*,
 288 F.3d 1359 (Fed. Cir. 2002) …………………………...….……………2

*Collaborative Agreements, LLC v. Adobe Systems, Inc.*,
 15-cv-3853-EMC, 2015 WL 7753293 (N.D. Cal. Dec. 2, 2015)……………35

*Dow Chem. Co. v. United States*,
 226 F.3d 1334 (Fed. Cir. 2000)………………………………………………..32

*ePlus, Inc. v. Lawson Software, Inc.*
 700 F.3d 509 (Fed. Cir. 2012) …………………………...…………………4

*Finjan, Inc. v. Proofpoint, Inc.*,
 No. 13-cv-05808-HSG, 2015 WL 10477927 (N.D. Cal. Dec. 3, 2015)..…..10

*Free Stream Media Corp. v. Alphonso Inc.,*

2:15-cv-1725-RWS, 2017 WL 1165578 (E.D. Tex. March 29, 2017)……..34

*Genuine Enabling Tech., LLC v. Sony Corp.,*
 No. CV 17-135, 2020 WL 1140910 (D. Del. Mar. 9, 2020)………………27

*Hakim v. Cannon Avent Grp., PLC*,
 479 F.3d 1313 (Fed. Cir. 2007)…………..………………………………...33

*Hitachi Metals, Ltd. v. All. of Rare-Earth Permanent Magnet Indus*.,
 699 F. App'x 929 (Fed. Cir. 2017)………………………………………32

*Home Diagnostics, Inc. v. LifeScan, Inc*.,
 381 F.3d 1352 (Fed. Cir. 2004) ………………………….………………2

*Idenix Pharm., Inc. v. Gilead Scis., Inc*.,
 No. CV 13-1987-LPS, 2015 WL 9048010 (D. Del. Dec. 16, 2015)……….30

*Ingenio, Filiale De Loto-Quebec, Inc. v. Gamelogic, Inc.*,
 445 F. Supp. 2d 443 (D. Del. 2006)………………………………….…23

*Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp*.,
 309 F.3d 1365 (Fed. Cir. 2002)………….…………………………………19

*Katz v. AT&T Corp.*,
 63 F. Supp. 2d 583 (E.D. Pa. 1999)…………..…………………………27

*Katz Interactive Call Processing Patent Litig.*,
 639 F.3d 1303 (Fed. Cir. 2011)…………………………………………..26

*Kenexa Brassring Inc. v. Taleo Corp.*,
 No. 07-521-SLR, 2010 WL 4814673 (D. Del. Nov. 18, 2010)……………..30

*Linear Technology Corp. v. Impala Linear Corp.*,
 379 F.3d 1311 (Fed. Cir. 2004) …………………………………………7, 8

*Masimo Corp. v. Philips Elecs. N.A. Corp*.,
 2015 WL 7737308 (D. Del. Dec. 1, 2015)………………………….……11-12

*Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*,
 No. CIV.A. 11-409-LPS, 2012 WL 2126873 (D. Del. June 12, 2012)………21

*Nautilus Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)……….…………………………………………………4

*Odyssey Wireless, Inc. v. Apple Inc.*,
  No. 15-CV-1735-H (RBB), 2016 WL 3055900 (S.D. Cal. Mar. 30, 2016)…8

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
  161 F.3d 696 (Fed. Cir. 1998) …………………….....……….……………...7

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)…………………………....………..……*passim*

*Primos Inc. v. Hunter's Specialties Inc.*,
  451 F.3d 841 (Fed. Cir. 2006)………………………………………………….22

*Progress Vending, Inc. v. Department of Liquor Control*,
  59 Ohio App.2d 266 (1978)…………………………………………………15, 27

*Quanergy Sys., Inc. v. Velodyne Lidar, Inc.*,
  No. 16-CV-05251-EJD, 2017 WL 4410174 (N.D. Cal. Oct. 4, 2017)……...9-10

*Realtime Adaptive Streaming LLC v. Adobe Sys.*,
  CV 18-9344-GW, 2019 U.S. Dist. LEXIS 125180 (C.D. Cal. July 25, 2019).8

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243, 1250 (Fed. Cir. 1998)………………………………………18

*SkyHawke Techs., LLC v. DECA Int'l Corp.*,
  No. CV 18-1234-GW, 2020 WL 2527050 (C.D. Cal. Feb. 20, 202………...12

*St. Isidore Research, LLC v. Comerica Inc.*,
  No. 2:15-CV-1390-JRG, 2016 WL 4988246 (E.D. Tex. Sept. 19, 2016)....11

*Smartflash LLC v. Apple Inc.*,
  No. 6:13-CV-447-JRG, 2015 WL 4208754 (E.D. Tex. July 7, 2015)……...9, 34

*SunRace Roots Enter. Co. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003)………………………………………….32

*Syncpoint Imaging, LLC v. Nintendo of America Inc.*,
   No. 215CV00247-JRG, 2016 WL 55118 (E.D. Tex. Jan. 5, 2016)…….…..8, 13

*Uniloc USA, Inc. v. Autodesk, Inc.*,
   2:15-cv-1187-JRG, 2016 WL 3647977 (E.D. Tex. July 7, 2016)…………..35

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015) ……………………………………………...…3

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)………………………...……...…………2

*Williamson v. Citrix Online, LLC,*
   792 F.3d 1339 (Fed. Cir. 2015) …………………………………………*passim*

## <u>*Statutes*</u>**:**

35 U.S.C. § 112……………………………………………………………*passim*

# **EXHIBITS**

Exhibit A - Declaration of Dwight Crevelt

Exhibit B - Dictionary of Computer Words (1995), at 58, 175, 226

Exhibit C - U.S. Patent No. 5,882,258

Exhibit D - Declaration of Chris Cummings

Exhibit E - Published Application US 2007/0232384 A1

Exhibit F - Microsoft Press Computer Dictionary (5th ed. 2005), at 106, 276

Exhibit G - Ohio Rev. Code § 2915.01(C) (version effective until Oct. 24, 2007)

## I.       Introduction

Savvy Dog Systems and POM of Pennsylvania (collectively, "POM") assert that Pennsylvania Coin and PA Coin Holdings (collectively, "PA Coin") infringe U.S. Patent 7,736,223 (the "223 Patent"). As a utility patent, the 223 Patent is comprised of drawings (FIGS. 1-8), followed by the textual "specification" starting at column 1, line 1.  Seventy-five enumerated "claims" follow, starting at column 12, line 50.  Only the patent claims define the exclusive right granted to the patent applicant, whereas the drawings and specification facilitate a better understanding of the claimed invention. POM submits a technology tutorial to aid the Court's understanding of the technology described in the 223 Patent.

POM asserts infringement of two independent claims: Claim 44 and Claim 51. [*See* 223 Pat., 16:44-17:45[1]]. Claims 45-50 are "dependent" claims, meaning they depend from Claim 44 and, in addition to requiring all of the elements (so-called "claim terms" or "claim limitations") of Claim 44, each dependent claim also adds one or more additional elements. Likewise, claims 52-57 are dependent claims of Claim 51.

The disputed claim terms at issue appear in Claim 44 and/or Claim 51.  Only after the boundaries of these claims are determined through claim construction can

---

[1]  The 223 Patent is filed as Dkt. 71-3. Citations to the 223 Patent in POM's brief are by column:line.

the factfinder decide whether the allegedly infringing products fall within the scope of the patentee's claims, or whether the asserted claims are invalid in view of the prior art.

## II.    Claim Construction Principles

To construe a claim, a court begins with the intrinsic evidence, consisting of the patent's claim language, specification and prosecution history. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). The claims define the metes and bounds of the patentee's invention. *Id*. Claim language is normally interpreted in accordance with the ordinary meaning the term would have to a person of ordinary skill in the art ("POSITA") "at the time of the invention [as] of the effective filing date of the patent application." *Id.* at 1312. There are only two exceptions to this general rule: (1) when a patentee sets out a definition and acts as his own lexicographer;[2] or (2) when the patentee disavows the full scope of a claim term, either in the specification or during prosecution. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed. Cir. 1996). "Absent a clear disavowal in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc*., 381 F.3d 1352, 1358 (Fed. Cir. 2004).

---

[2]  To act as its own lexicographer, a patentee must "clearly set forth a definition of the disputed claim term" other than its plain and ordinary meaning. *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002).

Differences in claim terms also assist in understanding a term's meaning. *Phillips*, 415 F.3d at 1314. For example, when a dependent claim adds a limitation not in its independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"Importantly, the [POSITA] is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. at 1314-1315 (quotation omitted).

The prosecution history is also intrinsic evidence, albeit less useful than claims and the specification because of the lack of clarity that occurs during prosecution (*e.g*., the ongoing negotiation between the Patent Office and the Applicant). *Id.* at 1317.

A court may also consult extrinsic evidence, including "expert and inventor testimony, dictionaries, and learned treatises." *Id.*; *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331-32 (2015) (court may make subsidiary factual determinations in claim construction based in part on extrinsic evidence).

### III.    The Law of Patent Indefiniteness

PA Coin claims that the disputed terms "game processor" and "program instructions" are "indefinite." Claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim must therefore "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is invalid as indefinite. *Id*. at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the patent application was filed. *Id*. at 899. As a challenge to the validity of a patent, the failure of any asserted claim to comply with § 112 must be shown by <u>clear and convincing evidence</u>. *Id*. at 912, n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

As shown herein, the terms at issue impart a clear meaning when read by a POSITA. Thus, PA Coin cannot carry its heavy burden to show that the claims at issue are indefinite/invalid.

## IV.    Terms to be Construed

### A.    <u>Term 1</u>:

| <u>Term 1</u>: "game processor" (Claim 44) | |
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "a CPU or microprocessor with input/output circuitry that executes program instructions to generate a game."<br><br>Not a means-plus-function term. | (1) ***Indefinite.***[3]<br><br>***This is a means-plus-function term***.<br><br>(2) *Alternative*: "a conventional CPU or microprocessor processor that executes program instructions to generate a game." |

The Court must resolve whether "game processor" is a "means-plus-function" ("MPF") term under 35 U.S.C. § 112(f).[4]  MPF law requires that if a claim is drafted in "means for [a specified function]" format, the Court must refer to the specification to locate the "structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112(f).  In the context of "means for" performing an advanced software function, the corresponding structure is usually not a general computer, but rather the special purpose computer programmed to perform a disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game*

---

[3]   For each disputed term, POM uses boldface to highlight the objectionable portion of PA Coin's proffered construction.

[4]   35 U.S.C. § 112, Paragraph 6, codified the MPF statute prior to the passage of the America Invents Act ("AIA").  The AIA did not substantively change the statutory language.

*Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (holding "means for …" claim indefinite where there was no disclosure of algorithmic structure in the specification). Here, PA Coin invokes *Aristocrat*, asserting that "game processor" is indefinite because of two <u>falsely</u>-premised reasons: (1) that "game processor" is an MPF claim term; and (2) that there is no algorithmic structure in the 223 Patent. They are wrong on both counts.

Here, the claim term is <u>not</u> expressed in MPF format. "Means" is not used. *See Phillips*, 415 F.3d at 1311 ("baffles" is not a MPF limitation).  Instead, "game processor" is itself the name for structure within the claim.

### 1.   A Presumption exists that "game processor" is not subject to MPF treatment.

Because "game processor" does not use the word "means," there is a presumption that it is not a term subject to MPF treatment.  *Apex Inc. v. Raritan Computer, Inc.*, 325 F.3d 1364, 1371 (Fed. Cir. 2003) ("a claim term that does not use 'means' will trigger the rebuttable presumption that § 112, [¶] 6 does not apply"). "To determine whether § 112, [¶] 6 applies to a claim limitation, our precedent has long recognized the importance of the presence or absence of the word 'means.'" *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (*en banc*).

As "game processor" does not use the word "means", the presumption is that it is not a MPF term. As set forth in Section IV(A)(2)-(3) below, this presumption is not rebutted.

### 2.    "Game Processor" is the "name for structure."

The Federal Circuit has not addressed whether the presumption against MPF treatment can be rebutted in the context of a claim reciting a specific subclass of processors such as "game processor." *Cf. Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) (holding that "detector" connotes sufficient structure so as to avoid MPF treatment because, even though "detector" did not specifically evoke a particular structure, it conveyed to a POSITA a variety of structures known as "detectors."). However, the Federal Circuit has held that "circuit" connotes structure and the context of a claim can show how the circuit operates within the claimed invention to achieve its objective.  *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004).

More recently, *Williamson v. Citrix Online, LLC* held that the presumption against MPF treatment can be rebutted when the claim language merely employs a "nonce" word that is merely a substitute for "means."  792 F.3d at 1350 (Fed. Cir. 2015). "The standard is whether the words of the claim are understood by [a POSITA] to have a <u>sufficiently definite meaning as the name for structure</u>." *Id.* at 1349 (emphasis added).

*Williamson* did not overturn *Linear Tech.* Furthermore, *Williamson* did <u>not</u> include any "processor" in its list of "nonce" words (non-structural generic placeholders like "means"), which included "mechanism for," "module for," "device

for," and "element for." *Id.* at 1350. Since *Williamson*, courts have recognized, "processor" is more analogous to "circuit" than to "means."[5] *See Realtime Adaptive Streaming LLC v. Adobe Sys.*, No. CV 18-9344-GW, 2019 U.S. Dist. LEXIS 125180, \*46-47 (C.D. Cal. July 25, 2019) ("a processor configured to" connoted structure such that "35 U.S.C. § 112, ¶ 6 is not applied to the 'processor' terms").

A "processor" is a term of art defined in technical dictionaries as a specific type of integrated circuit, sometimes called a microprocessor or central processing unit (CPU). [*See* Declaration of Dwight Crevelt ("Crevelt Dec.", **Exhibit A**), ¶¶ 115-118; Dictionary of Computer Words (1995) (**Exhibit B**), at 58, 175, 226]. Unlike the "module" in *Williamson*, "processor" is concrete. [Crevelt Dec. ¶¶ 112-118]. Furthermore, in the prior art "game processor" designates a known subclass of processors. [*Id.* ¶¶ 120-125; U.S. Patent No. 5,882,258 (**Exhibit C**), at Fig. 1a, 5:2-6, 5:24-28, 7:43-60 and 8:48-50]. Dwight Crevelt, an expert with over 40 years' experience in the field, opined that "game processor" imparts structure and meaning to a POSITA as a subclass of processor. [Crevelt Dec. ¶¶ 119-129]. Unlike a nonce word, a POSITA can visualize a "game processor." [*Id.* ¶¶ 119, 121-123; *see*

---

[5] *See  Odyssey Wireless, Inc. v. Apple Inc.,* No. 15-CV-1735-H (RBB), 2016 WL 3055900, at \*11 (S.D. Cal. Mar. 30, 2016) ("processor" is not a nonce word because the "term 'processor' connotes structure") (citing *Syncpoint Imaging, LLC v. Nintendo of Am. Inc*., No. 215CV00247-JRG, 2016 WL 55118, at \*20-21 (E.D. Tex. Jan. 5, 2016) ("a processor . . . for processing" "connotes structure" and is not subject to MPF treatment)).

Declaration of Chris Cummings (**Exhibit D**), at Exs. A-B]. "Game processor" is understood by a POSITA in terms of its internal componentry. [Crevelt Dec. ¶¶ 120-129]. The 223 Patent's use of "game processor" is consistent with the understanding of a POSITA. [*Id.* ¶¶ 126-128; 223 Pat., 2:29-45].

### 3. The context of Claim 44 further precludes the application of MPF to "game processor."

*In Smartflash LLC v. Apple Inc.*, No. 6:13-CV-447-JRG, 2015 WL 4208754 (E.D. Tex. July 7, 2015), the defendant moved "for reconsideration of prior claim constructions of "processor" and "code" in light of *Williamson*. Rejecting the motion, the court again held that MPF law did not apply.

The court distinguished *Williamson*, explaining:

> The terms "code" and "processor" as used here are distinguishable from the word "module" in *Williamson* because, for example, [defendant's] own expert has opined that the word "processor" connotes structure to a person of ordinary skill in the art as "a general-purpose processor that can be programmed to carry out specific functions."

2015 WL 4208754, at *3 (quotation omitted). The claim in *Williamson* did not "describe how the 'distributed learning control module' interacts with other components" to provide structure, whereas "here, the terms at issue are not merely 'code' and 'processor' but rather include substantial additional language describing the operation of the components at issue and their interaction with other components." *Id.* at *3 (quotation omitted); *see also Quanergy Sys., Inc. v. Velodyne*

*Lidar, Inc.*, No. 16-CV-05251-EJD, 2017 WL 4410174, at *19 (N.D. Cal. Oct. 4, 2017) (in context of "processor being configured to[,]" processor referred to a "specific class of structures" rather than just being a substitute for "means"; term held not subject to MPF treatment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 WL 10477927, at *11 (N.D. Cal. Dec. 3, 2015) ("content processor [for a function]" not subject to MPF treatment; the claim itself described how the processor worked with other components).

Here, the claim provides the appropriate objective, context and componentry. Claim 44 states:

> 44. An electronic gaming system comprising:
>
> an electronic <u>game terminal</u> including a <u>touch screen display</u>;
>
> a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:
>
> <u>constructing</u> a field having a plurality of elements for the <u>interactive game display</u> wherein each element includes a game symbol from a plurality of predetermined game symbols;
>
> <u>determining</u> at least one winning combination for each play of the game;
>
> <u>testing</u> the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;
>
> automatically <u>displaying</u> an actual game to be played <u>on the touch screen game display</u> to a player prior to initiating activation of game play;

<u>determining</u> if the player has decided to play the displayed game; and

<u>displaying</u> an outcome resulting from play of the displayed game.

[223 Pat., 16:47-17:2 (emphasis added)].

Given the claim language, a POSITA would understand the objective of the game processor (generating an interactive electronic game on the game terminal), the componentry that the game processor interacts with via its input/output circuitry (game terminal, interactive touch screen display), and a context of how the game processor interacts with the componentry. [Crevelt Dec. ¶ 129].

Furthermore, MPF does not apply where there is algorithmic structure in the claim itself.  In *St. Isidore Research, LLC v. Comerica Inc.*, the court determined that "transaction processing module" was not an MPF term because:

> [t]he claim as a whole discloses a series of steps the module performs when it is in operation. That is, Claim 1 <u>discloses an algorithm</u>. The claim explains that the "transaction processing module" performs the "transaction processing" function in the following manner. The "module" (1) <u>communicates</u> by receiving transaction information, (2) <u>identifies</u> a specific party to the transaction, (3) <u>transmits</u> a request for verification to that party, (3) <u>recognizes</u> the result of that request, (4) <u>determines</u> the authenticity of the request using that result, and (5) <u>appropriately</u> continues with the transaction. <u>This step-wise description of the operation of the "module" forms an algorithm.</u>

No. 2:15-CV-1390-JRG, 2016 WL 4988246, at *13 (E.D. Tex. Sept. 19, 2016) (emphasis added); *see also Masimo Corp. v. Philips Elecs. N.A. Corp.*, C.A. No. 11-742-LPS, 2015 WL 7737308, at *8 (D. Del. Dec. 1, 2015) ("a processor configured

11

to perform a method comprising . . . selecting one of the plurality of possible oxygen saturation values as an oxygen saturation measurement … to determine which of the plurality of possible oxygen saturation values corresponds to the oxygen saturation of the pulsing blood" sufficiently structural; MPF did not apply).

Applied here, Claim 44 embodies an algorithm imparting structure. [Crevelt Dec. ¶¶ 136-138].  Specifically, Claim 44 outlines the following algorithm for generating an interactive electronic game on the game terminal:



[*Id.* ¶ 137].  "[C]onstrued in light of persuasive legal authority and the intrinsic record in this case, Defendants' [MPF] arguments remain unpersuasive." *SkyHawke*

*Techs., LLC v. DECA Int'l Corp.*, No. CV 18-1234-GW, 2020 WL 2527050, at *4 (C.D. Cal. Feb. 20, 2020).

### 4. Because MPF law does not apply to "game processor," the claim is <u>not</u> indefinite.

PA Coin's construction hinges on whether "game processor" is subject to MPF treatment. "[W]here a claim is <u>not</u> drafted in [MPF] format, the reasoning in the *Aristocrat* line of cases [holding claims indefinite due to the failure to disclose algorithmic support for functional claim language in the specification] does <u>not</u> automatically apply, and an algorithm is therefore not necessarily required [for the claim term to be definite]." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1298 (Fed. Cir. 2014) (emphasis added), *overruled on other grounds* by *Williamson*, 792 F.3d at 1349; *Syncpoint*, 2016 WL 55118, at *21 ("the *Aristocrat* rule applies only after § 112, ¶ 6 has been invoked. The *Aristocrat* rule should not apply when determining <u>whether</u> § 112, ¶ 6 should be invoked") (emphasis added). "Defendants' attempt to overcome the presumption that § 112, ¶ 6 does not apply to the 'processor...for [performing a function]' term fails because it is premised on requiring an *Aristocrat*-level disclosure in the claims themselves[.] Federal Circuit precedent does not require this level of disclosure in the claims." *Syncpoint*, 2016 WL 55118, at *21 (citation omitted). PA Coin's argument therefore fails.

Hardly indefinite, "game processor" is "a CPU or microprocessor with input/output circuitry that executes program instructions to generate a game."

13

[Crevelt Dec. ¶¶ 120, 128-129].   PA Coin's alternative construction of "game processor" is "a conventional CPU or microprocessor processor that executes program instructions to generate a game." [*See* Dkt. 71-2, at 2].   Its use of "conventional" is not supported by intrinsic evidence and is unhelpful to the factfinder. PA Coin's construction also mistakenly omits the input/output circuitry, an essential part of a "game processor" as understood by a POSITA. [*See* Crevelt Dec. ¶¶ 120, 122-124, 128-129].

B.   **Terms 2 & 3:**

| Term 2: "[W]inning combination" (Claims 44 and 51) ||
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "array of symbols yielding a successful outcome or corresponding to a prize" | "array of game symbols in the game field yielding a successful outcome" |

| Term 3: "Determine[determining/determined] at least one winning combination for each play of the game" (Claims 44 and 51) ||
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "Establish or ascertain at least one array of symbols yielding a successful outcome or corresponding to a prize for each game to be played" | "*guaranteeing/guarantee/guaranteed* at least one winning combination that may be formed for each game to be played" |

The 223 Patent teaches determining winning combination(s) for each play of the game in at least three ways:  (a) establishing a table of successful outcomes or prizes (in a preferred embodiment); (b) establishing the winning combinations before showing the newly-constructed game field to the player; and (c) ascertaining winning combination(s) after the player has played the game (to determine game

outcome success or prizes, if any). [Crevelt Dec. ¶¶ 91-95].   According to the intrinsic evidence, a "winning combination" refers to the array of game symbols (*e.g.,* 3 cherries in a row) in the game field yielding a successful outcome, and POM adds "corresponding to a prize" to its construction to aid the factfinder in more fully understanding the nature of a "winning combination."   The example Award Table (223 Pat., 5:35-47) illustrates that a successful outcome is one where a given array of symbols yields a corresponding prize. [Crevelt Dec. ¶¶ 78-79]. In fact, most of the examples of a successful outcome in the 223 Patent involve a corresponding prize. *See also Progress Vending, Inc. v. Department of Liquor Control*, 59 Ohio App.2d 266, 269 (1978) (player of pinball machine "may receive an additional number of [free] plays dependent upon the number of times the ball passes through the open gate"). For this reason, the Court should adopt POM's proposed construction of Term 2.

POM's construction of Term 3 is similarly grounded in the intrinsic evidence: the patent's description of the example Award Table, game field construction, and post-play prize determination.

Award Table:  "An exemplary award schedule for this version of the Tic-Tac-Fruit electronic game is provided in Table 1." [223 Pat., 5:15].

TABLE 1

| Symbol/Denomination | Tic-Tac-Fruit (Classic) | | | |
|---|---|---|---|---|
| | 50¢ | $1.00 | $2.00 | $4.00 |
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

*Selected Play Level* — annotation

*Winning Combinations* — annotation

*Corresponding Prizes* — annotation

[223 Pat., 5:35-47 (emphasis added); Crevelt Dec. ¶ 78].  A POSITA understands such an award table to be a data structure defined by the system in advance of each game play, to establish each "complete line" or "winning line" (*e.g.,* 3 symbols in a row) will yield a prize. [Crevelt Dec. ¶¶ 78, 82, 95].  Here, the Award Table applicable to each instance of game play shows a prize corresponding to each array of symbols depending on the level of play. [223 Pat., 5:35-47].

Field Construction:  Where the wild symbol is used, the system constructs the game field, chooses how many winning lines on the field, the orientation of the winning lines, and which symbol(s) will form a winning line. [*Id.,* 4:56-64].

16

The Tic-Tac-Fruit electronic game does not pick random fields until testing indicates that one is acceptable. Instead, the field is constructed to meet certain criteria. The steps involved in constructing a field in this electronic game are as
55   follows:

1. chose the number of winning lines (i.e., 1, 2, 3, 4);
2. chose the orientation of each of the winning lines (i.e., horizontal, vertical, or diagonal);
3. chose the symbols for each of the lines (i.e., cherries,
60      plums, bells, etc.);
4. fill in empty spots with random symbols; and
5. test the complete field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails.

[*Id.*, 4:51-64 (emphasis added)].

After determining what winning combination(s) will be used, random symbols are inputted to complete the field, and the system then tests the board for compliance to ensure there are no new winners caused by insertion of random symbols (Steps 4-5, *id.* 4:61-64): "the game software determines all of the initial 'no-line' (non-winning) fields and tests each of these for potential winners where all fields that can potentially complete a line are counted." [*Id.*, 4:44-47]. The system determines the winning combinations based on the prizes to be awarded for a given game field before showing the field to the user. It then masks these winning combination(s): "The key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player." [*Id.*, 6:24-33]. Hoping to find the location of this masked "key symbol," the player then chooses the location of the wild symbol. [*Id.*, 4:9-12].

Post-Game Determination: After the system receives and processes the player's selection of a wild symbol location in FIG. 5, step 508, the system again determines the winning combination(s) of symbols in step 510, and displays the winning combinations to the player in step 512. The game software automatically determines the total number of plays of the game based on the player's action before commencing the game play in step 514.  [*Id.*, 10:7-11].



[*Id.*, FIG. 5; *see also id.*, FIG. 6 (614, 616), 1:57-62, FIG. 8 (808)].

Based on the foregoing, to "determine" in Term 2 means in each instance to "establish or ascertain" the winning combination(s).  POM's construction "stays true to the claim language and most naturally aligns with the patent's description of the invention[.]" *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citation omitted).  In fact, POM's construction works with the usage of "determine" wherever it appears in the claims and specification, including

in cases where "determine" refers to things other than winning combination(s). "A claim term used in multiple claims should be construed consistently[.]" *Inverness Med. Switzerland GmbH v. Princeton Biomeditech Corp*., 309 F.3d 1365, 1371 (Fed. Cir. 2002) (citation omitted).

For example, Claims 44 and 51 also use "determine" in the phrase "determining if the player has decided to play the displayed game[.]" [223 Pat., 16:66-67 (emphasis added)]. Here again, "determine" means "establish or ascertain," such as establishing or ascertaining if the player has decided to play the displayed game. Conversely, "guaranteeing if the player has decided to play the displayed game" is nonsensical. *See Phillips*, 415 F.3d at 1314 (claim terms should have a consistent meaning throughout the patent).

C.    **Term 4:**

| **Term 4**: "Test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" (Claims 44 and 51) | |
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "examin[ing] or observ[ing] an array of symbols prior to displaying the game to the player to ensure that the anticipated prize corresponding to the array is not superseded by the award of a better prize"[6]<br><br>more valuable: "Having a better outcome or a higher prize level"<br><br>in completing the field: "in making the field from the plurality of predetermined game symbols" | test[ing] *the previously constructed field* prior to displaying the *actual game to be played* to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently *when the player completes a winning combination during play of the game*" |

PA Coin seeks to add language more restrictive than the language of the claim read in view of the specification.  For example, while PA Coin includes "when the player completes a winning combination during play of the game" in its proffered construction, Claims 44 and 51 do <u>not</u> require any player interaction with the game display to create a winning combination, and they do not mention the selection of a field element as the location for a wild symbol.

On the other hand, Claim 1 is directed to the player selection of a wild symbol embodiment, providing in part:

---

[6] In view of Terms 2 and 3, *supra*, "prize" here necessarily means "successful outcome or prize."

… there is no winning combination without player interaction with the game display;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

\* \* \* \* \*

receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection[.]

[223 Pat., 12:51-13:4 (emphasis added); *see Phillips*, 415 F.3d at 1314 (other claims can aid in determining the claim's meaning and differences among the claim terms can assist in understanding a term's meaning)]. Here, the differences in scope between Claim 1 and the claims at issue counsel against importing PA Coin's more restrictive interpretation of Claim 1 into the broader scope of Claims 44 and 51.

In *Medicis Pharm. Corp. v. Actavis Mid Atl. LLC*, one aspect of a defendant's proposed claim construction was at odds with the specification, namely, that the polymer's viscosity be "less than 15,000 cP[.]" No. C.A. 11-409-LPS, 2012 WL 2126873, at \*10–11 (D. Del. June 12, 2012), *report and recommendation adopted*, No. CIV.A. 11-409-LPS, 2012 WL 2918071 (D. Del. July 16, 2012). Of the five examples of polymers disclosed in the specification, the highest viscosity range had a top level of 15,000 cP, such that the defendant's construction, if adopted, would exclude at least one of the specification's preferred embodiments. Declining to adopt the proffered construction, the court noted that "[c]laim constructions that exclude

preferred embodiments are generally disfavored." *Id*., at *10 (citing *Primos Inc. v. Hunter's Specialties Inc.*, 451 F.3d 841, 848 (Fed. Cir. 2006)).

Here, PA Coin's construction would exclude certain patent embodiments, such as the preview screen example in FIG. 8, which does not require player interaction or a wild symbol to complete a game field. "The preview screen of the present invention can be used in various additional embodiments. <u>These additional embodiments can be implemented without the use of a wild symbol</u>." [223 Pat., 11:14-20 (emphasis added)].

**FIGURE 6 – Wild Symbol (Red)**          **FIGURE 8 – No Wild Symbol**



Conversely, POM's construction is consistent with the intrinsic evidence and will assist the factfinder's understanding of Term 4 in the context of the invention. In the context of testing, "inadvertently" appears one time in the 223 Patent specification: "Prizes may be presented on one, two, three, or four lines in a single game play. The device selects the level of prize(s) to be awarded. A software algorithm <u>assesses</u> the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will <u>inadvertently</u> be presented." [*Id.*, 6:25-33 (emphasis added)]. Considering the disparate embodiments of the wild symbol (*e.g.,* FIGS. 5, 6) and the preview screen (*e.g.,* FIGS. 6, 8), "in completing the field" simply means "making the field from the plurality of predetermined game symbols." This construction is based on plain and ordinary meaning.  It is the only construction that works with the various disclosed embodiments where a game field is completed.  PA Coin's proposed construction, by contrast, covers only a single aspect of the wild symbol embodiment (after the player sees a "field completely filled" (223 Pat., 4:4-5) and uses the wild symbol to change the field). *See Ingenio, Filiale De Loto-Quebec, Inc. v. Gamelogic, Inc.*, 445 F. Supp. 2d 443, 451-452 (D. Del. 2006) ("I will not construe this term to exclude a preferred embodiment set out in the patent").

Furthermore, a POSITA would read this language with the example Award Table in mind. [Crevelt Dec. ¶ 99].  The example Award Table (223 Pat, 5:35-47) defines the winning combinations in terms of various 3-in-a-row symbol lines, and

each symbol line is associated with a prize. That "the device selects the quantity of lines which will present a winning outcome" and "[p]rizes may be presented on one, two, three, or four lines in a single game play" (*id.*, 6:25-27) "reinforce the inextricable linkage created by the award table between a given array of symbols and a successful outcome or prize that the electronic game anticipates awarding for it." [Crevelt Dec. ¶ 100].

Therefore, a POSITA would understand this limitation to refer to observing or examining an array of symbols to assure that the anticipated outcome or prize corresponding to the array is not superseded by the award of a better outcome or prize in making the field from the plurality of predetermined game symbols. [*Id.* ¶¶ 99-100]. The "better prize" is the successful outcome or prize that has the higher value. [223 Pat., 6:27-30].[7]

POM's construction is reinforced by the statement during prosecution that application paragraph 39 (now 223 Pat., 6:19-33) provides specification support for this claim limitation. [*See* Dkt. 71-4 (223 Pat. Prosecution History), at POM000210]. Paragraph 39 refers to paragraph 39 of the published version of the patent application which led to issuance of the 223 Patent.  [*See* Crevelt Dec. ¶¶ 96-98; Published Application US 2007/0232384 A1 (**Exhibit E**), at ¶ 39]. Paragraph 39 recites the

---

[7]  PA Coin's construction does not address the phrase "more valuable than." POM's construction is true to the intrinsic evidence and should be adopted.

same language referenced above (223 Pat., 6:19-33), in support of POM's construction.

PA Coin errs by needlessly injecting additional verbiage into its proffered construction, to wit:

- Replacing "the game field" with "the <u>previously constructed</u> field", rather than simply "the game field" or "an array of symbols";

- Replacing "prior to displaying the game to the player" with "prior to displaying the <u>actual game to be played</u> to the player";

- Replacing "in completing the field" with "<u>when the player completes</u> a winning combination during play of the game".

As shown herein, PA Coin's attempts to narrow the claim language scope are flawed.

First, it would be erroneous to hold that "game field" is limited to "the <u>previously constructed</u> field", rather than simply "an array of symbols." Field construction and testing can be overlapping processes prior to displaying a game field on the screen. [223 Pat., 4:51-64, 6:19-33].

Second, for similar reasons, it would be error to instruct that "prior to displaying the game to the player" is limited to "prior to displaying <u>the actual game to be played</u> to the player", because "the game" being tested may <u>not</u> actually be displayed to the player, depending on the results of the testing. [223 Pat., 4:51-64 (step 5), 6:19-33].

25

Third, PA Coin's construction limits "completing the game field" to situations where the player completes the field.  Yet this is not the only embodiment of the 223 Patent. [223 Pat., 11:14-20].  PA Coin's construction does not address the situation where the system completely fills in the field before showing it to a player, and it outright excludes the embodiment of FIG. 8, where the game field is shown to the player and the player does not select a wild symbol. [*See id.*, 2:12-14, 4:4-5, 4:62-67, FIG. 8 (800, 802 and 810), 11:65-12:3, 12:11-14; Crevelt Dec. ¶¶ 80-90; *see In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1324 (Fed. Cir. 2011) (because of the importance of the specification, there is "a strong presumption against a claim construction that excludes a disclosed embodiment" of the inventor) (citation omitted).

Only POM's construction is consistent with the totality of the intrinsic evidence.

### D.   Terms 5 & 6:

| Term 5:"Automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" (Claims 44 and 51) ||
| --- | --- |
| **POM's Construction** | **PA Coin's Construction** |
| "Programmatically instruct[ing] the terminal to display on the touch screen the identification of the next game to the player, including showing the player an otherwise unknown system-generated attribute of the next game before the player commits to play the next game" | "automatically display[ing] an actual game to be played on the touch screen game display to the player before the player commits to play the displayed game" |

| **Term 6: "an actual game to be played"** (as used above). | |
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "the identification of the next game, including at least an otherwise unknown system-generated attribute of the next game" | "the *constructed game field of* the game to be played" |

Recalling the inventor's objective of producing a game platform that elevates skill while reducing the role of chance,[8] a POSITA would understand there are many ways to implement a preview screen feature into an electronic game to reduce the role of chance. [Crevelt Dec. ¶ 104]. "The preview screen of the present invention can be used in <u>various additional embodiments</u>. These additional embodiments can be implemented without the use of a wild symbol." [223 Pat., 11:14-15 (emphasis added)]. The multiple disclosed embodiments – discussed below – suggest the inventor's entitlement to a broad construction of Terms 5 and 6. *See Genuine Enabling Tech., LLC v. Sony Corp.,* No. CV 17-135, 2020 WL 1140910, at *16 (D. Del. Mar. 9, 2020) (based on multiple alternative embodiments of "converter" disclosed in the specification, the "converter" in independent claim was not limited to the converter disclosed in a dependent claim); *Katz v. AT&T Corp.*, 63 F. Supp. 2d 583, 591 (E.D. Pa. 1999) ("[I]f a term is used in a variety of ways by the patentee

---

[7] 223 Pat., 1:24-32; *see* Ohio Rev. Code § 2915.01(C) (version effective until Oct. 24, 2007 (**Exhibit G**), defining "Scheme of chance" as excluding a skill-based amusement machine); *see also Progress Vending,* 59 Ohio App.2d at 277 (pinball games at issue held to be predominantly games of skill, rather than games of chance).

in the specification, this may be indicative of the breadth of the term, rather than a limited definition") (citation omitted).

The various embodiments of the preview screen include: first, FIG. 6 teaches processing logic for combining the wild symbol embodiment of the 223 Patent with the preview screen embodiment.  In connection with step 602, "the player can select from a plurality of game preview displays, with each game preview being associated with a different play level. Any potential player can observe the game display for as long as desired before making a decision to play the displayed game in decision step 604." [223 Pat., 10:37-44].

 Second, for an additional embodiment, FIG. 8 teaches describing the use of a preview without necessitating a wild symbol. [*Id*., 12:5-16 (describing the use of a "Next Puzzle" button which the player can touch to display the next game board)].

A third embodiment uses a screen showing the outcome of the next game before it is played.  "In the context of the electronic game having an array of symbols as described herein, the game preview screen can be constructed and displayed without the need for a player to do anything other than to select 'Play.' In this case, the preview screen could actually be the results screen, displaying the game outcome." [*Id.*, 11:17-22]. "Such a preview screen could display a winning or a non-winning combination." [*Id.*, 11:22-23]. A POSITA would therefore understand that

a fourth embodiment could be to preview a specific combination from the next game to be played – but not the entire game field – for the user to see. [Crevelt Dec. ¶ 106].

Still another embodiment is showing a player a preview of the next game field during current game play, on the same screen. "A preview of the next game could be displayed adjacent to the current preview screen." [223 Pat., 11:27-28; *see also id.*, FIG. 7, 11:30-34 (referring to FIG. 7 "in which the current game is previewed on the main portion of the display and the next game (e.g., at the same play level or denomination) is displayed adjacent to the current game display in the upper right portion of the display")].

A sixth embodiment of the preview screen is where "[t]he preview display could also be implemented in other forms of electronic or electromechanical games. For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols. The displayed game could actually be the result which may or may not be a winning combination of symbols." [*Id.*, 11:43-49].

A POSITA would understand from the multitude of preview screen embodiments in the 223 Patent that the claimed preview serves to "reduce the role of chance by previewing to the player something unique about the next game to be played that the player otherwise would not know, so that the player makes the decision whether to play the next game based on information rather than

happenstance." [Crevelt Dec. ¶ 109]. Only POM's construction – "showing the player an otherwise unknown system-generated attribute of the next game before the player commits to play the next game" – captures the essence of each of the inventor's disclosed embodiments.

On the other hand, PA Coin's construction is not consistent with the inventor's disclosure of numerous embodiments of the preview screen, including the next game results screen and the screen showing an exemplary winning or non-winning combination of symbols. "[E]xclud[ing] from claim scope [a] preferred embodiment of [a patent is] a disfavored result." *Bowers v. Baystate Techs. Inc*., 320 F.3d 1317, 1332 (Fed. Cir. 2003); *Idenix Pharm., Inc. v. Gilead Scis., Inc*., No. CV 13-1987-LPS, 2015 WL 9048010, at *5 (D. Del. Dec. 16, 2015) (defendants' construction would improperly exclude a preferred embodiment disclosed in the specification from the claim language); *Kenexa Brassring Inc. v. Taleo Corp.*, No. 07-521-SLR, 2010 WL 4814673, at *1 (D. Del. Nov. 18, 2010) (declining to adopt a claim construction that would exclude a preferred embodiment of the inventor).

PA Coin also improperly conflates the meaning of "game to be played" and the "constructed game field of the game to be played." In ordinary usage, "game" is a general reference to a contest. It is a broader term than "game field" – *e.g.* "Did you catch the game last night?" "What was the final score of the game?" "What time does the game start?" "Game field" is used elsewhere in claims 44 and 51, meaning

that "game" has a broader meaning than "game field." *See Phillips*, 415 F.3d at 1314 (recitation of "steel baffles" strongly implies that "baffles" does not inherently mean objects made of steel).

"Constructed game field" in PA Coin's construction narrows the actual claim language, that is, "the game to be played." If "the actual game to be played" was an upcoming football game, "the constructed football field of the football game to be played" would not be a suitable construction for "upcoming football game." This kind of effort to narrow claim scope is at odds with the plain meaning a POSITA would afford to Terms 5 and 6.

Moreover, comparison of Claim 44 to dependent Claims 45 and 46 (referring to a game <u>field</u> of the next game to be played) shows that "actual game to be played" is not limited to the "constructed game field of the game to be played." A comparison of Claim 51 to dependent Claims 52 and 53 makes the same point.

| Independent Claim Language | Dependent Claim Language |
|---|---|
| Claim 44: "Automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" | 45. The electronic gaming system of claim 44 further comprising a component for <u>generating and displaying an additional game field</u> simultaneously on the game display in proximity to the displayed game.<br><br>46. The electronic gaming system of claim 45 wherein <u>the additional game field is for a next game to be played</u>. |
| Claim 51: "Program instructions that automatically display an actual game to be played on the touch screen game | 52. The computer program product for electronic gaming of claim 51 further comprising program instructions that |

| display to a player prior to initiating activation of game play" | <u>generate and display an additional game field</u> simultaneously on the game display in proximity to the displayed game.<br>53. The computer program product for electronic gaming of claim 52 wherein the <u>additional game field is for a next game to be played</u>. |
|---|---|

[223 Pat., 16:63-65, 17:3-8, 17:22-52 (emphasis added)].

In this case, the dependent claims expressly adding the "game field" of an upcoming game suggest that Terms 5 and 6 are entitled to a broader construction – one that merely requires an actual game to be played, not the <u>game field</u> of an actual game to be played. *See Phillips*, 415 F.3d at 1314–15; *Hitachi Metals, Ltd. v. All. of Rare-Earth Permanent Magnet Indus.*, 699 F. App'x 929, 937 (Fed. Cir. 2017) (agreeing with the patentee that "rapid cooling method" covered by claim 1 should be broader than the range specified in dependent claim 5 of 102–104 °C./sec); *Dow Chem. Co. v. United States*, 226 F.3d 1334, 1341–42 (Fed. Cir. 2000) (concluding that an independent claim should be given broader scope than a dependent claim to avoid rendering the dependent claim redundant).

This is especially true where, as here, the limitation in dispute is the only meaningful difference between the foregoing independent and dependent claims, and PA Coin is urging that the limitation in the dependent claims should be read into the independent claims. *See SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

32

The prosecution history also aligns with POM's construction. During prosecution, claims 47 and 54 (issued Claims 44 and 51) originally recited displaying the "field of game symbols" of the upcoming game. [Dkt. 71-4, at POM00058-60]. Later, they were amended to recite "displaying" the game "field" of the next game to be played. [Dkt. 71-4, at POM000196-198]. Subsequently, by Examiner's Amendment, the Examiner replaced the reference to displaying the "field" of the upcoming game in these claims with the broader phrase "display[/displaying] an actual game to be played." [*Id.* at POM000242-44]. "Field" was therefore removed from the claim term in question. The Examiner Amendment did not disturb the other references to game field elsewhere in each independent claim, nor did it disturb the usage of constructed game field in the dependent claims. [*Id.*] Thus, "field" is a limitation where it is used in the claims, but in Terms 5 and 6, where it is not used, it should not be read into broader claim language. *See Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317 (Fed. Cir. 2007) ("It is recognized that an applicant can broaden as well as restrict his claims during the procedures of patent examination[.]") (citation omitted); *see, e.g., Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1326 (Fed. Cir. 2003) ("Our court has made clear that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement.") (quotation omitted).

33

E.   **Term 7**

| Term 7: "program instructions" (Claim 51) | |
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "conventional commands that can be executed by a computer"<br><br>Not a means-plus-function term. | (1) Indefinite.<br><br>This is a means-plus-function term.<br><br>(2) *Alternative*: "conventional commands that can be executed by a computer" |

POM construes "program instructions" as "conventional commands that can be executed by a computer." This construction comports with the understanding of a POSITA. [Crevelt Dec. ¶ 133].

Here, PA Coin reprises its "game processor" argument, falsely asserting that the term "program instructions" is subject to MPF treatment. *See Smartflash*, at *3 ("code" in context of computer code connotes sufficient structure so as to avoid the need for MPF treatment); *Free Stream Media Corp. v. Alphonso Inc.,* 2:15-cv-1725-RWS, 2017 WL 1165578, at *19-20, 25-26, 30-31 (E.D. Tex. March 29, 2017) ("content identification server," "client device," "networked device," "instructions" and "set of instructions" each connoted sufficient structure;  MPF did not apply).

As with "game processor," "program instructions" does not use "means."  In the context of "computer code,"[9] as used in claim 51, "program instructions" is not

---

[9] As used in claim 51, "computer readable code" is construed as "code in a form that can be executed by the computer."  [Dkt. 71-1].

a "nonce" word. [Crevelt Dec. ¶ 135]. "Instruction" and computer "code" are defined terms of art. [*Id*. ¶¶ 132-33; *Microsoft Press Computer Dictionary* (5th ed. 2005) (**Exhibit F**), at 106, 276; *see Amdocs (Israel) Limited v. Openet Telecom*, 1:10-cv-910, 2018 WL 1699429, at *16 (E.D. Va. April 6, 2018) ("'computer code' suggests some kind of structure as evidenced by the dictionary definitions"); *Uniloc USA, Inc. v. Autodesk, Inc.*, 2:15-cv-1187-JRG, 2016 WL 3647977, at *19-20 (E.D. Tex. July 7, 2016) ("add-on computer software code" connoted structure; not an MPF term); *Collab. Agreements, LLC v. Adobe Sys. Inc.*, 15-cv-3853-EMC, 2015 WL 7753293, at *6 (N.D. Cal. Dec. 2, 2015) ("'[C]ode segment' has some structural meaning, as supported by the dictionary definition tendered by Plaintiff; code segment is not a nonce word[.]").

Claim 51 further describes the objective of the computer program, with specific input and output descriptions. [Crevelt Dec. ¶ 135]. The claimed program instructions further infuse algorithmic structure into claim 51. [*Id*. ¶¶ 135, 137; *see Amdocs,* 2018 WL 1699429, at *17 ("the claim language here provides a description as to how the computer code operates")].

"Program instructions" is therefore not indefinite. To the extent PA Coin maintains that Claim 51's association of program instructions of the computer code with "multiple function usage is a basis for finding the claim indefinite, such an argument improperly conflates the issue of whether a term is a [MPF] term with the

35

issue of whether the specification discloses corresponding structure for a term that has been found to be a [MPF] term." *Amdocs,* 2018 WL 1699429, at *17 (citation omitted).

"Program instructions" should therefore be construed as "conventional commands that can be executed by a computer."

July 16, 2020

**HILL, KERTSCHER, & WHARTON, LLP**

*/s/ Steven G. Hill*
Steven G. Hill, GA Bar No. 354658
*Admitted pro hac vice*
John L. North, GA Bar No. 545580
*Admitted pro hac vice*
Martha L. Decker, GA Bar No. 420867
*Admitted pro hac vice*
3350 Riverwood Parkway
Atlanta, Georgia 30339
Telephone: (770) 953-0995
Fax: (770) 953-1358
sgh@hkw-law.com
jln@hkw-law.com
md@hkw-law.com

- **and -**

**KLEINBARD LLC**

Matthew H. Haverstick (PA ID No. 85072)
Eric J. Schreiner (PA ID No. 76721)
Paul G. Gagne (PA ID No. 42009)
Shohin H. Vance (PA ID No. 323551)
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-2000

36

Fax: (215) 568-0140
mhaverstick@kleinbard.com
eschreiner@kleinbard.com
pgagne@kleinbard.com
svance@kleinbard.com

*Counsel for Plaintiffs Savvy Dog Systems, LLC and POM of Pennsylvania, LLC*