# **EXHIBIT 2**

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SAVVY DOG SYSTEMS, LLC, a Wyoming limited liability company, and POM OF PENNSYLVANIA, LLC a Wyoming limited liability company, | |
| Plaintiff, | Civil Action No. 2:19-cv-00070-JRG-RSP |
| v. | Honorable Jennifer P. Wilson |
| PENNSYLVANIA COIN, LLC, a Pennsylvania limited liability company, and PA COIN HOLDINGS, LLC, a Pennsylvania limited liability company, | |
| Defendants. | |

# DECLARATION OF STACY FRIEDMAN

I, Stacy Friedman, declare as follows:

1.      I, Stacy Friedman, am the President of Olympian Gaming, LLC in Lake Oswego, Oregon, and professional game designer and casino gaming mathematician intimately familiar with the issues and technology relating to networked gaming systems, including land-based or Internet casino gaming systems; mobile, console or PC-based non-wagering game systems, and other electronic or video arcade games.  I have been retained as an expert by counsel for Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC (collectively, "PA Coin") in the above-titled matter to consider certain issues relating U.S. Patent No. 7,736,223 (the "'223 Patent" or the "Asserted Patent").

2.      I have been asked to render opinions regarding the proposed claim constructions and arguments of Plaintiff Savvy Dog Systems and POM of Pennsylvania, LLC (collectively, "POM"), and POM's expert Mr. Dwight Crevelt, related to certain disputed terms of the '223 Patent.  I am over 21 years of age and am legally competent to testify.

3.      I make the following statements based on my own personal knowledge, my experience, my analysis of the Asserted Patent as well as the materials I reviewed as set forth below and in Exhibit B to this declaration.  In the past four years I have testified by deposition five times and once at trial.  I am being compensated at my usual and customary rate of $575 per hour.  My compensation is in no way

1

contingent upon my performance, the outcome of this litigation, or any issues involved in or related to this litigation.  If called as a witness, I could and would testify to the following.

## I.     QUALIFICATIONS

4.     I am a professional game designer and casino gaming mathematician intimately familiar with the issues and technology relating to networked gaming systems, including land-based or Internet casino gaming systems; mobile, console or PC-based non-wagering game systems, and other electronic or video arcade games.  I have personally designed, implemented, tested, or analyzed many games, including dozens of single-player and multi-player games, both wagering and non-wagering.

5.     I am the President of Olympian Gaming, LLC in Lake Oswego, Oregon, a position that I have held since 2001.  In that capacity, I have consulted in the gaming industry regarding, among other things, game design and development, slot machine and table game mathematics, game software and hardware development, and gaming patent infringement and validity.  I have served as a subject matter expert in many matters related to gaming machines or gaming technology, including over 20 cases involving gaming-related intellectual property. Many of these cases have involved distributed software systems running on

networked computers, and in several of these cases I have performed source code reviews.

6.    I have over twenty years of professional experience in developing regulated casino games, gaming mathematics, and professional software design expertise.  My current CV is provided as Exhibit A to this report.

7.    In 1996, I earned my Bachelor of Arts degree in Computer Science, *magna cum laude,* from Harvard College, Harvard University, Cambridge, Massachusetts.  After college, I became interested in the mathematics of casino games.  I taught myself probability theory—the origins of which are based in wagering games—and began a self-directed study of gaming mathematics including "advantage play" techniques such as blackjack card counting.

8.    My professional experience in the gaming industry started in 1998 when I joined Silicon Gaming in Palo Alto, California as a game model engineer before it was acquired by International Game Technology ("IGT").  Silicon Gaming designed and developed interactive video slot machines.  As a game model engineer (i.e., mathematician), I worked on the designs of video slot games, video keno games, and video poker games.  I helped produce dozens of innovative new games for the Odyssey™ platform and engaged regulatory agencies to achieve regulatory approval for the mathematics used in the games.  In addition, I designed and developed game flow and storyboards for slot machines, and I developed and

shipped mathematical models for over 50 games.  I also served as a liaison to state regulatory agencies and corrected prior errors in gaming lab submissions, which led to savings of over $50,000 in regulatory fees.  I was also responsible for managing the statistical verification and mathematical gameplay testing for Silicon Gaming's products.  In 1999 I invented and analyzed a novel card game for Silicon Gaming's digital card game portfolio.  This game is described in U.S. Patent 6,457,715 and can best be described as "acey-deucy with a discard/draw option."

9.    In 2001, I started an independent casino game design and analysis consultancy, Olympian Gaming LLC.   Based on my experience designing, developing, and placing dozens of games in Las Vegas, Reno, and Atlantic City casinos, I advise Internet casino software vendors, new game inventors, and casino game manufacturers in the fields of wagering, gameplay design, mathematical analysis, and statistical verification. In my current position at Olympian Gaming, I have invented and applied for patents on over two dozen gaming methods and systems and, together with my patent attorney and frequent co-inventor, control a patent portfolio of over thirty issued and/or pending patents across several categories of the gaming industry.  Several of the patents on which I am a named inventor involve novel electronic wagering game devices, systems, or methods, including U.S. Patents 7,690,985 and 8,740,699 ("Slot machine with sliding symbols"), 8,257,159, 8,696,549, and 9,754,459 ("Slot machine with synchronized spinning

reels"), 8,403,737 and 8,998,693 ("Royal re-draw video poker side bet"), 9,659,445 ("Slot machine with variable suspense factor"), and 9,978,221 ("Gaming system and method for providing a multiple dimension symbol game with expanding wild symbols"). I performed the game design and/or mathematical analysis on the games described therein. Olympian Gaming has received regulatory approval for operation of its game Bad Beat Blackjack in Nevada, Mississippi, and Washington State where it holds a Distributor license.

10.  In 2011, I was engaged by DoubleDown Interactive, a social gaming website offering free-to-play slot machine games on its Facebook app, *DoubleDown Casino*. I designed the mathematics, payouts, and game features for all of DoubleDown's virtual slot machine games. In 2012, IGT bought DoubleDown for $500,000,000. I worked with IGT for approximately a year and was part of their internal invention assessment panel for new employee game ideas. Social gaming applications such as *DoubleDown Casino* do not earn revenue from wagering. Instead, they follow monetization practices such as microtransactions, in-app purchasing, ad-impression revenue, and subscription-based payments. In the past few years I have been engaged as a game design consultant by several video game studios using similar business models. I have also provided expert testimony in several other matters involving patents on non-wagering video game systems or methods.

11.    In my work as an expert in gaming-related intellectual property matters, I have been involved with matters, patents, and in some cases software source code relating to Class II games, historical horse racing games, and electronic instant lottery games where predetermined results are delivered to gaming machines to display in a manner that mimics a slot machine.

## II.    MATERIALS REVIEWED

12.    In preparing this declaration, I relied upon the materials cited herein.  I have collated a list of materials cited in Exhibit B to this declaration.

## III.    LEVEL OF ORDINARY SKILL IN THE ART

13.    In reaching my opinions, I have assumed that the relevant date of the '223 patent is March 31, 2006, which is the filing date of the provisional application to which the '223 patent claims priority.  I have not considered and am not opining on whether any claims in the patent are actually entitled to claim priority to this date.

14.    I am familiar with the level of skill a POSITA would have with respect to the subject matter of the '223 patent and my opinions are through the viewpoint of a POSITA (unless otherwise stated).  It is my opinion that a POSITA at the time of the alleged invention claimed in the '223 patent would have at least a bachelor's degree in computer science, engineering, or equivalent education and at least two years of experience with designing and developing electronic gaming devices.

15.    When I state that something would have been known or understood by a POSITA or a person having skill in the art, I am referring to a person with this level of education and experience in the March 2006 timeframe.

## IV.    LEGAL PRINCIPLES

### A.    Claim Construction

16.    I understand that the claims of the '223 patent are to be construed in accordance with the claim construction standard set forth in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).

17.    I understand that, under the *Phillips* standard, one should look first to the intrinsic record of the patents, including the claims, the specification, and the prosecution history, and that terms are normally given their plain and ordinary meanings to a POSITA when read in the context of that intrinsic evidence.

18.    I also understand that a limitation of a claim may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such limitation shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.  This is known as a "means-plus-function" claim or limitation. Further, while I understand there is a presumption against interpreting terms without the word "means" in this way, I also understand that this presumption is overcome where a patentee either a) uses a "nonce word" that does not otherwise convey

sufficiently definite structure for performing the claimed limitation, or else b) recites function without reciting sufficient structure for performing that function..

19.     I have been informed that construing a means-plus-function limitation is a two-step process.  The first step is to identify the claimed function.  The second step is to determine what structure, if any, disclosed in the specification corresponds to the claimed function.  "Corresponding" structure in the specification requires that the disclosed structure in the specification be clearly linked to the function recited in the claims.

20.     I have also been advised that for computer-implemented inventions, the law requires that the specification disclose an algorithm for performing the claimed function.  The algorithm may be disclosed in any understandable terms including as a mathematical formula, in prose, in a flow chart, or in any other manner that provides sufficient structure.  But the algorithm must be operative and disclose how to perform the claimed function.

21.     Where there are multiple claimed functions, the patentee must disclose adequate corresponding structure to perform all of the claimed functions.  If the specification fails to disclose structure for the claimed functions, then the claim is indefinite.

22.    I have followed these principles in my analysis throughout this declaration.  I discuss below the meaning of certain claim terms that I have applied in forming my opinions.

## V.    DESCRIPTION OF THE ASSERTED PATENT

### A.    '223 Patent Overview

23.    The Title of the '223 Patent is "Electronic Gaming Method and System Having Preview Screen."  The Abstract of the '223 Patent states that "a field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game.  If the player decides to play the game, the player selects a field element to turn the symbol displayed into a wild symbol." In view of the disclosure of the specification, a POSITA would understand this Abstract to be referring to an application of the preview screen concept to the previously-disclosed Tic-Tac-Fruit game.

24.    The Tic-Tac-Fruit game, in which a 3x3 grid of symbols is created in an apparently random fashion but which always has at least one symbol position where the player can form a complete line (3-in-a-row) of symbols if the player replaces that symbol position with a wildcard symbol, was disclosed in the parent application to the '223 Patent, which became U.S. Patent No. 8,118,661.  The '223 Patent is a continuation-in-part of the application leading to the '661 Patent and includes Figs. 1A through 4 of the '661 Patent, as well as Fig. 7 (renumbered as Fig.

5).  Further, the majority of the specification of the '223 Patent, from columns 3, line 43 to column 10, line 21, appear to be copied nearly verbatim from the application leading to the '661 Patent.  That section of the specification discloses information about Tic-Tac-Fruit, including information about the game's finite-pool behavior, but does not disclose the preview screen concept.

25.    The '223 Patent teachings related to the preview screen concept begin at column 10.  Starting at column 10, line 22 and continuing to column 11, line 13, the '223 Patent teaches an application of the preview screen concept to Tic-Tac-Fruit.  Specifically, the '223 Patent teaches "construction of a field of elements for a game display wherein each element is filled by a game symbol" and that "the field is presented to the player on the game display as a preview of the game."  '223 Patent at 10:24-38.  Play of the Tic-Tac-Fruit game then proceeds as normal, with the only difference from the previously-introduced Tic-Tac-Fruit game being that the player has already seen the field of symbols they will receive.

26.    The '223 Patent then discloses that "the preview screen of the present invention" could be used a version of Tic-Tac-Fruit without a wild symbol, that the player would not need "to do anything other than to select 'Play'," and that "the preview screen could actually be the results screen, displaying the game outcome." '223 Patent at 11:14-26.  These are differences from the primary Tic-Tac-Fruit embodiment disclosed earlier in the specification, in which the player needed to

select a position for a Wild symbol and in which the preview screen did not show

the final game outcome but the intermediate field prior to the player's choice of Wild

position.

27.    The '223 Patent then describes Fig. 7 and that a "next game" preview

screen could be added, in miniature, "adjacent to the current preview screen." '223

Patent at 11:27-42.

28.    The '223 Patent then suggests that "the preview display could also be

implemented in other forms of electronic or electromechanical games." '223 Patent

at 11:43-44.  However, no meaningful details are given as to the precise nature of

those other forms of games, and the specification explicitly relies on a POSITA's

knowledge for how to construct the field of symbols to be used as a preview display

for each game.  '223 Patent at 11:66-12:1.  Further, the specification does not suggest

that the specific steps peculiar to Tic-Tac-Fruit are required for or even applicable

to other forms of games.

### B.    Claims

29.    Asserted claims 44 and 51 are annotated for reference here:

#### 1.    Claim 44

[44PRE] An electronic gaming system comprising:

[44A] an electronic game terminal including a touch screen display;

[44B] a game processor for generating an interactive electronic game on the

game terminal, the game processor configured for:

[44C] constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;  *(Note: I refer to this element as the "Constructing" element)*

[44D] determining at least one winning combination for each play of the game;  *(Note: I refer to this element as the "Determining" element)*

[44E] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;  *(Note: I refer to this element as the "Testing" element)*

[44F] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;  *(Note: I refer to this element as the "Preview" element)*

[44G] determining if the player has decided to play the displayed game; and

[44H] displaying an outcome resulting from play of the displayed game.

## 2.    Claim 51

[51PRE] A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising:

[51A] program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols; *(Note: I refer to this element as the "Constructing" element)*

[51B] program instructions that determine at least one winning combination for each play of the game; *(Note: I refer to this element as the "Determining" element)*

[51C] program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; *(Note: I refer to this element as the "Testing" element)*

[51D] program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; *(Note: I refer to this element as the "Preview" element)*

[51E] program instructions that determine if the player has decided to play the displayed game; and

[51F] program instructions that display an outcome resulting from play of the displayed game.

## VI.    BACKGROUND OF THE TECHNOLOGY

30.    The history of the slot machine dates to the late 19th century when Charles Fey developed the Liberty Bell, a purely mechanical device; the name "slot machine" itself is a shortening of "nickel-in-the-slot" machine, a description of how one initiated the play.

31.    Historical slot games and most modern slot machines share several basic behaviors.  First and foremost is the ability to make wagers.  In traditional slot machines found in casinos, facilities for depositing funds include a coin slot, a bill accepter, and a ticket reader.  Any of those will register the amount on a credit meter to be used for wagering.  Once credits have been loaded onto the machine, the player initiates a wager by pulling a handle or pressing a "bet" button.  Slot machines commonly involve three or more spinning reels, where each reel contains images of different graphical symbols such as sevens, cherries, or bars in a particular order. The reels are set in motion (either physically, or in the case of a video slot machine, using computer animation) and when they come to rest, the symbols lining up on the designated "payline" are checked against the preestablished winning symbol combinations.  The player can see which winning combinations result in various payouts by referencing a "pay schedule," "paytable," or "award schedule."  If a winning symbol combination is achieved by the player, the associated payout is credited or paid to the player.  Some symbols function as wildcards or "wild"

symbols and can substitute for other symbols to complete a winning combination. When a player is finished playing and has any credits left, a cash-out functionality may distribute currency, print a paper ticket redeemable for cash at a kiosk or teller window, or otherwise dispense the credits to the player.

32.    While historical slot machines were mechanical devices, modern slot machines are essentially computers with input and output devices added to them appropriate for a gaming environment rather than (for example) an office environment.  In typical modern slot machines, the motion of the reels is determined not by mechanical principles as it was in historical slot machines like the Liberty Bell, but by a computerized "random number generator" ("RNG") that uses a mathematical function to produce a sequence of highly unpredictable numbers.  The numeric output of the RNG is converted into a number that represents a position on that reel, and the symbol(s) at and near that position will be displayed, either physically (by a computer-controlled stepper motor that moves the reels) or via animation on a video screen.  The frequency and distribution of the symbols on the reels, as well as the winning combinations and awards in the pay schedule, are developed and calculated by "game designers" like myself into what is known as a "game model," which is sometimes a spreadsheet with the appropriate calculations. The arrangement and ordering of the symbols on a given reel is known as a "reel strip," after the physical strips of plastic or paper affixed to the circumference of

mechanical reels. In most video slot games, numeric references to the symbols (rather than the graphical images themselves, which are much larger) are arranged onto in-memory electronic representations called virtual reels and are virtually "spun" in memory, allowing similar game logic to operate both a display with a video animation of reels and a display with physical, mechanically driven reels.

33.    The in-memory representation of a virtual reel is often stored in data structures that are well-known to software developers. The data structures could represent data in many different organizations, such as a binary tree, linked list, or array (an ordered list of items). An array is generally implemented as a contiguous portion of computer memory divided into equally-sized locations where each location is directly-addressable. A useful real-world analogy is a row of numbered, equally-sized mailboxes in a mailroom. I personally developed software to compute the mathematics of both slot machine games and video card games in the 1990s that used such data structures to store virtual reel strip data, virtual card deck data, and pay schedule data.

34.    Software engineers have wide flexibility to represent information such as reel strips or pay schedules in computer memory, and there is no single data structure that is widely recognized as the "correct" way to implement such features of a slot machine game.

35.     Some (but not all) electronic gaming machines in the 2006 timeframe involved spinning reels and matching combinations of symbols.  Such games are known as "reel slot games" or "reel spinning games."  Other games playable on electronic gaming machines include video versions of keno, poker, roulette, and blackjack.

36.     Traditional mechanical slot games had a particular feature or behavior: if certain predetermined combinations of symbols aligned on the single payline, an award was paid.  This is known as a "line pay."  Later games offered multiple paylines and various permutations of winning symbol combinations.  The earliest video slot games mirrored the behavior of their mechanical forebears, but later video screen slot games expanded the number of reels from the typical three to five and enabled multiple paylines to be wagered upon simultaneously (with multiple credits per line).  These are often called multi-line, multi-coin games.  Most line pays in five-reel video slot games are read from left to right, so an award for "three stars" was only won when three star symbols appeared on the first three reels on a payline. In such five-reel games, most pay schedules listed winning combinations and associated payouts of five, four, three, and sometimes two symbols in a row. Typically, the award for achieving a five-in-a-row combination is greater than the award for four-in-a-row of the same symbol, which in turn is greater than the award for three-in-a-row.  A POSITA would understand that the purpose of a pay schedule

is to disclose to the player (as well as to gaming regulators and operators) which combinations of symbols form winning combinations. As a corollary, a POSITA also understands that a symbol combination that is not disclosed on a pay schedule is not a paying combination. It is widely understood by slot machine players that non-paying outcomes are not enumerated on pay schedules because there are generally far too many such combinations.

37.    In historical games the pay schedule was printed on the machine itself, but in modern video slot games the pay schedule and other associated game rules are available in a series of help screens accessible to the player by pressing a button. One screen from the pay schedule for International Game Technology's popular Cleopatra slot machine game is depicted below.[1]

---

[1] Image from https://www.vegasslotsonline.com/features/pay-tables/, accessed

August 6, 2020.



## VII.  RESPONSE TO CREVELT'S BACKGROUND SECTION

38.    Mr. Crevelt states that "for slots, the RNG was used to create a value of 1-*X* for each reel where *X* equals the number of available game symbols and *Y* equals the number of reels used.  The player wins if all *Y* symbols generated at random by the RNG (one for each of the number of reels) make a winning combination."  Crevelt Decl. ¶ 51.  I disagree.  The RNG is almost always used in a slot machine game to uniformly select a random position on the reel, not a random game symbol.  This distinction is mathematically important because a slot machine reel almost always has unequal numbers of each symbol, called "symbol weighting," and

unequal symbol weights lead to different probabilities for different symbol combinations. In contrast, Mr. Crevelt's supposition that symbols (rather than reel positions) are randomly selected would lead to equal probabilities for each N-length combination regardless of the reel strips, but a POSITA would understand that this is not how slot machine games work. A POSITA would understand that in a game with 10 available game symbols on a reel strip with 64 positions, the RNG would select one of 64 positions, not just one of 10 symbols. Further, Mr. Crevelt incorrectly implies that a winning combination necessarily involves "all $Y$ symbols generated at random by the RNG." As demonstrated by the Cleopatra pay schedule that he cited, *id.* ¶ 56, slot machine games are known to define winning combinations that involve fewer than all the reels (i.e., fewer than Y winning symbols, such as 4, 3, or 2 Scarab symbols).

39.     Mr. Crevelt refers to game features like "multiple lines, multiple bets per line, multiple free spins, [and] multiple bonus games with multiple screens" and asserts that "this flexibility also had the side effect of creating complicated mathematical calculations to determine the correct winning percentages for a game. With greater number of winning combinations on these games, it has also created games with higher volatility." Crevelt Decl. ¶ 59. I disagree. The formula for volatility or variance is related to the amount and frequency of the possible outcomes, not the number of winning combinations. In fact, a POSITA would know

that many video slot games with a large number of different winning combinations in fact had far lower volatility than their earlier three-reel, one-payline counterparts. In part this is due to the fact that many multi-coin, multi-line games often paid back an amount greater than zero but less than the amount wagered. A POSITA would also know that one of the reasons for the popularity of multi-line games is their relatively lower volatility than older one-line games, because lower volatility tends to increase "time-on-device."

## VIII. AWARD SCHEDULE

40.    Mr. Crevelt asserts that the award schedule shown in Table 1 of the '223 patent is an "award table" and "data structure defined in advance of an instance of game play that is well-known in the art to establish which array(s) of symbols will yield an outcome corresponding to a prize." Crevelt Decl. ¶ 78. I disagree with Mr. Crevelt.

41.    In contrast to what Mr. Crevelt suggests, a POSITA would not understand the award schedule in Table 1 to establish for any particular game play which symbols will yield an outcome corresponding to a prize. Rather, the award schedule is merely a reference guide that defines the prizes available for various pre-defined winning combinations of symbols. The award schedule depicted in the '223 patent is not merely defined in advance of *an* instance (*i.e.*, a single instance) of game play. Rather, the award schedule would be created by a human game designer

21

in conjunction with the rest of the game's rules.  The award schedule would be created during game development, prior to a game's release to the marketplace. Therefore, the award schedule would be defined far in advance of *all* instances of game play.  A POSITA would also understand that many games had multiple game variations differentiated by payback percentage from which the operator could choose.  For example, an operator may choose a game variation with a 93% payback (a.k.a. "return-to-player" or RTP) or with an 86% RTP (i.e., 7% or 14% house win percentage, respectively).  Usually these multiple payback variations relied upon an identical award schedule so the player could not tell which game variation was being used (e.g, a "tighter" or "looser" game).  Less frequently, different game variations used different award schedules and were thus outwardly distinguishable by players because the displayed awards were different from one variation to another. Commonly, the operator selects a game variation by turning a key in a keyed switch on the gaming machine to activate operator mode, after which the operator configures the gaming machine to desired settings (including the specific game variation).

42.    Furthermore, in my opinion, the '223 patent's award schedule is not a "data structure" as that term would be understood by a POSITA.  Rather, a POSITA would understand a data structure to be a particular way of representing data in computer memory.  Examples include a binary tree, an associative array, or a linked

list.  In contrast, the information in an award schedule is data itself – there is no implied structure by the award schedule alone as to how that data is represented within a computer (or outside of one).

43.    Take for example the Cleopatra award schedule depicted by Mr. Crevelt at paragraph 56 of his declaration.  The Cleopatra award schedule is structured differently from the award schedule depicted in Table 1 of the '223 patent.  A human game designer would have to make a decision about how to implement the information in each of them in the software and would very likely, almost certainly, structure the data differently for each of them.  A POSITA would have appreciated that an award schedule's data could be arranged in various and different types of data structures including as multiple arrays, as a single multi-dimensional array, and as a dictionary, among other structures.  A POSITA would also know that award schedules and other game mathematics are often calculated using spreadsheets and exported to other data formats for later incorporation into executable game software.  Thus, a POSITA would disagree with Mr. Crevelt's statement that an award schedule such as the one in Table 1 of the '223 patent is a data structure because creating a data structure involves additional steps and making choices about how to actually structure the data.

## IX.    DETERMINING AT LEAST ONE WINNING COMBINATION FOR EACH PLAY OF THE GAME

44.    Mr. Crevelt states "there are numerous passages in the '223 Patent specification that a POSITA would recognize as teaching the determination of a winning combination." Crevelt Decl. ¶ 91. I disagree: Mr. Crevelt uses incomplete claim language. The claim does not merely require "the determination of a winning combination" as Mr. Crevelt states, it requires "a game processor configured for determining at least one winning combination for each play of the game" (claim 44) or "program instructions that determine at least one winning combination for each play of the game" (claim 51). Mr. Crevelt relies the incomplete language throughout his analysis.

45.    Mr. Crevelt appears to suggest that a POSITA would understand the award schedule shown in Table 1 of the patent to be equivalent to the Determining claim elements. *See* Crevelt Decl. ¶¶ 78-79, 93, 99-100. I disagree; as I discussed above, a POSITA would understand that the award schedule shown in Table 1 is simply a reference guide that defines the prizes available for various pre-defined winning combinations of symbols, should the player achieve such a combination. For example, the award schedule tells the player what the payout will be if he or she completes a line of three cherries (2 cents at the 50 cent level of play) versus three lemons (4 cents at the 50 cent level of play). But the award schedule itself does not define or dictate that there *will* be a winning combination for each play of the game.

Rather, the guarantee of at least one possible winning combination on every play is taught by the '223 Patent to be coordinated with the construction of the field: "the game's construction of the field guarantees that at least one line may be formed by placing the wild symbol selection in the proper spot…. there is always the possibility that at least one line can be formed." '223 Patent at 4:20-25. And Step 1 of the field construction process is "choose(sic) the number of winning lines (i.e., 1, 2, 3, 4)." *Id.* at 56. The option of zero winning lines is not disclosed.

46.    The patent does not teach that the award schedule is used or referenced by the game processor or program instructions during or in connection with construction of a game field. According to steps 1-5 for constructing a game field disclosed in the patent ('223 Patent at 4:51-64), there is no mention of the award schedule being used or implicated. A POSITA would understand that there is no need for the award schedule to be used, consulted, referenced or considered by a "game processor" or "program instructions" during the performance of any of these field-construction steps. The '223 Patent discloses that "there are eight symbols and therefore eight different winning combinations." *Id.* at 4:66-5:1. A POSITA would understand that this means "winning combinations" are complete lines (3 in a row) of identical symbols, such as three bells or three plums. *Id.* at 4:3-5:34. A POSITA would understand that for over 120 years award schedules for three-reel slot machines have shown winning combinations involving different (unlike) symbols or

fewer than complete lines (e.g. a winning combination in a three-reel game involving only two symbols, or as depicted in the five-reel Cleopatra pay schedule above, 5, 4, 3 or 2 Scarab symbols). A POSITA would therefore take notice of the statement "there are eight symbols and therefore eight different winning combinations" that excludes from the scope of "winning combinations" any symbol combinations other than complete lines of identical symbols.

47.    With a proper view on what "winning combination" or "winning line" means, a POSITA would understand that the steps set forth for constructing a Tic-Tac-Fruit game field create winning combinations on their own simply by (1) choosing the number of winning lines; (2) choosing the orientation of each winning line; and (3) choosing the symbols for each of the lines. A POSITA would understand that the choosing of the symbols in step 3 does not need to use, consult, or reference the award schedule: step 3 could be carried out by simply selecting one of the available symbols (*i.e.*, cherries, plums, bells, etc.), because, for the reasons described above, there is exactly one winning combination for every symbol and exactly one symbol for every winning combination. A POSITA would also understand that the list of symbols available in a game could be (and most likely would be) defined separately from the award schedule data (*i.e.*, in a different section or routine of software for the game).

48.    Even if the award schedule in Table 1 were a data structure as Mr. Crevelt contends, a POSITA would not understand it to be a data structure that "determine[s] at least one winning combination for each play of the game."  Data structures store data in a particular organization.  In order to access or manipulate data in a data structure, software needs to implement functionality in the form of an algorithm.  There is no disclosure of an algorithm in the '223 Patent related to the award schedule that performs the step of "determining at least one winning combination for each play of the game."  As discussed above, the "determining winning combination" steps cited by Mr. Crevelt do not do so with reference to the award schedule.  Rather, to the extent the award schedule is a data structure, a POSITA would understand that it would have been coded by a game designer during the development of the game software and prior to any game operation.  The Determining functionality could be coded in a completely different section of the game software from the award schedule, and as demonstrated above, could be implemented without making any reference to the data structure in which the award schedule is stored.  Critically, there is nothing in the '223 patent that teaches or suggests that the award schedule (or any purported data structure for the award schedule) is in any way used during the step that determines at least one winning combination for each play of the game.

49.    Further, the winning combination(s) that are determined by the Determining claim element are subsequently tested by the Testing claim element. According to the Testing claim element, the program instructions (claim 51) or the game processor (claim 44) must test the game field prior to displaying the game field to the player to "ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently."  However, this Testing step is nonsensical if "the determined winning combination" refers to the award schedule as Mr. Crevelt seems to suggest.  This is because the award schedule *defines* which combinations are winning combinations, as well as their associated values, so it is impossible to "inadvertently" create a winning combination "more valuable" than what is listed on the award schedule.  If a combination is not listed on the award schedule, then by definition it is not a winning one.  Therefore, a POSITA would not agree with Mr. Crevelt's suggestion that the Determining claim elements could be referring to an award schedule.

50.    Further, Mr. Crevelt is incorrect in suggesting that the award schedule defines winning combinations in terms of an "array of symbols" – in the schedule in column 5 of the '223 patent, the awards are defined in terms of quantities of symbols (e.g., 3 Titanium, 3 Plum).  As discussed above, an award schedule is not any particular data structure, it is just reference information.  How that award

information is represented in computer memory is up to the developers of a particular game.

51.    Mr. Crevelt also appears to suggest that a POSITA would understand that the process of iterating through approximately 134 million combinations is relevant to the Determining claim element. *See* Crevelt Decl. ¶ 92.  Specifically, Mr. Crevelt refers to the passage: "Valid fields are determined by using an embedded computer processor to iterate through and test *each combination* to determine if it has any complete lines.  If any lines are complete, the combination is *not counted or used.*" '223 Patent at 4:40-44 (emphasis added).  He states that "A POSITA would understand that this reference teaches to determine a winning combination … in the process of completing the game field."  I disagree.  The cited passage teaches that (a) each of approximately 134 million combinations of game fields are evaluated for whether it has any complete lines, and (b) any such combinations with complete lines are "not counted or used."  The "complete line" combinations evaluated via this iteration process are discarded, not used as "winning combinations for each play of the game."  This iteration process is therefore not relevant to the Determining step.  A POSITA would not think that the "determining at least one winning combination for each play of the game" could possibly involve iterating through 134,000,000 combinations every time the player plays a game.

52.    Mr. Crevelt also suggests that the Determining claim elements can be met by the process of evaluating the result of a play of the game.  Crevelt Decl. ¶ 93.  I disagree.  Mr. Crevelt points to the '223 Patent at 12:5-11 and Fig. 8, numeral 808 for support, because he perceives the words "determines the winnings" and "determine winning combinations of symbols and payout."  However, Mr. Crevelt fails to appreciate that this disclosure and usage of the word "determine" does not correspond to the claimed Determining step.  As noted, the Determining step occurs before the Testing step, and the Testing step explicitly requires testing "prior to displaying the game to the player."  In contrast, the results evaluation, reflected for example in Fig. 8, can only happen after the player plays the game, which necessarily happens after it is displayed to the player.  As shown in Fig. 8, the step 808 to which Mr. Crevelt refers occurs *after* both the steps of "Present Field on Game Display" (802) and "Play Game Displayed?" (804).  Therefore, the step 808 does not occur "prior to displaying the game to the player" as required by the claims.

53.    Further, the result of game play may not be a winning combination because a player may not play the game correctly (*e.g.*, placing the wild symbol in a location that does not complete a winning line) or within the allotted time.  In contrast, the Determining claim steps must determine "at least one winning combination for each play of the game."  Therefore, a POSITA would not agree with Mr. Crevelt's suggestion that the Determining claim element could be referring to

the post-play evaluation of results when there is potential for the player to not complete a winning combination.

54.    Mr. Crevelt states that some of the claims of the '223 Patent "are directed to limitations relating to the Wild Symbol embodiment that is described in the specification."  Crevelt Decl. ¶ 68.  He also states that "on the other hand, claims 44 and 51, for example, fail to mention any wild symbol and/or a player's selection of it."  *Id.*  Mr. Crevelt also states that "The Wild Symbol is not the only embodiment of the '223 Patent," *id.* ¶ 77, and goes on to cite to Fig. 8 and column 11 of the specification.   The only embodiment, however, that refers to any "testing" or "assessing" steps is the Wild Symbol embodiment.   I agree with Mr. Crevelt's statement in paragraph 71 that the Tic-Tac-Fruit Wild Symbol embodiment includes an electronic game that always incorporates at least one correct solution.

55.    Also, to the extent Mr. Crevelt is suggesting that because the Figure 8 embodiment does not refer to using the "wild" symbol that this embodiment forecloses the possibility of a player generating a winning combination in completing the field, I disagree.  According to Figure 8 and the patent, the first processing step is to construct the game field at step 800, according to methods known to a POSITA.  Thus, a POSITA would immediately appreciate that the Figure 8 embodiment may still pertain to electronic games with game fields where the player plays the game by completing the field.   For example, POSITA would

appreciate that the game field could be the same or a similar type to the one shown in Figure 1A of the patent.  However, instead of a game that required the player to use the "wild" symbol to complete a winning line or lines, the game could alternatively be a "symbol swap" game where the player selects two symbols to swap positions, a "respin" game where the player selects one or more reels to respin, or a "nudge" game like the one referenced in the '223 Patent at 11:54-60.  In these games, the player completes the field by swapping the positions of the symbols to complete a winning combination, by selecting and respinning certain reels, or by nudging one or more reels up or down.  A POSITA would have appreciated that such games were well known years before the '223 Patent's provisional application was filed in March 2006.

56.    Mr. Crevelt refers to claims 13 and 25, which I understand are not asserted in this matter, and states "In the wild symbol embodiment described in the preceding paragraph, a POSITA would understand that the '223 Patent teaches the determination of the winning combination both before and again after the player selects the location of the wild symbol."  Crevelt. Decl. ¶ 95.  I disagree, again with reference to Mr. Crevelt's reliance on only a select portion of the claim language. The language of the claim requires that the claimed Determining element occurs before the Testing element, which occurs before the step wherein the player plays the game, so any Determining must occur prior to (and not after) the player's actions.

32

Further, I obviously disagree to whatever extent Mr. Crevelt is suggesting that claims 44 or 51 should be read to insert a second Determining step after the player has played the game.

## X.    TESTING THE GAME FIELD PRIOR TO DISPLAYING THE GAME TO THE PLAYER TO ENSURE THAT A WINNING COMBINATION MORE VALUABLE THAN THE DETERMINED WINNING COMBINATION IS NOT INADVERTENTLY GENERATED IN COMPLETING THE FIELD

57.    With respect to the Testing claim elements, Mr. Crevelt asserts that paragraph 39 of the published application and the corresponding disclosure in column 6, lines 19-33 of the issued patent "explains the meaning" of the Testing claim elements.  Crevelt Decl. ¶¶ 96-100.  I disagree.

58.    As an initial matter, during his deposition, Mr. Crevelt admitted that he had not reached an opinion as to what the "in completing the field" phrase in the Testing claim elements means.  Crevelt Tr. at 126:11-23.  I understand that Plaintiffs contend that this phrase refers to constructing the field from the plurality of predetermined game symbols, while Defendants contend that this refers to the player completing a winning combination during play of the game.  I do not understand Mr. Crevelt to have applied either of these interpretations as part of his analysis.

59.    Unlike Mr. Crevelt, I have considered whether paragraph 39 of the published application is relevant to the Testing claim elements under both parties' proposed constructions of "in completing the field" and have concluded that

paragraph 39 is not relevant.  Paragraph 39 is explicitly directed toward Tic-Tac-Fruit and not any of the other possible embodiments alluded to later.  It does not refer to generating or testing *winning combinations* that might inadvertently be *generated* but assessing *prizes* that might inadvertently be *presented.*  A POSITA would understand that a winning combination (which in Tic-Tac-Fruit is a "complete line" of any three like game symbols) and a prize (which is a monetary award) are different things.  For example, the award schedule in Table 1 of the '223 Patent discloses that there are three different symbol combinations that lead to a 16 cent prize: 3 Orange at $1 denomination, 3 Lemon at $2 denomination, and 3 Cherry at $4 denomination.  Similarly, there are four different prizes for each symbol combination based on the denomination wagered.  Also, the Cleopatra award schedule depicted above discloses multiple different symbol combinations that lead to a 100-credit pay, multiple other different symbol combinations that lead to a 10-credit pay, and so forth.

60.    Moreover, POSITA would not understand the inadvertent presentation of a prize discussed in paragraph 39 to be the same an inadvertent winning combination being generated when a player completes a field.  The prize in paragraph 39 is taught to be "determined by a random selection from a finite pool of available prizes."  In contrast, the claimed "determined winning combination" is not taught to be selected from a pool, but determined by the prior claim step.  Further, a

POSITA would understand that it is possible for a prize that is larger than that selected from a finite pool could be inadvertently presented even as the combination that corresponds to that prize is not "more valuable" than the at least one winning combination determined by the Determining step. Therefore, the Testing limitation as claimed does not correspond to the disclosure in paragraph 39 (or the corresponding passage at column 6, lines 19-32 of the '223 Patent.). Paragraph 39 only addresses the inadvertent presentation of prizes.

61.    Assuming for argument's sake that a "prize" and a "winning combination" were deemed to be the same, paragraph 39's teachings still fail to provide support for and disclose the Testing claim elements. Substituting the term "winning combination" for "prize" in paragraph 39 results in "the winning combination is determined by a random selection from a finite pool of available winning combinations," a concept not remotely contemplated by the '223 Patent. Instead, the '223 Patent teaches that game software needs to iterate over 134M combinations to winnow down the "valid" fields to 118M, and then test each of these for potential winners, creating over 100M "compliant" fields. The '223 Patent is silent on whether or how these "compliant" fields are stored, retrieved, or used. However the '223 Patent states that Tic-Tac-Fruit "does not pick random fields until testing indicates one is acceptable," instead using the "constructing a field" steps discussed previously. Further, the substitution of "winning combination" for "prize"

in paragraph 39 also leads to "the device selects the level of winning combination(s) to be awarded," which makes no sense because winning combinations are defined as quantities of symbols, not as monetary prize values, and the '223 Patent is clear that "level" means a monetary amount. *See* '223 Patent at 7:1, 7:20-25, 7:58-60, 11:32-33. Therefore, the meaning of paragraph 39 in the counterfactual scenario where "prize" and "winning combination" are synonyms does not reflect the meaning of the Testing claim elements and would lead to conclusions that cannot be reconciled, because in reality, "winning combinations" and "prizes" are *not* synonyms.

62.     Moreover, this paragraph 39 (along with the rest of the specification) fails to provide any details about how the named inventor intended for the testing function claimed in the Testing claim elements to be performed to achieve the recited result—*i.e.*, ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field (regardless of whether "completing the field" means  the initial field construction or upon player completion).  The specification says the invention relies on "underlying software algorithms," but the specification discloses no algorithms.

63.     During his deposition, Mr. Crevelt asserted that the teachings at the bottom of column 4, lines 51-64 of the '223 patent, discussing the 5 steps involved in constructing a game field, were relevant to the Testing claim elements.  I disagree.

There is nothing in this section of the patent that discloses testing for more valuable winning combinations that might be inadvertently generated, and no discussion of the value of winning combinations whatsoever.  According to the steps, the field is constructed by choosing the number of winning lines, choosing the orientation of each line, choosing the symbols for each line, and then filling in the empty spots with random symbols.  The only "testing" discussed with respect to this passage in the patent is step 5, to "test the complete field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails."  Neither the goals of steps 1 nor 3 are related to comparing the value of any winning combination with another.

64.    Furthermore, even if the testing (step 5) described in column 4, lines 51-64 of the '223 patent is found to be relevant to the Testing claim elements, there is no disclosure in this section (or anywhere else in the patent) of how this testing is performed.  For example, no algorithm or flowchart is disclosed in the patent providing any details for how the testing in step 5 is accomplished.

65.    In paragraph 99, Mr. Crevelt states that the "Award Table defines the winning combinations in terms of an array of symbols for each game in advance of an instance of game play, and associates each winning combination with a prize." *Id.*  I disagree.  As described above, an award schedule (such as the one in Table 1 of the '223 patent) is merely reference information, it has no predefined or required

structure, and it plays no role in determining which winning combination(s) will be available for a player for any given instance of game play.

66.    Mr. Crevelt also states that "a POSITA would understand the Testing Limitation to refer to observing or examining an array of symbols to ensure that the anticipated successful outcome or prize corresponding to the array is not superseded by the award of a more successful outcome or better prize in making the field from the plurality of predetermined game symbols."  Crevelt Decl. ¶ 99.  I do not agree with this assessment.  Mr. Crevelt's statement is wrong because the Testing claim elements do not merely require "observing or examining" symbols, they specifically require testing the game field to ensure that other, more valuable winning combinations are not inadvertently generated.

67.    Mr. Crevelt's statement is also wrong because the Testing claim elements do not merely ensure that a "better prize" will not be awarded.  Rather, the function recited in these elements is to ensure that a more valuable winning combination than the determined winning combination will not be inadvertently generated.  It is unclear whether Mr. Crevelt means the award schedule or the game field when he refers to "examining an array of symbols" but either way, he assumes the existence of "the anticipated successful outcome" and a separate "more successful outcome."  By "the anticipated successful outcome," I understand Mr. Crevelt to be referring to the antecedent "the determined winning combination"

created by the previous Determining step.  And, as Mr. Crevelt acknowledges, there

must be at least one other "more successful outcome" that can potentially be created

or "generated."[2]  This is because the Testing step requires the comparison of "the

determined winning combination" with a second "winning combination …

generated … in completing the field" to ensure that the second combination is not

"inadvertently" "more valuable."    Therefore, the "winning combination …

inadvertently generated in completing the field," cannot be the same thing as "the

determined winning combination."

68.    Therefore, I disagree with Mr. Crevelt's suggestion that a POSITA

would understand the Testing claim limitations are supported by the specification at

column 6, lines 19-33.

## XI.    PREVIEW SCREEN

69.    Mr. Crevelt states that "the '223 Patent recites several different

embodiments for previewing a game to be played to the player before the player

makes a decision whether to play."  Crevelt Decl. ¶ 101.  He purports to find six

different examples of what a preview screen might be, and then suggests that these

allegedly distinct examples serve to "reduce the role of chance by previewing to the

---

[2] At his deposition, Mr. Crevelt acknowledged that the "outcome" refers to the

outcome when the player plays the game.  Crevelt Tr. at 148:8-16.

player *something unique about* the next game to be played that the player otherwise would not know." *Id.* at 32, emphasis added.

70.    I disagree with Mr. Crevelt to the extent that he suggests that claims 44 and 51 are met by a preview feature which simply previews "something unique about" the next game to be played.  Rather, each of these claims recites displaying "*an actual game to be played* … to a player prior to initiating activation of game play."  As Mr. Crevelt acknowledged during his deposition, there is an embodiment in the patent where there is a preview of an actual game to be played, and this is different from the embodiment where the preview is just of the game outcome. Crevelt Tr. at 195:19-196:6.  A POSITA would understand that claims 44 and 51 are directed to that former embodiment, which provides a preview of the actual game to be played (*i.e.*, where the player sees as a preview the constructed game field of the game to be played).  *See* '223 Patent at Abstract, 2:10-19; 2:28-39; 2:46-59; 2:67-3:5.

71.    This understanding is confirmed by my review of the File History of the '223 Patent.  The Applicant submitted language for claims 47 and 54 (which ultimately became claims 44 and 51) that included the language "present/ing **the field of game symbols** on the touch screen game display prior to activation of game play **as a preview** to a player for deciding whether to play the displayed game." '223 Patent File History, Amendment June 4, 2009 at 15, 17, emphasis added.  This

language was finally rejected by the Examiner who noted "Muir et al teaches presenting the field of game symbols on the game display as a preview for deciding whether to play the displayed game…." '223 Patent File History, Office Action October 26, 2009.  In response, the Applicant amended the language of claims 47 and 54 to read "automatically display/ing the game field on the touch screen game display to a player prior to initiating activation of game play," and remarked as follows:

> Since the terms "preview" and "present" have led to an apparent lack of clarity in the claim language, these terms have been eliminated from all pending claims.  The term "display" replaces the term "present" throughout the pending claims.  The term "preview" has been deleted from all claims.  Applicant's use of preview in the claims was intended to convey that the player at an electronic game terminal always sees the next game to be played on the terminal.  In most electronic game machines, the touch screen displays the last game played on the machine, not the next game to be played.  Applicant defined the next game to be played which was automatically displayed to the player following completion of a previous play as a "game preview."  However, the automatically displayed game field represented the actual game to play.
>
> Furthermore, *Vancura* does not display the game field before the player initiates play.  The spin outcome in *Vancura* always results from the player's wager beginning play.  In Applicant's invention, the "spin outcome" is displayed before beginning play.
>
> To further clarify this step, independent claims 1, 14, 27, 40, 47 and 54 have been amended to recite "automatically displaying the game field on the touch screen display to a player prior to initiating activation of game play."  This recitation clarifies that the actual game to be played (i.e., the game field constructed in the first recited step) is automatically displayed to the player in order for the player to decide whether to initiate play of the game displayed.  When the player hits

the Play button, he is initiating play of the actual game field that is displayed. '223 Patent File History, Amendment January 26, 2010 at 26-27.

Applicant's invention, as now claimed in independent claims 1, 14, 27, 40, 47, 54, 61, 68, and 75, includes the limitation of automatically displaying the game field on the touch screen game display to a player *prior to initiating activation of game play*. The electronic gaming machine generates the game field and automatically displays the game field on the touch screen game display, all without player interaction. *Id.* at 31.

With further regard to independent claims 40, 47, 54, 61, 68, and 75, each claim recites "automatically displaying the game field on the touch screen display to a player prior to initiating activation of game play." As discussed above, this recitation clarifies that the actual game to be played is presented to the player in order for the player to decide whether to initiate play of the game displayed. When the player hits the Play button, he is initiating play of the actual game that is displayed. The player can determine the optimum location of the wild symbol before he makes any commitment to play the displayed game. There is no time limit for viewing the game field or making a decision to play the displayed game. *Id.* at 32.

72.    Thus, among other things, the Applicant clarified that the use of the word "preview" "was intended to convey that the player at an electronic game terminal always sees the next game to be played on the terminal" and that "the actual game to be played" means "the game field constructed in the first recited step." *Id.* at 26-27.

73.    The submitted claims were again rejected by the Examiner in view of the previously-applied art. However, after an interview related to adding the Testing limitations, the Examiner amended the claims to their present, issued language. Specifically, the claim elements that previously read "automatically display/ing *the*

*game field* on the touch screen game display to a player prior to initiating activation of game play" were amended to read "automatically display/ing *an actual game to be played* on the touch screen game display to a player prior to initiating activation of game play."  The Examiner's substitution of the phrase "an actual game to be played" for the phrase "the game field" is consistent with Applicant's statement that those two phrases are equivalent: "the actual game to be played (i.e., the game field constructed in the first recited step)."  *Id.* at 26.

74.    I also disagree with Plaintiffs' assertion and Mr. Crevelt's suggestion that there is a "fourth" embodiment that supposedly "could be to preview a specific combination to be played—but not the entire game field—for the user to see."  Dkt. 74 at 28-29; Crevelt Decl. ¶ 106.  The specification does not describe such an embodiment with a preview of a partial field.  Every drawing that illustrates a preview, for example, illustrates a preview with a full field.  Thus, in my opinion, a POSITA would not understand the invention to encompass such a partial field preview embodiment.

75.    Therefore, I disagree with Mr. Crevelt's characterization of the preview feature disclosed in the patent and his suggestion that there are multiple different preview embodiments relevant to the claims.  In my opinion, in view of the specification and claims of the '223 Patent, and as further informed by statements made by Applicant in its File History, a POSITA would understand that there is only

one meaning of the claimed Preview element: the step of "automatically display/ing an actual game to be played" does in fact display the actual game that the player will play, should he or she choose to.

## XII.  GAME PROCESSOR

76.    Mr. Crevelt states that the claim term "game processor" is structure, and is not a nonce term.  Crevelt Decl. ¶ 114.  Mr. Crevelt further asserts that the term game processor "is a term known to a POSITA and commonly understood to represent a subclass of processors: customized, embedded processors adapted to and employed by the gaming industry in game device manufacture." *Id.* at 36.  I disagree with both contentions.  A POSITA would not think that a "game processor" is a subclass of processors, nor that it has a specific, definite structural meaning in the art.  The internal inconsistencies in Mr. Crevelt's own evidence supports my view that "game processor" is not a term of art with a consistent meaning to a POSITA.

77.    For instance, Mr. Crevelt copies the images from Exhibits A and B of Mr. Cummings' declaration and refers to them as "demonstrative aids to illustrate how a POSITA would visualize the processor (circled in red) on a printed circuit board." *Id.*  It is unclear why Mr. Crevelt calls these "demonstrative aids" because, according to Mr. Cummings, the depicted game boards "were used by Pace-O-Matic prior to June 30, 2006," Cummings Decl. at 1, and therefore reflect actual Pace-O-Matic products.  Moreover, Mr. Cummings refers to the components circled in red

as "the game processor/CPU embedded in the circuit board," *id.* at 2. Thus, Mr.
Cummings refers to the embedded CPU as "the game processor."

78.    The embedded CPUs depicted in Exhibits A and B, however, were not
customized, embedded processors adapted to the game device manufacturing
industry. They were commercially-available parts, manufactured by well-known
semiconductor manufacturers (Texas Instruments and AMD, respectively), and
available for use in whatever application the purchaser wished. In particular, an
AMD Geode microprocessor similar to that depicted in Exhibit B was used in the
One Laptop Per Child XO-1 laptop circa 2007, a charitable effort to get computing
resources into the hands of schoolchildren in developing nations.[3] One Laptop Per
Child had nothing to do with the game device manufacturing industry, but the AMD
Geode LX-700 processor in that product (shown below, circled in red for easier
identification) is in the same product family as that shown in Exhibit B: [4]

---

[3] https://www.anandtech.com/show/2292

[4] I cannot clearly identify the precise AMD Geode product in Exhibit B because

the image is too blurry. The above-cited article regarding the OLPC XO-1

states that it used the AMD Geode LX-700.



79.    Mr. Crevelt appears to distinguish between a "processor" and a "game processor." Despite Mr. Cummings' identification of the microprocessors circled in red as "game processors," Mr. Crevelt simply calls those "processors" and then goes on to discuss the alleged difference between a "processor" and a "game processor." His discussion is internally inconsistent. Mr. Crevelt first states that "game processors" are a subclass of processors and "have the internal structures of other CPUs/MPUs," Crevelt Decl. ¶ 120. He then points to U.S. Patent No. 5,882,258 to Kelly and states that it is "an example of a game designer using 'game processor' as a term of art consistent with the understand[ing] I conveyed in the previous paragraph." However, Kelly does not disclose that a "game processor" is a "subclass" of processor. Instead, Kelly's "game processor" depicted in Kelly, Fig.

1A (shown below) is a collection of components that *includes* a microprocessor, along with RAM, ROM, I/O, the clock, and the pathways to connect everything.



Fig. 1a

80.    The highlighted collection of components is also not universally known to a POSITA as a "game processor." For example, Mr. Crevelt is a named inventor on U.S. Patent No. 5,326,104 directed to a casino gaming system involving a central game controller connected to a number of keno-playing machines. It discloses that a "processor" includes "a microprocessor, RAM, ROM, timers, and input and output ports." Crevelt '104 at 8:14-16. Thus, the same collection of components that Kelly calls a "game processor" were previously called – by Mr. Crevelt himself – simply a "processor." Moreover, Kelly discloses that its microprocessor "can be any processor or controller with features sufficient to control the game apparatus. For example, a Pentium-class/Power PC class microprocessor, or specialized graphical or digital signal processors, can be used." Kelly '258 at 7:50-54. A POSITA would know that Pentium-class microprocessors were manufactured by Intel and were in widespread use in the 2006 timeframe in many home and office computers

Case 3:19-cv-01470-JPW    Document 87-1    Filed 08/13/20    Page 50 of 67

(including mine, at the time), and would not think a Pentium-class microprocessor was a "game processor" that was "customized," "embedded," or "adapted to" the gaming industry.

81.    Mr. Crevelt introduced the term "processor" by way of two dictionary references to "microprocessor" and "CPU."  Crevelt Decl. at 34.  But in his deposition on August 7, 2020, Mr. Crevelt acknowledged that when he says "game processor," he means the entire circuit board inside a gaming machine.  Crevelt Tr. at 39:4-17, 172:3-19.  Mr. Crevelt therefore holds three mutually-incompatible positions:  (1) a "game processor" is a subclass of "processor," (2) a "game processor" is an entire customized, gaming-specific circuit board that includes a microprocessor and other components, and (3) a "processor" is itself a microprocessor or CPU.

82.    Mr. Crevelt's declaration testimony asserts that a "game processor" is a "customized" product with "special features."  *See, e.g.*, Crevelt Decl. ¶ 120, 124. But Mr. Crevelt admitted at deposition that a "generic board" commercially available from a company called Densitron could both "be used in a gaming device" and "any embedded control device, not necessarily a gaming machine."  Crevelt Tr. at 76:13-24.  He further acknowledged that "a person could probably pick a board – a generic board like Densitron produces and build a gaming device and program it to operate like Tic-Tac-Fruit."  *Id.* at 77:14-22.  This acknowledgement that a generic

board capable of use in any embedded control device can also be used in a gaming device contradicts Mr. Crevelt's earlier opinion that there is necessarily something customized or gaming-industry-specific in a "game processor."  A POSITA would understand that the Tic-Tac-Fruit game with the claimed actual game preview feature and Testing claim elements could be implemented without any further customization or modification of a generic board, such as the Densitron board, because these features and elements could be implemented using generic software routines that could be stored in memory on the board and executed by the board's generic CPU or microprocessor.  Mr. Crevelt's use of "game processor" appears to be circular: a generic embedded circuit board can be called a "game processor" when it is used to process a game.

83.    In my opinion, and as demonstrated by the inconsistency with which Mr. Crevelt and his cited references use the term, "game processor" is not a term of art with a specific meaning that connotes specific structure to a POSITA.  A POSITA would not understand it to include any particular structures, such as specific input/output circuitry, either.  Input/output circuitry is not mentioned anywhere in the specification or the claims.

84.    Furthermore, even assuming that the "game processor" is a conventional central processing unit ("CPU") or microprocessor as proposed by Plaintiffs or even an entire game board (such as the one made by Densitron), none

of these structures alone or in combination with one another are capable of performing the functions recited in claim 44 because they would each need to execute an algorithm to perform the functions.  At deposition, Mr. Crevelt appears to have acknowledged that an algorithm is required when he described yet another embodiment of the "game processor"—one which includes software "necessary to run the device."  Crevelt Tr. at 186:7-187:3.  As I discuss below, no algorithms that explain how to perform these functions are recited in the claim.  There are also no algorithms disclosed in the specification that explain how to perform these functions.

## XIII.  PROGRAM INSTRUCTIONS / COMPUTER CODE

85.    Mr. Crevelt asserts that the terms "program instructions" and "computer readable code" in the context of claim 51 are not nonce words.  *See* Crevelt Decl. ¶¶ 131-135.  Mr. Crevelt also states that a POSITA would understand the structural arrangements of the claimed computer program of claim 51 includes "specific code components" based on the claim language itself.  *Id.*  I disagree.  In my opinion, a POSITA would not understand the terms "program instructions" or "computer readable code" by themselves to connote definite structure for performing the functions recited in claim 51.  Mr. Crevelt's states that claim 51 is "comprised of specific code components (e.g., descript (sic) program instructions explaining the various computer operations performed through the instructions)" *Id.*  I disagree: there are no computer operations disclosed in either the claim elements or anywhere

in the specification.  Nor is there disclosed any explanation as to how a computer operation would be performed through the non-descript program instructions as claimed.  A POSITA would understand that each of the claimed "program instructions" in claim 51 could be implemented in any one of multiple programming languages and using innumerable algorithms (as many as a coder's imagination might allow), none of which are disclosed in the specification.  Mr. Crevelt seems to agree with this view as he acknowledges that a POSITA "could create such code using a variety of different programming languages."  Crevelt Decl. ¶ 135.

86.    For instance, the claim 51 Testing element has no algorithmic support in the specification.  The portion of the specification cited by Mr. Crevelt as disclosure of the Testing step does not provide an algorithm for accomplishing the Testing function, it merely states "a software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented."  '223 Patent at 6:26-30.  Even assuming that passage corresponds to the claimed Testing element (which, as described above, it does not), it simply states a functional goal to be performed by an unspecified "software algorithm."  No software algorithms for Testing are disclosed anywhere in the specification so a POSITA would need to develop one, and then write the software code to implement that algorithm.

87.    Mr. Crevelt states that "the plain language of the claim itself …
describes the objective of the computer program." *Id.* A POSITA would understand
that functional objectives alone are insufficient to describe how code will achieve
those objectives. Claim 51 does not describe how the computer code would operate
nor does the specification of the '223 patent. Instead, the specification at best
restates goals reflected in the claims. The specification fails to provide these terms
with any structural significance: neither the terms "program instructions" nor
"computer readable code" are found in the specification (outside the claims and
summary restatement thereof) and there is no explanation of what specific code
components would perform the claimed functions.

88.    A POSITA would understand that the functions recited in the claims
with the "computer readable code" and "program instructions" limitation—i.e.,
"[generating / constructing] a game field . . .," "determin[ing] . . . at least one winning
combination for each play of the game," "testing the game field prior to displaying
the game to the player to ensure that a winning combination more valuable than the
determined winning combination is not generated inadvertently in completing the
field," and "automatically displaying an actual game to be played. . . ." must be
performed by software algorithms. However, neither the specification nor the claims
of the '223 Patent disclose algorithms to perform all of those recited functions. At
best, some of the field construction steps are discussed (but not fully specified) for

Tic-Tac-Fruit, and the steps for field construction are explicitly left to a POSITA's prior knowledge for any other game. As above, an algorithm for the claimed Testing element is entirely absent, as are algorithms for any subsequent claim elements. For example, the disclosure in the specification for the element of "automatically display an actual game to be played" simply restates the functional goal that a game should be displayed. There is no algorithm disclosed that sets out how.

## XIV. ALGORITHM

89.    Mr. Crevelt opines that both claims 44 and 51 contain an algorithm and that it would be understood by a POSITA as follows:



Flowchart illustrating "a game processor for generating an interactive electronic game on the game terminal"

90.    I disagree.  Mr. Crevelt's flowchart indicates that if the question "do any other combos result in a better prize?" is answered "Yes" then the process starts over with the step of "Fill fields with symbols."  This is not disclosed by the claim language: there is no language in the Testing step that limits what the game processor or program instructions must do differently regardless of whether the testing succeeds or fails.

91.    Even if there were such language, a POSITA would understand that if it is possible for "any other combos [to] result in a better prize" once, then it is possible every time.  It is therefore possible that the sequence of Constructing-Determining-Testing steps may form an infinite loop and never finish.  This conflicts with Mr. Crevelt's definition of an algorithm as "a finite sequence of steps for solving a logical or mathematical problem."  Crevelt Decl. ¶ 136.  An infinite loop, by definition, does not terminate after a finite number of steps and may continue forever.  Therefore, Mr. Crevelt's flowchart fails to meet his own definition of "algorithm."

92.    For another example, Mr. Crevelt's flowchart indicates that if the question "Play game" is answered "NO" then the process starts over with the step of "Fill fields with symbols."  This is also not disclosed by the claim language.  Mr. Crevelt's flowchart interpretation of the claims means that every time the player chooses not to play, a new field is constructed.  This interpretation is contrary to both

the claim language and the disclosure of the specification, which in Fig. 6 discloses that if a player does not play the displayed game at numeral 604, the process goes to step 606 to wait for a new player, *not* back to the initial step 600 of constructing a game field.    Therefore, I disagree that Mr. Crevelt's flowchart is an accurate representation of the claims and that it is supported by the written description of the '223 patent.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed this 13 th day of August, 2020 in Lake Oswego, Oregon.

Stacy Friedman

Exhibit A

# STACY A. FRIEDMAN

13380 Streamside Court  Lake Oswego, OR  97035
(503) 764-5614    stacy@olympiangaming.com

---

## SUMMARY

Creative technology product consultant with over 20 years' experience in product design, development, and IP strategy across several industry sectors, including enterprise software, mobile and online gaming, and casino gambling.  Harvard degree in computer science, *magna cum laude*.  Key product design resource for several small technology companies leading to over $500M in total M&A activity.

Named inventor on over 30 U.S. Patents.  Managing an IP portfolio of over 40 assets including patents and trademarks.  *Pro se* and counsel-assisted patent prosecution including initial specification/claims drafting, office action responses, and appeal brief drafting.  Successfully negotiated several IP transactions.

Subject matter expert consulting and expert witness testimony in over 40 disputes or litigations in US and internationally (Canada, UK, Australia, Costa Rica).   Matters include patent infringement, trade secret misappropriation, USPTO proceedings (*inter partes* review, covered business method review, *ex parte* reexamination), breach of contract, criminal proceedings, and pre-litigation analysis.  Over 60 written expert reports or declarations.  Testimony at deposition, 10 times.  Testimony at hearing or trial, 7 times, including appearances in U.S. district courts, U.S. state courts, and patent courts in UK and Canada.

Expert analysis tasks included:  software source code analysis, review of specialty hardware (regulated gaming equipment), game mathematics analysis, technical systems analysis, prior art search/analysis, regulatory compliance analysis, patent claim construction, patent validity and infringement, trade secret analysis, trade secret reverse engineering, analysis of other experts' opinions.

## EXPERT CONSULTANT EXPERIENCE

**Patent infringement, electronic gaming machines**
Client: counsel for defendant.  Tasks: validity analysis.  2020-ongoing.

**Patent infringement, electronic gaming machines**
Client: counsel for defendant.  Tasks: validity analysis.  2020-ongoing.

**Bot M8 LLC v. Sony Corporation of America, patent infringement, networked gaming system**
Client: Kramer Levin Naftalis & Frankel for plaintiff.  Tasks: validity analysis, infringement analysis, source code analysis, expert declarations, deposition testimony.  2019-2020.

**Patent infringement, electronic gaming machines**
Client: counsel for defendant.  Tasks: validity analysis, infringement analysis.  2019-ongoing.

**Misappropriation of trade secret, gaming methods**
Client: counsel for plaintiff.  Tasks: pre-litigation analysis.  2019-ongoing.

**Misappropriation of trade secret, casino gaming system**
Client: counsel for defendant.  Tasks: trade secret analysis, prior art analysis, expert report.  2019-ongoing.

**Damage assessment, electronic gaming machines**
Client: counsel for insurance company.  Tasks: machine evaluation after water damage.  2019-ongoing.

**Misappropriation of trade secret, gaming machine technology**
Client: counsel for plaintiff.  Tasks: forensic analysis.  2019-ongoing.

**Patent infringement, networked gaming system**
Client: counsel for defendant.  Tasks: validity analysis, expert reports, deposition testimony.  2019-ongoing.

**Supercell Oy v. GREE, Inc., *inter partes* review, networked gaming system**
Client: Fenwick & West for petitioner.  Tasks: validity analysis, expert declarations.  Disposition: IPR institution denied. 2019.

**Patent infringement, networked gaming system**
Client: plaintiff.  Tasks: source code analysis, infringement analysis, validity analysis, expert report.  2018-ongoing.

**Patent infringement, electronic gaming machines**
Client: plaintiff.  Tasks: infringement analysis, validity analysis, expert report.  2018-ongoing.

**Lego Systems, Inc and Warner Bros. Home Entertainment v. FigureFun LLC, *inter partes* review, electronic gaming machines**
Client: patent owner.  Tasks: validity analysis, expert declarations.  Disposition:  Final written decision.  2018-2019.

**Bookman v. Resorts World Casino, Genting New York and Int'l Game Technology (IGT), breach of contract & negligence, slot machine abnormality/withheld jackpot**
Client: Alan Ripka for plaintiff.  Tasks: technical investigation, expert affidavit.  2018.

***Inter partes* review, networked gaming system**
Client: counsel for patent owner.  Tasks: validity analysis.  2017-2018.

**Aristocrat Technologies v. High 5 Games, *inter partes* review, slot machine method**
Client: Covington & Burling for petitioner.  Tasks: prior art research, validity analysis, IPR declaration, deposition testimony.  Disposition: all claims unpatentable.  2017-2019.

**Video Gaming Technologies (VGT) v. Castle Hill Gaming, misappropriation of intellectual property, Class II gaming machines**
Client: Covington & Burling for plaintiff.  Tasks: functional analysis of Class II gaming machines, trade secret and trade dress analysis, source code analysis, expert reports and declarations, deposition testimony.  Disposition: public settlement of $3M.  2017-2019.

**Compliance investigation, electronic gaming machines**
Client: counsel for petitioner.  Tasks: examine behavior of electronic gaming machines with respect to regulations and state court opinions.  2015-2018.

**Int'l Game Technology (IGT) v. Aristocrat Technologies, patent infringement, gaming machines**
Client: Covington & Burling for defendant.  Tasks: prior art research, validity analysis, IPR declarations.  Disposition: confidential settlement.  2015-2016.

**Misappropriation of intellectual property, networked gaming system**
Client: counsel for plaintiff.  Tasks: technical analysis, trade secret analysis.  2015-2018.

**Patent infringement (pre-litigation), networked gaming system**
Client: counsel for defendant.  Tasks: validity analysis.  Disposition: litigation averted due to my analysis.  2015.

**International Internet Technologies, LLC v. Sweepstakes Patent Company, LLC, covered business method review, networked gaming system**
Client: Schneider Rothman for patent owner.  Tasks: validity and infringement analysis, written reports, deposition testimony.  Disposition: patent found invalid during CBM review.  2015-2016.

**Abnormality analysis, networked gaming machines**
Client: counsel for defendant.  Tasks: log file forensic analysis, source code analysis.  Disposition: confidential settlement.  2015-2016.

**MEI-GSR Holdings, LLC d/b/a Grand Sierra Resort v. Peppermill Casinos, Inc., misappropriation of trade secrets, slot machine par settings**
Client: Robison, Belaustegui, Sharp & Low for defendant.  Tasks: trade secret analysis, trade secret reverse engineering, damages analysis, written reports, trial testimony.  Disposition: jury verdict for defendant.  2014-2016.

**MGT Gaming v. Aruze, patent infringement, slot machine system**
Client: Watson Rounds for defendant.  Tasks: claim construction analysis, declaration.  Disposition: confidential settlement.  2014-2015.

**SHFL Entertainment v. GTECH, patent infringement, online gaming system**
Client: McCarter & English for defendant.  Tasks: validity analysis.  Disposition: confidential settlement.  2014.

**Stephenson v. Worldwinner, *inter partes* review, networked tournament system patent**
Client: Merchant & Gould for patent owner.  Tasks: validity analysis, expert declaration, deposition testimony.
Disposition: patent invalid for anticipation.  2013-2015.

**Agincourt Gaming v. Zynga, patent infringement, network gaming system**
Client: Quinn Emanuel Urquhart & Sullivan for defendant.  Tasks: prior art research, validity analysis.  Disposition:
confidential settlement.  2013-2014.

**eLot v. GTECH, patent infringement, networked lottery system**
Client: Finnegan, Henderson, Farabow, Garrett & Dunner for defendant.  Tasks: infringement analysis and validity
analysis.  Disposition: confidential settlement.  2013.

**Big Daddy Games v. Reel Spin Studios, copyright infringement, gaming machines**
Client: Michael Best for defendant.  Tasks: source code analysis, written report, deposition testimony.  Disposition:
confidential settlement.  2012.

**Seneca Nation of Indians v. State of New York, regulatory dispute, video lottery terminals**
Client: Kanji & Katzen / Harter Secrest & Emery for plaintiff.  Tasks:  systems and network protocol analysis,
gameplay analysis, regulation analysis, written reports, testimony at hearing.  Disposition:  public settlement of over
$600M dispute.  2012-2013.

**Safe Gaming System Inc. v. Atlantic Lottery Corp., patent infringement, networked gaming system**
Client: Borden Ladner Gervais for defendant.  Tasks: infringement analysis, validity analysis, written reports, trial
testimony (Federal Court of Canada).  Disposition:  dismissal / judgment for defendant.  2012-2018.

**eLot v. Atlantic Lottery Corporation, patent infringement, Internet lottery system**
Client: Borden Ladner Gervais for defendant.  Tasks:  infringement analysis, validity analysis, written report.
Disposition: favorable settlement shortly after my report was submitted.  2012-2014.

**Fortunet v. Playbook Publishing, misappropriation of trade secrets, proprietary wagering methods**
Client: Watson Rounds for plaintiff.  Tasks:  evaluation of differences between wagering methods produced by both
parties, written report, trial testimony.  Disposition:  jury verdict partly in favor of plaintiff.  2011-2013.

**McKee v. Isle of Capri Casinos, breach of contract & consumer fraud, slot machine
abnormality/withheld jackpot**
Client: Donnelly Nelson Depolo Murray for plaintiff.  Tasks:  analysis of slot machine forensic report.  My engagement
was terminated when I disputed counsel's technical interpretations.  Disposition: summary dismissal.  2011-2012.

**Legal iGaming / Zynga v. Int'l Game Technology (IGT), patent interference, networked gaming system**
Client:  Morrison Foerster for senior party defendant.  Tasks:  patent analysis, expert declaration.  Disposition: PTO
verdict for defendant.  2011.

**Gaming patent review (pre-litigation/confidential), networked gaming machine methods**
Tasks:  prior art research, infringement analysis, validity analysis.  2011.

**Lottotron v. Allgames Casino, patent infringement, remote wagering system**
Client: Stadheim Grear for plaintiff.  Tasks:  damages analysis and testimony at damages hearing.  Disposition:
plaintiff awarded damages over $14M.  2011.

**WMS Gaming v. Bally Technologies, patent infringement, slot machine technologies**
Client: Quinn Emanuel Urquhart & Sullivan for defendant.  Tasks: prior art research, validity analysis.  Disposition:
confidential settlement.  2011.

**Lottotron v. EH New Ventures, patent infringement of remote wagering system**
Client: Stadheim Grear for plaintiff.  Tasks:  Infringement analysis, written testimony, deposition testimony, trial
testimony.  Disposition:  jury verdict for defendant.  2010-2012.

**Compliance investigation, charitable bingo machines**
Client: Thunderbird Casino, Costa Rica.  Tasks:  investigation and analysis of gameplay on electronic bingo machines
relative to regulatory language, written report submitted to national legislator.  2010-2011.

**Compliance investigation, charitable bingo machines**
Client: Alabama Attorney General.  Tasks:  investigation and analysis of gameplay on multiple manufacturers' electronic bingo machines in view of Alabama Supreme Court ruling, pre-litigation technical support.  Disposition: project terminated due to Governor's intervention.  2010.

**State of California v. Wilkins, theft, casino loyalty club points**
Client: Public Defender, Humboldt County, CA for defendant.  Tasks:  evaluation of casino accounting data, damages calculation, written testimony.  Disposition:  case settled for the amount I calculated.  2009-2010.

**Dottie Janousek v. Canyon Casino, breach of contract, slot machine abnormality/withheld jackpot**
Client: Helmer McElyea for plaintiff.  Tasks:  analysis of slot machine forensic report and supporting evidence, written testimony.  Disposition:  based on my testimony, plaintiff received satisfactory settlement.  2009.

**Golden Route v. Ardent Gaming, breach of contract, casino accounting system**
Client: John Peter Lee for defendant.  Tasks:  contract review, software specification review, system data analysis, written report.  Disposition:  confidential settlement.  2009.

**Cranway v. Playtech (United Kingdom), patent infringement, online gaming system**
Client: Herbert Smith for plaintiff.  Tasks:  infringement and validity analysis, written testimony and testimony at trial.  Disposition:  patent was found invalid as excluded matter under UK patent law.  2008-2009.

**International Gamco v. Multimedia Games, patent infringement, video lottery system**
Client: Luce, Forward, Hamilton & Scripps for defendant.  Tasks:  infringement and validity analysis, written testimony and deposition testimony.  Disposition:  summary judgment for defendant.  2006-2010.

**Aristocrat Technologies v. Multimedia Games, patent infringement, video lottery machines**
Client: Luce, Forward, Hamilton & Scripps for defendant.  Tasks:  infringement and validity analysis, written testimony and deposition testimony.  Disposition:  settled in favor of defendant shortly after my deposition was taken. 2006-2008.

**HomeBingo v. Multimedia Games, patent infringement, electronic bingo system**
Client: Fish & Richardson for defendant.  Tasks:  infringement and validity analysis, written testimony.  Disposition: settled in defendant's favor after Judge, in Markman ruling, opined that defense construction was "in all respects, proper."  2006-2007.

**State of Mississippi v. (unknown defendant), felony cheating at gambling**
Client: Mississippi Gaming Commission.  Tasks:  provided statistical evidence for cheating vs. probability of random outcomes.  Disposition:  indictment handed down by grand jury.  2005.

## PUBLICATIONS AND MEDIA INTERVIEWS

April 2014       Web radio interview for Casino Enterprise Management podcast "Casino Talk with Brooke Dunn" regarding new casino game concepts.

January 2011     Video interview for CBS News show "60 Minutes" regarding video slot machine gameplay.  Published on the CBS News website.

March 2010       Written article in Casino Journal: "Gaming's Greatest Hits: 6 Ideas that Changed the Industry"

March 2007       Radio interview for National Public Radio show "Justice Talking" regarding slot machine design and mathematics.

## WORK AND BOARD EXPERIENCE

2001-present     **OLYMPIAN GAMING, LLC**, Beaverton, OR
Gaming industry consulting, intellectual property consulting and game development
***President***
- Developed profitable consulting practice around casino gameplay development and analysis, including custom software simulation and analysis

- Designed slot game models and new game features for land-based and online gaming vendors. Client list includes WagerWorks (IGT), Chartwell Technology, Parlay Entertainment, Diamond Game, Phantom EFX, and DEQ Systems.
- Designed and/or analyzed keno, bingo, lottery, blackjack, craps, roulette, poker, video poker, and many novel gaming propositions
- Social game design and virtual economy design for casual mobile or web games,
- Advised clients in IP strategy, including patent clearance and potential design-arounds
- Provided expert witness testimony in many gaming-related lawsuits
- Developed IP portfolio including over 30 issued US patents and several trademarks
  - Executed IP licenses with several casino operators and gaming vendors
- Currently licensed by Washington State Gambling Commission; achieved regulatory game approvals in WA, NV, MS.

2014-2020 **CONGREGATION BETH ISRAEL**, Portland, OR
*Board Treasurer*, 2018-2020
*Member, Board of Trustees*, 2014-2018

2011-2013 **DOUBLE DOWN INTERACTIVE / INTERNATIONAL GAME TECHNOLOGY,** Seattle, WA
Social casino operator
*Game Design Consultant / Gaming Strategist*
- Redesigned and corrected casino game implementations for DDI's social casino game website
- Led casino-industry education efforts for non-casino casual games staff
- Designed all of DDI's casino gameplay prior to its $500M acquisition by IGT
- Product integration between DDI's social games platform and IGT's slot machine content
- Internal gaming expert for evaluating new product submissions and patent filings

2011-2014 **VIZKINECT,** Reno, NV
A visual data capture and analysis company
*Member, Board of Advisors*
- Advising early-stage technology company on strategic direction and application of biometric capture technology, including eye tracking and galvanic skin response, across several verticals

2006-2008 **NIKE,** Beaverton, OR
A leading athletic footwear and apparel brand
*Senior Enterprise Architect*
- Delivered service-oriented architecture (SOA) strategy and web service solutions
- Facilitated application and service architecture for key eCommerce initiatives
  - Resulted in over $1.4M in incremental revenue in first quarter after go-live
- Authored and delivered executive-education presentations on SOA and Web 2.0 collaboration

2003-2005 **SYSTEMS RESEARCH AND DEVELOPMENT** (acquired by IBM), Las Vegas, NV
A boutique software consultancy and developers of a fraud/collusion detection platform
*Senior Software Engineer and Technical Consultant*
- Developed high-throughput data analysis software for use in identifying casino cheating rings and international terrorist cells: prevented at least two domestic terrorist incursions
- Derived computational algorithms for uncovering connections in biographical data
  - Improved processing efficiency and throughput by 66%
- Directed technical team during onsite implementation of secure web services for DoD/U.S. Navy Horizontal Fusion initiative, and provided military-spec technical documentation.
  - Successful deployment resulted in $90M acquisition by IBM

2002-2003 **PLUMTREE SOFTWARE** (acquired by BEA), San Francisco, CA
A pure-play portal software vendor
*Senior Software Engineer*
- Delivered web service-based portal application (portlet) SDK for both Java and MS .NET
  - Contributed to over $50M in portal software sales
- Delivered .NET custom controls and Visual Studio plug-ins for no-code portlet development
- Contributed to web standards committees and helped architect remote portlet infrastructure

2000-2001    **RAPT** (acquired by Microsoft), San Francisco, CA
A supply-planning and pricing optimization software vendor
***Technical Implementation Engineer***
- Managed client integration for software implementations at Sun Microsystems and H-P
  - Resulted in top-line uplift of $30M/quarter or roughly 2% revenue growth
- Developed custom SQL and PL/SQL database extraction/reporting software to deliver real-time intelligence to supply planning staff
  - Resulted in $15M/quarter cost reduction or roughly 2% profit growth

1998-2000    **SILICON GAMING** (acquired by IGT), Palo Alto, CA
A casino slot machine manufacturer
***Game Model Engineer***
- Self-education in probability theory and combinatorics led to successful employment as a casino gaming mathematician
- Designed game flow and storyboards for slot machines, and developed and shipped over 50 mathematical game models
  - Resulted in sales of hundreds of slot machines and over $10M in revenue
- Managed statistical verification and mathematical gameplay testing
- Liaison to state regulatory agencies; corrected prior errors in gaming lab submissions
  - Saved over $50,000 in regulatory fees

1996-1998    **ORACLE**, Redwood Shores, CA
A leading database and application software vendor
***Software Engineer / Senior Software Engineer***
- Responsible for final-tier maintenance engineering for premier Oracle clients
- Proposed and achieved consensus on enhancements to worldwide support process, and rolled out new process within my own organization.
  - Resulted in 50% decrease in defect reports and 10% increase in CSR response
- Earned promotion to Senior Engineer within 12 months
- Managed scalability and performance testing process, and designed scalability test suite
- Directed performance testing during pre-sales engagement with the Norwegian tax authority
  - Resulted in a 10-year, $3.5M license

## <u>EDUCATION</u>

1992-1996    **HARVARD UNIVERSITY**, Cambridge, MA
Bachelor of Arts in Computer Science, *magna cum laude*
- John Harvard and Harvard College scholarship awards
- "Empirical Testing of Algorithms for Variable-Sized Label Placement" published in 1997 Journal of the Symposium on Computational Geometry

# Exhibit B

Exhibit B

Materials Reviewed

1. U.S. Patent No. 7,736,223 (Pace) and its file history
2. U.S. Patent No. 8,118,661 (Pace)
3. Expert Declaration of Dwight Crevelt dated July 10, 2020
4. Declaration of Christopher A. Cummings dated July 9, 2020
5. Plaintiffs' Opening Claim Construction Brief
6. Defendants' Opening Claim Construction Brief
7. August 7, 2020 Deposition of Dwight Crevelt
8. https://www.vegasslotsonline.com/features/pay-tables/, retrieved August 10, 2020
9. U.S. Patent No. 5,882,258 (Kelly)
10. https://www.anandtech.com/show/2292/3, retrieved August 10, 2020