*SAVVY DOG SYSTEMS, LLC, and POM OF PENNSYLVANIA, LLC*
*v.*
*PENNSYLVANIA COIN, LLC, et al.*

*Civil Action No. 3:19-cv-01470-JPW*

# Plaintiffs' Markman Hearing Presentation

## September 15, 2020

1

# Terms to be presented

 "winning combination"

 "determining at least one winning combination for each play of the game"

 "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"

 "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" and "actual game to be played"

 "game processor"

 "program instructions"

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

## "Winning combination"

**['223 Pat., claim 44]**

| POM's Construction | PA Coin's Construction |
|---|---|
| array of game symbols yielding a successful outcome, including the award of a prize | array of game symbols in the game field yielding a successful outcome |

**Proposed constructions**

Plaintiffs concede that "'winning combination' refers to the array of *game symbols . . . in the game field* yielding a successful outcome." Dkt. 74 at 15. Thus, the Court's construction should incorporate this same language into the construction of "winning combination," and should begin and end with this agreed-upon language.

**We did <u>not</u> concede the construction**

**[Doc. No. 87 (Def. Response) at 11].**

According to the intrinsic evidence, a "winning combination" refers to the array of game symbols (e.g., 3 cherries in a row) in the game field yielding a successful outcome, and POM adds "corresponding to a prize" to its construction to aid the factfinder in more fully understanding the nature of a "winning combination."



**Plaintiff Opening Brief [Doc. 74 at 15.]**



"[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (*en banc*).

"[I]f we once begin to include elements not mentioned in the claim in order to limit such claim, we should never know where to stop." *McCarty v. Lehigh Valley R. Co*, 160 U.S. 110, 116 (1895) (quoted in *Research in Motion v. NTP*, 418 F.3d 1282, 1309 (Fed. Cir. 2005).

**Federal Circuit warnings against importing specification features into broader claim language**

7

The Tic-Tac-Fruit electronic game does not pick random fields until testing indicates that one is acceptable. Instead, the field is constructed to meet certain criteria. The steps involved in constructing a field in this electronic game are as follows:
1. chose the number of winning lines (i.e., 1, 2, 3, 4);
2. chose the orientation of each of the winning lines (i.e., horizontal, vertical, or diagonal);
3. chose the symbols for each of the lines (i.e., cherries, plums, bells, etc.);
4. fill in empty spots with random symbols; and
5. test the complete field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails.

**Intrinsic evidence describes winning combinations as "winning lines" before finishing the game field**

**[Doc. No. 74 at 17, quoting '223 Pat., 4:51-64]**

8

### TABLE 1

Tic-Tac-Fruit (Classic)

| Symbol/Denomination | 50¢ | $1.00 | $2.00 | $4.00 |
|---|---|---|---|---|
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

Selected Play Level

Winning Combinations

Corresponding Prizes

An exemplary award schedule for this version of the Tic-Tac-Fruit electronic game is provided in Table 1. The column headings represent denominations of play. In other words, the column headings represent the amount that the player can select for each play. The higher the denomination selected, the greater the potential winnings for each of the winning combinations. For example, if the player selects fifty cents as the denomination for the next play of the electronic game, and completes a line with three titanium symbols, he will win the equivalent of $250.00 in points. Had he successfully played the same game with a $4.00 denomination of play, his winnings would have been the equivalent of $2,000.00 in points. Likewise, if the player had selected a denomination of $2.00 and made a location selection for the wild symbol that simultaneously completed a line of three bells and a line of three plums, his winnings would have been the equivalent of $14.00 in points, $10.00 for the line of three bells and $4.00 for the line of three plums. The prizes marked with an asterisk are progressive value prizes. The value awarded for these prizes will increase with every game played.

## Intrinsic evidence also shows winning combinations in an award table

## [Doc. 74 at 16, citing '223 Pat., col. 5]

# "including the award of a prize"

**"Winning combination" issue no. 2**

**TABLE 1**

| Tic-Tac-Fruit (Classic) | | | | |
|---|---|---|---|---|
| Symbol/Denomination | 50¢ | $1.00 | $2.00 | $4.00 |
| 3 Titanium | $250* | $500* | $1,000* | $2,000* |
| 3 Spinner | 80¢ | $1.60* | $3.20* | $6.40* |
| 3 Flip | * | * | * | * |
| 3 Bell | $2.50 | $3 | $10 | $20 |
| 3 Plum | $1 | $2 | $4 | $8 |
| 3 Orange | 8¢ | 16¢ | 32¢ | 64¢ |
| 3 Lemon | 4¢ | 8¢ | 16¢ | 32¢ |
| 3 Cherry | 2¢ | 4¢ | 8¢ | 16¢ |

Selected Play Level

Winning Combinations

Corresponding Prizes

An exemplary award schedule for this version of the Tic-Tac-Fruit electronic game is provided in Table 1. The column headings represent denominations of play. In other words, the column headings represent the amount that the player can select for each play. The higher the denomination selected, the greater the potential winnings for each of the winning combinations. For example, if the player selects fifty cents as the denomination for the next play of the electronic game, and completes a line with three titanium symbols, he will win the equivalent of $250.00 in points. Had he successfully played the same game with a $4.00 denomination of play, his winnings would have been the equivalent of $2,000.00 in points. Likewise, if the player had selected a denomination of $2.00 and made a location selection for the wild symbol that simultaneously completed a line of three bells and a line of three plums, his winnings would have been the equivalent of $14.00 in points, $10.00 for the line of three bells and $4.00 for the line of three plums. The prizes marked with an asterisk are progressive value prizes. The value awarded for these prizes will increase with every game played.

**Winning suggests winning a prize**

**['223 Pat., col. 5]**

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

**"Determining at least one winning combination for each play of the game"**

**['223 Pat., claim 44]**

| POM's Construction | PA Coin's Construction |
|---|---|
| Establish or ascertain at least one winning combination, properly construed, for each game to be played | guaranteeing/guarantee/guaranteed at least one winning combination that may be formed for each game to be played |

## Proposed constructions

symbol. The game's construction of the field guarantees that at least one line may be formed by placing the wild symbol selection in the proper spot. On average, two lines may be formed if the optimal spot for the "wild" symbol is selected. However, there is always the possibility that at least one line can be formed.

**"Guarantee" is used <u>only once</u> in the '223 Patent (wild symbol)**

**['223 Pat., 4:20-25]**



"… one of the cardinal sins of patent law—reading a limitation from the written description into the claims[.]" *Phillips,* 415 F.3d at 1320 (internal quotation omitted).

**Federal Circuit warns against reading a feature of the written description into the claims**

15



"Because claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314-1315 (internal quotations omitted).

"[C]laim terms are normally used consistently throughout the patent[.]" *Integrated Claims Sys., LLC v. Travelers Indem. Co.*, 758 F. App'x 965, 967 (Fed. Cir. 2019) ("field" given same meaning in various phrases in which it appeared)

**"Determine" should have a consistent meaning throughout the patent claims and specification**

Claim 25: "... program instructions that receive the player's selection of a field element as a location for a wild symbol and ==determine== each winning combination of symbols that is formed by such selection"

Claim 27: "The computer program product for electronic gaming of claim 25 further comprising program instructions that ==determine== if the player has decided to play the game field displayed on the game display"

Claim 51: "... program instructions that ==determine== if the player has decided to play the displayed game"

## In other claims, "determine" means "establish or ascertain"

17



# "Determine" in the specification means to establish or ascertain

**['223 Pat., FIGS. 5 (and text at 10:1-21), 6 (and text at 10:59-62) and 8 (and text at 12:8-11)]**

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

determining at least one winning combination for each play of the game;

testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

**"Testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field"**

**['223 Pat., claim 44]**



**The patent ensures that the anticipated outcome based on the "determined winning combination" is not superseded by a winning combination associated with a better outcome (a higher prize level)**

['223 Pat., FIG. 1B4:62-64; Crevelt Dec., at 23-24, ¶ 87]

| POM's Construction | PA Coin's Construction |
|---|---|
| testing the game field prior to displaying the game to the player to ensure that the anticipated outcome corresponding to the winning combination, properly construed, is not superseded by a better outcome, such as a higher prize level, in making the field from the plurality of predetermined game symbols | test[ing] the previously constructed field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently when the player completes a winning combination during play of the game |

# Proposed constructions

21

"Testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently <u>in completing the field</u>"

| POM's Construction | PA Coin's Construction |
|---|---|
| testing the game field prior to displaying the game to the player to ensure that the anticipated outcome corresponding to the winning combination, properly construed, is not superseded by a better outcome, such as a higher prize level, in making the field from the plurality of predetermined game symbols | test[ing] the previously constructed field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently when the player completes a winning combination during play of the game |

## Competing constructions for "in completing the field"

## PA Coin's construction seeks to add the express limitation of player interaction from Claim 13 into broader claim language

22

> 5. test the **complete** field for compliance with the goals set by steps 1 and 3 and repeat the construction process if compliance fails.

> The Tic-Tac-Fruit electronic game is a single player game. The player is presented a field **completely filled** with apparently random symbols selected from a set of nine symbols that includes a "wild" symbol. The "wild" symbol can represent any of the other symbols in the set of game symbols. The

**According to the patent, the field is "complete" before player interaction**

**['223 Pat., 4:62-64 and 4:4-6; *compare* Fɪɢ. 6 *with* Fɪɢ. 8]**



A construction that excludes the preferred embodiment is "rarely, if ever, correct." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

**Avoid adopting a claim construction that excludes the inventor's disclosed preferred embodiments**

a game processor for generating an interactive electronic game on the game terminal, the game processor configured for:

    constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

    determining at least one winning combination for each play of the game;

    testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

    automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

**"automatically displaying <u>an actual game to be played </u>on the touch screen game display to a player prior to initiating activation of game play"**

**['223 Pat., Claim 44 (emphasis added)]**

25

| POM's Construction | PA Coin's Construction |
|---|---|
| the game to be played, including an otherwise unknown system-generated attribute of it | the constructed game field of the game to be played |

## "an actual game to be played"

actual game to be played

the constructed game field <mark>of</mark> the game to be played

**Claim language vs. PA Coin's proposed construction**



The preview display could also be implemented in other forms of electronic or electromechanical games. For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols. The displayed game could actually be the result which may or may not be a winning combination of symbols.



**Displaying unknown system-generated attributes of the game**

**['223 Pat., col. 11:14-26 and 11:43-49]**



A construction that excludes the preferred embodiment is "rarely, if ever, correct and would require highly persuasive evidentiary support, which is wholly absent in this case" *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

**Avoid adopting a claim construction that excludes the inventor's disclosed preferred embodiments**

> The preview display could also be implemented in other forms of electronic or electromechanical games. For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols. The displayed game could actually be the result which may or may not be a winning combination of symbols.

At least the sixth preview embodiment in the specification would be eliminated if "i.e." in the prosecution history is treated as lexicography.

*See Pfizer, Inc. v. Teva Pharmaceuticals, USA, Inc.*, 429 F.3d 1364, 1373 (Fed. Cir. 2005)

*See Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1326 (Fed. Cir. 2012)

**['223 Pat., col. 11:43-49]**

30



"[B]ecause the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1317.

## Federal Circuit warning regarding lack of clarity in the prosecution history

31

47.    (currently amended)    An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game terminal, the game processor ~~comprising~~ configured for:

~~a component for~~ constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols;

~~a component for presenting~~ automatically displaying the game field ~~of game symbols~~ on the touch screen game display to a player prior to initiating activation of game play ~~as a preview to a player for deciding whether to play the displayed game~~;

~~a component for~~ determining if the player has decided to play the displayed game ~~presented as a preview~~; and

14

WCSR  4244188v2

POM000196

**Issued claim 44 (application claim 47) as it existed during prosecution as of the Jan. 26, 2010 Amendment.**

**Amended Claim 47 recited displaying the "game field"**

**[Doc. 71-4 at POM000196]**

32

47.    An electronic gaming system comprising:

an electronic game terminal including a touch screen display;

a game processor for generating an interactive electronic game on the game

terminal, the game processor configured for:

constructing a field having a plurality of elements for the interactive game display

wherein each element includes a game symbol from a plurality of

predetermined game symbols;

determining at least one winning combination for each play of the game;

POM000242

Application/Control Number: 11/428,026                                    Page 8
Art Unit: 3714

testing the game field prior to displaying the game to the player to ensure that a

winning combination more valuable than the determined winning

combination is not generated inadvertently in completing the field;

automatically displaying an actual game to be played on the touch screen game

display to a player prior to initiating activation of game play;

determining if the player has decided to play the displayed game; and

displaying an outcome resulting from play of the displayed game. --

The following is an examiner's statement of reasons for allowance: Claims

1,14,27,40,47,54,61,68, and 75 distinguishes over the prior art in that the prior arts do not teach a

POM000247

Application/Control Number: 11/428,026                                    Page 13
Art Unit: 3714

system and method of playing an electronic game of constructing a game field having a plurality

of elements for an interactive touch screen display, such that game field includes game symbols

that are automatically determined such that there is at least one winning combination for each

play of the game, but there is no winning combination without player interaction; and also testing

the game field prior to displaying the game to the player to ensure that a winning combination

more valuable than the determined winning combination is not generated inadvertently in

completing the field, wherein the automatic displaying, displays the actual game to be played on

the touch screen prior to initiating activation of the game by the player.

**Examiner's Amendment**

**[Doc. 71-4, at POM000242-243, -247-248]**

a <mark>game processor</mark> for generating an interactive electronic game on the game terminal, the <mark>game processor</mark> configured for:

    constructing a field having a plurality of elements for the interactive game display …;

    determining at least one winning combination …;

    testing the game field …;

    automatically displaying an actual game to be played; on the touch screen game display …;

    determining if the player has decided to play the displayed game; and

    displaying an outcome resulting from play of the displayed game.

## "Game processor"

**['223 Pat., Claim 44]**

| POM's Construction | PA Coin's Construction |
|---|---|
| "a CPU or microprocessor with input/output circuitry that executes program instructions to generate a game."<br><br>Not a means-plus-function term. | (1) *Indefinite.*[4]<br><br>*This is a means-plus-function term.*<br><br>(2) *Alternative*: "a *conventional* CPU or microprocessor processor that executes program instructions to generate a game." |

## Proposed constructions

35



"An element in a claim for a combination may be expressed as a means or step for performing a specified **function without the recital of structure, material or acts in support thereof**, and such claim shall be construed to cover the corresponding structure, material or acts described in the specification and equivalents thereof." 35 U.S.C. § 112(f)

**MPF only applies to purely functional claiming**

"[C]onnoting <u>precise</u> physical structure is <u>not</u> a necessary condition to avoid § 112, ¶ 6 application." *TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 785–86 (Fed. Cir. 2019) ("conduit" not a MPF term)

36

A structure-connoting term coupled with a
description of its operation is not subject to MPF law

a **digital processing unit** operably coupled with the data entry device, **said digital processing unit performing**:
    identifying the selected at least one pixel in the frame of the user input video data stream;
    extracting the identified at least one pixel as the second image;
    storing the second image in a memory device operably coupled with the interactive media apparatus;
    receiving a selection of the first image from the original video data stream; extracting the first image;
    spatially matching an area of the second image to an area of the first image in the original video data …; and
    performing a substitution of the spatially matched first image with the spatially matched second image …[.]".

*Samsung Electronics America, Inc. v. Prisua Engineering Corp*., 948 F.3d 1342 (Fed. Cir. 2020) (reversing PTAB determination and finding "digital processing unit" was not "purely functional" where evidence showed that the term connoted a computer)

[*See also* Docket 86 (POM Response Brief) at 4 (citations omitted)]

37





*Fig. 1a*

FIG. 1*a* is a block diagram of a game processor used in the game apparatus of FIG. **1**;

[U.S. Pat. No. 5,882,258 ("Kelly"), at 3:46-47;
Crevelt Dec., ¶¶ 121-124]

80. The highlighted collection of components is also not <u>universally</u> known to a POSITA as a "game processor."

**Friedman Dec. [Doc. 87-1]**

**His rationale is the certain persons in the gaming industry refer to the collection of components as a "processor" or "processing unit."**

39

82.    Mr. Crevelt's declaration testimony asserts that a "game processor" is a "customized" product with "special features." *See, e.g.*, Crevelt Decl. ¶ 120, 124. But Mr. Crevelt admitted at deposition that a "generic board" commercially available from a company called Densitron could both "be used in a gaming device" and "any embedded control device, not necessarily a gaming machine." Crevelt Tr. at 76:13-24. He further acknowledged that "a person could probably pick a board – a generic board like Densitron produces and build a gaming device and program it to operate like Tic-Tac-Fruit." *Id.* at 77:14-22. This acknowledgement that a generic board capable of use in any embedded control device can also be used in a gaming device contradicts Mr. Crevelt's earlier opinion that there is necessarily something customized or gaming-industry-specific in a "game processor."

## Densitron

**[Compare Friedman Dec., ¶ 82 with Crevelt Dep., pp. 37-38]**

Q.   And so what did you do for Green Valley Gaming?
A.   I designed a gaming platform for them, hardware and software for them to use on their video games.
Q.   What was the nature of those video games?
A.   We took basically a commercial game processor board that was available

Page 38

from a company called Densitron, and I programmed that to implement their video poker machines and meet all the gaming requirements.
Q.   And so did you design the game board?
A.   The game board was a commercially available product from a company called Densitron. That was a specially made product for the gaming industry.
Q.   And who did Densitron sell that game board to?
A.   They sold that to numerous small slot machine manufactures. It allowed other manufacturers to get into the business that didn't have the expertise or the financial wherewithal to produce a game board on their own.

40

> Q. Is there some configuration of this board that makes it not generic?
>
> A. When I use the term "generic," I meant to -- when I -- Densitron, for example, sold a generic board that could be used in a gaming device. It had all the input and everything necessary to allow you to create a gaming device. It could be used to create any embedded control device, not necessarily a gaming machine, but it did have a lot of designs particularly for gaming.

**Friedman misrepresents Crevelt's testimony by claiming that Densitron is not gaming-industry-specific**

**[Compare Crevelt Dep., pp.37-38, 76 with Friedman Dec., ¶ 82]**

41

Existing commercial structures are not the same thing as "black box recitations" or "abstractions," but rather as "specific references to [known structures] existing in prior art at the time of the inventions"

*Zeroclick, LLC v. Apple Inc.*, **891 F.3d 1003, 1008-1009  (Fed. Cir. 2018)**



(19) **United States**
(12) **Patent Application Publication** (10) Pub. No.: US 2003/0073476 A1
Friedman (43) Pub. Date: **Apr. 17, 2003**

(54) METHOD OF PLAYING WAGERING GAMES

(76) Inventor: Stacy A. Friedman, San Francisco, CA (US)

Correspondence Address:
**QUIRK & TRATOS**
**3773 HOWARD HUGHES PARKWAY**
**SUITE 500 NORTH**
**LAS VEGAS, NV 89109 (US)**

(21) Appl. No.: 10/271,669

(22) Filed: Oct. 15, 2002

Related U.S. Application Data

(60) Provisional application No. 60/329,608, filed on Oct. 15, 2001.

Publication Classification

(51) Int. Cl.⁷ .................................................. A63F 9/24

(52) U.S. Cl. ...................................................... 463/13

(57) **ABSTRACT**

The embodiments of the present invention provide a method of playing wagering games. According to a first embodiment the present invention, one or more players place a wager and a dealer deals four cards to the players and to the dealer. The players and dealer then inspect their four cards and arrange them into two separate two-card hands. After the arrangement is complete, five cards are dealt face-up as community cards to be used in conjunction with each of the players' and the dealer's two separate two-card hands. The players' wagers are then resolved by evaluating the players' two separate two-card hands and the dealer's two separate two-card hands in a predetermined fashion according to the conventional rules of poker. Various modifications to the first embodiment of the present invention are set forth herein.

[0036] It should be understood that the embodiments of the card game disclosed herein are also ideal for implementation in an electronic gaming machine. It is well known to utilize gaming machines, controlled by processing units, for operating wagering games. The processing unit is typically a computer microprocessor. The first embodiment of the present invention will be used to describe a gaming machine implemented version of the present invention.

[0037] FIG. 3 illustrates a perspective front view of a traditional gaming machine that may be used to implement the embodiments of the present invention. The gaming machine includes a screen display 5, selection buttons 10, card reader 15, coin slot 20, and wager buttons 25.

[0038] The gaming machine may also incorporate a wager accepting means, such as a bill acceptor in addition to the coin slot 20, such that a player may place one or more wagers. Once a wager is accepted, a gaming machine processor causes four randomly selected cards to be dealt and displayed to the player and the dealer. The cards are

[U.S. Pat. App. No. 2003/0073476 ("Friedman"), at 3]

43





In various embodiments, an EGM includes at least one processor configured to operate with at least one memory device, at least one input device, and at least one output device. The at least one processor may be any suitable processing device or set of processing devices, such as a microprocessor, a microcontroller-based platform, a suitable integrated circuit, or one or more application-specific integrated circuits (ASICs). FIG. 5B illustrates an example EGM including a processor 1012.

(12) **United States Patent**
Friedman et al.

(10) Patent No.: **US 9,978,221 B2**
(45) Date of Patent: **May 22, 2018**

(54) **GAMING SYSTEM AND METHOD FOR PROVIDING A MULTIPLE DIMENSION SYMBOL GAME WITH EXPANDING WILD SYMBOLS**

(71) Applicant: **IGT**, Las Vegas, NV (US)

(72) Inventors: **Stacy A. Friedman**, Beaverton, OR (US); **Cooper Dubois**, Normandy Park, WA (US)

(56)     **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 1,978,395 A | 10/1934 | Groetchen |
| 3,420,525 A | 1/1969 | Waders |
| 3,642,287 A | 2/1972 | Lally et al. |
| 3,735,987 A | 5/1973 | Ohki |
| 4,099,722 A | 7/1978 | Rodesch et al. |
| 4,198,052 A | 4/1980 | Gauselmann |
| 4,200,291 A | 4/1980 | Hooker |
| 4,326,351 A | 4/1982 | Heywood et al. |
| 4,357,567 A | 11/1982 | Book |

**FIGS. 5A, 5B and 34:53-61**

44



# Recent authorities not cited in briefs

*Zak v. Facebook, Inc*., No. 4:15-CV-13437, 2020 WL 589433, at *7-12 (E.D. Mich. Feb. 6, 2020) ("**computer**" and "administrator portal")

*SEVEN Networks, LLC v. Apple Inc*., No. 2:19-CV-115-JRG, 2020 WL 1536152, at *45-50 (E.D. Tex. Mar. 31, 2020) ("**processor** configured…")

*Kit Check, Inc. v. Health Care Logistics, Inc*., No. 2:17-CV-1041, 2019 WL 4142719, at *7-12 (S.D. Ohio Aug. 30, 2019) ("**processor**")

*Corus Realty Holdings, Inc. v. Zillow Grp., Inc*., No. 18-CV-0847-JLR, 2019 WL 2766508, at *8 (W.D. Wash. July 2, 2019) (**processor** for determining information needed to …)

*Phenix Longhorn, LLC v. Wistron Corp.,* No. 2:17-CV-00711-RWS, 2019 WL 2568476, at *14-16 (E.D. Tex. June 21, 2019) ("**circuit** for programming…")

*Techno View IP, Inc. v. Facebook Techs*., LLC, No. 17-CV-386-CFC, 2018 WL 6427874, at *4 (D. Del. Dec. 7, 2018) (**processor**)

*3G Licensing, S.A. v. Blackberry Ltd*., No. 17-CV-82-LPS, 2018 WL 4375091, at *7 (D. Del. Sept. 13, 2018) (**processor** further being configured to)

51. A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising:

program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols;

program instructions that determine at least one winning combination for each play of the game;

program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field;

program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play;

program instructions that determine if the player has decided to play the displayed game; and

program instructions that display an outcome resulting from play of the displayed game.

## "Program instructions"

['223 Pat., Claim 51]

47

| Program instructions | |
|---|---|
| **POM's Construction** | **PA Coin's Construction** |
| "conventional commands that can be executed by a computer"<br><br>Not a means-plus-function term. | *(1) Indefinite.*<br><br>*This is a means-plus-function term.*<br><br>*(2) Alternative:* "conventional commands that can be executed by a computer" |

## Proposed constructions



**code¹** *n.* **1.** Program instructions. Source code consists of human-readable statements written by a programmer in a programming language. Machine code consists of numerical instructions that the computer can recognize and execute and that were converted from source code. *See also* data, program. **2.** A system of symbols used to convert information from one form to another. A code for converting information in order to conceal it is often called a *cipher*. **3.** One of a set of symbols used to represent information.

**instruction** *n.* An action statement in any computer language, most often in machine or assembly language. Most programs consist of two types of statements: declarations and instructions. *See also* declaration, statement.

## "Program instructions" is structural in the art.

[Doc. 74-6, Ex. F; Crevelt Dec., ¶¶ 132-135]

"Unlike the claims in the *AmDocs* case cited by Plaintiffs, the program instructions of claim 51 provide <u>no information </u>on how those program instructions operate nor do they even relate to one another in a way that could be viewed as algorithmic."

**PA Coin Response Brief [Doc. 87 at 35]**

1. A **computer program product** embodied on a **computer readable storage medium** for processing network accounting information comprising:

    **computer code** for receiving from a first source a first network accounting record;

    **computer code** for correlating the first network accounting record with accounting information available from a second source; and

    **computer code** for using the accounting information with which the first network accounting record is correlated to enhance the first network accounting record.

*Amdocs (Israel) Limited v. Openet Telecom, Inc.,* **1:10-cv-910, 2018 WL 1699429, at \*17 (E.D. Va. Apr. 6, 2018) ("Openet also argues that because the patents use 'computer code for' multiple functions, it must not be able to provide sufficient structure to a person of ordinary skill in the art. This argument is not convincing. Simply because a claim term is capable of performing numerous functions, the term is not devoid of structure").**



**Arendi**
Function:
"responding to a user selection by inserting a second information into the document, the second information associated with the first information from a second application program"

"[means for/computer readable medium . . . including program instructions for] inserting the information located in (2) into the document"

"inserting the second information into the document further comprises means for adding the second information to the first information in the document"

Structure: "programming and logic configured to perform the algorithms disclosed at Col. 3 ll. 63-66, Col. 4 ll. 46-51, Col. 5:67 – Col. 6 l. 4, Col. 7 ll. 5-6 and 11, Col. 7 ll. 48-49 or its equivalent"

**Defendants**
Indefinite

**Court**
Indefinite

27   Arendi identified claim 98 as including a means-plus-function limitation in the Joint Claim Construction Chart.

**The Patent Owner Arendi agreed in the Joint Statement that "computer readable medium … including program instructions" was MPF terminology. *See Arendi SARL v. LG Elecs., Inc.*, C.A. No. 12-1595- LPS, 2019 WL 3891150, *12-13, n.27 (D. Del. Aug. 19, 2019).**

**[*Arendi* is cited in PA Coin Response Brief, Doc. 87 at 36]**



# Recent authorities not cited in briefs

*Kit Check, Inc. v. Health Care Logistics, Inc.*, No. 2:17-CV-1041, 2019 WL 4142719, at *7-12 (S.D. Ohio Aug. 30, 2019) ("computer readable medium" and "computer executable instructions;" "It is generally accepted that **'instructions' or 'code' recite structure**")

*Blitzsafe Texas, LLC v. Subaru Corp*., No. 2:17-CV-00421-JRG, 2018 WL 6504174, at *16-25 (E.D. Tex. Dec. 11, 2018) ("**code portions for** …" not an MPF term)