# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

CIVIL ACTION NO. 3:19-cv-01470-JPW

- - -

SAVVY DOG SYSTEMS, LLC, and       :
POM OF PENNSYLVANIA, LLC,

                                  :

     Plaintiffs,

                                  :

  - vs -

                                  :

PENNSYLVANIA COIN, LLC, and
PA COIN HOLDINGS, LLC,            :

     Defendants.                  :


- - -

VIDEOTAPED DEPOSITION UPON ORAL

EXAMINATION OF

DWIGHT E. CREVELT, VOLUME I

Virtual Videoconference

August 7, 2020

- - -

REPORTED BY:  EDWARD J. RUGGERI, RPR, CCR

- - -


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



Page 34

were at EDT until '86, and I think I understand now.

IGT acquired EDT and that's why you started working for IGT again?

A.    Essentially, yes.

Q.    Okay.

And that lasted until '96, and then -- so in the time that you worked at EDT and IGT, in that '88 to '96 time frame, you were no longer working on game software?

A.    Yes and no.  I managed the team that did that and guided them on the systems side.  We also developed a cashless system and worked with the gaming software for that.  We worked with the interface through the slot machines and I worked very closely with the game software people at EDT -- or at IGT to interface our electronics to their systems for cashless gaming the way a slot machine would operate in a cashless environment.

We were the first ones to put out a cashless system and both using mag

Page 35

stripe cards as well as smart cards or computer chip cards.  So I was in charge of all of those kind of cashless applications.  I worked with progressive systems, a large variety of that and designing and developing those kind of systems.

Q.    And so were you writing code then for game software --

A.    In some cases -- in some cases, yes, I did do coding.  In others I provided the direction and assisted other programers in doing the coding.

Q.    Was that coding for game software or coding for the tracking system?

A.    Most of it was for the tracking system.  We did have some minor changes and stuff in the game software that I worked with the engineers at IGT in Reno on.  So it varied on whatever had to be done to get the project done.

Q.    Do you remember what issues arose that required you to do coding on

Page 36

game software during that period?

A.    I can't specifically come up with a specific item at this point.  My memory just doesn't.

Q.    That's fine.

And so you haven't worked for IGT since you left in '96; is that right?

A.    That is correct.

Q.    And with -- you've been working with Crevelt Consulting since then?

A.    That is correct.

Q.    And I know it's not been a full-time job for you because you started doing some -- making wine at some point in that period.

When did that start?

A.    We did not start the wine -- winery effort until after 2005 when we purchased the land here and decided to get out of the rat race in Vegas.

Q.    Good.

And so but leading up to 2005, I think you said you worked with -- as Crevelt Consulting worked with some gaming

Page 37

equipment manufacturers in design and development of slot machines; is that right?

A.    That is correct.  I worked at one time or another with Crevelt Computer Systems.  We have worked with most major slot manufacturers in the Las Vegas area on some aspect of game, game design equipment.  We designed a complete machine for Green Valley Gaming.  The game design work is whatever they needed done at a given time.

Q.    And do you have employees at Crevelt Consulting?

A.    No, just me.

Q.    And so what did you do for Green Valley Gaming?

A.    I designed a gaming platform for them, hardware and software for them to use on their video games.

Q.    What was the nature of those video games?

A.    We took basically a commercial game processor board that was available

MAGNA
LEGAL SERVICES

Page 38

from a company called Densitron, and I programmed that to implement their video poker machines and meet all the gaming requirements.

Q. And so did you design the game board?

A. The game board was a commercially available product from a company called Densitron. That was a specially made product for the gaming industry.

Q. And who did Densitron sell that game board to?

A. They sold that to numerous small slot machine manufactures. It allowed other manufacturers to get into the business that didn't have the expertise or the financial wherewithal to produce a game board on their own.

Q. And what was the game -- what was the game that the game board was used in? Were these -- these were slot machines or something else?

A. They were video-based games.

Page 39

They could be slots, pokers, anything they wanted to program into it, but they were video-based games.

Q. And what made these game boards unique that you said they were useful in the gaming industry?

A. They are game boards. That is essentially a game processor that has all of the necessary components to run a gaming machine. It has the microprocessor, the memory, the RAM, the input, output, the display controllers, all of the items that are needed to run a gaming machine. Drive a hopper, whatever else you're trying to do, read -- card reader, bill validator, the communications links.

Q. Is there something about that game board that would be different than, say, a motherboard on a PC?

A. Yes, there are differences.

Q. And what would those differences be?

A. Most of those differences

Page 40

involve adding specific IO requirements, that's input and output requirements, to handle specific communications to bill validators, to card readers, to drive components like a hopper, input/output switches, touch screen possibly. Back in that day, a lot of PCs did not have touch screens. So all of those extra components that are required in a gaming machine or amusement machine you have to have the interfaces to, and these boards had that interface on them.

Q. So it was -- it sounds like the main difference was the ability to interact with the hardware components that were unique to the gaming machine that a PC might not have such as a bill validator, for example?

A. Bill validator, input/output switches, those kind of components, yes.

Q. Okay.

And do you recall what year that was that you were working on that particular game board?

Page 41

A. Late nineties, close as I can remember right now.

Q. Do you think that game board would be able to operate Tic-Tac-Fruit today?

A. Probably.

Q. So have you ever designed software for a skill game?

A. Give me a better definition of skill game.

Q. So there's skill games referenced in the 223 patent, and they were -- so that's what I'm referring to, those types of games.

MR. HILL: Let me object to the form. You can answer if you understand the question.

THE WITNESS: I can't recall off the top of my head any specific game that would look like Tic-Tac-Fruit.

MR. DAVIS: Fair enough.

BY MR. DAVIS:

Q. Have you worked on any software

MAGNA
LEGAL SERVICES

Page 74

MR. HILL: Object to the form.
THE WITNESS: I don't understand what you mean by conventional.
BY MR. DAVIS:
Q. Was it common and well known?
MR. HILL: Object to the form.
THE WITNESS: A gaming device would have some sort of game processor control board in it, and it would have all of the input/output components necessary to handle all of the devices associated with a gaming machine.
BY MR. DAVIS:
Q. Right.
And were these things that you could buy off the shelf?
MR. HILL: Object to the form.
THE WITNESS: There were few manufacturers that made that kind of a device.
BY MR. DAVIS:
Q. And so you could just call

Page 75

these manufactures and get the device?
A. You could buy a generic computer process -- a generic game board to use in your machine, yes.
Q. Okay.
At one point you referred to a Cummins declaration, and we'll get to that later.
Is that the type of -- do you know what I'm talking about in the Cummins declaration where you referred to a game board?
A. Yes. I'm not sure which paragraph that is in my declaration, but I provided two photographs of a game board.
Q. Sure. Yeah. Why don't we do it that way. It's easier. Page 36 of your declaration.
Are these the sort of generic game boards that you were talking about?
A. No. These are not generic game boards.
Q. Why not?
A. These were provided as an

Page 76

illustration of what a game processor would look like. These particular ones were actually used in the Tic-Tac-Fruit according to Mr. Cummins' declaration, and they're provided as an example of what a board would look like. They are not specifically a generic board from another manufacturer.
Q. So why isn't this a generic board?
A. This board is specific to a given manufacturer.
Q. Is there some configuration of this board that makes it not generic?
A. When I use the term "generic," I meant to -- when I -- Densitron, for example, sold a generic board that could be used in a gaming device. It had all the input and everything necessary to allow you to create a gaming device. It could be used to create any embedded control device, not necessarily a gaming machine, but it did have a lot of designs particularly for gaming.

Page 77

Q. Is there something about the technology of the Densitron board that's different from the board reflected here in paragraph 19?
MR. HILL: Objection, calls for speculation.
THE WITNESS: I have no idea what components are on this board. I can't read it. I cannot compare it. It's like apples and oranges.
MR. DAVIS: Okay. Well, we'll come back to it.
BY MR. DAVIS:
Q. Given what you know about Tic-Tac-Fruit as it's described in the 223 patent, would you think that a generic board could be used to run Tic-Tac-Fruit?
A. A person could probably pick a board -- a generic board like Densitron produces and build a gaming device and program it to operate like Tic-Tac-Fruit, yes.
Q. Is there any embodiment disclosed in the 223 patent that you can

MAGNA
LEGAL SERVICES