# EXHIBIT E

**Exhibit A-3**

**<u>Invalidity Claim Chart for U.S. Pat. No. 7,736,223 with Respect to U.S. Pat. Pub. No 2004/0176167 to Michaelson et al.</u>**

As reflected below, claims 44, 47, 49-51, 54, 56, and 57 of U.S. Patent No. 7,736,223 ("the '223 patent")[1] are anticipated by U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. ("Michaelson"). Further, claims 44, 47, 49-51, 54, 56, and 57 of the '223 patent are rendered obvious by Michaelson, either alone or when combined with, *e.g.*, U.S. Pat. Pub. No. 2003/0060276 to Walker et al. ("Walker"), UK Pat. App. GB2251112 to Marchini et al. ("Marchini"), U.S. Patent No. 8,491,369 to Kowell ("Kowell"); U.S. Pat. No. 5,482,289 to Weingardt ("Weingardt"), U.S. Pat. No. 7,108,602 to Daly ("Daly"), EP Pat. App. No. 449,433 to Farrell et al. ("Farrell"), *William N. Thompson*, Gambling in America, An Encyclopedia of History, Issues, and Society (2001) ("Gambling in America"), UK Pat. App. No. GB2,382,911 to Chambers ("Chambers"), *Commonwealth v. McClintock*, 257 Mass. 431, 432-35, 154 N.E. 264, 264 (1926), *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105-06 (1925), In re: FOE Aerie 2171, Testimony of William Riedthaler, *Proceedings Before the Liquor Control Commission of the State of Ohio*, Case No. 1342-05 (Oct. 19, 2005) ("Riedthaler Testimony"), Ohio Senate Bill No. 220 and Dennis Papp, *Ohio SB 220 Bill Analysis – Legislature Service Commission*, 126th General Assembly Regular Session (October 27, 2005) ("Dennis Papp SB 220 Analysis," collectively "Ohio SB 220"), Slade Gordon, et al., *Lotteries -- Gambling -- Pinball Machines -- Punchboards -- Pull Tabs -- Cards -- Bingo -- Authority To License -- City – County*, Wash. Att'y Gen. Op. 1969 NO. 9, 1969 WL 98526 (Apr. 30, 1969) ("Gordon Gambling Article"), at least one version of the Tic-tac-Fruit game that was publically disclosed, used and/or commercialized before the filing date of the '223 patent including similar versions developed by or with Pace-o-matic that utilize different branding or graphics ("TTF"), U.S. Pat. Pub. No. 2004/0224745 to Bregenzer ("Bregenzer"), U.S. Pat. Pub. No. 2004/0224745 to Muir et al. ("Muir"), and/or U.S. Pat. No. 6,602,133 to Chan ("Chan"), Marshall Fey, *Slot Machines a Pictorial History of the First 100 Years*, Liberty Belle Books (1989) ("Fey 1989"), and/or Marshall Fey, *Slot Machines An Illustrated History of America's Most Popular Coin-Operated Gaming Device*, Stanley Paher Nevada Publications (1983) ("Fey 1983").

Michaelson is prior art under at least 35 U.S.C. § 102(b). Michaelson was filed March 6, 2003 and published September 9, 2004.

Marchini is prior art under at least 35 U.S.C. § 102(b). Marchini published May 24, 1992.
Walker is prior art under at least 35 U.S.C. § 102(b). Walker published March 27, 2003.
Kowell is prior art under at least 35 U.S.C. § 102(e) because it claims priority to at least provisional application No. 60/815,352 filed on June 21, 2006 ("Kowell Provisional").
Weingardt is prior art under at least 35 U.S.C. § 102(b). Weingardt issued January 9, 1996.
Daly is prior art under at least 35 U.S.C. § 102(e).  The application resulting in Daly was filed March 24, 2005.

---

[1] Claims 44, 47, 49-51, 54, 56 and 57 are the only claims identified in Plaintiffs' April 6, 2020 infringement contentions. Accordingly, only those claims are addressed in this chart. Nothing in this chart should be construed as admitting validity of any claim of the '223 patent. Should Plaintiffs be permitted to add additional claims at a later date, Defendants reserve their rights to submit Amended Preliminary Invalidity Contentions, including but not limited to additional arguments regarding current prior art references and additional prior art references, claims which fail due to failure to meet the indefiniteness and/or written description requirements of Section 112, and/or claim terms for construction, as appropriate.

1

Farrell is prior art under at least 35 U.S.C. § 102(b). Farrell published February 10, 1991.

Gambling in America is prior art under at least 35 U.S.C. § 102(b). Gambling in America published in 2001.

Chambers is prior art under at least 35 U.S.C. § 102(b). Chambers published June 11, 2003.

*Commonwealth v. McClintock*, 257 Mass. 431, 432–35, 154 N.E. 264, 264 (1926) is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1926.

*State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105–06 (1925) is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1925.

The Riedthaler Testimony is prior art under at least 35 U.S.C. § 102(a). The Riedthaler Testimony was given publicly in a proceeding before the Ohio Liquor Control Commission on October 19, 2005.

The Ohio SB 220 is prior art under at least 35 U.S.C. § 102(e) & (a). The Ohio SB 220 was introduced and publicly available at least as early as October 27, 2005, as evidenced by at least the Dennis Papp SB 220 Analysis.

The Gordon Gambling Article is prior art under at least 35 U.S.C. § 102(b). The Gordon Gambling Article was published April 30, 1969.

Bregenzer is prior art under at least 35 U.S.C. § 102(b). Bregenzer published November 11, 2004.

Muir is prior art under at least 35 U.S.C. § 102(b).  The application that published as Muir was filed August 2, 2004, and Muir published January 6, 2005.

Versions of TTF were available as prior art to the '223 patent as a product that was known, used by others, and/or on sale in the United States before the invention of the '223 patent pursuant to 35 U.S.C. § 102(a) and § 102(b).  Pace-O-Matic, Inc. developed and Ohio Skill Games distributed at least some versions of the game prior to the filing date, priority dates or purported conception dates of the '223 patent including versions (including but not limited to 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27) that were distributed at least as early as February 11, 2005.  Pace-O-Matic may have distributed or worked in concert with others to distribute similar games such as those having different graphics and branding prior to the filing date, priority dates or purported conception dates of the '223 patent. Evidence of the features of the TTF game are also shown in the Pittsburgh Post-Gazzette's article "Ohio 'skill' game a cross-border lure," which was published April 30, 2006, and is available at https://www.post-gazette.com/local/casino-news/2006/05/01/Ohio-skill-game-a-cross-border-lure/stories/200605010141 ("Gazette Article"). Also, evidence of the features of the TTF game are shown in Tic-Tac-Fruit: An Analysis, Clay S. Turner, published November 15, 2004 ("Turner Report").  The printed publications discussed above with respect to TTF also independently qualify as prior art with respect to the '223 patent. These publications also constitute prior art pursuant to 35 U.S.C. § 102(a) and § 102(b) and, at a minimum, are combinable under § 103 to render the asserted claims obvious.

2

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 44** [44.pre] An electronic gaming system comprising: | To the extent the preamble is limiting, Michaelson discloses "[a]n electronic gaming system." [2]<br><br>"A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and instructs the gaming terminal to generate another proposed game outcome for authorization."  Michaelson at Abstract.<br><br>"Referring now to the drawings, as illustrated in FIG. 1A, one embodiment of the present invention includes a plurality of gaming devices or gaming terminals 10 a, 10 b and 10 c located in a gaming establishment, such as a casino, coupled by one or more communication links 12 a, 12 b and 12 c to a central controller or central processor 14. The communication links 12 can be any of a plurality of devices known to those of skill in the art for receiving data transmissions to and from the gaming terminal. The central processor maintains supervision over the entire network of gaming terminals." Michaelson ¶ 35<br><br>"Two embodiments of the gaming terminal or gaming device of the present invention are shown in FIGS. 2A and 2B as gaming terminal 10 a and gaming terminal 10 b, respectively. Gaming terminal 10 a and/or gaming terminal 10 b are generally referred to herein as gaming terminal 10. Gaming terminal 10 is in one embodiment a slot machine having the controls, displays and features of a conventional slot machine. It is constructed so that a player can operate it while standing or sitting, and gaming terminal 10 is preferably mounted on a console. However, it should be appreciated that gaming terminal 10 can be constructed as a pub-style table-top game (not shown) which a player can operate preferably while sitting. Furthermore, gaming terminal 10 can be constructed with varying cabinet and display designs, as illustrated by the designs shown in FIGS. 2A and 2B." Michaelson ¶ 39. |

---

[2] All bolding, italics, coloring, underlining, brackets, ellipses, cropping of figures, and spacing-corrections added, unless otherwise stated. Any such bolding, italics, coloring, underlining, brackets, ellipses, cropping of figures, spacing-corrections, and otherwise that are not intended to be limiting, and should not be interpreted as such, but instead are added for instructional and clarity purposes only.

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | See Michaelson at Figs. 1-3. |
| [44.1] an electronic game terminal including a touch screen display; | Michaelson discloses "an electronic game terminal including a touch screen display." "A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming |

4

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and instructs the gaming terminal to generate another proposed game outcome for authorization."  Michaelson at Abstract. |
| | "The present invention relates to a central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller. The present invention includes a central controller and a plurality of gaming terminals in communication with the central controller." Michaelson ¶ 12. |
| | "In one embodiment illustrated in FIG. 1B, a plurality of the gaming terminals are configured so that different gaming device or gaming terminals may be used to play different types of games. That is, the central controller 14 may be in communication via one of more communication links 12 with a plurality of gaming devices or gaming terminals 10 a that are used for playing a slot machine style game, a different plurality of gaming devices or gaming terminals 10 b that are used for playing a poker style game, a different plurality of gaming devices or gaming terminals 10 c that are used for playing a blackjack style game, and the like. This embodiment enables the central controller to authorize every game outcome for game(s) played on every gaming terminal in the network of central determination gaming terminals. In an alternative embodiment, all of the gaming terminals which are coupled to the central processor are configured to play the same type of game. In another embodiment, a plurality of gaming terminals may each be configured for playing a plurality of different games. |
| | Two embodiments of the gaming terminal or gaming device of the present invention are shown in FIGS. 2A and 2B as gaming terminal 10 a and gaming terminal 10 b, respectively. Gaming terminal 10 a and/or gaming terminal 10 b are generally referred to herein as gaming terminal 10. Gaming terminal 10 is in one embodiment a slot machine having the controls, displays and features of a conventional slot machine. It is constructed so that a player can operate it while standing or sitting, and gaming terminal 10 is preferably mounted on a console. However, it should be appreciated that gaming terminal 10 can be constructed as a pub-style table-top game (not shown) which a player can operate preferably while sitting. Furthermore, gaming terminal 10 can be constructed with varying cabinet and display designs, as illustrated by the designs shown in FIGS. 2A and 2B."  Michaelson ¶¶ 38-39. |
| | "As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 |

5

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game." Michaelson ¶ 47.<br><br><br><br>*See* Michaelson at Figs. 1-3. |
| [44.2] a game processor for generating an interactive electronic game on the game terminal, the game processor configured for: | To the extent that the term "game processor" does not invoke § 112, ¶ 6 and is not found to be indefinite, then it and the functions it performs are disclosed, taught, and/or suggested as shown below.<br><br>Michaelson discloses "a game processor for generating an interactive electronic game on the game terminal, the game processor configured for." |

6

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Central determination gaming systems are also generally known. A central determination gaming system provides a plurality of individual gaming terminals or devices, located in a gaming establishment, such as a casino, coupled by one or more communication links, to a central processor or computing system. When a player plays a game on one of the gaming devices a game outcome is determined at the central processor based on probability data. The determined game outcome is communicated from the central system to the individual gaming device and then provided to the player. It should be appreciated that one central processor may continuously determine the game outcomes for hundreds or thousands of individual gaming devices at once."  Michaelson ¶ 8.<br><br>"Referring now to the drawings, as illustrated in FIG. 1A, one embodiment of the present invention includes a plurality of gaming devices or gaming terminals 10 a, 10 b and 10 c located in a gaming establishment, such as a casino, coupled by one or more communication links 12 a, 12 b and 12 c to a central controller or central processor 14. The communication links 12 can be any of a plurality of devices known to those of skill in the art for receiving data transmissions to and from the gaming terminal. The central processor maintains supervision over the entire network of gaming terminals."  Michaelson ¶ 35.<br><br>"As illustrated in FIG. 3, the general electronic configuration of gaming terminal 10 preferably includes: a processor 138; a memory device 140 for storing program code or other data; a central display device 130; an upper display device 132; a sound card 142; a plurality of speakers 136; and one or more input devices 144. The processor 138 is preferably a microprocessor or microcontroller-based platform which is capable of displaying images, symbols and other indicia such as images of people, characters, places, things and faces of cards. The memory device 140 can include random access memory (RAM) 146 for storing event data or other data generated or used during a particular game. The memory device 140 can also include read only memory (ROM) 148 for storing program code which controls the gaming terminal 10 so that it plays a particular game in accordance with applicable game rules and pay tables.<br><br>As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game. |

7

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | It should be appreciated that although a processor 138 and memory device 140 are preferable implementations of the present invention, the present invention can also be implemented using one or more application-specific integrated circuits (ASIC's) or other hard-wired devices, or using mechanical devices (collectively and/or alternatively referred to herein as a "processor"). Furthermore, although the processor 138 and memory device 140 preferably reside on each gaming terminal 10 unit, it is possible to provide some or all of their functions at a central location such as a network server for communication to a playing station such as over a local area network (LAN), wide area network (WAN), Internet connection, microwave link, and the like." Michaelson ¶¶ 46-48.<br><br> |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | See Michaelson at Figs. 1-3. |
| [44.3] constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols; | Michaelson discloses "constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols."<br><br>"In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any. The proposed game outcome is determined identical to how a game outcome is determined in, a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate |

9

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13. |

"Each reel 134 displays a plurality of indicia such as bells, hearts, fruits, numbers, letters, bars or other images which preferably correspond to a theme associated with the gaming terminal 10. The symbols and indicia used on and in gaming terminal 10 may be in mechanical, electronic, electrical or video form. Furthermore, gaming terminal 10 preferably includes speakers 136 for making sounds or playing music.

As illustrated in FIG. 3, the general electronic configuration of gaming terminal 10 preferably includes: a processor 138; a memory device 140 for storing program code or other data; a central display device 130; an upper display device 132; a sound card 142; a plurality of speakers 136; and one or more input devices 144. The processor 138 is preferably a microprocessor or microcontroller-based platform which is capable of displaying images, symbols and other indicia such as images of people, characters, places, things and faces of cards. The memory device 140 can include random access memory (RAM) 146 for storing event data or other data generated or used during a particular game. The memory device 140 can also include read only memory (ROM) 148 for storing program code which controls the gaming terminal 10 so that it plays a particular game in accordance with applicable game rules and pay tables." Michaelson ¶¶ 45-46.

"The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52.

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |

*See* Michaelson at Figs. 1-3. |
| [44.4] determining at least one winning combination for each play of the game; | Michaelson discloses and/or renders obvious "determining at least one winning combination for each play of the game."

Michaelson discloses that some "regulatory bodies permit the use of wagering gaming devices which are guaranteed to provide certain or definite awards." At a minimum, Michaelson' teachings confirm that it would have been obvious to a POSITA to try using the claimed step in a gaming device to determine a winning combination for each play of the game to guarantee a winning experience for the player; that there were design incentives or market forces prompting those in the field to find ways to provide a winning experience for a player, that multiple methods were well known to provide and enhance the winning experience for a player, and that the claimed step (to the extent not specifically disclosed in Michaelson) is merely a variation that would have been predictable to a POSITA; and that a POSITA |

11

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | would have been led and prompted to modify Michaelson's gaming device to implement the claimed step to achieve the goal of guaranteeing the player the opportunity to achieve certain game elements and to have a winning experience.<br><br>"After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome."  Michaelson ¶ 52.<br><br>"Regulatory bodies in certain jurisdictions do not permit the use of probability-based gaming devices in-part for these reasons. These regulatory bodies permit the use of wagering gaming devices which are guaranteed to provide certain or definite awards, so that, for example, a certain number of wins is guaranteed and the overall amount paid back to players is guaranteed. That is, the payback percentage is fixed and not an average expected amount." Michaelson ¶ 5.<br><br>***Obviousness***<br><br>To the extent that Michaelson does not disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone, and that implementing an operation where there is "one winning combination for each play of the game" would have been obvious to a PHOSITA to try, and would have been possible to try through known and simple techniques and substitutions.<br><br>To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of Bregenzer, Walker, Fey 1983, Fey 1989, and/or TTF. There are many reasons a PHOSITA would have looked to, and incorporated disclosures from at least these references. One such reason is that the references are directed toward the construction and operation of gaming devices. Additionally, a PHOSITA would seek to modify Michaelson to drive user enthusiasm for playing the game, to promote the game and drive user excitement about the game and encourage users to play and continue playing the game; to further distinguish the game over a game of |

12

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | chance and would have looked to other references to confirm or inform the PHOSITA's knowledge.  A POSITA would have also been motivated to modify the primary reference alone and/or in view of the teachings of the other cited references to implement these features to remove the element of chance so that it could be played in a particular state or city where games of chance were not allowed.  Any such modification, substitution, or combination would have been obvious to try and would have been well within a PHOSITA's skill.<br><br>*See, e.g.*,<br><br>"An apparatus and method for playing a gaming machine in which the player is told in advance that the indicia displays will reveal a winning combination, and that all the player needs to do is choose the correct Subset of indicia in order to obtain the winning combination."  Bregenzer at Abstract.<br><br>"Above the video screen 20 is a paytable 49. In addition to the information usually displayed in a paytable, the paytable, in one of the preferred embodiments advises the player that every spin of the reels will result in a winning combination on some subset of the indicia displays. The player chooses which subset of indicia displays he or she will use, in the embodiment set forth in FIG. 1, by pressing the touchscreen 20." Bregenzer at ¶ 12.<br><br>"In one of the preferred embodiments, the gaming machine is a five-reeled mechanical slot machine. A display advises the player that every game has at least one winning combination. This display can be a video screen, an LED display, a plasma screen, or even a sticker or other written notice attached to the game. In another embodiment, the player is advised that there will be at least one winning combination displayed by the indicia display. This can be done in any number of ways including sound effects, an LED display, a VFD display, a plasma screen, a video screen, a touch screen, a sticker, words printed or placed on the gaming machine itself, a sign, or some other method of conveying information to a player. Thus, if the player chooses correctly, the player will win on every play. This is a significant advantage to this invention over prior art inventions, in that the player knows that if he or she chooses right, the player will win every time, as opposed to prior art slot machines where the player knows that there will be certain plays that are losing results. While this may seem to be a problem, since the player must necessarily lose money in order for the casino to make money, it is actually not a problem. For example, in the case of a five reel slot machine wherein the player chooses three reels, the player has a just a 60% chance of picking the correct three reels. Thus, while the player has the impression that every spin of the reels is a winner, in actuality, the odds of a player winning is much less. A benefit to this is that a game can have a lower hold (i.e., be more profitable) while still giving the impression that it pays out more frequently than it really |

13

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | does. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods commonly known in the art to activate a gaming machine, the player is given the opportunity to choose three of the five reels to play. This can be done by selection buttons associated with each reel. The player cannot choose more than three reels or less then three reels. Once the player makes the selection, the reels are spun. Using the three reels chosen by the player, the game then determines whether a winning combination is displayed on the three reels chosen by the player. If there was a winning combination, then coins or credits are paid out. It is understood that coins can be paid out either directly, or credits can be added to the credits already on the game. The player is also provided the opportunity to see what the results could have been if the player had chosen a different three reels. For example, the three reels chosen by the player may not reveal a winning combination. But had the player chosen a different set of three reels, the player would have had a winning result. This gives the player the sense that they have a direct impact on the game, thereby increasing player enjoyment." Bregenzer ¶ 14.<br><br>"In another preferred embodiment, the gaming machine is a five-reeled video slot machine. It will be understood that while five reels is preferred, the game can be instituted on any number of reels. A display advises the player that every game has at least one winning combination. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods commonly known in the art to activate a gaming machine, the player is given the opportunity to choose three of the five reels to play. This can be done by selection buttons associated with each reel, or a touch screen. The player selects the required number of reels, usually less than the total number of reels. Once the player makes the selection, the reels are spun. Using the reels chosen by the player, the game then determines whether a winning combination is displayed. If there was a winning combination, then coins or credits are paid out. It is understood that coins can be paid out either directly, or credits can be added to the credits already on the game. The player is also provided the opportunity to see what the results could have been if the player had chosen a different three reels. For example, the reels chosen by the player may not reveal a winning combination, but had the player chosen a different set of three reels, the player would have had a winning result. Thus the game could notify the player that he or she did not choose reels that revealed a winning combination, but had the player chosen an alternate group of reels, the player would have won 'x' number of coins. This gives the player the sense that they have a direct impact on the game, thereby increasing player enjoyment. It also gives the player a sense that if they had played better, they would have won. It also gives the player a sense that there is a lot of money to be won, even if they are not winning it, there is still the possibility to win on every turn." Bregenzer ¶ 17.<br><br>"A display advises the player that every game has at least one winning combination. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods |

14

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | commonly known in the art to activate a gaming machine, the reels spin. The results of the reels are not immediately displayed to the player. Rather, they are obscured or not shown to the player. The player is then prompted to choose some subset of the reels." Bregenzer ¶ 18.<br><br>"In another embodiment, not only is the player told that there is at least one winning combination, the player is specifically told what types of potential winning combinations there are for that particular game. For example, assuming the player has spun the reels before selecting the reels to play, the game can determine that using all five reels, there are winning combinations resulting in a payout of two coins, five coins, and 100 coins. Thus, the player knows that there is a chance for a significant win. This also increases the anticipation associated with the game, leading to more exciting play." Bregenzer ¶ 19.<br><br>"In terms of the mechanics of implementing the instant invention, it will be well understood by one skilled in the art how to implement this instant invention using a processor or processors to control the gaming machine. It will also be well understood that the software and firmware that controls the game is stored on various memory devices, such as a ROM, EPROM, EEPROM, flash memory, hard drive, disk drive, or other alterable or inalterable memory or memories, and that the memory devices are linked to the processor or processors." Bregenzer ¶ 28. |

15

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  |  Bregenzer at Fig. 3<br><br>*See also, e.g.,*<br><br>"Based upon our evaluation of game play, a winning outcome is attainable for every game played." Farley Report at p. 18.<br><br>"It should be noted that the initial nine (9) symbols displayed will not present an automatic winning combination. The player must engage in the selection of the symbol to be replaced with a "Wild Card" in order to obtain a winning game outcome." Farley Report at 2.<br><br>"It is impossible to win the game being played without active participation by the player. The player can win or lose each play based upon the player's skill. The outcome of the task, game or play is controlled only by the person actively participating in the game. The outcome is determined exclusively by the player and not the machine. The machine does determine the prize which can be won for each play." Fawley Letter at 4. |

16

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See also, e.g.,*<br><br>"Applicants have recognized that many different types of players would find it appealing to ensure they will enjoy one or more aspects of a winning experience. For example, many types of players would find it appealing to be guaranteed a win at a game of chance, to be guaranteed to achieve a winning outcome, to be guaranteed to achieve one or more game elements, or to be guaranteed a positive payout amount." Walker ¶ 22.<br><br>"Some types of players would find it appealing to be guaranteed the occurrence of one or more aspects of a winning experience in exchange for a payment. For example, some players would find it appealing to provide a payment and in return be permitted to have play of a game continue until he wins. Some players would also find it appealing to be able to break a 'cold streak' at a game of chance by guaranteeing the occurrence of one or more aspects of a winning experience.<br><br>Applicants have also recognized that many different types of parties would benefit in various ways from participating in a payout to a player. Also, many different types of parties, including without limitation merchants and casinos, may benefit from the use by players of gaming devices that offer opportunities to players to enjoy aspects of a winning experience." Walker ¶¶ 24-24.<br><br>"Referring to FIG. 10, a flow chart 1000 represents an embodiment of the present invention that may be performed by a gaming device, including, without limitation, a video poker machine and a video slot machine. The particular arrangement of elements in the flow chart of FIG. 10, as well as the other flow charts discussed herein, is not meant to imply a fixed order to the steps; the steps can be practiced in any order that is practicable for various embodiments of the present invention.<br><br>The gaming device provides an offer to a player, the offer including a guarantee of providing a winning experience in a game of chance, in exchange for a payment (step 1010). The gaming device receives a payment from the player (1020). The gaming device also provides the guaranteed winning experience to the player (1030) in accordance with the offer."  Walker ¶¶ 159-60.<br><br>"In some embodiments, the player may be offered a winning experience comprising a guaranteed benefit. For example, the guaranteed benefit may comprise allowing the player to spin at least one reel of a slot machine as many times as necessary to achieve an outcome that corresponds to a payout amount that is greater than zero. Similarly, the guaranteed benefit may comprise allowing the player to receive as many |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | hands of cards (or other sets of game symbols) as is necessary to achieve an outcome that corresponds to a payout amount that is greater than zero.<br><br>In some embodiments, the guaranteed benefit comprises allowing the player to spin at least one reel of a slot machine as many times as is necessary to achieve a payout amount that is greater than a predetermined threshold. For example, in exchange for providing a payment (e.g., $12), the player may be allowed to re-spin, without providing any additional payment, as many times as is necessary to accumulate a number of credits above a particular threshold (e.g., $10). For instance, one spin may correspond to a $2 payout, and another spin may correspond to a $4 payout, and so on. The player may re-spin without additional wagering until the accumulated payout amount reaches or exceeds the threshold." Walker ¶¶ 161-162.<br><br>"In some embodiments, the guaranteed benefit comprises allowing the player to spin at least one reel of a slot machine as many times as is necessary to achieve a predetermined outcome. For example, as described variously herein, in exchange for a payment, the player may be guaranteed the ability to play a game of chance through any number of iterations (e.g., generation of outcomes) until the occurrence of a particular outcome (e.g., a target outcome).<br><br>In some embodiments, the guaranteed benefit comprises a positive payout that is based on the number of iterations that were necessary to achieve a target outcome." Walker ¶¶ 163-164. |

18

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | Walker at Fig. 10.<br><br>*See also, e.g.,* |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |
Fey 1983 at 150; Fey 1989 at 150; *see also* Fey 1983 at 151-157; Fey 1989 at 151-157. |

20

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [44.5] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | Based on Plaintiffs' apparent interpretation of this limitation during prosecution and as presented in its Infringement Contentions for the '223 patent (*see, e.g.,* Exs. A-K), Michaelson discloses and/or renders obvious "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."<br><br>For example, to the extent that Plaintiffs contend that paragraph 39 of the published application of the '223 patent provides written description and enablement support for limitation 44.e and this contention is determined to be correct, then prior art Michaelson discloses this limitation. *See, e.g.,:*<br><br>"The slot machine gaming terminal presents or displays the game outcome presentation associated with the slot machine gaming terminal generated proposed win S2 as a specific reel symbol combination. The poker style gaming terminal presents or displays the game outcome presentation associated with the poker style gaming terminal generated proposed win S5 as a specific hand of cards. As discussed above, this embodiment enables one central controller to authorize a plurality of game outcome generated by a plurality of different gaming terminal in a casino or other entity and thus assists the casino or other entity in maintaining proper records, controlling gaming, reducing and preventing cheating or electronic or other errors and the like.<br><br>The present invention provides a number of advantages over existing central determination gaming systems. For example, since the gaming terminals of the present invention are generating game outcome presentations (that are used to determine the proposed game outcomes) in an identical manner as probability based gaming terminals, the presentation to the player is the exact same as playing a probability based gaming terminal. That is, the game out comes are determined as in a probability based gaming terminal with the additional step, undetectable to the player, of the central controller authorizing or double checking the availability of the proposed game outcome prior to providing the generated outcome to the player. For example, in a slot machine gaming terminal, in the amount of time the reels of a probability based slot machine spin, the present invention is operable to perform the functions described above, multiple times if necessary, in order to authorize a gaming terminal generated proposed game outcome." Michaelson ¶¶ 63-64.<br><br>"Furthermore, even though the central controller maintains a pool of predetermined game outcomes (which guarantees a specific amount of actual wins and losses), since the gaming terminals are generating game outcome presentations (that are used to determine the proposed game outcomes) based on probabilities, over the course of the play cycle, the game outcomes generated from the plurality of gaming |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | terminals in the central determination gaming system will mirror a network of probability based gaming terminals in a non-central determination gaming system. That is, the present invention provides the advantage of a network of contemporary gaming terminals that determine game outcomes based on probability data while also com plying with certain jurisdictional regulations that require gaming terminals which are guaranteed to provide certain or definite awards. This increases the player's level of excitement and enjoyment because the network of gaming terminals in the central determination gaming system retains the look and feel of contemporary probability based gaming terminals." Michaelson ¶ 65.<br><br>"In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome." Michaelson at Abstract.<br><br>*See* Michaelson at Figs 3-5.<br><br>*__Obviousness__*<br><br>To the extent that Michaelson does not disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone. A PHOSITA would have recognized that "testing" and "determin[ing]" that the outcome is what should be presented would have been obvious to a PHOSITA to try, and would have been possible to try through known techniques and substitutions.  A PHOSITA would have been motivated to implement an algorithm to test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field in order to prevent erroneous game fields from being presented that could result in unexpected wins and more valuable than intended prizes from potentially being won.  This would have been possible to try through known techniques and substitutions.<br><br>To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of TTF.  Indeed, based on Plaintiffs' apparent interpretation of this limitation during prosecution and as presented in its Infringement Contentions for the '223 patent (*see, e.g.,* Exs. A-K), TTF discloses "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."  There are many reasons a PHOSITA would have looked to, and incorporated these disclosures. One such reason is that both references are directed toward |

22

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | the construction and operation of gaming devices.  Additionally, a PHOSITA modifying the Michaelson game might have been interested in systems and/or software algorithms for how to test game fields for potential winning combinations, and would have looked to these disclosures to confirm or inform the PHOSITA's knowledge and to understand known ways to test for and prevent erroneous winning combinations from being presented and generated during game play.<br><br>*See also, e.g.,*<br><br>"Essentially, Tic-Tac-Fruit presents a task whereby the player must select the appropriate symbol to replace with a "Wild" symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random section from a finite pool of available prizes. The device selects the quantity of lines which will present a winning outcome. The prize is determined by a random selection from a Prizes may be presented on 1, 2, 3 or 4 lines in a single game play. **The device then selects the level of prize(s) to be awarded. A software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented. The key symbol needed to attain the highest value prize is replaced with a non-winning symbol prior to display to the player.** The player is then presented with the puzzle to solve for the highest value prize. A successful selection of symbol replacement will award the player with the prize." Farley Report at 2.<br><br>In addition, to the extent that Plaintiffs contend that other references to testing in the '223 patent provide written description and enablement support for limitation 44.e and this contention is determined to be correct, then prior art TTF discloses this limitation. *See, e.g.*,:<br><br>"[Tic-Tac-Fruit] using computer to count through the combinations and testing each combination to see if it has any lines that are complete … . Again a computer program is used to find all of the initial no-line fields, and then each of these are subsequently tested for potential winners where all that can potentially complete a line are counted." Turner Report at 1-2.<br><br>"Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are:<br>1. Choose the number of winning lines. One of {1,2,3, 4}<br>2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal.<br>3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc.<br>4. Fill in empty spots with random symbols. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | 5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. |
| [44.6] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; | It appears that Plaintiffs are taking the position that this limitation can be met by a prize viewer. Defendant's disagree with Plaintiff's contentions.  Nevertheless, depending upon the outcome of claim construction, one or more of the following disclosures may render this limitation, in combination with the other elements of the asserted claims, obvious.

For example, Michaelson discloses that the gaming device "displays a plurality of reels" with symbols, and a POSITA would have recognized that those symbols would have been displayed prior to a user beginning game play.  At a minimum, Michaelson's teachings confirm that it would have been obvious to a POSITA to try using the claimed step in a gaming device to display an actual game to be played prior to initiating game play; that there were design incentives or market forces prompting those in the field to automatically display an actual game and that the claimed step (to the extent not specifically disclosed in Michaelson) is merely a variation that would have been predictable to a POSITA; and that a POSITA would have been led and prompted to modify Michaelson's gaming device to implement the claimed step to achieve the desired goal.

"In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any. The proposed game outcome is determined identical to how a game outcome is determined in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player.

The proposed game outcome is communicated to the central controller or central processor before it is displayed to the player. In an alternative embodiment, only the value associated with the proposed game outcome is communicated to the central controller. It should be appreciated that the generated game |

24

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | outcome presentation is not communicated to the central controller, but is retained in the memory of the gaming terminal." Michaelson ¶¶ 13-14.<br><br>"Upon authorization, the gaming terminal displays or presents the randomly generated game outcome presentation and provides the authorized game outcome to the player. If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the associated value, if any, to the player and the game ends. If the authorized game outcome is a secondary game triggering outcome, the gaming terminal provides the associated value, if any, to the player and then enables the player to play a secondary or bonus game." Michaelson ¶ 18.<br><br>"In order to comply with the above mentioned regulatory rules that do not permit the use of gaming devices or terminals that provide probability based game outcomes, central determination gaming systems have been implemented wherein the central system maintains one or more predetermined pools or sets of game outcomes. Each game outcome in each pool includes a game outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value or payout amount, if any, and a game presentation component (i.e., how the game outcome is displayed or presented to the player). In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 9.<br><br>"Gaming devices having a primary or base game and a secondary or a bonus game are also well known. A secondary or bonus game may be any type of suitable game, either similar to or completely different from the primary game, which is entered upon the occurrence of a triggering event or a selected outcome in the primary game. The secondary or bonus game enables the player to obtain a prize or payout in addition to the prize or payout, if any, obtained from the primary game. A secondary or bonus game may produce a significantly higher level of player excitement than a primary game alone because it provides a greater expectation of winning than the primary game and is accompanied with more attractive or unusual features than the primary game." Michaelson ¶ 11.<br><br>"Additionally, even though a pool may include more than one of the same game outcome, such as more than one lose game outcomes in the pool, the presentation to the player, such as the reel symbol |

25

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | combination in a slot machine, cards dealt in a card game and the like, is preferably varied for each sequential game outcome. For example, in the twenty ticket pool described above, while three game outcomes may each determine a win game outcome with a value of $1, each game outcome will be preferably presented to the player as a multiple different or all different combinations of reel symbols in a slot machine game. This provides increased excitement for the player because the player is continuously presented with different combinations of reel symbols." Michaelson ¶ 7.<br><br>"In one embodiment, the central controller maintains at least one predetermined pool of predetermined game outcomes. Each predetermined game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and a value component or pay amount, if any. Each pool of predetermined game outcomes may include a plurality of each type of predetermined game outcome. For example, a pool of one thousand game outcomes may include hundreds of a lower range award and one or few of the highest award." Michaelson ¶ 36.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.<br><br>"In addition to winning base game credits, the gaming terminal 10, including any of the base games disclosed above, also includes secondary or bonus games that give players the opportunity to win credits. The gaming terminal 10 preferably employs a video-based display device 130 or 132 for the secondary or bonus games. The secondary or bonus games include a program that automatically begins when the player achieves a qualifying condition or a secondary game triggering outcome in the primary or base game.<br><br>In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should |

26

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶¶ 49-50. |

"If the proposed game outcome is a secondary game triggering outcome, the gaming terminal randomly generates a proposed secondary game outcome presentation identical to how the primary game outcome presentation is generated. The gaming terminal then determines, with the use of an appropriate pay table or other stored data, the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In this case, the gaming terminal combines the value associated with proposed secondary game triggering outcome, if any, and the value associated with the proposed secondary game outcome, if any, to determine the proposed game outcome that is communicated to the central controller for authorization, as described below. For example, if the gaming terminal determines that the secondary game triggering outcome has a value of $1 and the secondary game outcome has a value of $6, a proposed $7 win game outcome is communicated to the central controller for authorization." Michaelson ¶ 53.

"If the authorized game outcome is a secondary game triggering outcome (not shown), the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. As described above, even though the gaming terminal enables the player to play a secondary or bonus game, the secondary game outcome has already been determined and authorized along with the primary game outcome. That is, the gaming terminal does not communicate with the central controller regarding the secondary game outcome but rather provides the prior authorized secondary game outcome and presents the prior generated secondary game outcome presentation to the player.

In an alternative embodiment, if a secondary or bonus game triggering outcome is provided to the player, the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. In the secondary or bonus game, the gaming terminal randomly generates a proposed secondary game outcome presentation based on probability data. As described above, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In one embodiment, the proposed secondary game outcome presentation is independent of and not related to the game outcome provided in the primary or base game. The gaming terminal then communicates the proposed secondary game outcome to the central controller. The central controller determines if a pool of predetermined secondary game outcomes includes the proposed secondary game outcome. The central

27

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | controller then proceeds with authorizing the gaming terminal to provide the player with the proposed secondary game outcome as described above regarding the primary or base game." Michaelson ¶¶ 58-59.<br><br><br><br>*See* Michaelson at Figs. 2-5.<br><br>***Obviousness***<br><br>To the extent Michaelson alone does not anticipate or render obvious this limitation, it would have been obvious in view of the disclosures discussed below. A PHOSITA would have been motivated to combine Michaelson with the references discussed below. A PHOSITA building the apparatus/method disclosed by Michaelson would have recognized that Michaelson discloses displaying information on a screen before a user begins playing. A PHOSITA would have been interested in increasing a potential user's interest in the game. To the extent the PHOSITA required additional disclosures or information regarding the |

28

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | operation of Michaelson or similar systems, a PHOSITA would have looked to at least the references discussed below. Any modification or combination would have been well within a PHOSITA's skill. |
| | *See, e.g.,* |
| | "More particularly, the invention relates to an amusement device and a method for conducting a game wherein the player must properly demonstrate a skill in order to advance to a subsequent round of play." Kowell Provisional at 1. |
| | "The invention also provides a configuration wherein the player may preview the game to be played. In this configuration, the player may evaluate if he wishes to play the game by pressing a preview button that shows the player the first step of the game to be played as well as the prize that he will be playing for. If the player decides he wishes to play the game as a result of the evaluation, the player will deposit the money and initiate the game." Kowell Provisional at 3. |
| | "The game may also include an optional preview button that allows the player to learn the first step of the game that will be played next. The preview may also tell the player how much the prize will be if the player plays the game, makes the correct plays, and wins the game. For example, the preview button may show the initial card deal, dice roll, or game set up as well as the prize that will be awarded if the player participates and wins." Kowell Provisional at 4-5. |
| | "The method and apparatus of the invention may thus be used to teach a player the correct manner to play a game. When the preview option is used, the player may determine the initial deal of the cards before the player commits to playing the game. The preview would show the player that the initial deal will be a pair of tens and that the payout will be one dollar if the player makes the correct play." Kowell Provisional at 6. |
| | *See also, e.g.,* |
| | "2. The method of playing a game of bingo comprising: a) providing a player with a bingo card having a plurality of numbered spaces formed as a matrix having five rows and five columns used in the play of a five-by-five bingo game; b) providing a plurality of bingo balls each having individual numbers corresponding to the numbered spaces on the bingo card; c) a player making a first wager to be eligible for the five-by-five bingo game, d) a player making a second wager to be eligible for a progressive jackpot; e) randomly selecting consecutive bingo balls; 13 awarding a first preselected amount when the player |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | achieves a predetermined winning combination on the five-by-five matrix of the bingo card; g) designating a portion of the second wager to a separate progressive jackpot pool; h) establishing a predetermined combination as a winning combination for the progressive jackpot pool; and i) awarding the progressive jackpot pool to the player when he achieves the predetermined winning combination the bingo card." Weingardt at 7:31-55.<br><br>"It is a further feature of the present invention to provide a progressive jackpot feature to the game of bingo in which the player can become eligible for the progressive jackpot by making a separate wager" Weingardt at 3:7-10.<br><br>"A bingo card of the present invention is shown generally at 10 in FIG. 1. The bingo card 10 consists of a plurality of spaces that will includes numbers formed in a seven-by-seven matrix. The seven vertical columns 21, 22, 23, 24, 25, 211 and 27 each preferably include a symbol designating the column, e.g. the symbols B I N G O E S as shown in FIG. 1." Weingardt at 3:63-4:1.<br><br>"The player makes a first wager to be eligible for a game of bingo played using the 5x5 portion of the bingo card and a second wager to be eligible to play the a game of bingo using the 7x7 portion of the bingo card. The player also makes a third wager to be eligible for the progressive jackpot to which a portion of the third wager is designated." Weingardt at 6:5-11.<br><br>"FIG. 5 is a flow chart that depicts the method of play of an alternative preferred embodiment of the present invention. In this flow chart, the player is provided with a bingo card having a 5x5 matrix and a plurality of bingo balls are provided forming the selection pool. The player makes a first wager to be eligible for a game of bingo played using the 5x5 matrix of the bingo card and a second wager to be eligible for the progressive jackpot to which a portion of the second wager is designated." Weingardt at 6:19-27.<br><br>Weingardt at Figs. 1-2, 4-6.<br><br>*See also, e.g.*,<br><br>"Each spin of the reels constitutes a complete game. The gaming device includes a plurality of selectable reels, a selection system, an actuating system, a prize controller, and a reselection system. The selectable reels each have symbols located on their periphery, such that each selectable reel displays an outcome symbol after being spun." Daly at 2:6-11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The reselection system then substitutes a previously non-active reel for an active reel from the initial game, thereby designating a new set of active reels for a second game. This new set of active reels for the second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels lo produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game." Daly at 2:21-33.<br><br>"A preferred embodiment reel spinning gaming device, constructed in accordance with the present invention uses a plurality of reels, some of which are designated as active reels and some of which are designated as non-active reels, to provide a player with the opportunity to play multiple consecutive games of slots, with each subsequent consecutive game utilizing a portion of the reel symbols from the outcome symbol combination of the previous game. After an initial game that utilizes an initial set of active reels, the gaming device begins a second game by substituting a previously non-active reel from the initial game for an active reel from the initial game, thereby designating a new set of active reels for the second game. This new set of active reels for the second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels to produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game.<br><br>In this manner, the gaming device provides a player with the opportunity to play subsequent consecutive games in an attempt to improve upon the outcome symbol combination of the previous game. Accordingly, the present invention creates and maintains more excitement to a player. For instance, after receiving a game result that includes an outcome symbol combination that constitutes a 'near win' (i.e., one symbol away from a winning outcome symbol combination), the player still has the possibility of achieving a winning outcome symbol combination in a subsequent consecutive game." Daly at 6:17-38.<br><br>*See also, e.g.,*<br><br>"A portable sample play device, such as a player tracking card or other player-carried device, allows players or users of a gaming machine to view, and/or participate in, sample or preview play of a game. The portable sample play device can be a smart card that stores all necessary information itself, or a |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | known magnetic stripe card that simply stores rudimentary information. Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired." Muir at Abstract.<br><br>"Methods of attracting players to unfamiliar games on unfamiliar gaming machines thus would help gaming establishments attract further business. In addition, players benefit by gaining access and familiarity to a wider variety of games, many of which they may not have been familiar with. It is therefore desirable to develop ways to allow players to preview games, so as to introduce them to those games that may have previously been unfamiliar to them." Muir ¶ 4.<br><br>"Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired." Muir ¶ 5.<br><br>"The configuration of the gaming machine system 10 encompasses embodiments in which the back-end server 50 controls the operation of the gaming machines 20, 30. The system 10 also encompasses embodiments in which the gaming machines 20, 30 are each stand-alone units capable of operating play of their games largely without the back-end server 50. Like gaming machine 20, gaming machines 30 are configured to allow a player to play a game." Muir ¶ 22.<br><br>"The microprocessor 120 then retrieves information from the memory 130 and transmits it to the gaming machine 20. The information can include such items as time information indicating how much sample play time remains, as well as various parameters of the sample game, and perhaps identification identifying the player. Receipt of this information prompts the gaming machine 20 to initiate a preview of the game." Muir ¶ 24.<br><br>"However, if preview play is allowed, the various parameters of preview play are read (step 220), and the gaming machine 20 sets up preview play according to these parameters (step 230). The parameters, then, |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | are basically instruction sets that govern play of this game. For example, the parameters can include paytable values that indicate how much payment, if any, could be awarded to the player upon a favorable outcome such as a winning card hand." Muir ¶ 28.<br><br>"The card 100 can also set up preview play illustrating a specific sequence of outcomes, so that in a slot game, for instance, the player is guaranteed to see a four King outcome, or in video poker, the player is guaranteed to be dealt a full house. Such favorable outcomes make the game more attractive to the player, in part by demonstrating possible outcomes of interest to the player." Muir ¶ 28.<br><br>"Once preview play is set up according to the parameters stored in the smart card 100, preview play is initiated (step 240). As discussed above, this preview play can be interactive, permitting players to play hands of video poker or play a slot game, for instance. Preview play can also be passive, with the various parameters instructing the gaming machine 20 to simply show players, for example, card hands they could have been dealt or slot machine outcomes they could have received.<br><br>If a player wins, or is shown a winning outcome (step 250), the gaming machine 20 determines the appropriate award from the paytable (step 260), and presents that award to the player (270)." Muir ¶¶ 29-30.<br><br>"Preview play may include randomly generated results rather than predetermined results 610, although predetermined results 610 are often desirable to show users some of the better outcomes and potentially larger jackpots.<br><br>In the example of FIG. 7, players are an active participant in preview play, pulling handles or pressing buttons themselves to initiate game play. However, as discussed previously, the invention can also allow players to be passive observers. It should be clear that, once the player inserts his or her tracking card, the preview play of FIG. 7 can be run automatically, with the player simply observing how the game is played.<br><br>Likewise, the invention is also not limited to display of the outcomes shown. Rather, any display of outcomes is contemplated. Thus, the parameters need not include preset results. Randomly generated results can be employed to give players a sense of what typical game play entails. Conversely, the results can include sequences of some of the more desirable game outcomes (e.g., several good poker hands, big slot jackpots, and the like), so as to entice the player to play." Muir ¶¶ 43-45. |

33

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "For example, the invention contemplates preview play of any game capable of being played on a game machine, either by smart card or simple magnetic stripe tracking card. The invention also includes multiple modes of preview play, including but not limited to displays of typical game play, predetermined sequences of more favorable outcomes, and progressive play." Muir ¶ 47.

*See* Muir at Figs 1, 3-4, 7; claims 1-2, 5, 12.

*See also, e.g.*,

"In addition to the package of mints, 'chips' are sometimes delivered also. These 'chips' are metal discs which are stamped as being 'good for five cents in trade.' These 'chips' furnish the allurement of the game. In order to avoid the appearance of chance in the game, an indicator is provided with this machine which indicates to the purchaser in advance just what he will receive by a pull of the lever and a deposit of a nickel. At the first play of the lever the purchaser is usually advised by the indicator that he will receive nothing but a package of mints. The first pull of the lever sets the indicator, however, for the next play. It may indicate that for the second pull of the lever the purchaser will receive a specified number of 'chips' in addition to the mint package, or it may indicate that only a package of mints will be received. It is a question of chance at this point. If the indicator fails to promise 'chips' for the second pull, such promise may be there when it is set for the third pull. The promise is sure to come if the lever is pulled and the nickel dropped a few times successively." *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105-06 (1925).

"The defendant operated a slot machine containing rolls of mints. On its front were the words, 'Mints of quality for 5¢ you receive a package of all quality mints and premium checks.' On the face of the machine between the words 'and a premium' there was a 'recess in which any number from 'No' to '20' in denominations of two would appear.' When a five-cent coin was dropped in the slot at the top of the machine and the lever pulled, a package of mints would drop from the slot on the right, and discs corresponding to the number appearing on the face of the machine before the lever was pulled, would also drop from a slot at the foot of the machine. These discs or premium checks were good for additional packages of mints or 'for merchandise to the value of five cents for each disc.' When the lever was pulled, after depositing the five-cent piece, a new number from 'No to 20' would appear in the recess. Before pulling the lever the person dropping the five-cent piece in the slot would know what he was to receive. If 'No' appeared he would receive no premium check, but would receive a package of mints; if a number up to '20' appeared, he would receive a corresponding number of premium checks redeemable in merchandise. … The enumeration in the recess on the face of the machine informed the operator what he was to receive on each play, but with each operation of the machine there appeared in the recess a number |

34

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | showing the prize to be received on the following play. The chance was in the prospect of gaining this prize. This was the incentive which attracted the player. The chance of game from the second operation was the inducement. It was an appeal to the gambling desire, a temptation to take the chance of gaining a substantial prize by continuing to operate the machine. The machine was a gambling device." *Commonwealth v. McClintock*, 257 Mass. 431, 432-35, 154 N.E. 264, 264 (1926). <br><br> "One of most ingenuous attempts at seeking to avoid the tag of being a 'gambling' machine came early, as machines were developed that would tell the player exactly what they would win when they put the next coin in. There was no chance. Of course, what the player was seeking was a chance to play in order to find out what would come after that. Courts wrestled with definitions of gambling on these kinds of machines for many decades." *William N. Thompson*, Gambling in America, An Encyclopedia of History, Issues, and Society (2001). <br><br> *See also, e.g.*, <br><br> "Many special features are provided nowadays in fruit machines, indeed they have to some extent taken over from the basic game, in that most of the bigger wins are obtained by the features rather than by the initial result when the reels first come to a halt. In a so called 'ladder' or 'trail' feature, steps in the ladder or trail may be illuminated as a result of certain symbols, e.g. symbols bearing superimposed numbers, appearing on the win line. When the 'ladder' or 'trail' is completed, a jackpot prize or another feature which may result in a jackpot prize may be awarded." Farrell at 3:9-14. <br><br> "The display 1 comprises a reel display 2 which has three reels, 3, 4 and 5 showing various reel symbols, a matrix display 6 comprising a 3 x 3 grid of nine segments 7, a fourth reel 8 with numbers from 1 to 12 on it, a ladder 9 indicating progressive prizes, a nudge-pot counter 10, and a skill-shot feature 11. The reels 3, 4, 5 carry the normal fruit symbols, plus first reel symbols of noughts 12 and second reel symbols of crosses 13." Farrell at 4:10-13. <br><br> "The player will enter the prize ladder 9 at a level dependent upon the number of complete lines of O's or X's shown in the matrix, from one to eight (if eight lines are possible in the reel display; we actually prefer to provide a maximum possible score of six lines). The ladder has twelve prize levels. Thus the player enters the ladder 9 at the level corresponding to the number of the lines completed. When a line in the matrix is lit the player will have the option of (i) collecting the win corresponding to the relevant entry in the prize ladder 6 by pressing the collect button." Farrell at 4:19-24. |

35

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  |

*See also, e.g.,*

"Q. … All right. Now, if I come up to the machine, and I haven't put my dollar in yet, but this is now on the machine.
A. And this is the game that you'll be playing.
Q. And this is the game that I'm going to be playing.
A. Right.
Q. And I know ahead of time that all I would have done if I put $.50 into this machine, or if I'm going to play it, the only thing I was going to win was $.10?
A. Right." Riedthaler Testimony at 149:3-17.

"A. Yeah, in this case, what you have is, let's say you took the minimum and bet $.50. You would, knowing that you were going to give $.50, if you guess correctly, you would win $.15, or you would - -

36

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | I'm sorry, $.25 in that case.  So you would knowingly know that you're playing the game with the intent of losing." Riedthaler Testimony at 145:18-146:6.<br><br>"A. If you knew the outcome, you knew the schedule, and that you knew that the process you were going into, then it would be a skill. Because you would be playing knowing that you're going to lose. I don't know why you'd do that<br>Q. I understand, but if you did, you would determine this machine to be a skill-based machine?<br>A. The same as, let's say, pinball, if you're playing a game that you know that you receive so many points, you receive such-and-such a reward, yes." Riedthaler Testimony at 146:12-24.<br><br>*See also, e.g.,*<br><br>"Modifies the additional Gambling Law rules that apply to a machine that operates as described in the definition of 'skill-based amusement machine' by: (1) additionally requiring that the prizes or rewards for the machine must be established prior to the placing of a wager by the individual utilizing the machine, and that the individual must be aware of what prize or reward will occur prior to the start of play … ." Ohio SB 220 at 1.<br><br>"An individual utilizing a machine that involves a single task, game, play, contest, competition, or tournament may be awarded prizes based on the results of play, the prizes or rewards must be established prior to the individual placing a wager, and the individual must be aware of what prize or reward will occur prior to the start of play (existing law retained by the bill, except that the italicized language is added by the bill)."  Ohio SB 220 at 4.<br><br>*See also, e.g.,*<br><br>"Before proceeding further, we shall digress, briefly, to consider the developmental history of coin-operated gambling machines - for we believe that some understanding of their history is essential to place the type of machine with which we are dealing in proper context. The first coin-operated gambling machine was invented before the turn of the century. It featured three reels adorned with oranges, lemons, bells and bars; was operated by depositing a coin and manually pulling a lever; and quickly became known as the 'slot machine' or 'one-armed bandit.'" Gordon Gambling Article at *4.<br><br>"The factor of a prize was most often concealed. Slot machines which returned tokens or trade checks instead of cash appeared. A mint vendor was attached to one version so that the player "won" something |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | (a mint) on every play. Another variation merely indicated how much a person had won, requiring him to insert a second coin to receive his winnings. Sometimes the machines paid winnings in merchandise, or (during World War II) in ration tokens." Gordon Gambling Article at *5.<br><br>"If the player is successful in lodging the ball in a hole which corresponds to one of the numbers lighted on the backboard, the machine automatically returns to him the number of nickels shown in the list of odds on the backboard, and, if not successful in lodging the ball in one of said holes, he receives nothing." Gordon Gambling Article at *7.<br><br>In addition to the foregoing, it would have been obvious to a person of ordinary skill in the art with knowledge of the prior art, including the prior art describing the desired benefits of presenting prizes, game boards and the like to players before the user plays that game where such desired benefits include making the game more acceptable to gaming regulators, to automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play. For example, a person of ordinary skill in the art would appreciate that previewing an entire game field to be played is on the continuum of previewing a prize to be won for purposes of satisfying gaming regulators and that such an implementation would be obvious in view of the prior art.<br><br>*See, e.g.,* |

38

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |

Fey 1983 at 161; Fey 1989 at 161.

*See, e.g.*, Fey 1983 at 162-165; Fey 1989 at 162-165.

*See also, e.g.*,

"Returning to FIG. 2, the electronic puzzle generated by the puzzle generation module 6 in step S6 is displayed to the player at step S8 by the display module 10. Also, depending upon the game selected by the player and/or the skill level selected, the list of words 22 (FIG. 4) which are to be identified within the electronic puzzle grid 20 (FIG. 4) are also displayed to the player by the display module 10. After the electronic puzzle is displayed to the player, the clock module 8 establishes an amount of time at step S10. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | As further described below, the time is established in which the player must find a word or perform other actions depending upon the puzzle selected by the player. The amount of time established will depend upon the game and/or skill level selected by the player. For example, the amount of time established would be greater for a beginner skill level as compared to an expert skill level. Preferably, for example, the amount of time established is 30 seconds for the beginner level, 25 seconds for the intermediate level and 20 seconds for the expert level. Once the amount of time is established by the clock module 8, a clock is started at step S12 in response to a command from the player to start play of the game." Chan at 5:40-61.<br><br>"If the end of the list has been reached, then the puzzle generation module 6 determines, at Step S40, whether all the words from the list of puzzle words have been placed in the puzzle grid. If all the words have been used, then the puzzle generation module 6 returns to step S8 of FIG. 2. If any of the words were previously skipped in Step S36, then the puzzle generation module 6 performs a second pass of the words in the list of puzzle words and attempts to place the skipped words in the puzzle grid similar to that described above for placement of the subsequent words within the puzzle grid. If, at Step S44, the second pass has already been completed and all words from the list of puzzle words are still not placed in the puzzle grid, then the puzzle generation module 6 preferably clears the puzzle grid at Step S46 and starts the placement process over at Step S26. This process is preferably repeated until a completed puzzle grid is generated by the puzzle generation module 6." Chan at 5:1-17.<br><br>"If the player monitoring module 4 does not detect the specific action required by the game at Step S16, and the clock has reached the established amount of time at Step S20, the puzzle generation module 6 (FIG. 1) rearranges the electronic puzzle at Step S22. While the electronic puzzle is being rearranged, play is suspended. After the puzzle has been rearranged, the rearranged puzzle is then displayed to the player by the display module 10 at Step S8. If there have been any words identified by the player and marked in the puzzle grid, these words are also marked in the rearranged puzzle. An example of the displayed rearranged puzzle grid 20, with marked words which were previously identified by the player, is shown in FIG. 6." Chan at 6:34-46.<br><br>"In response to the selection of the puzzle and skill level by the player, the puzzle generation module 6 generates the electronic word-search puzzle at step S6. Preferably, the electronic word-search puzzle is in the form of a puzzle grid having a plurality of columns and rows which intersect to define a location for a letter. The electronic puzzle, however, can take other forms as dictated by the particular game to be played."  Chan at 3:55-62. |

40

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |

Fig. 2

*See also* Chan at Figs. 2-6, 3:12-4:67. |
| [44.7] determining if the player has decided to play the displayed game; and | Michaelson discloses "determining if the player has decided to play the displayed game."

"In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 9. |

41

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game." Michaelson ¶ 47.<br><br>"In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any."  Michaelson ¶ 13.<br><br>"In an alternative embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly determines a set or plurality of proposed game outcomes. The set includes any suitable number of proposed game outcomes. Each game outcome in the set is determined identical to how a game outcome is, generated in a probability based gaming terminal as described above." Michaelson ¶ 20.<br><br>"With reference to FIG. 4, in one embodiment of the present invention illustrating a slot machine style gaming terminal, to initiate operation of a primary or base game of the gaming terminal, the player must insert the appropriate amount of money or tokens and then pull the arm or push the play button. The reels will then begin to spin. As the wheels are spinning, the gaming terminal randomly generates a proposed game outcome as indicated in block 202. In an alternative embodiment, the gaming terminal randomly generates a proposed game outcome upon the player placing a wager in the gaming terminal." Michaelson ¶ 51.<br><br>"As illustrated in FIG. 5, in an alternative embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a set or plurality of proposed game outcomes as indicated in block 302. The set includes any preferable number of proposed game outcomes. As described above, each proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal." Michaelson ¶ 67. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | *See* Michaelson at Figs 2-5. |
| [44.8] displaying an outcome resulting from play of the displayed game. | Michaelson discloses "displaying an outcome resulting from play of the displayed game."<br><br>"Each game outcome in each pool includes a game outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value or payout amount, if any, and a game presentation component (i.e., how the game outcome is displayed or presented to the player). In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 10.<br><br>"Upon authorization, the gaming terminal displays or presents the randomly generated game outcome presentation and provides the authorized game outcome to the player. If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the associated value, if any, to the player and the game ends. If the authorized game outcome is a secondary game triggering outcome, the gaming terminal provides the associated value, if any, to the player and then enables the player to play a secondary or bonus game." Michaelson ¶ 18.<br><br>"If the pool of predetermined game outcomes includes at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is at least one), the central controller authorizes the proposed game outcome to be provided to the player and marks or flags one of the available proposed game outcomes in the pool as used or unavailable." Michaelson ¶ 15.<br><br>"A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming |

43

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and instructs the gaming terminal to generate another proposed game outcome for authorization." Michaelson at Abstract.<br><br>"If the pool of predetermined game outcomes includes at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is at least one), the central controller authorizes the gaming terminal to provide the proposed game outcome to the player as indicated in block 208. The central controller flags or marks the proposed game outcome in the pool as used or unavailable as indicated in block 210. Once a proposed game outcome is flagged or marked as used or authorized, it is prevented from subsequent authorization by the central controller. It should be appreciated that if the pool of game outcomes includes more than one of the same game outcome and one of the game outcomes is flagged or marked, the remaining same game outcomes are still available for subsequent authorization. In the slot machine example used above, if the pool of game outcomes includes thirty available win $5 game outcomes and the central controller flags or marks one of the available win $5 game outcomes, the flagged win $5 game outcome would no longer be available for a subsequent authorization but the remaining twenty-nine win $5 game outcomes would remain available for subsequent authorizations. In the embodiment wherein the central controller stores information or data regarding the number of available game outcomes in a pool for each possible value, upon the authorization of a proposed game outcome, the central controller reduces the number of available game outcome in the pool with the same value as the value associated with the proposed game outcome by one.<br><br>If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the authorized game outcome and the associated value, if any, to the player as indicated in block 212. The gaming terminal also presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) to the player. For example, in the slot machine gaming terminal used above, the gaming terminal provides the player a win $5 game outcome and displays a reel symbol combination of a star symbol on each reel." Michaelson ¶¶ 56-57.<br><br>*See* Michaelson at Figs 2-5. |
| **Claim 47**. The electronic gaming system of claim 44 wherein the | Michaelson discloses "the displayed game comprises a two-dimensional array of game symbols." |

44

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| displayed game comprises a two-dimensional array of game symbols. | "That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13.

"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.

"In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶ 50.

"The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  |

47

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See* Michaelson at Figs. 1-5. |
| **Claim 49**. The electronic gaming system of claim 44 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols. | Michaelson discloses and/or renders obvious "the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols." "That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13. |

48

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.

"In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶ 50.

"The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52. |

49

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44. <br><br> |

50

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  |

*See* Michaelson at Figs. 1-5.

### *Obviousness*

To the extent that Michaelson does not disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone.

To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of the references discussed below. There are many reasons a PHOSITA would have looked to, and incorporated disclosures from the references below. One such reason is that the references are directed toward the construction and operation of gaming devices. Additionally, a PHOSITA building the Michaelson game might have been interested in more of the architecture of how to design and operate a touch screen fruit based entertainment screen in a way to

51

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | provide different player options. Any such modification would be well within a PHOSITA's knowledge and skill.<br><br>"Known fruit machines have user operable press buttons by means of which various machine operations can be initiated and controlled by the player. Commonly there is a main 'start' button, and also reel-control buttons located respectively under the different reels to control 'hold' and 'nudge' functions and auxiliary buttons for other functions such as 'gamble' 'pay out' and the like." Marchini at 1:13-17.<br><br>"An object of the present invention is to provide a machine of the kind described incorporating convenient controls with which control functions can be initiated by a player quickly and easily. According to the invention therefore there is provided a coin-operated entertainment machine of the kind described having player-operable controls, characterised in that at least some of said controls comprise touch-screen controls. - By touch-screen is meant a screen with associated electronic equipment which produces control signals in response to movement of a person's finger into contact with or close proximity to locations on the screen." Marchini at 2:2-11.<br><br>"The screen may be a video screen (whether crt or led), or may be a window. Thus, for example the screen may be a video screen providing a display of simulated rotating reels, or the screen may be a window through which actual rotating reels can be seen. The touch-sensitive controls may be used for any or all of the machine operations. Thus in the context of a fruit machine the touch sensitive controls may be used for any or all of: 'start', 'nudge', 'hold', 'gamble', 'pay-out' and the like." Marchini at 3:5-12.<br><br>"The reels 14 then rotate (in simulation) and come to rest with a combination of symbols displayed on a central, horizontal win line 16. The player may then have the opportunity of improving this combination by stepping one or more reels 14 through one or more positions (i.e. a 'nudge' function) or he may have the opportunity of holding one or more reels against rotation in a next game (i.e. a 'hold' function). Actuation of a 'nudge' or 'hold' function may be effected by the player touching the screen beneath one or more of the reel displays (or in some other related position) e.g. at locations 17, 18, 19 shown in Fig. 2." Marchini at 4:19-5:1.<br><br>"In this way, it will be appreciated that the player can respond quickly and conveniently to an invitation or opportunity to operate a control in so far as the location of the control can be prominently before his eyes at the time when operation is to be effected. It is feasible for the control location to be at or adjacent the location at which the operation invitation is displayed and/or the location at which the reel or other game feature is displayed." Marchini at 5:6-11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | <br><br>"In one embodiment the novice level may have no hidden features or nudges, the intermediate level may have no hidden features but may have nudges and the expert level may have hidden features, nudges and/or designer cheats." Chambers at 2:29-3:1.<br><br>"The machine can include a selection display for the player's preferred gamble option for use in combination with the feature game selected by the player, for example, a Hi/Lo reel, roulette, a number reel, or Turbo ,Gamble. Turbo Gamble is typically a gamble ladder where the current value is gambled either up or down by one increment." Chambers at 10:5-9.<br><br>"Similarly, there can be a style, or level, of play selections display that allows the player to select from, for example, amateur (no hidden features or nudges), intermediate/customary (no hidden features but with nudges) and expert (lots of hidden features and designer cheats). Hidden features and designer cheats are typically means by which a skilled or knowledgeable player can apparently influence the game to his/her advantage. This usually involves the execution of an action that is not obvious to a casual player, for example operating a cancel button during a "skill stop" in order to slow down the display."  Chambers at 10:18-27. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The screen is typically a cathode ray tube (CRT). Alternatively, it may 30 be a liquid crystal display (LCD), or any other suitable display medium. The selection means may be one or more portions of a touch sensitive layer, which may overlay the screen and may be connected to the processing circuitry. Such a selection means is convenient since it provides an easy, intuitive way for a player to input his/her choices." Chambers at 3:28-4:4. *See, e.g.*, Chambers at Fig. 3. |
| **Claim 50**. The electronic gaming system of claim 49 wherein an outcome of the displayed game can be changed by moving a reel up or down at least one position in order to replace a current symbol on a pay line. | *See, e.g.*, Claim 49, *supra*, incorporated here. |
| **Claim 51**. [51.pre] A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising: | To the extent the preamble is limiting: *See, e.g.*, Claim 44.pre, *supra*, incorporated here. |
| [51.1] program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols; | To the extent that the term "program instructions" does not invoke § 112, ¶ 6 and is not found to be indefinite, then it and the functions it performs are disclosed, taught, and/or suggested as shown below. *See, e.g.*, Claim 44.1-44.3, *supra*, incorporated here. |
| [51.2] program instructions that determine at least one winning | *See, e.g.*, Claim 44.4, *supra*, incorporated here. |

54

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| combination for each play of the game; | |
| [51.3] program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | *See, e.g.*, Claim 44.5, *supra*, incorporated here. |
| [51.4] program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; | *See, e.g.*, Claim 44.6, *supra*, incorporated here. |
| [51.5] program instructions that determine if the player has decided to play the displayed game; and | *See, e.g.*, Claim 44.7, *supra*, incorporated here. |
| [51.6] program instructions that display an outcome resulting from play of the displayed game. | *See, e.g.*, Claim 44.8, *supra*, incorporated here. |
| **Claim 54**. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a two-dimensional array of game symbols. | *See, e.g.*, Claim 47, *supra*, incorporated here. |
| **Claim 56**. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols. | *See, e.g.*, Claim 49, *supra*, incorporated here. |
| **Claim 57**. The computer program product for electronic gaming of claim 56 further comprising program instructions that enable a player to | *See, e.g.*, Claim 50, *supra*, incorporated here. |

55

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| move a reel up or down at least one position to replace a current symbol on a pay line and change an outcome of the displayed game. | |