# EXHIBIT 6

Case No. CBM2020-00014

Patent No. 7,736,223

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

BANILLA GAMES, INC.

Petitioner,

v.

SAVVY DOG SYSTEMS, LLC

Patent Owner.

Case No. CBM2020-00014

Patent No. 7,736,223

_____

**SAVVY DOG SYSTEMS, LLC'S**

**PATENT OWNER PRELIMINARY RESPONSE**

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................1

II.     BANILLA HAS FAILED TO NAME A REAL
        PARTY-IN-INTEREST: GROVER GAMING, INC. ..................................3

III.    OVERVIEW OF THE TECHNOLOGY OF THE '223 PATENT..............15

IV.     LEVEL OF ORDINARY SKILL IN THE ART..........................................18

V.      THE '223 PATENT IS NOT A COVERED BUSINESS METHOD
        PATENT .............................................................................................21

        A.     The '223 Patent Is Not Directed To A Financial Product Or
               Service ....................................................................................21

               1.     Banilla Relies Almost Exclusively On Claims That Savvy
                      Dog Has Statutorily Disclaimed .................................22

               2.     Banilla Heavily Cites Outdated Case Law That No Longer
                      Provides The Correct Legal Standard ......................22

               3.     The Current Claims Do Not Recite Any Financial Activity ....25

                      a.     A "Winning Combination" Is Not A Financial
                             Activity ........................................................27

                      b.     "More Valuable" Is Not Financial................................34

               4.     The Art Of Electronic Gaming Patents Confirms That The
                      Terms "Winning Combination" And "Value" Are Not
                      Necessarily Financial ...............................................44

               5.     The Gambling Laws Of Ohio Referenced In The '223
                      Patent Prohibit Financial Prizes .................................52

-ii-

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

6.    Banilla's Own Patent Applications Confirm That The Terms "Winning Combination" (Or "Winning Pattern") And "Value" Are Not Necessarily Financial ............................58

B.    Banilla Fails To Establish That The '223 Patent Does Not Claim A "Technological Invention" ....................................64

1.    Banilla Fails To Provide Any Reasoned Analysis Regarding Whether The Claims *As A Whole* Recite A Novel Or Nonobvious Feature ....................................65

2.    Banilla Fails To Provide Any Reasoned Analysis Regarding Whether The Claims *As A Whole* Recite A Technical Solution To A Technical Problem ...........................68

3.    The District Court Has Initially Determined That The Claims May Recite A Technological "Improvement" And An "Inventive Concept" ..............................................69

4.    Banilla Admits In Its Own Later-Filed Patent Applications That Its Analogous Claims Are A Technological Invention ....70

VI.    THE BOARD SHOULD EXERCISE ITS DISCRETION TO DENY INSTITUTION HERE IN VIEW OF *APPLE V. FINTIV* AND ITS PROGENY .............................................................................80

A.    The District Court And The Parties Have Already Expended Considerable Resources In Briefing And Evaluating The Section 101 And Section 112 Issues Raised In The Petition .............80

B.    The Six *Apple v. Fintiv* Factors Weigh In Favor Of Denial Of Institution Here ................................................................82

1.    Neutral: Whether The Court Granted A Stay Or Evidence Exists That One May Be Granted If A Proceeding Is Instituted ................................................................83

-iii-

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

2.      Slightly Favors Institution:  Proximity Of The Court's
        Trial Date To The Board's Projected Statutory Deadline
        For A Final Written Decision ......................................................85

3.      Favors Denial:  Investment In The Parallel Proceeding By
        The Court And The Parties ........................................................85

4.      Favors Denial:  Overlap Between Issues Raised In The
        Petition And In The Parallel Proceeding ..................................89

5.      Favors Denial:  Whether The Petitioner And The
        Defendant In The Parallel Proceeding Are The Same Party ....92

6.      Favors Denial:  Other Circumstances That Impact The
        Board's Exercise Of Discretion, Including The Merits............93

VII.    BANILLA HAS NOT PROVEN THAT ONE OR MORE CLAIMS
        OF THE '223 PATENT ARE MORE LIKELY THAN NOT
        UNPATENTABLE UNDER 35 U.S.C. § 112 AND § 101 ..........................95

VIII.   CONCLUSION.......................................................................................96

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

## TABLE OF AUTHORITIES

### Cases

*Apple Inc. v. ContentGuard Holdings, Inc.*,
740 Fed. App'x 714 (Fed. Cir. 2018) ........................................................23

*Apple Inc., v. Fintiv, Inc.*,
IPR2020-00019 (Paper 15), 2020 WL 2486683
(PTAB May 13, 2020) ............................................................. passim

*AT&T Mobility LLC v. Intellectual Ventures II, LLC*,
CBM2015-00185, Paper 12, 2016 WL 8944572
(PTAB Aug. 26, 2016) ................................................................31

*Blue Calypso, LLC v. Groupon, Inc.*,
815 F.3d 1331 (Fed. Cir. 2016) ..................................................24

*Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*,
IPR2020-00122, Paper 15 (PTAB May 15, 2020) ......................................87

*Delta Airlines, Inc. v. Loyalty Conversion Sys. Corp.*,
CBM2014-00096, 2014 WL 4925862 (PTAB Sept. 29, 2014) ....... 24, 41, 42

*Experian Mktg. Sols., Inc. v. RPost Commc'ns Ltd.*,
CBM2014-00010, Paper 20, 2014 WL 1628568
(PTAB Apr. 22, 2014) ................................................................66

*Facebook, Inc. v. Skky, LLC*,
CBM2016-00091, Paper 12, 2017 WL 4349404
(PTAB Sept. 28, 2017) ............................................. 22, 26, 39, 40

*Fairchild Semiconductor Corp. v. In-Depth Test LLC*,
CBM2015-00060, Paper 11, 2015 WL 4652717 (PTAB Aug. 3, 2015).......43

*Ford Motor Co. v. Versata Development Grp., Inc.*,
CBM2016-00100, Paper 12, 2017 WL 1087387
(PTAB Mar. 20, 2017)........................................................ 40, 41

WBD (US) 50040824v2

*Google Inc. v. At Home Bondholders' Liquidating Trust*,
   CBM2016-00036, Paper 12, 2016 WL 4987385
   (PTAB Aug. 22, 2016) ................................................................65

*Google Inc. v. SimpleAir, Inc.*,
   CBM2015-00019, Paper 11, 2014 WL 8879049
   (PTAB May 19, 2014) ................................................................31

*HTC Corp. v. Ancora Techs. Inc.*,
   CBM2017-00054, Paper 7 (PTAB Dec. 1, 2017) ..........................................65

*IBG LLC v. Trading Techs. Int'l, Inc.*,
   757 Fed. App'x 1004 (Fed. Cir. 2019) .................................................. 69, 78

*Intel Corp. v. VLSI Tech. LLC*,
   IPR2020-00141, Paper 16 (PTAB June 4, 2020) ....................... 82, 87, 90, 92

*InterMetro Indus. Corp. v. Enovate Med., LLC*,
   No. 3:13-CV-02854, 2017 WL 901100 (M.D. Pa. Mar. 7, 2017)................83

*International Internet Technologies, LLC v. Sweepstakes Patent Co.*,
   CBM2015-00106, 2016 WL 8944566 (PTAB July 29, 2015).....................24

*Old Republic Gen. Ins. Group, Inc. v. Intellectual Ventures II LLC*,
   CBM2015-00184, Paper 7 (PTAB Apr. 15, 2016)................................ 65, 67

*Progress Vending, Inc. v. Dept. of Liquor Control*,
   59 Ohio App.2d 266 (Ohio Sup. Ct. 1978).....................................56

*Proppant Express Investments, LLC v. Oren Techs., LLC*,
   IPR2017-01917, Paper No. 86 (PTAB Feb. 13, 2019)..........................1, 13

*Secure Axcess, LLC v. PNC Bank Nat'l Assoc.*,
   848 F.3d 1370 (Fed. Cir. 2017) ........................................................ 23, 24

*Servicenow, Inc. v. Hewlett-Packard, Co.*,
   CBM2015-00108, Paper 10, 2015 WL 5954591 (PTAB Oct. 8, 2015)........42

*SightSound Techs., LLC. v. Apple Inc.*,
   809 F.3d 1307 (Fed. Cir. 2015) ................................................................24

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

*Sony Corp. of Am. V. Network-1 Techs., Inc.*,
    CBM2015-00078, Paper 7, 2015 WL 4452074 (PTAB July 1, 2015)..........41

*Sophos Inc. v. RPost Holdings, Inc*,
    No. 13-cv-12856, 2016 WL 3149649 (D. Mass. June 3, 2016) ...................69

*Supercell Oy v. Gree, Inc.*,
    IPR2020-00310, Paper 13 (PTAB June 18, 2020) ........................... 17, 18, 83

*Unwired Planet, LLC v. Google Inc.*,
    841 F.3d 1376 (Fed. Cir. 2016) ...................................................... 22, 23, 41

*Versata Dev. Grp., Inc. v. SAP Am., Inc.*,
    793 F.3d 1306 (Fed. Cir. 2015) .................................................................24

*Wells Fargo Bank, N.A. v. USAA*,
    CBM2019-00028, Paper 14, 2019 WL 4855339 (PTAB Oct. 1, 2019)........65

## Federal Statutes

35 U.S.C. § 101 ...................................................................................... passim

35 U.S.C. § 102 ....................................................................................... 89, 90

35 U.S.C. § 103 ....................................................................................... 89, 90

35 U.S.C. § 112 ...................................................................................... passim

35 U.S.C. § 312 .......................................................................................3, 14

35 U.S.C. § 314 ...................................................................................... passim

35 U.S.C. § 315 .........................................................................................13

AIA § 18...................................................................................................20

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

**State Statutes**

ORC § 2915.01 ........................................................................................ 52-53

ORC § 2915.06 ........................................................................................ 53-54

**Rules**

37 C.F.R. § 42.24 ...........................................................................................96

37 C.F.R. § 42.301 ..................................................................... 2, 20, 63, 65

37 C.F.R. § 42.304 .........................................................................................20

37 C.F.R. § 42.6 .............................................................................................97

**Other Authorities**

77 FR 48680 (2012) .......................................................................................14

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223

**PATENT OWNER'S LIST OF EXHIBITS**

| EXHIBIT | DESCRIPTION |
|---|---|
| Ex. 2001 | Statutory Disclaimer |
| Ex. 2002 | Declaration of Kevin Harrigan, Ph.D. |
| Ex. 2003 | Kevin Harrigan CV |
| Ex. 2004 | Harrigan, Distorted Player Views of Payback Percentages |
| Ex. 2005 | The New York Times - How Slot Machines Raise Our Hopes, Even When We're Losing |
| Ex. 2006 | Clark, Dictionary of Gambling & Gaming |
| Ex. 2007 | BetAmerica – Poker Hand Values |
| Ex. 2008 | BSA - Poker Hand Values |
| Ex. 2009 | Wikipedia - Poker Hand Values |
| Ex. 2010 | M.D.Pa. - Complaint |
| Ex. 2011 | M.D.Pa. - Proof of Service |
| Ex. 2012 | M.D.Pa. - Defs.' Brief in Supp. of Their Mot. to Dismiss Compl. |
| Ex. 2013 | M.D.Pa. - Plfs.' Opp'n to Mot. to Dismiss Compl. |
| Ex. 2014 | M.D.Pa. - Plfs.' First Am. Compl. |
| Ex. 2015 | M.D.Pa. - Defs.' Brief in Supp. of Their Mot. to Dismiss Am. Compl. |
| Ex. 2016 | M.D.Pa. - Plfs.' Opp'n to Mot. to Dismiss Am. Compl. |
| Ex. 2017 | M.D.Pa. - Defs.' Reply in Supp. of Their Mot. to Dismiss Am. Compl. |
| Ex. 2018 | M.D.Pa. - Court Memo. re Mot. to Dismiss Am. Compl. |
| Ex. 2019 | M.D.Pa. - Court Order re Mot. to Dismiss Am. Compl. |
| Ex. 2020 | M.D.Pa. – Defs.' Answer to First Am. Compl. & CCs |
| Ex. 2021 | M.D.Pa. - Plfs.' Reply to CCs |

WBD (US) 50040824v2

| Ex. 2022 | M.D.Pa. - Order re Case Management Conference |
|---|---|
| Ex. 2023 | M.D.Pa. - Joint Case Management Plan |
| Ex. 2024 | M.D.Pa. - Joint Case Management Plan - Ex. A |
| Ex. 2025 | M.D.Pa. - Joint Case Management Plan - Ex. B |
| Ex. 2026 | M.D.Pa. - Case Management Order |
| Ex. 2027 | M.D.Pa. - Defs.' Brief in Supp. of Their Mot. to Stay |
| Ex. 2028 | M.D.Pa. - Plfs.' Opp'n to Mot. to Stay |
| Ex. 2029 | M.D.Pa. - Defs.' Reply in Supp. of Their Mot. to Stay |
| Ex. 2030 | M.D.Pa. - Order re Motion to Stay |
| Ex. 2031 | M.D.Pa. - Plfs.' Infringement Contentions |
| Ex. 2032 | M.D.Pa. - Defs.' Invalidity Contentions |
| Ex. 2033 | M.D.Pa. - Joint Claim Construction Statement |
| Ex. 2034 | M.D.Pa. - Ex. A - Parties' Agreed Upon Claim Constructions |
| Ex. 2035 | M.D.Pa. - Ex. B - Parties' Disputed Claiim Constructions |
| Ex. 2036 | M.D.Pa. - Plfs.' Opening Claim Construction Brief |
| Ex. 2037 | M.D.Pa. - Defs.' Opening Claim Construction Brief |
| Ex. 2038 | M.D.Pa. - Plfs.' Responsive Claim Construction Brief |
| Ex. 2039 | M.D.Pa. - Defs.' Responsive Claim Construction Brief |
| Ex. 2040 | M.D.Pa. - Crevelt Declaration |
| Ex. 2041 | U.S. Pat. No. 8,511,550 (McGhie) |
| Ex. 2042 | Banilla Games, Inc. - NC Corporate Info. |
| Ex. 2043 | Grover Gaming, Inc. - NC Corporate Info. |
| Ex. 2044 | IndustryNet - Banilla Games, Inc. AKA Grover Gaming, Inc. |
| Ex. 2045 | M.D.N.C. - Complaint |
| Ex. 2046 | M.D.N.C. - Plaintiffs' Rule 26(a)(1)(A) Initial Disclosures |

WBD (US) 50040824v2

| Ex. 2047 | Grover Gaming Press Release |
|---|---|
| Ex. 2048 | Grover Gaming Announces New Expansion |
| Ex. 2049 | Facebook, Grover Gaming - Banilla Games Check |
| Ex. 2050 | Banilla Petition for a Declaratory Order |
| Ex. 2051 | Banilla & Washington State Correspondence |
| Ex. 2052 | Triangle Business Journal |
| Ex. 2053 | Banilla Letter to Iowa Dept. of Inspections & Appeals |
| Ex. 2054 | Banilla Games - About Us |
| Ex. 2055 | Grover Gaming - Contact Us |
| Ex. 2056 | Grover Gaming - Games |
| Ex. 2057 | Banilla Games - Diamond Skill Games |
| Ex. 2058 | Facebook, Grover Gaming - G2E 2018 with Banilla Games Day 1 |
| Ex. 2059 | Facebook, Grover Gaming - G2E 2018 with Banilla Games Day 2 |
| Ex. 2060 | Facebook, Banilla Games - G2E 2018 with Grover Gaming |
| Ex. 2061 | Facebook, Grover Gaming - G2E 2019 Booth with Banilla Games |
| Ex. 2062 | Facebook, Banilla Games - G2E 2017 with Grover Gaming |
| Ex. 2063 | Glassdoor, Grover Gaming - Banilla Games Careers |
| Ex. 2064 | Facebook, Banilla Games - Grover Gaming Careers |
| Ex. 2065 | Facebook, Grover Gaming - Banilla Games Teams |
| Ex. 2066 | U.S. Pat. App. Pub. No. 20160049039A1 (Blackwelder) |
| Ex. 2067 | U.S. Pat. App. Pub. No. 20200168027A1 (Blackwelder) |
| Ex. 2068 | Thompson, Gambling in America |
| Ex. 2069 | Wang, Game Reward Systems Gaming Experiences and Social Meanings |
| Ex. 2070 | U.S. Pat. No. 7,252,591 (Van Asdale) |

| Ex. 2071 | U.S. Pat. App. Pub. No. 20200020201A1 (Berman) |
| Ex. 2072 | U.S. Pat. No. 7,618,316 (Cole) |
| Ex. 2073 | U.S. Pat. App. Pub. No. 2000032284A1 (Englman) |
| Ex. 2074 | U.S. Pat. No. 7,744,458 (Marks) |
| Ex. 2075 | U.S. Pat. App. Pub. No. 20130040724A1 (Rood) |
| Ex. 2076 | 2007 ORC Ann. 2915.01 |
| Ex. 2077 | 2007 ORC Ann. 2915.06 |
| Ex. 2078 | 2006 Press Release with Inserts 1, 2 & 7 |
| Ex. 2079 | U.S. Pat. App. Pub. No. 20070232384A1 (Pace) |
| Ex. 2080 | U.S. Pat. App. No. 14825908 Prosecution History |
| Ex. 2081 | U.S. Pat. App. No. 16776597 Prosecution History |
| Ex. 2082 | U.S. Pat. App. No. 14468493 Prosecution History |

WBD (US) 50040824v2

## I.    INTRODUCTION

Patent Owner Savvy Dog Systems, LLC ("Savvy Dog") hereby provides this Patent Owner Preliminary Response ("POPR") to the CBM Petition filed by Petitioner Banilla Games, Inc. ("Banilla") on May 21, 2020.

Banilla's Petition is defective for multiple reasons, each of which provides the Board with sufficient basis to deny institution here.  First, Banilla only identified itself as the sole real party-in-interest (Pet. at 1), purposely failing to also identify its closely related sister company, Grover Gaming, Inc. ("Grover").  Banilla's knowing exclusion of Grover, in a bad faith attempt to avoid the application of CBM estoppel to Grover, cannot be properly remedied here because none of the four *Proppant Express Investments, LLC v. Oren Techs., LLC*, Case IPR2017-01917, Paper No. 86 (PTAB Feb. 13, 2019) factors support any amendment to Banilla's identification of *all* real parties-in-interest, as required under the AIA.

Second, Banilla has failed to carry its burden of proof that the challenged patent, U.S. Patent No. 7,736,223 ("the '223 patent") is a CBM patent.  On August 21, 2020, Savvy Dog statutorily disclaimed nearly all of the '223 patent's claims that Banilla identified in its Petition as allegedly directed to a financial product or service. Ex. 2001; Pet. at 7-11.  This statutory disclaimer entirely moots most of Banilla's arguments on the first prong of the CBM inquiry.  The remaining claims simply recite the terms "winning combination" and "more valuable," neither of which is

-1-

financial, particularly in the context of the '223 patent's claims, its disclosure, and the understanding of those terms in the gaming field.

Moreover, Banilla has failed to carry its burden of proof that the claims of the '223 patent do not recite a technological invention. Banilla improperly parses the claims into their individual components, and then examines each component in isolation. Pet. at 12-16. Nowhere does Banilla properly evaluate whether the claims *as a whole* recite a novel and nonobvious technological invention, as required under the USPTO Rules and PTAB precedent. 37 C.F.R. § 42.301(b). Indeed, Banilla makes no prior art challenges of any kind in its Petition, relying solely on Section 101 and Section 112 attacks. Accordingly, Banilla has failed to carry its burden on the second prong of the CBM inquiry.

Finally, Banilla waited nearly nine months to file its CBM petition, after having lost a Motion to Dismiss in the parallel district court action making the same Section 101 challenges. Ex. 2018. A review of the six *Apple v. Fintiv* factors readily demonstrates that, on balance, the Board should exercise its discretion in this case to deny institution under Section § 314(a).

The parties are currently litigating the claim construction issues (including the Section 112 arguments) and the Section 101 issues in the parallel District Court action. The District Court will have finally resolved at least some of those issues

WBD (US) 50040824v2

before the institution decision here. Accordingly, Savvy Dog will address those arguments on the merits in the event that the Board institutes this CBM review.

## II.   BANILLA HAS FAILED TO NAME A REAL PARTY-IN-INTEREST: GROVER GAMING, INC.

The AIA mandates that "[a] petition filed under section 311 may be considered *only* if . . . (2) the petition identifies all real parties in interest." 35 U.S.C. § 312(a)(2) (emphasis added). Accordingly, the PTAB cannot consider a CBM petition unless it names *all* of the real parties-in-interest.

Here, Banilla has purposely failed to identify its closely related sister company, **Grover Gaming, Inc.** ("Grover"). These two companies – Banilla and Grover – are essentially the same entity for purposes of the real party-in-interest inquiry. Both companies have identical corporate officers (Exs. 2042-2043), identical addresses (*id.*), the same registered agent (*id.*), and are treated as alter egos of one another. *See* Ex. 2044 ("Banilla Games, Inc." "AKA Grover Gaming, Inc.").

In late 2019, both companies filed suit as co-plaintiffs (Ex. 2045), making the following representations on behalf of both plaintiffs (plural):

BANILLA GAMES, INC. and
GROVER GAMING, INC.,

Plaintiffs,

-3-

Case No. CBM2020-00014
Patent No. 7,736,223

| Individual | Subject(s) |
|---|---|
| **Garrett Blackwelder**, Plaintiffs' owner and president.<br><br>Mr. Blackwelder may be contacted through counsel for Plaintiffs. | Mr. Blackwelder has knowledge of Plaintiffs' business, Plaintiffs' trade secrets, the creation of Plaintiffs' Copyrighted Works, and Plaintiffs' loss and/or damages. |

Ex. 2046. Indeed, Mr. Blackwelder verified the Complaint on behalf of both Banilla and Grover with a single signature:

> Garrett Blackwelder, being duly sworn, deposes and says that he is the President of Banilla Games, Inc. and Grover Gaming, Inc. and as such is authorized to make this verification that he has read the foregoing VERIFIED COMPLAINT and the same is true of his own knowledge, except as to those matters and things stated on information and belief, and, as to those, he believes them to be true.
>
> Garrett Blackwelder, President
> Banilla Games, Inc. and Grover Gaming, Inc.

Ex. 2045 at 23.

Based on the foregoing alone, it is evident that Mr. Blackwelder controls both Banilla and Grover, and thus exercises significant control over their legal proceedings, including this CBM. *See id.*; *see also* Ex. 2047 at 1 ("According to Garrett Blackwelder, President of Grover Gaming and its sister company, Banilla Games . . . ."); Ex. 2049 ("Garrett Blackwelder, President of Grover Gaming,

-4-

Case No. CBM2020-00014
Patent No. 7,736,223

presented a check for $10,000.00 . . . .  Garrett presented the check from Grover's sister company, Banilla Games, Inc. . . . ."):



Similarly, Mr. Kevin Morse routinely represents both Grover and Banilla in a similar hybrid capacity:

Dated: 3-3-2016

Respectfully Submitted by:

Kevin Morse
Banilla Games, Inc.
3506 NE Greenville Blvd.
Greenville, NC  27834
252-329-7977
Kevin@grovergaming.com

Ex. 2050 at 8; *see* Ex. 2051 at 1, 5 & 11 ("Mr. Kevin Morse, Banilla Games"); Ex. 2052 at 1 ("Kevin Morse, senior market development specialist at Grover Gaming."); Ex. 2053 (letter to Iowa Department of Inspections and Appeals from Keven Morse on Banilla letterhead).

-5-

Moreover, Banilla and Grover regularly treat themselves as essentially the same entity, both purporting to design and develop Grover's/Banilla's electronic games. *E.g.*, Pet. at 5 ("Patent Owner has accused touchscreen games made by Petitioner [Banilla] . . . of infringement . . . ."); Ex. 2045 at 2 ("Grover is in the business of creating, designing, developing, and manufacturing, among other things, electronic games of skill."); *id.* at 5 ("Grover distributes its Fusion Package in stand-alone gaming cabinets sold through Banilla, its exclusive distributor."); Ex. 2047 at 2 ("Using software from Grover, Banilla Games produces games for various markets such as electronic skill games for the Coin Operated Amusement Machine program . . . ."); Ex. 2048 at 2 ("Grover Gaming develops software, game content and gaming systems . . . ."); Ex. 2050 at 1 ("Petitioner [Banilla Games, Inc.] manufactures and sells electronic game devices in several jurisdictions, including Georgia and Iowa. . . . Petitioner [Banilla Games, Inc.] has designed and developed two new electronic skill game devices entitled 'Superior Skill 1' and 'Superior Skill 2.'"); Ex. 2051 at 1, 6 ("the five Olympic Skill 1 and five Olympic Skill 2 amusement games created and designed by Banilla Games . . . .").

As illustrated in the examples above, the companies' frequent and repeated representations to the government and the public blur any distinction between the legal entities. Even their websites reveal that the two companies design and produce the same gaming products:

-6-

| Banilla | Grover |
|---|---|
| Banilla Games, Inc. designs, develops, and distributes products for various board, nudge, skill, redemption, and amusement game markets. | Grover Gaming is a leading supplier of premium casino and slot game content to land based, online and mobile gaming markets. |

Ex. 2054-2055.  Indeed, both Banilla's and Grover's websites market many of the same games, including the following 35 games listed under both Banilla's "Diamond Skill Games" and Grover's "Our Games":



-7-

Case No. CBM2020-00014
Patent No. 7,736,223



*Compare* Ex. 2056 (Grover's games) *with* Ex. 2057 (Banilla's games).

Banilla and Grover also share the same booth at trade shows, including at the Global Gaming Expo ("G2E") show in Las Vegas, further melding their identities in the marketplace:

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223



Ex. 2058 ("It's been a busy first day at the Global Gaming Expo (G2E) in Las Vegas for Grover Gaming and Banilla Games!"); Ex. 2059 (Day 2 at Global Gaming Expo (G2E) has been a HUGE success for Grover Gaming and Banilla Games!"); Ex. 2060 ("Want to attend the Global Gaming Expo in October for FREE, courtesy of Banilla Games and Grover Gaming?").

-9-

WBD (US) 50040824v2



Ex. 2061 ("We are OPEN FOR BUSINESS at the Global Gaming Expo 2019 in beautiful Las Vegas!").




Ex. 2062 ("Banilla and Grover Gaming present at G2E Las Vegas 2017!").

-10-

Case No. CBM2020-00014
Patent No. 7,736,223

Further still, Banilla's and Grover's hiring practices reveal that they are indistinct entities:





Ex. 2063.

Banilla Games
July 30, 2019 ·

Check out our latest job opening in Georgia! We are looking to hire a Lead Service Technician. Come join our growing team!

Apply on our website at www.grovergaming.com/careers.

GROVERGAMING.COM
**CAREERS**
Grover Gaming, located in Greenville, North Carolina, is looking for talented and passionate individuals to add to our constantly expanding teams. Establishing a balance between creativity

Ex. 2064.

It is therefore not surprising that Banilla and Grover are a unitary organization:

-11-

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223



Ex. 2065.

Finally, Banilla's and Grover's patent applications on skill-based electronic games, which list both Mr. Blackwelder and Mr. Morse as named inventors, list the "applicant" as either Banilla or Grover, seemingly interchangeably:

| (54) ELECTRONIC SKILL GAME | (54) NO ELEMENT OF CHANCE ELECTRONIC GAME SYSTEM AND METHOD |
|---|---|
| (71) Applicant: Banilla Games, Inc., Greenville, NC (US) | (71) Applicant: Grover Gaming, Inc., Greenville, NC (US) |
| (72) Inventors: Garrett Blackwelder, Grimesland, NC (US); Kevin Morse, Greenville, NC (US); Timothy Smith, Grimesland, NC (US); Justin Harris, Greenville, NC (US) | (72) Inventors: Garrett Blackwelder, Greenville, NC (US); Kevin Morse, Greenville, NC (US); Timothy Smith, Greenville, NC (US) |

Ex. 2066-2067.

As demonstrated by the publicly available evidence summarized above, Banilla and Grover (and particularly Mr. Blackwelder) are actively controlling the companies' joint legal activities, including this CBM. There can be no legitimate dispute that both Banilla and Grover were *required* by the AIA to be identified as

-12-

real parties-in-interest in the CBM Petition. Also, given the inextricable intertwinement of Banilla and Grover (as the purported actual designer/maker of the games that Banilla sells and which they claim are the alleged infringing products), there can be no tenable argument that failing to name Grover was simply an inadvertent oversight.

Savvy Dog appreciates that recent PTAB precedent allows a party to request authorization to file a motion to amend its mandatory notices, and the Board will look to the following factors in deciding that motion:

> whether there have been: (1) attempts to circumvent the [35 U.S.C.] § 315(b) bar or estoppel rules, (2) bad faith by the petitioner, (3) prejudice to the patent owner caused by the delay, or (4) gamesmanship by the petitioner.

*Proppant Express Investments, LLC v. Oren Techs., LLC*, IPR2017-01917, Paper No. 86 (PTAB Feb. 13, 2019) (precedential). From the evidence cited above, Banilla's failure to identify Grover as a real party-in-interest was a purposeful attempt to avoid the CBM estoppel effects for Grover. Bad faith can be readily inferred given how notoriously the two companies present themselves as a single organization to the industry and consumers alike. Banilla's conduct has unduly prejudiced Savvy Dog, requiring it to expend significant resources to investigate and litigate this issue, and subjecting it to the risk of further PTAB challenges by Grover.

-13-

WBD (US) 50040824v2

Banilla's gamesmanship with the PTAB is readily evident by its conduct in other fora, in which Banilla and Grover readily acknowledge that their interests are one and the same.

Accordingly, the Board should conclude that Banilla was required to name Grover as a real party-in-interest in the Petition, and any belated attempt to amend the Petitioner's mandatory notice should not be permitted. Petitioners are required by the AIA to carefully investigate the identity of the real parties-in-interest and take the naming of real parties-in-interest in a PTAB petition seriously. They should not simply expect a "free pass" from the Board if/when they get caught with an intentional omission, as doing so here would effectively eliminate the statutory requirement altogether. Thus, given the ample evidence discussed above, Banilla's failure to properly name Grover as a real party-in-interest alone is sufficient for the Board to deny institution based on the express requirement of the AIA. 35 U.S.C. § 312(a)(2).

Finally, if the Board institutes this CBM, discovery on this real party-in-interest issue would be necessary.[1]  *See* 77 FR 48680, 48695 (2012) (response to

---

[1] Savvy Dog believes that discovery directed to the real party-in-interest issue at the pre-institution stage would unnecessarily expend further resources of the Board and

WBD (US) 50040824v2

comment 8) (The PTAB would consider authorizing motions for additional discovery in support of standing challenges after institution.).  Savvy Dog is obviously not "fishing" here—the foregoing evidence easily establishes a compelling showing that these two companies are commonly controlled, and targeted discovery directed to the relationship between Banilla and Grover would further establish Grover's officers' involvement in this CBM review.

## III.    OVERVIEW OF THE TECHNOLOGY OF THE '223 PATENT

The use of gaming devices to implement games of chance (*e.g.*, slot machines, roulette) is largely outlawed in most states because the games in question are considered games of chance.  *See* Ex. 1001 at 1:13-60.  However, amusement machines that are more skill-based may be permitted.  *See id*. at 1:13-24.  "To qualify as a skill-based amusement machine . . . the outcome of play during the game must be controlled by the person playing the game and not by predetermined odds or random chance controlled by the machine."  *Id*. at 1:24-27; Ex. 2002 ¶ 35.

---

the parties.  Given the other fundamental deficiencies of the Petition, as explained in this POPR, the Board should deny institution here, thus effectively mooting the real party-in-interest issue.

-15-

In the '223 patent, a novel processor "test[s] the [game] field for compliance with at least one of the preceding selections prior to presenting the field to the player. The displayed game field cannot contain a winning combination before play." *See* Ex. 2014 ¶¶ 16-22; Ex. 2002 ¶ 36; Ex. 1001 at 9:63-66. The testing is needed to "ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." Ex. 1001 at 16:59-62; Ex. 2002 ¶ 36.

Next, the specification describes the invention as "providing a game preview display to players of an amusement or entertainment electronic game ***before playing the game***." Ex. 1001 at 1:64-67 (emphasis added); Ex. 2002 ¶ 37. "The field is presented to the player on the game display as a preview of the game in step 602. In one embodiment, the player can select from a plurality of game preview displays, with each game preview being associated with a different play level. Any potential player can observe the game display for as long as desired before making a decision to play the displayed game in decision step 604." Ex. 1001 at 10:37-43; Ex. 2002 ¶ 37. Before the time of invention in 2006, when Michael Pace applied for the '223 patent, gaming terminals were devoid of a game processor that incorporated this preview element. *See* Ex. 2014 ¶¶ 16-22; Ex. 2002 ¶ 37. It was considered counter-intuitive to add game preview functionality to electronic games. Ex. 2014 ¶ 22.

-16-

The '223 patent thus describes a new type of game processor implementing "the elimination of chance through the ability of a player to see the next game outcome on-screen before ever making a financial commitment. This enhances the appeal of the game in jurisdictions which do not permit games of chance, but do permit games of predominant skill." *Id.* ¶ 23. The '223 patent claims encompass technology that was neither well-understood, routine nor conventional to a skilled artisan at the time of the invention.[2]  Ex. 2002 ¶ 38.

---

[2] Similarly, the Board in *Supercell v. Gree* denied institution of a PGR for a patent with claims to a video game that improved upon a conventional game of "*reversi*" by providing a greater number of strategies for winning the game because:

> [T]he challenged claims require the system to "identify one or more areas of the game field sandwiched between the first area and a third area of the game field" and "calculate a value" and "apply the value" to a player's score "based on a number of the one or more media or a numerical value associated with the one or more media" within the sandwiched area. In our view, calculating a player's score based on a game piece's "value" and the specific "area" in which the game piece is placed may amount to an inventive concept because, plausibly, it is

-17-

Such novel technology includes, but is not limited to, testing the game field and automatically displaying an actual game to be played to a player prior to initiating activation of game play. *See* Ex. 2014 ¶¶ 25-26; Ex. 2002 ¶ 38. Those knowledgeable in the field, and the patent examiner who conducted the prior art searches before allowing the '223 patent to issue, determined that the claimed game processor specially configured for testing and preview is inventive technology that was neither generic nor conventional as of June of 2006 (the filing date of the application leading to the '223 patent). *See id.* ¶¶ 27-30; Ex. 2002 ¶ 38.

## IV.  LEVEL OF ORDINARY SKILL IN THE ART

Savvy Dog's expert, Dr. Kevin Harrigan, provides the following definition for this CBM proceeding:

a "new source or type of information" for scoring points not found in the traditional reversi game.

*Supercell Oy v. Gree, Inc.*, PGR2018-00091, Paper 9 at 8 (PTAB Feb. 26, 2019); *see id.* at 11 ("[A]s discussed above, the evidence of record supports that the challenged claims harness an inventive concept that establishes their patent eligibility.").

[A] person having ordinary skill in the art ("POSITA") in the field of the '223 patent (*i.e.*, electronic gaming) at the time of the invention (*i.e.*, in the 2006 time frame) would be a person who had a bachelor's degree in computer engineering, computer science, or similar field of study, and at least 2 years of professional experience researching, re-engineering, designing, and developing electronic games.

Ex. 2002 ¶ 39.

Accordingly, the parties have presented three different definitions of a POSITA:

| Harrigan (Ex. 2002) | Crevelt (Ex. 2040) | Kitchen (Ex. 1003) |
|---|---|---|
| A person having ordinary skill in the art ("POSITA") in the field of the '223 patent (*i.e.*, electronic gaming) at the time of the invention (*i.e.*, in the 2006 time frame) would be a person who had a bachelor's degree in computer engineering, computer science, or similar field of study, and at least 2 years of professional experience researching, re-engineering, designing, and developing electronic games. | [A] person having ordinary skill in the art would be a person who has a bachelor's degree in computer engineering, computer science or similar field of study, and at least 3 years of professional experience as an engineer designing and developing games for a gaming company.<br><br>I should note that elevated work experience could take the place of a certain amount of education, and vice-versa. | A person of ordinary skill in the art ("POSITA") in the field of the '223 patent (*i.e.*, electronic gaming) would have had (1) a bachelor's degree in engineering or computer science or equivalent experience and (2) at least two years of development experience in the electronic gaming industry. |

Ex. 2002 ¶ 39; Ex. 2040 ¶ 33; Ex. 1003 ¶ 27.

A comparison of the three definitions reveals that the differences are not significant with respect to the substantive issues presented in this CBM. *See* Ex. 2002 ¶ 41. Accordingly, the analysis herein would not change regardless of which definition the Board adopts. *See id.*

## V. THE '223 PATENT IS NOT A COVERED BUSINESS METHOD PATENT

The threshold question for any CBM review is whether the challenged patent is a "covered business method patent," defined by the AIA as "a patent that claims a method or corresponding apparatus for performing data processing or other operations used in the practice, administration, or management of a financial product or service, except that the term does not include patents for technological inventions." AIA § 18(d)(1); *see* 37 C.F.R. § 42.301(a). Thus, to qualify as a CBM patent and be eligible for PTAB review, a patent must ***both*** (1) be directed to a financial product or service, and (2) not be directed to a technological invention. Banilla bears the burden of demonstrating that the '223 patent qualifies for CBM review. 37 C.F.R. § 42.304(a). For the reasons explained below, Banilla has failed to meet this burden on both prongs of the threshold CBM inquiry. The '223 patent is not a CBM patent and institution should therefore be denied.

### A. The '223 Patent Is Not Directed To A Financial Product Or Service

The '223 patent is not a CBM patent because the current claims (*i.e.*, the claims remaining after Savvy Dog's statutory disclaimer) are not directed to a financial product or service. In arguing that the '223 patent is directed to a financial product or service, Banilla relies on an overly broad, outdated interpretation of the

-21-

definition of a CBM patent that has been rejected (and greatly narrowed) by the Federal Circuit and ignores the plain language of the claims themselves.

### 1. Banilla Relies Almost Exclusively On Claims That Savvy Dog Has Statutorily Disclaimed

In attempting to satisfy the "financial product or service" prong of the threshold CBM inquiry, Banilla relies almost exclusively on claims in the '223 patent that Savvy Dog has now statutorily disclaimed. In particular, in its Petition, Banilla points to Claims 4, 16, and 28 ("credit balance", "associated payout"), Claims 43, 50, 57, 63, 69, and 75 ("pay line"), Claims 10, 21, and 32 ("associated payout"), and Claims 12, 17, and 34 ("denomination of play", "level of play") to argue that these claims recite a financial product. *See* Pet. at 7-11.

Regardless of the merits of Banilla's arguments in this regard, on August 21, 2020, Savvy Dog filed a statutory disclaimer of Claims 2, 4, 8-10, 12, 14, 16, 17, 21, 23, 24, 26, 28, 32, 34-36, 43, 50, 57-75 of the '223 patent. Ex. 2001. That statutory disclaimer effectively cancels all of those claims from the '223 patent, rendering them unavailable for purposes of the CBM inquiry. *Facebook, Inc. v. Skky, LLC*, CBM2016-00091, Paper 12 at 7-8, 2017 WL 4349404 (PTAB Sept. 28, 2017).

### 2. Banilla Heavily Cites Outdated Case Law That No Longer Provides The Correct Legal Standard

Before November 21, 2016, the Board interpreted "financial product or service" broadly, finding that a patent qualified for CBM review if it "claims

-22-

activities that are financial in nature, incidental to a financial activity, or complementary to a financial activity." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376, 1380 (Fed. Cir. 2016). That analysis, however, no longer reflects the proper legal standard. In *Unwired Planet*, the Federal Circuit clarified that "CBM patents are limited to those with claims that are directed to methods and apparatuses of particular types and with particular uses 'in the practice, administration, or management of a financial product or service,'" effectively removing the "incidental to" and "complementary to" language from the definition. *Id.* at 1382 ("[T]he Board's reliance on whether the patent claims activities 'incidental to' or 'complementary to' a financial activity as the legal standard to determine whether a patent is a CBM patent was not in accordance with the law.").

Under the updated, narrower standard, a patent is not a CBM patent simply because it may involve the potential sale of a good or service, because "[a]ll patents, at some level, relate to potential sale of a good or service." *See id.* Rather, a patent must "have a claim that contains, however phrased, a financial activity element." *Secure Axcess, LLC v. PNC Bank Nat'l Assoc.*, 848 F.3d 1370, 1381 (Fed. Cir. 2017). Nor is it sufficient that the patent may eventually involve a financial activity because "most, if not virtually all, inventors . . . have some expectation that complementary financial activity will result." *Id.* Further, "the mere possibility that a patent can be used in financial transactions is not enough to make it a CBM patent." *Apple Inc. v.*

-23-

*ContentGuard Holdings, Inc.*, 740 Fed. App'x 714, 717 (Fed. Cir. 2018) (unpublished) (noting that "it is not enough for the specification to describe how the invention could, in some instances, be used to facilitate financial transactions" if the specification also describes embodiments where the invention could "be used in ways that do not involve financial transactions").

Since the *Unwired Planet* decision, the Federal Circuit has further clarified that it is the ***claims*** themselves, not the specification, that determines whether a patent is a CBM patent. *See Apple v. ContentGuard*, 740 Fed. App'x at 716 ("Moreover '[i]t is not enough that a sale has occurred or may occur, or even that the specification speculates such a potential sale might occur.' Instead, 'CBM patents are limited to those with ***claims*** that are directed to methods and apparatuses of particular types and with particular uses in the practice, administration, or management of a financial product or service.'" (quoting *Unwired Planet*, 841 F.3d at 1382) (citations omitted) (emphasis added); *Secure Axcess*, 848 F.3d at 1378 ("The statutory definition [of CBM patent] by its terms makes what a patent 'claims' determinative of the threshold requirement for coming within the defined class."); *accord Blue Calypso, LLC v. Groupon, Inc.*, 815 F.3d 1331, 1340 (Fed. Cir. 2016) (noting that Section "§ 18(d)(1) directs us to examine ***the claims*** when deciding whether a patent is a CBM patent") (emphasis added). While the written description can be considered in determining whether a patent is a CBM

-24-

patent, the written description "alone cannot substitute for what may be missing in the patent 'claims,' and therefore does not in isolation determine CBM status." *Secure Axcess*, 848 F.3d at 1379-80.

Banilla fails to acknowledge this significant change in the law—indeed the majority of the cases cited by Banilla conspicuously pre-date the Federal Circuit's narrowing interpretation[3]—or analyze the claims under the proper and more exacting claim-focused standard. When analyzed under the correct standard, the current claims of the '223 patent are not directed to a financial product or service.

### 3. The Current Claims Do Not Recite Any Financial Activity

As a preliminary matter, the majority of Banilla's Petition argues that Claims 4, 16, and 28 ("credit balance", "associated payout"), Claims 43, 50, 57, 63, 69, and 75 ("pay line"), Claims 10, 21, and 32 ("associated payout"), and Claims 12, 17, and

---

[3] *See* Pet. at 6-11 (*Versata Dev. Grp., Inc. v. SAP Am., Inc.*, 793 F.3d 1306, 1325 (Fed. Cir. 2015); *International Internet Technologies, LLC v. Sweepstakes Patent Co.*, CBM2015-00106, 2016 WL 8944566 (PTAB July 29, 2015); *SightSound Techs., LLC. v. Apple Inc.*, 809 F.3d 1307, 1316 (Fed. Cir. 2015); *Delta Airlines, Inc. v. Loyalty Conversion Sys. Corp.*, CBM2014-00096, 2014 WL 4925862 (PTAB Sept. 29, 2014)).

34 ("denomination of play", "level of play") are financial in nature and thus the '223 patent is subject to CBM review.[4]  *See* Pet. at 7-10.  However, all of those claims have now been disclaimed.  Ex. 2001 (disclaiming Claims 2, 4, 8-10, 12, 14, 16, 17, 21, 23, 24, 26, 28, 32, 34-36, 43, 50, 57-75).  "The Federal Circuit has held consistently that claims disclaimed under § 253(a) should be treated as though they never existed."  *Facebook*, CBM2016-00091, Paper 12 at 7-8.  For at least this reason, the disclaimed claims cannot be considered in determining whether the '223 patent is subject to CBM review.

The current claims simply recite, in relevant part, "determin[ing] . . . at least one winning combination for each play of the game" and "testing the game field

---

[4] Savvy Dog disagrees that those claim terms—particularly in the context of the '223 patent's claims, its disclosure, and the understanding of those terms in the gaming field—are necessarily financial.  However, Savvy Dog has statutorily disclaimed the claims containing those terms to simplify this first prong of the threshold CBM inquiry and out of an abundance of caution.  Banilla also inaccurately argues that the claims of the '223 patent are directed to a "redemption value" and a "monetary payout".  *See* Pet. at 7 (quotations in original).  Those terms do not appear in the '223 patent's claims.

prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." Ex. 1001 (Claims 1, 13, 25, 37, and 44). Banilla devotes only *two* paragraphs in its Petition to these claim limitations, arguing in a conclusory fashion that the claims are directed to a financial product or service because "[g]enerating and redeeming value brings a claim within the ambit of CBM jurisdiction." Pet. at 10-11. Specifically, Banilla claims that the "winning combination" recited by the claims has an intrinsic monetary value such as the "associated payout" referenced in the written description and in the '223 patent's (disclaimed) dependent claims. However, the current claims themselves do not recite *any* elements requiring financial activity. And Banilla's expert declarant, Mr. Garry Kitchen, provides no testimony of any kind on this issue. As discussed below, Banilla and Grover have repeatedly argued in prosecuting their own patent applications that their own claims with similar limitations as those at issue here are not financial products or services.

### a. A "Winning Combination" Is Not A Financial Activity

The '223 patent describes a "winning combination" as simply an array of

-27-

game symbols yielding a successful outcome.[5]  The current '223 Patent claims do not indicate whether the value of a "winning combination" corresponds to anything financial in nature.  Ex. 2002 ¶ 55.  Winning combinations *could*—only *after* the game has been played and *after* the player elects to redeem any accumulated points—result in a monetary payout, as in a version of Savvy Dog's commercial "*Tic Tac Fruit*" game.  *Id.*  But winning combinations are intrinsically non-monetary.  *Id.*  And those post-game play steps are not recited in any of the '223 patent's current claims.  *Id.*

For example, obtaining 3 plums in a row (which includes obtaining 2 plums plus a wild symbol in a row) is a "winning combination":

---

[5] In the co-pending district court litigation, the parties' proposed claim constructions for "winning combination" are as follows:

## B.    Term 2  ("winning combination")

| POM's Construction (**Revised**)[7] | PA Coin's Construction |
|---|---|
| "array of game symbols yielding a successful outcome, including the award of a prize" | "array of game symbols *in the game field* yielding a successful outcome" |

Ex. 2038 at 7.  Notably, neither party has asserted that the claim term "winning combination" is financial.

-28-

WBD (US) 50040824v2



Ex. 1001 at Fig. 1B (annotated).

While this embodiment of the '223 patent uses fruit and other symbols to establish a "winning combination", many other amusement and entertainment games use other symbols to accomplish the same objective. *See, e.g.*, Ex. 2002 ¶ 80. For example, in traditional card games such as poker, a Royal Flush is a "winning combination":



Ex. 2007 at 2.

Whoever has the highest hand on the list wins the hand.

- Royal Flush*A royal flush consists of the top five cards all in the same suit. The ace, king, queen, jack, and 10 of hearts make up one of the four possible royal flush hands. The same five cards, all in spades, or all in diamonds, or all in clubs is also a royal flush.*

Ex. 2008 at 1.



| Royal flush | Straight flush from Ten to Ace | |
|---|---|---|

Ex. 2009 at 9-10; Ex. 2002 ¶ 53.

As shown in the above examples, a "winning combination" is not a financial term. Rather, a "winning combination" is simply an array of game symbols yielding a successful outcome in the game. Ex. 2002 ¶¶ 54-55.

-30-

Banilla ignores that the claims themselves do not recite the final game result from a obtaining a "winning combination" after playing the game, and importantly the claims are silent with respect to whether the game's final result is non-monetary (*e.g.*, points or a prize) or monetary. Contrary to Banilla's assertion, there is no intrinsic or inherent monetary value in "winning," or in obtaining a "winning combination." Pet. at 10 ("[E]ach 'winning combination' recited in the claims is to some extent 'valuable' and . . . that value corresponds to a monetary value.").[6] While

---

[6] Banilla cites Merriam-Webster's dictionary definition of "valuable" as "having monetary value." Pet. at 10 (citing Ex. 1008). However, Merriam-Webster's dictionary also defines "valuable" as "having desirable or esteemed characteristics or qualities." Ex. 1008. And in the gaming context, more relevant discussions reveal that "value" is not necessarily financial. *E.g.*, Ex. 2006 at 3 (defining "win, v." as, *inter alia*, "[t]o achieve a victory in horse racing, at dice, cards, roulette, etc." and "[i]n cards, to be of *higher value and beat another card*") (emphasis added); Ex. 2068 ("Machines indicated that prizes were paid off as cigars or drinks or other merchandise *rather than cash*.") (emphasis added); *id.* ("Machines also were configured so that a player would actually get a piece of gum or some other novelty prize with each play . . . .").

the specification describes a "payout" as one possible game result after obtaining a winning combination, the claims themselves do not recite any payout and are silent with respect to the final game result.  *See AT&T Mobility LLC v. Intellectual Ventures II, LLC*, CBM2015-00185, Paper 12 at 3-4, 2016 WL 8944572 (PTAB Aug. 26, 2016) ("Petitioner's citations to the specification, however, do not provide a persuasive basis to conclude that the claims deal with the movement of money or are involved directly in a financial transaction in anything other than a tangential way.") (citation omitted).   Banilla's analysis improperly focuses too narrowly on examples in the specification and fails to tie any of those examples to the actual language of the current claims.  *See Google Inc. v. SimpleAir, Inc.*, CBM2015-00019, Paper 11 at 11-12, 2014 WL 8879049 (PTAB May 19, 2014) (finding that a patent directed to a central broadcast server configured to receive data and process that data was not a CBM patent because the Petitioner failed to tie language in the specification disclosing that the "data" received and processed may include "stock quotes" or "lotto" to the language of the claims).

Indeed, there are many final game results that may be obtained from a "winning combination" that are ***non-monetary*** in nature.  *See* Ex. 1001 at 6:22-24 ("The prize is determined by a random selection from a finite pool of available prizes.").  For example, a winning combination could result in the award of points or hitting of certain targets (*i.e.*, completing a row of symbols), regardless of whether

-32-

those points or rewards have any monetary value. *See* Ex. 2002 ¶¶ 78-80. A winning combination could yield other intangible, non-monetary prizes such as a free spin, receipt of a special buzzer or lighting effect, player status upgrade, or unlocking a new screen or special game feature which provide satisfaction to the player. *See id.* ¶¶ 56, 85; *see* Ex. 2069 at 6 ("Properly timed rewards can help create senses of accomplishment and value . . . ."); *id.* at 5 ("Pictures, sound effects, and video clips are also commonly used as feedback mechanisms. Since they are ephemeral, they are neither collectable nor available for player comparisons, and do not directly affect gameplay. Their value exists in the sense of praise they evoke . . . ."). These outcomes are successful or "winning" and add to the player's enjoyment of the game even though they cannot be redeemed for any monetary reward and have no intrinsic monetary value. Ex. 2002 ¶ 56. A winning combination could also yield a tangible, non-monetary prize such as a plush toy. Thus, while a winning combination *could* (under one example disclosed in the specification) ultimately yield a monetary prize such as a cash payout, *as claimed*, a winning combination does not do so.

Importantly, the current claims do not recite the player actually *receiving* any kind of points or prize, let alone a monetary payout. Rather, the claims simply recite *displaying* a winning combination to the player, and are silent whether the winning combination may later yield points or a prize. *See* Ex. 1001, Claims 1, 13, 25 and 44 ("displaying each winning combination of symbols on the touch screen

-33-

display."). While the specification discloses an embodiment in which, in subsequent steps of the game, the player may redeem points or receive a payout, those steps are not recited in the current claims of the '223 patent.

**b.    "More Valuable" Is Not Financial**

The '223 patent describes a winning combination that is "more valuable" than another winning combination as an array of game symbols yielding a ***better*** successful outcome.[7]    For example, obtaining 3 plums in a row (which

---

[7] In the co-pending district court litigation, the parties' proposed claim constructions for "more valuable" are as follows:

**D.    Term 4 ("test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field")**

| POM's Construction **(Revised)** | PA Coin's Construction |
|---|---|
| test[ing] the game field prior to displaying the game to the player to ensure that the anticipated outcome corresponding to the winning combination, properly construed, is not superseded by a better outcome, such as a higher prize level, in making the field from the plurality of predetermined game symbols | test[ing] ***the previously constructed field*** prior to displaying the ***actual*** game ***to be played*** to the player to ensure that a winning combination more valuable than the previously determined winning combination is not generated inadvertently ***when the player completes a winning combination during play of the game*** |

Ex. 2038 at 11.    Notably, neither party has asserted that "more valuable" is financial.

-34-

includes obtaining 2 plums plus a "wild" symbol in a row) is "more valuable" than

obtaining 3 lemons  in a row (which includes obtaining 2 lemons plus a wild

symbol in a row):



Ex. 1001 at Fig. 1B (annotated).  As shown in the above example, the ranking of

game symbols on the left side of the game field establishes which winning

combinations are "more valuable" than others (from titanium as the most

valuable, to cherries as the least valuable).

-35-

WBD (US) 50040824v2

While this embodiment of the '223 patent uses fruit and other symbols to establish which winning combination is "more valuable" than another winning combination, many other amusement and entertainment games use other symbols to accomplish the same objective. Ex. 2002 ¶ 61. For example, in traditional card games such as poker, a Royal Flush is more valuable than a Straight Flush:

**Standard Poker Hand Values**

**(Listed from Highest to Lowest Value)**

The following is a description of all the hands that you can assemble in standard poker. Most variations are based on standard poker and use similar value rankings.

**Royal Flush**

When you have the 10, J, Q, K, A of the same suit.



-36-

**Straight Flush**

Cards are consecutive and of the same suit.



Ex. 2007 at 1-3.

# Poker Hand Values

Hand Values Each game of Texas holdem is dealt using a standard playing card deck of 52 cards. Each deck has four suits made up of 13 cards per suit. The four suits are

\* \* \*

The following hand values are ranked from highest value to lowest. Go down the list until you find the value of your highest possible hand. Then do the same for your opponent's hand. Whoever has the highest hand on the list wins the hand.

- Royal Flush*A royal flush consists of the top five cards all in the same suit. The ace, king, queen, jack, and 10 of hearts make up one of the four possible royal flush hands. The same five cards, all in spades, or all in diamonds, or all in clubs is also a royal flush.*

- Straight Flush*A straight flush is five cards in order, all of the same suit. The 8, 7, 6, 5, 4 all of clubs is a straight flush.*

Ex. 2008 at 1.

-37-

Case No. CBM2020-00014
Patent No. 7,736,223

## Hand values

Following table shows the possible hand values in increasing order.



| Name | Description | Example |
|---|---|---|
| Highcard | Simple value of the card. Lowest: 2 - Highest: Ace | |
| Pair | Two cards with the same value | |
| Two pairs | Two times two cards with the same value | |
| Three of a kind | Three cards with the same value | |
| Straight | Sequence of 5 cards in increasing value (Ace can precede 2 and follow up King) | |
| Flush | 5 cards of the same suit | |
| Full house | Combination of three of a kind and a pair | |
| Four of a kind | Four cards of the same value | |
| Straight flush | Straight of the same suit | |
| Royal flush | Straight flush from Ten to Ace | |

Ex. 2009 at 7-10.

-38-

Thus, in the field of gaming, it is well understood that "value" is attributable to many non-monetary measures. Ex. 2002 ¶ 96; *see, e.g.*, Ex. 2069 at 9 ("Greater risk must be accompanied by the potential for more valuable rewards."); *id.* at 11 ("A common game marketing strategy is to give players valuable virtual items as easily achieved rewards."); *id.* at 12 ("It is frustrating to receive reward not valuable enough constantly. On the other hand, the players will no longer appreciate high value rewards if they are gained relatively easy.").

As shown in the above examples, the claim term "more valuable" is not a financial term. Rather, as the parties in the co-pending litigation have not disputed (*see* Ex. 2038 at 7 & 11), "more valuable" is simply an array of game symbols yielding a ***better*** successful outcome than another array of game symbols.

Just as the claim limitation "winning combination" is not a financial term, the same is true for the claim limitation "more valuable." That is, while the claims recite one winning combination may be "more valuable" than another, the claims do not recite that one "winning combination" is "more valuable" than another ***because it has a higher monetary value or results in a greater monetary payout***. Indeed, the current claims do not recite any kind of redemption or payout at all. Only ***after*** the game is played (as recited in the claims) could the player potentially take further ***unclaimed*** redemption or payout steps. Ex. 2002 ¶ 55. And even those unclaimed additional steps would not necessarily be monetary or financial in nature because

-39-

they could be, for example, receiving points, credits, noncash awards, or other non-monetary prizes. Accordingly, as discussed above, the game itself establishes intrinsic value in a "winning combination" that is not financial.

In addition, there are many other reasons that one "winning combination" may be more valuable than another, for example, because it allows the player to reach a new level in the game, or awards the player additional points. Ex. 2002 ¶ 65. Thus, contrary to Banilla's assertion, there is no inherent monetary value in one "winning combination" that is "more valuable" than another. Pet. at 10.

In *Facebook v. Skky*, the Board found that a patent directed to wirelessly delivering one or more digital audio and/or visual files from servers to cell phones was not a CBM patent because the claims had "context-neutral terminology that lack[ed] any language relating to a financial product or service." *Facebook, Inc. v. Skky, LLC*, CBM2016-00091, Paper 7 at 14 (PTAB Nov. 23, 2016) . In so finding, the Board rejected Petitioner's argument that it was a CBM patent because one of the purposes for the invention recited in the specification was to facilitate the payment of royalties, emphasizing that "one theoretical use is not enough to justify institution of CBM review." *Id.* at 13. Similarly, Banilla has only identified one potential outcome resulting from a winning combination—a payout recited in the specification but not in the current claims—that could possibly involve a financial activity. Pet. at 10-11. Banilla's proposed outcome lacks any connection to the

-40-

language of the claims themselves and improperly seeks to limit the claimed invention to a single use disclosed in the specification. "By relying on the Specification, and ignoring the disclosure of the claims themselves, Petitioner at best establishes that the claimed methods *could* be used to generate revenue in a number of ways, even though the language of the claims does not require any exchange of money or other financially-related step." *Facebook*, CBM2016-00091, Paper 7 at 14 (emphasis in original).

In *Ford v. Versata*, the Board found that a patent directed to a system and method for using computer assisted configuration technology to generate answers to queries was not a CBM patent. *Ford Motor Co. v. Versata Development Grp., Inc.*, CBM2016-00100, Paper 12, 2017 WL 1087387 (PTAB Mar. 20, 2017). The Petitioner argued that claims 1, 6, and 11, which included the term "attribute," encompassed the attribute of "price," pointing to disclosures in the specification describing that the attribute may be price. *Id.* at 9-10. The Board disagreed, finding that the claims were "agnostic to the specific data with the attribute field. . . . Specifically, there is nothing in the claims themselves that specifies that the attribute is price." *Id.* at 10 (noting that "[w]hile we agree with Petitioner that the Specification . . . does describe that the attribute may be price, the Specification also describes many examples of attributes that are non-financial in nature.").

-41-

Case No. CBM2020-00014
Patent No. 7,736,223

Banilla makes the same mistake as the patent owner in *Ford* and its arguments must fail for the same reason. Specifically, Banilla effectively argues that the terms "winning combination" and "more valuable" encompass only a "cash payout" referenced in the specification, ignoring the discussion in the specification of other prizes, and focus on the "associated payout" referenced in the claims that have been disclaimed. *See* Pet. at 10-11 (citing Ex. 1001 at 5:37-40, claims 10, 21, and 32). However, the current claims are not so limited, and the fact that a disclosed embodiment *may* be equipped to deliver a monetary payout *after* the game has been played does not convert the claims into those that cover a financial transaction. *See Sony Corp. of Am. V. Network-1 Techs., Inc.*, CBM2015-00078, Paper 7 at 10, 2015 WL 4452074 (PTAB July 1, 2015) ("The fact that certain devices may be equipped for PoE does not mean that claim 23 'covers' activities like transaction data analysis, inventory control, or supply chain management.").

*Delta Airlines* is the sole case that Banilla cites supporting its argument that the current claims are directed to a financial product or service. Pet. at 10 (citing *Delta Airlines, Inc. v. Loyalty Conversion Sys. Corp.*, CBM2014-00096, 2014 WL 4925862, at *4 (PTAB Sept. 29, 2014)). In that pre-*Unwired Planet* case, the Board found that a patent directed to a method for transferring or converting loyalty points of an entity into loyalty points of a commerce partner was a CBM patent because the loyalty points had a "monetary value" that could be used to purchase goods or

-42-

services from the commerce partner.[8] *Delta Airlines*, CBM2014-00096, Paper 23 at 6. In so finding, the Board relied on the now-rejected definition of a CBM patent, noting that the term "financial product or service" "has been interpreted broadly to encompass activities that are financial in nature, ***incidental to a financial activity, or complementary to a financial activity***." *Id.* (emphasis added). Moreover, the patent owner in *Delta Airlines* also ***did not dispute*** that the challenged patent was directed to a financial product or service. *Id.* (not surprisingly, because each of the independent claims in that patent recited "***amount of cash***".).

By focusing its analysis on ***possible use*** of the claimed invention rather than the actual ***claim*** language itself, Banilla "would capture claimed inventions only tangentially related to activities involving financial products and services," which is improper. *Servicenow, Inc. v. Hewlett-Packard, Co.*, CBM2015-00108, Paper 10 at 13, 2015 WL 5954591 (PTAB Oct. 8, 2015) ("[F]inding that anything with a

---

[8] Each of the independent claims challenged in U.S. Pat. No. 8,511,550 (*viz.*, Claims 1, 9, and 17) expressly recited "wherein the agreement specifies that the entity is to compensate the commerce partner in an agreed upon ***amount of cash*** or credit for conversions of non-negotiable credits to entity independent funds . . . ." Ex. 2041, 6:42-10:43 (Claims 1, 9, and 17) (emphasis added).

possible use with respect to activities involving financial products and services would capture claimed inventions only tangentially related to activities involving financial products and services."); *see also Fairchild Semiconductor Corp. v. In-Depth Test LLC*, CBM2015-00060, Paper 11 at 8, 2015 WL 4652717 (PTAB Aug. 3, 2015) ("[S]tatutory language [] requires us to focus on the challenged claims rather than speculate on possible uses of products recited in claims.").   This is especially true where, like here, the specification broadly describes the object of the game as "for the player to recognize the most rewarding game outcome and to select the appropriate element (i.e., field location) to change from the displayed symbol to a wild symbol in order to obtain the most valuable prize available for the displayed field."  Ex. 1001 at 5:62-67.

**4.     The Art Of Electronic Gaming Patents Confirms That The Terms "Winning Combination" And "Value" Are Not Necessarily Financial**

It is not surprising that other gaming patents uses the terms "winning combination" and "valuable" (or "value") in manners similar to those used in the '223 patent, namely, as non-financial terms.  Several non-exhaustive examples are illustrated below.

U.S. Patent No. 7,252,591 (Ex. 2070) discusses an electronic reel game as depicted in the embodiment of Figure 5 below:

-44-

Case No. CBM2020-00014
Patent No. 7,736,223



Ex. 2070 at Fig. 5.

> [T]he gaming device 10 in an embodiment rotates the symbol in either the clockwise or counterclockwise direction about the axis 110 until one of the originally hidden symbols 108 creates a ***winning combination*** for the player.

*Id.* at 11:49-52 (emphasis added).

U.S. Patent Publication No. 2020/0020201 A1 (Ex. 2071) discusses an electronic reel game as depicted in the embodiment of Figure 3B below:

-45-



**FIG. 3B**

Ex. 2071 at Fig. 3B.

[A] "minimum winning combination" feature occurs whenever a threshold condition(s) exists to make a ***winning combination*** in the game, which may be presented on the game screen. A minimum ***winning combination*** could be applied to any game of chance, in which game play items are revealed in a sequential manner. This includes, but is not limited to, games such as slot machines, card games, and dice games. For illustrative purposes, a 5-reel slot machine using a 3x5 grid is mentioned and depicted throughout this document, although any game or grid configuration using a sequential method to reveal game play items could be used to apply the ideas described herein. On a 5-reel slot machine, where a representative minimum win is defined as

-46-

getting three like symbols on consecutive reels on a played line starting
with the leftmost reel, a minimum ***winning combination*** could be
considered getting wild symbols on the same played line on reels 1 and
2.

*Id.* at [0027] (emphases added).

The premium reel strip includes a higher concentration of ***valuable***
symbols in a game, such as wild, bonus, high value, multiplier, and/or
other symbols. . . .  For example, premium reel strip(s) may include a
higher percentage than normal of wild symbols, ***higher value*** symbols,
etc.

*Id.* at [0036] (emphases added).

U.S. Patent No. 7,618,316 (Ex. 2072) discusses an electronic reel game as
depicted the embodiment of in Figure 3B below:



Ex. 2072 at Fig. 3B.

-47-

Case No. CBM2020-00014
Patent No. 7,736,223

Preferably, one or more combinations of the indicia 24 when displayed simultaneously as a result of a spin of the reels 22 are designated as a *winning combination* of indicia.

*Id.* at 5:57-59 (emphasis added).

[A] player who has won one or more of those difficult to obtain bonus indicia but who has not yet won all of the indicia necessary for a bonus win can store those *valuable* indicia already won for use in the future.

*Id.* at 16:24-28 (emphasis added).

U.S. Patent Pub. No. 2007/0032284 A1 (Ex. 2073) discusses an electronic reel game as depicted in the embodiment of Figure 3(f) below:



**FIG. 3(f)**

Ex. 2073 at Fig. 3f.

FIG. 3(f) shows that, in at least some embodiments, the expanded set 375 yields three separate sets of *winning combinations* S1 ("Q,

-48-

WBD (US) 50040824v2

Q"), S2 ("A, A"), and S3 ("A, A, Q, Q"), respectively. In one aspect

of the present concepts, the controller 34 may be configured to

automatically provide awards for each of the **winning combinations**

S1, S2, S3, or the like, or may alternatively be configured to provide an

award only for the **highest** of the winning combinations.

*Id.* at [0042] (emphases added).

U.S. Patent No. 7,744,458 (Ex. 2074) discusses an electronic reel game as

depicted in the embodiment of Figure 10 below:



FIG. 10

Ex. 2074 at Fig. 10.

At least one first predetermined symbol appears on at least one of a

predetermined position, column and row, triggering a reposition of at

-49-

Case No. CBM2020-00014
Patent No. 7,736,223

least one of the plurality of symbols on the display area to create a

**most valuable winning combination**.

*Id.* at 6:3-7 (emphasis added).

One of the bonus features of the present invention is revealed in FIG. 10. The balloon 92 in the display triggers the MVP scatter pay. This balloon will fill with air, come down from its position, and an animated monkey will run to the balloon and hang from its strings. The balloon will then move and drop the monkey at whatever symbol is to be moved to form the **most valuable combination**.

*Id.* at 17:23-29 (emphasis added).

U.S. Patent Pub. No. 2013/0040724 A1 (Ex. 2075) discusses an electronic reel game as depicted in the embodiment of Figure 8B below:

| 9 | 9 | A | 10 | 10 |
|---|---|---|----|----|
| K | K | K | K  | K  |
| Q | J | J | A  | 9  |

**Figure 8B**

Ex. 2075 at Fig. 8B.

In an embodiment, the optimal **winning combination** for the feature game round is a **combination** of symbols from the feature subset that

-50-

WBD (US) 50040824v2

corresponds to the highest prize according to prize data for the game round.

*Id.* at [0015] (emphasis added).

U.S. Patent No. 7,252,591 (Ex. 2070), discussed above with reference to the embodiment of Figure 5, also discusses an electronic reel game as depicted in Figure 4 below:



FIG.4

Ex. 2070 at Fig. 4

[T]he player may rotate the symbol set 100, 102 or 104 to attempt to make a ***winning combination*** or attempt to ***upgrade a winning combination***.

*Id.* at 11:60-62 (emphases added).

-51-

WBD (US) 50040824v2

> If the generated combination or a portion of the combination matches one of a number of predetermined award producing or ***winning combinations***, the player receives an award.

*Id.* at 1:32-35 (emphasis added).

> If the current combination [of symbols] is a ***winning combination***, the player can keep the ***winning combination*** or risk it for a possibly ***more valuable winning combination***.

*Id.* at 2:67-3:2 (emphases added).

Accordingly, the terms "winning combination" and "valuable" (or "value") are used in the art in manners similar to those used in the '223 patent, namely, as non-financial terms.

### 5.    The Gambling Laws Of Ohio Referenced In The '223 Patent Prohibit Financial Prizes

The '223 patent expressly references statutes in Ohio regarding skill-based amusement games:

> [T]he State of Ohio generally prohibits, pursuant to statutes, gambling and the use of any gambling devices.  However, skill-based amusement machines are permitted.

Ex. 1001 at 1:21-24.

-52-

The referenced Ohio statutes expressly codify that the term "value" is not necessarily financial:

**ORC** § 2915.01 Definitions.[9]

As used in this chapter:

* * *

---

[9] The application for the '223 patent was filed in 2006, and the enactment of this revised statute was roughly contemporaneous with the publication of the application in October 2007. *See* Ex. 2079 (U.S. Pat. Pub. No. 2007/0232384 A1). Ohio's revised statute codified the State's existing interpretation of the law, for example, as articulated by the Ohio Attorney General. *See* Ex. 2078 at 52 ("The courts have generally adopted a broad definition of the word 'prize' as meaning ***anything of value***. Even the opportunity to replay a machine at no additional cost upon attaining a sufficiently high score in the initial play has been determined to have sufficient value to constitute a prize.") (emphasis in original); *see id.* at 54 ("***Anything of value*** that is offered for winning a contest, competition, or tournament, based upon the play of a machine referred to in R.C. 2915.01(AAA)(2), constitutes a 'prize' for purposes of R.C. 2915.01(AAA)(2)(c)") (emphasis added).

-53-

**(AAA)(1)** "Skill-based amusement machine" means a mechanical, video, digital, or electronic device that rewards the player or players, if at all, only with merchandise prizes or with redeemable vouchers redeemable only for merchandise prizes, . . .

* * *

**(2)** A device shall *not* be considered a skill-based amusement machine and shall be considered a slot machine if it pays cash . . . .

* * *

**(BBB)** "Merchandise prize" means any item of value, but shall not include any of the following:

**(1)** Cash, gift cards, or any equivalent thereof;

**(2)** Plays on games of chance, state lottery tickets, bingo, or instant bingo;

**(3)** Firearms, tobacco, or alcoholic beverages; or

**(4)** A redeemable voucher that is redeemable for any of the items listed in division (BBB)(1), (2), or (3) of this section.

**(CCC)** "Redeemable voucher" means any ticket, token, coupon, receipt, or other noncash representation of value.

Ex. 2076 at 10-11 (emphases added).

**ORC** § 2915.06 Skill-based amusement machine prohibited conduct.

-54-

**(A)** No person shall give to another person any item described in division (BBB)(1), (2), (3), or (4) of section 2915.01 of the Revised Code in exchange for a <mark>noncash prize, toy, or novelty received as a reward for playing or operating a skill-based amusement machine</mark> or for a free or reduced-price game won on a skill-based amusement machine.

Ex. 2077 at 1 (emphasis added).

Ohio courts have also discussed the terms "best combination" and "highest value" without limiting them to financial meanings.  For example, multiple Ohio courts used these terms in reference to a version of Savvy Dog's commercial "*Tic Tac Fruit*" game shown below:



-55-

WBD (US) 50040824v2

Ex. 2078 at 1.

> Unlike traditional tic tac toe, the game is played with a variety of icons, such as hearts and clovers which are used instead of a traditional "x" and "o" when attempting to get three in a row.  The icons have varying degrees of value. . . .  The player's goal is to quickly identify the three in a row combination which produces the greatest value.  Upon identifying the best combination, the player must select the symbol to be replaced with a "wild card.". . .  As noted above, because the icons have differing values, the player must choose the correct spot on the screen that results in the highest value when completing the three in a row line. . . .  Prior to playing the game, a player may read a help screen which gives directions on how to play the game and further informs the player as to the relative value of the icons that will be employed to solve the puzzles.

*Id.* at 11.

> The player then has a limited time to touch the screen at any of the nine spots and change the symbol to a wild symbol which will match any other symbol.  If the player selects the correct spot which the computer program had changed so that there would be no completed lines, he or she has correctly solved the puzzle and wins the game.  Because of the

-56-

possible multiple line winners, there may be more than one spot which when changed will result in making three symbols in a row. Also, because of the different values for the nine symbols, the player much choose the spot which will result in the highest value for completing the line.

*Id.* at 6.

Further, the Ohio Supreme Court has discussed a "successful outcome" that rewards a non-financial prize of one or more replays:

> [A]mple evidence was adduced from which it can be reasonably concluded that skill in play of the machines greatly predominates over chance in achieving ***a successful outcome*** of attaining the ***prize rewarded.*** With respect to the "Spirit of '76" pinball machine, it was stipulated that it "***awards one replay*** for the accumulation of 65,000 points and ***a second replay*** if a score of 83,000 is accumulated" . . . .

*Progress Vending, Inc. v. Dept. of Liquor Control*, 59 Ohio App.2d 266, 269 (Ohio Sup. Ct. 1978) (emphases added); *see also id.* at 327 ("gaining additional amusement (a prize)").

As discussed in the preceding sections, the intrinsic and extrinsic evidence repeatedly demonstrates that the terms "winning combination" and "more valuable" are commonly used in the gaming field as non-financial terms. Accordingly, Banilla

-57-

has not met its burden of demonstrating that the '223 patent is directed to a financial product or service, as is necessary to meet the first prong of the threshold CBM inquiry. In particular, Banilla has failed to establish that either of the recited claim terms "winning combination" or "more valuable" is a financial product or service.[10] For at least this reason, the Board lacks jurisdiction over this Petition and institution should be denied.

### 6. Banilla's Own Patent Applications Confirm That The Terms "Winning Combination" (Or "Winning Pattern") And "Value" Are Not Necessarily Financial

Banilla's (and Grover's) own patent applications on electronic games confirm that the terms "winning combination" (or "winning pattern") and "value" are not necessarily financial. Exs. 2066-67. For example, Banilla's U.S. Patent App. Pub. No. 2016/0049039 A1 (Blackwelder) (Ex. 2066) discusses an electronic reel game as depicted in the embodiment of Figure 1B below:

---

[10] *See infra* §§ V.A.3. – V.A.5.; Ex. 2078 at 226 ("The instant claims are not specifically directed to determining financial obligations.").



FIG. 1B

Ex. 2066 at Fig. 1B.

[0005] . . . An associated prize may be awarded upon a win outcome. The associated prize may include any one of money, merchandise, tokens, points, credits, chips, tallies, tickets, and/or an item of *value* or perceived *value*.

* * *

[0006] . . . The play amount may include a *value* of any one or more of money, tokens, points, chips, tallies, tickets, and/or the like selected to play a particular game play. . . . [S]electing the alternate icon that

-59-

most correctly completes the at least one pattern of icons may include

selecting an alternate icon that provides the <mark>at least one pattern of icons</mark>

<mark>resulting in a *highest value* as compared to the other available</mark>

<mark>selections.</mark>

*Id.* at [0005]-[0006] (emphases added).

[0017] . . . Game device 103 may include a display for displaying

electronic game board screen 115 for electronic skill game 107, and

may include a number of pay lines 135, (e.g., shown as numbered 1-25

in FIGS. 1A and 1B), wherein on a given play if <mark>a *winning pattern* of</mark>

<mark>icons 110</mark> is displayed on, or caused to be displayed by a user's

selection, on one or more of pay lines 135 (e.g., <mark>matching *winning*</mark>

<mark>*combinations*</mark> on one or more pay lines 135), the player will win

associated prize 140.

*Id.* at [0017] (emphases added).

Banilla's U.S. Patent App. Pub. No. 2016/0049039 A1 (Blackwelder) further

illustrates an electronic reel game as depicted in the embodiments of Figures 2A and

2B below:

-60-

Case No. CBM2020-00014
Patent No. 7,736,223



*FIG. 2A*

*Id.* at Fig. 2A.

WBD (US) 50040824v2

Case No. CBM2020-00014
Patent No. 7,736,223



FIG. 2B

*Id.* at Fig. 2B.

As a further example, Banilla/Grover's U.S. Patent App. Pub. No. 2020/0168027 A1 (Blackwelder) (Ex. 2067) discusses an electronic reel game with a "Next Outcome" (Preview) feature as depicted in the embodiment of Figure 4A below:

-62-

Case No. CBM2020-00014
Patent No. 7,736,223



FIG. 4A

Ex. 2067 at Fig. 4A.

[0016] . . . The term outcome may include a prize *value* and/or a board display of the play. Consideration may take a number of forms, including, but not limited to money, tokens, points, chips, tallies, tickets, or the like, whether purchased, earned, or otherwise received in order to use, activate, or play a game.

\* \* \*

[0018] As opposed to existing games of chance, such as slot machines, and video poker games that charge a player to play for a chance to win more money, tokens, or other item of *value* based on some element of chance, in the game system of the present invention, a player may play

-63-

the game and possibly win <mark>something of *value*</mark>, but not based on any
element of chance

*Id.* at [0016], [0018] (emphases added).

As repeatedly shown above, Banilla's patent applications expressly contemplate prizes of value other than money, such as tokens, points, chips, tallies, tickets, or other items of value. Thus, as shown above, Banilla's own patent applications on electronic games confirm that the terms "winning combination" (or "winning pattern") and "value" are not necessarily financial. Exs. 2066-2067.

## B. Banilla Fails To Establish That The '223 Patent Does Not Claim A "Technological Invention"

Patents for "technological inventions" are excluded from CBM review. 37 C.F.R. § 42.301(a); Ex. 2002 ¶ 103. To determine whether a patent claims a technological invention, the Board considers "whether the claimed subject matter *as a whole* [1] recites a technological feature that is novel and unobvious over the prior art; and [2] solves a technical problem using a technical solution." 37 C.F.R. § 42.301(b) (emphasis added); Ex. 2002 ¶ 103. This two-part technological invention analysis expressly requires evaluating claims *as a whole*. Contrary to this requirement, Banilla assesses the claims of the '223 Patent only on an element-by-element basis (Pet. at 12–16), thus failing to carry its burden of establishing that the '223 Patent is eligible for CBM review. *See* 37 C.F.R. § 42.301(a) .

-64-

1.    **Banilla Fails To Provide Any Reasoned Analysis Regarding Whether The Claims *As A Whole* Recite A Novel Or Nonobvious Feature**

With respect to the first part of the technological invention analysis—whether the claimed subject matter recites a novel and unobvious technological feature—Banilla ignores the context of any claim ***as a whole*** and instead parses each claim element individually, without reference to the remaining elements. *See* Pet. at 12–15 (evaluating the "electrical game terminal," "touch screen display," and "game processor" components separately). For example, Banilla states that the '223 patent "does not allege that any of these ***components*** constitute technological advancements or were novel at the time of the claimed invention." *Id.* at 13 (emphasis added). Banilla then summarily states that "the generically claimed well-known computer ***components*** are just that—generic and/or well known." *Id.* at 15 (emphasis added). However, Banilla fails to provide reasoning as to why it would have been obvious to combine the claimed components and features in the manner required by the independent claims. Moreover, Banilla provides no explanation regarding how the technological feature of, for example, having a processor with firmware that elevates a game of chance into a game of skill was allegedly known or obvious. And, Banilla provides no evidence that this type of gaming system (a game processor that could insert skill into a game of chance) existed prior to the May 9, 2006 filing date of the '223 patent. Ex. 2002 ¶¶ 107, 111. Banilla's conclusory

-65-

analysis is insufficient to carry its burden on the second prong of the CBM threshold inquiry. *See Wells Fargo Bank, N.A. v. USAA*, CBM2019-00028, Paper 14 at 17–19, 2019 WL 4855339, at *7–8 (PTAB Oct. 1, 2019) (finding that petitioner failed "to meet its burden" and denying petition, including because petitioner "does not establish sufficiently that it would have been obvious to combine the purported old and well-known features in the manner required by independent claims 1, 12, and 30, much less with any reasonable expectation of success", and because petitioner "addresses each feature of the challenged claims in isolation, without considering the challenged claims, as a whole").[11]    Thus, Banilla has failed to sufficiently

---

[11] *See also, e.g.*, *HTC Corp. v. Ancora Techs. Inc.*, CBM2017-00054, Paper 7 at 10–11 (PTAB Dec. 1, 2017) ("Petitioner, however, does not address the technological feature . . . but rather refers to the individual elements of the claims without considering the claims as a whole, as required by § 42.301(b)."); *Google Inc. v. At Home Bondholders' Liquidating Trust*, CBM2016-00036, Paper 12 at 8–9, 2016 WL 4987385 (PTAB Aug. 22, 2016); *Old Republic Gen. Ins. Group, Inc. v. Intellectual Ventures II LLC*, CBM2015-00184, Paper 7 at 7–8 (PTAB Apr. 15, 2016) ("Petitioner focuses on the individual components of the '002 patent, without analyzing how each claim of the '002 patent combines these individual components

-66-

Case No. CBM2020-00014
Patent No. 7,736,223

demonstrate that the claims of the '223 Patent do not recite a technological feature that is novel and unobvious.[12] Ex. 2002 ¶ 107.

_____

into an ordered whole. . . . ***Such a cursory analysis is insufficient*** to demonstrate that the [] patent claims, as a whole, do not recite a technological feature that is novel and unobvious." (emphasis added)) (citing additional PTAB cases); *Experian Mktg. Sols., Inc. v. RPost Commc'ns Ltd.*, CBM2014-00010, Paper 20 at 9, 2014 WL 1628568, at *6 (PTAB Apr. 22, 2014) (denying institution of CBM review where the petitioner "analyzed the method steps separately, instead of examining each claim as a whole, as required", and also concluding that "Petitioner's conclusory language in the petition that none of the steps of a claim requires any novel and unobvious technological implementation, or solves a technical problem, without more, is not sufficient to demonstrate that the claimed subject matter is not a technical invention").

[12] In prosecuting its own later-filed claims, Grover emphasized that in assessing a technological invention under Section 101, the USPTO was required to view the claims "as a whole":

[I]t is the unique combination of the limitations as recited in applicant's amended claims, ***as a whole***, that solve the specific technical problem.

-67-

> **2.** **Banilla Fails To Provide Any Reasoned Analysis Regarding Whether The Claims *As A Whole* Recite A Technical Solution To A Technical Problem**

With respect to the second part of the technological invention analysis, Banilla similarly states in conclusory fashion that the '223 patent "does not solve a technical problem with a technical solution." Pet. at 15–16. Banilla asserts that "[t]he '223 patent mentions only non-technical problems" but provides no reasoned explanation and offers no evidence as to why the claimed invention, as a whole, is not a technical solution to a technical problem. *Id.* at 15. Simply labeling the problems as "non-technical" is insufficient. *See, e.g., Old Republic*, CBM2015-00184, Paper 7 at 9-10 ("Simply labeling the problem addressed in the '002 patent as 'one of personal mobility' and the resulting solution as 'a logistical issue,' is not sufficient to demonstrate that the claims of the '002 patent do not solve 'a technical problem

---

That is, the electronic game system, as claimed by the applicant, solves

the specifically note[d] technical problem.

Ex. 2082 at 204-05 (emphasis added).

using a technical solution.'"). For at least this reason, Banilla has failed to satisfy the second part of the technological invention analysis.[13]

### 3. The District Court Has Initially Determined That The Claims May Recite A Technological "Improvement" And An "Inventive Concept"

As extensively briefed and argued in the co-pending District Court litigation, the claims of the '223 patent are patent eligible. *See, e.g.*, Exs. 2015-19. The '223 patent is directed to a specially configured electronic gaming processor—one that is configured to test a game field and display a game to be played to a player prior to game play—thus infusing skill into a game of chance and resulting in an improvement upon existing game processor technology. *Id.*; Ex. 2002 ¶ 108. This technical solution to the technical problem of infusing skill into a game of chance is claimed, for example, in the element requiring that "the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display." Ex. 1001 (Claim 1); Ex. 2002 ¶¶ 109-10.

---

[13] *See infra* § V.B.4. & Ex. 2078 at 269 ("[A]pplicant's claimed elements provides an improvement to and solves a problem in the prior art and technological area of electronic game systems.").

"If 'the claimed subject matter is directed to a specific improvement to the way computers operate,' . . . the patents are also for a 'technological invention' under any reasonable meaning of that term." *IBG LLC v. Trading Techs. Int'l, Inc.*, 757 Fed. App'x 1004, 1007–08 (Fed. Cir. 2019) (unpublished). It would be "inconsistent" to find otherwise. *Id.* at 1008. Here, in light of the District Court's denial of the Section 101 motion to dismiss (Ex. 2018), it would be "inconsistent" to find that the '223 patent does not claim a technological invention. *See IBG*, 757 Fed. App'x at 1007–08; *cf. Sophos Inc. v. RPost Holdings, Inc*, No. 13-cv-12856, 2016 WL 3149649, at *12 n.6 (D. Mass. June 3, 2016) (denying Section 101 motion for judgment on the pleadings, noting that earlier CBM challenges were denied for failing the "technological innovation" analysis).

As set forth above, Banilla has failed to meet its burden of establishing that the '223 patent—with its claims considered *as a whole*—is not a "technological invention" and is eligible for CBM review. Thus, the Petition should be denied for this independent reason.

### 4.   **Banilla Admits In Its Own Later-Filed Patent Applications That Its Analogous Claims Are A Technological Invention**

Banilla's arguments to the PTAB regarding the '223 patent's claims are in stark contrast to Banilla's arguments to the USPTO regarding Banilla's and Grover's own analogous patent claims. In particular, Banilla's arguments in its CBM petition

-70-

directly contradict the positions taken in Banilla's own pending Patent Application No. 14/825,908, directed to an "Electronic Skill Game" (Ex. 2080) ("the '908 application"), as well as in Grover's pending Patent Application Nos. 14/468,493 (Ex. 2082) ("the '493 application") and 16/776,597 (Ex. 2081) ("the '597 application") directed to a "No Element of Chance Electronic Game System and Method."

For example, the chart below compares analogous portions of Banilla's Claim 1 of its '908 application and Claim 1 of the '223 patent:

| Banilla's Claim 1 | The '223 Patent Claim 1 |
|---|---|
| "analyzing the generated at least one pattern of icons, designated icon, and the set of alternate icons to determine if one or more winning combinations are possible by replacing the designated icon with one of the alternate icons, and if more than one winning combination is available determining which of the alternate icons most correctly completes the at least one pattern of icons in accordance with a predefined criteria" | "wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display[, and] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" |

*Compare* Ex. 2080 at 208 *with* Ex. 1001 at 12:56-64.

In response to the Examiner's rejection of Banilla's Claim 1 under Section 101, Banilla argued as follows:

-71-

Here, the pending claims represent *a specific, practical application in a gaming system involving a novel way to employ a display device, a player interface, a credit input, and a game processor* that is operable, among other things, to provide a skills function requirement to a player in a casino like gaming machine, and to control the gaming machine display device to display a pattern of icons and visually distinguish a designated icon amongst the pattern of icons; displaying a set of alternate icons separate from the pattern of icons; *analyzing the pattern of icons, designated icon, and the set of alternate icons to determine if one or more winning combinations are possible by replacing the designated icon with one of the alternate icons, and if so which of the alternate icons most correctly completes the at least one pattern of icons in accordance with a predefined criteria*; providing a function requiring the player to select an alternate icon via the player interface to replace the designated icon; and then determining if the player selected the alternate icon that most correctly completes the pattern of icons based on the predetermined criteria. *Such features, are practical and not abstract*, even if they may involve ancillary wagering activity.

-72-

It is clear that the pending claims do not recite merely an abstract idea of wagering, and, as amended, do not recite wagering explicitly. *The instant claims are not specifically directed to determining financial obligations*. Moreover, the instant claims do not concern any specific underlying game. Put another way, *the pending claims do not merely recite long known practices that implement them on an electronic game system*. Indeed, the pending claims are not directed to such a judicial exception.

Ex. 2080 at 225-26 (emphases added).

During prosecution of the '908 application, Banilla made further representations to the USPTO that stand in stark contrast to its arguments in the CBM Petition. For example, Banilla argued that its claims solved a problem in the "technological area of electronic game systems":

[A]pplicant's claimed elements provides *an improvement to and solves a problem in the prior art and technological area of electronic game systems*. Applicant's presently claimed invention provides a gaming/gambling experience that has the look and feel of traditional gaming systems, such as slot machines, while at the same time requires some level of player skill to play the game. . . . Thus, applicant's

-73-

presently claimed invention *solves a known problem in the prior art and technological area of electronic game systems*.

*Id.* at 269 (emphases added).

> [I]t is the combination of the limitations as recited in applicant's amended *claims, as a whole, that solve the specific problem in the art*. That is, the electronic skills game system, as claimed by the applicant, *solves the specific problem in the art* of creating a "skills" type electronic gaming device, while still maintaining the look and feel of a traditional gambling/gaming device (e.g., casino style slot machine).

*Id.* at 362-363 (emphases added).

Banilla further repeatedly emphasized during the prosecution of the '908 application that, in assessing patentability, the USPTO was required to view the claims "as a whole":

> The mere generic statement in Paulsen that "Video poker machines, video slot machines and video blackjack machines are well known in the art" is not sufficient to meet the threshold to demonstrate that applicant's particular claimed elements (or combination of elements), when viewed individually and *as a whole*, are well-understood, routine, conventional. The relied upon statement in Paulsen generically refers to Video poker machines, video slot

-74-

machines, and video blackjack machines, and in particular to a video draw poker machine; and does not address applicant's particularly claimed elements viewed individually <u>and</u> *as a whole*, which have already been found by the Examiner to be unique and novel overcoming all previously cited prior art.   Further, the Examiner's conclusory statement, appears to ignore all the elements of the Appellant's claimed invention (viewed individual and *as a whole*), and makes the erroneous conclusion that since it includes memory, a display, a processor, and user inputs then the invention as a whole is considered well known and conventional, and thus abstract.

*Id.* at 287 (underlining in original; additional emphases added).

In response to Banilla's arguments, the USPTO issued a Notice of Allowance for Banilla's claims, including Claim 1.  *Id.* at 1 & 151 ("The amended claims have overcome the previous 101 rejection.").

Further, during prosecution of the '493 application (listing 3 of the same inventors and prosecuted by the same counsel), Grover made strikingly similar/near identical representations to the USPTO that stand in stark contrast to its arguments, made through Banilla, in the CBM Petition.  For example, Grover argued that its claims solved a specific technical problem of "being able to remove all elements of

-75-

chance, while still providing the look and feel of a gaming/gambling device, such as a slot machine":

> Applicant's presently claimed invention provides a gaming/gambling experience without falling under various state's statutes definition of "gambling." Until applicant's invention, nothing in the electronic game system prior art *solved this problem* (i.e., *being able to remove all elements of chance, while still providing the look and feel of a gaming/gambling device, such as a slot machine*). Thus, applicant's presently claimed invention *solves a known problem* in the prior art.

Ex. 2082 at 48-49 (emphases added).

> As presently amended, applicant's claims are directed to *a technical solution to this particular technical problem in the gambling/gaming industry*. As claimed, applicant's invention solves this problem by transforming what would be considered a "gambling" device to a "non-gambling" game device, while still maintaining the look and feel of a traditional gambling/gaming device (e.g., casino style slot machine, video game poker machines, etc.).

*Id.* at 257 (emphasis added).

> [I]t is the combination of the limitations as recited in applicant's amended claims*, as a whole* that *solve the specific technical problem*.

-76-

That is, the electronic game system, as claimed by the applicant, *solves the specific technical problem of transforming a "gambling" device to a "non-gambling" game device*

Id. at 258 (emphases added).

Applicant's claims, as presently amended, are directed to *a specific technological solution to a specific technological problem in the regulated electronic gambling/gaming industry*. . . . However, to do so poses *a significant technical problem to be solved*, that is, how to develop/transform an electronic gaming machine/device that eliminates all elements of chance, but yet still maintains the look and feel of a traditional electronic gambling/gaming machine (e.g., casino style slot machine, video poker machine, etc.).

Id. at 202-03 (emphases added).

[T]he electronic game system, as claimed by the applicant, *solves the specifically note[d] technical problem*.

Id. at 205 (emphasis added).

Grover also argued during prosecution of the '493 application that its claims are not directed to "financial obligations, but rather to a system (its components and configuration) upon which a game(s) may be played":

-77-

The fact that a player, playing a particular game on the claimed game system, may insert some money into the game system to play a game thereon, and may or may not receive an awarded as a result of the game outcome, is at best an underlying concept, but is not the main focus/thrust of the claim, its character as a whole. That is, ***applicant's claims are not directed to playing a specific wager game or "determining financial obligations"***, but rather to a system (its components and configuration) upon which a game(s) may be played.

*Id.* at 46 (emphasis added).

Thus, it is wholly inconsistent for Banilla to argue that its and Grover's claims are patentable under Section 101, while simultaneously attacking the '223 patent's earlier-filed analogous claims under that same statutory section and the "technological invention" prong of the threshold CBM inquiry:

In the CBM proceedings involving the '132 and '304 patents, the Board agreed with *CQG* and found the claims of both patents eligible. At the same time, the Board held that the patents are not for technological inventions. If "the claimed subject matter is directed to a specific improvement to the way computers operate," as we held in *CQG*, 675 F. App'x at 1006, the patents are also for a "technological invention" under any reasonable meaning of that term.

-78-

*IBG LLC v. Trading Techs. Int'l, Inc.*, 757 Fed. App'x 1004, 1007–08 (Fed. Cir. 2019) (unpublished).    Consequently, the PTAB should weigh Banilla's own admissions to the USPTO strongly against institution here.[14]

---

[14] Apparently realizing how its lack of candor with the USPTO would likely be called into question in this CBM proceeding and/or in the parallel District Court litigation, on July 2, 2020 (after filing its CBM Petition), Banilla and Grover filed the following remarks in the '908 application and the '597 application:   "Applicant hereby expressly rescinds, disclaims, and withdraws any and all arguments previously made or submitted in the present application."   Ex. 2080 at 50; *see* Ex. 2081 at 112.  The legal effect of such self-serving and after-the-fact remarks is unknown to the undersigned, but is believed to be a nullity.  Notably, neither Banilla nor Grover abandoned either of those patent applications—both directed to similar electronic skill games as covered by the '223 Patent claims at issue here, including the use of a "Next Outcome" (Preview) function—and the '908 application has been allowed and is expected to issue soon.  Ex. 2080 at 1.

Case No. CBM2020-00014
Patent No. 7,736,223

## VI.   THE BOARD SHOULD EXERCISE ITS DISCRETION TO DENY INSTITUTION HERE IN VIEW OF *APPLE V. FINTIV* AND ITS PROGENY

Many months ago, Banilla (through its customer in Pennsylvania named "Pennsylvania Coin") elected to litigate the merits of the issues raised in this CBM (namely, § 101 and § 112) in the United States District Court for the Middle District of Pennsylvania.  Only ***after*** the District Court rejected the Section 101 challenge did Banilla raise those same issues before the PTAB in its belated CBM petition. Further, Banilla (through Pennsylvania Coin) also elected to raise the same Section 112 challenges in its fully briefed claim construction arguments before the District Court, and the Court's decision in that regard will likely be issued before the Institution Decision here.  Accordingly, given the facts and circumstances here, the Board should exercise its discretion to deny Banilla a second bite at the same apple. *Apple Inc., v. Fintiv, Inc.*, IPR2020-00019 (Paper 15), 2020 WL 2486683, at \*3 (PTAB May 13, 2020) (precedential).

### A.   The District Court And The Parties Have Already Expended Considerable Resources In Briefing And Evaluating The Section 101 And Section 112 Issues Raised In The Petition

Savvy Dog filed the co-pending district court action on August 23, 2019, and served the Complaint on August 28, 2019.  Exs. 2010-11.  Thereafter, on October 18, 2019, Banilla's customer, Pennsylvania Coin, filed a motion to dismiss the action based on alleged failure of the '223 patent's claims to comply with Section 101.  Ex.

-80-

2012.   The parties fully briefed those issues (Exs. 2012-13 & 2015-17), and on March 17, 2020, the Court held a hearing on that motion.   After post-hearing briefing, the Court denied Pennsylvania Coin's motion to dismiss in its entirety.   Ex. 2018-19.   Apparently recognizing that its Section 101 attack would be unlikely to succeed in the District Court, Banilla thereafter turned to the PTAB, filing its CBM petition seven weeks later on May 21, 2020—nearly nine months after commencement of the parallel District Court litigation.

Further, on July 16, 2020 and August 13, 2020, Banilla (through Pennsylvania Coin) raised the same Section 112 arguments in its claim construction briefing before the District Court.   Exs. 2032-35, 2037, & 2039.   The Court has scheduled a Markman Hearing for September 15, 2020, and thus will likely decide the parties' claim construction disputes (including Banilla's Section 112 challenges) well before the Institution Decision in this case (which is scheduled to issue on or before November 28, 2020).   Accordingly, given the considerable resources already expended by the District Court and the parties litigating Banilla's Section 101 and Section 112 challenges in the parallel co-pending litigation, Banilla should not be provided with a second opportunity to re-litigate those same issues before the Board.

-81-

**B.    The Six *Apple v. Fintiv* Factors Weigh In Favor Of Denial Of Institution Here**

In *Apple v. Fintiv*, the Board outlined six factors to consider in evaluating whether to discretionarily deny institution under 35 U.S.C. § 314(a) based on duplicative parallel proceedings in a district court:

1.    whether the court granted a stay or evidence exists that one may be granted if a proceeding is instituted;

2.    proximity of the court's trial date to the Board's projected statutory deadline for a final written decision;

3.    investment in the parallel proceeding by the court and the parties;

4.    overlap between issues raised in the petition and in the parallel proceeding;

5.    whether the petitioner and the defendant in the parallel proceeding are the same party; and

6.    other circumstances that impact the Board's exercise of discretion, including the merits.

*Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 15 at 7-8 (PTAB May 13, 2020) (precedential).  The Board has since also looked to these factors in its decision whether to institute a covered business method review in the presence of a parallel district court proceeding.  *See Stripe, Inc. v. Boom! Payments, Inc.*, CBM2020-

-82-

00002, Paper 21 (PTAB Mar. 25, 2020). On balance, these factors favor denial of institution here.

### 1.    Neutral: Whether The Court Granted A Stay Or Evidence Exists That One May Be Granted If A Proceeding Is Instituted

On June 25, 2020, Banilla (through its customer Pennsylvania Coin) filed a motion to stay the District Court proceeding in view of Banilla's CBM petition. Ex. 2027. The District Court has held that motion in abeyance pending the Board's decision on institution here. Ex. 2030. Further, the District Court allowed for the potential of supplemental briefing on the motion to stay once the Board has made its decision on Banilla's CBM petition, so even if review were instituted here, there is no guarantee that the court would grant a stay. *Id.*

Accordingly, this factor is likely neutral in the Section 314(a) analysis. *See Apple v. Fintiv*, Paper 15 at 12 ("We decline to infer, based on actions taken in different cases with different facts, how the District Court would rule should a stay be requested by the parties in the parallel case here. This factor does not weigh for or against discretionary denial in this case."); *Intel Corp. v. VLSI Tech. LLC*, IPR2020-00141, Paper 16 at 9 (PTAB June 4, 2020) (hereinafter "*VLSI*") ("We decline to infer, based on actions taken in different cases with different facts, how the District Court would rule should a stay be requested by the parties in the

-83-

copending litigation. Thus, this factor does not weigh for or against discretionary denial in this case.").

In some instances, the Board has discussed the district court's general practices in assessing whether a stay is likely. *See Supercell Oy v. Gree, Inc.*, IPR2020-00310, Paper 13 at 10 (PTAB June 18, 2020) ("We agree in principle that a court's general practices on requests for stays may be relevant in some circumstances."). To the extent the Board considers the general practices of the Middle District of Pennsylvania where the parallel District Court action here resides, this district has denied motions for stays in cases that were at earlier stages than the parallel District Court action here. *See, e.g.*, *InterMetro Indus. Corp. v. Enovate Med., LLC*, No. 3:13-CV-02854, 2017 WL 901100, at *4 (M.D. Pa. Mar. 7, 2017) (denying a motion for a stay pending resolution of a parallel IPR where "[n]o trial date ha[d] been set, fact discovery [was] not over, expert discovery ha[d] not even begun, the *Markman* hearing ha[d] not been held and no *Markman* order ha[d] issued, InterMetro's motion to dismiss two counterclaims [was] still pending, and *Daubert* and summary judgment motions have not been filed."). As discussed below, in the parallel District Court action here, a motion to dismiss has been decided, a trial date has been set, *Markman* briefing is complete (and a *Markman* hearing is scheduled to have been held by the time of the Board's decision here), and significant discovery is complete. Accordingly, consideration of the district court's

-84-

general practices indicates that a stay is unlikely and would weigh, if anything, in favor of denial here.

### 2. Slightly Favors Institution: Proximity Of The Court's Trial Date To The Board's Projected Statutory Deadline For A Final Written Decision

The Final Written Decision in this case would be scheduled for November 28, 2021. The District Court has scheduled the trial date in the parallel co-pending litigation for about three (3) months thereafter, March 7, 2022. Ex. 2026 at 12. Accordingly, this factor likely weighs slightly in favor of institution in the Section 314(a) analysis. *See Apple v. Fintiv*, Paper 15 at 13 ("Because the currently scheduled District Court trial is scheduled to begin two months before our deadline to reach a final decision, this factor weighs somewhat in favor of discretionary denial in this case.").

### 3. Favors Denial: Investment In The Parallel Proceeding By The Court And The Parties

Due to Banilla's unreasonable delay in filing the Petition, the District Court and the parties have already invested significant resources in the co-pending litigation, including the following filings in the 89 entries in the District Court docket as of the filing of this POPR:

- Motion to Dismiss: 10/18/19, 11/15/19 (Exs. 2012 & 2015)

-85-

- Opposition to Motion to Dismiss: 11/01/19, 12/02/19 (Exs. 2013 & 2016)

- Reply re: Motion to Dismiss: 12/16/19 (Ex. 2017)

- Oral Argument re: Motion to Dismiss: 03/17/20

- Order re: Motion to Dismiss: 04/02/20 (Exs. 2018-19)

- Case Management Plan: 01/29/20 (Exs. 2023-25)

- Case Management Conference: 02/25/20 (*see* Ex. 2022)

- Case Management Order: 02/26/20 (Ex. 2026)

- Motion to Stay: 06/25/20 (Ex. 2027)

- Opposition to Motion to Stay: 07/09/20 (Ex. 2028)

- Reply re: Motion to Stay: 07/23/20 (Ex. 2029)

- Order re: Motion to Stay: 08/04/20 (Ex. 2030)

- Infringement contentions: 04/06/20 (Ex. 2031)

- Invalidity contentions: 06/04/20 (Ex. 2032)

- Joint claim construction statement: 07/09/20 (Ex. 2033)

- Claim construction opening briefs: 07/16/20 (Exs. 2036-37)

- Claim construction responsive briefs: 08/13/20 (Exs. 2038-39)

- (Scheduled) Claim construction hearing: 09/15/20 (*see* Ex. 2026)

WBD (US) 50040824v2

As listed above, as of the filing of this POPR, the motion to dismiss has been fully briefed, argued, and decided; all contentions have been served (with Savvy Dog serving infringement contentions with 133 pages of related claim charts and Pennsylvania Coin serving invalidity contentions with 372 pages of prior art and 339 pages of claim charts); and claim construction has been fully conferred upon and briefed.  By the time of the Board's Institution Decision, claim construction will likely have been decided by the District Court.

Significant discovery is also complete.  Savvy Dog has responded to 16 interrogatories and 99 document requests, and Pennsylvania Coin has responded to 14 interrogatories and 100 document requests.  To date, Savvy Dog has produced thousands of pages of documents and Pennsylvania Coin believes its production is substantially complete.  At Pennsylvania Coin's request, Pace-O-Matic, Inc., the former owner of the '223 patent, has identified significant electronic files, including source code files, which are responsive to Pennsylvania Coin's requests.  Savvy Dog has produced a privilege log and the parties have exchanged no less than a dozen substantive follow-up letters with each other regarding the scope and progress of ongoing discovery.

Third party discovery is also actively underway.  On February 28, 2020, Savvy Dog served a subpoena on Banilla.  Banilla, also represented by counsel for Pennsylvania Coin, has refused to produce responsive documents until "entry of an

-87-

acceptable Protective Order" protecting Banilla's interests. Since then, the parties have exchanged three draft third-party protective orders in anticipation of review of source code and other sensitive technical documents. To date, Pennsylvania Coin has issued four subpoenas for the production of documents. Two of the subpoenaed parties produced approximately 1,700 files.

The parallel District Court action here is further along than other actions where the Board still held this factor in favor of denying institution. *See Cisco Sys., Inc. v. Ramot at Tel Aviv Univ. Ltd.*, IPR2020-00122, Paper 15 at 9 (PTAB May 15, 2020) ("[T]he district court has yet to issue a claim construction order or make other determinations on the merits. Considering the current investment in the invalidity and construction contentions, though, this factor weighs somewhat in favor of discretionary denial."). Accordingly, this factor weighs in favor of denial of institution in the Section 314(a) analysis. *Apple v. Fintiv*, Paper 15 at 14 ("Based on the level of investment and effort already expended on claim construction and invalidity contentions in the District Court, this factor weighs somewhat in favor of discretionary denial in this case."); *VLSI*, Paper 16 at 12 ("[W]e do find that the parties have invested significantly in the Western District of Texas litigation. As noted above, the district court claim construction order issued in January 2020, final infringement and invalidity contentions were served in January 2020. In light of the present posture of the district court action, we find that the parties' investment in

-88-

that action weighs in favor of exercising our discretion to deny institution pursuant to § 314(a).") (citations omitted).

### 4.     Favors Denial:  Overlap Between Issues Raised In The Petition And In The Parallel Proceeding

All of the issues raised in the CBM Petition are also being litigated in the parallel District Court case.  In particular, Banilla has raised the following challenges to the '223 patent in the CBM Petition:

- Ground 1:  The Challenged Claims Are Ineligible Under 35 U.S.C. § 101

- Ground 2:  The Claims Are Unpatentable Under 35 U.S.C. § 112, First Paragraph, For Lack Of Written Description With Respect To The Valuation Testing Limitation

- Ground 3:  Claims 13-24, 44-50, And 64-69 Are Unpatentable Under 35 U.S.C. § 112, Sixth Paragraph, For Indefiniteness

- Ground 4:  Claims 25-36, 51-57, And 70-75 Are Unpatentable Under 35 U.S.C. § 112, Sixth Paragraph, For Indefiniteness

- Ground 5:  Claims 45-46 And 65 Are Unpatentable Under 35 U.S.C. § 112, Sixth Paragraph, For Indefiniteness

-89-

In the co-pending District Court litigation, Banilla (through its customer Pennsylvania Coin) has raised the following challenges to the '223 patent in the Invalidity Contentions (highlighting illustrates the overlap with the CBM Petition):

- Invalidity Under 35 U.S.C. §§ 102 and 103

- Indefiniteness Under 35 U.S.C. § 112, ¶ 1 (All Claims - Valuation Testing Limitation)

- Indefiniteness Under 35 U.S.C. § 112, ¶ 1 (Claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 - Determination Limitation)

- Indefiniteness Under 35 U.S.C. § 112, ¶ 6:
  - Claims 13-24, 44-50, and 64-69
  - Claims 25-36, 51-57, and 70-75
  - Claims 45-46[15]

- Invalidity Under 35 U.S.C. § 101

---

[15] The Invalidity Contentions do not expressly identify Claim 65, which may simply be an oversight. Regardless, the indefiniteness challenge is the same: "Claim 45 is indefinite because 'component for' is a means-plus-function limitation and the specification fails to disclose sufficient structure for performing each of the claimed functions." Ex. 2032 at 28.

-90-

- Invalidity Under 35 U.S.C. § 112(f)

As illustrated by the highlighting above, all of the patent challenges raised in the CBM Petition have also been raised in the District Court Invalidity Contentions. While the Invalidity Contentions raise two additional issues (namely, prior art (§§ 102/103) and inventorship (§ 112(f) ), the Board's case law allows for the invalidity contentions to raise additional issues as long as they also overlap the issues raised in the petition. *See Apple v. Fintiv*, Paper 15 at 15 ("We agree with Patent Owner that Petitioner's assertion of additional invalidity contentions in the District Court is not relevant to the question of the degree of overlap for this factor."); *VLSI*, Paper 16 at 13 ("Petitioner does not dispute that the present Petitioner relies on the same references, in the same combinations, for the same disclosures, contending instead that '[t]he [P]etition advances only a few grounds in Intel's contentions' and that the limited duration of trial will inhibit Petitioner from presenting each invalidity ground to the jury. Accordingly, we find that the issues raised in the Petition largely overlap with those currently raised in the Western District of Texas litigation.") (citations omitted). Accordingly, this factor weighs in favor of denial of institution in the Section 314(a) analysis. *Id.*

**5.      Favors Denial:  Whether The Petitioner And The Defendant In The Parallel Proceeding Are The Same Party**

Here, Savvy Dog is the patent owner in the Petition and the plaintiff in the parallel District Court action.  Further, the Petitioner here is Banilla, the distributor of the games accused of infringement in the parallel District Court action.  *See* Ex. 2010 ¶ 28.  The Defendant in that parallel proceeding is Pennsylvania Coin, Banilla's customer in Pennsylvania.  *Id.*  While the two parties are technically different, they are undeniably collaborating closely in both cases and treating the two parallel proceedings as joint endeavors:

> Patent Owner has expressly accused Petitioner of infringing the '223 patent. Ex. 1004.  And, Patent Owner has initiated a district court proceeding for alleged infringement of the '223 patent against a third-party distributor of Petitioner's products.  As such, Petitioner has standing to seek a declaratory judgment that the '223 patent is invalid and to file this petition.

Pet. at 4; *see also id.* at 35 ("In corresponding district court proceedings, Patent Owner admitted that claim 44 is representative for purposes of a § 101 analysis. Ex.1006 at 40:25 ("Claim 44 is representative.")); Ex. 2018 at 4-5 ("Because these games were commercially successful, other companies such as Banilla Games sought to copy POM's approach by 'embedding a game board suitable for

-92-

installation into a gaming terminal with a specifically configured game processor that performs testing and preview features in an effort to elevate the level of skill associated with the game.'") (quoting Ex. 2014 ¶ 32). Pennsylvania Coin also shares the same outside counsel law firm with Banilla for this Petition and the parallel District Court action. For purposes of this factor, to treat Banilla and Pennsylvania Coin as different entities would be exalting form over substance. *See Apple v. Fintiv*, Paper 11 at 13-14 (PTAB Mar. 20, 2020) (weighing this factor against denial only if the petitioner is "unrelated" to the defendant). Accordingly, this factor weighs in favor of denial of institution in the Section 314(a) analysis. *Apple v. Fintiv*, Paper 15 at 15 ("The parties agree that the Petitioner here, and the defendant in District Court, are the same party."); *VLSI*, Paper 16 at 14 ("Petitioner and Patent Owner are the defendant and plaintiff, respectively, in the Western District of Texas litigation.").

### 6. Favors Denial: Other Circumstances That Impact The Board's Exercise Of Discretion, Including The Merits

As discussed above, Banilla delayed filing its CBM Petition for nearly nine months, strategically electing to mount its Section 101 challenge of the '223 patent in the District Court. Only when that challenge failed did Banilla turn to the PTAB to try to raise that identical issue with a different tribunal. The PTAB should weigh

-93-

Banilla's purposeful and strategic delay, tantamount to forum shopping, against institution.

Further, the District Court has already expended considerable energy in evaluating the merits of Banilla's Section 101 challenge. Ex. 2018. After carefully considering the parties' Section 101 arguments in a motion to dismiss, the Court denied that motion, concluding as follows:

> At oral argument, the court gained a greater understanding of **the technology at issue in that it is the firmware in the game processor that performs the task of converting a game of chance into a game of skill**. While it may ultimately be proven that this firmware is an abstract idea without any inventive concept, the court finds that viewing the allegations in Plaintiffs' favor, **the amended complaint and '223 Patent adequately allege an inventive concept sufficient** to survive a motion to dismiss.

*Id.* at 18-19 (emphases added).

Patent Owner appreciates that the Court's above-quoted denial is not case dispositive. However, at a bare minimum, the decision demonstrates that Banilla's Section 101 challenge is not very compelling. Accordingly, this factor weighs in favor of denial of institution in the Section 314(a)  analysis. *See Apple v. Fintiv*, Paper 15 at 17 ("[A] patent owner can use the opportunity to call attention to

-94-

particular arguments that, on balance, make the petitioner's case a close call." . . .

"As noted in our Order, a full analysis of the merits is not necessary to evaluate this factor.  It is sufficient that Patent Owner has pointed out that Petitioner's case, at least as to two of three independent claims, is a close call.").

After review of the six *Apple v. Fintiv* factors as they apply to the present Petition, four of the factors favor denial, one factor is neutral, and only one factor slightly favors institution.  Accordingly, on balance, the six *Apple v. Fintiv* factors favor the Board's exercise of its discretion to deny to institution here.

## VII.   BANILLA HAS NOT PROVEN THAT ONE OR MORE CLAIMS OF THE '223 PATENT ARE MORE LIKELY THAN NOT UNPATENTABLE UNDER 35 U.S.C. § 112 AND § 101

As noted above in the Introduction and discussed in connection with the *Apple v. Fintiv* discretionary denial factors, the parties are currently litigating the claim construction issues (including the Section 112 arguments) and the Section 101 issues in the parallel District Court action.  *See supra* §§ I & VI.B.3.  The District Court will have finally resolved at least some of those issues before the institution decision here.  *Id.*  Thus, solely for the sake of conserving the resources of the PTAB and the parties, and to avoid the possibility of inconsistent analyses and/or determinations from the District Court and the PTAB, Savvy Dog will not address the substance of Banilla's Section 112 and Section 101 arguments in this POPR.  Importantly, however, Savvy Dog does not concede, and expressly disagrees with, Banilla's

-95-

Case No. CBM2020-00014
Patent No. 7,736,223

Section 112 and Section 101 arguments as set forth in the CBM Petition, as Savvy Dog has extensively briefed in the parallel co-pending District Court litigation. *E.g.*, Exs. 2016, 2033-36, 2038, 2040. But simply duplicating those arguments here, particularly when the petition should be denied for multiple other independent reasons as explained herein, would unnecessarily expend significant Board and party resources at this preliminary stage of the proceeding. Accordingly, Savvy Dog will address those arguments in the event that the Board institutes this CBM.

## VIII.  **CONCLUSION**

For the foregoing reasons, Savvy Dog respectfully requests that the Board deny institution of this CBM proceeding.

Respectfully Submitted,

Dated: August 28, 2020

/s/ *Brenton R. Babcock*
Brenton R. Babcock (Reg. No. 39,592)
*Counsel for Patent Owner*

-96-

WBD (US) 50040824v2

Case No. CBM2020-00014<br>Patent No. 7,736,223

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 37 C.F.R. § 42.24(d), the undersigned certifies that this Patent Owner Preliminary Response complies with the type-volume limitation of 37 C.F.R. § 42.24(b).  The word count application of the word processing program used to prepare this Patent Owner Preliminary Response indicates that the Preliminary Response contains 16,711 words, and is therefore in compliance with the 18,700-word limit established by 37 C.F.R. § 42.24(a)(1)(ii) & (b)(1).

Respectfully Submitted,

Dated: August 28, 2020

/s/ <em>Brenton R. Babcock</em><br>Brenton R. Babcock (Reg. No. 39,592)<br><em>Counsel for Patent Owner</em>

-97-

Case No. CBM2020-00014<br>Patent No. 7,736,223

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to 37 C.F.R. §§ 42.6(e), I hereby certify that a true and correct copy

of the foregoing was served on Petitioner via filing through the PTAB E2E System,

as well as by delivering a copy via electronic mail to the following:

Banilla-CBM@morganlewis.com

Respectfully Submitted,

Dated: August 28, 2020

/s/ *Brenton R. Babcock*
Brenton R. Babcock (Reg. No. 39,592)
*Counsel for Patent Owner*

WBD (US) 50040824v2