**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SAVVY DOG SYSTEMS, LLC, and POM of Pennsylvania, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> PENNSYLVANIA COIN, LLC, and PA COIN HOLDINGS, LLC <br><br> Defendants. | CIVIL ACTION NO: 3:19-cv-01470-JPW |

## DEFENDANTS' FINAL INVALIDITY CONTENTIONS

Pursuant to paragraph 13 of the Case Management Order (Dkt. No. 50), Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC ("Defendants") hereby serve their Final Invalidity Contentions.

## I.      INTRODUCTION

### A.      Patent-In Suit

These Final Invalidity Contentions address U.S. Patent No. 7,736,223 (the "'223 patent").

### B.      Priority Dates

Plaintiffs have also not established that any claim is entitled to a priority date earlier than the '223 patent's filing date of June 30, 2006.

Because Plaintiffs have not produced sufficient documentation or evidence (despite being requested to do so) to support a conception date before the filing date of the application that resulted in the '223 patent and further have not established that any claim is entitled to the benefit of an earlier filed application or date of invention, for the purposes of these Final Invalidity Contentions, Defendants assume a priority date and date of invention of June 30, 2006 for the claims of the '223 patent.

To the extent Plaintiffs are permitted to assert an earlier conception date, otherwise claim

an earlier priority date, and/or produce sufficient evidence or it is found that the '223 patent is entitled to an earlier priority date or date of invention, Defendants reserve the right to amend and/or supplement their invalidity contentions.

### C.    Claim Scope

These Final Invalidity Contentions are based on the Court's December 21, 2020 claim construction order.  Defendants' contentions are not, and should in no way be interpreted as, admissions, suggestions, or adoptions of any particular claim scope or construction other than as set out in the Court's December 21, 2020 claim construction order.  Defendants take no position on any matter of claim construction in these Final Invalidity Contentions.  Defendants reserve the right to appeal any claim construction they consider to be incorrect.  Defendants reserve the right to amend or supplement these contentions in the event of any further claim construction rulings.

### D.    Amendment and Supplementation

Defendants make these disclosures based on information currently available to Defendants, including, but not limited to, their current knowledge and understanding of the '223 patent.Plaintiffs' responses to interrogatories and document requests, and the Court's claim construction order.  Defendants have not completed their investigation of the facts relating to this case, and discovery in this action is ongoing.  Accordingly, Defendants reserve the right to further modify, supplement, or otherwise amend these Final Invalidity Contentions to address any additional information uncovered by Defendants, including any newly discovered prior art or new theories of invalidity.

### E.    Scope of Contentions

These Final Invalidity Contentions disclose the current bases for Defendants' contentions regarding invalidity, *i.e.*, prior art references under 35 U.S.C. §§ 102 and 103, failure to name the true inventors of the claimed subject matter as required by § 102(f), indefiniteness under 35 U.S.C.

§ 112, ¶ 2, lack of written description under 35 U.S.C. § 112, ¶ 1, and ineligible subject matter under 35 U.S.C. § 101.[1]

## II.    INVALIDITY UNDER 35 U.S.C. §§ 102 AND 103

### A.    Invalidating Prior Art

Table 1 identifies prior art references that anticipate and/or render obvious one or more claims of the '223 patent.

**Table 1: Invalidating References for the '223 Patent**

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| | Tic Tac Fruit Electronic Game Product/System (including at least versions 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27), as well as documentation, publications, and/or knowledge regarding the Tic Tac Fruit Electronic Game | | Before June 30, 2006. | Ex. A-1, A2 - A-7 |
| Farley | Nick Farley & Associates POM000420-POM000516; POM000921-POM000948; WBD002428-WBD002492; WBD001972-WBD001991; | Report on the review and analysis of the *Tic-Tac-Fruit* game | Mar. 7, 2005 | Ex. A-1, A-2 - A-7 |

[1] Citations to Title 35 of the United States Code refer to the pre-AIA version of the Code. *See* America Invents Act, P.L. 112-29 (Sept. 16, 2011) at §§ 3(n) and 4(e) (amendments to 35 U.S.C. §§ 102 and 103 take effect and apply to applications filed on or after March 16, 2013, and amendments to 35 U.S.C. § 112 take effect and apply to applications filed on or after September 16, 2012).

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| | WBD002495-WBD002556 | | | |
| Fawley et al. | Fawley & Associates<br><br>POM000420-POM000516;<br>WBD002428-WBD002492;<br>WBD002495-WBD002556 | Skill-Based Amusement Machines Known as Tic Tac Fruit | Oct. 28, 2004 | Ex. A-1, A-2 - A-7 |
| Turner | PA0000199-PA0000206;<br>POM000420-POM000516;<br>WBD002428-WBD002492;<br>WBD002495-WBD002556 | Tic-Tac-Fruit: An analysis | Nov. 15, 2004 | Ex. A-1, A-2 - A-7 |
| Toland | Pittsburgh Post-Gazette<br><br>PA0000169-PA0000173 | Ohio 'skill' game a cross-border lure | Apr. 30, 2006 | Ex. A-1, A-2 - A-7 |
| Walker et al. | US 2003/0060276<br><br>PA0000233-PA0000267 | Method and apparatus for offering a guaranteed win | Mar. 27, 2003 | Ex. A-2, A-1, A-3 - A-7 |
| Michaelson et al. | US 7,291,069<br><br>PA0000110-PA0000132 | Central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller | Nov. 6, 2007 (filed Mar. 6, 2003) | Ex. A-3, A-1, A-2, A-4, A-5, A-6, A-7 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Michaelson et al. | US 2004/0176167<br><br>PA0000133-PA0000154 | Central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller | Nov. 6, 2007 (filed Mar. 6, 2003) | Ex. A-3, A-1, A-2, A-4, A-5, A-6, A-7 |
| Vancura | US 7,040,985<br><br>PA0000207-PA0000222 | Method and apparatus for selecting wild symbols by a player | May 9, 2006 (filed Jan. 15, 2002) | Ex. A-4, A-1, A-2, A-3, A-5, A-6, A7 |
| Vancura | US 2003/0153382<br><br>PA0000223-PA0000232;<br>POM000289-POM000304;<br>WBD001082-WBD001097;<br>WBD001618-WBD001633 | Method and apparatus for selecting wild symbols by a player | Aug. 14, 2003 | Ex. A-4 |
| Kowell | US 8,491,369<br><br>PA0000081-PA0000089;<br>PA0000090-PA0000097 | Method and apparatus for playing a skill game | Jul. 23, 2013 (filed Apr. 3, 2007) priority to Prov. App. No. 60/815,352 (filed Jun. 21, 2006) | Ex. A-1 – A-7 |
| Weingardt | US 5,482,289<br><br>PA0000268-PA0000279 | Method of playing a bingo game with progressive jackpot | Jan. 9, 1996 | Ex. A-1 – A-7 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Daly | US 7,108,602<br><br>PA0000034-PA0000052 | Multi-reel slot machine with selectable reel play | Sep. 19, 2006 (filed Mar. 24, 2005) | Ex. A-1 – A-7 |
| Marchini et al. | GB 2,251,112<br><br>PA0000098-PA0000109 | Entertainment machines | Jun. 24, 1992 | Ex. A-1 – A-7 |
| Chambers | GB 2,382,911<br><br>PA0000010-PA0000031 | Player configurable entertainment machine | June 11, 2003 | Ex. A-6, A-1 – A-5, A7 |
| Farrell et al. | EP 0449,433<br><br>PA0000053-PA0000061 | Gaming and amusement machines | October 2, 1991 | Ex. A-1 – A-7 |
| Carroll, J. | *Commonwealth v. McClintock*, 257 Mass. 431, 432–35, 154 N.E. 264, 264 (1926)<br><br>PA0000032-PA0000033 | | Nov. 29, 1926 | Ex. A-1 – A-7 |
| Evans, J. | *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105–06 (1925)<br><br>PA0000196-PA0000198 | | Dec. 15, 1925 | Ex. A-1 – A-7 |
| Thompson | Gambling in America<br><br>PA0000062-PA0000065 | An Encyclopedia of History, Issues, and Society | | Ex. A-1 – A-7 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Papp | *Ohio SB 220 Bill Analysis – Legislature Service Commission*, 126th General Assembly<br><br>PA0000174-PA0000181 | | October 27, 2005 | Ex. A-1 – A-7 |
| Riedthaler | Case No. 1342-05<br><br>PA0000182-PA0000193 | *Proceedings Before the Liquor Control Commission of the State of Ohio* | October 19, 2005 | Ex. A-1 – A-7 |
| Gorton | Wash. Att'y Gen. Op. 1969 NO. 9, 1969 WL 98526<br><br>PA0000066-PA0000081 | *Lotteries -- Gambling -- Pinball Machines -- Punchboards -- Pull Tabs -- Cards -- Bingo -- Authority To License -- City – County* | Apr. 30, 1969 | Ex. A-1 – A-7 |
| Bregenzer | US 2004/0224754<br><br>PA0000001-PA0000009 | Slot machine with added player selection | Nov. 11, 2004 | Ex. A-5, A-1, A-2, A-3, A-4, A-6, A-7 |
| Muir | US 2005/0003883<br><br>PA0000155-PA0000168;<br>POM000305-POM000318;<br>WBD001957-WBD001970;<br>WBD001992-WBD002005 | Method and apparatus for previewing a game | Jan. 6, 2005 (filed Aug. 2, 2004) | Ex. A-1 – A-7 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Chan | US 6,602,133<br><br>PA0000358-PA0000372 | Interactive electronic puzzle game and a method for providing the same | Aug. 5, 2003 | Ex. A-1 |
| Marshall Fey | Slot Machines PA0000300-PA0000326 | An Illustrated History of America's Most Popular Coin-Operated Gaming Device | 1983 | Ex. A-1 – A-6 |
| Marshall Fey | Slot Machines<br><br>PA0000327-PA0000357 | A Pictorial History of the First 100 Years | 1989 | Ex. A-1 – A-6 |
| Schuring et al. | 126th General Assembly Regular Session 2005-2006<br><br>PA0000280-PA0000299 | Ohio SB 220 Bill | At least October 19, 2005 | Ex. A-1 – A-6 |
| McClintic et al. | US 6,964,416<br><br>PA0000409-PA0000423 | Method of playing a matching bonus game | Nov. 15, 2005 (filed Dec. 21, 2001) | Ex. A-1 – A-7 |
| | Nudgemaster Electronic Game Product/System (including at least versions released and/or distributed by Skill Tech Gaming LLC and/or World Touch Gaming Inc. in 2004), as well as documentation, publications, and/or knowledge regarding the Nudgemaster Game | | Before June 30, 2006. | Ex. A-7 |

| Inventor/Author | Patent/Publication/Other Prior Art | Title | Date | Exhibit(s) |
|---|---|---|---|---|
| Sertell | PA0000424-PA0000431; POM000429-POM000443; POM017914-POM017932 | *State v. 26 Gaming Machines*, 356 Ark. 47 (2004)<br><br>*Akron v. Georgekolopous* (2006) | Feb. 5, 2004<br><br>May 11, 2006 (expert report submitted May 4, 2006) | Ex. A-1 – A-7 |
| Cannon | US 6,860,810<br><br>PA0000377-PA0000408 | Gaming machines and systems offering simultaneous play of multiple games and methods of gaming | Mar. 1, 2005 (filed Nov. 24, 2003) | Ex. A-1 – A-7 |
| Latchford, C.J. | *R. v. Bailey*, 1938 Carswell Ont 311 (Ontario Court of Appeal 1938)<br><br>PA0000373 | | | A-1 – A-7 |
| Supreme Court of Canada | *Bailey v. R.*, 1938 CarswellOnt 111 (Supreme Court of Canada 1938)<br><br>PA0000374-PA0000376 | | | A-1 – A-7 |

## B.     Claim Charts

Attached hereto as Exhibits A-1 – A-7 are charts that set forth prior art references along with exemplary citations where each element of the asserted claims of the '223 patent is found in the prior art system and/or reference.

These claim charts include citations to exemplary disclosures in the prior art references. Other portions of the identified prior art may, either expressly or inherently, anticipate and/or

render obvious one or more elements of the claims.  The citations provided are merely non-limiting examples and should not be understood to preclude Defendants from relying on other portions of the prior art references.  It should also be recognized that a person of ordinary skill in the art would generally read a prior art reference as a whole and in the context of other publications, literature, and general knowledge in the field.  To understand and interpret any specific statement or disclosure in a prior art reference, a person of ordinary skill in the art would rely upon other information, including other publications and general scientific, engineering, or other technical knowledge.  Defendants reserve the right to rely on any portion of the identified prior art, additional documents that describe the prior art, additional prior art, additional documents that lend context to the prior art, and fact witness and/or expert testimony to demonstrate the invalidity of the claims and/or to aid in understanding of the cited portions of the identified prior art.

Where Defendants cite to a particular drawing or figure in the claim charts, the citation encompasses not only the drawing or figure, but also any corresponding text within the specification of the prior art reference associated with the drawing or figure.  Similarly, where Defendants cite to particular text of the specification that relates to or references a drawing or figure in a prior art reference, the citation should be understood to encompass not only the text, but also the drawing or figure associated with that reference.

Although not required by the Case Management Order, Defendants have included exemplary contentions of the rationale that supports a conclusion of obviousness that may include in some instances be the basis for one of ordinary skill in the art to modify the prior art or combine specific references to arrive at the claimed invention.  These examples are intended to be non-limiting.  To the extent that Plaintiffs contend that any of the prior art fails to disclose one or more limitations of the claims, Defendants reserve the right to identify portions of the aforementioned

references and additional prior art references and testimony that address the alleged missing limitation to support a conclusion of obviousness and render each and every limitation of the claims obvious.

The motivation to combine, modify, add, limit, or otherwise vary any of the prior art references, alone and/or in combination, discussed herein is found, explicitly or implicitly, in at least one or more of the following:

1. a person of ordinary skill in the art's own knowledge or common sense;

2. the prior art references themselves;

3. the subject matter acknowledged as prior art in the '223 patent;

4. the interrelated teachings of multiple prior art references identified herein;

5. the nature of the problem to be purportedly solved by the '223 patent and the existence of similar improvements in similar applications;

6. design incentives and other market forces, including the advantages of creating a superior and more desirable product and the effects of demands known to the design community or present in the marketplace, such as the desire to create games of skill and/or games where the outcome is not determined largely or wholly by chance in order to comply with federal, state, and/or local gaming regulations;

7. the ability to implement the alleged invention as a predictable variation of the prior art;

8. improvements in similar devices;

9. any needs or problems known in the field and purportedly addressed by the '223 patent; and

10. the number of identified, predictable solutions to the problem(s) purportedly

addressed by the '223 patent.

In addition to the specific combinations of prior art identified herein, Defendants reserve the right to rely on other rationales or combinations of the prior art references disclosed herein. Defendants further reserve the right to rely upon combinations disclosed within the prosecution history of the references cited herein.

Evidence that there would have been a motivation to combine the prior art references identified above includes the interrelated teachings of multiple prior art references; the effects of demands known to the design community or present in the marketplace; the existence of a known problem for which there was an obvious solution encompassed by the claims of the '223 patent; the existence of a known need or problem in the field of the endeavor at the time of the invention(s); and the background knowledge that would have been possessed by a person having ordinary skill in the art.

In addition, the motivation to combine the teachings of the prior art references disclosed herein is found in the references themselves and: (1) the nature of the problem being solved, (2) the express, implied, and inherent teachings of the prior art, (3) the knowledge of persons of ordinary skill in the art, (4) the fact that the prior art is generally directed to the same fields of art, and/or (5) the predictable results obtained in combining different elements of the prior art.

Multiple teachings, suggestions, motivations, and/or reasons to modify any of the references and/or to combine any two or more of the references disclosed herein come from many sources, including the prior art (specific and as a whole), common knowledge, common sense, predictability, expectations, industry trends, design incentives or need, market demand or pressure, market forces, obviousness to try, the nature of the problem faced, and/or knowledge possessed by a person of ordinary skill and is inherent in the nature of the problem to be solved.

## III.    INVALIDITY UNDER 35 U.S.C. § 112

### A.    Insufficient written description under 35 U.S.C. § 112, ¶ 1

The following claim terms lack written description support under 35 U.S.C. § 112, ¶ 1.

#### 1.    *All Claims (Valuation Testing Limitation)*

Independent Claims 1, 13, 25, 37, 44, and 51 of the '223 patent recite "[testing/test] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."  The Court has construed this limitation as "test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the game."  This limitation will be referred to as the "Valuation Testing Limitation."

The specification of a patent must "contain a written description of the invention."  35 U.S.C. § 112, ¶ 1.  The test for written description is "whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."  *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (*en banc*).

None of the '223 patent's specification, figures, or originally filed claims use the language of the Valuation Testing Limitation.  Yet, even if the specification disclosed the Valuation Testing Limitation word-for-word (which it does not) or if a person of ordinary skill in the art ("POSITA") would know how to perform and implement the required testing, this would still be insufficient. To satisfy the written description requirement, the specification must do more than merely repeat the same words or functions recited in the claims—it must show that the inventor knew to perform what is claimed.  *See Vasudevan*, 782 F.3d at 683 ("The more telling question is whether the

-13-

specification shows possession by the inventor of how [the claimed function] is achieved.") (emphasis added); *In re Wilder*, 736 F.2d 1516, 1520-21 (Fed. Cir. 1984) (affirming rejection of claims directed to indicating location of information recorded on a dictating machine because the specification does "little more than outlin[e] goals appellants hope the claimed invention achieves and the problems the invention will hopefully ameliorate") (emphasis added).

Here, the '223 patent's specification fails to provide any required details about how the inventor would perform the claimed testing to achieve the aspirational result of ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently, as construed by the Court. Indeed, despite alleging the purported invention relies on "underlying software algorithms," the specification discloses none. At least because there is no written description support that explains how the testing required by the Valuation Testing limitation could be performed, the "claims merely recite a description of the problem to be solved while claiming all solutions to it . . . leaving it to the [gaming] industry to complete an unfinished invention." *Ariad*, 598 F.3d at 1353.

Although the Applicant alleged during prosecution there was support for the Valuation Testing Limitation, the cited portions of the specification fail to support it. The Valuation Testing Limitation was introduced into only some of the pending claims in a response to rejection of the claim on January 23, 2010, and into the remaining claims following the March 2010 examiner interview and amendment—nearly four years after the application was filed. In the January 23, 2010, response to an Office Action the applicant pointed only to "Paragraph 39" as support for the Valuation Testing Limitation:

> Claims 6, 19 and 32 have been amended to clarify the testing step. Support for the amendment is found at least in **Paragraph 39**. Testing the constructed field before presenting the field to the player on the game display ensures that a winning

combination more valuable than the selected winning combinations is not generated inadvertently in completing the field.

'223 patent File History at p. 190 (1/26/2010 Office Action Response at p. 28).

Neither Paragraph 39 of the as-filed application nor Paragraph 39 of the published application supports the Valuation Testing Limitation.

Paragraph 39 of the as-filed application contains irrelevant disclosures as this paragraph merely refers to certain steps shown in Figure 2 related to "determining the remaining number of plays . . . that are available at different denominations (*i.e.*, levels) of play." '223 patent File History at pp. 18-19 (pages 14 and 15 of original application). Nothing in this paragraph concerns testing a game field in accordance with the Valuation Testing Limitation, as construed by the Court.

Paragraph 39 of the published application also fails to support the added Valuation Testing Limitation because it contains no description of *how* the claimed testing step is to be performed to achieve the claimed objective—referring instead to the aspirational and undisclosed "software algorithm":

> [Paragraph 39] Essentially, the Tic-Tac-Fruit electronic game presents a task whereby the player must select the appropriate field element to replace with a wild symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random selection from a finite pool of available prizes. The device selects the quantity of lines that will present a winning outcome. Prizes may be presented on one, two, three, or four lines in a single game play. The device selects the level of prize(s) to be awarded. A software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented. The key

> symbol needed to obtain the highest value prize is replaced with a
> non-winning symbol prior to display to the player.

*See* U.S. Pat. Pub. No. 2007/0232384 (Publication of the application that resulted in the '223 patent) ("'223 Pub.") ¶ 0039 (emphasis added).

Moreover, Paragraph 39 refers to assessing offered prizes to assure that no other, more valuable prizes "**will inadvertently be presented**" instead of the claimed objective: "to ensure that a winning combination more valuable than the previously determined winning combination . . . **is not generated inadvertently when the player completes a winning combination during play of the game**. *See id.* (emphasis added); '223 patent at 6:19-33 (location of Paragraph 39 in issued patent). A POSITA would not equate the inadvertent presentation of a prize in Paragraph 39 with an inadvertent winning combination being generated **when a player completes a winning combination during play of the game**. As the Court's claim construction of "winning combination" confirms, completing a winning combination means the player completes the "array of game symbols in the game field yielding a successful outcome." Plainly, a prize could be presented inadvertently in a game field even if a winning combination is not completed by a user during game play. Paragraph 39 addresses the former situation, not the latter.

Paragraph 39 also refers to "prizes" which a POSITA would understand to be different from "winning combinations." The Court's construction of "winning combination" confirms that the two concepts are different and that a POSITA would understand "winning combination" means the "array of game symbols in the game field yielding a successful outcome." Yet, even if "prizes" were deemed to be the same as "winning combinations" (a position the Court already rejected), Paragraph 39's teachings still fail to provide support. At most, were one to substitute "winning combinations" for "prizes" in the specification, Paragraph 39 would still only refer to assessing the arrangement of "winning combinations." Nothing in such a hypothetical Paragraph 39

-16-

discloses testing **to ensure** that a more valuable winning combination is not generated inadvertently **when the player completes a winning combination during play of the game**.

Even if the specification were found to disclose an algorithm that tests for the possibility of a more valuable winning combination being generated inadvertently when the player completes a winning combination during play of the game (which it does not disclose), the specification never describes the added steps that are needed to ensure that such an event does not occur, which is also a requirement of the Valuation Testing Limitation. There is simply no teaching in the specification as to how to do that.

Nothing in Paragraph 39, including its last sentence, cures this deficiency. The last sentence of this paragraph only states that "the key symbol needed to obtain the highest value prize is replaced with a non-winning symbol prior to display to the player."[2] '223 patent at 6:30-32. A POSITA would understand that the last sentence of Paragraph 39 only teaches a technique for the player to obtain the highest value prize that is intended to be offered to that player. For example, if the intended highest value prize is associated with three Bell symbols, this technique teaches replacing one of those three Bell symbols with a non-winning symbol such as a Titanium symbol. This technique, however, does nothing to ensure that a winning combination more valuable than the determined winning combination will not be inadvertently generated when the player completes a winning combination during play of the game.

In fact, the technique of Paragraph 39 could readily lead to scenarios where the player is

---

[2] A POSITA would understand that, according to the teachings of Paragraph 39, the "highest value prize" referenced here refers to the highest value prize that is intended "to be offered" to the player after the game "selects the level of prize(s) to be awarded" and/or "determine[s] [the prize(s)]" by a random selection from a finite pool of available prizes." *See* '223 patent at 6:22-30.

able to obtain a more valuable prize associated with a more valuable winning combination.  For example, if the technique replaces one of the three Bell symbols with a Titanium symbol (as in the prior example) but another Titanium symbol is already in a line with that newly introduced Titanium symbol, this will result in a field where there is a winning combination (*i.e.*, three Titanium symbols) more valuable than the determined winning combination (*i.e.*, three Bell symbols) that can be inadvertently generated when the player completes the field.

Therefore, the portions of the specification cited by the applicant during prosecution are irrelevant to and fail to provide written description support for the Valuation Testing Limitation as construed.

Nothing in the '223 patent's specification, including 4:36-64, 6:19 – 33; 9:49-67 (and related figure), and 10:29-36 (and related figure), provides written description support for the Valuation Testing Limitation.  These particular portions of the patent fail to provide written description support for the Valuation Testing Limitation at least because, while there is a reference to testing, it is for an entirely different purpose and/or embodiment.

The specification refers to "test[ing] the complete field for compliance with the goals set by steps 1 and 3," which are "1. chose the number of winning lines (*i.e.*, 1, 2, 3, 4); 2. chose the orientation of each of the winning lines (*i.e.*, horizontal, vertical, or diagonal); 3. chose the symbols for each of the lines (*i.e.*, cherries, plums, bells, etc.)." '223 patent at 4:51-64; *see also id.* at 9:49-67, 10:29-36 (describing testing for compliance with same goals plus whether symbols were randomly selected for remaining grid elements).  This testing, however, only relates to choosing the number of winning lines, the orientation of those lines, the symbols in those lines, and the randomly selected symbols for the remaining spots.  None of this testing even relates to, much less requires out of necessity, evaluating whether a "more valuable" winning combination might be

inadvertently generated by the player when completing a winning combination during play of the game, which is what the Valuation Testing Limitation requires.

In addition, the specification refers to a "test" performed by an "embedded computer processor" which iterates through each of the 134 million possible field combinations (that number of combinations is based on an assumption that there are eight symbols and nine spots) and "test[s] each combination to determine if it has any complete lines." '223 patent at 4:36-43. But a POSITA would have no reason to understand that the "embedded computer processor" referenced here is the same component as the "game processor," as construed, which in claim 44 and multiple other claims is what is required to be configured to perform the testing required by the Valuation Testing Limitation. Further, the test described with respect to the "embedded computer processor" is not a test to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field, as construed by the Court. All this test is said to achieve is determining whether a particular field combination (of the 134 million possible field combinations) has "any complete lines" (*e.g.*, 3 Bell symbols in a row). As this test only achieves the goal of identifying fields with already complete lines (*e.g.*, 3 Bell symbols in a row), this test has nothing to do with evaluating whether there is a more valuable winning combination than the determined winning combination in a given field or whether there is a winning combination that might be inadvertently generated when the player completes a winning combination during play of the game.

The specification teaches that "game software" "determines all of the initial 'no-line' fields and tests each of these for potential winners where all fields that can potentially complete a line are counted." '223 patent at 4:44-47. But the specification does not teach that this is a test performed by the claimed "game processor," or describe how it is performed. Moreover, all the

"game software" test does is identify "potential winners" so as to allow for counting of "all fields that can potentially complete a line." *Id.* at 4:45-47. The "game software" test simply does not test to ensure that a winning combination that is more valuable than the determined winning combination is not generated inadvertently in completing the field, as required by the Valuation Testing Limitation construed by the Court. As such, a POSITA would recognize that test performed by the "game software" is only concerned with counting fields with a line that can be potentially completed, and fails to disclose the testing required by the Valuation Testing Limitation as construed.

A POSITA would recognize that none of the described testing discloses explicitly or inherently performing the testing required by the Valuation Testing Limitation, as construed. Rather, the only express reference to "testing" in the patent's specification relates to choosing the number of winning lines or combinations, the orientation of those lines or combinations, the symbols in those lines or combinations, and the symbols in the other grid elements; to identify and ferret out which fields have any complete lines or combinations already; or to identify and count which fields have lines or combinations which can potentially be completed. None of this testing even relates to, much less requires out of necessity, the Valuation Testing Limitation, as that term is construed by the Court. And, notably, the above references to "testing" in the specification describe only the function ascribed to the test and no algorithm as to specifically how that described testing is actually accomplished.

Just as critically, none of the goals purported to be sought by the "testing" disclosed in the '223 patent specification includes the testing required by the Valuation Testing Limitation, as construed by the Court. None of the following provides written description support for the Valuation Testing Limitation as construed: (1) 6:19-33 of the '223 patent, (2) paragraph [032] of

the as-filed application 11/428,026, (3) paragraph [030] of the 11/430,770 application, and (4) paragraph [029] of provisional application 60/788,363 provide written description support for the Valuation Testing Limitation as construed.   These portions and paragraphs are identical to Paragraph 39 of the published application, discussed above, and thus fail to provide written description support for the same reasons.

Paragraphs [0025] – [0026] of the '026 Application, paragraphs [023] – [024] of the '770 application; and paragraphs [022] – [023] of the '363 application fail to provide written description support for the Valuation Testing Limitation as construed. These sections, paragraphs, and claims fail to support the Valuation Testing Limitation, as construed by the Court, for at least the same or similar reasons that 4:36-64 of the '223 patent fails to disclose this limitation, discussed above.

Paragraph [044] and Fig. 5 of the '026 application and paragraph [047] and Fig. 7 of the '770 application fail to provide written description support for the Valuation Testing Limitation as construed.  These sections, paragraphs, and claims fail to support the Valuation Testing Limitation, as construed by the Court, for at least the same or similar reasons that 9:49 – 67 (and Fig. 5) of the '223 patent fails to disclose this limitation, discussed above.

Paragraph [046] and claims 6 and 19 of the '026 application and claims 5 and 17 of the '770 application fail to provide written description support for the Valuation Testing Limitation. These references fail to support the Valuation Testing Limitation, as construed by the Court, for at least the same or similar reasons that 10:29-36 of the '223 patent fails to disclose this limitation, discussed above.

To summarize, the testing mentioned in these sections, paragraphs, and claims only relates to selection of the number of winning combinations for a play of the game, selection of the orientation of each winning combination, selection of the symbols for each winning combination,

and the random selection of the symbols for the remaining spots. None of this testing even relates to, much less requires out of necessity, ensuring that a winning combination more valuable than the determined winning combination is not generated in advertently in completing the field, as required by the Valuation Testing Limitation construed by the Court. None of the cited figures cure these deficiencies because none even mentions testing, much less discloses the testing required by the Valuation Testing Limitation as construed by the Court.

Paragraphs [008]-[011] of the as-filed '026 application and [008]-[010] of the '770 application also fail to provide written description support for the Valuation Testing Limitation as construed. None of these paragraphs mentions or discloses any form of testing, much less discloses the testing required by the Valuation Testing Limitation as construed. At most, these paragraphs recite the aspirational objective of automatic determination of game symbols such that there is no winning combination without player interaction. Even if this automation is inferred, there no disclosure here of the Valuation Testing Limitation, as construed, for at least the same or similar reasons described above.

In sum, the specification provides no support for the Valuation Testing Limitation as construed and does not demonstrate that the named inventor was in possession of this concept at the time of filing. Here, the '223 patent's specification fails to adequately describe how the Valuation Testing Limitation as construed could be performed to achieve the aspirational result of ensuring that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field. The specification provides no support for the Valuation Testing Limitation and thus fails to confirm that the named inventor was in possession of this concept at the time of filing. Because independent claims 1, 13, 25, 37, 44, 51, 58, 64, and 70 lack written description support and are invalid under 35 U.S.C. § 112, ¶ 1, all other claims that

depend from them are also invalid.

2.    *Claims 11, 22, and 33 (Predetermined Probability of Occurrence)*

Claims 11, 22, and 33 are indefinite under § 112, ¶ 1.  Each of these claims requires "wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game."  The '223 patent's specification fails to provide any details about how the named inventor intended for the claimed winning combination of symbols to have a predetermined probability of occurrence for any instance of game play.  The patent teaches that "there is always the possibility that at least one line can be formed," *see* 4:24-25, but the patent never explains how any given winning combination might have a predetermined probability of occurrence or gives any examples of such predetermined probabilities.  Because there is no written description support that explains anything about predetermined probability of occurrences for winning combinations, the "claims merely recite a description of the problem to be solved while claiming all solutions to it . . . leaving it to the [gaming] industry to complete an unfinished invention."  *Ariad*, 598 F.3d at 1353.

3.    *Technology Platform and Computer Program Products.*

To the extent Plaintiffs contend that any of the claim of the '223 patent are eligible for patenting because the claims are directed to i) a new technology platform for elevating the level of skill into an electronic game, ii) a game processor specially configured to test the game field prior to displaying the game to the player to ensure that a winning combination is not generated inadvertently in completing the field, and preview an actual game to be played to the player before a decision to play is made, iii) a new type of computer program product, iv) a new computer readable storage medium or v) a new and improved, tangible technology platform for elevating the level of skill into an electronic game, such claims are invalid as failing the written description requirement of 35 USC §112, ¶1.  There is no disclosure in the patent as to how to create or

implement any of the aforementioned alleged improvements. In particular, there is no explanation in the patent as to how to specifically configure a game processor in a new and previously unknown way to both test the game field as required by the Valuation Testing Limitation and preview an actual game to be played to the player before a decision to play is made. To the extent Plaintiffs are correct that this combination of elements and functions was not obvious in view of the prior art cited in these contentions and/or would not have been routine, well-understood, or conventional at the time of patenting or alleged date of invention, then the specification was required to provide an explanation as to how a person of skill in the art could achieve this combination of functions.

### B.    Indefiniteness under 35 U.S.C. § 112, ¶ 6

#### 1.    *Claims 45-46*

Claim 45 recites "a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game." Claim 46 depends from claim 45.

Plaintiffs concede these claims are subject to means-plus-function treatment.

Claims 45 and 46 are indefinite because the specification fails to disclose sufficient structure for performing each of the functions recited in these claims. No corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions. A POSITA would understand that the functions recited in these claims are performed at least in part by software algorithms. "It is well-established that the corresponding structure for a function performed by a software algorithm is the algorithm itself." *EON Corp. IP Holdings LLC v. AT&T Mobility LLC*, 785 F.3d 616, 621 (Fed. Cir. 2015). Thus, the corresponding structure from the specification must be "more than simply a general purpose computer or microprocessor," and, indeed, the specification must "disclose an algorithm for performing the claimed function."

*Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1318-19 (Fed. Cir. 2012).

Here, the '223 patent's specification fails to disclose any algorithms for performing the functions recited in these claims. The specification refers loosely to "underlying software algorithms" used for game construction, but fails to disclose such algorithms.

Claims 45 and 46 are therefore indefinite.

## IV.    INVALIDITY UNDER 35 U.S.C. § 101

All claims of the '223 patent are invalid because they are directed to patent ineligible subject matter, for example, the abstract idea of game play. The parties and this Court previously agreed that claim 44 was representative of the '223 patent for purposes of a § 101 analysis. *See* Dkt. 61 at 8-9. The Court found that claim 44 describes rules for playing a game and is thus an abstract idea. *See id.* at 15. Therefore, for at least this same reason, all claims of the '223 patent claim abstract ideas. In fact, the other claims of the patent (claim 1 and its dependent claims) are even more abstract than claim 44 because they do not require a "game processor," the one element that Plaintiffs have argued makes the claims non-abstract. *See id.* at 12.

The claims of the '223 patent do not recite any inventive concepts, steps, or otherwise that transform the abstract idea into patent-eligible material. Nowhere does the '223 patent describe a new and improved technology platform for elevating the level of skill in an electronic game, a processor with any special configuration, a new type of computer program product, a new computer readable storage medium or a new or improved tangible technology platform. The '223 patent simply recites generic, off-the-shelf computer components and computational steps that could be easily performed by human beings. Further explanation as to why the '223 patent is invalid under 35 U.S.C. § 101 is provided in Defendants' Brief in Support of Their Motion to Dismiss, Dkt. No. 32 at 5-20, and Defendants' Reply Brief in Support of Their Motion to Dismiss, Dkt. No. 43-1 at 3-14, which are incorporated herein by reference.

Plaintiffs represented to the Court that basis for the patent eligibility of the '223 patent claims is the configuration of the "game processor." *See, e.g.*, 3/17/2020 Hearing Tr. at 55:21-56:6, 56:22-57:1, 58:2-6, 64:18-24. But the patent does not describe any technological problems existing in the art that needed to be overcome in order to configure a "game processor" (construed as a "a CPU or microprocessor that executes program instructions to generate a game") to perform any of the recited abstract steps, including the testing required by the Valuation Testing Limitation as construed and "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" (the "Preview Limitation") as construed. Tellingly, the patent describes no new technological solution (*e.g.*, a novel platform or hardware) made necessary by limitations in the art or for specially configuring a game processor, as construed, for the capability to perform these steps. The claims recite no technological means for specially configuring a CPU, or microprocessor in this manner either.

Before the alleged invention of the '223 patent, "a game processor"—which Plaintiffs admit could be just a conventional CPU or microprocessor—was not new and could be programmed to do the steps required by the Valuation Testing Limitation and Preview Limitation as construed. This fact is underscored by the Court's construction of "game processor" as simply "a CPU or microprocessor that executes program instructions to generate a game" and by the Court's adoption of the parties' agreed upon alternate construction of "program instructions" to mean "<u>conventional</u> commands that can be executed by a computer."

The conventional nature of "gaming processor" can be seen, for example, in the disclosures of the prior art cited in these Final Invalidity Contentions which taught the same or similar conventional gaming processors for use in various wagering and gaming applications. *See, e.g.,* Vancura at Abstract (disclosing "a processor displaying on a second display a matrix comprising

-26-

symbols . . . wherein the processor converts to wild the selected at least one symbol within the matrix and of awarding the player in accord with the displayed pay table"), Fig. 6, 6:15-26 (discussing the capability of the processor); U.S. Patent No. 5,882,258 to Kelly et al. ("Kelly") at Fig. 1a, 2:30-32 ("The game apparatus, for example, can take the form of a bar-top-style or arcade game console including a game processor, display screen and player controls."), 4:5-6, 4:10-25 (describing functions of the "game processor" such as "calcuating and updating prize lists and prize costs"), 7:43-65, 10:11-24 ("The steps of method 200 are preferable performed by the game processor 12 of game unit 10 according to program instructions or code . . ."), Figs. 4 & 5; U.S. Patent No. 7,775,872 to Bleich et al. ("Bleich") at 1:35-54 ("the more modern day gaming machines which employ micro-processor control" such as one "providing video base wagering games (e.g., video poker, video blackjack, video keno, video pachinko, video lottery, and the like"), 12:49-61 ("The microprocessor 204 is capable of displaying images, symbols and other indicia[.]  The program memory 202 is capable of storing program code which controls the gaming machine 10 so that it plays a particular game in accordance with applicable math models, game rules, and pay tables."); U.S. Patent Pub. No. 2004/0048659 to Seelig et al. ("Seelig") at Abstract ("The gaming device may also include a processor in communication with the random number generator. …"), Figs. 7, 8 & 10, ¶¶[0063]-[0071] ("Processor 82 may control both skill game device 22 and game apparatus 24…"), ¶[0089], ¶[0113], ¶[0116]-[0119]. [3] Defendants expressly reserve the right to identify additional arguments and evidence in response to Plaintiffs' discovery request on this issue.

---

[3] Defendants further incorporate by reference all of the references identified in these Final Invalidity Contentions.

The conventional nature of a "gaming processor" is further supported by the admissions of Plaintiffs own expert, Dwight E. Crevelt, in his August 7, 2020 deposition testimony ("Crevelt Dep.") and his July 8, 2020 expert declaration "On Technology Background And Meaning Of Claim Terms Set Forth In U.S. Patent No. 7,336,233" ("Crevelt Decl."). For example, Mr. Crevelt testified in his declaration that the term "'game processor' is a term known to a POSITA and **commonly understood** to represent a subclass of processors: customized, embedded processors adapted to and employed by the gaming industry in game device manufacture." Crevelt Decl. at ¶120 (emphasis added); *see also id* at ¶¶120, 121, 125, 128, 129. Mr. Crevelt testified at his deposition that he, himself, was working on a "game board" with a "game processor that has all of the necessary components to run a gaming machine" in the "[l]ate nineties," and that game processors were well known in the industry before the '223 patent's alleged invention. *See* Crevelt Dep. at 39:7-17, 40:22-41:2; *see also id*. at 36:22-39:17, 40:22-41:6, 162:21-163:17, 164:2-7, 176:9-19, 180:7-16. Mr. Crevelt further testified that he could not "think of" "any embodiment disclosed in the '223 patent … that couldn't be run on a generic board." *See id*. at 77:14-78:3.

The Valuation Testing Limitation and Preview Limitation recited in the claims and as construed by the Court do not represent inventive concepts at least because they merely apply known abstract concepts, *i.e.*, rules for playing a game, using a conventional piece of computer hardware (*i.e.*, microprocessor or CPU). The patent discloses no special platform or hardware required to incorporate these elements. Indeed, the claims merely recite performance of conventional features that could have been undertaken by a person playing a game. Nor are any claims rooted in computer technology that overcomes a problem arising in the realm of computers. Nowhere do the claims or the specification of the '223 patent specify how any particular problem or unconventional computer functionality is overcome. Plaintiffs have also represented to the

Court that the claims are not eligible for patenting as an ordered combination. *See* 3/17/2020 Hearing Tr. at 47:15-48 (The Court: "[C]orrect me if I'm wrong, yours is an elements only argument, not an ordered combination argument. Is that right?" Attorney Hill: "That's right.").

None of the other claims add any elements or features that would have been regarded as not routine or conventional. For example, claims 47, 49, 54, 56, and 57 merely recite additional abstract, well-known and generic game features, such as "a two-dimensional array of game symbols" (claims 47 and 54), "a plurality of vertically-oriented reels, each having a plurality of game symbols" (claims 49 and 56). The other challenged claims likewise recite generic and conventional game steps and features. *See, e.g.*, claim 3 ("determining if the player has decided to play the game field"), claim 6 (reciting steps for constructing the game field and populating it with symbols), claim 7 ("the orientation of each winning combination is horizontal, vertical or diagonal"). As demonstrated by the prior art referenced in the attached invalidity charts, these features were well-understood, routine, and conventional in the art and thus cannot serve as an inventive concept that transforms the claims into a patent eligible application.

## V.    INVALIDITY UNDER 35 U.S.C. § 102(f) AND DESCRIPTION OF § 102(f) ART

Under the pre-AIA Patent Code, a patent is invalid if the inventor "did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f) (2006); *see also In re VerHoef*, 888 F.3d 1362, 1365, n.1 (Fed. Cir. 2018), as amended (May 7, 2018). Section 102(f) "requires that a patent accurately name the correct inventors of a claimed invention." *In re VerHoef*, 888 F.3d at 1365. If an unnamed inventor contributed any "essential feature" of a claimed invention, the claim is invalid under Section 102(f), even if other limitations were contributed by named inventors. *Id.* at 1366.

On information and belief, discovery will show that one or more individuals either conceived of or communicated the claimed invention, or an essential feature of the claimed

invention (*e.g.*, the Preview Limitation), to Michael R. Pace, the sole named inventor on the '223 patent. Those individuals include, but are not limited to, individuals involved with various Ohio government proceedings (*e.g.*, Jeff Mayle, Kurt Gearhiser, Grant Kowell, William Riedthaler, and/or Robert Sertell) regarding the Tic-Tac-Fruit prior art, such as *Fraternal Order of Eagles Aerie 2171 Meigs, Inc. v. Ohio Dep't. Pub'l. Safety*, Case No. 05-CV-060 (Ct. Common Pls., Meigs Cty, OH); *In re: FOE Aerie 2171*, Proceedings Before the Liquor Control Commission of the State of Ohio, Case No. 1342-05; *State of Ohio v. Jeffrey A. Mayle*, Case No. 2005-CRB-30662. *See also* POM002382 (crediting State's expert witnesses, William Riedthaler and Robert Sertell, examining early Tic-Tac-Fruit games with first raising concerns about their lack of an actual game preview feature—*i.e.*, "the inability of the player to know which future Tic Tac Fruit grids would appear" during the game); WBD000465 at 114:2-25 (Grant "Fuzzy" Kowell testimony that the idea for a "preview button on a skill game . . . came from a court case we had"). According to at least Plaintiffs' Amended Complaint (Dkt. No. 25), the preview feature is an essential feature of the claims. On information and belief, the claimed invention was either derived from communcations with one or more individuals who are not named as inventors or from one or more individuals who are the true purported inventor(s) of the claimed invention. Because the claimed invention was derived from an unnamed inventor and/or an unnamed inventor contributed an essential feature, all claims are invalid under 102(f).

Dated:  February 19, 2021   MORGAN, LEWIS & BOCKIUS LLP

           */s/ John V. Gorman*
           John V. Gorman (PA 80631)
           Kenneth J. Davis (PA 87944) (admitted *pro hac vice*)
           Amy M. Dudash (PA 311898) (admitted *pro hac vice*)
           1701 Market Street
           Philadelphia, PA  19103
           Telephone:  215.963.5000
           Fax:  215.963.5001
           john.gorman@morganlewis.com
           kenneth.davis@morganlewis.com
           amy.dudash@morganlewis.com

           *Attorneys for Defendants Pennsylvania Coin, LLC and PA*
           *Coin Holdings, LLC*