**Exhibit A-3**

**Invalidity Claim Chart for U.S. Pat. No. 7,736,223 with Respect to U.S. Pat. Pub. No 2004/0176167 to Michaelson et al.**

As reflected herein, Claims 1, 3, 5-7, 11, 13, 15, 18-20, 22, 25, 27, 29-31, 33, 37, 40-42, 44, 46-49, 51, and/or 54-56 of U.S. Patent No. 7,736,223 ("the '223 patent") [1] are at least obvious in view of U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. ("Michaelson"). Further, Claims 1, 3, 5-7, 11, 13, 15, 18-20, 22, 25, 27, 29-31, 33, 37-42, 44-49, and/or 51-56 of the '223 patent are rendered obvious by Michaelson, either alone or when combined with, *e.g.*, U.S. Pat. Pub. No. 2003/0060276 to Walker et al. ("Walker"), UK Pat. App. GB2251112 to Marchini et al. ("Marchini"), U.S. Patent No. 8,491,369 to Kowell ("Kowell"); U.S. Pat. No. 5,482,289 to Weingardt ("Weingardt"), U.S. Pat. No. 7,040,985 to Vancura ("Vancura"), U.S. Pat. No. 7,108,602 to Daly ("Daly"), EP Pat. App. No. 449,433 to Farrell et al. ("Farrell"), *William N. Thompson*, Gambling in America, An Encyclopedia of History, Issues, and Society (2001) ("Gambling in America"), UK Pat. App. No. GB2,382,911 to Chambers ("Chambers"), *Commonwealth v. McClintock*, 257 Mass. 431, 432-35, 154 N.E. 264, 264 (1926), *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105-06 (1925), In re: FOE Aerie 2171, Testimony of William Riedthaler, *Proceedings Before the Liquor Control Commission of the State of Ohio*, Case No. 1342-05 (Oct. 19, 2005) and/or any associated expert report ("Riedthaler Testimony"), Testimony of Robert Sertell, *Akron v. Georgekopolous*, Case No. 05 CRS 15037 (Aug. 11, 2006) and/or any associated expert report ("Sertell Testimony"), Ohio Senate Bill No. 220 and Dennis Papp, *Ohio SB 220 Bill Analysis – Legislature Service Commission*, 126th General Assembly Regular Session (October 27, 2005) ("Dennis Papp SB 220 Analysis," collectively "Ohio SB 220"), Slade Gorton, et al., *Lotteries -- Gambling -- Pinball Machines -- Punchboards -- Pull Tabs -- Cards -- Bingo -- Authority To License -- City – County*, Wash. Att'y Gen. Op. 1969 NO. 9, 1969 WL 98526 (Apr. 30, 1969) ("Gorton Gambling Article"), at least one version of the Tic-tac-Fruit game that was publicly disclosed, used and/or commercialized, or described in publications that describe the game, before the filing date of the '223 patent including similar versions developed by or with Pace-o-matic that utilize different branding or graphics ("TTF") (the elements found in TTF are set forth in a separate table in Exhibit A-1 and incorporated herein as if repeated for each claim element), U.S. Pat. Pub. No. 2004/0224745 to Bregenzer ("Bregenzer"), U.S. Pat. Pub. No. 2005/0003883 to Muir et al. ("Muir"), and/or U.S. Pat. No. 6,602,133 to Chan ("Chan"), U.S. Patent No. 6,964,416 to McClintic et al. ("McClintic"), *R. v. Bailey*, 1938 Carswell Ont 311 (Ontario Court of Appeal 1938) ("*Bailey I*"), *Bailey v. R.*, 1938 CarswellOnt 111 (Supreme Court of Canada 1938) ("*Bailey II*"), the Nudgemaster game that was publicly disclosed, used and/or commercialized, or described in publications that describe the game, before the filing date of the '223 patent including similar versions developed by or with Skill Tech Gaming LLC and/or World Touch Gaming Inc. that utilize different branding or graphics ("Nudgemaster"), Marshall Fey, *Slot Machines a Pictorial History of the First 100 Years*, Liberty Belle Books (1989) ("Fey 1989"), and/or Marshall Fey, *Slot Machines An Illustrated History of America's Most Popular Coin-Operated Gaming Device*, Stanley Paher Nevada Publications (1983) ("Fey 1983"), *State of Arkansas v. 26 Gaming Machines*, No. 03-173, (Ark. 2004) ("26 Gaming"), US6,860,810 to Cannon et al. ("Cannon").

---

[1] Claims 1, 3, 5-7, 11, 13, 15, 18-20, 22, 25, 27, 29-31, 33, 37-42, 44-49, and 51-56 are the only claims remaining in the '223 patent after Plaintiffs' disclaimer of Claims 2, 4, 8–10, 12, 14, 16, 17, 21, 23, 24, 26, 28, 32, 34–36, 43, 50, and 57–75 of the '223 patent at the patent office.  Accordingly, only those claims are addressed in this chart.  Nothing in this chart should be construed as admitting validity of any claim of the '223 patent.

1

Michaelson is prior art under at least 35 U.S.C. § 102(b). Michaelson was filed March 6, 2003 and published September 9, 2004.

Marchini is prior art under at least 35 U.S.C. § 102(b). Marchini published May 24, 1992.

Walker is prior art under at least 35 U.S.C. § 102(b). Walker published March 27, 2003.

Kowell is prior art under at least 35 U.S.C. § 102(e) because it claims priority to at least provisional application No. 60/815,352 filed on June 21, 2006 ("Kowell Provisional").

Weingardt is prior art under at least 35 U.S.C. § 102(b). Weingardt issued January 9, 1996.

Vancura is prior art under at least 35 U.S.C. § 102(a) and 35 U.S.C. § 102(e). The application resulting in Vancura was filed January 15, 2002 and issued May 9, 2006.

Chan is prior art under at least 35 U.S.C. § 102(b). Chan published August 3, 2003.

McClintic is prior art under at least 35 U.S.C. § 102(b). McClintic was filed Dec. 21, 2001 and published Nov. 15, 2005.

Daly is prior art under at least 35 U.S.C. § 102(e). The application resulting in Daly was filed March 24, 2005.

Farrell is prior art under at least 35 U.S.C. § 102(b). Farrell published February 10, 1991.

Gambling in America is prior art under at least 35 U.S.C. § 102(b). Gambling in America published in 2001.

Chambers is prior art under at least 35 U.S.C. § 102(b). Chambers published June 11, 2003.

*Commonwealth v. McClintock*, 257 Mass. 431, 432–35, 154 N.E. 264, 264 (1926) is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1926.

*State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105–06 (1925) is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1925.

*R. v. Bailey*, 1938 Carswell Ont 311 (Ontario Court of Appeal 1938) ("*Bailey I*") is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1938.

*Bailey v. R.*, 1938 CarswellOnt 111 (Supreme Court of Canada 1938) ("*Bailey II*") is prior art under at least 35 U.S.C. § 102(b). The cited decision published in 1938.

The Riedthaler Testimony is prior art under at least 35 U.S.C. §§ 102(a) and 102(f). The Riedthaler Testimony was given publicly in a proceeding before the Ohio Liquor Control Commission on October 19, 2005.

The Sertell Testimony is prior art under at least 35 U.S.C. §§ 102(a) and 102(f). The Sertell Testimony was given publicly in a proceeding before the Municipal Court of Akron, Ohio on May 11, 2006.

The Ohio SB 220 is prior art under at least 35 U.S.C. § 102(e) & (a). The Ohio SB 220 was introduced and publicly available at least as early as October 27, 2005, as evidenced by at least the Dennis Papp SB 220 Analysis.

The Gorton Gambling Article is prior art under at least 35 U.S.C. § 102(b). The Gorton Gambling Article was published April 30, 1969.

Bregenzer is prior art under at least 35 U.S.C. § 102(b). Bregenzer published November 11, 2004.

Muir is prior art under at least 35 U.S.C. § 102(b). The application that published as Muir was filed August 2, 2004, and Muir published January 6, 2005.

26 Gaming is prior art at least under 35 U.S.C. § 102(b). 26 Gaming was published in 2004.

Cannon is prior art at least under 35 U.S.C. § 102(b). Cannon issued on March 1, 2005 (and published earlier as US2004/0106446 which is a continuation of US 6,652,378.

Versions of TTF were available as prior art to the '223 patent as a product that was known, used by others, and/or on sale in the United States before the invention of the '223 patent pursuant to 35 U.S.C. § 102(a) and § 102(b).  Pace-O-Matic, Inc. developed and Ohio Skill Games distributed at least some versions of the game prior to the filing date, priority dates or purported conception dates of the '223 patent including versions (including but not limited to 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27) that were distributed at least as early as February 11, 2005.  Pace-O-Matic may have distributed or worked in concert with others to distribute similar games such as those having different graphics and branding prior to the filing date, priority dates or purported conception dates of the '223 patent. Evidence of the features of the TTF game are also shown in the Pittsburgh Post-Gazette's article "Ohio 'skill' game a cross-border lure," which was published April 30, 2006, and is available at https://www.post-gazette.com/local/casino-news/2006/05/01/Ohio-skill-game-a-cross-border-lure/stories/200605010141 ("Gazette Article"). Also, evidence of the features of the TTF game are shown in Tic-Tac-Fruit: An Analysis, Clay S. Turner, published November 15, 2004 ("Turner Report").  The printed publications discussed above with respect to TTF also independently qualify as prior art with respect to the '223 patent.  These publications also constitute prior art pursuant to 35 U.S.C. § 102(a) and § 102(b) and, at a minimum, are combinable under § 103 to render the asserted claims obvious.  Defendants are continuing their investigation into TTF, to the extent any element of one of the claims listed below is not expressly reflected in these charts, Defendants reserve the right to update these charts as discovery progresses.

Versions of Nudgemaster, including version 4.4.(2).172, were available as prior art to the '223 patent as a product that was known, used by others, and/or on sale in the United States before the invention of the '223 patent pursuant to 35 U.S.C. § 102(a) and § 102(b).  Evidence of the features of the Nudgemaster game can be seen in a YouTube video posted by user "UniversalAmusement," showing a game displaying a 2004 copyright date, which is available at https://www.youtube.com/watch?v=XCCfMtFafgw&feature=youtu.be ("UniversalAmusement Video").  Defendants are continuing their investigation into Nudgemaster, to the extent any element of one of the claims listed below is not expressly reflected in these charts, Defendants reserve the right to update these charts as discovery progresses.

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 1** [1.pre] An electronic gaming method comprising the steps of: | Michaelson, alone or in view of the other cited references, at least suggests "An electronic gaming method."[2]<br><br>*See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |
| [1.a] constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is | Michaelson, alone or in view of the other cited references, at least suggests "constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols."<br><br>*See, e.g.*, Claim 44 (44.3), *infra*, incorporated here. |

---

[2] All bolding, italics, coloring, underlining, brackets, ellipses, cropping of figures, and spacing-corrections are added, unless otherwise stated.  Any such bolding, italics, coloring, underlining, brackets, ellipses, cropping of figures, spacing-corrections, and otherwise are not intended to be limiting, and should not be interpreted as such, but instead are added for instructional and clarity purposes only.

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| filled by a game symbol from a plurality of predetermined game symbols, | |
| [1.b] wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display; | Michaelson, alone or in view of the other cited references, at least suggests "the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display." *See, e.g.*, Claim 44 (44.5), *infra*, incorporated here; *see also* Claim 13 (13.3), *infra*, incorporated here. |
| [1.c] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | Michaelson, alone or in view of the other cited references, at least suggests "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." *See, e.g.*, Claim 44 (44.5), *infra*, incorporated here. |
| [1.d] automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play; | Michaelson, alone or in view of the other cited references, at least suggests "automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play." *See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |
| [1.e] receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and | The Court has construed "winning combination" as "array of game symbols in the game field yielding a successful outcome." Tic-Tac-Fruit ("TTF") discloses "receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination [i.e. array of game symbols in the game field yielding a successful outcome] of symbols that is formed by such selection." "It should be noted that the initial nine (9) symbols displayed will not present an automatic winning combination. The player must engage in the selection of the symbol to be replaced with a "Wild Card" in order to obtain a winning game outcome." Farley Report at 2. |

4

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Essentially, Tic-Tac-Fruit presents a task whereby the player must select the appropriate symbol to replace with a "Wild" symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random section from a finite pool of available prizes. The device selects the quantity of lines which will present a winning outcome. The prize is determined by a random selection from a Prizes may be presented on 1, 2, 3 or 4 lines in a single game play. The device then selects the level of prize(s) to be awarded. A software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented. The key symbol needed to attain the highest value prize is replaced with a non-winning symbol prior to display to the player. The player is then presented with the puzzle to solve for the highest value prize. A successful selection of symbol replacement will award the player with the prize." Farley Report at 2.<br><br>*See, e.g.*, Vancura at Abstract and Fig. 8. |
| [1.f] displaying each winning combination of symbols on the touch screen display. | Michaelson, alone or in view of the other cited references, at least suggests "displaying each winning combination of symbols on the touch screen display."<br><br>*See, e.g.*, Claim 44 (44.8), *infra*, and Vancura, Fig. 5. |
| **Claim 3.** The electronic gaming method of claim 1 further comprising the step of determining if the player has decided to play the game field displayed on the game display. | Michaelson, alone or in view of the other cited references, at least suggests "determining if the player has decided to play the game field displayed on the game display."<br><br>*See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |
| **Claim 5.** The electronic gaming method of claim 1 wherein the constructed field is a two-dimensional array having a plurality of rows and columns. | Michaelson, alone or in view of the other cited references, at least suggests "the constructed field is a two-dimensional array having a plurality of rows and columns."<br><br>*See, e.g.*, Claim 47, *infra*, incorporated here. |
| **Claim 6.** The electronic gaming method of claim 1 wherein the step of constructing the field comprises: | Michaelson, alone or in view of the other cited references, at least suggests "determining an orientation of each winning combination for the play of the game; determining the symbols for each of the winning combinations; and randomly determining symbols for the remaining elements of the field." |

5

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| determining an orientation of each winning combination for the play of the game; determining the symbols for each of the winning combinations; and randomly determining symbols for the remaining elements of the field. | *See, e.g.*, Claim 44 (44.3, 44.5, 44.6), *infra*, incorporated here. |
| **Claim 7.** The electronic gaming method of claim 6 wherein the orientation of each winning combination is horizontal, vertical or diagonal. | Michaelson, alone or in view of the other cited references, at least suggests "the orientation of each winning combination is horizontal, vertical or diagonal." <br><br> *See, e.g.*, Claim 49, *infra*, incorporated here. <br><br> *See also, e.g.*, <br><br> TTF discloses that "the orientation of each winning combination is horizontal, vertical or diagonal." <br><br> "Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are: <br> 1. Choose the number of winning lines. One of {1,2,3,4} <br> 2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal. <br> 3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc. <br> 4. Fill in empty spots with random symbols. <br> 5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. |
| **Claim 11.** The electronic gaming method of claim 1 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game. | Michaelson, alone or in view of the other cited references, at least suggests "each winning combination of symbols has a predetermined probability of occurrence for a play of the game." <br><br> *See, e.g.*, Claim 44 (44.4-44.5), *infra*, incorporated here. <br><br> *See also, e.g.*,: <br><br> "If the central controller determines that the pool of predetermined game outcomes does not include at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is zero), for example, the proposed game |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | outcome is flagged as previously authorized, the central controller discards the proposed game outcome. The central controller then instructs the gaming terminal to randomly generate another proposed game outcome. In such case, the gaming terminal discards the retained proposed game outcome presentation and randomly generates another game outcome presentation. The gaming terminal then determines, according to an appropriate pay table, the associated proposed game outcome (again, identical to how a probability based gaming terminal generates a game outcome). This proposed game outcome is communicated to the central controller for authorization. This process is repeated as described above until the central controller authorizes a proposed game outcome." Michaelson ¶¶ 14-16.<br><br>"The slot machine gaming terminal presents or displays the game outcome presentation associated with the slot machine gaming terminal generated proposed win S2 as a specific reel symbol combination. The poker style gaming terminal presents or displays the game outcome presentation associated with the poker style gaming terminal generated proposed win S5 as a specific hand of cards. As discussed above, this embodiment enables one central controller to authorize a plurality of game outcome generated by a plurality of different gaming terminal in a casino or other entity and thus assists the casino or other entity in maintaining proper records, controlling gaming, reducing and preventing cheating or electronic or other errors and the like.<br><br>The present invention provides a number of advantages over existing central determination gaming systems. For example, since the gaming terminals of the present invention are generating game outcome presentations (that are used to determine the proposed game outcomes) in an identical manner as probability based gaming terminals, the presentation to the player is the exact same as playing a probability based gaming terminal. That is, the game out comes are determined as in a probability based gaming terminal with the additional step, undetectable to the player, of the central controller authorizing or double checking the availability of the proposed game outcome prior to providing the generated outcome to the player. For example, in a slot machine gaming terminal, in the amount of time the reels of a probability based slot machine spin, the present invention is operable to perform the functions described above, multiple times if necessary, in order to authorize a gaming terminal generated proposed game outcome." Michaelson ¶¶ 63-64.<br><br>Fawley Letter at 15-16<br><br>"The apparatus and method of the present invention may be based on any game having at least one round of play wherein the player must make a play decision and a definable correct play (such as a statistically correct play or a play that is correct in accordance with the rules of the game) exists for each play decision. |

7

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | The definable correct play identifies which play gives the player a better chance of winning. Such games include a variety of card games (poker, blackjack, baccarat), dice games, and games traditionally associated with gambling such as backgammon and cribbage. A play in one of these games may be any of the actions that a player normally makes while playing the game—such as moving a playing piece, discarding cards, requesting additional cards, laying down a particular card or cards, and the like. One configuration of the invention involves only a single play chance for the player. Two exemplary games that play well with a single play chance are blackjack and draw poker. If the player makes the correct play, then the player is rewarded by proceeding to a bonus or reward round. If the player makes an incorrect play, the game ends. In another configuration of the invention, the player continues playing the game to the conclusion of the game as long as he executes correct game plays.<br><br>The invention may be applied to any game that has at least one round of play requiring a decision from the player wherein statistics define the correct play. The method rewards the player when the player makes the correct game play and punishes the player by ending the game when the player makes an incorrect play. The skill of this game is to play the game in a way that gives the player the best chance—under previously defined statistics or game rules—to win. If the player makes a play that is not favored by the statistics or allowed by the game rules, then the game is over and the player must start again. When the player succeeds in making the correct play, the player may continue playing the game's next step or continue playing the game to its conclusion with the outcome of the game deciding the prize awarded to the player. In another embodiment, the player proceeds to play a bonus round where a prize is awarded by some random manner (such as a completely random selection, a spinning wheel-type round where the player pushes a button to stop on a prize, or the like). The game may reward the player for each correct play." Kowell Provisional at 3-4. |
| **Claim 13.** [13.pre] An electronic gaming system comprising: | Michaelson, alone or in view of the other cited references, at least suggests "An electronic gaming system."<br><br>*See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |
| [13.1] an electronic game terminal including a touch screen display; | Michaelson, alone or in view of the other cited references, at least suggests "an electronic game terminal including a touch screen display."<br><br>*See, e.g.*, Claim 44 (44.1), *infra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [13.2] a game processor for generating an interactive electronic game on the game terminal with a plurality of options selectable by a player, the game processor configured for: | Michaelson, alone or in view of the other cited references, at least suggests "a game processor for generating an interactive electronic game on the game terminal with a plurality of options selectable by a player." *See, e.g.*, Claim 44 (44.2), *infra*, incorporated here. |
| [13.3] constructing a game field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display; | Michaelson, alone or in view of the other cited references, at least suggests "constructing a game field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display." *See, e.g.*, Claim 44 (44.3), *infra*, incorporated here. *See also, e.g.,* TTF: TTF discloses the limitation that "there is no winning combination without player interaction with the game display: "The machine is activated by the insertion of money. The machine contains a video touch screen which allows the player to choose by touching the correct location necessary to complete the task, game or play. If the player chooses an incorrect location, the player therefore has failed to complete the required task, game or play. If the player fails to choose a location in the required time, then the player has failed to complete the task, game or play. There is a possibility of winning each play if the player has the requisite skill. The amount of the prize video touch screen the player is trying to win is determined on a random basis prior to the play. There are a total of thirty thousand (30,000) plays in the virtual cartridge. Once the thirty thousand plays have been completed a new virtual cartridge must be loaded into the machine for additional play on the machine." Fawley Letter at 3. "It is impossible to win the game being played without active participation by the player. The player can win or lose each play based upon the player's skill. The outcome of the task, game or play is controlled only by the person actively participating in the game. The outcome is determined exclusively by the player and not the machine. The machine does determine the prize which can be won for each play." Fawley Letter at 4. |

9

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [13.4] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | Michaelson, alone or in view of the other cited references, at least suggests "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."<br><br>*See, e.g.*, Claim 44 (44.5), *infra*, incorporated here. |
| [13.5] automatically displaying an actual game to be played on the touch screen game display prior to initiating activation of game play; | Michaelson, alone or in view of the other cited references, at least suggests "automatically displaying an actual game to be played on the touch screen game display prior to initiating activation of game play."<br><br>*See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |
| [13.6] receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection; and | Michaelson, alone or in view of the other cited references, at least suggests "receiving the player's selection of a field element as a location for a wild symbol and determining each winning combination of symbols that is formed by such selection."<br><br>*See, e.g.*, Claim 1 (1.e), *supra*, incorporated here. |
| [13.7] displaying each winning combination of symbols on the touch screen display. | Michaelson, alone or in view of the other cited references, at least suggests "displaying each winning combination of symbols on the touch screen display."<br><br>*See, e.g.*, Claim 1 (1.f), *supra*, incorporated here. |
| **Claim 15.** The electronic gaming system of claim 13 wherein the game processor is further configured for determining if the player has decided to play the game field displayed on the game display. | Michaelson, alone or in view of the other cited references, at least suggests "the game processor is further configured for determining if the player has decided to play the game field displayed on the game display."<br><br>*See, e.g.*, Claim 44 (44.7), *infra*, incorporated here. |
| **Claim 18.** The electronic gaming system of claim 13 wherein the game processor is further configured for constructing the field as a two-dimensional array having a plurality of rows and columns. | Michaelson, alone or in view of the other cited references, at least suggests "the game processor is further configured for constructing the field as a two-dimensional array having a plurality of rows and columns."<br><br>*See, e.g.*, Claim 47 (44.7), *infra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 19.** [13.pre] The electronic gaming system of claim 13 wherein the game processor is further configured for: | Michaelson, alone or in view of the other cited references, at least suggests "An electronic gaming system wherein the game processor is further configured for."<br><br>*See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |
| [19.1] determining an orientation of each winning combination for the play of the game; | Michaelson, alone or in view of the other cited references, at least suggests "determining an orientation of each winning combination for the play of the game."<br><br>*See, e.g.*, Claim 44 (44.8) and 49, *infra*, incorporated here.<br><br>*See also, e.g.*,<br><br>TTF discloses "determining an orientation of each winning combination for the play of the game"<br><br>"Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are:<br>1. Choose the number of winning lines. One of {1,2,3, 4}<br>2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal.<br>3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc.<br>4. Fill in empty spots with random symbols.<br>5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. |
| [19.2] determining the symbols for each of the winning combinations; and | Michaelson, alone or in view of the other cited references, at least suggests "determining the symbols for each of the winning combinations."<br><br>*See, e.g.*, Claim 44 (44.4), *infra*, incorporated here. |
| [19.3] randomly determining symbols for the remaining elements of the field. | Michaelson, alone or in view of the other cited references, at least suggests "randomly determining symbols for the remaining elements of the field."<br><br>*See, e.g.*, Claim 44 (44.5, 44.6), *infra*, incorporated here. |

11

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 20.** The electronic gaming system of claim 19 wherein the orientation of each winning combination is horizontal, vertical or diagonal. | Michaelson, alone or in view of the other cited references, at least suggests "the orientation of each winning combination is horizontal, vertical or diagonal." <br><br> *See, e.g.*, Claim 44 (44.8) and 49, *infra*, incorporated here. <br><br> *See also, e.g.*, <br><br> TTF discloses that "the orientation of each winning combination [i.e. array of game symbols in the game field yielding a successful outcome] is horizontal, vertical or diagonal." <br><br> "Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are: <br> 1. Choose the number of winning lines. One of {1,2,3,4} <br> 2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal. <br> 3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc. <br> 4. Fill in empty spots with random symbols. <br> 5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. <br><br> *See also, e.g.*, Chambers, p. 8 - 9 |
| **Claim 22.** The electronic gaming system of claim 13 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game. | Michaelson, alone or in view of the other cited references, at least suggests "each winning combination of symbols has a predetermined probability of occurrence for a play of the game." <br><br> *See, e.g.*, Claim 44 (44.4-44.5), *infra*, incorporated here; Claim 11, *supra*, incorporated here. |
| **Claim 25** [25.pre] A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising: | Michaelson, alone or in view of the other cited references, at least suggests "A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein." <br><br> *See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [25.1] program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols, wherein the game symbols for each element are automatically determined such that there is at least one winning combination for each play of the game but there is no winning combination without player interaction with the game display." <br><br> *See, e.g.*, Claim 44 (44.1, 3, 4, 5, and 6), *infra*, incorporated here; *see also* Claim 13 (13.3), *supra*, incorporated here. |
| [25.2] program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." <br><br> *See, e.g.*, Claim 44 (44.5), *infra*, incorporated here. |
| [25.3] program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play." <br><br> *See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [25.4] program instructions that receive the player's selection of a field element as a location for a wild symbol and determine each winning combination of symbols that is formed by such selection; and | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that receive the player's selection of a field element as a location for a wild symbol and determine each winning combination of symbols that is formed by such selection." <br><br> *See, e.g.*, Claim 44 (44.5), *infra*, incorporated here.; Claim 1 (1.e), *supra*, incorporated here. |
| [25.5] program instructions that display each winning combination of symbols on the touch screen display. | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that display each winning combination of symbols on the touch screen display." <br><br> *See, e.g.*, Claim 44 (44.8), *infra*, incorporated here. |
| **Claim 27.**  The computer program product for electronic gaming of claim 25 further comprising program instructions that determine if the player has decided to play the game field displayed on the game display. | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that determine if the player has decided to play the game field displayed on the game display." <br><br> *See, e.g.*, Claim 44 (44.7), *infra*, incorporated here. |
| **Claim 29.**  The computer program product for electronic gaming of claim 25 wherein the field is a two-dimensional array having a plurality of rows and columns. | Michaelson, alone or in view of the other cited references, at least suggests "the field is a two-dimensional array having a plurality of rows and columns." <br><br> *See, e.g.*, Claim 47, *infra*, incorporated here. |
| **Claim 30.**  [30-pre] The computer program product for electronic gaming of claim 25 wherein the | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." |

14

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| program instructions that construct the field comprise: | Michaelson, alone or in view of the other cited references, at least suggests "program instructions that construct the field." <br><br> *See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |
| [30.1] program instructions that determine an orientation of each winning combination for the play of the game; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that determine an orientation of each winning combination for the play of the game." <br><br> *See, e.g.*, Claim 44 (44.8) and 49, *infra*, incorporated here. <br><br> *See also, e.g.*, <br><br> TTF discloses "an orientation of each winning combination [i.e. array of game symbols in the game field yielding a successful outcome] for the play of the game." <br><br> "Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are: <br> 1. Choose the number of winning lines. One of {1,2,3, 4} <br> 2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal. <br> 3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc. <br> 4. Fill in empty spots with random symbols. <br> 5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. <br><br> *See, e.g.*, Chambers, p. 8 - 9 |
| [30.2] program instructions that determine the symbols for each of the winning combinations; and | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that determine the symbols for each of the winning combinations." |

15

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See, e.g.*, Claim 44 (44.4), *infra*, incorporated here. |
| [30.3] program instructions that randomly determine symbols for the remaining elements of the field. | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that randomly determine symbols for the remaining elements of the field." <br><br> *See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |
| **Claim 31.** The computer program product for electronic gaming of claim 30 wherein the orientation of each winning combination is horizontal, vertical or diagonal. | Michaelson, alone or in view of the other cited references, at least suggests "the orientation of each winning combination is horizontal, vertical or diagonal." <br><br> *See, e.g.*, Claim 20, *supra*, incorporated here.; Claim 44 (44.5), *infra*, incorporated here. |
| **Claim 33.** The computer program product for electronic gaming of claim 25 wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game. | Michaelson, alone or in view of the other cited references, at least suggests "each winning combination of symbols has a predetermined probability of occurrence for a play of the game." <br><br> *See, e.g.*, Claim 44 (44.4-44.5), *infra*, incorporated here; Claim 11, *supra*, incorporated here. |
| **Claim 37.** [37-pre] An electronic gaming method comprising the steps of: | Michaelson, alone or in view of the other cited references, at least suggests "An electronic gaming method." <br><br> *See, e.g.*, Claim 44 (44.pre), *infra*, incorporated here. |
| [37.1] constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols; | Michaelson, alone or in view of the other cited references, at least suggests "constructing a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols." <br><br> *See, e.g.*, Claim 44 (44.3), *infra*, incorporated here. |

16

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [37.2] determining at least one winning combination for each play of the game; | Michaelson, alone or in view of the other cited references, at least suggests "determining at least one winning combination for each play of the game." <br><br> *See, e.g.*, Claim 44 (44.4), *infra*, incorporated here. |
| [37.3] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | Michaelson, alone or in view of the other cited references, at least suggests "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field." <br><br> *See, e.g.*, Claim 44 (44.5), *infra*, incorporated here. |
| [37.4] automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; | Michaelson, alone or in view of the other cited references, at least suggests "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play." <br><br> *See, e.g.*, Claim 44 (44.6), *infra*, incorporated here. |
| [37.5] determining if the player has decided to play the displayed game; and | Michaelson, alone or in view of the other cited references, at least suggests "determining if the player has decided to play the displayed game." <br><br> *See, e.g.*, Claim 44 (44.7), *infra*, incorporated here. |
| [37.6] displaying an outcome resulting from play of the displayed game. | Michaelson, alone or in view of the other cited references, at least suggests "displaying an outcome resulting from play of the displayed game." <br><br> *See, e.g.*, Claim 44 (44.8), *infra*, incorporated here. |
| **Claim 38.** The electronic gaming method of claim 37 further comprising generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game. | Michaelson, alone or in view of the other cited references, at least suggests "generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game." <br><br> *See, e.g.*, Claim 44 (44.6) *infra*, incorporated here. <br><br> *See also, e.g.*, |

17

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any. The proposed game outcome is determined identical to how a game outcome is determined in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13.<br><br>"Upon authorization, the gaming terminal displays or presents the randomly generated game outcome presentation and provides the authorized game outcome to the player. If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the associated value, if any, to the player and the game ends. If the authorized game outcome is a secondary game triggering outcome, the gaming terminal provides the associated value, if any, to the player and then enables the player to play a secondary or bonus game." Michaelson ¶ 18.<br><br>"In order to comply with the above mentioned regulatory rules that do not permit the use of gaming devices or terminals that provide probability based game outcomes, central determination gaming systems have been implemented wherein the central system maintains one or more predetermined pools or sets of game outcomes. Each game outcome in each pool includes a game outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value or payout amount, if any, and a game presentation component (i.e., how the game outcome is displayed or presented to the player). In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 9. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Gaming devices having a primary or base game and a secondary or a bonus game are also well known. A secondary or bonus game may be any type of suitable game, either similar to or completely different from the primary game, which is entered upon the occurrence of a triggering event or a selected outcome in the primary game. The secondary or bonus game enables the player to obtain a prize or payout in addition to the prize or payout, if any, obtained from the primary game. A secondary or bonus game may produce a significantly higher level of player excitement than a primary game alone because it provides a greater expectation of winning than the primary game and is accompanied with more attractive or unusual features than the primary game." Michaelson ¶ 11

"In one embodiment, the central controller maintains at least one predetermined pool of predetermined game outcomes. Each predetermined game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and a value component or pay amount, if any. Each pool of predetermined game outcomes may include a plurality of each type of predetermined game outcome. For example, a pool of one thousand game outcomes may include hundreds of a lower range award and one or few of the highest award." Michaelson ¶ 36.

"In addition to winning base game credits, the gaming terminal 10, including any of the base games disclosed above, also includes secondary or bonus games that give players the opportunity to win credits. The gaming terminal 10 preferably employs a video-based display device 130 or 132 for the secondary or bonus games. The secondary or bonus games include a program that automatically begins when the player achieves a qualifying condition or a secondary game triggering outcome in the primary or base game.

In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶¶ 49-50.

"If the proposed game outcome is a secondary game triggering outcome, the gaming terminal randomly generates a proposed secondary game outcome presentation identical to how the primary game outcome presentation is generated. The gaming terminal then determines, with the use of an appropriate pay table or other stored data, the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In this case, the gaming terminal combines the value associated with proposed secondary game triggering outcome, if any, and the value associated with the proposed secondary game |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | outcome, if any, to determine the proposed game outcome that is communicated to the central controller for authorization, as described herein. For example, if the gaming terminal determines that the secondary game triggering outcome has a value of $1 and the secondary game outcome has a value of $6, a proposed $7 win game outcome is communicated to the central controller for authorization." Michaelson ¶ 53.<br><br>"If the authorized game outcome is a secondary game triggering outcome (not shown), the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. As described above, even though the gaming terminal enables the player to play a secondary or bonus game, the secondary game outcome has already been determined and authorized along with the primary game outcome. That is, the gaming terminal does not communicate with the central controller regarding the secondary game outcome but rather provides the prior authorized secondary game outcome and presents the prior generated secondary game outcome presentation to the player.<br><br>In an alternative embodiment, if a secondary or bonus game triggering outcome is provided to the player, the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. In the secondary or bonus game, the gaming terminal randomly generates a proposed secondary game outcome presentation based on probability data. As described above, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In one embodiment, the proposed secondary game outcome presentation is independent of and not related to the game outcome provided in the primary or base game. The gaming terminal then communicates the proposed secondary game outcome to the central controller. The central controller determines if a pool of predetermined secondary game outcomes includes the proposed secondary game outcome. The central controller then proceeds with authorizing the gaming terminal to provide the player with the proposed secondary game outcome as described above regarding the primary or base game." Michaelson ¶¶ 58-59.<br><br>Michaelson at Figs. 2-5.<br><br>*See also, e.g.,* |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "2. The method of playing a game of bingo comprising: a) providing a player with a bingo card having a plurality of numbered spaces formed as a matrix having five rows and five columns used in the play of a five-by-five bingo game; b) providing a plurality of bingo balls each having individual numbers corresponding to the numbered spaces on the bingo card; c) a player making a first wager to be eligible for the five-by-five bingo game, d) a player making a second wager to be eligible for a progressive jackpot; e) randomly selecting consecutive bingo balls; 13 awarding a first preselected amount when the player achieves a predetermined winning combination on the five-by-five matrix of the bingo card; g) designating a portion of the second wager to a separate progressive jackpot pool; h) establishing a predetermined combination as a winning combination for the progressive jackpot pool; and i) awarding the progressive jackpot pool to the player when he achieves the predetermined winning combination the bingo card." Weingardt at 7:31-55.<br><br>"The player makes a first wager to be eligible for a game of bingo played using the 5x5 portion of the bingo card and a second wager to be eligible to play the a game of bingo using the 7x7 portion of the bingo card. The player also makes a third wager to be eligible for the progressive jackpot to which a portion of the third wager is designated." Weingardt at 6:5-11.<br><br>"FIG. 5 is a flow chart that depicts the method of play of an alternative preferred embodiment of the present invention. In this flow chart, the player is provided with a bingo card having a 5x5 matrix and a plurality of bingo balls are provided forming the selection pool. The player makes a first wager to be eligible for a game of bingo played using the 5x5 matrix of the bingo card and a second wager to be eligible for the progressive jackpot to which a portion of the second wager is designated." Weingardt at 6:19-27.<br><br>Weingardt at Figs. 1-2, 3-6.<br><br>*See also, e.g.,*<br><br>"Each spin of the reels constitutes a complete game. The gaming device includes a plurality of selectable reels, a selection system, an actuating system, a prize controller, and a reselection system. The selectable reels each have symbols located on their periphery, such that each selectable reel displays an outcome symbol after being spun." Daly at 2:6-11.<br><br>"The reselection system then substitutes a previously non-active reel for an active reel from the initial game, thereby designating a new set of active reels for a second game. This new set of active reels for the |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels lo produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game." Daly at 2:21-33.<br><br>"A preferred embodiment reel spinning gaming device, constructed in accordance with the present invention uses a plurality of reels, some of which are designated as active reels and some of which are designated as non-active reels, to provide a player with the opportunity to play multiple consecutive games of slots, with each subsequent consecutive game utilizing a portion of the reel symbols from the outcome symbol combination of the previous game. After an initial game that utilizes an initial set of active reels, the gaming device begins a second game by substituting a previously non-active reel from the initial game for an active reel from the initial game, thereby designating a new set of active reels for the second game. This new set of active reels for the second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels to produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game." Daly at 6:17-38.<br><br>Daly at Figs. 1, 3-8.<br><br>*See also, e.g.*,<br><br>"Many special features are provided nowadays in fruit machines, indeed they have to some extent taken over from the basic game, in that most of the bigger wins are obtained by the features rather than by the initial result when the reels first come to a halt. In a so called 'ladder' or 'trail' feature, steps in the ladder or trail may be illuminated as a result of certain symbols, e.g. symbols bearing superimposed numbers, appearing on the win line. When the 'ladder' or 'trail' is completed, a jackpot prize or another feature which may result in a jackpot prize may be awarded." Farrell at 3:9-14.<br><br>"The display 1 comprises a reel display 2 which has three reels, 3, 4 and 5 showing various reel symbols, a matrix display 6 comprising a 3 x 3 grid of nine segments 7, a fourth reel 8 with numbers from 1 to 12 on it, a ladder 9 indicating progressive prizes, a nudge-pot counter 10, and a skill-shot feature 11. The reels 3, |

22

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | 4, 5 carry the normal fruit symbols, plus first reel symbols of noughts 12 and second reel symbols of crosses 13." Farrell at 4:10-13.<br><br>"The player will enter the prize ladder 9 at a level dependent upon the number of complete lines of O's or X's shown in the matrix, from one to eight (if eight lines are possible in the reel display; we actually prefer to provide a maximum possible score of six lines). The ladder has twelve prize levels. Thus the player enters the ladder 9 at the level corresponding to the number of the lines completed. When a line in the matrix is lit the player will have the option of (i) collecting the win corresponding to the relevant entry in the prize ladder 6 by pressing the collect button; (ii) pressing the higher or lower button to spin the fourth reel, reel 8.  If the guess that the next number at which the reel 8 comes to rest will be higher or lower than the previous number is correct the player advances one position up the prize ladder. If the guess is wrong a 'lose' lamp is illuminated and the feature is terminated. The player either automatically collects the prize on the ladder at which he already stands, or loses everything (the machine can of course be adapted to provide either result). Pressing the higher/lower button also automatically adds a random/pseudo-random number of nudges to the nudge-pot indicator 10. (iii) Collect the nudge-pot. This is an option when an 'exchange' light 10' is illuminated. If taken, the nudge pot will automatically step the reels 3, 4, 5 to the best possible win for the given number of nudges." Farrell at 4:19-33.<br><br>*See also, e.g.,*<br><br>"A portable sample play device, such as a player tracking card or other player-carried device, allows players or users of a gaming machine to view, and/or participate in, sample or preview play of a game. The portable sample play device can be a smart card that stores all necessary information itself, or a known magnetic stripe card that simply stores rudimentary information. Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired."  Muir at Abstract<br><br>"Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply |

23

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired." Muir ¶ 5.<br><br>"Gaming machine 70 may be configured for simultaneous, sequential, and/or random play of a variety of games of chance at the same time.<br><br>By "simultaneous play" it is meant that a plurality of selected games may be initiated for play at the same time and wherein the image representations for each of the selected games are substantially mutually concurrently displayed on single display screen 72. "Simultaneous play" is referred to interchangeably herein as "mutually concurrent play." After initiation of simultaneous play, game outcomes may be simultaneously, sequentially, or randomly displayed on single display screen 72. Preferably, however, game outcomes for a "simultaneous play" mode are revealed on single display screen 72 in a synchronous fashion (e.g., the game outcomes are displayed one at a time and according to predetermined intervals)." Cannon at 7:45 – 60. |
| **Claim 39.** The electronic gaming method of claim 38 wherein the additional game field is for a next game to be played. | TTF, alone or in view of other cited references, at least suggests "the additional game field is for a next game to be played."<br><br>*See, e.g.*, Claim 38, *supra*, incorporated here. |
| **Claim 40.** The electronic gaming method of claim 37 wherein the displayed game comprises a two-dimensional array of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a two-dimensional array of game symbols."<br><br>*See, e.g.*, Claim 47, *infra*, incorporated here. |
| **Claim 41.** The electronic gaming method of claim 37 wherein the displayed game comprises a one-dimensional array of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a one-dimensional array of game symbols."<br><br>*See, e.g.*, Claim 47, *infra*, incorporated here. |
| **Claim 42.** The electronic gaming method of claim 37 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols."<br><br>*See, e.g.*, Claim 49, *infra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 44** [44.pre] An electronic gaming system comprising: | To the extent the preamble is limiting, Michaelson discloses "[a]n electronic gaming system." <br><br> "A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and instructs the gaming terminal to generate another proposed game outcome for authorization."  Michaelson at Abstract. <br><br> "Referring now to the drawings, as illustrated in FIG. 1A, one embodiment of the present invention includes a plurality of gaming devices or gaming terminals 10 a, 10 b and 10 c located in a gaming establishment, such as a casino, coupled by one or more communication links 12 a, 12 b and 12 c to a central controller or central processor 14. The communication links 12 can be any of a plurality of devices known to those of skill in the art for receiving data transmissions to and from the gaming terminal. The central processor maintains supervision over the entire network of gaming terminals." Michaelson ¶ 35 <br><br> "Two embodiments of the gaming terminal or gaming device of the present invention are shown in FIGS. 2A and 2B as gaming terminal 10 a and gaming terminal 10 b, respectively. Gaming terminal 10 a and/or gaming terminal 10 b are generally referred to herein as gaming terminal 10. Gaming terminal 10 is in one embodiment a slot machine having the controls, displays and features of a conventional slot machine. It is constructed so that a player can operate it while standing or sitting, and gaming terminal 10 is preferably mounted on a console. However, it should be appreciated that gaming terminal 10 can be constructed as a pub-style table-top game (not shown) which a player can operate preferably while sitting. Furthermore, gaming terminal 10 can be constructed with varying cabinet and display designs, as illustrated by the designs shown in FIGS. 2A and 2B." Michaelson ¶ 39. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | FIG. 2A <br><br> *See* Michaelson at Figs. 1-3. |
| [44.1] an electronic game terminal including a touch screen display; | Michaelson discloses "an electronic game terminal including a touch screen display." <br><br> "A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and instructs the gaming terminal to generate another proposed game outcome for authorization." Michaelson at Abstract.<br><br>"The present invention relates to a central determination gaming system with a game outcome generated by a gaming terminal and approved by a central controller. The present invention includes a central controller and a plurality of gaming terminals in communication with the central controller." Michaelson ¶ 12.<br><br>"In one embodiment illustrated in FIG. 1B, a plurality of the gaming terminals are configured so that different gaming device or gaming terminals may be used to play different types of games. That is, the central controller 14 may be in communication via one of more communication links 12 with a plurality of gaming devices or gaming terminals 10 a that are used for playing a slot machine style game, a different plurality of gaming devices or gaming terminals 10 b that are used for playing a poker style game, a different plurality of gaming devices or gaming terminals 10 c that are used for playing a blackjack style game, and the like. This embodiment enables the central controller to authorize every game outcome for game(s) played on every gaming terminal in the network of central determination gaming terminals. In an alternative embodiment, all of the gaming terminals which are coupled to the central processor are configured to play the same type of game. In another embodiment, a plurality of gaming terminals may each be configured for playing a plurality of different games.<br><br>Two embodiments of the gaming terminal or gaming device of the present invention are shown in FIGS. 2A and 2B as gaming terminal 10 a and gaming terminal 10 b, respectively. Gaming terminal 10 a and/or gaming terminal 10 b are generally referred to herein as gaming terminal 10. Gaming terminal 10 is in one embodiment a slot machine having the controls, displays and features of a conventional slot machine. It is constructed so that a player can operate it while standing or sitting, and gaming terminal 10 is preferably mounted on a console. However, it should be appreciated that gaming terminal 10 can be constructed as a pub-style table-top game (not shown) which a player can operate preferably while sitting. Furthermore, gaming terminal 10 can be constructed with varying cabinet and display designs, as illustrated by the designs shown in FIGS. 2A and 2B." Michaelson ¶¶ 38-39.<br><br>"As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 |

27

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game." Michaelson ¶ 47.<br><br><br><br>*See* Michaelson at Figs. 1-3. |
| [44.2] a game processor for generating an interactive electronic game on the game terminal, the game processor configured for: | The Court has construed "game processor" as "a CPU or microprocessor that executes program instructions to generate a game."<br><br>Michaelson discloses "a game processor [i.e. a CPU or microprocessor that executes program instructions to generate a game] for generating an interactive electronic game on the game terminal, the game |

28

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | processor [i.e. a CPU or microprocessor that executes program instructions to generate a game] configured for," as construed.<br><br>"Central determination gaming systems are also generally known. A central determination gaming system provides a plurality of individual gaming terminals or devices, located in a gaming establishment, such as a casino, coupled by one or more communication links, to a central processor or computing system. When a player plays a game on one of the gaming devices a game outcome is determined at the central processor based on probability data. The determined game outcome is communicated from the central system to the individual gaming device and then provided to the player. It should be appreciated that one central processor may continuously determine the game outcomes for hundreds or thousands of individual gaming devices at once." Michaelson ¶ 8.<br><br>"Referring now to the drawings, as illustrated in FIG. 1A, one embodiment of the present invention includes a plurality of gaming devices or gaming terminals 10 a, 10 b and 10 c located in a gaming establishment, such as a casino, coupled by one or more communication links 12 a, 12 b and 12 c to a central controller or central processor 14. The communication links 12 can be any of a plurality of devices known to those of skill in the art for receiving data transmissions to and from the gaming terminal. The central processor maintains supervision over the entire network of gaming terminals." Michaelson ¶ 35.<br><br>"As illustrated in FIG. 3, the general electronic configuration of gaming terminal 10 preferably includes: a processor 138; a memory device 140 for storing program code or other data; a central display device 130; an upper display device 132; a sound card 142; a plurality of speakers 136; and one or more input devices 144. The processor 138 is preferably a microprocessor or microcontroller-based platform which is capable of displaying images, symbols and other indicia such as images of people, characters, places, things and faces of cards. The memory device 140 can include random access memory (RAM) 146 for storing event data or other data generated or used during a particular game. The memory device 140 can also include read only memory (ROM) 148 for storing program code which controls the gaming terminal 10 so that it plays a particular game in accordance with applicable game rules and pay tables.<br><br>As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in |

29

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game.<br><br>It should be appreciated that although a processor 138 and memory device 140 are preferable implementations of the present invention, the present invention can also be implemented using one or more application-specific integrated circuits (ASIC's) or other hard-wired devices, or using mechanical devices (collectively and/or alternatively referred to herein as a "processor"). Furthermore, although the processor 138 and memory device 140 preferably reside on each gaming terminal 10 unit, it is possible to provide some or all of their functions at a central location such as a network server for communication to a playing station such as over a local area network (LAN), wide area network (WAN), Internet connection, microwave link, and the like." Michaelson ¶¶ 46-48.<br><br> |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See* Michaelson at Figs. 1-3. |
| [44.3] constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols; | Michaelson discloses "constructing a field having a plurality of elements for the interactive game display wherein each element includes a game symbol from a plurality of predetermined game symbols." "In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any. The proposed game outcome is determined identical to how a game outcome is determined in, a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate |

31

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13.<br><br>"Each reel 134 displays a plurality of indicia such as bells, hearts, fruits, numbers, letters, bars or other images which preferably correspond to a theme associated with the gaming terminal 10. The symbols and indicia used on and in gaming terminal 10 may be in mechanical, electronic, electrical or video form. Furthermore, gaming terminal 10 preferably includes speakers 136 for making sounds or playing music.<br><br>As illustrated in FIG. 3, the general electronic configuration of gaming terminal 10 preferably includes: a processor 138; a memory device 140 for storing program code or other data; a central display device 130; an upper display device 132; a sound card 142; a plurality of speakers 136; and one or more input devices 144. The processor 138 is preferably a microprocessor or microcontroller-based platform which is capable of displaying images, symbols and other indicia such as images of people, characters, places, things and faces of cards. The memory device 140 can include random access memory (RAM) 146 for storing event data or other data generated or used during a particular game. The memory device 140 can also include read only memory (ROM) 148 for storing program code which controls the gaming terminal 10 so that it plays a particular game in accordance with applicable game rules and pay tables." Michaelson ¶¶ 45-46.<br><br>"The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See* Michaelson at Figs. 1-3. |
| [44.4] determining at least one winning combination for each play of the game; | The Court has construed "winning combination" as "array of game symbols in the game field yielding a successful outcome" and "determining at least one winning combination for each play of the game" as "establish or ascertain at least one winning combination, properly construed, for each game to be played." Michaelson discloses and/or renders obvious "determining at least one winning combination [i.e. establish or ascertain at least one array of game symbols in the game field yielding a successful outcome for each game to be played] for each play of the game," as construed by the Court Michaelson discloses that some "regulatory bodies permit the use of wagering gaming devices which are guaranteed to provide certain or definite awards." At a minimum, Michaelson' teachings confirm that it would have been obvious to a POSITA to try using the claimed step in a gaming device to determine a |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | winning combination [i.e. array of game symbols in the game field yielding a successful outcome] for each play of the game to guarantee a winning experience for the player; that there were design incentives or market forces prompting those in the field to find ways to provide a winning experience for a player, that multiple methods were well known to provide and enhance the winning experience for a player, and that the claimed step (to the extent not specifically disclosed in Michaelson) is merely a variation that would have been predictable to a POSITA; and that a POSITA would have been led and prompted to modify Michaelson's gaming device to implement the claimed step to achieve the goal of guaranteeing the player the opportunity to achieve certain game elements and to have a winning experience.<br><br>"After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52.<br><br>"Regulatory bodies in certain jurisdictions do not permit the use of probability-based gaming devices in-part for these reasons. These regulatory bodies permit the use of wagering gaming devices which are guaranteed to provide certain or definite awards, so that, for example, a certain number of wins is guaranteed and the overall amount paid back to players is guaranteed. That is, the payback percentage is fixed and not an average expected amount." Michaelson ¶ 5.<br><br>To the extent that Michaelson does not disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone, and that implementing an operation where there is "one winning combination [i.e. array of game symbols in the game field yielding a successful outcome] for each play of the game" would have been obvious to a PHOSITA to try, and would have been possible to try through known and simple techniques and substitutions.<br><br>To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of Bregenzer, Walker, Fey 1983, Fey 1989, and/or TTF. There are many reasons a PHOSITA would have looked to, and incorporated disclosures from at least these references. One such reason is that the references are directed toward the construction and |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | operation of gaming devices. Additionally, a PHOSITA would seek to modify Michaelson to drive user enthusiasm for playing the game, to promote the game and drive user excitement about the game and encourage users to play and continue playing the game; to further distinguish the game over a game of chance and would have looked to other references to confirm or inform the PHOSITA's knowledge. A POSITA would have also been motivated to modify the primary reference alone and/or in view of the teachings of the other cited references to implement these features to remove the element of chance so that it could be played in a particular state or city where games of chance were not allowed. Any such modification, substitution, or combination would have been obvious to try and would have been well within a PHOSITA's skill.<br><br>*See, e.g.,*<br><br>"An apparatus and method for playing a gaming machine in which the player is told in advance that the indicia displays will reveal a winning combination, and that all the player needs to do is choose the correct Subset of indicia in order to obtain the winning combination." Bregenzer at Abstract.<br><br>"Above the video screen 20 is a paytable 49. In addition to the information usually displayed in a paytable, the paytable, in one of the preferred embodiments advises the player that every spin of the reels will result in a winning combination on some subset of the indicia displays. The player chooses which subset of indicia displays he or she will use, in the embodiment set forth in FIG. 1, by pressing the touchscreen 20." Bregenzer ¶ 12.<br><br>"In one of the preferred embodiments, the gaming machine is a five-reeled mechanical slot machine. A display advises the player that every game has at least one winning combination. This display can be a video screen, an LED display, a plasma screen, or even a sticker or other written notice attached to the game. In another embodiment, the player is advised that there will be at least one winning combination displayed by the indicia display. This can be done in any number of ways including sound effects, an LED display, a VFD display, a plasma screen, a video screen, a touch screen, a sticker, words printed or placed on the gaming machine itself, a sign, or some other method of conveying information to a player. Thus, if the player chooses correctly, the player will win on every play. This is a significant advantage to this invention over prior art inventions, in that the player knows that if he or she chooses right, the player will win every time, as opposed to prior art slot machines where the player knows that there will be certain plays that are losing results. While this may seem to be a problem, since the player must necessarily lose money in order for the casino to make money, it is actually not a problem. For example, in the case of a five reel slot machine wherein the player chooses three reels, the player has a just a 60% chance of picking |

35

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | the correct three reels. Thus, while the player has the impression that every spin of the reels is a winner, in actuality, the odds of a player winning is much less. A benefit to this is that a game can have a lower hold (i.e., be more profitable) while still giving the impression that it pays out more frequently than it really does. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods commonly known in the art to activate a gaming machine, the player is given the opportunity to choose three of the five reels to play. This can be done by selection buttons associated with each reel. The player cannot choose more than three reels or less then three reels. Once the player makes the selection, the reels are spun. Using the three reels chosen by the player, the game then determines whether a winning combination is displayed on the three reels chosen by the player. If there was a winning combination, then coins or credits are paid out. It is understood that coins can be paid out either directly, or credits can be added to the credits already on the game. The player is also provided the opportunity to see what the results could have been if the player had chosen a different three reels. For example, the three reels chosen by the player may not reveal a winning combination. But had the player chosen a different set of three reels, the player would have had a winning result. This gives the player the sense that they have a direct impact on the game, thereby increasing player enjoyment." Bregenzer ¶ 14. <br><br> "In another preferred embodiment, the gaming machine is a five-reeled video slot machine. It will be understood that while five reels is preferred, the game can be instituted on any number of reels. A display advises the player that every game has at least one winning combination. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods commonly known in the art to activate a gaming machine, the player is given the opportunity to choose three of the five reels to play. This can be done by selection buttons associated with each reel, or a touch screen. The player selects the required number of reels, usually less than the total number of reels. Once the player makes the selection, the reels are spun. Using the reels chosen by the player, the game then determines whether a winning combination is displayed. If there was a winning combination, then coins or credits are paid out. It is understood that coins can be paid out either directly, or credits can be added to the credits already on the game. The player is also provided the opportunity to see what the results could have been if the player had chosen a different three reels. For example, the reels chosen by the player may not reveal a winning combination, but had the player chosen a different set of three reels, the player would have had a winning result. Thus the game could notify the player that he or she did not choose reels that revealed a winning combination, but had the player chosen an alternate group of reels, the player would have won 'x' number of coins. This gives the player the sense that they have a direct impact on the game, thereby increasing player enjoyment. It also gives the player a sense that if they had played better, they would have won. It also gives the player a sense that there is a lot of money to be won, even if they are not winning it, there is still the possibility to win on every turn." Bregenzer ¶ 17. |

36

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "A display advises the player that every game has at least one winning combination. Once the gaming machine is activated by the player placing a wager, or inserting a player card, or one of the other methods commonly known in the art to activate a gaming machine, the reels spin. The results of the reels are not immediately displayed to the player. Rather, they are obscured or not shown to the player. The player is then prompted to choose some subset of the reels."  Bregenzer ¶ 18.<br><br>"In another embodiment, not only is the player told that there is at least one winning combination, the player is specifically told what types of potential winning combinations there are for that particular game. For example, assuming the player has spun the reels before selecting the reels to play, the game can determine that using all five reels, there are winning combinations resulting in a payout of two coins, five coins, and 100 coins. Thus, the player knows that there is a chance for a significant win. This also increases the anticipation associated with the game, leading to more exciting play." Bregenzer ¶ 19.<br><br>"In terms of the mechanics of implementing the instant invention, it will be well understood by one skilled in the art how to implement this instant invention using a processor or processors to control the gaming machine. It will also be well understood that the software and firmware that controls the game is stored on various memory devices, such as a ROM, EPROM, EEPROM, flash memory, hard drive, disk drive, or other alterable or inalterable memory or memories, and that the memory devices are linked to the processor or processors."  Bregenzer ¶ 28. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  FIG. — 3 <br><br> Bregenzer at Fig. 3 <br><br> *See also, e.g.,* <br><br> "Based upon our evaluation of game play, a winning outcome is attainable for every game played." Farley Report at p. 18. <br><br> "It should be noted that the initial nine (9) symbols displayed will not present an automatic winning combination. The player must engage in the selection of the symbol to be replaced with a "Wild Card" in order to obtain a winning game outcome." Farley Report at 2. <br><br> "It is impossible to win the game being played without active participation by the player. The player can win or lose each play based upon the player's skill. The outcome of the task, game or play is controlled only by the person actively participating in the game. The outcome is determined exclusively by the player and not the machine. The machine does determine the prize which can be won for each play." Fawley Letter at 4. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See also, e.g.,* <br><br> "Applicants have recognized that many different types of players would find it appealing to ensure they will enjoy one or more aspects of a winning experience. For example, many types of players would find it appealing to be guaranteed a win at a game of chance, to be guaranteed to achieve a winning outcome, to be guaranteed to achieve one or more game elements, or to be guaranteed a positive payout amount." Walker ¶ 22. <br><br> "Some types of players would find it appealing to be guaranteed the occurrence of one or more aspects of a winning experience in exchange for a payment. For example, some players would find it appealing to provide a payment and in return be permitted to have play of a game continue until he wins. Some players would also find it appealing to be able to break a 'cold streak' at a game of chance by guaranteeing the occurrence of one or more aspects of a winning experience." Walker ¶ 24. <br><br> "The gaming device provides an offer to a player, the offer including a guarantee of providing a winning experience in a game of chance, in exchange for a payment (step 1010). The gaming device receives a payment from the player (1020). The gaming device also provides the guaranteed winning experience to the player (1030) in accordance with the offer." Walker ¶¶ 159-60. <br><br> "In some embodiments, the player may be offered a winning experience comprising a guaranteed benefit. For example, the guaranteed benefit may comprise allowing the player to spin at least one reel of a slot machine as many times as necessary to achieve an outcome that corresponds to a payout amount that is greater than zero. Similarly, the guaranteed benefit may comprise allowing the player to receive as many hands of cards (or other sets of game symbols) as is necessary to achieve an outcome that corresponds to a payout amount that is greater than zero. <br><br> In some embodiments, the guaranteed benefit comprises allowing the player to spin at least one reel of a slot machine as many times as is necessary to achieve a payout amount that is greater than a predetermined threshold. For example, in exchange for providing a payment (e.g., $12), the player may be allowed to re-spin, without providing any additional payment, as many times as is necessary to accumulate a number of credits above a particular threshold (e.g., $10). For instance, one spin may correspond to a $2 payout, and another spin may correspond to a $4 payout, and so on. The player may re-spin without additional wagering until the accumulated payout amount reaches or exceeds the threshold." Walker ¶¶ 161-162. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "In some embodiments, the guaranteed benefit comprises allowing the player to spin at least one reel of a slot machine as many times as is necessary to achieve a predetermined outcome. For example, as described variously herein, in exchange for a payment, the player may be guaranteed the ability to play a game of chance through any number of iterations (e.g., generation of outcomes) until the occurrence of a particular outcome (e.g., a target outcome). <br><br> In some embodiments, the guaranteed benefit comprises a positive payout that is based on the number of iterations that were necessary to achieve a target outcome." Walker ¶¶ 163-164. <br><br> Walker at Fig. 10. <br><br> *See also, e.g.,* |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |
Fey 1983 at 150; Fey 1989 at 150; *see also* Fey 1983 at 151-157; Fey 1989 at 151-157. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [44.5] testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | The Court has construed "prior to displaying" as "before making visible on the touch screen display," "winning combination" as "array of game symbols in the game field yielding a successful outcome," and "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field" as "testing the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the game"<br><br>Michaelson at least suggests, alone or in combination with the other references, "testing the game field prior to displaying [i.e. before making visible on the touch screen display] the game [i.e. the actual game to be played] to the player to ensure that a winning combination [i.e. array of game symbols in the game field yielding a successful outcome] more valuable than the determined winning combination [i.e. array of game symbols in the game field yielding a successful outcome] is not generated inadvertently in completing the field."<br><br>*See, e.g.,:*<br><br>"The proposed game outcome is communicated to the central controller or central processor before it is displayed to the player. In an alternative embodiment, only the value associated with the proposed game outcome is communicated to the central controller. It should be appreciated that the generated game outcome presentation is not communicated to the central controller, but is retained in the memory of the gaming terminal. The central controller determines if a pool of predetermined game outcomes includes at least one of the proposed game outcome. That is, the central controller accesses an appropriate pool of game outcomes for the specific game played and determines if the pool includes at least one of the proposed game outcome. Alternatively, the central controller determines if the pool of predetermined game outcomes includes at least one available game outcome based on the proposed game outcome. In the alternative embodiment wherein only the value associated with the proposed game outcome is communicated to the central controller, rather than storing each game outcome in the pool, the central controller stores the number of available game outcomes in the pool for each possible value. In this embodiment, the central controller determines if the number of available game outcomes in the pool with the same value as the value associated with the proposed game outcome is at least one." Michaelson ¶ 15. |

42

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "If the pool of predetermined game outcomes includes at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is at least one), the central controller authorizes the proposed game outcome to be provided to the player and marks or flags one of the available proposed game outcomes in the pool as used or unavailable. Once a proposed game outcome is marked or flagged it is prevented from a subsequent authorization. The central controller communicates the authorization of the proposed game outcome to the gaming terminal." Michaelson ¶ 16.<br><br>"If the central controller determines that the pool of predetermined game outcomes does not include at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is zero), for example, the proposed game outcome is flagged as previously authorized, the central controller discards the proposed game outcome. The central controller then instructs the gaming terminal to randomly generate another proposed game outcome. In such case, the gaming terminal discards the retained proposed game outcome presentation and randomly generates another game outcome presentation. The gaming terminal then determines, according to an appropriate pay table, the associated proposed game outcome (again, identical to how a probability based gaming terminal generates a game outcome). This proposed game outcome is communicated to the central controller for authorization. This process is repeated as described above until the central controller authorizes a proposed game outcome." Michaelson ¶¶ 14-16.<br><br>"The slot machine gaming terminal presents or displays the game outcome presentation associated with the slot machine gaming terminal generated proposed win S2 as a specific reel symbol combination. The poker style gaming terminal presents or displays the game outcome presentation associated with the poker style gaming terminal generated proposed win S5 as a specific hand of cards. As discussed above, this embodiment enables one central controller to authorize a plurality of game outcome generated by a plurality of different gaming terminal in a casino or other entity and thus assists the casino or other entity in maintaining proper records, controlling gaming, reducing and preventing cheating or electronic or other errors and the like.<br><br>The present invention provides a number of advantages over existing central determination gaming systems. For example, since the gaming terminals of the present invention are generating game outcome presentations (that are used to determine the proposed game outcomes) in an identical manner as probability based gaming terminals, the presentation to the player is the exact same as playing a probability based gaming terminal. That is, the game out comes are determined as in a probability based gaming terminal with the additional step, undetectable to the player, of the central controller authorizing |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | or double checking the availability of the proposed game outcome prior to providing the generated outcome to the player. For example, in a slot machine gaming terminal, in the amount of time the reels of a probability based slot machine spin, the present invention is operable to perform the functions described above, multiple times if necessary, in order to authorize a gaming terminal generated proposed game outcome." Michaelson ¶¶ 63-64.<br><br>*See* Michaelson at Figs 3-5.<br><br>To the extent that Michaelson does not expressly disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone. A PHOSITA would have recognized that "testing" and "determin[ing]" that the outcome is what should be presented would have been obvious to a PHOSITA to try, and would have been possible to try through known techniques and substitutions. A PHOSITA would have been motivated to implement an algorithm to test the game field prior to displaying [i.e. before making visible on the touch screen display] the game [i.e. the actual game to be played] to the player to ensure that a winning combination [i.e. array of game symbols in the game field yielding a successful outcome] more valuable than the determined winning combination [i.e. array of game symbols in the game field yielding a successful outcome] is not generated inadvertently in completing the field in order to prevent erroneous game fields from being presented that could result in unexpected wins and more valuable than intended prizes from potentially being won.<br><br>To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of TTF. TTF at least suggests, alone or in combination with the other references, "testing the game field prior to displaying [i.e. before making visible on the touch screen display] the game to the player to ensure that a winning combination [i.e. array of game symbols in the game field yielding a successful outcome] more valuable than the determined winning combination [i.e. array of game symbols in the game field yielding a successful outcome] is not generated inadvertently in completing the field." There are many reasons a PHOSITA would have looked to, and incorporated these disclosures. One such reason is that both references are directed toward the construction and operation of gaming devices. Additionally, a PHOSITA modifying the Michaelson game might have been interested in systems and/or software algorithms for how to test game fields for potential winning combinations, and would have looked to these disclosures to confirm or inform the PHOSITA's knowledge and to understand known ways to test for and prevent erroneous winning combinations from being presented and generated during game play. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See also, e.g.,*<br><br>"Essentially, Tic-Tac-Fruit presents a task whereby the player must select the appropriate symbol to replace with a "Wild" symbol in an effort to obtain the highest value game outcome offered by the device. The prize is determined by a random section from a finite pool of available prizes. The device selects the quantity of lines which will present a winning outcome. The prize is determined by a random selection from a Prizes may be presented on 1, 2, 3 or 4 lines in a single game play. **The device then selects the level of prize(s) to be awarded. A software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented. The key symbol needed to attain the highest value prize is replaced with a non-winning symbol prior to display to the player.** The player is then presented with the puzzle to solve for the highest value prize. A successful selection of symbol replacement will award the player with the prize." Farley Report at 2.<br><br>In addition, to the extent that Plaintiffs contend that other references to testing in the '223 patent provide written description and enablement support for limitation 44.e and this contention is determined to be correct, then prior art TTF discloses this limitation. *See, e.g.,*:<br><br>"[Tic-Tac-Fruit] using computer to count through the combinations and testing each combination to see if it has any lines that are complete … . Again a computer program is used to find all of the initial no-line fields, and then each of these are subsequently tested for potential winners where all that can potentially complete a line are counted." Turner Report at 1-2.<br><br>"Tic-Tac-Fruit doesn't pick random fields until testing says one is acceptable, instead the field is constructed to meet certain criteria. The Steps involved in constructing a field are:<br>1. Choose the number of winning lines. One of {1,2,3, 4}<br>2. Choose the orientation of each of the winning lines: horizontal, vertical, or diagonal.<br>3. Choose the symbols for each of the lines: Cherries, Plums, Bells, etc.<br>4. Fill in empty spots with random symbols.<br>5. Test complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails." Turner Report at 2. |
| [44.6] automatically displaying an actual game to be played on the touch screen game display to a | The Court has construed "an actual game to be played" as "the constructed game field of the game to be played" and "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play" as "automatically displaying an actual game to be |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| player prior to initiating activation of game play; | played, properly construed, on the touch screen game display to the player before the player commits to play the displayed game." |

player prior to initiating activation of game play;

played, properly construed, on the touch screen game display to the player before the player commits to play the displayed game."

Michaelson at least suggests, in combination with the other references, "automatically displaying an actual game to be played on the touch screen game display to a player prior to initiating activation of game play [i.e. automatically displaying the constructed game field of the game to be played on the touch screen game display to the player before the player commits to play the displayed game]," as construed.

For example, Michaelson discloses that the gaming device "displays a plurality of reels" with symbols, and a POSITA would have recognized that those symbols would have been displayed prior to a user beginning game play. At a minimum, Michaelson's teachings confirm that it would have been obvious to a POSITA to try using the claimed step in a gaming device to display an actual game to be played prior to initiating game play; that there were design incentives or market forces prompting those in the field to automatically display an actual game and that the claimed step (to the extent not specifically disclosed in Michaelson) is merely a variation that would have been predictable to a POSITA; and that a POSITA would have been led and prompted to modify Michaelson's gaming device to implement the claimed step to achieve the desired goal.

"In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any. The proposed game outcome is determined identical to how a game outcome is determined in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player.

The proposed game outcome is communicated to the central controller or central processor before it is displayed to the player. In an alternative embodiment, only the value associated with the proposed game outcome is communicated to the central controller. It should be appreciated that the generated game

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | outcome presentation is not communicated to the central controller, but is retained in the memory of the gaming terminal." Michaelson ¶¶ 13-14.<br><br>"Upon authorization, the gaming terminal displays or presents the randomly generated game outcome presentation and provides the authorized game outcome to the player. If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the associated value, if any, to the player and the game ends. If the authorized game outcome is a secondary game triggering outcome, the gaming terminal provides the associated value, if any, to the player and then enables the player to play a secondary or bonus game." Michaelson ¶ 18.<br><br>"In order to comply with the above mentioned regulatory rules that do not permit the use of gaming devices or terminals that provide probability based game outcomes, central determination gaming systems have been implemented wherein the central system maintains one or more predetermined pools or sets of game outcomes. Each game outcome in each pool includes a game outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value or payout amount, if any, and a game presentation component (i.e., how the game outcome is displayed or presented to the player). In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 9.<br><br>"Gaming devices having a primary or base game and a secondary or a bonus game are also well known. A secondary or bonus game may be any type of suitable game, either similar to or completely different from the primary game, which is entered upon the occurrence of a triggering event or a selected outcome in the primary game. The secondary or bonus game enables the player to obtain a prize or payout in addition to the prize or payout, if any, obtained from the primary game. A secondary or bonus game may produce a significantly higher level of player excitement than a primary game alone because it provides a greater expectation of winning than the primary game and is accompanied with more attractive or unusual features than the primary game." Michaelson ¶ 11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Additionally, even though a pool may include more than one of the same game outcome, such as more than one lose game outcomes in the pool, the presentation to the player, such as the reel symbol combination in a slot machine, cards dealt in a card game and the like, is preferably varied for each sequential game outcome. For example, in the twenty ticket pool described above, while three game outcomes may each determine a win game outcome with a value of $1, each game outcome will be preferably presented to the player as a multiple different or all different combinations of reel symbols in a slot machine game. This provides increased excitement for the player because the player is continuously presented with different combinations of reel symbols." Michaelson ¶ 7.<br><br>"In one embodiment, the central controller maintains at least one predetermined pool of predetermined game outcomes. Each predetermined game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and a value component or pay amount, if any. Each pool of predetermined game outcomes may include a plurality of each type of predetermined game outcome. For example, a pool of one thousand game outcomes may include hundreds of a lower range award and one or few of the highest award." Michaelson ¶ 36.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.<br><br>"In addition to winning base game credits, the gaming terminal 10, including any of the base games disclosed above, also includes secondary or bonus games that give players the opportunity to win credits. The gaming terminal 10 preferably employs a video-based display device 130 or 132 for the secondary or bonus games. The secondary or bonus games include a program that automatically begins when the player achieves a qualifying condition or a secondary game triggering outcome in the primary or base game.<br><br>In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶¶ 49-50.<br><br>"If the proposed game outcome is a secondary game triggering outcome, the gaming terminal randomly generates a proposed secondary game outcome presentation identical to how the primary game outcome presentation is generated. The gaming terminal then determines, with the use of an appropriate pay table or other stored data, the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In this case, the gaming terminal combines the value associated with proposed secondary game triggering outcome, if any, and the value associated with the proposed secondary game outcome, if any, to determine the proposed game outcome that is communicated to the central controller for authorization, as described below. For example, if the gaming terminal determines that the secondary game triggering outcome has a value of $1 and the secondary game outcome has a value of $6, a proposed $7 win game outcome is communicated to the central controller for authorization." Michaelson ¶ 53.<br><br>"If the authorized game outcome is a secondary game triggering outcome (not shown), the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. As described above, even though the gaming terminal enables the player to play a secondary or bonus game, the secondary game outcome has already been determined and authorized along with the primary game outcome. That is, the gaming terminal does not communicate with the central controller regarding the secondary game outcome but rather provides the prior authorized secondary game outcome and presents the prior generated secondary game outcome presentation to the player.<br><br>In an alternative embodiment, if a secondary or bonus game triggering outcome is provided to the player, the gaming terminal provides the associated value, if any, to the player, presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) and enables the player to play a secondary or bonus game. In the secondary or bonus game, the gaming terminal randomly generates a proposed secondary game outcome presentation based on probability data. As described above, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed secondary game outcome associated with the proposed secondary game outcome presentation. In one embodiment, the proposed secondary game outcome presentation is independent of and not related to the game outcome provided in the primary or base game. The gaming terminal then communicates the proposed secondary game outcome to the central controller. The central controller determines if a pool of |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | predetermined secondary game outcomes includes the proposed secondary game outcome. The central controller then proceeds with authorizing the gaming terminal to provide the player with the proposed secondary game outcome as described above regarding the primary or base game." Michaelson ¶¶ 58-59.<br><br><br><br>*See* Michaelson at Figs. 2-5.<br><br>To the extent Michaelson alone does not expressly disclose this limitation, it would have been obvious in view of the disclosures discussed herein. A PHOSITA would have been motivated to combine Michaelson with the references discussed herein. A PHOSITA building the apparatus/method disclosed by Michaelson would have recognized that Michaelson discloses displaying information on a screen before a user begins playing.  A PHOSITA would have been interested in increasing a potential user's interest in the game.  To the extent the PHOSITA required additional disclosures or information regarding the operation of |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | Michaelson or similar systems, a PHOSITA would have looked to at least the references discussed herein. Any modification or combination would have been well within a PHOSITA's skill.

*See, e.g.,*

 "The invention also provides a configuration wherein the player may preview the game to be played. In this configuration, the player may evaluate if he wishes to play the game by pressing a preview button that shows the player the first step of the game to be played as well as the prize that he will be playing for. If the player decides he wishes to play the game as a result of the evaluation, the player will deposit the money and initiate the game." Kowell Provisional at 3.

"The game may also include an optional preview button that allows the player to learn the first step of the game that will be played next. The preview may also tell the player how much the prize will be if the player plays the game, makes the correct plays, and wins the game. For example, the preview button may show the initial card deal, dice roll, or game set up as well as the prize that will be awarded if the player participates and wins." Kowell Provisional at 4-5.

"The method and apparatus of the invention may thus be used to teach a player the correct manner to play a game. When the preview option is used, the player may determine the initial deal of the cards before the player commits to playing the game. The preview would show the player that the initial deal will be a pair of tens and that the payout will be one dollar if the player makes the correct play." Kowell Provisional at 6.

*See also, e.g.,*

 "2. The method of playing a game of bingo comprising: a) providing a player with a bingo card having a plurality of numbered spaces formed as a matrix having five rows and five columns used in the play of a five-by-five bingo game; b) providing a plurality of bingo balls each having individual numbers corresponding to the numbered spaces on the bingo card; c) a player making a first wager to be eligible for the five-by-five bingo game, d) a player making a second wager to be eligible for a progressive jackpot; e) randomly selecting consecutive bingo balls; 13 awarding a first preselected amount when the player achieves a predetermined winning combination on the five-by-five matrix of the bingo card; g) designating a portion of the second wager to a separate progressive jackpot pool; h) establishing a predetermined combination as a winning combination for the progressive jackpot pool; and i) awarding |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | the progressive jackpot pool to the player when he achieves the predetermined winning combination the bingo card." Weingardt at 7:31-55.

"It is a further feature of the present invention to provide a progressive jackpot feature to the game of bingo in which the player can become eligible for the progressive jackpot by making a separate wager" Weingardt at 3:7-10.

"A bingo card of the present invention is shown generally at 10 in FIG. 1. The bingo card 10 consists of a plurality of spaces that will includes numbers formed in a seven-by-seven matrix. The seven vertical columns 21, 22, 23, 24, 25, 211 and 27 each preferably include a symbol designating the column, e.g. the symbols B I N G O E S as shown in FIG. 1." Weingardt at 3:63-4:1.

"The player makes a first wager to be eligible for a game of bingo played using the 5x5 portion of the bingo card and a second wager to be eligible to play the a game of bingo using the 7x7 portion of the bingo card. The player also makes a third wager to be eligible for the progressive jackpot to which a portion of the third wager is designated." Weingardt at 6:5-11.

"FIG. 5 is a flow chart that depicts the method of play of an alternative preferred embodiment of the present invention. In this flow chart, the player is provided with a bingo card having a 5x5 matrix and a plurality of bingo balls are provided forming the selection pool. The player makes a first wager to be eligible for a game of bingo played using the 5x5 matrix of the bingo card and a second wager to be eligible for the progressive jackpot to which a portion of the second wager is designated." Weingardt at 6:19-27.

Weingardt at Figs. 1-2, 4-6.

*See also, e.g.*,

"Each spin of the reels constitutes a complete game. The gaming device includes a plurality of selectable reels, a selection system, an actuating system, a prize controller, and a reselection system. The selectable reels each have symbols located on their periphery, such that each selectable reel displays an outcome symbol after being spun." Daly at 2:6-11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The reselection system then substitutes a previously non-active reel for an active reel from the initial game, thereby designating a new set of active reels for a second game. This new set of active reels for the second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels lo produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game." Daly at 2:21-33.<br><br>"A preferred embodiment reel spinning gaming device, constructed in accordance with the present invention uses a plurality of reels, some of which are designated as active reels and some of which are designated as non-active reels, to provide a player with the opportunity to play multiple consecutive games of slots, with each subsequent consecutive game utilizing a portion of the reel symbols from the outcome symbol combination of the previous game. After an initial game that utilizes an initial set of active reels, the gaming device begins a second game by substituting a previously non-active reel from the initial game for an active reel from the initial game, thereby designating a new set of active reels for the second game. This new set of active reels for the second game includes the newly substituted active reel and the remaining active reels. The newly substituted active reel is spun for the second game while the remaining active reels are not spun for the second game. The outcome symbol from the newly substituted active reel is used in conjunction with the outcome symbols from the remaining active reels to produce an outcome symbol combination for the second game. The prize controller then performs a prize determination for the second game.<br><br>In this manner, the gaming device provides a player with the opportunity to play subsequent consecutive games in an attempt to improve upon the outcome symbol combination of the previous game. Accordingly, the present invention creates and maintains more excitement to a player. For instance, after receiving a game result that includes an outcome symbol combination that constitutes a 'near win' (i.e., one symbol away from a winning outcome symbol combination), the player still has the possibility of achieving a winning outcome symbol combination in a subsequent consecutive game." Daly at 6:17-38.<br><br>*See also, e.g.,*<br><br>"A portable sample play device, such as a player tracking card or other player-carried device, allows players or users of a gaming machine to view, and/or participate in, sample or preview play of a game. The portable sample play device can be a smart card that stores all necessary information itself, or a |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | known magnetic stripe card that simply stores rudimentary information. Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired." Muir at Abstract.<br><br>"Methods of attracting players to unfamiliar games on unfamiliar gaming machines thus would help gaming establishments attract further business. In addition, players benefit by gaining access and familiarity to a wider variety of games, many of which they may not have been familiar with. It is therefore desirable to develop ways to allow players to preview games, so as to introduce them to those games that may have previously been unfamiliar to them." Muir ¶ 4.<br><br>"Additionally, such a sample or preview can include many different modes of play. For instance, the gaming machine can display a preview of link progressive play, along with the progressive jackpot. It can also display the special bonus modes of various games, demonstrating to the player various special prizes than can be won. Such preview play can be interactive, allowing player participation, or passive, simply illustrating sample play without allowing user interaction. Preview play can also include full, nominal, zero, or other payouts if so desired." Muir ¶ 5.<br><br>"The configuration of the gaming machine system 10 encompasses embodiments in which the back-end server 50 controls the operation of the gaming machines 20, 30. The system 10 also encompasses embodiments in which the gaming machines 20, 30 are each stand-alone units capable of operating play of their games largely without the back-end server 50. Like gaming machine 20, gaming machines 30 are configured to allow a player to play a game." Muir ¶ 22.<br><br>"The microprocessor 120 then retrieves information from the memory 130 and transmits it to the gaming machine 20. The information can include such items as time information indicating how much sample play time remains, as well as various parameters of the sample game, and perhaps identification identifying the player. Receipt of this information prompts the gaming machine 20 to initiate a preview of the game." Muir ¶ 24. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The card 100 can also set up preview play illustrating a specific sequence of outcomes, so that in a slot game, for instance, the player is guaranteed to see a four King outcome, or in video poker, the player is guaranteed to be dealt a full house. Such favorable outcomes make the game more attractive to the player, in part by demonstrating possible outcomes of interest to the player." Muir ¶ 28.<br><br>"Once preview play is set up according to the parameters stored in the smart card 100, preview play is initiated (step 240). As discussed above, this preview play can be interactive, permitting players to play hands of video poker or play a slot game, for instance. Preview play can also be passive, with the various parameters instructing the gaming machine 20 to simply show players, for example, card hands they could have been dealt or slot machine outcomes they could have received.<br><br>If a player wins, or is shown a winning outcome (step 250), the gaming machine 20 determines the appropriate award from the paytable (step 260), and presents that award to the player (270)." Muir ¶¶ 29-30.<br><br>"Preview play may include randomly generated results rather than predetermined results 610, although predetermined results 610 are often desirable to show users some of the better outcomes and potentially larger jackpots.<br><br>In the example of FIG. 7, players are an active participant in preview play, pulling handles or pressing buttons themselves to initiate game play. However, as discussed previously, the invention can also allow players to be passive observers. It should be clear that, once the player inserts his or her tracking card, the preview play of FIG. 7 can be run automatically, with the player simply observing how the game is played.<br><br>Likewise, the invention is also not limited to display of the outcomes shown. Rather, any display of outcomes is contemplated. Thus, the parameters need not include preset results. Randomly generated results can be employed to give players a sense of what typical game play entails. Conversely, the results can include sequences of some of the more desirable game outcomes (e.g., several good poker hands, big slot jackpots, and the like), so as to entice the player to play." Muir ¶¶ 43-45.<br><br>"For example, the invention contemplates preview play of any game capable of being played on a game machine, either by smart card or simple magnetic stripe tracking card. The invention also includes multiple modes of preview play, including but not limited to displays of typical game play, predetermined sequences of more favorable outcomes, and progressive play." Muir ¶ 47. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | *See* Muir at Figs 1, 3-4, 7; claims 1-2, 5, 12.<br><br>*See also, e.g.,*<br><br>"In addition to the package of mints, 'chips' are sometimes delivered also. These 'chips' are metal discs which are stamped as being 'good for five cents in trade.' These 'chips' furnish the allurement of the game. In order to avoid the appearance of chance in the game, an indicator is provided with this machine which indicates to the purchaser in advance just what he will receive by a pull of the lever and a deposit of a nickel. At the first play of the lever the purchaser is usually advised by the indicator that he will receive nothing but a package of mints. The first pull of the lever sets the indicator, however, for the next play. It may indicate that for the second pull of the lever the purchaser will receive a specified number of 'chips' in addition to the mint package, or it may indicate that only a package of mints will be received. It is a question of chance at this point. If the indicator fails to promise 'chips' for the second pull, such promise may be there when it is set for the third pull. The promise is sure to come if the lever is pulled and the nickel dropped a few times successively." *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105-06 (1925).<br><br>"The defendant operated a slot machine containing rolls of mints. On its front were the words, 'Mints of quality for 5¢ you receive a package of all quality mints and premium checks.' On the face of the machine between the words 'and a premium' there was a 'recess in which any number from 'No' to '20' in denominations of two would appear.' When a five-cent coin was dropped in the slot at the top of the machine and the lever pulled, a package of mints would drop from the slot on the right, and discs corresponding to the number appearing on the face of the machine before the lever was pulled, would also drop from a slot at the foot of the machine. These discs or premium checks were good for additional packages of mints or 'for merchandise to the value of five cents for each disc.' When the lever was pulled, after depositing the five-cent piece, a new number from 'No to 20' would appear in the recess. Before pulling the lever the person dropping the five-cent piece in the slot would know what he was to receive. If 'No' appeared he would receive no premium check, but would receive a package of mints; if a number up to '20' appeared, he would receive a corresponding number of premium checks redeemable in merchandise. … The enumeration in the recess on the face of the machine informed the operator what he was to receive on each play, but with each operation of the machine there appeared in the recess a number showing the prize to be received on the following play. The chance was in the prospect of gaining this prize. This was the incentive which attracted the player. The chance of game from the second operation was the inducement. It was an appeal to the gambling desire, a temptation to take the chance of gaining a |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | substantial prize by continuing to operate the machine. The machine was a gambling device." *Commonwealth v. McClintock*, 257 Mass. 431, 432-35, 154 N.E. 264, 264 (1926).<br><br>"One of most ingenuous attempts at seeking to avoid the tag of being a 'gambling' machine came early, as machines were developed that would tell the player exactly what they would win when they put the next coin in. There was no chance. Of course, what the player was seeking was a chance to play in order to find out what would come after that. Courts wrestled with definitions of gambling on these kinds of machines for many decades." *William N. Thompson*, Gambling in America, An Encyclopedia of History, Issues, and Society (2001).<br><br>*See also, e.g.,*<br><br>"Many special features are provided nowadays in fruit machines, indeed they have to some extent taken over from the basic game, in that most of the bigger wins are obtained by the features rather than by the initial result when the reels first come to a halt. In a so called 'ladder' or 'trail' feature, steps in the ladder or trail may be illuminated as a result of certain symbols, e.g. symbols bearing superimposed numbers, appearing on the win line. When the 'ladder' or 'trail' is completed, a jackpot prize or another feature which may result in a jackpot prize may be awarded." Farrell at 3:9-14.<br><br>"The display 1 comprises a reel display 2 which has three reels, 3, 4 and 5 showing various reel symbols, a matrix display 6 comprising a 3 x 3 grid of nine segments 7, a fourth reel 8 with numbers from 1 to 12 on it, a ladder 9 indicating progressive prizes, a nudge-pot counter 10, and a skill-shot feature 11. The reels 3, 4, 5 carry the normal fruit symbols, plus first reel symbols of noughts 12 and second reel symbols of crosses 13." Farrell at 4:10-13.<br><br>"The player will enter the prize ladder 9 at a level dependent upon the number of complete lines of O's or X's shown in the matrix, from one to eight (if eight lines are possible in the reel display; we actually prefer to provide a maximum possible score of six lines). The ladder has twelve prize levels. Thus the player enters the ladder 9 at the level corresponding to the number of the lines completed. When a line in the matrix is lit the player will have the option of (i) collecting the win corresponding to the relevant entry in the prize ladder 6 by pressing the collect button; (ii) pressing the higher or lower button to spin the fourth reel, reel 8. If the guess that the next number at which the reel 8 comes to rest will be higher or lower than the previous number is correct the player advances one position up the prize ladder. If the guess is wrong a 'lose' lamp is illuminated and the feature is terminated. The player either automatically collects the prize on the ladder at which he already stands, or loses everything (the machine can of course |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | be adapted to provide either result). Pressing the higher/lower button also automatically adds a random/pseudo-random number of nudges to the nudge-pot indicator 10. (iii) Collect the nudge-pot. This is an option when an 'exchange' light 10' is illuminated. If taken, the nudge pot will automatically step the reels 3, 4, 5 to the best possible win for the given number of nudges." Farrell at 4:19-33.<br><br><br><br>*See also, e.g.,*<br><br>"Q. … All right. Now, if I come up to the machine, and I haven't put my dollar in yet, but this is now on the machine.<br>A. And this is the game that you'll be playing.<br>Q. And this is the game that I'm going to be playing.<br>A. Right.<br>Q. And I know ahead of time that all I would have done if I put $.50 into this machine, or if I'm going to play it, the only thing I was going to win was $.10? |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | A. Right." Riedthaler Testimony at 149:3-17.<br><br>"A. Yeah, in this case, what you have is, let's say you took the minimum and bet $.50. You would, knowing that you were going to give $.50, if you guess correctly, you would win $.15, or you would - - I'm sorry, $.25 in that case. So you would knowingly know that you're playing the game with the intent of losing." Riedthaler Testimony at 145:18-146:6.<br><br>"A. If you knew the outcome, you knew the schedule, and that you knew that the process you were going into, then it would be a skill. Because you would be playing knowing that you're going to lose. I don't know why you'd do that<br>Q. I understand, but if you did, you would determine this machine to be a skill-based machine?<br>A. The same as, let's say, pinball, if you're playing a game that you know that you receive so many points, you receive such-and-such a reward, yes." Riedthaler Testimony at 146:12-24.<br><br>*See also, e.g.,*<br><br>"Modifies the additional Gambling Law rules that apply to a machine that operates as described in the definition of 'skill-based amusement machine' by: (1) additionally requiring that the prizes or rewards for the machine must be established prior to the placing of a wager by the individual utilizing the machine, and that the individual must be aware of what prize or reward will occur prior to the start of play … ." Ohio SB 220 at 1.<br><br>"An individual utilizing a machine that involves a single task, game, play, contest, competition, or tournament may be awarded prizes based on the results of play, the prizes or rewards must be established prior to the individual placing a wager, and the individual must be aware of what prize or reward will occur prior to the start of play (existing law retained by the bill, except that the italicized language is added by the bill)." Ohio SB 220 at 4.<br><br>*See also, e.g.,*<br><br>"Mr. Sertell testified that gambling consists of three elements: consideration, chance, and reward. He said "consideration" means that money must be paid to buy the right to play a game. "Chance" means that the player can do nothing to change or predict the outcome of the game. And "reward" means that the design of the game may entitle the player or winner to become entitled to something of value." 26 Gaming. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "Before proceeding further, we shall digress, briefly, to consider the developmental history of coin-operated gambling machines - for we believe that some understanding of their history is essential to place the type of machine with which we are dealing in proper context. The first coin-operated gambling machine was invented before the turn of the century. It featured three reels adorned with oranges, lemons, bells and bars; was operated by depositing a coin and manually pulling a lever; and quickly became known as the 'slot machine' or 'one-armed bandit.'" Gorton Gambling Article at *4.<br><br>"The factor of a prize was most often concealed. Slot machines which returned tokens or trade checks instead of cash appeared. A mint vendor was attached to one version so that the player "won" something (a mint) on every play. Another variation merely indicated how much a person had won, requiring him to insert a second coin to receive his winnings. Sometimes the machines paid winnings in merchandise, or (during World War II) in ration tokens." Gorton Gambling Article at *5.<br><br>"If the player is successful in lodging the ball in a hole which corresponds to one of the numbers lighted on the backboard, the machine automatically returns to him the number of nickels shown in the list of odds on the backboard, and, if not successful in lodging the ball in one of said holes, he receives nothing." Gorton Gambling Article at *7. |

*See, e.g.,*

Fey 1983 at 161; Fey 1989 at 161.

*See, e.g.*, Fey 1983 at 162-165; Fey 1989 at 162-165.

*See also, e.g.*,

"Returning to FIG. 2, the electronic puzzle generated by the puzzle generation module 6 in step S6 is displayed to the player at step S8 by the display module 10. Also, depending upon the game selected by the player and/or the skill level selected, the list of words 22 (FIG. 4) which are to be identified within the electronic puzzle grid 20 (FIG. 4) are also displayed to the player by the display module 10. After the

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | electronic puzzle is displayed to the player, the clock module 8 establishes an amount of time at step S10. As further described below, the time is established in which the player must find a word or perform other actions depending upon the puzzle selected by the player. The amount of time established will depend upon the game and/or skill level selected by the player. For example, the amount of time established would be greater for a beginner skill level as compared to an expert skill level. Preferably, for example, the amount of time established is 30 seconds for the beginner level, 25 seconds for the intermediate level and 20 seconds for the expert level. Once the amount of time is established by the clock module 8, a clock is started at step S12 in response to a command from the player to start play of the game." Chan at 5:40-61.<br><br>"If the end of the list has been reached, then the puzzle generation module 6 determines, at Step S40, whether all the words from the list of puzzle words have been placed in the puzzle grid. If all the words have been used, then the puzzle generation module 6 returns to step S8 of FIG. 2. If any of the words were previously skipped in Step S36, then the puzzle generation module 6 performs a second pass of the words in the list of puzzle words and attempts to place the skipped words in the puzzle grid similar to that described above for placement of the subsequent words within the puzzle grid. If, at Step S44, the second pass has already been completed and all words from the list of puzzle words are still not placed in the puzzle grid, then the puzzle generation module 6 preferably clears the puzzle grid at Step S46 and starts the placement process over at Step S26. This process is preferably repeated until a completed puzzle grid is generated by the puzzle generation module 6." Chan at 5:1-17.<br><br>"If the player monitoring module 4 does not detect the specific action required by the game at Step S16, and the clock has reached the established amount of time at Step S20, the puzzle generation module 6 (FIG. 1) rearranges the electronic puzzle at Step S22. While the electronic puzzle is being rearranged, play is suspended. After the puzzle has been rearranged, the rearranged puzzle is then displayed to the player by the display module 10 at Step S8. If there have been any words identified by the player and marked in the puzzle grid, these words are also marked in the rearranged puzzle. An example of the displayed rearranged puzzle grid 20, with marked words which were previously identified by the player, is shown in FIG. 6." Chan at 6:34-46.<br><br>"In response to the selection of the puzzle and skill level by the player, the puzzle generation module 6 generates the electronic word-search puzzle at step S6. Preferably, the electronic word-search puzzle is in the form of a puzzle grid having a plurality of columns and rows which intersect to define a location for a letter. The electronic puzzle, however, can take other forms as dictated by the particular game to be played." Chan at 3:55-62. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  See also Chan at Figs. 2-6, 3:12-4:67. "The method includes a bonus game associated with a base game that allows players to use skill and memory to determine the outcome of the bonus game. Players are prompted at the beginning of the bonus game to select at least a first and then a second game space from an array of game spaces, revealing previously hidden indicia. The player continues the selections for a predetermined period of time or until some event occurs, terminating the selections. Bonus payouts are awarded in the event the revealed indicia match. Alternative embodiments include allowing players to qualify for a "sneak peek", wherein all or some hidden indicia on the game space array are revealed for a short period of time, and random shuffling of the indicia to different game spaces." McClintic at Abstract. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The present invention, in one embodiment, includes a gaming machine having an underlying base game in combination with a bonus game. The base game comprises a conventional casino gaming machine, such as a slot machine. The bonus game comprises a matching game in which a player may compete for bonus awards. The present invention allows a player to wager in the regular play mode on the base game. Each time a player meets certain qualifying criteria in the base game, the player earns an opportunity to participate in the bonus game play mode." McClintic at 2:26-36.<br><br>"The game field or board in which the bonus game is played comprises an array of game spaces on which indicia may be placed. These indicia may be any visual indicia including numbers, colors, images pictograms, etc. Each indicium may have a duplicate somewhere in the game space. The indicia are typically hidden during the bonus game play mode, except for brief periods when the player has an opportunity to view the indicia. The indicia are again hidden and the player has an opportunity to use his memory skills to match game spaces with the same indicium." McClintic at 2:37-46.<br><br>"The bonus game awards are based on the number and quality of the matches that are made. For example, if number indicia are used, the number on the matched indicia may reflect the bonus points that the player receives. If images of playing cards are used the player wins that playing card. The playing card may then be used to develop a winning hand in a game of cards such as poker, or blackjack." McClintic at 2:47-53.<br><br>"The bonus game may be further enhanced by allowing a player to have a "sneak peek" of the bonus game field or board. These are opportunities to momentarily view all, or portions of, the game area or field. These opportunities may depend on the player's success in the base game or in the bonus game. For example, the player may need to find certain markers in the bonus game, or hit certain symbols in play of the base game to be allowed a sneak peek." McClintic at 2:53-61.<br><br>"The bonus game of the present invention comprises a process for winning bonus awards by matching indicia 30 on two or more game spaces 20. The indicia 30 are generally hidden during bonus game play. The only time the indicia 30 are revealed is at the start of the bonus game when the player is allowed to briefly view the indicia 30. The game field or board 10 reverts to the hidden indicia mode depicted in drawing FIG. 4 after a specified period. The indicia 30 in game spaces 20 may also be briefly revealed when a player earns a "sneak peek" during play of the base game or the bonus game. Depicted in drawing FIG. 3 are both the sneak peek feature and the initial opening of the bonus game when a player is given the opportunity to memorize revealed indicia 30 on the game field or board 10. The sneak peek feature may be earned based on matching certain indicia 30, revealing specified indicia 30, earning a minimum |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | number of points, etc. Otherwise, during the bonus game, the player only sees a pair of indicia 30 that he has selected for an attempted match." McClintic at 8:17-35.<br><br>"After the initial brief revealing of indicia 30 on bonus game field or board 10, the player is next allowed to select specific game spaces 20 in an attempt to match the indicia 30 on those game spaces 20. The indicium 30 associated with a first selected game space 20 is revealed as the player makes his selection. The player next attempts to select another game space 20 with associated indicium 30 that matches the indicium 30 associated with the previously selected game space 20. If the two selected, revealed indicia 30 match as shown at 50 in FIG. 5, the player is awarded the prize indicated by the indicia match 50, and is allowed to continue to attempt to select pairs of game spaces 20 with matching indicia 30. If the revealed indicia 30 of the next pair of selected game spaces 20 do not match, the player is returned to the base game play mode. Illustrated in drawing FIG. 5 is a player who has matched both the numbers "7" and "66" and the "$" image." McClintic 8:36-52.<br><br>"The base game awards may be based on typical slot machine pay out schedules or pay tables. To increase the flexibility of the game, it is possible to award players certain benefits or advantages associated with the bonus game based on the outcomes obtained during base game play. For example, certain specified outcomes that enable or qualify a player to have a sneak peek of the revealed indicia may appear in play of the base game. Once the player enters the bonus game, the sneak peek "award" won in base game play may be activated to obtain an advantage in selecting matching indicia 30. The sneak peak may be provided, depending upon configuration of the bonus game, at a preset time during bonus play, at the player's instigation, upon revealing a selected indicium 30, at a random time, or otherwise as determined to be appropriate by the gaming establishment operating the bonus game. Of course, the sneak peak advantage may also be offset in the game architecture by shuffling the locations of the indicia 30 in the game spaces after a predetermined number of game space selections, or otherwise as deemed appropriate to maintain a fairly consistent payout."  McClintic at 9:51-10:4. |

65

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  |
| | Fig. 3 |
| | McClintic at Fig. 3; *see also id.* at 2:65-67 ("FIG. 3 depicts an enlarged view of the video display of FIG. 2 depicting the bonus game "sneak peek" feature on the bonus game field or board") |
| | *See also, e.g.,*: |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "The game kept by accused on a counter in his drug store was similar to the ordinary punch board having a series of holes on its face with a perforator adapted to punching them.  On its front the board bore in two places the words "SKILL PUZZLE BOARD" and the legend "10c per sale."  The later was deceptive and purposefully so.  The word 'sale' connoted a purchase of the thing sold. What was obtained for each ten cents paid did not constitute a purchase even of the attached punching tool, but only of a right to win something, possibly one of the two "Miracle Dry Shavers" each, according to the witness Douglas, seen advertised at $15. How many of the holes punched would win such a prize does not appear.  A person who was capable of reading the minutely printed 72 puzzle questions dispersed along the columns of perforations, and was a prodigy of learning and versed in recondite subjects, might be able to place the punch where it would result in a prize, but the ordinary player had no such physical and intellectual equipment. He paid his money, took up the perforator and placed it in one of the six hundred holes.  He won by chance or lost by chance. If it was not a game of chance only, it was a mixed game of skill (but little) and chance (very great) and was therefore within the prohibition of the Code." *Bailey I* at 1-2. |
|  | "Mr. Singer argues that the game is not a "game of chance or a mixed game of chance and skill, gaming or betting" because each of the questions in the six columns has one and only one correct answer — which can be ascertained; and if such correct answers are ascertained each one of the winning letters will appear in one or more of them. The magistrate was entitled to look at the character of the questions and to consider the probability that people participating in this game would seriously undergo the labour of ascertaining the correct answers to these questions, as well as the probability that anybody offering this game to people entering a public shop would expect that any such thing would be done. The magistrate evidently came to the conclusion that, while the game could be played as a game involving research and with certain results, it would, nevertheless, in actual practice, be operated in such a manner that the result, favourable or unfavourable, would depend entirely upon luck, and that such was the expectation of the shopkeeper." *Bailey II* at 3-4. |
|  | "The contention of the appellant is that, there being only one correct answer to each question, there is no gaming or no chance connected with the operation of the board. I think, however, we must apply our knowledge of the usual everyday custom of mankind and hold that the ordinary person entering the drug store would pay ten cents for the chance of winning a prize, without critically examining the questions and returning later with the correct answers to one or more of them. It is quite apparent that it was never intended that the board would be so used but, on the contrary, it was expected that some members of the public entering the drug store would be inveigled to pay ten cents for the opportunity of punching a hole, and the chance of winning a prize." *Bailey II* at 11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Tic Tac Fruit is a modified computer version of the game of tic tac toe. Unlike traditional tic tac toe, the game is played with a variety of icons, such as hearts and clovers which are used instead of a traditional 'x' and 'o' when attempting to get three in a row. The icons have varying degrees of value. After inserting currency, the player selects the demonination of play to be played with each game having a price per play. Play is initiated by pressing a 'play' button which causes a puzzle to appear on a video screen. The video screen contains 9 symbols that are presented in a 3x3 display as one would see when playing tic tac toe." *Akron v. Georgekopolous* at 2; *see also* Sertell Expert Report.

"The City offered the testimony of one expert witness, Robert Sertell. Mr. Sertell, who is a consultant with respect to gaming devices, could not offer expert testimony regarding the actual computer technology of the Tic Tac Fruit machine. He was aware that the Tic Tac Fruit Machines at issue have a cycle comprised of approximately 24,000 games and understood its basic operation." *Akron v. Georgekopolous* at 7; *see also* Sertell Expert Report.

"Mr. Sertell opined that the Tic Tac Fruit game is 'overwhelmingly' a game of chance. When asked what the basis for his opinion was, he replied 'because the player cannot predict or control what they receive as a game display.'

Upon cross-examination, Mr. Sertell agreed that result of play of every puzzle is up to the skill of the player. He further agreed that the player must skillfully solve each puzzle and that the Tic Tac Fruit machine had no control over whether the puzzle was solved correctly, rather the player controlled whether he/she got the correct answer. He confirmed that while the player did not control which screen was presented to the player, he agreed that the player does control how much of a prize is earned from each play. As an example, Mr. Sertell agreed that the amount of the bonus available to a player to win could vary but whether the player actually obtained the bonus was determined by the skill of the player and not the computer." *Akron v. Georgekopolous* at 8; *see also* Sertell Expert Report.

"Repeatedly during his testimony, Mr. Sertell agreed that the player controlled whether he got a correct answer and whether he ultimately was awarded a prize. Mr. Sertell acknowledged that in order to win a prize the player needed to skillfully solve each puzzle. Further, in his report he suggested that the level of skill that one would need to play the game was considerable." *Akron v. Georgekopolous* at 12. |

*See also, e.g.*, Nudgemaster:



UniversalAmusement Video at 0:50.

In addition to the foregoing, it would have been obvious to a person of ordinary skill in the art with knowledge of the prior art, including the prior art describing the desired benefits of presenting prizes, game boards and the like to players before the user plays that game where such desired benefits include making the game more acceptable to gaming regulators, to automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play.  For example, a person of ordinary skill in the art would appreciate that previewing an entire game field to be played is on the continuum of previewing a prize to be won for purposes of satisfying gaming regulators and that such an implementation would be obvious in view of the prior art.

69

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | <br><br>UniversalAmusement Video at 0:55. |
| [44.7] determining if the player has decided to play the displayed game; and | Michaelson discloses "determining if the player has decided to play the displayed game."<br><br>"In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 9.<br><br>"As illustrated in FIG. 3, the player preferably uses the input devices 144, such as pull arm 118, play button 120, the bet one button 124 and the cash out button 126 to input signals into gaming terminal 10. In certain instances it is preferable to use a touch screen 150 and an associated touch screen controller 152 instead of a conventional video monitor display device. Touch screen 150 and touch screen controller 152 |

70

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | are connected to a video controller 154 and processor 138. A player can make decisions and input signals into the gaming terminal 10 by touching touch screen 150 at the appropriate places. As further illustrated in FIG. 3, the processor 138 can be connected to coin slot 112 or bill acceptor 114. The processor 138 can be programmed to require a player to deposit a certain amount of money in order to start the game." Michaelson ¶ 47.<br><br>"In one embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a proposed game outcome. Each proposed game outcome includes an outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value component or payout amount, if any." Michaelson ¶ 13.<br><br>"In an alternative embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly determines a set or plurality of proposed game outcomes. The set includes any suitable number of proposed game outcomes. Each game outcome in the set is determined identical to how a game outcome is, generated in a probability based gaming terminal as described above." Michaelson ¶ 20.<br><br>"With reference to FIG. 4, in one embodiment of the present invention illustrating a slot machine style gaming terminal, to initiate operation of a primary or base game of the gaming terminal, the player must insert the appropriate amount of money or tokens and then pull the arm or push the play button. The reels will then begin to spin. As the wheels are spinning, the gaming terminal randomly generates a proposed game outcome as indicated in block 202. In an alternative embodiment, the gaming terminal randomly generates a proposed game outcome upon the player placing a wager in the gaming terminal." Michaelson ¶ 51.<br><br>"As illustrated in FIG. 5, in an alternative embodiment of the present invention, upon a player initiating a game at one of the plurality of gaming terminals, the gaming terminal randomly generates a set or plurality of proposed game outcomes as indicated in block 302. The set includes any preferable number of proposed game outcomes. As described above, each proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal." Michaelson ¶ 67.<br><br>*See* Michaelson at Figs 2-5. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [44.8] displaying an outcome resulting from play of the displayed game. | Michaelson discloses "displaying an outcome resulting from play of the displayed game."<br><br>"Each game outcome in each pool includes a game outcome component (i.e., a win, a lose, a secondary game trigger or other suitable outcome) with an associated value or payout amount, if any, and a game presentation component (i.e., how the game outcome is displayed or presented to the player). In these systems, when a player makes a wager on one of the gaming devices, the central system selects a game outcome from a pool of game outcomes and flags or marks the selected game outcome as used. Once a game outcome is used, it is prevented from further selection from the predetermined pool or set and cannot be selected by the central processor upon another wager. The selected game outcome is communicated to the individual gaming terminal. The individual gaming terminal displays or presents the game presentation component and provides the player the game outcome component with the associated value, if any, for the selected game outcome." Michaelson ¶ 10.<br><br>"Upon authorization, the gaming terminal displays or presents the randomly generated game outcome presentation and provides the authorized game outcome to the player. If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the associated value, if any, to the player and the game ends. If the authorized game outcome is a secondary game triggering outcome, the gaming terminal provides the associated value, if any, to the player and then enables the player to play a secondary or bonus game." Michaelson ¶ 18.<br><br>"If the pool of predetermined game outcomes includes at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is at least one), the central controller authorizes the proposed game outcome to be provided to the player and marks or flags one of the available proposed game outcomes in the pool as used or unavailable." Michaelson ¶ 15.<br><br>"A central determination gaming system including a plurality of gaming terminals in communication with a central controller. In one embodiment, upon initiation of a game at one of the gaming terminals, the gaming terminal randomly generates a proposed game outcome. The proposed game outcome is communicated to the central controller. The central controller determines if a pool of predetermined game outcomes includes the proposed game outcome. If the pool includes the proposed game outcome, the central controller authorizes the proposed game outcome to be provided to the player, flags the authorized game outcome from further authorizations and communicates the authorized game outcome to the gaming terminal. The gaming terminal then provides the authorized game outcome to the player. If the pool does not include the proposed game outcome, the central controller discards the proposed game outcome and |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | instructs the gaming terminal to generate another proposed game outcome for authorization." Michaelson at Abstract.<br><br>"If the pool of predetermined game outcomes includes at least one of the proposed game outcome (or the number of available game outcomes with the same value as the value associated with the proposed game outcome is at least one), the central controller authorizes the gaming terminal to provide the proposed game outcome to the player as indicated in block 208. The central controller flags or marks the proposed game outcome in the pool as used or unavailable as indicated in block 210. Once a proposed game outcome is flagged or marked as used or authorized, it is prevented from subsequent authorization by the central controller. It should be appreciated that if the pool of game outcomes includes more than one of the same game outcome and one of the game outcomes is flagged or marked, the remaining same game outcomes are still available for subsequent authorization. In the slot machine example used above, if the pool of game outcomes includes thirty available win $5 game outcomes and the central controller flags or marks one of the available win $5 game outcomes, the flagged win $5 game outcome would no longer be available for a subsequent authorization but the remaining twenty-nine win $5 game outcomes would remain available for subsequent authorizations. In the embodiment wherein the central controller stores information or data regarding the number of available game outcomes in a pool for each possible value, upon the authorization of a proposed game outcome, the central controller reduces the number of available game outcome in the pool with the same value as the value associated with the proposed game outcome by one.<br><br>If the authorized game outcome is a win outcome or a lose outcome, the gaming terminal provides the authorized game outcome and the associated value, if any, to the player as indicated in block 212. The gaming terminal also presents or displays the randomly generated game outcome presentation (that is retained in the gaming terminal's memory) to the player. For example, in the slot machine gaming terminal used above, the gaming terminal provides the player a win $5 game outcome and displays a reel symbol combination of a star symbol on each reel." Michaelson ¶¶ 56-57.<br><br>*See* Michaelson at Figs 2-5. |
| **Claim 45.**  The electronic gaming system of claim 44 further comprising a component for generating and displaying an additional game field simultaneously | Plaintiffs have conceded that Claim 45 invokes § 112, ¶ 6.  To the extent the claim is not found to be indefinite, then Michaelson, alone or in view of the other cited references, at least suggests "a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game" and structure that performs the recited function, including for example a microprocessor executing software to generate an additional game field and a display device to display it. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| on the game display in proximity to the displayed game. | *See, e.g.*, Claim 38, *supra*, incorporated here. |
| **Claim 46.** The electronic gaming system of claim 45 wherein the additional game field is for a next game to be played. | Plaintiffs have conceded that Claim 45 invokes § 112, ¶ 6. To the extent the claim is not found to be indefinite, then Michaelson, alone or in view of the other cited references, at least suggests "the additional game field is for a next game to be played." <br><br> *See, e.g.*, Claim 44 (44.6), *supra*, incorporated here. |
| **Claim 47.** The electronic gaming system of claim 44 wherein the displayed game comprises a two-dimensional array of game symbols. | Michaelson discloses "the displayed game comprises a two-dimensional array of game symbols." <br><br> "That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13. <br><br> "Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44. <br><br> "In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶ 50. |

74

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | "The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| |  |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | *See* Michaelson at Figs. 1-5. |
| **Claim 48**. The electronic gaming system of claim 44 wherein the displayed game comprises a one-dimensional array of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a one-dimensional array of game symbols." <br><br> *See, e.g.*, Claim 47, *supra*, incorporated here. |
| **Claim 49**. The electronic gaming system of claim 44 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols. | Michaelson discloses and/or renders obvious "the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols." <br><br> "That is, the gaming terminal randomly generates a game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. The proposed game outcome is then determined using the generated game outcome presentation and an appropriate pay table. For example, a slot machine gaming terminal may virtually use probability data to generate the stop positions of each reel |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | and then use an appropriate pay table to determine the proposed game outcome that is associated with the combination of symbols on the stopped reels. This is done virtually and not shown to the player." Michaelson ¶ 13.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.<br><br>"In the slot machine embodiment, the qualifying condition or a secondary game triggering outcome includes a particular symbol or symbol combination generated on a display device. As illustrated in the five reel slot game shown in FIGS. 1A and 1B, the qualifying condition or secondary game triggering outcome includes the number seven appearing on three adjacent reels 134 along a payline 156. It should be appreciated that the present invention includes one or more paylines, such as payline 156, wherein the paylines can be horizontal, diagonal or any combination thereof." Michaelson ¶ 50.<br><br>"The proposed game outcome is generated identical to how a game outcome is generated in a probability based gaming terminal such as conventional slot, poker and blackjack gaming machines. That is, the gaming terminal uses the same probability data as a probability based gaming terminal (i.e., the same random number generating algorithm or program code) to randomly generate a proposed game outcome presentation, such as the reel symbol combination in a slot machine or the cards dealt in a card game. For example, in a slot machine gaming terminal, a probability is associated with each symbol on each reel (i.e., a star symbol may have a one in twenty probability of occurring on each reel, thus there is a one in eight-thousand probability that three star symbols will occur on three reels). After the gaming terminal randomly generates a proposed game outcome presentation, with reference to an appropriate pay table or other stored data, the gaming terminal determines the proposed game outcome that is associated with the proposed game outcome presentation. Each proposed game outcome includes an outcome component (i.e., a win, a lose outcome, a secondary game triggering outcome or other suitable outcome), and an associated value component or pay amount, if any. For example, in the slot machine gaming terminal, the reel symbol combination of three star symbols may be associated with a win $5 game outcome. In an |

78

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | alternative embodiment, the gaming terminal uses probability data to randomly generate the proposed game outcome. In this embodiment, a game outcome presentation is associated with each proposed game outcome." Michaelson ¶ 52.<br><br>"Gaming terminal 10 also includes one or more display devices. The embodiment shown in FIG. 2A includes a central display device 130, and the alternative embodiment shown in FIG. 2B includes a central display device 130 as well as an upper display device 132. Gaming terminal 10 preferably displays a plurality of reels 134, preferably three to five reels 134 in mechanical or video form at one or more of the display devices. A display device can be any viewing surface such as glass, a video monitor or screen, a liquid crystal display or any other display mechanism. If the reels 134 are in video form, the display device for the video reels 134 is preferably a video monitor. It should be appreciated that the present invention can include one or more paylines displayed in a horizontal and/or diagonal fashion." Michaelson ¶ 44.<br><br> |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | <br><br>*See* Michaelson at Figs. 1-5.<br><br>To the extent that Michaelson does not expressly disclose this limitation, a PHOSITA reviewing this reference would have found this claim limitation obvious based on Michaelson alone.<br><br>To the extent the PHOSITA would not have found this limitation obvious in view of Michaelson alone, the PHOSITA would have found it obvious in view of the references discussed herein. There are many reasons a PHOSITA would have looked to, and incorporated disclosures from the references herein. One such reason is that the references are directed toward the construction and operation of gaming devices. Additionally, a PHOSITA building the Michaelson game might have been interested in more of the architecture of how to design and operate a touch screen fruit based entertainment screen in a way to provide different player options. Any such modification would be well within a PHOSITA's knowledge and skill. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | "Known fruit machines have user operable press buttons by means of which various machine operations can be initiated and controlled by the player. Commonly there is a main 'start' button, and also reel-control buttons located respectively under the different reels to control 'hold' and 'nudge' functions and auxiliary buttons for other functions such as 'gamble' 'pay out' and the like." Marchini at 1:13-17.<br><br>"An object of the present invention is to provide a machine of the kind described incorporating convenient controls with which control functions can be initiated by a player quickly and easily. According to the invention therefore there is provided a coin-operated entertainment machine of the kind described having player-operable controls, characterised in that at least some of said controls comprise touch-screen controls. - By touch-screen is meant a screen with associated electronic equipment which produces control signals in response to movement of a person's finger into contact with or close proximity to locations on the screen." Marchini at 2:2-11.<br><br>"The screen may be a video screen (whether crt or led), or may be a window. Thus, for example the screen may be a video screen providing a display of simulated rotating reels, or the screen may be a window through which actual rotating reels can be seen. The touch-sensitive controls may be used for any or all of the machine operations. Thus in the context of a fruit machine the touch sensitive controls may be used for any or all of: 'start', 'nudge', 'hold', 'gamble', 'pay-out' and the like." Marchini at 3:5-12.<br><br>"The reels 14 then rotate (in simulation) and come to rest with a combination of symbols displayed on a central, horizontal win line 16. The player may then have the opportunity of improving this combination by stepping one or more reels 14 through one or more positions (i.e. a 'nudge' function) or he may have the opportunity of holding one or more reels against rotation in a next game (i.e. a 'hold' function). Actuation of a 'nudge' or 'hold' function may be effected by the player touching the screen beneath one or more of the reel displays (or in some other related position) e.g. at locations 17, 18, 19 shown in Fig. 2." Marchini at 4:19-5:1.<br><br>"In this way, it will be appreciated that the player can respond quickly and conveniently to an invitation or opportunity to operate a control in so far as the location of the control can be prominently before his eyes at the time when operation is to be effected. It is feasible for the control location to be at or adjacent the location at which the operation invitation is displayed and/or the location at which the reel or other game feature is displayed." Marchini at 5:6-11. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| | <br><br>"In one embodiment the novice level may have no hidden features or nudges, the intermediate level may have no hidden features but may have nudges and the expert level may have hidden features, nudges and/or designer cheats." Chambers at 2:29-3:1.<br><br>"The machine can include a selection display for the player's preferred gamble option for use in combination with the feature game selected by the player, for example, a Hi/Lo reel, roulette, a number reel, or Turbo ,Gamble. Turbo Gamble is typically a gamble ladder where the current value is gambled either up or down by one increment." Chambers at 10:5-9.<br><br>"Similarly, there can be a style, or level, of play selections display that allows the player to select from, for example, amateur (no hidden features or nudges), intermediate/customary (no hidden features but with nudges) and expert (lots of hidden features and designer cheats). Hidden features and designer cheats are typically means by which a skilled or knowledgeable player can apparently influence the game to his/her advantage. This usually involves the execution of an action that is not obvious to a casual player, for example operating a cancel button during a "skill stop" in order to slow down the display."  Chambers at 10:18-27.<br><br>"The screen is typically a cathode ray tube (CRT). Alternatively, it may 30 be a liquid crystal display (LCD), or any other suitable display medium. The selection means may be one or more portions of a touch |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
|  | sensitive layer, which may overlay the screen and may be connected to the processing circuitry. Such a selection means is convenient since it provides an easy, intuitive way for a player to input his/her choices." Chambers at 3:28-4:4.<br><br>*See, e.g.*, Chambers at Fig. 3. |
| **Claim 51**. [51.pre] A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein, the computer readable storage medium comprising: | The Court has construed "computer readable code" as "code in a form that can be executed by the computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded herein."<br><br>*See, e.g.*, Claim 44.pre, *supra*, incorporated here. |
| [51.1] program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that construct a game field having a plurality of elements for an interactive touch screen game display on an electronic game terminal wherein each element is filled by a game symbol from a plurality of predetermined game symbols."<br><br>*See, e.g.*, Claim 44.1-44.3, *supra*, incorporated here. |
| [51.2] program instructions that determine at least one winning combination for each play of the game; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that determine at least one winning combination for each play of the game."<br><br>*See, e.g.*, Claim 44.4, *supra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| [51.3] program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that test the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."<br><br>*See, e.g.*, Claim 44.5, *supra*, incorporated here. |
| [51.4] program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play; | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that automatically display an actual game to be played on the touch screen game display to a player prior to initiating activation of game play."<br><br>*See, e.g.*, Claim 44.6, *supra*, incorporated here. |
| [51.5] program instructions that determine if the player has decided to play the displayed game; and | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that determine if the player has decided to play the displayed game."<br><br>*See, e.g.*, Claim 44.7, *supra*, incorporated here. |
| [51.6] program instructions that display an outcome resulting from play of the displayed game. | The Court has construed "program instructions" as "conventional commands that can be executed by a computer."<br><br>Michaelson, alone or in view of the other cited references, at least suggests "program instructions that display an outcome resulting from play of the displayed game."<br><br>*See, e.g.*, Claim 44.8, *supra*, incorporated here. |

| '223 Patent Claim | U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. |
|---|---|
| **Claim 52.** The computer program product for electronic gaming of claim 51 further comprising program instructions that generate and display an additional game field simultaneously on the game display in proximity to the displayed game. | The Court has construed "program instructions" as "conventional commands that can be executed by a computer." <br><br> Michaelson, alone or in view of the other cited references, at least suggests "program instructions that generate and display an additional game field simultaneously on the game display in proximity." <br><br> *See, e.g.*, Claim 38, *supra*, incorporated here. |
| **Claim 53.** The computer program product for electronic gaming of claim 52 wherein the additional game field is for a next game to be played. | Michaelson, alone or in view of the other cited references, at least suggests "the additional game field is for a next game to be played." <br><br> *See, e.g.*, Claim 38, *supra*, incorporated here. |
| **Claim 54**. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a two-dimensional array of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a two-dimensional array of game symbols." <br><br> *See, e.g.*, Claim 47, *supra*, incorporated here. |
| **Claim 55.** The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a one-dimensional array of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a one-dimensional array of game symbols." <br><br> *See, e.g.*, Claim 47, *supra*, incorporated here. |
| **Claim 56**. The computer program product for electronic gaming of claim 51 wherein the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols. | Michaelson, alone or in view of the other cited references, at least suggests "the displayed game comprises a plurality of vertically-oriented reels, each having a plurality of game symbols." <br><br> *See, e.g.*, Claim 49, *supra*, incorporated here. |