C

# EXHIBIT C

Unsealed Public Version Filed on February 8, 2022

C

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SAVVY DOG SYSTEMS, LLC and  )

POM of PENNSYLVANIA, LLC,    )

                Plaintiffs,  )   Civil Action Number

        vs.            )   3:19-cv-01470-JPW

PENNSYLVANIA COIN, LLC and  )

PA COIN HOLDINGS, LLC,      )

               Defendants.  )


                    _ _ _
JANUARY 12, 2022

                    _ _ _


Video-recorded deposition of KEVIN
HARRIGAN, Ph.D., taken remotely, before Patricia
R. Frank, Registered Merit Reporter, Certified
Realtime Reporter, and Notary Public, commencing
at 10:38 a.m. EST, on the above date.


                    _ _ _


MAGNA LEGAL SERVICES
(866) 624-6221
www.MagnaLS.com



A P P E A R A N C E S:
(All parties appearing remotely)


ATTORNEYS FOR PLAINTIFFS AND THE WITNESS:


            HILL, KERTSCHER & WHARTON, LLP
            BY: JOHN L. NORTH, ESQUIRE
                MARTHA DECKER, ESQUIRE
                STEVEN G. HILL, ESQUIRE
                JOHN MAHAFFEY, ESQUIRE
            One Overton Park
            3625 Cumberland Boulevard SE
            Suite 1050
            Atlanta, GA 30339-6406
            770.670.6324
            jln@hkw-law.com
            md@hkw-law.com
            sgh@hkw-law.com
            jm@hkw-law.com


ATTORNEYS FOR DEFENDANTS:
            MORGAN, LEWIS & BOCKIUS LLP
            BY: AHREN C. HSU-HOFFMAN, ESQUIRE
                AUSTIN L. ZUCK, ESQUIRE
            1400 Page Mill Road
            Palo Alto, CA 94304-1124
            650.843.7250
            650.843.7266
            ahren.hsu-hoffman@morganlewis.com
            austin.zuck@morganlewis.com
            MORGAN, LEWIS & BOCKIUS LLP
            BY: KENNETH J. DAVIS, ESQUIRE
            1701 Market Street
            Philadelphia, PA 19103-2921
            215.963.5392
            kenneth.davis@morganlewis.com




(Appearances cont'd. on next page)



(Appearances cont'd.)

ALSO PRESENT:

       GREG CLINE, ESQUIRE

       In-House Counsel for

       Savvy Dog and POM

       CHLOE YARBROUGH, Intern

       RALPH MITCHELL, Videographer

       NATE BERNICK, Exhibit Tech



Page 4

                    I N D E X

Witness                                              Page
KEVIN HARRIGAN, Ph.D.
    By Mr. Hsu-Hoffman                                  6
    By Mr. North                                      235


                  E X H I B I T S
            (Exhibits attached to transcript in hard
copy format and/or electronically.)

Marked for I.D.                                      Page

Exhibit 1        Amended Responsive Expert            11
                 Report of Kevin Harrigan, Ph.D.
Exhibit 2        Exhibit A - Materials                34
                 Considered in Forming Opinions

Exhibit 3        Deposition of Michael Pace           36
                 taken on August 4, 2021
Exhibit 4        Declaration of Clinton Lowe          47
Exhibit 5        US Patent No. 7,736,223 B2           51
Exhibit 6        Tic Tac Fruit Game Screen           193
Exhibit 7        Tic Tac Fruit Game Interface        197
                 Scan

Exhibit 8        Declaration of Clinton Lowe         211
                        _ _ _



BY MR. HSU-HOFFMAN:

Q.    Dr. Harrigan, I want to refer you to paragraph 334 of your report.  Is this a portion of your report where you refer to -- all right.  Let me know if you're there.  I'll just give you a chance.

A.    334.  Yes, I just got there.

Q.    Is this the portion of your report where you opine on a prior art version of a Tic-Tac-Fruit game?

A.    Yes.

Q.    And correct me if I'm wrong, but you're only disputing whether prior art versions of Tic-Tac-Fruit disclosed the "testing" element and the "automatically displaying" element of the challenged claims; is that correct?

A.    That I'm only addressing those?  Is that what you said?

Q.    Are you -- let's start over.

Are those the only elements that you're addressing with respect to prior art Tic-Tac-Fruit games?

A.    Yes.

Q.    And I think I -- correct me if I'm wrong.  Again, I think I heard you clarify earlier today that you now agree that the testing in Tic-Tac --



MAGNA
LEGAL SERVICES

Page 112

prior art Tic-Tac-Fruit games was the same as the testing that's claimed in the challenged claims; is that right?

A.      Yes.

Q.      You're only disputing whether the automatic display element of the challenged claims is disclosed by prior art Tic-Tac-Fruit games?

A.      Yes, the -- two things.  One of them is the order that the testing and then automatic displaying before activation of game play, and then the, you're right, automatically displaying.

Q.      You would agree that in addition to the testing that prior art Tic-Tac-Fruit games would automatically display the constructed game field but do so after the player initiates activation of game play, correct?

A.      It would display the game field after the player wagered, yes.

Q.      So prior art Tic-Tac-Fruit games disclosed what's required by the "testing" limitation after the player initiates activation of game play, correct?

A.      Could I get you to repeat that?  I thought you sort of combined two claims there, the --



Page 113

Q.      Sure.  Let me just -- I want to separate them out, and just first let's focus on -- go back to kind of focus on testing.

So prior art Tic-Tac-Fruit games, you agree they disclose what's required by the "testing" limitation but performing that step after the player initiates activation of game play.

A.      Correct.

Q.      And then the same thing with the "automatically displaying" element.  You agree that their "automatically displaying" element is present and disclosed by prior art Tic-Tac-Fruit games, but that step occurs after the player initiates activation of game play; is that right?

A.      Not quite.  Almost like that.  The automatically displaying the game without activation of game play I'm saying is a new step that occurs after the testing.

Q.      But you agree prior art Tic-Tac-Fruit games would display a constructed game field of the game to be played to the player after the player initiates activation of game play, correct?

A.      Correct.  But the game -- to be clear, the game that's being displayed in this claim is not a game that you can play.  It's a game that displays



Page 130

to what configures it, so the program is what configures it.  But, no, I'm not saying, what I think is your question, whether Mr. Pace like went in with screwdrivers or whatever you would do to specially have a game processor, and that's not what I mean.  I mean like the claim construction of the processor, that it takes his instructions and runs them.  That's what's configuring it.  Maybe that's not the best word, I don't know, but that's what's configuring it.

Q.    You use the term "specially configured" and I want to make sure I understand exactly what you mean by that.  What do you mean by "specially configured"?

A.    I think it's a good point.  So the "specially configured" just means that it's running Pace's program.  So I have "specially" in there to sort of highlight that it's Pace's game.  It's Tic-Tac-Fruit.  But any processor that's running any program is specially configured to do whatever it does.

Q.    Did Mr. Pace's program change the way in which the processor operates?

A.    Well, kind of yes and no.  I mean the operator -- kind of one answer is that the -- it



Page 131

never changes the processor; it just takes in program instructions and does them, so it never. But the other way to look at it is that it's specially configured or configured in the sense that it doesn't pop up a word processor on your terminal. It pops up Tic-Tac-Fruit.  So it's configured to pop up Tic-Tac-Fruit.  That's what I meant by that.

Q.    Were there any existing problems with CPUs or microprocessors that Mr. Pace's invention addressed?

A.    No.  By "invention," you mean the '223 patent?  No.

(Court reporter clarification.)

THE WITNESS:  By "invention, you mean the '223 patent.  The answer is no.  And I just add that little bit because he did invent perhaps some things in the past -- I may have read that -- but long before the '223 patent.

BY MR. HSU-HOFFMAN:

Q.    Were there any other problems that needed to be overcome for a CPU or a microprocessor to execute the program instructions that Mr. Pace created for Tic-Tac-Fruit?

A.    No.

Q.    And by the Tic-Tac-Fruit, I'm referring



Page 132

to the Tic-Tac-Fruit that's described and claimed in the '223 patent?

A.      I was thinking of the version that he actually implemented from March 2.  It didn't require anything special.  Whether the patent -- I don't think so, no.

Q.      So the Tic-Tac-Fruit game that Mr. Pace came up with with the "next puzzle" button could be implemented using a conventional, off-the-shelf CPU or microprocessor?

A.      Yes.

Q.      Were there any changes that Mr. Pace needed to make in order to have a CPU or a microprocessor execute the program instructions for Tic-Tac-Fruit with the "next puzzle" button?

A.      Not that I know -- excuse me.  Not that I know of.

Q.      Were there any problems that Mr. Pace needed to overcome that existed in the art in order to implement the functions that are recited in the challenged claims?

A.      I'm not sure what -- let me think about this.  Like the -- are you talking about the -- would the pre-fetch, sorry, fit into something -- in that he had to do?


MAGNA
LEGAL SERVICES

Page 133

Q.      Let's go to the functions that are in claim 44.

A.      Okay.

Q.      So the constructing, determining, testing, automatically displaying, determining and displaying functions, right?

A.      And I'm just lost then.  Exactly what's your question?

Q.      Well, my question is, were there any problems that Mr. Pace needed to overcome to implement any of the functions that are recited in claim 44?

A.      Well, I don't know if -- like all programming, you're there to solve a problem.  I don't know specifically -- the answer is always yes to that.  If you're going to program something, you have programs to overcome.  So it seems like in this case the biggest problem he had to overcome was to write this pre-fetch.

Q.      Other than issues with -- other than overcoming issues with pre-fetch, were there any other problems that Mr. Pace needed to overcome in order to implement the functions that are recited in claim 44?

A.      Not that I know of.



MR. NORTH:  Counsel, if you would just -- I need to step out my door and ask somebody to be quiet just for ten seconds.  If you wouldn't mind just pausing the examination just for ten seconds.

MR. HSU-HOFFMAN:  No problem.

MR. NORTH:  Thank you, counsel.  I'm back.  I appreciate the courtesy.

MR. HSU-HOFFMAN: No problem.

BY MR. HSU-HOFFMAN:

Q.    Dr. Harrigan, we've been talking about Mr. Pace, but let me ask about a person of ordinary skill in the art as you've defined that person. Would they have needed to overcome any problems in order to implement the functions that are recited in claim 44?

A.    They would have to have the idea to do it, and -- which Pace did, but the programming of the -- any version of the Tic-Tac-Fruit is within the range of a POSITA.

Q.    So if a person of ordinary skill in the art had the idea, the same idea as Mr. Pace, that person would have been able to implement the functions that were recited in claim 44?

A.    I can't think of anything in particular



Page 135

why somebody else couldn't do it.

Q.    They would have been able to do it in the early 2006 time frame?

A.    Yeah.  Well, I was thinking of that time frame.

Q.    You could go back even further, right?

A.    Yeah.  I didn't go back further, but I'm certainly not saying that people just learned how to program games in 2006.

Q.    So the idea of an automatic preview feature would be, in your opinion, the only barrier to a POSITA creating and implementing the alleged invention in the early 2006 time frame?

MR. NORTH:  Could the court reporter read that back.

(The court reporter read back the question as follows:  "So the idea of an automatic preview feature would be, in your opinion, the only barrier to a POSITA creating and implementing the alleged invention in the early 2006 time frame?")

THE WITNESS:  So what I'm saying is that if they had all of the ideas of the '223 patent, then they could implement those ideas, yes.

BY MR. HSU-HOFFMAN:

Q.    Let's talk about Mr. Pace's idea.  So



Q.    223.

A.    Sorry.  Wrong place.

Q.    And at the very last sentence, you make a statement concerning the technical solution that is recited in the challenged claims, correct?

A.    That's the sentence that says, "Each of the claims at issue do far more"?  That sentence you're referring to?

Q.    That's correct.

A.    And, sorry, I think I was reading at the same time.  So can you ask me the question again?

Q.    Sure.  In that last statement, paragraph 223, you opine the claims recite the specific technological solution; is that correct?

A.    Yes.

      MR. NORTH:  And under the rules of completeness, I'm sorry, counsel, at trial I'd have them read the complete sentence into the record. Thank you.

BY MR. HSU-HOFFMAN:

Q.    And that solution, Dr. Harrigan, is for accomplishing the goals of elevating the level of skill and reducing the level of chance in electronic gaming, correct?

A.    That's right.



Page 150

Q.    Other than those two goals, are there any other specific technological solutions that are recited in the challenged claims?

MR. NORTH:  Objection to the form.

THE WITNESS:  Are there any other -- I don't think so.

BY MR. HSU-HOFFMAN:

Q.    Let me have you turn to paragraph 110, page 53 of your report.  And I'm sorry to just backtrack, but I just want to make sure it's clear for the record the response to the last question I asked.

So are there any other technical solutions that are recited in the claims apart from the two goals that we referenced previously?

A.    I don't think so.

Q.    Are there any others that you intend to offer an opinion on at trial in this case?

A.    None that I know of, no.

Q.    Just so I've got it clear, the technological solutions that you allege are captured by the challenged claims are elevating the level of skill and reducing the level of chance in electronic gaming?

A.    Yes.

