D

# EXHIBIT D

Unsealed Public Version Filed on February 8, 2022

Page 1

UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF PENNSYLVANIA


SAVVY DOG SYSTEMS, LLC and )

POM of Pennsylvania, LLC,  )

            Plaintiffs,     )   Civil Action Number

       vs.             )   3:19-CV-01470-JPW

PENNSYLVANIA COIN, LLC and )

PA COIN HOLDINGS, LLC,     )   Honorable Jennifer P.

      Defendants.       )   Wilson


   ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

      ** PURSUANT TO PROTECTIVE ORDER **


ZOOM VIDEOCONFERENCE DEPOSITION OF

MICHAEL PACE

(Taken by Defendants)

August 4, 2021

9:08 a.m.


Deposition held via Zoom Videoconference


Reported by:

F. Renee Finkley, RPR, RMR, CRR, CLR, CCR-B-2289

(Via Videoconference)



APPEARANCES:


On behalf of the Defendants:

KENNETH J. DAVIS, Esq. (Via Videoconference)

Morgan, Lewis & Bockius, LLP

1701 Market Street

Philadelphia, Pennsylvania  19103

(215) 963-5000

kenneth.davis@morganlewis.com


On behalf of the Plaintiffs and

the witness, Michael Pace:

STEVEN G. HILL, Esq. (Via Videoconference)

MARTHA DECKER, Esq. (Via Videoconference)

3350 Riverwood Pkwy SE - Suite 800

Atlanta, Georgia  30339

(770) 670-6144

sgh@hkw-law.com


Also Present:

MIGUEL BANUELOS, Videographer

(Via Videoconference)


SEAN FRANKLIN, Exhibit Tech

(Via Videoconference)



Page 3

APPEARANCES (continued):


Also Present:

STACY FRIEDMAN (Via Videoconference)


GREG CLINE (Via Videoconference)


EMMA BURRI (Via Videoconference)


BRAD WOOD, Esq. (Via Videoconference)



Page 4

                    I N D E X


       WITNESS:  MICHAEL PACE (Via Videoconference)


EXAMINATION                                          Page

     By Mr. Davis                                      6


                    E X H I B I T S


Exhibit No.        Description                        Page

Exhibit No. 11  Plaintiff's seventh supplemental

                response and objections to

                defendant's first set of

                interrogatories                        61

Exhibit No. 12  '223 patent                            72

Exhibit No. 13  Farley letter                          77

Exhibit No. 14  Directory from thumb drive            129

Exhibit No. 15  Hex file display                      132

Exhibit No. 16  Patent license agreement              163

Exhibit No. 17  Plaintiff's fifth supplemental

                response and objections to

                defendant's first set of

                interrogatories                       165

Exhibit No. 18  Document dated June 23rd, 2006        170

Exhibit No. 19  Letter from Meeks                     175



Page 5

E X H I B I T S (continued)

Exhibit No.          Description                    Page

Exhibit No. 20  Document Bates stamped

                HC 00003689                         179

Exhibit No. 21  Document Bates stamped

                POM 018322                          190



Page 25

said why they believe what I was doing was legal, because this piece of paper and this letter were essential, in most cases, in convincing a tribe that what we were upgrading to, they're not going to have a problem with.

And also convincing myself that I don't want to go out there and do this and get in trouble.  So that's why we did it.

Q.    (By Mr. Davis)  And at some point, you migrated from that work to working on Ateup.  How did that come about?

A.    I had lived in Wyoming.  I was living on my ranch there.  I built a big research center with an indoor arena for training horses.  Silly business.  But I owned a chain of hotels based out of Atlanta that was having some problems.  And when we -- we went to a trade show in September of '03.  And we just didn't do a good job of selling.

A lot of reasons there, but -- and then I needed to move back to Atlanta.  So I moved back to Atlanta -- I'm sorry, I lost my whole train of thought there somehow, but I was trying to get somewhere with that.

Q.    No, this was about the migration to Ateup.

A.    Okay.  That was all part of it.  So once I


MAGNA
LEGAL SERVICES

Page 26

got back to Atlanta, I was done with the Indian gaming stuff.  I looked at the law in Georgia.  They had just removed all the games in Georgia, including the Pot of Golds, which had no business being in Georgia.  I didn't sell them there.

And I looked at what we could develop in Georgia that would be legal.  I came up with the world's first electronic nudge games.  I did not invent the concept.  IGT did a long time ago on a mechanical reel.  You could nudge the reels up and down.

But I came up with the idea of having three reels and nudging one up or down each play to satisfy the some skill requirement for Georgia.  I made this game.  We put it out.  It was doing well.  And then I created a whole world of competitors that started building these things.

I was called upon to be the expert witness in the Cobb County trial in Georgia, where we won the fact that these games were legal.  The problem is then, there's too many people in it.  I can't make any money.  I had moved on, looking at different states.  Ohio was one of those states.

I had this concept, Ateup, that I had written, I think, originally in early '04.  I know it


MAGNA
LEGAL SERVICES

Page 47

do -- and to make different type games and other things, I use what's called a conditional compile.  I set the parameters up in my gigconc.H file.  And then I recompile everything.  And I should get what I asked for.

There was a -- the date was a stamp.  It was like a six-digit decimal number, like today's date.  I believe today is the 4th of August, so it would -- it would be the year, month, and day.  So I'd go 210804.  That's the way I'd know.  That way, I also had a way of filtering game files for certain things with dates in them, so that I could go back -- if the date stamp got screwed up on something, I could look at that stuff, and I could use a file find command that was written by Norton.  That's an old utility from the '80s, but that was very useful.

And I use that to find things that would say, I can look at all the files past a certain date that had been modified.  So it was very useful in writing code.

Q.    So when you were writing code for those first versions of Tic-Tac-Fruit, was that for the Pot of Gold platform?

A.    I wrote all of the code for all of the



Page 48

stuff that went on the Pot of Gold platform that we called Platinum Plus.  There was a knock-off board that was designed by a company in Atlanta to replace the Pot of Gold boards in the field.  It had nothing to do with me, but I ended up buying those boards 'cause it would run my code, when it became hard to get Pot of Gold boards.

Q.    Did that knock-off board have a name?

A.    The Skidmore board.

Q.    And how long did you develop software for Tic-Tac-Fruit that would run on the Skidmore board?

A.    It would always run on both boards, but --

Q.    I'm sorry, when you mean both boards, do you mean both the Pot of Gold board and the Skidmore board?

A.    Yes, sir.  The Skidmore board emulated the processor and other things.  There was very little I had to do to my code to make it run well on the Skidmore board.  So we did make -- no, it was an automatic process.

The same code was cranked out that would run on either board, and the code knew which board it was on, and made the slight changes that it needed to.  They were both very close to the same.



Page 49

So that code, I wrote that -- both platforms had very limited graphics capability, very limited audio capability, at least -- I mean, it was state of the art in 1990. But by 1910 [sic], the stuff is getting kind of old. And it's very hard for me to compete. And I had to keep coming up with really cool things that even on an obsolete platform would make money, so that we could finance the development of a high resolution system that we now call Edge.

And I was successful. But I think I quit programming that about five years ago. It just was -- I didn't need to do it anymore. The Edge product was taking off on its own and being successful. And it was a lot of work. And it just -- there's no longer anything I could produce on those boards that I think can compete. It would be a lot of lost or wasted effort.

MR. HILL: Ken, when you get to a good stopping point, can we take a break? We've been going just a little over an hour.

MR. DAVIS: Yep, maybe five minutes, Steve, if that's okay?

MR. HILL: Yeah, finish up.

Q. (By Mr. Davis) When did you start


MAGNA
LEGAL SERVICES

Page 50

employing the Skidmore board, do you remember?

A.    We had problems getting the Pot of Gold board in the summer of either '05 or '06.  I think it was '05, because I remember we finally got the Skidmore boards instead of the Pot of Gold boards and we actually shipped 880 machines in a November time frame, which was pretty good for us.  And I just got to get the years right.  I know I got the rest of it right.

I think, yeah, we ran -- we couldn't -- the Pot of Gold boards were $100 a piece for a while.  We could buy them.  And then all of a sudden, it dried up, and we couldn't get them.  And then we had huge orders for it, of course.  That's the way the world works.  You couldn't get it.  So I would guess that was 2005, we were taking orders, but we couldn't ship.  And then finally, by November 2005, we shipped all of the games.

Q.    Who made the Skidmore board?

A.    A guy named Brad Skidmore.  He had the same problem.  He couldn't get ahold of Pot of Gold boards, and he was putting them into products.  And he couldn't get them, so he had his own board built.

MR. DAVIS:  Great.  I think this is a good place for a break.  Can we come back maybe 20



tried to do that.  It caused a lot less -- your customers get a lot less upset, the customers being operators of the equipment, and the players tend to come right back and play the machine, whereas if you jerk the players around too much, they won't play it for a while.

So we had the software that upgraded the conventional board, the Pot of Gold board with the Platinum Plus operating system would be EPROMs.  It sounds crazy now, but most of my life, we had burned EPROMs and plugged them into a board, okay.  I'm sure the kids today are spoiled to death, they having flash memory, but we didn't have it.

So each part stored 4 million bits of information, that is two to the 22nd power.  And you took two of them, there were eight bits wide, to give you a 16-bit wide bus, which is what the processor read.

So anything it upgraded had to work in pairs of EPROMs.  I believe on the board, there were EPROMs 4, 5, 6, 7, 8, 9, and I don't remember the pairing, but that's the way it worked.  So on the old board, you changed EPROM.  Turn the power off, take a screwdriver, you pry EPROM out very carefully, put it back in the tube, so somebody doesn't bend the pin.



Page 56

And put the new one in.  We had pre bench where they could be plugged in not get screwed up too bad.  We still had people screw up EPROMs.

If it was a Skidmore board, we loaded the code via a USB thumb drive, which is more common to what goes on today.  And it had a flash memory that would emulate those EPROMs, because it was nothing but a big emulation device that emulated the code that would run on a Pot of Gold board.

Q.    Was the Skidmore board delivered to you with capability to be updated with flash memory?

A.    Yeah, the Skidmore board was delivered to us without any program running on them.  They had some sort of a BIOS built into it, but it was made to load into its memory, the contents of six -- those six EPROMs, whether -- it was designed for people that wanted to knock-off Pot of Gold board.  We didn't use it for that purpose.  We used it to put our code on it.

There were several instructions which had never been implemented in the Skidmore board that I used that the Pot of Gold never did.  So we had -- we contacted Skidmore and his guys, his engineers had to had those few instructions that didn't hurt the operation of Pot of Gold -- Pot of Gold software, but



Page 57

allowed us to make it work.  So you either did it through USB drive to update, if it was Skidmore, or you did it by EPROM replacement if it was the Pot of Gold board.

Q.    What were the instructions that you had to have the Skidmore folks implement?

A.    These are computer op codes.  When a computer runs across all the op codes in the Texas Instruments 34010, which was the processor, all the op codes are 16 bits wide.  Now, the words -- complete words can be five of those.  Could be 80 bits.  But a minimal op code size is 16 bits.

So 16 bits gives you 64K or 65,536 possible instruction bytes.  Most don't -- most are illegal instructions that you shouldn't have that code.  But there is a great deal of orthogonalness in a processor that says, if you have certain instruction, then if it's going to load a register then you -- if it's going to clear a register, there also ought to be able to clear ram, and also ought to be able to clear something else.

They didn't implement the instruction set that way.  They simply ran until the processor ran across an instruction it did not know, and then they implemented the code that would do the same as the



whole way everything worked, because we had, beforehand, generated puzzles on the fly that did not work the same way as we did after that, because we needed to be one step ahead and one move ahead in the creation of these puzzles, if we were going to allow the player to glean any information about what type of puzzle it was, what you could possibly win, and the difficulty of it.

That took place during that time period. A total reworking of the system, because in order to build a preview into it, I had to develop something called a pre-fetch. That was a great deal of coding. It was just one of those things that sounds like it should have been simple, but in my system, it was incredibly difficult, but I did get it done. So I believe that to be an accurate statement.

Q. Okay. And the testing that was done in the earlier version of Tic-Tac-Fruit, the version that predated the modifications that are referenced here, did testing of a game field, didn't it?

A. I don't think I did it the same way. I know I didn't. You -- there are a lot of different ways of doing that.

Q. And so what was different about the way that you did it after the referenced modifications



Page 69

than the way you did it before?

A.    Whatever way that I had put the puzzles together before, they were very voluminous, the information that was generated in putting them together.  And I needed, because of a restriction and non-volatile memory in the system, I had to get a complete rework of that, so that I'd be able to store those results for the next puzzle in a certain amount of memory that would work on these boards that didn't have a lot of memory to them, if that makes sense.

Q.    So what changes did you make to the coding to accommodate the lack of memory?

A.    Well, I can tell you where we got to with it.  I know how that works.  Where we were before, I don't fully remember.  It was not near as a comprehensive mode, the game was kind of in its infancy.

Q.    So was the approach to testing the game board different in these modifications than they were in previous versions of Tic-Tac-Fruit?

A.    I think so.  In fact, we had some versions where the patterns were pre-stored in the system, like a pull tab.  And that the system would not necessarily randomly, but sequentially select these patterns in order to show to the players.  We were



Page 70

trying to work around the idea that law enforcement believed that if there was a random number generator involved, that it was bad.

So I developed a system that had all the -- we generated the puzzles prior to putting them into the game. And it did not have to do any calculating or looking at the puzzle. They were already preformed. That was one of the first ways that we did it, because we were basically selling boxes of pull tabs, if you know what that is. Those are pictures of preset winners, or already puzzles that are -- puzzles that are to be solved, but have already been figured out.

We did that, and loaded it in that way. That made the best sense upfront. But when we got restricted by the memory as part of that total overhaul in 2006, I developed a puzzle generator that could build these puzzles on the fly, so that we wouldn't take up so much memory, because now we needed to be able to store the results for each of the play dominations, because my system allowed for eight different ways -- price levels to play the game at.

So each one of those play levels became -- had to have an answer to him -- to his


MAGNA
LEGAL SERVICES

Page 71

price range already decided, already figured up what the next play is going to be.  Just not simple to do with such an old board, but I got it done.

Q.   So when you were constructing the field before these modifications were made, were you constructing the field in a different way than you were constructing it after these modifications were made?

A.   Well, the processor didn't generate or test field.  I came up with these puzzles, and put them on paper.  And then entered them in code in the machine.  So the machine did not have to calculate a puzzle in the earlier Ateups.  They were stored like a series of predetermined winners and losers, like in a pull tab box.

Q.   So is the modified testing approach that you're describing described in the '223 patent?

A.   I think so.

Q.   Did you look at that yesterday, when you were reviewing the '223 patent?

A.   We did look at that part, yes, sir.

Q.   Can you point me to where that modified language is in the -- or the modification language is in the '223 patent?  Can we -- let's make that an exhibit, if we can.


MAGNA
LEGAL SERVICES

Page 88

replaced as the host, and that Stacy Friedman is now the host of the session, which I don't think is probably true.  Let's go off the record and try to get this cleared away.

(Discussion off the record.)

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 11:32 a.m.  Go ahead.

Q.    (By Mr. Davis)  Welcome back, Mr. Pace.

A.    Thank you.

Q.    So we were talking about the events between January 1, 2006 and March 31, 2006 that may have led you to believe that a preview feature would be helpful.  Can you tell me what those events were?

A.    I thought you were asking what events led up to thinking about whether you needed a preview or not.

Q.    Right.  What were the events that led up -- why don't I ask it that way, then.  What are the events that led up to needing a preview feature?

A.    Okay.  So many of the important features to a game being not a game of chance and for being legal for other reasons in a state are so often things that we get by talking with what we call credible law enforcement, that some cops don't care



MAGNA

LEGAL SERVICES

Page 89

whether it's legal or not, just don't run them. We're going to lock you up, and take your games.

But some of them will actually talk to you and tell you what it is that they don't like about something.  And then we go back in and fix that.  And then they find something else they don't like.  You go back fix that.  And sooner or later, you fix enough of it, they leave you alone.

And so often that these things that they don't like are irrational, but it doesn't matter.  I had a talk with a guy in Ohio sometime in the fall of '05.  He was the expert for the state, both in criminal matters and in the liquor administrative hearings.  His name was Reidthaler.  And I remember being in at the end of some sort of function.  It may have been administrative hearing, and talking to him.

And he told me, he said, well, the biggest problem I have is that the players don't know what they're playing for, or something along those lines. And I thought about that for a while.  I know that I had discussed this with our lawyer, Kurt Gearhiser, who was also lawyer for Ohio Skill Games, which had three people in Ohio Skill Games.

And that I had come up with a scheme or several different schemes that I was going to do to



Page 90

solve this.  The name preview, I don't think had ever been used yet.  That was one that I applied to it, because it was really what the processor was doing.

It was -- the game was, it was -- I had a pre-fetch phase, to where they -- the special processor could go and grab these next puzzles you were going to play.  In fact, it was a next puzzle, is what I called it.  But internally, I called it a preview, and the name got going.

But it was basically any of a number of different ways that the player could use to effectively know what he was playing for that would solve the problem, if that answers the question.

Q.    So do you recall having a discussion with Mr. Gearhiser in connection with a liquor control commission hearing in Ohio in 2005, about that next puzzle feature that you just described?

A.    I do remember talking to Gearhiser and the rest of his guys about it.

Q.    Do you recall talking with Mr. Reidthaler before the hearing, or during the hearing, or after the hearing, if you recall?

A.    I think it was after the hearing, because we ran across him several times in different cases, but primarily Gearhiser was an administrative lawyer.



Page 156

A.    No, sir.

Q.    So are you saying that just the code has that flexibility, and before the particular code is deployed to the field, it would either include or not include that feature?

A.    That's on our Edge products.  When I originally had it on the Platinum Plus, we left some of those buttons unlocked for the operators to control, where it was unclear whether that feature being turned on or not gave us -- bought us anything legally.  And we wanted to see which one earned more money, especially in a beta test of some sort.

And all the time, we have some kind of testing going on with something.  So I can't keep track of all of them, but I'd say where we think these features are important for its defense, they would be locked on.

Q.    So once you decided to implement the next puzzle feature, did you have to modify any hardware?

A.    No, sir.

Q.    And so the next puzzle feature, that would operate would operate equally on a -- on hardware that was before 2005 as it would after 2005?

A.    Yeah, because it's been locked one way or the other.  The hardware doesn't have anything to do



so.

Q.   (By Mr. Davis)  Okay.  Mr. Pace, did any improvements you made to the software for Tic-Tac-Fruit -- let me restate that.

Did the software that implemented the next puzzle feature improve any operations of the game board?

A.   Say that again?

Q.   Did the game board operate differently because of the software that included the next puzzle feature?

MR. HILL:  Object to the form.

THE WITNESS:  Would the game board operate differently?  I don't know.

Q.   (By Mr. Davis)  Okay.  If I could just take maybe another ten minutes.  I think I might be done.  I just want to check my notes.  Does that work for you, Steve?

MR. HILL:  Sure.

Q.   (By Mr. Davis)  Mr. Pace, will that be all right?

A.   That would be perfect.

MR. DAVIS:  Come back at 3:50.

MR. HILL:  3:50.  Sure, no problem.

THE VIDEOGRAPHER:  Going off the record at


MAGNA
LEGAL SERVICES

Page 201

3:40 p.m.

(A recess was taken.)

THE VIDEOGRAPHER:  Back on the record at 3:50 p.m.  Go ahead.

Q.    (By Mr. Davis)  Welcome back, Mr. Pace.

A.    Good to be here.

Q.    I do not have any further questions.  We may want to come out and inspect the operation of that object code, but we'll discuss it internally, take you up on that offer.

MR. DAVIS:  I saw, Steve, that there was an offer to do some other inspection last night, so I haven't had a chance to talk to the team about that.

THE WITNESS:  Okay.  That code also could be run on a game, and we could video it for you or something.  I mean, we want to make it as easy on you as possible.

MR. DAVIS:  Okay.

THE WITNESS:  I'm not sure why -- well, I guess we -- I know why we sent it to you, because it is a version -- it is the earliest version that we can find that actually has the preview in it.

Q.    (By Mr. Davis)  Right.



A.    And I don't know that -- thinking back, when I saw it, I don't know that it was fully implemented, or that it would be like what really went out in the field.  I don't know.  I'd have to look at it again.  I think it was.

Q.    But it had every -- every element of it that you contend is your invention?

A.    Yes, sir.

Q.    And it could operate on a system from 1998 -- a 1998 Pot of Gold system?

A.    Which was designed in 1990.  Yeah, but that's right.  The earlier boards wouldn't be able to support it.  From '98 onward, that's about right, or 97 onward.  So, yeah, certainly a '98 board would run.

MR. DAVIS:  Okay.  We may like to come out and take a look at it.

THE WITNESS:  Okay.

MR. HILL:  All right.  I reserve my questions for trial.

(Discussion off the record.)

(After being asked, off the record, if counsel would like a rough draft and a copy of the transcript, counsel replied with the following:)

MAGNA
LEGAL SERVICES