# EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

SAVVY DOG SYSTEMS, LLC and    )

POM of PENNSYLVANIA, LLC,     )

              Plaintiffs,  )  Civil Action Number

    vs.                   )  3:19-cv-01470-JPW

PENNSYLVANIA COIN, LLC and    )

PA COIN HOLDINGS, LLC,        )

             Defendants.   )

                - - -
           JANUARY 12, 2022
                - - -

      Video-recorded deposition of KEVIN HARRIGAN, Ph.D., taken remotely, before Patricia R. Frank, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public, commencing at 10:38 a.m. EST, on the above date.

                - - -

        MAGNA LEGAL SERVICES
          (866) 624-6221
          www.MagnaLS.com



Page 112

1    prior art Tic-Tac-Fruit games was the same as the
2    testing that's claimed in the challenged claims; is
3    that right?
4         A.    Yes.
5         Q.    You're only disputing whether the
6    automatic display element of the challenged claims
7    is disclosed by prior art Tic-Tac-Fruit games?
8         A.    Yes, the -- two things.  One of them is
9    the order that the testing and then automatic
10   displaying before activation of game play, and then
11   the, you're right, automatically displaying.
12        Q.    You would agree that in addition to the
13   testing that prior art Tic-Tac-Fruit games would
14   automatically display the constructed game field but
15   do so after the player initiates activation of game
16   play, correct?
17        A.    It would display the game field after the
18   player wagered, yes.
19        Q.    So prior art Tic-Tac-Fruit games
20   disclosed what's required by the "testing"
21   limitation after the player initiates activation of
22   game play, correct?
23        A.    Could I get you to repeat that?  I
24   thought you sort of combined two claims there,
25   the --



Page 113

```
 1       Q.     Sure.  Let me just -- I want to separate
 2   them out, and just first let's focus on -- go back
 3   to kind of focus on testing.
 4              So prior art Tic-Tac-Fruit games, you
 5   agree they disclose what's required by the "testing"
 6   limitation but performing that step after the player
 7   initiates activation of game play.
 8       A.     Correct.
 9       Q.     And then the same thing with the
10   "automatically displaying" element.  You agree that
11   their "automatically displaying" element is present
12   and disclosed by prior art Tic-Tac-Fruit games, but
13   that step occurs after the player initiates
14   activation of game play; is that right?
15       A.     Not quite.  Almost like that.  The
16   automatically displaying the game without activation
17   of game play I'm saying is a new step that occurs
18   after the testing.
19       Q.     But you agree prior art Tic-Tac-Fruit
20   games would display a constructed game field of the
21   game to be played to the player after the player
22   initiates activation of game play, correct?
23       A.     Correct.  But the game -- to be clear,
24   the game that's being displayed in this claim is not
25   a game that you can play.  It's a game that displays
```



Page 129

1  read that back.  I don't understand the question.
2              THE COURT REPORTER:  I was just going to
3  ask to repeat it because I think I didn't get the
4  beginning of it.
5              THE WITNESS:  And I'm going to ask, just
6  before you repeat it, so are you sure that's G
7  you're referring to?  You said G like "goat."
8              MR. HSU-HOFFMAN:  We're going off the
9  rails here.
10 BY MR. HSU-HOFFMAN:
11     Q.    Okay.  Subparagraph paragraph G, do you
12 see the reference in there in the second to last
13 sentence "specially configured electronic game
14 processor"?
15     A.    Got it.  I'm with you now.  Thank you.
16     Q.    And we're in agreement that the Court has
17 construed "game processor" to be "a CPU or
18 microprocessor that executes program instructions to
19 generate a game," correct?
20     A.    Yes.
21     Q.    So your view is that Mr. Pace invented a
22 specially configured CPU or microprocessor that
23 executes program instructions to generate a game?
24     A.    No.  That sentence might infer that, but,
25 no.  What I'm saying is that the instructions were



Page 130

1  to what configures it, so the program is what
2  configures it.  But, no, I'm not saying, what I
3  think is your question, whether Mr. Pace like went
4  in with screwdrivers or whatever you would do to
5  specially have a game processor, and that's not what
6  I mean.  I mean like the claim construction of the
7  processor, that it takes his instructions and runs
8  them.  That's what's configuring it.  Maybe that's
9  not the best word, I don't know, but that's what's
10 configuring it.
11     Q.     You use the term "specially configured"
12 and I want to make sure I understand exactly what
13 you mean by that.  What do you mean by "specially
14 configured"?
15     A.     I think it's a good point.  So the
16 "specially configured" just means that it's running
17 Pace's program.  So I have "specially" in there to
18 sort of highlight that it's Pace's game.  It's
19 Tic-Tac-Fruit.  But any processor that's running any
20 program is specially configured to do whatever it
21 does.
22     Q.     Did Mr. Pace's program change the way in
23 which the processor operates?
24     A.     Well, kind of yes and no.  I mean the
25 operator -- kind of one answer is that the -- it



Page 131

1  never changes the processor; it just takes in
2  program instructions and does them, so it never.
3  But the other way to look at it is that it's
4  specially configured or configured in the sense that
5  it doesn't pop up a word processor on your terminal.
6  It pops up Tic-Tac-Fruit.  So it's configured to pop
7  up Tic-Tac-Fruit.  That's what I meant by that.
8      Q.    Were there any existing problems with
9  CPUs or microprocessors that Mr. Pace's invention
10 addressed?
11     A.    No.  By "invention," you mean the '223
12 patent?  No.
13           (Court reporter clarification.)
14           THE WITNESS:  By "invention, you mean
15 the '223 patent.  The answer is no.  And I just add
16 that little bit because he did invent perhaps some
17 things in the past -- I may have read that -- but
18 long before the '223 patent.
19 BY MR. HSU-HOFFMAN:
20     Q.    Were there any other problems that needed
21 to be overcome for a CPU or a microprocessor to
22 execute the program instructions that Mr. Pace
23 created for Tic-Tac-Fruit?
24     A.    No.
25     Q.    And by the Tic-Tac-Fruit, I'm referring



```
 1   why somebody else couldn't do it.
 2       Q.     They would have been able to do it in the
 3   early 2006 time frame?
 4       A.     Yeah.  Well, I was thinking of that time
 5   frame.
 6       Q.     You could go back even further, right?
 7       A.     Yeah.  I didn't go back further, but I'm
 8   certainly not saying that people just learned how to
 9   program games in 2006.
10       Q.     So the idea of an automatic preview
11   feature would be, in your opinion, the only barrier
12   to a POSITA creating and implementing the alleged
13   invention in the early 2006 time frame?
14              MR. NORTH:  Could the court reporter
15   read that back.
16              (The court reporter read back the
17   question as follows:  "So the idea of an automatic
18   preview feature would be, in your opinion, the only
19   barrier to a POSITA creating and implementing the
20   alleged invention in the early 2006 time frame?")
21              THE WITNESS:  So what I'm saying is that
22   if they had all of the ideas of the '223 patent,
23   then they could implement those ideas, yes.
24   BY MR. HSU-HOFFMAN:
25       Q.     Let's talk about Mr. Pace's idea.  So
```



```
 1      Q.      223.
 2      A.      Sorry.  Wrong place.
 3      Q.      And at the very last sentence, you make a
 4   statement concerning the technical solution that is
 5   recited in the challenged claims, correct?
 6      A.      That's the sentence that says, "Each of
 7   the claims at issue do far more"?  That sentence
 8   you're referring to?
 9      Q.      That's correct.
10      A.      And, sorry, I think I was reading at the
11   same time.  So can you ask me the question again?
12      Q.      Sure.  In that last statement,
13   paragraph 223, you opine the claims recite the
14   specific technological solution; is that correct?
15      A.      Yes.
16              MR. NORTH:  And under the rules of
17   completeness, I'm sorry, counsel, at trial I'd have
18   them read the complete sentence into the record.
19   Thank you.
20   BY MR. HSU-HOFFMAN:
21      Q.      And that solution, Dr. Harrigan, is for
22   accomplishing the goals of elevating the level of
23   skill and reducing the level of chance in electronic
24   gaming, correct?
25      A.      That's right.
```



Page 150

```
 1      Q.     Other than those two goals, are there any
 2   other specific technological solutions that are
 3   recited in the challenged claims?
 4             MR. NORTH:  Objection to the form.
 5             THE WITNESS:  Are there any other -- I
 6   don't think so.
 7   BY MR. HSU-HOFFMAN:
 8      Q.     Let me have you turn to paragraph 110,
 9   page 53 of your report.  And I'm sorry to just
10   backtrack, but I just want to make sure it's clear
11   for the record the response to the last question I
12   asked.
13             So are there any other technical
14   solutions that are recited in the claims apart from
15   the two goals that we referenced previously?
16      A.     I don't think so.
17      Q.     Are there any others that you intend to
18   offer an opinion on at trial in this case?
19      A.     None that I know of, no.
20      Q.     Just so I've got it clear, the
21   technological solutions that you allege are captured
22   by the challenged claims are elevating the level of
23   skill and reducing the level of chance in electronic
24   gaming?
25      A.     Yes.
```

