# EXHIBIT D

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


-----------------------------:
                             :
SAVVY DOG SYSTEMS, LLC, and  :
POM OF PENNSYLVANIA, LLC,     :
                             :
        Plaintiffs,          :
                             :   CIVIL ACTION NO.
   vs.                       :   3:19-cv-01470-JPW
                             :
PENNSYLVANIA COIN, LLC,       :
and PA COIN HOLDINGS,         :
LLC,                         :
                             :
        Defendants.          :
-----------------------------



VIDEOTAPED DEPOSITION OF STACY FRIEDMAN
Taken in behalf of the Plaintiffs
January 7, 2022
***TAKEN VIA VIDEOCONFERENCE***




MAGNA LEGAL SERVICES
866-624-6221



```
 1   Q.  In your view, could new programming on an existent
 2       system constitute a technological improvement?
 3           MS. DUDASH:  Object to form.
 4   A.  In -- in certain cases it could.
 5   BY MR. NORTH:
 6   Q.  And so you are not saying that the '223 necessarily
 7       had to include a hardware improvement in order to
 8       have patentable subject matter?
 9           MS. DUDASH:  Object to form.
10   A.  No, I'm not saying that.
11   BY MR. NORTH:
12   Q.  Now, in his report, and let's open it up, it's
13       the -- Exhibit Number 4 is Dr. Harrigan's report.
14   A.  Okay, I have that.
15   Q.  And if you would turn to paragraph 228, which is
16       at -- begins, at least, on page 102.
17   A.  I'm there.
18   Q.  And the second -- in the second sentence,
19       Dr. Harrigan says, "An inventive concept can be
20       found in the nonconventional and nongeneric
21       arrangement of known, conventional pieces."
22           Did I read that correctly?
23   A.  You did.
24   Q.  Do you agree with that sentence?
25   A.  Let me refer to my instructions.
```



Page 33

1    BY MR. NORTH:

2    My opinion in this matter is that the particular

3    software or the steps set out in this claim, or these

4    challenged claims, don't effect a technological

5    improvement.

6    Q.   Could an algorithm ever constitute a technological

7         improvement in a controller?

8              MS. DUDASH:   Object to form.

9    A.   Ever?   I mean, I think the answer is yes, but it's

10        hard to speculate, because I would need to

11        understand the -- the specific facts.

12   BY MR. NORTH:

13   Q.   Well, let me give you a little bit more flesh on the

14        question, then.

15             If the Court found that the '223 patent

16        disclosed a novel algorithm, including the two

17        limitations we just read, would you agree that that

18        could be patent eligible under the Alice standard?

19             MS. DUDASH:   Object to form.

20   A.   So as you just phrased that question, I don't

21        understand that to be a sufficient basis for -- for

22        finding eligibility, because an algorithm is -- I

23        mean, it's a phrase in computer science.   An

24        algorithm is just a new way -- or it's a

25        well-defined method for accomplishing a task.   Every



```
 1        algorithm that's different from another one is a new

 2        method, but not all methods are patent eligible.

 3   BY MR. NORTH:

 4   Q.   Could a new algorithm be a technological

 5        improvement?

 6             MS. DUDASH:  Object to form.

 7   A.   My understanding of the test is that if a new

 8        algorithm leads to -- well, I mean, I think I was

 9        going to say if an algorithm leads to a

10        technological improvement, then it's a technological

11        improvement, which sounds circular, so I think the

12        answer to the question is yes.

13             MR. NORTH:  And if the court reporter could

14        read back my question just to make sure that I

15        understand what the yes was.  Thank you.

16             (The reporter read back as requested.)

17   BY MR. NORTH:

18   Q.   And potentially your answer is yes; is that correct?

19             MS. DUDASH:  Object to form.

20   A.   Right.  So it depends on what the algorithm is or

21        what it accomplishes.

22   BY MR. NORTH:

23   Q.   And I'm not asking you to agree that there is a

24        novel algorithm here.  I'm just asking whether, in

25        theory, an algorithm on a known processor could be a
```



1          technological improvement, and I believe the answer

2          is "potentially yes"?

3               MS. DUDASH:  Object to form.

4     A.   That's my current understanding of -- of this

5          analysis.

6     BY MR. NORTH:

7     Q.   The -- let's talk about another term.  Towards the

8          end of your report under -- in connection with

9          secondary indicia relating to obviousness, you talk

10         about "near simultaneous invention."  Do you recall

11         that?

12              MS. DUDASH:  Object to form.

13    A.   I see that in paragraph 273.

14    BY MR. NORTH:

15    Q.   And let me move -- and when you refer to "near

16         simultaneous invention," what did you mean by that?

17              MS. DUDASH:  Object to form.

18    A.   Well, I note at the end of paragraph 273 that in

19         this case the evidence shows that four different

20         parties had conceived or worked on the purported

21         invention within several months of one another.

22    BY MR. NORTH:

23    Q.   So to be near simultaneous, how many months need it

24         be?

25              MS. DUDASH:  Object to form.



Page 64

1       correct?

2            MS. DUDASH:  Object to form.

3   A.   The -- the Ohio, I think, Liquor Control hearing I

4        believe is what you're referring to.

5   BY MR. NORTH:

6   Q.   Yes.

7   A.   Yes, that's correct.

8   Q.   All right.  And in connection with the many patents

9        that have your name on them, have you ever cited to

10       a transcript of a regulatory hearing as being

11       pertinent prior art?

12           MS. DUDASH:  Object to form.

13  A.   I don't know.

14  BY MR. NORTH:

15  Q.   Have you ever in any of your patents cited to prior

16       case law as being pertinent prior art?

17           MS. DUDASH:  Object to form.

18  A.   I don't recall.

19  BY MR. NORTH:

20  Q.   Now, let's shift to another term, including the --

21       the automatically displaying an actual game to be

22       played portion of the preview limitation.  And

23       focusing on that, what do you understand the word

24       "automatic" or "automatically" to mean in the

25       context of that limitation?



Page 65

 1          MS. DUDASH:   Object to form.

 2    A.   Well, I recall addressing this in my reply report.

 3         Let me refer to that.

 4    BY MR. NORTH:

 5    Q.   And we haven't noted for the record, but that reply

 6         report is Exhibit Number 5, premarked Exhibit 5.

 7    A.   Let me just refresh my recollection of this section.

 8         I'm starting on page 25 of my reply report at

 9         paragraph 38.

10         Right.  So in my reply, I note that the Court

11         didn't construe the term that you're asking me

12         about, and so, as such, my opinion is based on that

13         term's plain and ordinary meaning as it would have

14         been understood by a person of ordinary skill, and

15         then go on to note that the patent discloses

16         multiple embodiments of a preview feature, only some

17         of which involve pressing a "Next Puzzle" button.

18         And without reading the entirety of this

19         section, I -- I say that, in paragraph 40, "A POSITA

20         would have understood that if the player can only

21         trigger the preview display of the actual game to be

22         played by pressing a button, the player can choose

23         not to press that button and the preview will not be

24         displayed.  Such a game would not meet the plain and

25         ordinary meaning of 'automatically displaying'



Page 66

```
 1        because the display of the actual game to be played
 2        is not automatic, but rather dependent on whether or
 3        not the player chooses to push the preview button."
 4    Q.  Let me ask a little bit about that, and thanks for
 5        pointing out this paragraph 44 for some of your
 6        discussion on this point.
 7             Is it your view that if a player comes to the
 8        screen, that to be -- to automatically display, the
 9        player can't press any button whatsoever?
10             MS. DUDASH:  Object to form.
11    A.  I'm going to need more information about that -- the
12        scenario that you're envisioning.
13    BY MR. NORTH:
14    Q.  Let's say you're at a road stop in Pennsylvania and
15        somebody walks in to the road stop and sees a game
16        with Tic-Tac-Fruit configured according to the
17        Tic-Tac-Fruit and the player wants to play.  Is it
18        your opinion that the -- the game to be played needs
19        to pop up without any intervention whatsoever of the
20        person who wants to play the game?
21             MS. DUDASH:  Object to form.
22    A.  In order for me to answer that question, I need to
23        understand which part of the gameplay cycle you're
24        referring to.
25    BY MR. NORTH:
```



Page 200

1    individual reference as anticipatory for this

2    matter.

3 BY MR. NORTH:

4 Q.  Well, okay, the -- let's turn to Exhibit Number 1

5    and to Claim 44, which is Column 16.  And it says

6    one of the limitations is "automatically displaying

7    an actual game to be played on the touchscreen game

8    display to a player prior to initiating activation

9    of gameplay."

10       Was that limitation as a whole, in your view,

11   conventional, well known, and routine in June of

12   2006?

13       MS. DUDASH:  Object to form.

14 A.  I think as a whole, the answer is probably no.

15       MR. NORTH:  All right.  Let's -- this is a good

16   time, we've been going about 50 minutes or so, let's

17   take another break.  Thank you.  And let's do

18   another 15 minutes, which would get us to what's

19   6:50 Eastern time which is 3:50 Pacific time.

20       THE VIDEOGRAPHER:  Okay.

21       MR. NORTH:  We can go off the record.  Thank

22   you.

23       THE VIDEOGRAPHER:  Going off the record at

24   3:36 P.M.

25       (A recess was taken from 3:36 to 3:50.)

