# EXHIBIT I

# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SAVVY DOG SYSTEMS, LLC, a
Wyoming limited liability company, and
POM OF PENNSYLVANIA, LLC a
Wyoming limited liability company,

                Plaintiff,

     v.

PENNSYLVANIA COIN, LLC, a
Pennsylvania limited liability company,
and PA COIN HOLDINGS, LLC, a
Pennsylvania limited liability company,

                Defendants.

Civil Action No. 3:19-cv-01470-JPW

Honorable Jennifer P. Wilson

# EXPERT REPORT OF STACY FRIEDMAN

# ON THE INVALIDITY OF U.S. PATENT 7,736,223

# <u>CONTAINS INFORMATION DESIGNATED AS "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" AND "PACE-O-MATIC – OUTSIDE ATTORNEYS' EYES ONLY"</u>

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ..................................................................................6

II.  QUALIFICATIONS ...............................................................................7

III. MATERIALS REVIEWED ..................................................................10

IV.  LEVEL OF ORDINARY SKILL IN THE ART ....................................12

V.   LEGAL PRINCIPLES .........................................................................13

    A.   Invalidity ....................................................................................14

    B.   Anticipation ................................................................................15

    C.   Obviousness ...............................................................................16

    D.   Secondary Considerations ..........................................................22

    E.   Secondary Consideration of Obviousness - Independent
        Invention ....................................................................................24

    F.   Written Description and Indefiniteness.......................................24

    G.   Ineligibility ................................................................................25

VI.  THE '223 PATENT ..............................................................................27

    A.   Overview of the '223 Patent.......................................................27

        1.   The '223 Patent Specification................................................27

            a.   '223 Patent Claims..........................................................34

        2.   Patent Prosecution History of the '223 Patent.........................36

            a.   Priority Date.....................................................................41

    B.   Claim Construction.....................................................................43

VII. GENERAL STATE OF THE PRIOR ART RELATING TO THE
     '223 PATENT.....................................................................................45

# TABLE OF CONTENTS
## (Continued)

Page

A.  Regulatory Landscape ........................................................................45

B.  Game Features and Game Design .....................................................47

VIII.  GAME AND SOURCE CODE INSPECTION....................................51

A.  Source Code for Version TTF524.......................................................51

B.  Machine Inspection ...........................................................................55

1.  Tic-Tac-Fruit Version TTF527GPX .........................................55

2.  Modern Games .........................................................................65

a.  Nudge Games................................................................66

b.  Non-Rapid Games .........................................................68

c.  Rapid Games.................................................................69

IX.  THE CHALLENGED CLAIMS OF THE '223 PATENT ARE
PATENT-INELIGIBLE ......................................................................73

A.  The Challenged Claims of the '223 Patent are Drawn to An
Abstract Idea......................................................................................73

B.  The Challenged Claims of the '223 Patent Require Nothing
Other Than Well-Understood, Routine, and Conventional
Components and Activities .................................................................75

X.  THE CHALLENGED CLAIMS OF THE '223 PATENT ARE
INVALID FOR LACK OF WRITTEN DESCRIPTION.............................93

A.  The Testing Limitation........................................................................93

B.  Claims 11, 22, and 33 (Predetermined Probability of
Occurrence) ........................................................................................99

C.  Claims 45-46 (Additional Game Field)..............................................100

XI.  ANTICIPATION AND OBVIOUSNESS OF THE '223 PATENT...........101

# TABLE OF CONTENTS
## (Continued)

Page

A. The Applied Prior Art ........................................................................101

    1. Applicant Admitted Prior Art: Tic-Tac-Fruit .........................101

    2. Patent References ...................................................................103

    3. Other Publications ..................................................................105

    4. Other Publicly-Available Products .........................................107

B. The Challenged Claims of the '223 Patent are Rendered
Obvious in Light of the Applied Prior Art .........................................108

    1. Tic-Tac-Fruit ..........................................................................109

        a. At Least One Winning Combination for Each
Play of the Game .........................................................110

        b. Testing ........................................................................111

        c. Automatically Displaying .............................................113

    2. Walker et al. ...........................................................................126

    3. Michaelson et al. ....................................................................129

    4. Vancura, Bregenzer, and Chambers .......................................132

    5. NudgeMaster ..........................................................................133

C. SECONDARY CONSIDERATIONS RELATING TO THE
'223 PATENT .....................................................................................136

    1. Secondary Consideration of Obviousness – Near
Simultaneous Invention ..........................................................140

        a. Ohio Liquor Control Commission Testimony:
October 2005 ..............................................................140

        b. Michael Pace: January through June 2006 ...................141

# TABLE OF CONTENTS
## (Continued)

**Page**

  c. Grant Kowell: November 2005 through June 2006 ................................................................142

  d. NudgeMaster: June – October 2006 ............................144

XII. IMPROPER INVENTORSHIP ..................................................145

## I.    INTRODUCTION

1.     I have been retained by counsel for Defendants Pennsylvania Coin, LLC and PA Coin Holdings, LLC (collectively, "PA Coin" or Defendants) in the above-titled matter between PA Coin and Plaintiffs Savvy Dog Systems, LLC and POM of Pennsylvania, LLC (collectively "POM" or Plaintiffs) to consider certain issues relating to U.S. Patent No. 7,736,223 (the "'223 patent" or the "challenged patent" or "patent-in-suit").

2.     Specifically, I have been asked to render opinions regarding the validity of claims 1, 3, 5-7, 11, 13, 15, 18-20, 22, 25, 27, 29-31, 33, 37-42, 44-49, and 51-56 of the '223 patent (the "challenged claims").  I understand that Savvy Dog Systems, LLC disclaimed claims 2, 4, 8-10, 12, 14, 16, 17, 21, 23, 24, 26, 28, 32, 34-36, 43, 50, and 57-75.

3.     I make the following statements based on my own personal knowledge, my experience, and my analysis of the patent-in-suit, as well as the materials I reviewed as set forth below and in Appendix B to this report.  I am being compensated at my usual and customary rate of $600/hour.  In the past four years, I have testified by deposition twelve times and two times at trial.  My compensation is in no way contingent upon my performance, the outcome of this litigation, or any issues involved in or related to this litigation.  I am over 21 years

of age and am legally competent to testify.  If called as a witness, I could and would testify to the following.

## II.    QUALIFICATIONS

4.    I am a professional game designer and casino gaming mathematician intimately familiar with the issues and technology relating to electronic gaming systems, including land-based or Internet casino gaming systems (including, *e.g.*, Class II and Class III games under IGRA, lottery games and video lottery terminals, central determinant gaming systems, sweepstakes games, historical horse race games); mobile, console or PC-based non-wagering game systems; and other electronic or video arcade games.  I have personally designed, implemented, tested, and analyzed many games, including dozens of single-player and multi-player games, both wagering and non-wagering.

5.    I am the President of Olympian Gaming, LLC in Lake Oswego, Oregon, a position that I have held since 2001.  In that capacity, I have consulted in the gaming industry regarding, among other things, game design and development, slot machine and table game mathematics, game software and hardware development, and gaming patent infringement and validity.  I have served as a subject matter expert in many matters related to gaming machines or gaming technology, including over twenty cases involving gaming-related intellectual property. Many of these cases have involved distributed software systems running

on networked computers, and in several of these cases I have performed source code reviews.

6.    I have over twenty years of professional experience in developing regulated casino games, gaming mathematics, and professional software design. My current CV is provided as Appendix A to this report.

7.    In 1996, I earned my Bachelor of Arts degree in Computer Science, *magna cum laude,* from Harvard College, Harvard University, Cambridge, Massachusetts. During college, I became familiar with a wider variety of game genres, including RTS or "real time strategy" computer games (specifically Warcraft: Orcs vs. Humans), CCG or "collectible card games" (specifically Magic: The Gathering), and expanded my knowledge of wagering card games to blackjack, baccarat, and casino poker. After college, I became interested in the mathematics of casino games. I taught myself probability theory—the origins of which are based in wagering games—and began a self-directed study of gaming mathematics, including "advantage play" techniques such as blackjack card counting.

8.    My professional experience in the gaming industry started in 1998 when I joined Silicon Gaming in Palo Alto, California as a game model engineer before it was acquired by International Game Technology ("IGT"). Silicon Gaming designed and developed interactive video slot machines. As a game

model engineer (i.e., mathematician), I worked on the designs of video slot games, video keno games, and video poker games.  I helped produce dozens of innovative new games and engaged regulatory agencies to achieve regulatory approval for the mathematics used in the games.  In addition, I designed and developed game flow and storyboards for slot machines, and I developed and shipped mathematical models for over 50 games.  I also served as a liaison to state regulatory agencies and corrected prior errors in gaming lab submissions, which led to savings of over $50,000 in regulatory fees.  I was also responsible for managing the statistical verification and mathematical gameplay testing for Silicon Gaming's products.

9.    In 2001, I started an independent casino game design and analysis consultancy, Olympian Gaming LLC.  Based on my experience designing, developing, and placing dozens of games in Las Vegas, Reno, and Atlantic City casinos, I advise Internet casino software vendors, new game inventors, and casino game manufacturers in the fields of wagering, gameplay design, mathematical analysis, and statistical verification.

10.    I have also provided expert testimony in matters relating to gaming methods applicable to several types of games, similar to the teaching in the '223 patent that "[t]he preview display could also be implemented in other forms of electronic or electromechanical games."  '223 patent at 11:43-44.  For example, in *Epic Tech, LLC v. Fusion Skill, Inc. et al.,* No. 4:19-cv-02400 (S.D. Tex.), the

challenged patent, U.S. Patent No. 9,589,423, had claims directed to sweepstakes games, but the patent specification expressly taught that the methods "may be applicable to skill based games, which may or may not be selected from a finite pool of games." '423 patent at 8:31-32.  Similarly, challenged patent, U.S. Patent No. 8,545,315, taught "the present games and methods can be used in connection with Class III random number generated ("RNG") games, Class III electronic pull tab games, electronic bingo games, lottery-based games, and sweepstakes games. Embodiments of the invention are agnostic to the methods in which the results are delivered." '315 patent at 2:64-3:2.

## III.    MATERIALS REVIEWED

11.    In forming the opinions I set forth in this report, I relied upon the materials linked or cited in this document as well as the materials set forth in Appendix B.  Unless otherwise stated, I have personally reviewed all of the materials linked or cited in this document and therefore have personal knowledge of these materials.

12.    In forming my opinions, I have drawn on my many years of education and experience researching, publishing, and working in the fields of gaming, electronic media, online communities, and computer science, as well as my understanding of the knowledge, creativity, and experience of a person having ordinary skill in the art of gaming, to which the challenged patent relates.  I have

also reviewed the challenged patent and its file history.  I have read other documents including patents, industry standards, and manuals related to the prior art systems discussed in this report.  I have also reviewed the Court's claim construction order and followed that in forming my opinions expressed in this report.  I have also read the transcript of the August 7, 2020 deposition of Dwight Crevelt (hereinafter "Crevelt Tr."), the transcript of the August 30, 2021 deposition of Donald Fiechter (hereinafter "Fiechter Tr."), the transcript of the July 28, 2021 deposition of Kurt Gearhiser, the transcript of the September 2, 2021 deposition of Grant Kowell (hereinafter "Kowell 9-2 Tr."), the transcript of the August 4, 2021 deposition of Michael Pace (hereinafter "Pace Tr."), the transcript of the August 30, 2021 deposition of Louis Miele, and the transcripts of the August 25, 2021 and September 17, 2021 30(b)(6) depositions of Greg Cline (hereinafter "Cline 8-25 Tr." and "Cline 9-17 Tr." respectively).  A complete list of documents and other materials reviewed is attached as Appendix B.  I incorporate here by reference each of these items, as well as all other sources cited in this report.

13.     For any future testimony I may give in this matter, I may use some or all of the documents and information cited to, referred to, or identified in this report, as well as any additional materials that are entered into evidence in this matter.

14.    My work on this matter is ongoing.  As I examine additional materials and perform further analyses on current information, I reserve the right to revise and supplement my opinions and this report.

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

15.    It is my understanding that the challenged patent is to be interpreted based on how it would be read by a person of "ordinary skill in the art" ("POSITA") at the time of the alleged date of invention, which Plaintiffs have alleged is May 2, 2006, and in my opinion, is no earlier than the '223 patent's filing date of June 30, 2006.  It is my understanding that factors such as the education level of those working in the field, the sophistication of the technology, the types of problems encountered in the art, the prior art solutions to those problems, and the speed at which innovations are made may help establish the level of skill in the art.

16.    The technology relevant to the challenged patent generally relates to the area of gaming machines.  I understand that POM contends that it believes the date of conception for each of the purported inventions claimed in the '223 patent is between January 1, 2006, and March 31, 2006, and that it purports to have evidence of an invention date of May 2, 2006.  For reasons discussed below, I disagree that there is sufficient evidence that Mr. Pace himself conceived of the

purported inventions claimed in the '223 patent prior to June 30, 2006, the date of its filing.

17.    However, in my opinion, the level of ordinary skill in the art of the challenged patent at the time of the filing date would not have changed in any material way between January 1, 2006, and June 30, 2006.  It is my opinion that a POSITA at the time of the alleged invention claimed in the '223 patent would have at least a bachelor's degree in computer science, engineering, or equivalent education and at least two years of experience with designing and developing electronic gaming devices.

18.    Based on my education and experience as described in Appendix A, I consider myself to have at least such ordinary skill in the art with respect to the subject matter of the challenged patent at the time of its filing date, and I can speak to the knowledge and abilities of a POSITA at that time.

19.    In my analysis below, where I discuss what a POSITA would have known, unless I expressly state otherwise, it should be understood to reflect what a POSITA would have known at the filing date of the '223 patent.

## V.    LEGAL PRINCIPLES

20.    I am not an expert on patent law.  I have been instructed on certain aspects of patent law by counsel.  I have been informed that a patent may be

proven invalid by clear and convincing evidence, which is more than a preponderance of the evidence.

21.    I understand from counsel that the following principles, among others, should be considered in forming my opinions:

### A.    Invalidity

22.    It is my understanding that, under the patent law, a claim of an issued patent is invalid if it does not cover eligible subject matter, is not novel, and/or is obvious in light of what came before, and/or if the patent fails to meet the formal requirements of written description, enablement, and definiteness.  I understand that invalidity of a patent claim must be proven by clear and convincing evidence.

23.    I further understand that what came before for the purposes of determining whether the claimed invention is novel and nonobvious is referred to as "prior art."  The claims of a patent are invalid if they are anticipated by the prior art (i.e., not novel) and/or are obvious in light of the prior art.

24.    It is also my understanding that a statement by an applicant in the specification or made during prosecution identifying the work of another as "prior art" is an admission which can be relied upon for both anticipation and obviousness determinations, regardless of whether the applicant admitted prior art would otherwise qualify as prior art.

25.     I have been informed that, for purposes of determining whether a reference is prior art to a claimed invention, the claim at issue is considered to be effectively filed on (i) the actual filing date of the patent or application, or (ii) if the patent or application includes a claim of priority to or benefit of an earlier filing date, then as of the filing date of the earliest such application that properly describes the claimed invention.

## B.    Anticipation

26.     I understand that "anticipation" is a question of fact and that for a reference to anticipate a claimed invention it must disclose (either explicitly or inherently) each and every element set forth in the claim for that invention. I further understand that the requirement of strict identity between the claim and the reference is not met if a single element or limitation required by the claim is missing from the applied reference.

27.     It is my further understanding that a prior art reference is anticipatory only if it discloses each and every limitation of the claim (as properly construed) at issue. In other words, every limitation of a claim must be disclosed in a single prior art reference for the reference to anticipate the claim.

28.     28.     I understand that the validity of the patent at issue in this case will be evaluated under US statutes that existed prior to the enactment of America Invents Act (the "pre-AIA statute").   In particular, it is my understanding that

(among other reasons) a patent claim is invalid if each and every element of the claimed invention, was either expressly or inherently:

- Known or used by others in the US, or patented or described in a printed publication anywhere in the world, before the date of the invention; or

- Patented or described in a printed publication anywhere in the world, more than one year before the date of the application for the patent;

- in public use in the United States more than one year before the date of the application for the patent;

- on sale in the United States more than one year before the date of the application for the patent; or

- described in a United States patent that has issued or a United States patent application that was published and that names another inventor and was filed before the date of the invention.

29.    I also understand a patent is invalid if it can be shown that the named inventor did not himself invent the subject matter of claimed invention.

30.    I further understand that an element is disclosed inherently in a prior art reference if it is necessarily present in the prior art reference, or is the natural result flowing from the disclosure of the prior art reference.

**C.    Obviousness**

31.    I understand that a claimed invention is unpatentable if the differences between the invention and the prior art are such that the subject matter of the claim as a whole would have been obvious at the time the invention was made to a

person having ordinary skill in the art to which the subject matter pertains (i.e., a POSITA).

32.    It is my understanding that obviousness is a question of law based on underlying factual issues including (1) the scope and content of the prior art, (2) the differences between the prior art and the challenged claims, (3) the level of ordinary skill in the pertinent art, and (4) the existence of secondary considerations such as commercial success, long-felt but unresolved needs, failure of others, etc.

33.    I should first determine the scope and content of the prior art.

34.    It is also my understanding that I should then consider the differences, if any, between the prior art and each challenged claim; and that in doing so, although it is proper to consider differences between the claimed invention and the prior art, I should not focus on only the differences, because the test is whether the claimed invention as a whole would be obvious over all of the prior art.  It is also my understanding that each claim of the patent must be considered separately and in its entirety.

35.    It is my understanding that the next step is to determine the level of ordinary skill in the art to which the claimed invention pertains at the time the invention was made; and that factors to be considered in determining the level of ordinary skill in the pertinent art include:

- the educational level of the inventor and of others working in the field;

- the types of problems encountered in the art at the time of the invention;

- the activities of others;

- prior art solutions to the problems encountered by the inventor; and

- the sophistication of the technology.

36.    It is my understanding that a person of ordinary skill in the art is presumed to have knowledge of the relevant prior art at the time of the claimed invention; and that if I find that the available prior art discloses, teaches or suggests each of the elements of the challenged claims, I should determine whether a POSITA would have a reason to combine or coordinate these elements in the same manner as the challenged claim.  I further understand that precise teachings directed to specific aspects of the challenged claim is not required for an obviousness determination.  Inferences and considerations given to the creativity of a POSITA can be taken into account.

37.    I understand that an obviousness evaluation can be based on a combination of multiple prior art references.

38.    I understand that for a single reference or a combination of references to render obvious the claimed invention, a POSITA must have been able to arrive at the claims by altering or combining the applied reference or references.

39.    It is my understanding that a patent claim composed of several elements is not proved obvious merely by demonstrating that each of its elements

was independently known in the art, but obviousness would arise where it is determined that the claimed invention simply implemented a predictable variation of prior art elements or amounts to nothing more than the predictable use of prior art elements according to their established functions.

40.    I understand that the prior art references themselves may provide a suggestion, motivation, or reason to combine, but other times the nexus linking two or more prior art references is simple common sense.

41.    I further understand that obviousness analysis recognizes that market demand, rather than scientific literature, often drives innovation, and that a motivation or reason to combine references may be supplied by the direction of the marketplace.

42.    It is also my understanding that a person of ordinary skill in the art is also a person of ordinary creativity; and that, in many cases, a person of ordinary skill in the art will be able to fit the teachings of multiple patents or other prior art together like the pieces of a puzzle.  For example, I understand that if a technique has been used to improve one device or product, and a POSITA would recognize that it would improve similar devices or products in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

43.    I also understand that practical and common-sense considerations should guide a proper obviousness analysis, because familiar items may have

obvious uses beyond their primary purposes. I further understand that a POSITA looking to overcome a problem will often be able to fit together the teaching of multiple publications but that precise teachings directed to specific aspects of the challenged claim is not required for an obviousness determination. I understand that obviousness analysis therefore takes into account the inferences and creative steps that a POSITA would employ under the circumstances.

44.    I understand that a particular combination may be proven obvious merely by showing that it was obvious to try the combination. For example, when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a POSITA has good reason to pursue the known options within his or her technical grasp because the result is likely the product not of innovation but of ordinary skill and common sense.

45.    I also understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results. When a work is available in one field of endeavor, design incentives and other market forces can prompt variation of it, either in the same field or a different one. If a POSITA can implement a predictable variation, the patent claims are likely obvious.

46.    It is further my understanding that where there is a design need or market pressure to solve a problem and there are a finite number of identified,

predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp, and that if this leads to the anticipated success, it is likely the product, not of innovation, but of ordinary skill and common sense.  In that instance the fact that a combination was obvious to try might show that it is obvious.

47.     I understand that a claim can be obvious in light of a single reference, without the need to combine references, if the elements of the claim that are not found explicitly or inherently in the reference can be supplied by the common sense of one of skill in the art.

48.     It is my understanding that, in determining whether the challenged claims would have been obvious to a person of ordinary skill in the art and, therefore, are invalid, I should not apply any rigid test or formula, but rather should use my common sense to determine whether the claimed invention is truly innovative or is merely a combination of known elements to achieve predictable results.

49.     It is my understanding that, in my analysis, I should be aware of the distortion possibly caused by hindsight bias, that is, of relying upon a hindsight combination of the prior art; and should cast my mind back to the time of the inventions and consider whether the invention as a whole would have been obvious to a person of ordinary skill in the art, taking into consideration  any interrelated

teachings of the prior art, the effects of demands known to the marketplace, and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine any known elements in the fashion claimed by the patent at issue.

50.     In sum, my understanding is that prior art teachings are properly combined where a POSITA having the understanding and knowledge reflected in the prior art and motivated by the general problem facing the inventor, would have been led to make the combination of elements recited in the claims. Under this analysis, the prior art references themselves, or any need or problem known in the field of endeavor at the time of the invention, can provide a reason for combining the elements of multiple prior art references in the claimed manner.

### D.    Secondary Considerations

51.     It is my understanding that in forming my opinions only as to the obviousness of the challenged claims, I should consider the following objective evidence which may tend to show non-obviousness of the claims at issue:

- a long felt but unmet need in the prior art that was satisfied by the invention of the challenged patent;

- commercial success or lack of commercial success of products or processes covered by the challenged patent;

- unexpected results achieved by the alleged invention;

- praise of the invention by others skilled in the art;

- taking of licenses under the patent by others;

- deliberate copying of the alleged invention by others in the field;

- failure of others to find a solution to the long felt need; and

- expressions of disbelief or skepticism by those skilled in the art upon learning of the alleged inventions.

52.     It is my understanding that there must be a nexus or a connection between the evidence showing these factors and the inventions of the challenged claims, if this evidence is to be given weight in arriving at a conclusion on the obviousness issue; for example, if commercial success is due to market position, advertising, promotion, salesmanship, or the like, or is due to features of the products other than those described in the challenged claims, then any commercial success may have no relation to the issue of obviousness.

53.     It is my understanding that, in my determination of obviousness, I must consider whether Plaintiffs have demonstrated not only that such secondary considerations exist, but also whether Plaintiffs have proven that there is sufficient nexus between these considerations and the claimed invention – in other words whether the claimed inventions in the patent contributed to these secondary considerations rather than the considerations being due to other features of the allegedly accused products, or any other actions taken in producing and marketing the accused products.

54.     It is my understanding that Plaintiffs have the burden of proving any secondary consideration by a preponderance of the evidence, i.e., that Plaintiffs

must produce evidence which, considered in the light of all the facts, leads one to believe that what Plaintiffs claim is more likely true than not; but that I should keep in mind, that Defendants continue to bear the ultimate burden of proving invalidity by clear and convincing evidence.

### E.    Secondary Consideration of Obviousness - Independent Invention

55.    It is my understanding that, just as the failure of others to make the invention can be evidence of non-obviousness, independent making of the invention by persons other than the inventor prior to or at about the same time can be evidence that the claimed invention was the product only of ordinary skill in the art and would have been obvious to a POSITA.

56.    It is also my understanding that the simultaneous or near simultaneous invention by two or more other persons working independently may indicate of obviousness when considered in light of all of the circumstances.

### F.    Written Description and Indefiniteness

57.    It is my understanding that the patent law requires a patent applicant to provide an adequate written description of the invention, and to enable the invention.

58.    It is my understanding that a patent must have a so-called written description of the claimed invention(s), and that the test for sufficiency of a written description is whether the disclosure of the application relied upon reasonably

coveys to those skilled in the art at the time that the inventor had possession of the claimed subject matter as of the filing date. In other words, the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed.

59.    It is my understanding that the specification must provide written description support for each and every limitation of the claims; in other words, if some limitations of a claim are supported by the specification but one or more are not, then the claim lacks written description support. The full scope of the claim, read as a whole, must find written description support in the specification.

60.    It is my understanding that a patent claim is invalid for indefiniteness if the claim, read in light of the specification and prosecution history, fails to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### G.    Ineligibility

61.    It is my understanding that patent eligible subject matter is defined as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement therefore," subject to other limitations.

62.    I understand that certain fundamental principles are exceptions to the statutory grant of patent eligibility, such as laws of nature, natural phenomena, or abstract ideas.

63.     I understand that the term "abstract idea" stands for the principle that an idea itself is not patentable, and that the concern that drives this exclusionary principle is preemption.

64.     I also understand that there is a two-step framework for determining whether a patent claims patent-ineligible subject matter and that it is the Court that makes the determinations at each step. The first issue for the Court to determine is whether the claims at issue are directed to one of the patent-ineligible concepts: a law of nature, natural phenomena, or abstract idea. In determining whether the claims are directed to an abstract idea, the question is whether the character as a whole or the focus of the claims center on an abstract idea. I understand that, in this inquiry, the Court considers whether the claims focus on a specific means or method that improves the relevant technology or are directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery. As such, patents that do not claim a particular way of carrying out an invention, but instead merely claim a result or function are invalid.

65.     I understand that if it is determined by the Court that the patent is directed to a patent-ineligible concept, the second step in the analysis is for the Court to determine whether the limitations of each claim, either individually or as an ordered combination, transform the nature of the claim into a patent-eligible

application.  This analysis determines whether the patent claims an inventive concept beyond what was already well-understood, routine, and conventional.

66.    I understand that whether a claim element or combination of claim elements is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination.

## VI.    THE '223 PATENT

### A.    Overview of the '223 Patent

#### 1.    The '223 Patent Specification

67.    The challenged patent describes "[a]n electronic gaming method and system with a game preview display.  A field of game symbols is presented on the game display to the player as a preview for deciding whether or not to play the displayed game."  '223 patent at Abstract.

68.    The challenged patent teaches that "[t]he present invention is related … more particularly, to a method and system for providing a game preview display to players of an amusement or entertainment electronic game before playing the game."  '223 patent at 1:13-17.

69.    The "Background of the Invention" section then discusses "amusement and entertainment type electronic games" in the context of gambling games, gaming regulation, and a distinction under Ohio statute between a "skill-based amusement machine" and a gambling device.  '223 patent at 1:18-32.  The

specification then discusses the Indian Gaming Regulatory Act, which is a federal law defining three "classes" of gaming for tribal gaming operations. *Id.* at 1:33-60.

70.    The challenged patent teaches that "[i]n yet another aspect of the invention, a method, system, and program product for electronic gaming are provided that can be integrated with various types of electronic games.  A game field is constructed having a plurality of elements for a game display wherein each element is filled by a game symbol from a plurality of available game symbols. The field of game symbols is presented on the game display to the player as a preview for deciding whether to play the displayed game.  If the player decides to play the displayed game, an outcome is displayed on the game display."  '223 patent at 2:65-3:7.

71.    The challenged patent teaches that "[t]he preview display could also be implemented in other forms of electronic or electromechanical games.  For example, it could be used in the context of an electronic or electromechanical slot machine having a plurality of spinning reels (actual or simulated) and displaying one or more lines of symbols.  The displayed game could actually be the result which may or may not be a winning combination of symbols.  The player would play the displayed game, knowing its result, in order to preview the next game." '223 patent at 11:43-51; *see also* Fig. 8 and 11:61-12:20.

72.     In the patent specification, the "preview display" concept is "described in the context of the Tic-Tac Fruit electronic skill-based amusement game developed and licensed by Pace-O-Matic, Inc." '223 patent at 3:59-61.  The Tic-Tac-Fruit game is acknowledged prior art, but the '223 patent specification describes that prior art Tic-Tac-Fruit game in the section of the specification entitled "Detailed Description of the Invention" rather than "Background of the Invention."  '223 patent at 3:43-10:21. Specifically, several passages in the description of Tic-Tac-Fruit are paraphrased or copied nearly verbatim from prior art references listed on the face of the patent, including "Tic-Tac-Fruit: An Analysis" (POM000496-498) and "Report on the Review and Analysis of the Tic-Tac-Fruit Game" (POM000450-469).  For example, much of POM000496 and approximately half of POM000497 is paraphrased into the '223 patent specification at 3:61-4:64.  Also, much of POM000450-451 is paraphrased into the '223 patent specification at 5:49-6:40 and POM000454 is paraphrased into 6:41-55.

73.     Thus, a bulk of the written description section of the specification relates to the prior art, not to any invention.

74.     The patent specification describes that the preview display may be activated manually based on a player's selection, or may occur automatically without player interaction.  For example, in the context of the described Tic-Tac-

Fruit game, the specification teaches that "Referring to FIGS. 1A-1B, the player

can select the 'Next Puzzle' or similarly labeled buttons to preview the next

game." '223 patent at 10:66-11:1, emphasis added. FIG. 1A showing "Tic Tac

Fruit" and the Next Puzzle button is reproduced and annotated here:



FIG. 1A

75.    In contrast to the embodiment where the player selects the "Next

Puzzle" button, the patent specification also discusses "various additional

embodiments" wherein "the game preview screen can be constructed and displayed

without the need for a player to do anything other than to select 'Play.'" '223

patent at 11:14-20, emphasis added. The patent teaches that "FIG. 8 illustrates the

processing logic for other exemplary embodiments of the invention having a game

preview display." *Id.* at 11:61-62.  Specifically, after the player plays a game, "[i]f

the result of the play of the game is a winning combination, the game software

determines the winnings and displays the winning outcome to the player, as

indicated in step 808.  The player can then select 'Preview' or 'Next Puzzle' to

have the next game displayed, or the next game already could be displayed

adjacent to the current game display.  This is indicated in step 810." *Id.* at 12:8-14,

emphasis added.  FIG. 8 is reproduced and steps 808 and 810 are annotated here:



**FIG. 8**

76.    The concept of a game preview display is described using wholly

conventional and generic computer equipment.  The specification states that "[t]he

present invention of an electronic game in its various embodiments has been

described as a combination of hardware and software components."  '223 patent at

12:21-23.  However, the specification does not disclose previously unknown

"hardware components" and instead discloses generic devices such as "game

terminal" (8:4, 8:43-44, 9:36), "touch screen" or "video screen" (5:1, 5:61, 6:37, 10:51), "game processor" or "embedded computer processor" (2:32, 4:41), or "button" (5:60).

77.    Further, the specification provides purely functional descriptions of the "game software," without describing details as to how the software should be written, in what language, for what hardware platform, etc.  For instance, "the game software program constructs a puzzle or task for the player to solve" (3:65-67); "[t]he electronic game software determines the denomination of play selected by the player in step 208" (8:14-16); "[t]he electronic game software remains in a wait state until a player decides to play the displayed game" (10:44-45); "[i]f the result of the play of the game is a winning combination, the game software determines the winnings and displays the winning outcome to the player" (12:8-11).  All of these functions are not only generic computer functionality but have long been well-known in the field of electronic games.

78.    In several cases, the patent specification uses the same word to refer to different concepts, including "display" or "screen" which must be read in context.  For example, the patent uses the phrases "game display" and "preview screen" to refer to images of an upcoming game shown on a display device, but "the display" to refer to the physical display device itself.  *Id.* at 11:27-42.

### a.    '223 Patent Claims

79.    The challenged claims are 1, 3, 5-7, 11, 13, 15, 18-20, 22, 25, 27, 29-31, 33, 37-42, 44-49, and 51-56, where claims 1, 13, 25, 37, 44, and 51 are independent claims.  All challenged claims recite variations on the same basic elements: (a) an electronic game terminal including an interactive touch screen display, (b) constructing a game field having a plurality of elements for the touch screen display, each element includes a game symbol from a plurality of predetermined game symbols, (c) determining at least one winning combination for each play of the game, (d) testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field, and (e) automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play.  Other claim limitations include steps such as "determining if the player has decided to play the displayed game," "displaying an outcome resulting from play of the displayed game," or "displaying each winning combination of symbols on the touch screen display."

80.    The challenged claims can generally be categorized into two groups. Claims 1, 13, and 25 (and their dependents) all require "receiving the player's selection of a field element as a location for a wild symbol," "determining each winning combination of symbols that is formed by such selection," and "displaying

each winning combination of symbols on the touch screen display."   I will refer to these claims as "Wild Symbol Placement" claims.  The remaining challenged claims 37, 44, and 51 (and their dependents) are not limited to a game in which the player selects a location for a wild symbol, but instead recite "determining if the player has decided to play the displayed game" and "displaying an outcome resulting from play of the displayed game."

81.    Claims 13, 25, 44, and 51 (and their dependents) recite a "game processor" configured for performing various functions.  As noted above, the "processor" component itself is not in any way novel, and the Court construed "game processor" as "a CPU or microprocessor that executes program instructions to generate a game."  Thus, "game processor" is not limited to an *embedded* game processor, as Plaintiff has argued, which would still be a non-inventive, well-understood component.  In my opinion, a POSITA would understand that the specification's lack of details as to the claimed game processor meant that the game processor is at best a conventional, off-the-shelf component, or a pre-existing component (*e.g.*, already used on game boards at the time) and that it is not novel or inventive (e.g., involving a novel physical architecture or instruction set).  Therefore, a POSITA would understand that the claimed "game processor" adds nothing novel or inventive to the claims.

## 2.    Patent Prosecution History of the '223 Patent

82.    The '223 patent was filed as U.S. Pat. Appl. 11/428,026 on June 30, 2006. '223 patent file history at POM000076. There were 60 originally-filed claims of the '026 application, each including the limitations of "construct[ing] a field having a plurality of elements for a game display wherein each element is filled by a game symbol from a plurality of available game symbols" and "present[ing] the field of game symbols on the game display as a preview to a player for deciding whether to play the displayed game." *Id.* at POM000048-61.

83.    On June 12, 2007, prior to initial examination, the applicant filed an amended set of claims including additional claims 61-81, each of which included the limitations of "generat[e/ing] a field having a plurality of elements for [a/the] game display wherein each element is filled by a game symbol from a plurality of available game symbols" and "[present/ing] the field [of game symbols] on the game display as the electronic game preview to the player." *Id.* at POM000085-104.

84.    On December 4, 2008, the examiner rejected claims 10, 21 and 34 as lacking utility, rejected claims 1-8, 11-20, 23, 26-33, and 35-37 as anticipated by U.S. Pat. No. 7,040,985 to Vancura[1] ("Vancura"), rejected claims 9, 24, 25, and

---

[1] In the rejection itself, the Examiner mistyped the patent number for Vancura as 6,165,069 but 7,040,985 was accurately listed on the Notice of References Cited.

38-81 as obvious over Vancura in view of U.S. Pat. Publication 2005/0003883 to Muir ("Muir"). *Id.* at POM000115-121.

85.    On June 4, 2009, the applicant traversed the anticipation and obviousness rejections, stating "the Examiner has not shown where 'presenting the field of game symbols on the game display as a preview to a player for deciding whether to play the displayed game' is disclosed by *Vancura*." *Id.* at POM000154. Applicant further amended claims 1, 14 and 27 "to more clearly distinguish the invention from the teachings of Vancura. … Claims 1, 14, and 27 have been amended further to clarify that the field of game symbols for each play of the game is presented to the player on the touch screen display prior to activation of game play. In other words, the actual game that the player would play is displayed before the player makes any commitment to playing the game." *Id.* at POM000155.

86.    Addressing the combination of Vancura and Muir references, the applicant stated "In contrast, Applicant's invention, as claimed in independent claims 1, 14, 27, 40, 47, 54, 61, 68, and 75 includes the limitation of 'presenting the field of game symbols on the touch screen game display prior to activation of game play as a preview to a player for deciding whether to play the displayed game.' The electronic gaming machine previews the next game to be played by constructing the game field and displaying the game so constructed on the touch

screen game display, all without user interaction.  Therefore, even if the teachings

of *Vancura* and *Muir et al.* could be combined, they would still not result in the

claimed invention."  *Id.* at POM000158-159.

87.    On October 26, 2009, the examiner issued a final rejection for claims

1-8, 11-20, 23, 24, 26-33, 38, 35-37, 67, 74 and 81 as anticipated by U.S. Pat. No

7,040,985 to Vancura[2], and claims 9, 25, 38-66, 69-73, and 75-80 as obvious over

Vancura in view of Muir.  *Id.* at POM000170-178.

88.    On January 26, 2010, the applicant traversed the anticipation and

obviousness references, stating "Since the terms 'preview' and 'present' have led

to an apparent lack of clarity in the claim language, these terms have been

eliminated from all pending claims.  The term 'display' replaces the term 'present'

throughout the pending claims.  The term 'preview' has been deleted from all

claims.  Applicant's use of preview in the claims was intended to convey that the

player at an electronic game terminal always sees the next game to be played on

the terminal.  In most electronic game machines, the touch screen displays the last

game played on the machine, not the next game to be played.  Applicant defined

the next game to be played which was automatically displayed to the player

following completion of a previous play as a 'game preview.'  However, the

automatically displayed game field represented the actual game to play.  Once the

---

[2] In the rejection itself, the Examiner mistyped 7,040,985 as 4,040,985.

player selects a level of play (i.e., denomination of wager) and presses the 'Play'
button on the machine, play begins and the player selects a displayed symbol to
turn into the 'wild' symbol to determine the game outcome.  In comparison to
*Vancura*, there is no simulated spinning of reels once the player selects the 'Play'
button." *Id.* at POM000208, emphasis added.

89.    The applicant further stated "To further clarify this step, independent
claims 1, 14, 27, 40, 47, and 54 have been amended to recite 'automatically
displaying the game field on the touch screen display to a player prior to initiating
activation of game play.'  This recitation clarifies that the actual game to be played
(i.e., the game field constructed in the first recited step) is automatically displayed
to the player in order for the player to decide whether to initiate play of the game
displayed.  When the player hits the Play button, he is initiating play of the actual
game field that is displayed.  Thus, the player can study the game field carefully to
determine the optimum location of the wild symbol before he makes any
commitment to play the displayed game.  There is no time limit for studying the
game field or making a decision to play the displayed game." *Id.* at POM000209,
emphasis added.

90.    I further note that the Court construed the limitation "automatically
display[ing] an actual game to be played on the touch screen game display to a
player prior to initiating activation of game play" as "automatically display[ing] an

actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play." Thus, any electronic game machines in which the touch screen does not automatically display the next game to be played prior to the player initiating activation of play of that game, does not fall within the scope of the claims as construed by the Court.

91.    I further note that the Plaintiff's amended complaint states that "[t]he claims of the '223 Patent encompass novel and non-obvious electronic game processor technology" that includes "a game processor that is specially configured for testing the game elements and automatically previewing the feature of a game to be played to a player prior to initiating activation of game play." November 1, 2019 Amended Complaint at ¶ 25, emphasis added.

92.    On February 17, 2010, the examiner issued an advisory action, noting that the January 26, 2010 reply failed to place the application in condition for allowance. '223 patent file history at POM000221-223.

93.    On March 23, 2010, the applicant's counsel John Timar and examiner had an examiner-initiated telephonic interview, the record of which is in an April 16, 2010 summary. The substance of the interview reads "Claim language regarding the 'testing' limitation was discussed and how it can be added to the independent claims to furhter [sic] prosecution of applicantion [sic] was also discussed.". *Id.* at POM000235. The summary also notes that the interview

directly resulted in the allowance of the application on April 16, 2010 based on an examiner's amendment that was also entered on April 16, 2010.  *Id.*

### a.    Priority Date

94.    The '223 patent states "[t]his is a continuation-in-part of application Ser. No. 11/430,770, filed May 9, 2006, which claims the benefit of Provisional Application No. 60/788,363, filed Mar. 31, 2006."  '223 patent at 1:7-9.

95.    U.S. Pat. Appl. No. 11/430,770 and Provisional Appl. No. 60/788,363 are directed to a system and method for "controlling plays of an electronic game," essentially a mechanism for limiting the number of times a game may be played before it is disabled for further play.  Play may be re-enabled if the game operator pays a fee.

96.    Notably, nothing in either the '770 application or the '363 provisional are related to the concept of a "preview screen" or "preview display."  For instance, FIG. 1A of the '770 application depicts a game screen similar to FIG. 1A of the '223 patent, but with the notable omission of a "Next Puzzle" button.



**FIG. 1A**

FIG. 1A from US Pat. Appl. 11/430,770

97.    All claims of the '223 patent, as construed by the Court, require automatically displaying an actual game to be played (*i.e.*, the constructed game field of the game to be played) to a player prior to initiating activation of game play.  Since disclosure of that preview concept is not found in either of the priority applications, and I have reviewed no documentary or source code evidence supporting any contention that Mr. Pace had earlier conceived of that preview concept, it is my opinion that the Challenged Claims of the '223 patent are not entitled to a priority date earlier than June 30, 2006, the date of filing of U.S. Patent App. No. 11/428,026.

98.    Additionally in my opinion, dependent claims 38, 39, 45, 46, 52, and 53 are also not entitled to a priority date earlier than the filing date of June 30, 2006.  Those six claims all require "generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game." Nothing in either the '770 application or the '363 provisional are related to the concept of a simultaneously-displayed additional game field.  Since disclosure of that simultaneously-displayed additional game field concept is not found in either of the priority applications, and I have reviewed no documentary or source code evidence supporting any contention that Mr. Pace had earlier conceived of that simultaneously-displayed additional game field concept, it is my opinion that claims 38, 39, 45, 46, 52 and 53 of the '223 patent are not entitled to a priority date earlier than the date of its filing, namely June 30, 2006.

**B.    Claim Construction**

99.    I understand that the Court entered a Claim Construction Memorandum Opinion and Order regarding the challenged patent on December 21, 2020.  (Dkts. 111 and 112, hereinafter "Claim Construction Order").  I understand the Court entered the following constructions in that Order.

| Terms (and Claims) | Construction of the Court |
| --- | --- |
| prior to displaying | before making visible on the touch screen display |

| Terms (and Claims) | Construction of the Court |
|---|---|
| computer readable code | code in a form that can be executed by the computer |
| winning combination | array of game symbols in the game field yielding a successful outcome |
| [determining/determine/determined] at least one winning combination for each play of the game | establish or ascertain at least one winning combination, properly construed, for each game to be played |
| test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field | test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the game. |
| automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play | automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play |
| an actual game to be played | the constructed game field of the game to be played |
| game processor | a CPU or microprocessor that executes program instructions to generate a game |
| program instructions | conventional commands that can be executed by a computer |

100.   I further understand that the parties have agreed on the following constructions:

| Terms (and Claims) | Agreed Construction |
|---|---|
| prior to displaying | before making visible on the touch screen display |
| computer readable code | code in a form that can be executed by the computer |

101.   My opinions expressed in this report regarding invalidity of the challenged claims apply the Court's claim constructions and the parties' agreed constructions.  If the Court modifies its constructions or construes additional terms, I reserve the right to supplement my opinions as necessary.

102.   I understand that where the Court has declined to offer a construction for a claim term, that term has its plain and ordinary meaning in the field of the patent.

## VII.   GENERAL STATE OF THE PRIOR ART RELATING TO THE '223 PATENT

### A.   Regulatory Landscape

103.   Laws and regulations related to gaming devices have varied widely from jurisdiction to jurisdiction since long before the '223 patent's application was filed.  Still to this day, it is common that a particular game may be arguably legal in one jurisdiction but arguably not legal in another.  For example, electronic bingo games that comply with the Class II criteria under the Indian Gaming Regulatory

Act (25 U.S.C. Ch. 29 § 2701 et seq.) are legal to operate in Native American casinos, but not outside of tribal lands in Oregon and many other states.  For another example, in 2005 Ohio defined "slot machine" to exclude "skill-based amusement machines" under Ohio Rev. Code § 2915.01(VV)(2) (*see* PA0000294-295), but Nevada at that time defined "slot machine" to expressly include games involving "the skill of the operator" under Nev. Rev. Stat. § 463.0191.

104.    Even the meaning of a "game of skill" has been defined or evaluated differently from one jurisdiction to another, and further may change over time. Several states define a "skill-based game" or "game of skill" using a "dominant factor" test.  For example, Nevada defines a "game of skill" as one "in which the skill of the player, rather than chance, is the dominant factor in affecting the outcome of the game as determined over a period of continuous play."  *See* Nev. Rev. Stat. §463.15997.4(a).  Similarly, an Ohio Attorney General opinion from 2004 referred to Ohio's requirement that a "skill-based amusement machine" required that "the outcome of an individual's play and participation is not determined largely or wholly by chance," which the Attorney General found to mean "if the outcome of the play of a game is determined more than fifty percent by chance."  POM000501-504.  Notwithstanding, such definitions often change over time, as demonstrated by Ohio's proposed modification S.B. 220 that would

amend the aforementioned 2004 definition of a "skill-based amusement machine" to include several additional limitations.  PA0000296-298.

105.   A POSITA would have understood that regulations change over time, and that complying with ever-shifting gaming regulations was an important factor in the commercial success of a gaming machine developer.

### B.    Game Features and Game Design

106.   A POSITA would also know that historically, some developers of gaming devices have incorporated features into their games for the purpose of setting those games outside the scope of gambling laws.  For instance, U.S. Patent 2,102,532 to Harry H. Hoke, Jr. describes a gaming machine "equipped with an object throwing device such as a ball or the like which controls the final operation of the machine before a payout may be had therefrom."  1:9-12.  The 1983 book "Slot Machines" by Marshall Fey (grandson of Charles Fey, the inventor of the slot machine) describes the 1939 Hoke SNAKE machine: "When a slot machine is classified as a game of skill, it is technically no longer a gambling device, although the application of skill was actually negligible and had little or no influence on the end result.  In order for the Hoke SNAKE machine to pay, the player had to flip a steel ball into the open mouth of the snake located at the top of the machine.  As very little expertise was required for this feat, it was actually a sham to circumvent the law."  PA0000322.

107.   Other features involving a player's physical or mental skill that were at least sometimes used to circumvent gambling laws include a nudge feature in which one or more reels are shifted up or down one symbol; a hot swap feature in which two symbols on a video gaming machine were transposed, a hold-and-respin feature where the player could freeze (hold) one or more reels and respin the others, presumably increasing the likelihood of a payout.  The Marshall Fey book has an entire chapter on "Circumventing Innovations" in gaming devices that were used "to conceal the fact that they were indeed gaming devices."  PA0000304. Among them were the concepts that a machine that pays out something every time is not a gaming device but is instead a "trade stimulator" or vending machine; and the concept that "[t]he player knew in advance before he inserted a coin if he would win or lose on the next handle pull, thus theoretically eliminating the chance element" and thereby turning a slot machine into a non-gambling device. PA0000308-315, 319.

108.   The antique machines described in the Fey book were purely mechanical devices, but a POSITA would know that modern gaming machines around the 2006 timeframe were primarily based on commodity computer technology.  This technology included commercially-available components such as

industrial computer boards with Intel processors[3], cash handling devices such as bill validators[4], and video touchscreen displays[5].  The majority of typical video slot machines used a computerized random number generation algorithm to produce random numbers, use those random numbers to construct a field of game symbols appropriate to the game being played, and then evaluate the symbol combination(s) on the constructed field of game symbols to calculate the payout, if any.  Certain other types of games essentially work in reverse, by starting with a payout value and constructing a field of game symbols that evaluate to that payout value.  When the payout value is received by the gaming machine from a remote server, such games are generally called "central determinant."  Examples of constructing a game field that corresponds to a payout value are described in U.S. Patent Nos. 4,817,951 to Crouch and 7,291,069 to Michaelson, both of which also describe how payout values can be selected from a finite pool of instant lottery tickets.

109.   Game designers in the late 1990s and early 2000s (including myself) were constantly looking for exciting gameplay options to hold the interest of

---

3

https://web.archive.org/web/20041011053519/http://www.gamingboards.com/Products/Products/dpx115.html/
4

https://web.archive.org/web/20060115095456/http://www.cashcode.com/docHTML/applications.htm
5

https://web.archive.org/web/20051230070234/http://www.3m.com/3MTouchSystems/Products/Capacitive/index.jhtml

players and entice players to play again once their last game had ended.  Game designers regularly reviewed old and new games on the market—both from descriptions in magazines and from hands-on play in casinos—and would therefore have known about many of these various gaming features and understood that mixing and matching such features is a common part of game design.  A POSITA would understand that mixing and matching game features found in the industry (*e.g.*, using a feature that one game applied in a specific manner on another game in a more general manner) was common practice in the game design process.

110.   In my experience, at the time of the purported invention claimed in the '223 patent, gaming machine game designers were adept at assembling a new game from a collection of existing components.  For example, given a base game involving spinning reels and matching symbols, as well as a wide variety of on-reels or second-screen bonus features, a gaming machine game designer would have known to ensure that an assembled collection of features satisfies various mathematical parameters such as desired theoretical return-to-player percentage or variance.  At the time of the purported invention, game designers would generally fashion games to not allow a gaming machine to theoretically pay back more than 100% of money wagered, primarily because such games tend to lose money for the operator over time.  A game designer would not only have performed these requisite calculations, but would have understood the predictable results of

combining certain game features and would advise other team members whether certain combinations were a good or bad idea.

111.   In my opinion, all of the above information would have been a part of a POSITA's common general knowledge by January 1, 2006.

## VIII.  GAME AND SOURCE CODE INSPECTION

### A.    Source Code for Version TTF524

112.   On April 23, 2021 I received source code and binary files produced by Plaintiffs.  POM018460 and POM018461.

113.   The source code was primarily written in the C programming language and resided in three subdirectories of the directory PLATPLUS SOURCE V524\DEV called PLATGROM, PLATPLUS, and PLATOPTS.  Within the file PLATPLUS_SOURCE_V524\DEV\PLATINUM\GIGCONST.H, the constant OPSYSVER was defined as 524.  Due to that definition, and the directory name including "V524," I presume that the version of the source code is TTF524 as indicated by Plaintiffs in their interrogatory responses.  Plaintiffs' Seventh Supplemental Responses to Defendants' First Set of Interrogatories at 24-25.

114.   Several files within PLATPLUS SOURCE V524\DEV\PLATINUM relate to the Tic-Tac-Fruit game, including ATEUP.C, ATEUP.H and RNGATEUP.C.  *See also* Pace Tr. at 15:11-16:9, 27:22-25.  The Windows last-modified-date for ATEUP.C, ATEUP.H and RNGATEUP.C, respectively, are

5/1/2006, 4/27/2006, and 4/30/2006.  The last-modified-date for the compiled

object files corresponding to those source files (namely ATEUP.OBJ and

RNGATEUP.OBJ) is 5/2/2006.

115.    Within RNGATEUP.C, the function ateup_calcRNGnetwork at lines

278-554 performs field construction and testing functionality similar to the steps

described in the Turner Report (POM000497) as well as the patent specification at

4:51-64.  The actual testing process in the source code is more detailed than the

high-level steps disclosed in the Turner Report or patent specification, and it is also

implemented in a way that may never succeed (as is Turner's description).  For

example, Step 5 of the Turner Report's description says "[t]est complete field for

compliance with goals desired by steps 1 and 3 and repeat the construction process

anew if compliance fails."  That is similar to the disclosure in the '223 patent at

4:62-64.  However, a POSITA would understand that if a constructed field can be

tested and found non-compliant once, it can be tested and found non-compliant

again, which means that the field construction and testing process described in the

patent specification may never complete successfully.  In the source code, this

possibility is handled by returning an error condition if compliance testing fails

100 times.

116.    There is no other game field testing functionality in the source code

that corresponds to the claim limitations of "testing the game field…."  There is

also no testing functionality that is separate from the field construction function. In RNGATEUP.C, the function ateup_calcRNGnetwork does not complete successfully unless the tests pass.

117.   Within ATEUP.C, the function ateup_betting at lines 1557-2089 handles certain button inputs from the player after the previous game has concluded, including pressing a help button, raising or lowering the bet, pressing the "PLAY" button, or pressing the "NEXT PUZZLE" button.  At that time, the game screen depicts the last game played, which is typical for gaming machines.

118.   TTF524 can be configured to enable or disable the NEXT PUZZLE feature depending on whether the "ateup_previewoption" flag is set.  If the flag is set, the software displays a button that reads "NEXT PUZZLE" with code ATB_ATEUP_PREVIEW and a button that reads "PLAY" with code ATB_ATEUP_NARROWPLAY; if the flag is not set, the software displays only a button that reads "PLAY" with code ATB_ATEUP_PLAY button.  ATEUP.C at 1643-1663.

119.   If the player presses the NEXT PUZZLE button, a button-press message with code ATB_ATEUP_PREVIEW is processed that leads to the game temporarily displaying the next puzzle (field of symbols) on the screen instead of the previous game display.  The function ateuptask_reelmotion at lines 4606-4828 is called to perform this display.  After a few seconds, the previous game's field is

redisplayed on the screen (also using function ateuptask_reelmotion) and the

ateup_betting function returns to waiting for the next button press.  ATEUP.C at

1759-1910, 1974-2050.

120.   If the player instead presses the PLAY button, a button-press message

with either code ATB_ATEUP_PLAY or ATB_ATEUP_NARROWPLAY is

processed that leads to the gameplay processing and ultimately calls the function

ateup_action at lines 2200-2411 (the configuration flag discussed above determines

whether the PLAY or NARROWPLAY message is sent, but the processing for

both messages is handled by the same code).  The function ateup_action displays

the symbols using either (i) the function ateuptask_reelmotion or (ii) the function

ateuptask_spinreels at lines 4831-4946.  In other words, the function used to

display the game symbols of the NEXT PUZZLE and then revert the screen to the

previous game played is one of the same functions used to display the game

symbols upon initiating gameplay.

121.   There is no other function that displays a NEXT PUZZLE without the

corresponding button being pressed.  The NEXT PUZZLE display never occurs

automatically in the source code I have reviewed.

122.   I understand that Plaintiffs contend that version TTF524 of the source

code demonstrate "conception and reduction to practice of the game preview

feature in Tic Tac Fruit on or before May 2, 2006."  Plaintiffs' Seventh

Supplemental Responses to Defendants' First Set of Interrogatories at 25.  I

disagree that a game which requires the player to press a NEXT PUZZLE button in

order to prompt the game to temporarily display a next game to be played is an

embodiment of any of the Challenged Claims, all of which include the

"automatically displaying" limitation.

### B.    Machine Inspection

123.    On August 31, 2021, I visited the Pace-O-Matic offices at 3450

Corporate Way, Duluth, Georgia 30096 and inspected five gaming devices.  Each

of these machines was running software that Plaintiffs contend is an embodiment

of one or more of the Challenged Claims.  *See* Plaintiffs' Seventh Supplemental

Responses to Defendants' First Set of Interrogatories at 16-18, 21-23 (for Tic-Tac-

Fruit version TTF527GPX); Plaintiffs' Sixth Supplemental Responses to

Defendants' Second Set of Interrogatories at 3-14 (for all other games).  I spent

approximately one hour evaluating the machine and software for TTF527GPX, and

another four hours evaluating the remaining four machines and other games.  I

recorded approximately 43GB of photo and video footage using the camera of a

Samsung Galaxy Note 8.

### 1.    Tic-Tac-Fruit Version TTF527GPX

124.    One device was running version TTF527GPX of Tic-Tac-Fruit.

Internal inspection revealed a gaming board that appears to be a version of the

board depicted in Exhibit B of the declaration of Mr. Cummings, and described as the "Skidmore" board by Mr. Pace.  Pace Tr. at 48:2-21, 56:4-9.  Specifically, the gaming board in the machine included an AMD Geode chip[6] with a copyright date of 2001, two CompactFlash slots, and the text "Copyright 2005 Seaside Technologies, Inc.  All Rights Reserved.  SKID 533 0548" as well as a sticker with the text "PIS[7] 01/2006 FCT Tested" indicating that the board had been functional-tested in January of 2006.



TTF motherboard photo

---

[6] The depicted AMD Geode CS5535 is a "companion chip" to the CPU itself, which was obscured by a heatsink for this particular board, but the AMD Geode CPU can be seen on the Skidmore board in Exhibit B of the Cummings Declaration.

[7] Possibly "PTS" but the top of the character is cut off.

125.   My play of the game, including the operation of the NEXT PUZZLE
button, corresponded with the behaviors described in the source code analysis
above.



126.   Specifically, I first pressed the PLAY button at the 50c level.



127.    The reel positions showed a spinning-reel animation and then came to rest, and a message prompted me to "PICK SPOT" with a countdown timer, but I let the game time out, whereupon the game displayed the message "PICK TIMEOUT – NO WINS  CLEAN YOUR GLASSES!"





128.   I pressed PLAY again and selected a spot for the wild symbol, leading to a four-line win.



129.   No NEXT PUZZLE display was presented before I played the game by pressing the PLAY button.  In other words, I was able to play the game without viewing a preview of a next game to be played.

130.   I then pressed the NEXT PUZZLE button and all nine symbols displayed a flipping animation (not the spinning-reel animation from before) to reveal the symbols for the next game to be played, and a message on the screen stated "THIS IS THE NEXT PUZZLE AT $0.50".



131.    I was therefore able to view a next puzzle after pressing a button labeled "NEXT PUZZLE" but not without pressing the NEXT PUZZLE button.

132.    Approximately five seconds later, the nine symbols flipped again to re-display the symbols from the conclusion of my prior game, and the message on the screen changed to state "THE LAST PUZZLE PLAYED AT $0.50."



133.    All Challenged Claims require "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," construed as "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play."  Tic-Tac-Fruit version TTF527GPX does not "automatically display an actual game to be played" but requires the player to press a NEXT PUZZLE button in order to observe the next game to be played.

134.   For the above reason, it is my opinion that version TTF527GPX of Tic-Tac-Fruit is not an embodiment of any of the Challenged Claims.

135.   I understand that Plaintiffs also contend that "[b]y May 8, 2006, Pace had created .HEX files for incorporating an embodiment of the game preview feature … into Tic-Tac-Fruit, internal version TTF527GPX."  Plaintiffs' Seventh Supplemental Responses to Defendants' First Set of Interrogatories at 21. However, after I was finished playing the machine with TTF527GPX on it, Plaintiff's counsel, Mr. Steve Hill, assisted me in removing the CompactFlash card from that machine's gaming board and installing it in a Windows laptop where I could examine the contents.  The contents of that CompactFlash card included four ROM images named TTF527.U4, TTF527.U6, TTF527.U7 and TTF527.U9, with last-modified-dates of June 9, 2006, and I confirmed via checksums that these files were identical to those produced in POM018460 and depicted in the above Interrogatories at p. 23.  However, there were no .HEX files on that CompactFlash card.  Therefore, .HEX files cannot be evidence that version TTF527GPX of Tic-Tac-Fruit incorporated "an embodiment of the game preview feature."  I also understand that Mr. Pace acknowledged at deposition that .HEX files are unrelated to the implementation of the preview feature but are instead terminal ID files.  Pace Tr. at 137:9-139:23.

136.   A file called OS.BIN was also on the CompactFlash card.  I understand OS.BIN to implement software emulation of the Pot-of-Gold boards. Pace Tr. at 48:14-21, 56:4-17, 58:1-3.  The last-modified-date of OS.BIN was 10/25/2005.  Other than OS.BIN and the four ROM images, the only other files on the CompactFlash card were 272 files with numbered filenames in the SOUNDS directory, all with last-modified-date of 8/5/2005.  Therefore, the emulator software required to run version TTF527GPX of Tic-Tac-Fruit on the machine I played was from 10/25/2005 or earlier and thus existed long-before the alleged date of invention.  Similarly, the hardware required to run version TTF527GPX of Tic-Tac-Fruit was a motherboard with a copyright date of 2005, also before the alleged date of invention.

## 2.    Modern Games

137.   Besides version TTF527GPX of Tic Tac Fruit, I reviewed four other gaming machines running newer software.  Combined, these machines had all of the game titles listed in Plaintiffs' Sixth Supplemental Responses to Defendants' Second Set of Interrogatories at pp. 3-14.

138.   I opened up each machine but was only able to observe a motherboard in one of them.  That machine used a motherboard labelled A320I-S01, which based on several Internet vendor listings was designed by MSI (a well-known

computer hardware vendor) and used an AMD Socket AM4 processor.[8]  Though I could not observe any other motherboards within the other three machines themselves, I observed a motherboard similar to the A320I-S01 board sitting on the ground near the Tic-Tac-Fruit machine.

### a.     Nudge Games

139.   Two of the game titles, American Prize and Lucky Eddie, were nudge games, not wild-symbol placement games like Tic Tac Fruit.  These two games displayed a standard 3-reel slot machine interface with three visible symbols per reel.  When I pressed PLAY, the reels would spin and stop, then I had the option to nudge one reel up or down one stop to try to make a winning three-symbol combination on the single center payline.  There was also a NEXT PUZZLE button.  Pressing the NEXT PUZZLE button showed the next set of reels that would be displayed after pressing PLAY but before the player nudged any reel.

---

[8] See, e.g., https://pcel.com/MSI-A320I-S01-T-Madre-MSI-A320I-S01-BULK-Chipset-AMD-A320-Soporta-Procesador-AMD-Ryzen-1ra-Gen-A-series-7ma-Gen-Socket-AM4-Memoria-DDR4-3200-O-C-2400-1866-MHz-32GB-Max-I-372512 or
https://www.neobits.com/msi_a320i_s01_msi_a320i_s01_p15223435.html.



American Prize game screen after pressing NEXT PUZZLE

140.   All Challenged Claims require "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," construed as "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play," but neither American Prize nor Lucky Eddie included any automatic display of an actual game, instead requiring the player to press a NEXT PUZZLE button to see the next play.

141.   For the above reason, it is my opinion that American Prize and Lucky Eddie are not embodiments of any of the Challenged Claims.

**b.    Non-Rapid Games**

142.    There were two versions of "Bombs and Bombshells" installed, one labelled "Rapid" and the other not.  The non-Rapid version of Bombs and Bombshells, as well as Cocktail Cove and Pirates Prize, all appeared to have gameplay features in common with Tic Tac Fruit, namely a 3x3 grid with a wild-placement requirement.



Cocktail Cove game screen after pressing NEXT PUZZLE

143.    In addition, like version TTF527GPX of Tic-Tac-Fruit discussed above, these three games required the player to press a NEXT PUZZLE button before seeing the next game preview.   It is therefore my opinion that non-Rapid Bombs and Bombshells, Cocktail Cove, and Pirates Prize are not embodiments of any of the Challenged Claims.

### c.    Rapid Games

144.   Other than non-Rapid Bombs and Bombshells, Cocktail Cove, and Pirates Prize (which are Tic-Tac-Fruit-style games) and American Prize and Lucky Eddie (nudge games), the rest of the modern games I reviewed were Rapid Tic-Tac-Fruit-style games:

    a.  Amigos Locos

    b.  Bandito Brothers

    c.  Big Cheese

    d.  Bombs and Bombshells (Rapid)

    e.  Fishy Loot

    f.  Gem Master

    g.  Graveyard Gold

    h.  Hi-Way 50s Overhauled

    i.  House of Voodoo

    j.  Lady Periwinkle

    k.  Living Large

    l.  Lucky Fruit

    m.  Lucky Liberty

    n.  Pirates

    o.  Reapers Wild

p.  Under the Mountain

q.  Wild Beasts

145.   In a Rapid game there is not a winning symbol combination on every play, regardless of where the Wild symbol is placed.  In a Rapid game, if a winning position for the Wild symbol does exist, the Play button cannot be used until the Wild is placed by the player or the game times out.  However, if no possible winning combination exists, the Play button shortcuts the Wild placement timer and spins the reels for the next game.  As a result, the player can rapidly press the Play button and ignore the wild-placement feature for several games until the Play button no longer responds, and at that point know there is a winning position available for that game.



Graveyard Gold game screen after pressing NEXT PUZZLE



Pirates game screen after pressing NEXT PUZZLE



House of Voodoo game screen after pressing NEXT PUZZLE

146.   All Challenged Claims require "[determining/determine/determined] at least one winning combination for each play of the game," construed as "establish or ascertain at least one [array of game symbols in the game field yielding a successful outcome] for each game to be played."  None of the games listed in this section satisfy this limitation because it was not always possible to achieve a winning combination in the game field for every play – sometimes the player would lose no matter which of the nine possible positions were selected.

147.   All Challenged Claims require "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," construed as "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior

to initiating activation of game play."  None of the games listed in this section satisfy this limitation because, like version TTF527GPX of Tic-Tac-Fruit and the Non-Rapid TTF-style games discussed above, all the games listed in this section require the player to press a NEXT PUZZLE button before seeing the next game preview.

148.   For the above reasons, it is my opinion that all of the games listed in this section are not embodiments of any of the Challenged Claims.

## IX.   THE CHALLENGED CLAIMS OF THE '223 PATENT ARE PATENT-INELIGIBLE

149.   In my opinion, the Challenged Claims of the '223 patent do not recite any element or combination of elements that is not well-understood, routine and conventional.  For at least this reason the Challenged Claims are patent ineligible.

### A.    The Challenged Claims of the '223 Patent are Drawn to An Abstract Idea

150.   I understand the first step in evaluating patent eligibility is to consider the patent claims in light of the specification and determine whether their character as a whole is directed to ineligible subject matter.  I understand the Court has already held that "claim 44 describes the rules for playing a game, and is thus an abstract idea within the meaning of *Alice* step one."  Dkt. 61 at 15.  I further understand that "the parties agree that claim 44 is representative of the '223 Patent at least for the purpose of resolving Defendants' motion to dismiss" on the grounds

of eligibility.  *Id.* at 8-9.  For several reasons, including those articulated by the Court, I agree.  *Id.* at 9-15.

151.   I note that the Plaintiffs contend that the Challenged Claims are "directed to an improved method/system/computer program product for electronic gaming.  The claims directed to an electronic gaming system are directed to a specific system utilizing a specific and unconventional game processor in a specific manner based on an unconventional ordering of claim elements to accomplish a specific result of electronic gaming that is not merely based on chance."  Plaintiffs' Sixth Supplemental Responses to Defendants' Second Set of Interrogatories at 35-36.  I disagree.

152.   The claims are neither directed to any specific or unconventional game processor nor a specific system that utilizes such a processor.  The Challenged Claims directed to "an electronic gaming system" recite "an electronic game terminal including a touch screen display" and "a game processor for generating an interactive electronic game on the game terminal."  These claims are not directed to any "specific system utilizing a specific and unconventional game processor" as contended by Plaintiffs, but to any "electronic game terminal including a touch screen display" and "game processor" that can carry out the claimed steps of "constructing a field," "testing the game field," "automatically displaying," etc.  Gaming hardware systems and components before January 1,

2006 were well known to have such functionality.   The challenged claims directed to a "computer program product for electronic gaming" recite similarly-generic hardware components, and the challenged claims directed to "an electronic gaming method" do not recite a "game processor" at all.

153.   For at least these reasons, it is my opinion that the Challenged Claims' character as a whole is directed to an abstract idea of rules for playing a game, namely rules for a game that permit a player to preview a game before deciding to play it.

**B.    The Challenged Claims of the '223 Patent Require Nothing Other Than Well-Understood, Routine, and Conventional Components and Activities**

154.   It is also my opinion that, beyond the practice of the ineligible abstract idea itself, the Challenged Claims require only well-understood, routine, and conventional components and activities.  The claims of the '223 patent recite only conventional and functional components incidental to implementing the abstract idea of rules for a game that permit a player to preview a game before deciding to play it.

155.   It would be possible to implement the abstract rules in the '223 patent claims using a physical card game and standard casino gaming table.  A casino dealer could physically deal (construct) a 3x3 field of nine playing cards with at least one winning combination, mentally perform the claimed testing step, and the field would be dealt face-up so any passing player could see it and decide whether

to play.  Upon deciding to play, the player's goal is to position a wild card so as to achieve one or more rows of three-of-a-kind.  Such a game could be played with no electronic technology whatsoever.

156.   The claims of the '223 patent simply automate those manual processes, and the automation of those manual processes is performed by pre-existing gaming technology, using conventional software instructions to implement the game rules.

157.   Nowhere does the '223 patent describe a new and improved technology platform for an electronic game, a processor with any special configuration, a new type of computer program product, a new computer readable storage medium or a new or improved tangible technology platform.  The '223 patent simply recites generic, off-the-shelf computer components and computational steps that could be performed by human beings or pre-existing gaming machines.  At deposition, Mr. Pace acknowledged that he did not have to modify any hardware to implement the desired functionality and that he devised the first purported embodiment of the '223 patent by merely writing software that was stored on conventional hardware including commercially-available motherboards (the Pot of Gold board and the Skidmore board) and commercially-available memory devices (EPROMs and CompactFlash cards) and executed by conventional processors (the Texas Instruments 34010 and AMD Geode) on such

motherboards.  *See, e.g.,* Pace Tr. at 47:22-48:21, 55:7-56:19, 57:7-10, 156:18-20, Cummings Decl. at Exhibit B.  The Skidmore board was developed by Brad Skidmore to "knock off" the Pot of Gold board, and Pace-O-Matic began using the Skidmore board in late 2005.  Pace Tr. at 49:25-50:23.  The Pot of Gold board itself was purported to be originally designed by Mr. Pace between 1989 and 1990, and a second derivation was designed around 1998 after Mr. Pace had sold the company and other people continued the development and evolution of the products.  Pace Tr. at 12:12-17, 13:15-22, 123:15-123:24.  Mr. Pace acknowledged that a Pot of Gold system from 1998 would have been capable of running the software for Tic-Tac-Fruit version TTF527GPX (one of the versions that Plaintiffs contend has every element of the invention in the '223 patent.)  Pace Tr. at 199:23-202:15.

158.   A POSITA would find nothing about the order of the steps recited in the claims that integrates the abstract idea into a practical application or that amounts to significantly more than the abstract idea itself.  All that the order of the claimed steps do is show the player the actual game to be played before the player pays rather than after the player pays.  A POSITA would view the claimed invention as merely causing conventional computer components to apply the claimed steps in order or applying the rules to gaming environment.   The claimed steps do not purport to improve the functioning of a computer or effect an

improvement in other technology.  A POSITA would view the claimed steps as being structured only enhance the view of the game as being legal in some jurisdictions.  In my opinion, reordering the known steps of a known game to show the player the actual game to be played prior to initiating game play (rather than after) amounts to nothing more than the abstract idea itself and does not overcome any technical problems or challenges.

159.   Specifically, in my opinion, the independent Challenged Claims and the prior art TTF game all carry out the same steps, the only difference is that the claims re-order the step of displaying the game to be played to be undertaken before the game is "activated" rather than afterwards.  Plaintiffs have acknowledged that the each and every one of the limitations in the Challenged Independent Claims were found in prior art versions of Tic-Tac-Fruit, save the "automatically displaying" step and the point in the game when the "testing" step occurs.  Plaintiffs' First Supplemental Responses to Defendants' Fourth Set of Interrogatories, Exhibit A at 1-7.  It is my opinion that there is not sufficient written description for the "testing" limitations in the specification and I discuss that opinion below.  However, even if the Court finds that there is sufficient written description, the portions of the specification that purportedly support the "testing" limitations were paraphrased from admitted prior art descriptions of TTF including the Farley and Turner reports.  *See supra* at Section VI.A.1.  Plaintiffs

specifically acknowledge that "Versions prior to the versions of Tic-Tac-Fruit released in May-June 2006 … included the testing as part of the field construction algorithm, but not prior to displaying the game to the player."  Plaintiffs' First Supplemental Responses to Defendants' Fourth Set of Interrogatories, Exhibit A at 5-6.  Of course this statement is incorrect – the prior art TTF games' field construction algorithm was necessarily carried out prior to displaying the game to the player, otherwise there would be no game field to display.  Since the testing step was part of the field construction algorithm, it was therefore carried out prior to displaying the game to the player.  The Turner Report states that "[t]he player is presented a field completely filled with apparently random symbols selected from a set of nine.  The game constructs the field so that the initial field does not place three of the same symbols in a row."  POM000496.  The Turner Report describes the field construction steps on the next page, the last of which is "[t]est complete field for compliance with goals desired by steps 1 and 3 and repeat the construction process anew if compliance fails."  POM000497.  The Farley Report similarly describes the field construction steps and says "the player is then presented with the puzzle to solve."  POM000451.  Therefore, prior art TTF games also constructed and tested the game field prior to displaying or presenting the game to the player.

160.   As to displaying a game to the player, this function was well known at the time of the invention and in fact is one of the most basic behaviors of a gaming device, especially one with a video touchscreen.  As described in the Farley report, prior art TTF games displayed a game to the player before the player was prompted to select a location for a wild symbol.  As acknowledged by Mr. Pace, the same 1998 Pot of Gold system that could run the first versions of Tic-Tac-Fruit could also run the versions that Plaintiffs contend embody the claims.  In my opinion, taking the known steps of the prior art TTF game and changing the order of those steps so the display occurs before (rather than after) the player pays does not result in any technological improvement to the system carrying out those steps. As such, reordering the steps of prior art TTF games does not represent any technological advance, nor does it provide a solution to a technical problem.

161.   I understand that the Court earlier declined to rule that the '223 patent failed to disclose an inventive concept at the pleading stage because Plaintiffs "adequately allege[d] an inventive concept sufficient to survive a motion to dismiss" based on the claimed "game processor."  Dkt. 61 at 15-19.

162.   However, the "game processor," which is not even a claim limitation for claims 1-12 and 37-43, is not a specific component developed by Plaintiffs but rather is a generic component disclosed in the prior art that I have cited and discussed herein.  The '223 patent is directed to *any* conventional prior art game

processor that can be programmed to carry out the functional steps in the claims. The patent does not describe any technological problems existing in the art that needed to be overcome in order to configure a "game processor" (construed as a "a CPU or microprocessor that executes program instructions to generate a game") to perform any of the recited abstract steps, including the testing or preview steps. The patent describes no new technological solution (e.g., a novel platform or hardware) made necessary by limitations in the art or for specially configuring a game processor, as construed, for the capability to perform these steps. The claims recite no technological means for specially configuring a CPU, or microprocessor in this manner either.

163.   Before the '223 patent, "a game processor" was not new and could be programmed to perform the steps recited in the claims.  This fact is underscored by the Court's construction of "game processor" as simply "a CPU or microprocessor that executes program instructions to generate a game" and by the Court's adoption of the parties' agreed upon alternate construction of "program instructions" to mean "conventional commands that can be executed by a computer."

164.   The conventional nature of "game processor" can be seen, for example, in the disclosures of the prior art cited and discussed in my report, which disclosed and taught the same or similar conventional "game processors" (as the term was construed by the Court) for use in various wagering and gaming

applications. See, e.g., Vancura at Abstract (disclosing "a processor displaying on a second display a matrix comprising symbols . . . wherein the processor converts to wild the selected at least one symbol within the matrix and of awarding the player in accord with the displayed pay table"), Fig. 6, 6:15-26 (discussing the capability of the processor); U.S. Patent No. 5,882,258 to Kelly et al. ("Kelly") at Fig. 1a, 2:30-32 ("The game apparatus, for example, can take the form of a bar-top-style or arcade game console including a game processor, display screen and player controls."), 4:5-6, 4:10-25 (describing functions of the "game processor" such as "calculating and updating prize lists and prize costs"), 7:43-65, 10:11-24 ("The steps of method 200 are preferably performed by the game processor 12 of game unit 10 according to program instructions or code . . ."), Figs. 4 & 5; U.S. Patent No. 7,775,872 to Bleich et al. ("Bleich") at 1:35-54 ("the more modern day gaming machines which employ micro-processor control" such as one "providing video base wagering games (e.g., video poker, video blackjack, video keno, video pachinko, video lottery, and the like"), 12:49-61 ("The microprocessor 204 is capable of displaying images, symbols and other indicia . . . The program memory 202 is capable of storing program code which controls the gaming machine 10 so that it plays a particular game in accordance with applicable math models, game rules, and pay tables."); U.S. Patent Pub. No. 2004/0048659 to Seelig et al. ("Seelig") at Abstract ("The gaming device may also include a processor in

communication with the random number generator."), Figs. 7, 8 & 10, ¶¶[0063]-[0071] ("Processor 82 may control both skill game device 22 and game apparatus 24…"), ¶[0089], ¶[0113], ¶[0116]-[0119].

165.    As further demonstration that the game processor recited in the Challenged Claims of the '223 patent is conventional, each and every game terminal I reviewed that Plaintiffs purport to be an embodiment of the claimed invention operated on a conventional and well known processor obtained elsewhere.  Early versions of the prior art Tic-Tac-Fruit games[9] ran on a Pot of Gold motherboard, including a board marked "All Layers © 1999 Leisure Time Technology, Inc.," that used a Texas Instruments 34010 processor.  Pace Tr. at 47:22-48:2, 57:7-10, Cumming Decl. at Ex. A.  Later versions of Tic-Tac-Fruit also ran on a motherboard designed by Brad Skidmore that used an AMD Geode processor to emulate the Pot of Gold board.  Pace Tr. at 48:17-18, Cummings Decl. at Exhibit B.  And as discussed above, one of the Pennsylvania Skill games that I reviewed at Pace-O-Matic's headquarters used an MSI motherboard with an AMD processor.  Plaintiffs did not invent any of those motherboards nor the processors that were used within them.

166.    Nor are Plaintiffs' allegations regarding firmware correct.  Plaintiffs argued that "it is the firmware in the game processor that performs the task of

---

[9] E.g., version 4.71 from late 2004.  See Farley Report.

converting a game of chance into a game of skill." Dkt. 61 at 18-19. I disagree. The patent does not use the word "firmware" anywhere in the specification or claims, and the specification does not teach or suggest that firmware for converting a game of chance into a game of skill is somehow "in the game processor." Instead, Plaintiffs are apparently referring to the game software that would be stored in memory devices (*e.g.*, EPROM or flash media) and loaded by the processor for execution. See, *e.g.*, '223 patent at 12:24-26 ("the software of the present invention is capable of being distributed as a program product in a variety of forms") or claim 25 ("A computer program product for electronic gaming when executed on a game processor, the computer program product comprising a computer readable storage medium having computer readable code embedded therein, the computer readable storage medium comprising [five limitations reciting program instructions]"). A POSITA would understand that a processor with the ability to read instructions from a storage medium and execute them, regardless of what those instructions accomplish, is the purpose of a generic processor (as opposed to a purpose-built one).

167. Moreover, the purported innovations in the '223 patent – the testing feature and the preview feature – are directed to overcoming a legal challenge (i.e., "the task of converting a game of chance into a game of skill") rather than overcoming any technical challenge. Plaintiffs also stated "Although the Court

determined on the motion to dismiss that Claim 44 is not directed to a 'new technology,' and is therefore directed to an abstract concept, Plaintiffs respectfully dispute that part of the Court's opinion and intend to show that in fact, Claim 44 is directed to a new technology platform for elevating the level of skill into an electronic game." Plaintiffs' Sixth Supplemental Responses to Defendants' Second Set of Interrogatories at 15, 17, 23, 29, 36, 45. Plaintiffs make essentially the same argument with respect to claim 51, that it is "a new tangible, technology platform for elevating the level of skill into an electronic game." *Id.* at 16, 17, 23-24, 30, 36, 47. Plaintiffs also state "each of the claims at issue do far more than recite a mere desired result of an electronic game, but rather, recite a specific technical solution for accomplishing the goals of elevating the level of skill and reducing the level of chance in electronic gaming." *Id.* at 36.

168. A POSITA would recognize that Plaintiffs' "goals of elevating the level of skill and reducing the level of chance in electronic gaming" are not technical problems but legal ones. The solution was a non-technical one because the "testing" and "automatically displaying…" features that purportedly solve this problem could be implemented without any change in the underlying technology, as admitted by Mr. Pace. Pace Tr. at 47:22-48:21, 55:7-56:19, 57:7-10, 156:18-20, 199:23-202:15. The same technology that enabled games without these features

before the priority date could be used to provide a game that included these features.

169.   Further, there is no technological improvement as to how the claimed functions must (or must not) be performed, and the Challenged Claims only recite generic and conventional computer components for carrying out those functions (e.g., "game processor," "computer readable storage medium," "computer readable code," "program instructions," etc.)  In my opinion, the independent Challenged Claims recite only generic and conventional computer components to carry out the abstract idea to which they are directed.  Specifically:

   a.  The technology recited in independent claim 1 consists of "an interactive touch screen game display / game display / touch screen display" and "an electronic game terminal," both of which are well-known components and acknowledged to be within the admitted prior art;

   b.  The technology recited in independent claim 13 consists of "a touch screen display / interactive game display / game display / touch screen game display[10],"  "an electronic game terminal," and "a game processor."  That the "game processor" as

---

[10] Despite the lack of antecedent precision in the claim language, I understand the various references to touchscreen or interactive displays or game displays to all be referring to the same touchscreen display.

construed by the Court is a generic CPU has been addressed above, and the other two components are no different from their counterparts in claim 1, were well-known components, and acknowledged to be within the admitted prior art;

c. The technology recited in independent claim 25 consists of "a game processor," "a computer readable storage medium," and "computer readable code / program instructions." As above, "game processor" is generic. The specification states that "the software of the present invention is capable of being distributed as a program product in a variety of forms, and that the present invention applies regardless of the particular type of signal bearing media utilized to carry out the distribution. Examples of signal bearing media include, without limitation, recordable-type media such as diskettes or CD ROMs," '223 patent at 12:24-30. A POSITA would understand that recordable media such as diskettes or CD ROMs were conventional examples of "computer readable storage media." Further, "program instructions" were construed by the Court to be "conventional commands" and therefore cannot be unconventional.

d.  The technology recited in independent claim 37 is equivalent to that recited in claim 1: a touch screen display and an electronic game terminal.  As above, both are well-known components of the prior art, including the admitted prior art.

e.  The technology recited in independent claim 44 is equivalent to that recited in claim 13: a touch screen display, a game processor, and an electronic game terminal.  As above, all are well-known components of the prior art, including the admitted prior art.

f.  The technology recited in independent claim 51 is equivalent to that recited in claim 25: a game processor, a computer readable storage medium, and computer readable code / program instructions.  As above, all are well-known components of the prior art, including the admitted prior art.

170.   All of the independent Challenged Claims implement the abstract idea using only well-known computer components and functions according to their ordinary and expected usage, which therefore fails to transform the abstract idea in any independent Challenged Claim into a patent-eligible invention.

171.   Aside from the limitations of the independent Challenged Claims, the remainder of the Challenged Claims also fail to transform the abstract idea into a

patent-eligible invention.  In fact, Plaintiffs have acknowledged that the majority of the limitations in the Challenged Claims were found in prior art versions of Tic-Tac-Fruit.  Plaintiffs' First Supplemental Responses to Defendants' Fourth Interrogatories, Exhibit A at 1-7.  In my experience, as further illustrated by the prior art references cited below, these limitations were found in many other games as well as Tic-Tac-Fruit.  Some of the dependent Challenged Claims recite limitations for which, according to Plaintiffs, "No version of Tic-Tac-Fruit had this limitation."  However, setting aside the claim limitations related to a preview feature which I have already addressed above, these remaining limitations not found in Tic-Tac-Fruit are nevertheless related to well-known, routine and conventional features of gaming machines, also as demonstrated by the cited prior art below.  Such conventional features include:

    a.  "determin[e/ing] if the player has decided to play the game field displayed on the game display" in claims 3, 15, 27: this element is equivalent to the "determin[e/ing] if the player has decided to play" element claimed in independent claims 37, 44, 51 and Plaintiffs admit this functionality was found in prior TTF versions (with the inconsistent exception of claim 3).  In any event this functionality is found in every prior art interactive game discussed herein and is inherent: when an interactive

gaming machine processes user interaction with a game field, that processing constitutes a determination that the player has decided to play the game field displayed;

b. "wherein the constructed field is a two-dimensional array having a plurality of rows and columns" in claims 5, 18, 29, 40, 47, 54: this element is admitted in prior TTF games, and is also found in the vast majority of video slot games produced since the 1990s, including several of the prior art references discussed herein;

c. The limitations related to field construction in claims 6, 7, 19, 20, 30, 31: these limitations are admitted in prior TTF games;

d. "each winning combination of symbols has a predetermined probability of occurrence for a play of the game" in claims 11, 22, 33: this mathematical behavior is commonplace in slot machines and is admitted to be known by the background section of the '223 patent at 1:24-28;

e. "a one-dimensional array of game symbols" in claims 41, 48, 55: the vast majority of traditional, mechanical reel slot machines have a one-dimensional array of game symbols, including those depicted in Fey 1983 and 1989; and in any

event every two-dimensional array of game symbols (including

the game fields of TTF and most video slot machines) also

contains at least one one-dimensional array of game symbols;

f.  "generat[e/ing] and display[ing] an additional game field

simultaneously on the game display in proximity to the

displayed game" in claims 38, 45, 52: this feature is shown by

several prior art references including Cannon, Farrell,

McClintic, Chambers, Fey 1983 at 163, and Fey 1989 at 163;

g.  "wherein the additional game field is for a next game to be

played" in claims 39, 46, 53: this feature is shown by at least

Farrell and Cannon;

h.  "wherein the displayed game comprises a plurality of vertically-

oriented reels, each having a plurality of game symbols" in

claims 42, 49, 56: this feature is admitted in prior art TTF

games, is found in many of the prior art references applied

herein, and has been a recognized feature of gaming machines

for over 100 years.

172.  The testing and preview limitations recited in the claims and as

construed by the Court merely apply known abstract concepts, i.e., rules for

playing a game, using a conventional piece of computer hardware (i.e.,

microprocessor or CPU). The patent discloses no special platform or hardware required to incorporate these elements. Indeed, the claims merely recite performance of conventional features that could have been undertaken by a person playing a game. Nor are any claims rooted in computer technology that overcomes a problem arising in the realm of computers. Nowhere do the claims or the specification of the '223 patent specify how any particular problem or unconventional computer functionality is overcome.

173.   None of the other claims add any elements or features that would have been regarded as not routine or unconventional. For example, claims 47, 49, 54, 56, and 57 merely recite additional abstract, well-known and generic game features, such as "a two-dimensional array of game symbols" (claims 47 and 54), "a plurality of vertically-oriented reels, each having a plurality of game symbols" (claims 49 and 56). The other challenged claims likewise recite generic and conventional game steps and features. See, e.g., claim 3 ("determining if the player has decided to play the game field"), claim 6 (reciting steps for constructing the game field and populating it with symbols), claim 7 ("the orientation of each winning combination is horizontal, vertical or diagonal"). As demonstrated by the prior art analyzed in the charts attached to my report, these features were well-understood, routine, and conventional in the art and thus cannot transform the claims into a patent eligible application.

174.   Therefore, it is my opinion that all Challenged Claims fail to involve anything more than what would have been regarded as conventional, routine, or well-known by a POSITA in the field of the '223 patent and therefore are patent-ineligible.

## X.   THE CHALLENGED CLAIMS OF THE '223 PATENT ARE INVALID FOR LACK OF WRITTEN DESCRIPTION

175.   As above, I am informed that if some limitations of a claim are supported by the specification but one or more are not, then the claim lacks written description support.  I understand that the test for sufficiency of a written description is whether the disclosure of the application reasonably conveys to a POSITA that the inventor had possession of the claimed subject matter as of the filing date.  In my opinion, the claims of the '223 patent lack written description support.

### A.    The Testing Limitation

176.   All Challenged Claims include the limitation "test[ing] the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field."  The Court has construed this limitation to mean "test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated

inadvertently when the player completes a winning combination during play of the game." The Court has construed "winning combination" to mean "array of game symbols in the game field yielding a successful outcome."

177.     According to the prosecution history of the '223 patent, the initially filed claims on June 30, 2006 did not include a separate testing limitation. Instead, original independent claims 1, 14, and 27 disclosed a method including a step of "construct[ing] a field," and original dependent claims 6, 19 and 32 further limited the "construct[ing]" step in the parent claim to include a step of "test[ing] the field for compliance with at least one of the preceding selections prior to presenting the field to the player." Claims 1, 14, and 27 were amended on June 4, 2009, but dependent claims 6, 19, and 32 were not.

178.     On January 26, 2010, the "testing" limitations in claims 6, 19, and 32 were amended to delete reference to "compliance with at least one of the preceding steps" and to add the phrase "to ensure that a winning combination more valuable than the selected winning combinations is not generated inadvertently in completing the field." In an amendment, the applicant wrote "Claims 6, 19, and 32 have been amended to clarify the testing step. Support for the amendment is found at least in Paragraph 39." I disagree with the applicant's statement that the amendment "clarifies" the testing step. In my opinion, there is a vast difference in meaning between testing "for compliance with at least one of the preceding steps"

and testing "to ensure that a winning combination more valuable than the selected winning combinations is not generated inadvertently in completing the field." Those two phrases mean entirely different things so the amendment was not a clarification but a significant change in claim scope that is not supported by the patent specification as filed.

179.    I also disagree with the applicant's assertion that Paragraph 39 supports the amendment. Paragraph 39 (of the as-published application) states "a software algorithm assesses the arrangement of the prize(s) to be offered to assure that no other, more valuable prizes will inadvertently be presented." There is no other reference to anything "inadvertent" in the patent specification, and a POSITA would understand that the concept of presenting a prize is distinct from the concept of generating a winning combination in completing the field. This distinction is taught by the patent itself, which notes the distinction between a winning combination (of symbols) and a prize in its discussion of the paytable at Table 1, which discloses four different prizes for the same winning combination, depending on which denomination is played, and further that the same prize may be won with different combinations. For instance, a prize of 16 cents may be won by achieving a winning combination of 3 Oranges at a $1.00 denomination, or 3 Lemons at the $2.00 denomination, or 3 Cherries at the $4.00 denomination. Therefore,

Paragraph 39 of the as-published application fails to provide support for the notion that a "prize" and a "winning combination" are the same concept.

180.    Moreover, Paragraph 39 uses the phrase "software algorithm" as a placeholder phrase to refer to a functional goal – assessing the arrangement of prizes to be offered to assure no other, more valuable prizes will inadvertently be presented – rather than any description of how to perform that function.  No software algorithms are disclosed for performing the "assessing" function set forth in the specification.  Further, there is no written description in the specification of any software algorithm that could "ensure that a[n array of game symbols in the game field yielding a successful outcome] more valuable than the determined [array of game symbols in the game field yielding a successful outcome] is not generated inadvertently when the player completes a[n array of game symbols in the game field yielding a successful outcome] during play of the game."  In fact, the only other mention of "software algorithm" in the specification is found at paragraphs 51 and 53 of the as-published application (or '223 patent at 9:56-64 and 10:26-36), both times referring to "several rules of game field construction." Those rules disclose "testing the field for compliance with at least one of the preceding selections," a phrase that was paraphrased in the original claims but was *deleted* from the claims by the January 26, 2010 amendment.  Therefore, even if the disclosure of Paragraph 39 of the as-published application is found to

correspond to the claim language, the specification is nevertheless silent on any software algorithm for carrying out the claimed function.  As a result, a POSITA would have to guess at how to implement the claimed testing functionality, and would not know whether the solution they devised was the same as any algorithm that may have been possessed by the inventor, because there is no disclosure in the specification of any software algorithm for carrying out the claimed testing function.

181.   In Exhibit A to Plaintiffs' Second Supplemental Responses to Defendants' Third Set of Interrogatories, Plaintiffs contend that written description support for the "testing" limitation can be found in:

a. The '223 patent at 4:36-64; 6:19-33; 9:49-67 (and related figure); 10:29-36 (and related figure);

b. U.S. Pat. Appl. 11/428,026 at [008]-[011]; [025]-[026]; [032]; [044] (and related figure); [046] (and related figure); claim 6; claim 19;

c. U.S. Pat. Appl. 11/430,770 at [008]-[010]; [023]-[024]; [030]; [047] and related figure; claim 5; claim 17;

d. U.S. Provisional Pat. Appl. 60/788,363 at [022]-[023]; [029].

182.   In all cases, I disagree.  The identified portions of the '223 patent specification at 4:36-64, 9:49-67, and 10:29-36 mention "testing the field for

compliance with at least one of the preceding selections" which, as discussed above, is distinct from the claimed testing limitation. Plaintiffs also identify Figures 5 and 6, but those figures do not mention testing whatsoever so do not provide support. Finally, as to 6:19-33, that portion of the specification is equivalent to applicant's reference to Paragraph 39 of the as-published application during prosecution. As discussed above, that passage relates to "assessing the arrangement of prizes" but not "winning combinations," and also does not disclose any algorithm to accomplish goal, which is stated in purely functional terms.

183.    The identified portions of the '026 application at [008]-[011] do not disclose any testing and therefore do not provide support. The portions at [025]-[026], [044] and [046] are equivalent to the '223 patent at 4:36-64, 9:49-67, and 10:29-36 and do not provide support as discussed above. The related figures 5 and 6 are equivalent to the '223 patent at figures 5 and 6 and do not mention testing, so do not provide support as discussed above. The portion at [032] is equivalent to the '223 patent at 6:19-33 and does not provide support as discussed above. Claims 6 and 19 mention "testing the field for compliance" which, as discussed above, is distinct from the claimed testing step.

184.    The identified portions of the '770 application at [008]-[010] do not disclose any testing and therefore do not provide support. The portions at [023]-[024] and [047] are equivalent to the '223 patent at 4:36-64, 9:49-67 and do not

provide support as discussed above.  The related figure 7 is equivalent to the '223 patent at figure 5 and does not mention testing, so does not provide support as discussed above.  The portion at [030] is equivalent to the '223 patent at 6:19-33 and does not provide support as discussed above.  Claims 5 and 17 mention "testing the field for compliance" which, as discussed above, is distinct from the claimed testing step.

185.    The identified portions of the provisional '363 application at [022]-[023] are equivalent to the '223 patent at 4:36-64 and do not provide support as discussed above.  The portion at [023] is equivalent to the '223 patent at 6:19-33 and does not provide support as discussed above.

186.    Therefore, in my opinion, the claims as amended by the examiner fail to find written description support in the specification.  Further, there is no evidence that the inventor had possession of an invention where the claimed step of testing was separate from the claimed step of constructing the field.

187.    For the above reasons, it is my opinion that all Challenged Claims are invalid for lack of written description.

**B.    Claims 11, 22, and 33 (Predetermined Probability of Occurrence)**

188.    In my opinion, claims 11, 22, and 33 are indefinite under § 112, ¶ 1. Each of these claims requires "wherein each winning combination of symbols has a predetermined probability of occurrence for a play of the game."  The '223

patent's specification fails to provide any details about how the named inventor intended for the claimed winning combination of symbols to have a predetermined probability of occurrence for any instance of game play. The patent teaches that "there is always the possibility that at least one line can be formed," *see* 4:24-25, but the patent never explains how any given winning combination might have a predetermined probability of occurrence or gives any examples of such predetermined probabilities. Because there is no written description support that explains anything about predetermined probability of occurrences for winning combinations, the claims merely recite a description of the problem to be solved while claiming all solutions to it and leaving it to the game designer to complete an unfinished invention.

### C.    Claims 45-46 (Additional Game Field)

189.    Claim 45 recites "a component for generating and displaying an additional game field simultaneously on the game display in proximity to the displayed game." Claim 46 depends from claim 45. Plaintiffs concede these claims are subject to means-plus-function treatment.

190.    Claims 45 and 46 are indefinite because the specification fails to disclose sufficient structure for performing each of the functions recited in these claims. No corresponding structure can be identified because the specification fails to disclose algorithms for performing the claimed functions. A POSITA

would understand that the functions recited in these claims are performed at least in part by software algorithms.

191.    The '223 patent's specification fails to disclose any algorithms for performing the functions recited in these claims.  The specification refers loosely to "underlying software algorithms" used for game construction, but fails to disclose such algorithms.

## XI.    ANTICIPATION AND OBVIOUSNESS OF THE '223 PATENT

### A.    The Applied Prior Art

#### 1.    Applicant Admitted Prior Art: Tic-Tac-Fruit

192.    Tic-Tac-Fruit (hereinafter "TTF") is described in the '223 patent specification at 3:43-10:21, and the specification admits this description is "of the Tic-Tac Fruit electronic skill-based amusement game developed and licensed by Pace-O-Matic, Inc." '223 patent at 3:59-61.  The Plaintiffs further admit that, with the exception of the purportedly-novel "automatically displaying an actual game to be played … prior to initiating activation of game play" element, all of the functionality claimed in at least the independent claims of the '223 patent was in prior art Tic-Tac-Fruit games.  Plaintiffs' First Supplemental Responses to Defendants' Fourth Set of Interrogatories, Ex. A at 5-6.  Specifically, Plaintiffs stated that "[v]ersions prior to the versions of Tic-Tac-Fruit released in May-June 2006 … included the testing as part of the field construction algorithm, but not prior to displaying the game to the player." *Id.*  However, all prior versions of Tic-

Tac-Fruit constructed, tested, and displayed a game field to be played to the player. The distinction alleged by Plaintiffs between prior versions of Tic-Tac-Fruit and the claimed invention lies in performing Tic-Tac-Fruit's known steps of constructing, testing and displaying the game field before "initiating activation of game play" rather than afterwards.

193.    Further descriptions of prior versions of the Tic-Tac-Fruit game may be found in "Tic-Tac-Fruit: An Analysis" by Clay S. Turner, published November 15, 2004 and available at POM000496-POM000498 (herein, "Turner Report"), and "Report on the Review and Analysis of the Tic-Tac-Fruit Game," by Nick Farley, published March 7, 2005 and available at POM000450-POM000469 (herein, "Farley Report"). Both references appear on the face of the '223 patent under "Other Publications." Both references were submitted by the applicant during prosecution in an Information Disclosure Statement dated August 29, 2006. Plaintiffs have admitted that both the Farley Report and the Turner Report are prior art to the '223 patent, *see* Plaintiffs' Responses to RFA Nos. 1 and 3, and both reports evidence that prior versions of TTF were known or used by others and in at least public use more than one year before the '223 patent's filing date.

194.    Versions of TTF were available as prior art to the '223 patent as a product that was known, used by others, and/or on sale in the United States before the invention of the '223 patent pursuant to 35 U.S.C. § 102(a) and § 102(b).

Pace-O-Matic, Inc. developed and Ohio Skill Games distributed at least some versions of the game prior to the filing date, priority dates or purported conception dates of the '223 patent including versions (including but not limited to 4.71, 4.91, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and/or 5.27) that were distributed at least as early as February 11, 2005.

195.    Evidence of the features of the TTF game are also shown in the Pittsburgh Post-Gazette's article "Ohio 'skill' game a cross-border lure," which was published April 30, 2006, and is available at https://www.post-gazette.com/local/casino-news/2006/05/01/Ohio-skill-game-a-cross-border-lure/stories/200605010141 ("Gazette Article").  PA0000169-173.

### 2.    Patent References

196.    U.S. Pat. Pub. No 2004/0176167 to Michaelson et al. ("Michaelson") describes a central determination gaming system.  PA0000133-154.

197.    UK Pat. App. GB2251112 to Marchini et al. ("Marchini") describes a gaming machine with a video touch-screen display, and a game involving symbol-bearing reels and several functions including "nudge", "hold" and "gamble." PA0000098-109.

198.    U.S. Patent No. 8,491,369 to Kowell ("Kowell") describes a skill game including a "configuration wherein the player may preview the game to be played."  Kowell at 2:29-30.  That configuration involves "a preview button that

shows the player the first step of the game to be played as well as the prize that he will be playing for." *Id.* at 2:32-34.  PA0000082-89.

199.   U.S. Pat. No. 5,482,289 to Weingardt ("Weingardt") describes a bingo game with a seven-by-seven matrix.  PA0000268-279.

200.   U.S. Pat. No. 7,040,985 to Vancura ("Vancura") describes a gaming machine feature that allows a player to select a symbol within a matrix of symbols to convert into a wild symbol.  PA0000207-222.

201.   U.S. Pat. No. 7,108,602 to Daly ("Daly") describes a slot machine game with selectable reels.  PA0000034-52.

202.   EP Pat. App. No. 449,433 to Farrell et al. ("Farrell") describes a gaming machine with a set of reels and a 3x3 matrix display, where "[t]he matrix display may be held and continued over to successive spins of the reels."  Farrell at 4:1.  PA0000053-61.

203.   UK Pat. App. No. GB2,382,911 to Chambers ("Chambers") describes a gaming machine that allows a player to "construct his/her own game from a variety of options" … "before play of [the] game is commenced."  Chambers at 2:15-16, 3:22-23.  PA0000010-31.

204.   U.S. Pat. Pub. No. 2004/0224745 to Bregenzer ("Bregenzer") describes "a gaming machine in which the player is told in advance that the indicia

displays will reveal a winning combination."  Bregenzer at Abstract.  PA0000001-9.

205.   U.S. Pat. Pub. No. 2005/0003883 to Muir et al. ("Muir") describes a gaming machine that permits a player to preview a game with no cost to the player. PA0000155-168.

206.   U.S. Pat. No. 6,602,133 to Chan ("Chan") describes an electronic puzzle game that generates a puzzle grid.  PA0000358-372.

207.   U.S. Patent No. 6,964,416 to McClintic et al. ("McClintic") describes a gaming machine with matrix of indicia and an indicia-matching game, including the features of an "initial brief revealing of indicia" and a "sneak peek."  McClintic at 8:26-36.  PA0000409-423.

208.   U.S. Patent No. 6,860,810 to Cannon et al. ("Cannon") describes a gaming machine that presents multiple games simultaneously.  PA0000377-408.

209.   U.S. Pat. Pub. No. 2003/0060276 to Walker et al. ("Walker") describes a gaming method that offers a "guaranteed win."  PA0000233-267.

### 3.    Other Publications

210.   *William N. Thompson,* Gambling in America, An Encyclopedia of History, Issues, and Society (2001) ("Gambling in America"), PA0000062-65.

211.   *Commonwealth v. McClintock,* 257 Mass. 431, 432-35, 154 N.E. 264, 264 (1926), PA0000032-33.

212.  *State v. Ellis*, 200 Iowa 1228, 206 N.W. 105, 105-06 (1925),

PA0000196-198.

213.  In re: FOE Aerie 2171, Testimony of William Riedthaler,

*Proceedings Before the Liquor Control Commission of the State of Ohio*, Case No.

1342-05 (Oct. 19, 2005) and/or any associated expert report ("Riedthaler

Testimony"), PA0000182-193, HC00005699-5778.

214.  Testimony of Robert Sertell, *Akron v. Georgekopoulos*, Case No. 05

CRS 15037 (Aug. 11, 2006) and/or any associated expert report ("Sertell

Testimony"), POM017914-932.

215.  S.B. 220, 126th General Assembly, Regular Session (Ohio 2005) and

Dennis Papp, *Ohio SB 220 Bill Analysis – Legislature Service Commission*, 126th

General Assembly Regular Session (October 27, 2005) ("Dennis Papp SB 220

Analysis," collectively "Ohio SB 220"), PA0000174-181, PA0000280-299.

216.  Slade Gorton, et al., *Lotteries -- Gambling -- Pinball Machines --*

*Punchboards -- Pull Tabs -- Cards -- Bingo -- Authority To License -- City –*

*County*, Wash. Att'y Gen. Op. 1969 NO. 9, 1969 WL 98526 (Apr. 30, 1969)

("Gorton Gambling Article"), PA0000066-81.

217.  *R. v. Bailey*, [1938] 2 D.L.R. 762 (Can. Ont. C.A.) ("Bailey I"),

PA0000373.

218.  *Bailey v. R.*, [1938] S.C.R. 427 (Can) ("Bailey II"), PA0000374-376.

219.    Marshall Fey, *Slot Machines A Pictorial History of the First 100 Years,* (2nd ed. 1989) ("Fey 1989"), PA0000327-357.

220.    Marshall Fey, *Slot Machines An Illustrated History of America's Most Popular Coin-Operated Gaming Device*, (1983) ("Fey 1983"), PA0000300-326.

221.    *State v. 26 Gaming Machines*, No. 03-173, (Ark. 2004) ("26 Gaming"), PA0000424-431.

### 4.    Other Publicly-Available Products

222.    The NudgeMaster game that was publicly disclosed, used and/or commercialized, or described in publications that describe the game, before the alleged date of invention (May 2, 2006) and more than one year before the application filing date (June 30, 2006) of the '223 patent including similar versions developed by or with Skill Tech Gaming LLC and/or World Touch Gaming Inc. that utilize different branding or graphics ("NudgeMaster").

223.    Evidence of the features of and public availability the Nudgemaster game can be seen in a YouTube video posted by user "UniversalAmusement," showing a game displaying a 2004 copyright date, which is available at https://www.youtube.com/watch?v=XCCfMtFafgw&feature=youtu.be ("UniversalAmusement Video"), as described by Mr. Fiechter during his deposition, as described in the draft Farley report dated December 14, 2006

(Fiechter Depo. Ex. 3), and as described in the Farley report dated January 30, 2007 (Fiechter Depo. Ex. 4).

**B.    The Challenged Claims of the '223 Patent are Rendered Obvious in Light of the Applied Prior Art**

224.    It is my opinion that the Challenged Claims of the '223 patent are rendered obvious in view of the prior art described above, taken alone or in conjunction with other prior art references and in view of the knowledge of a person of ordinary skill.  I have reached these conclusions in light of the Court's construction of the claim terms as described above.

225.    Plaintiffs contend that games that require the pressing of a button to display an actual game to be played before a player initiates activation of game play are commercial embodiments of the invention.  *See supra at* Section VIII.B.2. Plaintiffs' Sixth Supplemental Responses to Defendants' Second Set of Interrogatories at 3-14.  I disagree that a game that requires the press of a button to display a game satisfies the "automatically displaying . . ." step recited in each of the claims of the '223 patent.  But even if it did, my opinion would still be that the prior art references listed in this report render the claims obvious to a POSITA at the time of the invention.

226.    Claim charts attached as Appendices A-1 through A-6 identify where each element of the Challenged Claims can be found in each prior art reference. All citations to prior art references and screenshots contained within these

Appendices are exemplary and I explicitly reserve my right to supplement or amend any of my Appendices in response to opinions expressed by Plaintiffs' experts or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this report. Although I cite to certain features of the prior art in my report, I reserve the right to further elaborate on the teachings of these references at trial and refer to other features that may be not specifically cited herein but that further support my analysis. My Report and Appendices are cumulative to one another, and my opinion is reflected in the aggregate of these documents. As such, the information contained in my Appendices is incorporated by reference into the Report, and the information in the Report is incorporated by reference into the Appendices.

## 1.     Tic-Tac-Fruit

227.   In my opinion, prior art versions of Tic-Tac-Fruit, alone or in combination with certain other prior art references, discloses or renders obvious all elements of the Challenged Claims. I incorporate Appendix A-1 which provides an element-by-element analysis of each Challenged Claim and explains where, in TTF or the other cited prior art references, each element may be found, as well as certain reasons why a POSITA would have a reason to modify and/or combine those references. In addition, as noted above, a POSITA would have reason to modify and/or combine the teachings of TTF with the other references cited in

Appendix A-1 at least because the references are all related to known features of gaming machines.  In addition, a game designer's job includes the modifying, mixing, and matching of known features of gaming machines within regulatory constraints to continually develop new and exciting gaming products.  I additionally address certain claim elements below:

### a.    At Least One Winning Combination for Each Play of the Game

228.    With respect to the Challenged Claims' limitation of "determin[ing] at least one winning combination for each play of the game," prior versions of TTF had this feature, as admitted by Plaintiffs.  *See* Plaintiffs' First Supplemental Responses to Defendants' Fourth Set of Interrogatories, Exhibit A; *see also* Appendix A-1 at Element 44.4.  Other games, including those disclosed and described by Bregenzer, Walker, Fey 1983, and Fey 1989, likewise had this feature.  *Id.*

229.    A POSITA would have been motivated to combine the teachings of Bregenzer, Walker, Fey 1983, and Fey 1989 with TTF because they all teach gaming machine games wherein there is at least one way to win for every play of the game.  A POSITA would have understood that the concept of a gaming machine that provides the opportunity to win on every play dates back over 100 years, as described in the cited portions of Fey 1983 and Fey 1989.  Moreover, a game that did not allow for the possibility to be won every time could easily be

modified so that it could be won every time, and the results of modifying the game in this way would be predictable. A POSITA would understand that the possibilities for winning plays in slot machine games are usually represented by predetermined winning symbol combinations listed on a paytable, so it would have been obvious to a POSITA to implement the feature of providing the opportunity to win on every play by ensuring that at least one of the winning combinations would result, for example, if the player played the game correctly.

### b.    Testing

230.    With respect to the Challenged Claims' limitation of "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," prior versions of TTF had this feature as admitted by Plaintiffs. Appendix A-1 at Element 44.5. In TTF, testing is (and was) part of the field construction step. Also, both the Farley and Turner reports describe that, in prior art TTF games, a game field is constructed before it is displayed to a player and that the field construction step involves a testing step. Farley Report at POM000451, Turner Report at POM000496-497. Other games, including those described by Michaelson, likewise disclosed game field testing that renders this limitation obvious. Appendix A-1 at Element 44.5. A POSITA would have understood that in any gaming system where a particular play's win amount

cannot exceed a predetermined value, including the system of TTF and many central determinant systems (such as Michaelson), the game field presented to the player cannot result in the win of a prize larger than that predetermined value. A POSITA would have been motivated to look to both TTF and Michaelson for the additional reason that both references disclose games involving a finite pool of game outcomes. When creating a graphical display to represent a game outcome, a POSITA would understand that some game field construction algorithms could possibly lead to an outcome greater than the outcome selected from the finite pool, such as by using randomness in the field construction process. Games of that nature would logically include testing to ensure that unintended wins outside of that finite pool cannot be achieved inadvertently when the player plays the game. *See* Michaelson at [0005]-[0007], Farley Report at 5. TTF uses such an algorithm. Turner Report at 2. A POSITA would also understand that testing to avoid critical failure conditions in software systems is a best practice; and in the case of gaming machine software, "paying the player too much" would be a critical failure condition as it would break the game's intended mathematics, possibly cause a loss to the operator, and/or lead to regulatory violations. As such, a POSITA would have understood that a field of game symbols generated randomly (or partly-randomly) for the purpose of presenting a game outcome selected from a finite pool should be tested to ensure that it does not present the player with an

opportunity to win a prize greater than the selected outcome itself. A POSITA would have been prompted and motivated to add such a testing feature to a game to avoid unintended outcomes and potential liability as described above. This would be a modification within the skill-set of a POSITA and would merely involve writing software routines to perform the testing for integration with the game software, and the results would have been predictable.

### c.    Automatically Displaying

231.   With respect to the Challenged Claims' limitations of "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," prior versions of TTF provided a display of an actual game to be played on the touch screen game display to a player <u>after</u> initiating activation of game play. Appendix A-1 at Element 44.6. In my opinion, a POSITA would have found it obvious to reorder the steps of displaying and initiating activation because there are only two possible orderings (either the displaying comes before or after the initiating activation), the result of each ordering would have been predictable and unsurprising to a POSITA. Automating the display would also have been obvious to a POSITA at least because automatic displays are common-place in the gaming industry including, for example, the automatic display of a bonus feature that is triggered by a symbol combination from a base game. *See* Bregenzer at [0007], [0016]. In addition, it would have

been obvious to display the actual game automatically. This is evidenced by at least the testimony of Mr. Riedthaler discussed herein, and obvious in view of at least the Kowell reference. A POSITA would have had the ability to implement either ordering, whether the displaying was to be triggered by a player pressing a button or not. As evidenced by at least the testimony of William Riedthaler, cited and discussed herein, it was known to reorder steps in this fashion to improve the functioning of games (and in particular TTF) so that they player would know what they were playing for before committing to play the game.

232.   Other games, including those described by Kowell, Weingardt, Daly, Muir, *State v. Ellis*, *Commonwealth v. McClintock*, Gambling in America, Farrell, Ohio SB 220, Gorton Gambling Article, Fey 1983, Fey 1989, Chan, McClintic, *Bailey I*, *Bailey II*, and NudgeMaster, likewise had features (*e.g.*, Kowell's "preview" button,[11] Daly's held-over reels, Gambling in America's "machines … that would tell the player *exactly* what they would win when they put the next coin in," Fey's future pay concept, McClintic's "sneak peek," NudgeMaster's "press here to view next play" button) that display to a player aspects of a game outcome before play. These games provide further evidence that it would have been obvious to a POSITA to automatically display an actual game to be played, since at

[11] As above, Plaintiffs consider a preview display triggered by a button to be an "automatic display"

least some of them (McClintic, Fey, Daly, Bailey I, Bailey II) performed their respective displays without requiring the player to press a button. Appendix A-1 at Element 44.6. A POSITA would have thus been well aware of game features that displayed an actual game to be played prior to the player initiating game play and would have been prompted to and been able to easily modify TTF to include this feature whether the display was triggered by a button or not.

233. A POSITA would have understood that one of the motivating factors for including a feature that automatically displayed an actual game to be played prior to the player initiating game play was to eliminate the element of chance. This is acknowledged by Plaintiffs, describing the '223 patent as directed to "the elimination of chance through the ability of a player to see the next game outcome on-screen before ever making a financial commitment. This enhances the appeal of the game in jurisdictions which do not permit games of chance, but do permit games of predominant skill." Amended Complaint at ¶ 23. However, the motivation to eliminate chance in gaming machines and thereby "enhance the appeal of games in jurisdictions which do not permit games of chance" dates back over 100 years, as described in the cited portions of Fey 1983 and Fey 1989, as well as Fey 1983 at 154 and Fey 1989 at 154 (describing the Mills O.K. Gum Vender whose indicator window "showed in advance just how many premium checks the player would get"). The Fey references explain that "The deferred or

future pay concept introduced in 1912 and used on slots through the 1920's was among the cleverist [sic] and most successful ruses devised to pass off slot machines as non-gambling devices.  The player knew in advance before he inserted a coin if he would win or lose on the next handle pull, thus theoretically eliminating the chance element."  Fey 1983 at 161.  A POSITA wanting to "pass off slot machines as non-gambling devices" would therefore have been motivated to "theoretically eliminate the chance element" in other games by implementing the future pay concept introduced in 1912.  A POSITA would also have been motivated to seek such a solution because it was widely known that gambling devices were more stringently-regulated (and/or more often prohibited) than non-gambling devices, and any feature that would evade prohibition would therefore lead to increased acceptance.

234.    The evidence indicates that Pace-O-Matic's product development was similarly motivated by a desire to try to eliminate the element of chance.  A Memorandum of Understanding dated June 23, 2006 and filed with the Franklin County Municipal Court discusses versions of TTF that had been seized by the State of Ohio because "the State maintains that the TTF machines using software versions 4.71, 4.91, 4.95, 5.02, 5.08, 5.23, 5.24, 5.25, 5.26, and 5.27 are not in compliance with Ohio gambling statutes as set forth at Ohio Rev. Code § 2915.01, *et seq.*"  POM002385-2390.  Therefore, prior to the Critical Date, both Pace-O-

Matic and a POSITA would have understood that prior versions of TTF had been

deemed illegal gambling machines by at least some authorities in the State of Ohio.

An April 5, 2012 document entitled "Pace O Matic Trademark and Patent Status"

states that the '223 patent "protects the chance removal feature of a game via a

preview screen." POM_ESI_03518-19. Similarly, an August 14, 2013 document

entitled "Paceomatic's Patent Portfolio" purportedly authored by Clay S. Turner

states "Preview feature used to remove chance from a skill game since a player

may look at the next puzzle before committing to play of the game."

POM_ESI_00464. These documents suggest that the motivation for Pace-O-Matic

to add the preview screen to TTF was the same motivation – to demonstrate to

local and state governing authorities that the game was different from a traditional

slot machine where the outcome is unknown to the player in advance and depends

on pure chance – that prompted the "future pay" concept on mechanical slot

machines over 100 years ago. The existence of this motivation is further

evidenced by the fact that a state expert, Mr. Riedthaler, called by the Ohio

attorney general to analyze whether TTF was a legal skill-based game under Ohio

law, said he wouldn't have a problem with the game if it displayed a preview of the

game to be played (*see* Riedthaler Testimony discussed herein). For at least these

reasons it is my opinion that a POSITA would have found it obvious to add a

preview of the actual game feature to TTF so that it would be possible to make the

same argument articulated in Fey and in Gambling in America with respect to the deferred and future pay machines (discussed above) and, by Riedthaler with respect to TTF in particular, to government regulators that the TTF game, as modified, is different from a traditional slot machine because it reveals to the player the outcome of the next game to be played, by showing a preview of the next game field to be played, and this eliminates the element of chance because the player knows what he or she will be playing for.

235.    A POSITA would have also been motivated to combine TTF with the Riedthaler Testimony (and to modify TTF to conform with what Mr. Riedthaler testified would be acceptable under Ohio law at the time). This motivation is plainly demonstrated because Mr. Riedthaler was specifically answering questions about a TTF game machine in the hearing room when he described the proposed solution under cross-examination. Riedthaler Testimony at 54:14-55:20. As discussed above, it is my opinion that cross-examining counsel Mr. Gearhiser and Mr. Riedthaler had several exchanges that expressly disclosed the idea of modifying TTF to include the feature of "automatically displaying an actual game to be played on the touch screen display to a player prior to initiating activation of game play" including:

a. "Q: If this machine put the field that you were going to play prior to your putting the dollar in, would that change your opinion any?" Riedthaler Testimony at 144:23-145:2

b. "Q: "With that pattern out there right now. … Now, if I come up to the machine, and I haven't put my dollar in yet, but this is now on the machine.

A: And this is the game that you'll be playing.

Q: And this is the game that I'm going to be playing.

A: Right.

Q:  And I know ahead of time that all I would have done if I put $.50 into this machine, or if I'm going to play it, the only thing I was going to win was $.10?

A: Right.

Q: If that was up there and everything else is the same on this machine?

A: Right.

Q: I think you're giving it your blessing?

A: I wouldn't see a problem with it.  Because you're basing – your skill is completing the task as well as knowing what your prize is that you're going to receive." *Id.* at 148:23-149:24.

236.    A POSITA would have understood that Mr. Gearhiser's and Mr. Riedthaler's reference to "this" (as in "***this*** is now on the machine" and "***this*** is the game that you'll be playing") is identification of "an actual game to be played" as construed by the Court, because just a moment before Mr. Gearhiser had "changed the play so we can let it time out" and then asked "I come up to the machine, and I haven't put my dollar in yet, but ***this*** is now on the machine."  In other words, a POSITA familiar with the full transcript would have understood that Mr. Gearhiser was suggesting that, without any other interaction and prior to initiating activation of game play, a player could "come up to" a TTF machine and observe an automatic display of the constructed game field of the game to be played, and asking Mr. Riedthaler whether TTF would be legal if it behaved that way.  This understanding was later confirmed by Mr. Gearhiser himself.  Gearhiser Tr. at 63:4-65:24 ("if we could find a way to present the field to the player prior to the play, would that remove the state, in this case Mr. Riedthaler's objection to the game?")  Mr. Riedthaler answered in the affirmative.  In view of the above testimony, it is my opinion that a POSITA would have found it obvious to implement Mr. Gearhiser's suggested modifications to TTF to result in a game that would receive regulatory blessing, at least in Ohio.  Mr. Riedthaler stated that "[i]f you knew the outcome, you knew the schedule, and that you knew the process you were going into, then it would be a skill" and "your skill is completing the task as

well as knowing what your prize is that you're going to receive." *Id.* at 146:12-15, 149:22-24.  Mr. Riedthaler's references to "skill" are in the context of the controlling Ohio laws that prohibit games whose outcomes are "determined largely or wholly by chance."  Ohio Rev. Code § 2915.01, *et seq.*  Therefore, a POSITA would have understood from Mr. Riedthaler's testimony that modifying TTF by adding a preview screen was, at least in Ohio, a path toward approval because according to Mr. Riedthaler this would render the game one of skill rather than one of chance.

237.   At his deposition, Mr. Pace acknowledged that this is precisely what he did:

> a.  Mr. Pace recalled that Mr. Riedthaler said "the problem he had with the game … was that the players did not know what they were playing for.  I remember that line very clearly."  Pace Tr. at 105:18-21.
>
> b.  "I'm pretty sure [Mr. Riedthaler's] words were that he didn't think our current product was legal, because the player did not know what they were playing for."  Pace Tr. at 100:6-9.
>
> c.  "After I had talked to Reidthaler I remember telling Grant Cowell [sic] … So I told them we're going to do this – try to get – figure up how to solve the – this problem because it was

important to Reidthaler. So therefore, important to the state, as he was their expert report, to try to find some way in the code or graphically to add a feature to a game that accomplished what he wanted, which was to make sure that the players knew what they were playing for." Pace Tr. at 140:11-25.

238. Mr. Pace's testimony reveals that he was motivated in the same way a POSITA would have been: to try to satisfy the conditions for regulatory compliance. A POSITA would have known that those conditions for compliance were, in the State of Ohio where the Riedthaler Testimony had been given, pending amendment to include the requirement "that the individual must be aware of what prize or reward will occur prior to the start of play." Dennis Papp SB 220 Analysis at 1, PA0000174. In my opinion, a POSITA would have found it obvious to modify a non-compliant gaming product (or one that may soon become non-compliant) to attempt to satisfy the conditions for regulatory compliance. It is an essential part of the game design process to ensure that, in a regulated industry such as gaming, the products being designed can be legally sold into and operated in the target markets. Moreover, the testimony from Mr. Riedthaler did not just allege a regulatory problem with the prior versions of TTF, but provided a solution to address the identified regulatory issue. Mr. Gearhiser specifically asked about modifying TTF to automatically display the "field that you were going to play" or

"the game that you'll be playing" prior to the player coming up to the machine and putting money in, and Mr. Riedthaler acknowledged that such a modification would be acceptable because, in his opinion, it would then be a skill game. In my opinion, a POSITA familiar with this testimony would have found it obvious to implement the modification to TTF proposed by Mr. Gearhiser and blessed by Mr. Riedthaler. In my opinion, when a regulatory authority blesses a proposed modification to a non-compliant game that would achieve compliance, it is obvious and not inventive to make that modification.

239.    Moreover, a POSITA would understand that there were only a limited number of solutions to the known problem of showing the player "what they were playing for" so as to theoretically eliminate chance from a game or comply with regulations. As noted above, the concept of a gaming machine that displays the amount of the next prize before the player makes the next play is over 100 years old. Moreover, it was certainly within the capabilities of a POSITA before the alleged date of invention and filing date of the '223 patent to display on a computerized video gaming machine a video game presentation that leads to a prize—since computerized video gaming machines can display whatever they are programmed to display. For example, the prior art NudgeMaster video game shows a button on the touch screen that reads "PRESS HERE TO VIEW NEXT PLAY". It would have been obvious to a POSITA in view of that button that

pressing the button would show the player the "NEXT PLAY," and a POSITA would also have understood that the "NEXT PLAY" was the screen they could expect to view on their next play – such as an actual game to be played.  The Kowell reference similarly teaches "a preview button that shows the player the first step of the game to be played as well as the prize that he will be playing for." Kowell at 2:32-34.  Similarly, the puzzle game described in McClintic uses a video screen that displays an "initial brief revealing of indicia" and a "sneak peek" of the actual puzzle to be played.  McClintic at 8:27-36, FIG. 3.  Therefore, a POSITA would have known that the prior art solutions to the known problem of showing a player what they were playing for included both displaying the amount of the next prize as well as displaying the next game presentation or game field to be played. At deposition, Mr. Pace admitted that, after prompting from Mr. Riedthaler, he began to explore these limited solutions and moreover considered all of them to be a "preview feature."  Pace Tr. at 140:11-25, 117:10-120:5, 86:21-87:4, 40:25-41:1. In my opinion, Mr. Pace was not inventing during this exploration but was merely carrying out the same level of ordinary creativity that a POSITA would have done when faced with the same regulatory requirement to "show the player what they were playing for."

240.    Additionally, many known gaming machines carry over game state from one play to the next.  For example, a progressive jackpot is a prize that

increases from one play to the next based on amounts wagered on prior non-winning plays.  As another example, several types of gaming machines allow game state to carry over from one play to the next, as opposed to many traditional slot machines wherein each spin is independent from the next.  Daly is an example of such a game in that some of Daly's prior game's reels (and therefore the symbols on those reels) are not spun each game and instead carry over from one game to the next.  Daly at 2:66-3:4.  Farrell is another example of such a game in that symbols in Farrell's "matrix display may be held and continued over to successive spins of the reels."  Farrell at 4:1.  Some games that carry over game state from one play to the next involve collecting a plurality of bonus-triggering symbols and are known as "accumulator bonus" games.  In such games, the player can observe on the screen how many remaining bonus symbols need to be collected in order to trigger the bonus game, before initiating gameplay.  I personally designed several accumulator bonus games in the late 1990s.  In sum, a POSITA would understand that many prior games displayed at least some of the symbols or other game elements that would appear in the next game, prior to initiating activation of that next game.  In my opinion, a POSITA would have thought it obvious to display all of them, would not have had any difficulty in implementing that modification, and would have been unsurprised by the results.

241.   Therefore, for the above reasons, as well as those mentioned in Appendix A-1, it is my opinion that TTF, either alone or in combination with the other cited references, either discloses or renders obvious each element of the Challenged Claims.

### 2.    Walker et al.

242.   In my opinion, Walker, alone or in combination with certain other prior art references, discloses or renders obvious all elements of the Challenged Claims.  I incorporate Appendix A-2 which provides an element-by-element analysis of each Challenged Claim and explains where, in Walker or the other cited prior art references, each element may be found, as well as certain reasons why a POSITA would have thought to combine those references.  In addition, as noted above, a POSITA would have thought to combine the teachings of Walker with the other references cited in Appendix A-2 at least because they are all related to known features of gaming machines as well as regulatory constraints, and a game designer's job includes modifying, mixing and matching known features of gaming machines within regulatory constraints to continually develop new and exciting gaming products.  I additionally address certain claim elements below:

243.   With respect to the Challenged Claims' limitation of "determin[ing] at least one winning combination for each play of the game," which the Court construed as "establish[ing] or ascertain[ing] at least one winning combination,

properly construed, for each game to be played," Walker renders this limitation as construed obvious by disclosing, for example, guaranteeing "a winning outcome" or "one or more game elements" in a game of chance. *See, e.g.*, Appendix A-2 at Element 44.4. For reasons discussed above, and incorporated herein by reference, a POSITA would have been motivated to combine the guaranteed-win teachings of Walker with several other gaming references that similarly teach games wherein there is at least one way to win for every play of the game and to modify Walker's game in view of these teachings to provide for a game that allows a player a winning combination every play of the game (a modification that would be easy to achieve through mere software modifications and also yield predictable results in terms of having an achievable winning combination every time). *See supra,* Section XI.B.1.a.

244. With respect to the Challenged Claims' limitation of "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," which the Court construed as "test[ing] the game field prior to displaying the actual game to be played to the player to ensure that a winning combination more valuable than the previously determined winning combination, properly construed, is not generated inadvertently when the player completes a winning combination during play of the

game," Walker renders this limitation as construed obvious by disclosing, for example, testing to ensure that an outcome satisfies the criteria for a "target outcome." *See, e.g.*, Appendix A-2 at Element 44.5. For reasons discussed above, and incorporated here by reference, a POSITA would have been motivated to combine the testing teachings of Walker with several other gaming references, including TTF and/or Michaelson, that similarly teach games wherein testing is performed and to modify Walker's game in view of these teachings to implement testing such as that performed in TTF and/or in Michaelson that ensures a more valuable winning combination will not be generated inadvertently when the player plays the game (a modification that would be easy to achieve through mere software modifications and also yield predictable results in terms of preventing undesired wins and payouts). *See supra*, Section XI.B.1.a.

245. "With respect to the Challenged Claims' limitations of "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," which the Court construed as "automatically display[ing] an actual game to be played, properly construed, on the touch screen game display to a player prior to initiating activation of game play," Walker renders this limitation as construed obvious by disclosing a "guaranteed hand" mode for video poker games that "includes at least one card from the initial hand." *See, e.g.*, Appendix A-2 at Element 44.6. A POSITA would understand

that video poker involves five cards, and that a guaranteed hand involving all five cards from the initial hand would "show the player what they're playing for," and that showing the player what they are playing for could be done automatically, without a player having to do anything, such as push a button. For this reason, and reasons discussed above, incorporated here, a POSITA would have been motivated to combine the automatically displaying teachings of Walker with several other gaming references that similarly teach games wherein automatically displaying an actual game to be played prior to the player initiating game play is performed. *See supra*, Section XI.B.1.c.

246.   Therefore, for the above reasons, as well as those mentioned in Appendix A-2, it is my opinion that Walker, either alone or in combination with the other cited references, either discloses or renders obvious each element of the Challenged Claims.

### 3.    Michaelson et al.

247.   In my opinion, Michaelson, alone or in combination with certain other prior art references, discloses or renders obvious all elements of the Challenged Claims. I incorporate Appendix A-3 which provides an element-by-element analysis of each Challenged Claim and explains where, in Michaelson or the other cited prior art references, each element may be found, as well as certain reasons why a POSITA would have thought to combine those references. In

addition, as noted above, a POSITA would have thought to combine the teachings of Michaelson with the other references cited in Appendix A-3 at least because they are all related to known features of gaming machines as well as regulatory constraints, and a game designer's job is to mix and match known features of gaming machines within regulatory constraints to continually develop new and exciting gaming products. I additionally address certain claim elements herein below:

248. With respect to the Challenged Claims' limitation of "determin[ing] at least one winning combination for each play of the game," Michaelson renders this limitation as construed by the Court obvious by disclosing, for example, "wagering devices which are guaranteed to provide certain awards." *See, e.g.*, Appendix A-3 at Element 44.4. For reasons discussed above, incorporated here, a POSITA would have been motivated to combine this feature of Michaelson with several other gaming references that similarly teach games wherein there is at least one way to win for every play of the game and to modify Michaelson's game in view of these teachings to provide for a game that allows a player a winning combination every play of the game (a modification that would be easy to achieve through mere software modifications and also yield predictable results in terms of having an achievable winning combination every time). *See supra,* Section XI.B.1.a.

249.    With respect to the Challenged Claims' limitation of "testing the game field prior to displaying the game to the player to ensure that a winning combination more valuable than the determined winning combination is not generated inadvertently in completing the field," Michaelson renders obvious limitation as construed by the Court by disclosing, for example, testing to ensure that a pool of predetermined game outcomes includes at least one of the proposed game outcome.  *See, e.g.*, Appendix A-3 at Element 44.5.  For reasons discussed above, incorporated here, a POSITA would have been motivated to combine the testing teachings of Michaelson with several other gaming references, including TTF, that similarly teach games wherein testing is performed and to modify Michaelson's game in view of these teachings to implement testing such as that performed in TTF that ensures a more valuable winning combination will not be generated inadvertently when the player plays the game (a modification that would be easy to achieve through mere software modifications and also yield predictable results in terms of preventing undesired wins and payouts).  *See supra*, Section XI.B.1.a.

250.    "With respect to the Challenged Claims' limitations of "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play," Michaelson in combination with the other references discussed in Appendix A-2 discloses and renders this

limitation as construed by the Court obvious.  For the reasons discussed above, incorporated here, a POSITA would have known how to and been motivated to modify a game such as Michaelson's to automatically display an actual game to be displayed prior to a player initiating game play.  *See supra*, Section XI.B.1.c.

251.   Therefore, for the above reasons, as well as those mentioned in Appendix A-3, it is my opinion that Michaelson, either alone or in combination with the other cited references, either discloses or renders obvious each element of the Challenged Claims.

### 4.    Vancura, Bregenzer, and Chambers

252.   In my opinion, Vancura, Bregenzer, and Chambers, alone or in combination with certain other prior art references, discloses or renders obvious all elements of the Challenged Claims.  I incorporate Appendix A-4 (Vancura charts), Appendix A-5 (Bregenzer charts), and Appendix A-6 (Chambers charts) which provides an element-by-element analysis of each Challenged Claim and explains where, in these and the other cited prior art references, each element may be found, as well as certain reasons why a POSITA would have thought to combine those references.

253.   In addition, as noted above, a POSITA would have thought to combine the teachings of Vancura, Bregenzer, and Chambers with the other references cited in the respective charts, at least because they are all related to

known features of gaming machines as well as regulatory constraints, and a game designer's job is to mix and match known features of gaming machines within regulatory constraints to continually develop new and exciting gaming products.

254.   In addition, a POSITA would have known to add the features and functionality discussed above (*i.e.*, a winning combination every time, testing, and automatically displaying) in Section XI.B.1 with respect to TTF, incorporated here, to any of Vancura, Bregenzer, and Chambers, for at least the same reasons discussed previously.

255.   Therefore, for the above reasons, as well as those mentioned in Appendix A-4 (Vancura charts), Appendix A-5 (Bregenzer charts), and Appendix A-6 (Chambers charts), it is my opinion that any of Vancura, Bregenzer, and Chambers, either alone or in combination with the other cited references, either discloses or renders obvious each element of the Challenged Claims.

### 5.   NudgeMaster

256.   At deposition, Mr. Fiechter, one of the founders of World Touch Gaming, reviewed the video depicting a NudgeMaster game referred to as the UniversalAmusement Video.  Fiechter Tr. at 12:3-5, 86:1-87:13.  Mr. Fiechter confirmed that a player who pressed the button in the lower-right corner labelled "PRESS HERE TO VIEW NEXT PLAY" would "see what the next … layout of symbols would be … if it were touched, it would have shown the next

permeatation [sic: permutation] of symbols for the next play – prior to the player actually expending their money." *Id.* at 88:20-89:3. Mr. Fiechter further confirmed that the "press here to view next play" functionality had been deployed in 2004 and certainly prior to 2006. *Id.* at 89:5-12.

257.   Mr. Fiechter was also shown Exhibit 7, a screenshot from the UniversalVideo video:



Exhibit 7 to the deposition of Mr. Fiechter

258.   Mr. Fiechter testified that if somebody pressed the 'press here to view next play' icon, "they would be shown all the symbols that would result in the next

game play … what symbols are going to be on the reels … exactly how it's going to be presented to them." Fiechter Tr. at 90:13-25. He confirmed that exact functionality existed in games that were deployed in Georgia in 2004. *Id.* at 91:1-3.

259. Mr. Fiechter also referred to a report by Nick Farley on version 4.3.2.10 of NudgeMaster, exhibit 4 of the deposition. Fiechter Tr. at 60:12-61:1, 62:23-63:23. Page 2 of that report states that "prior to engaging in game play, the player may touch the 'Press Here to View Next Play' icon on the video display to preview the next game to be presented." Mr. Fiechter confirmed that Mr. Farley's description allows the player "to see the outcome that will be revealed to them once they do hit play …they will see the game symbols." Fiechter Tr. at 63:24-64:18. He again confirmed that functionality has been part of NudgeMaster since the summer of 2004. *Id.* at 65:7-10.

260. Therefore, it is my opinion that NudgeMaster disclosed a preview button that, when pressed, would show the player the constructed field of the next game to be played. This is a conceptually similar disclosure as that found in Kowell.

261. It is my opinion that, NudgeMaster, in combination with TTF, Walker, Michaelson, Vancura, Bregenzer, or Chambers as noted in Appendices A-

1 through A-6, either discloses or renders obvious each element of the Challenged

Claims.

### C.    SECONDARY CONSIDERATIONS RELATING TO THE '223 PATENT

262.    It is my understanding that one must consider objective indicia of

non-obviousness when considering the obviousness of patent claims.  I also

understand that the burden rests with the patent holder to identify such

considerations.

263.    I have not seen evidence of any of the secondary considerations of

non-obviousness for the claims of the '223 patent.  I have reviewed POM's

interrogatory responses related to secondary considerations of nonobviousness and

understand that they are relying on only one such secondary consideration:

commercial success.

264.    I have not seen any evidence of commercial success.  To my

knowledge, Plaintiffs have not provided any evidence that the products it contends

embody the Challenged Claims (as opposed to other products or services which do

not[12]) are commercially successful.  Furthermore, Plaintiffs have not tied any such

evidence of commercial success to any of the Challenged Claims.

---

[12] Plaintiffs mention only games sold in Pennsylvania and Virginia as practicing
the claims.  Plaintiffs Sixth Supplemental Responses to Defendants Second Set of
Interrogatories at 3-14.  However, Plaintiffs sell games into other jurisdictions that
it does not contend embody the claims.  For example, an archival copy of the Pace-

265.   I have reviewed Exhibits 30-32 of the August 25, 2021 deposition of Greg Cline, POM013575-14065, POM017676-17838, and POM000408-413, respectively.  Exhibit 30 relates to gaming performance as measured by total wagered and total awarded per machine, for locations in Virginia.  Cline 8-25 Tr. at 169:1-171:5.  Exhibit 31 also purportedly relates to gaming performance but for machines in an unspecified location.  Cline 8-25 Tr. at 178:6-15. In some cases, the games appear to generate positive financial performance.

266.   The referenced documents, however, do not relate the positive gaming machine performance to commercial success of the purported inventions claimed in the '223 patent.  For example, these documents do not evidence that the "automatically displaying …" limitation is a feature that, if present in any of these machines, is ever used, much less to what extent it is used.  These documents also do not evidence that the purported commercial success is due to this feature, even assuming it is included in these machines.

267.   Exhibits 30 through 32 do not provide any detail about which machines are being operated, what their features are, what those machines' market share may be (measured by either unit share or total revenues), or how those

---

O-Matic website from May 6, 2021 lists "Dragon's Ascent" as a product "Available in DC and KS only."
https://web.archive.org/web/20210506061629/https://www.paceomatic.com/products/dragons-ascent.

machines performance is tied to the Challenged Claims.  Moreover, one of the

claim limitations that was embodied in certain earlier games was not found in

many of Plaintiffs' later games.  Each Challenged Claim requires

"[determining/determine/determined] at least one winning combination for each

play of the game," which the Court has construed as "establish or ascertain at least

one winning combination, properly construed, for each game to be played."  In

turn, "winning combination" was construed by the Court as "array of game

symbols in the game field yielding a successful outcome."  Thus, in order for a

game to practice this limitation, it must establish or ascertain an array of game

symbols that yields a successful outcome for each game to be played.

268.   As described in detail in my inspection overview, Tic-Tac-Fruit

version TTF527GPX, Bombs and Bombshells (non-Rapid), Cocktail Cove, and

Pirates Prize all presented arrays of game symbols that had at least one position

where placing a wild would lead to a payout.  As discussed above TTF527GPX

was created in 2006, and the other three (Bombs and Bombshells (non-Rapid),

Cocktail Cove, and Pirates Prize) were first released in 2013.  Plaintiffs' Sixth

Supplemental Responses to Defendants' Second Set of Interrogatories at 12.

Therefore, these four games had the feature of a winning combination for each

game.

269.    However, the remainder of the games I reviewed did not have the feature of a winning combination for each game.  In all of the games listed above under "Nudge Games" or "Rapid Games," the game could (and often did) present an initial game field which had no possible winning combination, regardless of what the player chose to do.  *See supra* at Sections VIII.B.2.a, VIII.B.2.c.  These games were released between 2017 and 2020.  In other words, while Plaintiffs' earlier games had the feature of "at least one winning combination for each play of the game," Plaintiff chose not to implement this feature in its later products.

270.    This evidence is supported by testimony from Mr. Pace, who said that when the Ateup (TTF) game was first developed, every single play had a solvable puzzle.  Pace Tr. at 149:3-20.  However, he acknowledged that after he developed the "Follow Me" feature, "we felt strongly after we had put the product out that the follow me feature itself provided enough skill, and we did not need to have a winner on every play – a solvable puzzle for each play."  *Id.* at 168:2-6, *see also* 150:20-152:18.  This evidence is also supported by testimony from Mr. Cline who said that "in some instances, there is not a solvable puzzle on the reel in those iterations" for games with the Follow Me feature.  Cline 8-25 Tr. at 164:1-14.

271.    The fact that Plaintiffs removed the "solvable puzzle for each play" feature in its later games, and thereby removed one of the claimed limitations from

its products, suggests that the invention claimed in the '223 patent was not relevant to the commercial success of Plaintiffs' products.

272.   Therefore, it is my opinion that whatever commercial success Plaintiffs' products may have realized could not be a secondary consideration of nonobviousness for the Challenged Claims because none of Plaintiffs' products embody all of the limitations of any Challenged Claim, and Plaintiffs removed one of the claimed features from its newer games, thereby demonstrating that there is no nexus between commercial success and the claimed invention.

### 1.    Secondary Consideration of Obviousness – Near Simultaneous Invention

273.   At least one secondary consideration of obviousness (as opposed to nonobviousness) supports my opinion that the claims are obvious in view of the references discussed above and analyzed in the attached Appendices.  This secondary consideration relates to simultaneous or near simultaneous invention.  In this case, the evidence shows that four different parties had conceived of or worked on the purported invention within several months of one another.

### a.    Ohio Liquor Control Commission Testimony: October 2005

274.   As discussed herein, the idea of automatically displaying an actual game to be played before a player initiates game play (and for modifying TTF to have such a feature) was publicly expressed by Mr. Riedthaler, who testified that

showing the player what they would be playing for would render the TTF game compliant with Ohio gaming laws, and at least was publicly disclosed by Kurt Gearhiser when cross examining Mr. Riedthaler at a liquor control commission hearing. Mr. Riedthaler expressed this concept for modifying the existing TTF game and Mr. Gearhiser facilitated public disclosure of it, just a few months before Mr. Pace claimed to have conceived of the exact same concept and modification of TTF and filed his patent application.

### b. Michael Pace: January through June 2006

275. Plaintiffs allege that the conception date of the '223 patent was between January 1, 2006 and March 31, 2006. Plaintiffs' Seventh Supplemental Responses to Defendants' First Set of Interrogatories at 14, 15, 16, 20. Plaintiffs' have produced source dated May 2, 2021 that they contend demonstrates a conception and reduction to practice date. *Id.* at 25. I have seen no statement by Plaintiffs' that alleges evidence of an earlier invention date.

276. At deposition, Mr. Pace stated that he invented the preview feature which was "allowing the player to glean information of what puzzle he is about to be presented, whether it's in a form of showing him what the value he's going to win, whether it highlights the particular tiers in the pay table that he's going to win, or whether it shows the particular puzzle to him, or a bunch of other different ways that I tried." Pace Tr. at 86:20-87-4, 40:25-41:1.

### c.    Grant Kowell: November 2005 through June 2006

277.    At deposition, Mr. Kowell stated that after the Riedthaler Testimony at the October 2005 OLCC hearing, he "came up with, yes, a preview idea to put on a machine based on his testimony that if you could see what was going to happen and you could get your money back it wouldn't be gambling if you didn't want to play."  Kowell 9-2 Tr. at 6:7-7:20.

278.    Mr. Kowell also stated that he invented "the preview feature" and told Mr. Pace how the preview feature should operate, after which Mr. Pace "put it on a game board."  Kowell 9-2 Tr. at 34:6-18, 35:24-37:13.

279.    Mr. Kowell filed U.S. Provisional Pat. Appl. No. 60/815,352 on June 21, 2006.  Kowell Ex. 9.  The provisional application disclosed "pressing a preview button that shows the player the first step of the game to be played as well as the prize that he will be playing for.  If the player decides he wishes to play the game as a result of the evaluation, the player will deposit the money and initiate the game."  *Id.* at PA0000093.  The application further discloses "an optional preview button that allows the player to learn the first step of the game that will be played next.  … For example, the preview button may show the initial card deal, dice roll, or game set up as well as the prize that will be awarded if the player participates and wins."  *Id.* at PA0000094-95.

280.   Mr. Kowell filed U.S. Pat. Appl. 11/696,185 on April 3, 2007, claiming priority to Provisional Appl. No. 60/815,352.  Kowell Ex. 7 at POM003070.  The '185 patent application was allowed by the examiner on February 15, 2011.  *Id.* at POM003126.  Subsequently, attorneys for Michael Pace and Pace-O-Matic sent Mr. Kowell's patent lawyer, Mr. Zollinger, a letter dated March 14, 2011 regarding certain claims of the '223 patent.  *Id.* at POM003237-39.  That letter asserted that "Mr. Kowell did not invent previewing the next game to be played without paying any money[.]"  *Id.* at POM003237.  The letter further mentioned several prior art references that it contended were material to patentability.  *Id.*  On May 16, 2011, Mr. Kowell's attorney filed a Request for Continued Examination along with an Information Disclosure Statement, listing the references provided in the March 14, 2011 letter as well as other documents (including the Farley Report, the Turner Report, and the March 14, 2011 letter itself).  *Id.* at POM03143-55.  On March 19, 2013, despite having considered the references submitted on the May 16, 2011 Information Disclosure Statement, the examiner allowed the pending claims.  *Id.* at POM003268.  On July 23, 2013 the USPTO granted U.S. Patent No. 8,491,369 listing Mr. Kowell as the sole inventor.  Kowell Ex. 6.

281.   The subject matter of Mr. Kowell's provisional patent application and non-provisional patent application was filed with the Patent Office at nearly the

same time that Mr. Pace claimed to have conceived of and filed an application purporting to disclose his alleged invention.

### d.   NudgeMaster: June – October 2006

282.   Also at nearly the same time, according to release notes documentation, the developers of the NudgeMaster game had already created a NudgeMaster version for Ohio, version 4.1.2.9 dated April 10, 2006. POM018331.  By June 5, 2006, the developers had documented implementation of "legalizing changes for Ohio" including "show next play's win amount" in version 4.2.2.2 of NudgeMaster Ohio.  *Id.* By October 25, 2006, the developers had documented "expand[ing] 'Peek Next Game' functionality to allow preview of next game win amount, entertaining-display result, neither, or both" in version 4.3.2.3 of NudgeMaster Ohio. POM018329.  A POSITA would understand that the phrase "entertaining display" relates to the game field (including symbols) shown to the player, as opposed to the win amount.  Showing the next game's "entertaining display" is equivalent to showing "an actual game to be played" as construed.  These records document the implementation of a NudgeMaster Ohio product that previews an actual game to be played at nearly the same time as Mr. Pace's purported conception.

283.   Therefore, the evidence indicates at least two game makers other than Mr. Pace conceived of products having a feature that would display an actual game

to be played a player before initiating activation of game play.  The contemporaneousness of these actions with Plaintiffs purported invention dates and patent application filing dates further supports my opinion that the solution claimed in the '223 patent was obvious.

## XII.  IMPROPER INVENTORSHIP

284.   I am informed that a patent is invalid if the inventor did not invent the subject matter sought to be patented, and that if an unnamed inventor contributed any "essential feature" of a claimed invention, the claim is invalid under Section 35 U.S.C. § 102(f) of the pre-AIA patent code.

285.   In my opinion, one of the "essential features" in every Challenged Claim is the feature claimed as "automatically display[ing] an actual game to be played on the touch screen game display to a player prior to initiating activation of game play."  Plaintiffs appear to agree, repeatedly citing the preview feature as one of the inventive concepts in their interrogatory answers as well as their complaint. *See*, e.g., Amended Complaint at 7, Plaintiffs' Sixth Supplemental Responses to Defendants' Second Set of Interrogatories at 23, 24, 29, 30, 46, 47.

286.   In my opinion, the evidence demonstrates that the sole listed inventor on the '223 patent, Michael R. Pace, did not invent the "automatically displaying…" feature described in the '223 patent specification.  It is my opinion that a POSITA would understand that the "automatically displaying …" feature

claimed in the '223 patent was earlier disclosed or suggested in the prior art Riedthaler Testimony.

287.    Specifically, on October 19, 2005, Mr. Gearhiser solicited cross-examination testimony from Mr. Riedthaler, admitted as an expert on gambling devices at a public hearing before the Ohio Liquor Control Commission.  A prior art Tic-Tac-Fruit machine was in the hearing room.  Riedthaler Testimony at 54:14-55:20.  Tic-Tac-Fruit games at the time were known to display an actual game to be played after the player initiated activation of gameplay.  "Now, what happens when you place your wager, you would place either $.50, $1.00, $2.00, or $4.00.  You would then hit the play button.  These images would move [i.e., the reels on the screen would spin and stop], and there would be – you would make a decision where you want to place a wild card."  Riedthaler Testimony at 81:12-17.

288.    On cross-examination, Mr. Gearhiser asked Mr. Riedthaler a series of questions about whether specific actions during the play of a Tic-Tac-Fruit game take skill:

> a.  "Q: What I'm asking is, picking a location [for a wild symbol] here, just doing the picking, is that skill, does that take skill?
>
> A: Again, you can win by the application of not choosing, randomly picking."  Riedthaler Testimony at 142:9-13.

b. "Q: Now, once I've done that, I've completed all of the participation by the player, correct?  Once I've completed putting the money in, pressing the button, picking a location, I've done all the participation I can do?

A: If you don't count your noninvolvement in the spinner and flip game.

Q: In this game, it awarded me $.20.

A: Well, you have to do activity, but it produces – its of no value, your activity performed, because it's [the game has] already selected the prize that you're receiving.

Q: Okay.

A: But you're still performing an activity, but the activity you're performing has no effect on the outcome, because it's already been decided by the machine."  Riedthaler Testimony at 144:4-22.

289.   In my opinion, a POSITA would have understood that Mr. Gearhiser's very next question was disclosure of the claimed "automatically displaying …" feature:

a. "Q: If this machine put the field that you were going to play prior to your putting the dollar in, would that change your opinion any?" Riedthaler Testimony at 144:23-145:2.

290.    By that question, and the several questions that followed, Mr. Gearhiser was proposing that the Tic-Tac-Fruit machine be modified to automatically display an actual game field to be played on the screen to the player prior to initiating activation of game play, so as to show the player what they would be playing for in advance of committing funds, and asking Mr. Riedthaler whether that modification would change his opinion on compliance. And questioning over the next several minutes revealed Mr. Riedthaler's answer to be yes. *See* Riedthaler Testimony at 145:3-150:19.

291.    Testimony from Mr. Gearhiser indicates that, after Mr. Gearhiser elicited the testimony from Mr. Riedthaler, Mr. Gearhiser asked for a break to inquire with gaming manufacturers if the identified modification could be implemented. Gearhiser Tr. at 73:8-78:7. Mr. Gearhiser received affirmative responses from those manufacturers – including Pace-o-Matic and Ohio Skill Games. *Id*.

292.    I have reviewed no evidence that Mr. Pace had any possession of such an invention prior to its public disclosure as evidenced by the prior art Riedthaler Testimony. In fact, Plaintiffs have contended that Mr. Pace is the sole inventor of

the inventions claimed in the '223 patent and that the date of Mr. Pace's purported

invention was between January 1, 2006 and March 31, 2006. Plaintiffs' Seventh

Supplemental Responses to Defendants' First Set of Interrogatories at 14, 15, 16,

20. Mr. Gearhiser's disclosure of the preview feature was earlier, on October 19,

2005.

293. Therefore, it is my opinion that Mr. Pace was not the inventor of the

preview feature that forms an essential component of each Challenged Claim of the

'223 patent and that this essential component was conceived of and/or disclosed by

another, namely at least Mr. Riedthaler and/or Mr. Gearhiser. It is therefore my

opinion that the Challenged Claims are invalid due to improper inventorship.

Submitted this 19th day of October, 2021.

_____

Stacy Friedman